## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>*EX REL.* **LORI MORSELL** | ) )<br>) |
| **-and-** | )     **FILED UNDER SEAL**<br>) |
| **LORI MORSELL**<br>**c/o London & Mead**<br>**1225 19ᵗʰ St., N.W., Suite 320**<br>**Washington, D.C. 20036,** | )<br>)<br>)<br>)<br>) |
|     **Plaintiffs,** | )<br>) |
| **v.** | )     **Civil Action No._____**<br>) |
| **SYMANTEC CORPORATION**<br>**c/o Paul Lokie**<br>**2350 Corporate Park Drive**<br>**Herndon, VA 20171,** | )     **JURY TRIAL DEMANDED**<br>)<br>)<br>) |
|     **Defendant.** | )<br>) |

## COMPLAINT

This lawsuit is based on a scheme by Defendant Symantec Corporation ("Symantec") to defraud the United States by failing to monitor and disclose deep discounts Symantec offered to commercial customers when Symantec sold software products to federal government agencies through a General Services Administration Multiple Award Schedule. Symantec's failure to monitor and disclose the discounts it offered to its most favored customers resulted in overcharges to the federal Government totaling tens of millions of dollars. Plaintiff Lori Morsell, by undersigned counsel, and acting on behalf of and in the name of the United States of America, brings this civil action under the qui tam provisions of the False Claims Act, and alleges as follows:

## JURISDICTION AND VENUE

1.      This is a civil action by Plaintiff Lori Morsell, acting on behalf of and in the name of the United States, against Symantec under the False Claims Act, 31 U.S.C. 3729-33. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. 1345 and 31 U.S.C. 3732(a).

2.      Symantec transacted business in this District by selling its products to numerous agencies of the United States located in this District.  Venue in this District is proper pursuant to 28 U.S.C. 1391(c) and 31 U.S.C. 3732(a).

## PARTIES

3.      Plaintiff Lori Morsell is currently employed with Symantec. Symantec recruited Morsell to manage and administer its GSA schedule contract and relations with business partners who sold Symantec products on their own GSA schedule contracts. Morsell has worked continuously for Symantec in that role since March 2011.  She has obtained direct personal knowledge of the schemes and conduct described in this Complaint as a result of her employment with Symantec.

4.      Symantec Corporation is a Fortune 500 company that reported over six billion dollars in revenue for its 2011 fiscal year.  Symantec is incorporated in Delaware and publicly traded on the NASDAQ stock exchange under the symbol SYMC.  Its corporate headquarters are located in Mountain View, California.  Symantec sells a variety of software and appliance products designed to protect computers, servers, processors, and data from viruses and malware; to create secure internet identities and communications; to backup, archive, store, and manage electronic data; and to assistant customers in efficiently creating, organizing, and storing electronic data.  Symantec is known for its Norton Antivirus, Veritas, and VeriSign brand products, among others.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

5.      This action arises out of Symantec's false or fraudulent conduct in providing false information to the General Services Administration of the United States (GSA) about its commercial pricing practices. As a result of Symantec's false representations and the Government's reliance upon those false representations, GSA was induced to enter into and maintain contract terms and conditions to which it would not have agreed had Symantec accurately and truthfully disclosed its commercial sales practices to the Government.

6.      As discussed in detail herein, Symantec's false and fraudulent statements and conduct took several interconnected forms. First, Symantec provided false, incomplete, and inaccurate information to the Government regarding its commercial pricing practices during the negotiation of a Multiple Award Schedule (MAS) contract with GSA in 2006 and early 2007. Second, during the performance of the contract Symantec breached its contractual obligations to 1) report to GSA that it had offered higher discounts to commercial customers than had been disclosed to GSA during the contract negotiations, and 2) provide these higher discounts to Government purchasers. Finally, in order to obtain modifications to the contract, Symantec reiterated and confirmed false statements that they had made during the contract negotiations and breached their affirmative duty to inform the Government of higher discounts that they were offering to commercial customers.

7.      As a result of Symantec's false and fraudulent statements and conduct, Symantec knowingly submitted and caused to be submitted false or fraudulent claims for payment to the United States for products that it sold to the United States.

## THE GSA MULTIPLE AWARD SCHEDULE PROGRAM

8.    Executive agencies of the United States may procure products and services only through full and open competition, unless they meet certain exceptions. 41 U.S.C. § 253(a)(l).

9.    The competitive bidding process, and the negotiation of contractual terms, is a lengthy and costly process. In order to expedite the procurement process for executive agencies and contractors wishing to sell products to executive agencies, the GSA, through the Federal Acquisition Service, solicits, negotiates, awards, and administers MAS contracts to procure products and services for federal agencies. 41 U.S.C. § 251, et seq.; 40 U.S.C. § 501 (b).

10.    Under the MAS program, GSA negotiates prices and contract terms that will apply to subsequent orders placed for all of the items that are covered by the MAS contract. The list of products or services that are available for purchase under a particular MAS contract is referred to as the contract "schedule." The pre-negotiation of the terms of sale for a large number of products and services under the MAS program saves a significant amount of administrative time for Government agencies ordering off of MAS contract schedules and for contractors wishing to sell products to the Government.

11.    The MAS program allows the Government to obtain commercial supplies and services at prices associated with volume buying. 41 U.S.C. § 259(b)(3). Additionally, agencies placing orders under MAS contracts are considered to meet the requirements of full and open competition. 48 C.F.R. § 8.404(a). Contractors also benefit from the MAS program, because they do not have to compete in sealed bidding or negotiated acquisitions, and their products are more widely available to federal agencies, thus making it easier for the agencies to place orders.

12.    The Administrator of GSA establishes the procedures that govern the MAS program, including the requirements that contractors must follow in order to participate in the

program. 40 U.S.C. §§ 121(c), 501(b)(2). These rules and regulations are set forth in the Federal Acquisition Regulations (FAR) and the General Services Administration Acquisition Manual (GSAM).

13.    GSA initiates the MAS process by publishing a contract solicitation. Interested contractors then submit responses to the solicitation to GSA. Any contractor that enters into an MAS contract with the United States Government must abide by 1) the obligations that are outlined in the Government's solicitation; 2) the FAR and GSAM clauses that are incorporated into the contract; 3) any additional requirements negotiated between the parties; and 4) any other general federal contracting requirements set forth in the applicable regulations.

14.    The MAS contract solicitation requires prospective contractors to provide GSA with extensive information about their commercial sales and practices, including price and discount information. GSA contracting officers use this information to negotiate MAS contract prices. Pursuant to 48 C.F.R. § 538.270(a), GSA contracting officers are required to "seek to obtain the offerer's best price (the best price given to the most favored customer)." In negotiating the terms of an MAS contract, the contracting officer must determine whether the price offered to GSA is reasonable by "comparing] the terms and conditions of the [offeror's response to the] MAS solicitation with the terms and conditions of agreements with the offeror's commercial customers." 48 C.F.R. § 538.270(c). GSA contracting officers therefore rely heavily on the accuracy and truthfulness of the information provided by the offeror regarding its commercial sales in negotiating the terms of an MAS contract. *Id.*

15.    The MAS contract provides that if, subsequent to formation of the contract, GSA discovers that the information provided to the contracting officer at the time of negotiation was not current, accurate, and complete, the Government is entitled to a reduction in the price of each

order issued pursuant to the MAS contract. The amount of the reduction is the amount by which the Government orders were inflated as a result of the inaccurate or undisclosed information. 48 C.F.R. § 552.215-72; GSAM 552.238-75(c).

16.    The regulations governing MAS contracts include a mechanism that is known as the "Price Reductions clause" (PRC). GSAM 552.238-75 states as follows:

Price Reductions:

(a) Before award of a contract, the Contracting Officer and the Offeror will agree upon (1) the customer (or category of customers) which will be the basis of award, and (2) the Government's price or discount relationship to the identified customer (or category of customers). This relationship shall be maintained throughout the contract period. Any change in the Contractor's commercial pricing or discount arrangement applicable to the identified customer (or category of customers) which disturbs this relationship shall constitute a price reduction.

(b) During the contract period, the Contractor shall report to the Contracting Officer all price reductions to the customer (or category of customers) that was the basis of award. The Contractor's report shall include an explanation of the conditions under which the reductions were made.

17.    As set forth above, the regulations require the contracting officer and the offeror to agree upon 1) the customer or category of customers which will be known as the "Basis of Award" (BOA) customer, and 2) a fixed relationship between the prices that the offeror gives to the BOA customer and those that it gives to the Government. If, during the period that the contract is in effect, the Contractor offers the BOA customer prices, discounts, or other terms that are better than those previously offered to the BOA customer, the prices that are offered to the Government must be adjusted accordingly. Any such change offered by the Contractor to the BOA customer must be reported to the Government no later than 15 days after its effective date, and the resulting change in prices on products sold to the Government is effective retroactive to the date on which the change in price was offered to the BOA customer. GSAM 552.238-75(f)

18.     In addition to the requirement that the Contractor inform the Government of any changes in prices offered to the BOA customer, the PRC also requires the Contractor to report any changes in the commercial pricing practices or policies that were disclosed to GSA during pricing negotiations:

> (1) A price reduction shall apply to purchases under this contract if, after the date negotiations conclude, the Contractor-
>
> (i) Revises the commercial catalog, pricelist, schedule or other document upon which the award was predicated to reduce prices;
>
> (ii) Grants more favorable discounts or terms and conditions than those contained in the commercial catalog, pricelist, schedule or other documents upon which contract award was predicated;
>
>                *     *     *
>
> (2) The Contractor shall offer the price reduction to the Government with the same effective date, and for the same time period, as extended to the commercial customer (or category of customers).

GSAM 552.238-75(c).

19.     28. Orders under MAS contracts are submitted by executive agencies directly to contractors such as Symantec. 48 C.F.R. § 8.406-1.

## MORSELL BEGINS WORK FOR SYMANTEC MARCH 2011

20.     As she began working for Symantec in March 2011, Morsell did her best to learn about Symantec's existing GSA contract, FSS Contract No. GS-35F-0240T, which went into effect January 25, 2007, and is due to expire later in 2012 (the "existing GSA Schedule Contract").  Morsell's responsibilities included preparing and submitting modifications to Symantec's existing GSA Schedule Contract.  From her previous experience with GSA schedule contracts, Morsell understood that GSA schedule contract terms, and applicable regulations, required companies to file modifications adding or removing products to the GSA schedule,

reporting changes in price lists for products on the schedule, reporting any reductions in prices offered to comparable customers for products on the GSA schedule, and reporting any changes to the company's commercial sales practices.

## SYMANTEC'S PRICE REDUCTION CLAUSE

21.     Symantec's existing GSA Schedule Contract incorporated the following price reduction clause:

552.238-75 PRICE REDUCTIONS (MAY 2004) (ALTERNATE I -MAY 2003) 538.273(b)(2)

(a) Before award of a contract, the Contracting Officer and the Offeror will agree upon (1) the customer (or category of customers) which will be the basis of award, and (2) the Government's price or discount relationship to the identified customer (or category of customers). This relationship shall be maintained throughout the contract period. Any change in the Contractor's commercial pricing or discount arrangement applicable to the identified customer (or category of customers) which disturbs this relationship shall constitute a price reduction.

(b) During the contract period, the Contractor shall report to the Contracting Officer all price reductions to the customer (or category of customers) that was the basis of award. The Contractor's report shall include an explanation of the conditions under which the reductions were made.

(c) (1) A price reduction shall apply to purchases under this contract if, after the date negotiations conclude, the Contractor —
(i) Revises the commercial catalog, pricelist, schedule or other document upon which contract award was predicated to reduce prices;
(ii) Grants more favorable discounts or terms and conditions than those contained in the commercial catalog, pricelist, schedule or other documents upon which contract award was predicated; or
(iii) Grants special discounts to the customer (or category of customers) that formed the basis of award, and the change disturbs the price/discount relationship of the Government to the customer (or category of customers) that was the basis of award.

(2) The Contractor shall offer the price reduction to the eligible ordering activities with the same effective date, and for the same time period, as extended to the commercial customer (or category of customers).

22.     Symantec's existing GSA Schedule Contract defined the category of customers that formed the basis of award as all commercial customers.  The existing GSA Schedule Contract had a Maximum Order Limitation of $500,000.

## MORSELL BEGINS FILING MODIFICATIONS

23.     When she began working for Symantec in March 2011, Morsell learned that the person previously responsible for managing and administering Symantec's existing GSA Schedule Contract, Kari Reinhardt, had left Symantec's employment over a year before. Symantec was behind on filing modifications to add or subtract products to the GSA schedule, or to note specific price list price changes for specific products.  Morsell focused on filing modifications to catch up with those specific product changes.  It is standard for GSA schedule contractors to state in modifications that they have not changed their commercial sales practices. Morsell saw that Symantec's previous modifications filed for the existing GSA Schedule Contract had represented that Symantec's commercial sales practices had not changed. Morsell's supervisor, Paul Lokie, told Morsell that Symantec's commercial sales practices had not changed, and Morsell included the standard representation that Symantec's commercial sales practices had not changed on the initial modifications she filed for Symantec.

## MORSELL RESEARCHES PAST CSP DISCLOSURES AND CURRENT PRACTICES FOR SYMANTEC'S RENEWAL APPLICATION

24.     Morsell also had responsibility for filing an application to renew Symantec's GSA schedule contract.  The existing GSA Schedule Contract was due to expire in January 2012, and GSA granted two extensions allowing the contract to continue through June 2012. Morsell knew that a renewal application would have to include representations about Symantec's commercial

-9-

sales practices.  Morsell began to do research on Symantec's filings with GSA that led up to the grant of the existing GSA Schedule Contract.  Morsell reviewed what Symantec had told GSA about its commercial sales practices.  She saw that Symantec had filed charts describing the frequency of its commercial discounts, and the reasons for those discounts.  Symantec's commercial sales practices ("CSP") disclosures and charts filed with GSA in 2006, are attached as Exhibit 1.  Those charts showed that Symantec granted discounts in the range of 21-30% off list prices 5.68% of the time, discounts in the range of 31-40% off list 88% of the time, and discounts from 41-100% only 2% of the time.

25.     Symantec's 2006 CSP disclosure to GSA also described the reasons for those discounts, and the percentage frequency of each reason, as follows:

| | |
|---|---|
| Pro-rated Appliance Add-Ons | 1% |
| Pro-rated Maintenance / Subscription | 21% |
| Contract Pricing | 5% |
| Competitive Price Match | 15% |
| Quarter end discount | 3% |
| Other | 7% |
| Customer Satisfaction Issue | 8% |
| Product Bundle | 3% |
| Enterprise License Agreement/True-up Non-Compliance [sic] | 26% |
| Previous Purchase Price Match | 4% |
| Error Quoted an old price list | 1% |
| Non-Profit | 1% |
| Promotional Special - New Product | 2% |

       Multi-Year Incentive                                                   3%

26.     Based on those disclosures, GSA accepted schedule discounts under the existing GSA Schedule Contract of 10% off list prices for security software licenses, 27.5% off list prices for availability software licenses, and 5% off list prices for support services. In 2009, Symantec added Backup Exec software products to the GSA Schedule, at 28.5-35% discounts off list prices.  Symantec's price lists had lower list prices for certain volume thresholds, or discount "bands," and the GSA Schedule discounts applied the same discount percentages across all bands on the price lists.

## MORSELL REVIEWS SALES DATA FROM 7/1/10-6/30/11

27.     Morsell knew that when Symantec filed its application to renew the GSA Schedule Contract, GSA's Office of Inspector General ("OIG") would request one year of commercial sales data to conduct a pre-award audit in connection with the renewal application. Morsell asked Symantec's IT department to provide her with one year of sales data from Symantec's sales database.  She received sales data for the period July 1, 2010 - June 30, 2011 in approximately August 2011.  Morsell spent considerable time analyzing that sales data, and was alarmed by what she saw.

28.     Morsell saw many examples of deep discounts to commercial customers, given more frequently than disclosed in Symantec's previous CSP disclosures.  Morsell researched some of those deeply discounted commercial deals in Symantec's SalesForce database, which included explanations for the discounts, either in the form of pre-selected drop box menu items, or in comments from the sales force.

## "LEGACY" DISCOUNTS

29.    Morsell saw that the SalesForce database contained a menu of pre-selected reasons for providing non-standard discounts.  While many of those menu items corresponded to the categories in Symantec's previously-submitted CSP chart, one item on the menu stood out, because it had not been included in Symantec's CSP disclosures to GSA.  That item was called "Legacy/Contract Pricing–Please explain in comments."  A copy of the SalesForce menu for non-standard discount explanations is attached as Exhibit 2.

30.    Morsell realized that "Legacy/Contract Pricing–Please explain in comments" was not the same as the "Previous Purchase Price Match" explanation included in Symantec's previous CSP disclosures, because the Previous Purchase Price Match explanation remained a separate item in the SalesForce discount explanation menu.  When she researched discounts explained as "Legacy/Contract Pricing," Morsell saw that Symantec had granted "legacy" discounts to customers who had previously negotiated deep discounts based on minimum volume purchase commitments over a definite period of time.  When those contractual commitments to purchase large amounts of product within a specified time had expired, Symantec had continued to give those customers the same deep discount as a "legacy," even though the customer was no longer willing to make the volume purchase requirement that had justified that deep discount in the first place.

31.    Morsell knew that GSA schedule contractors would often take the position in negotiations with GSA that because the federal government could not make minimum volume purchase commitments for any specific period of time, the federal government was not entitled to the deepest discounts offered to commercial customers who were willing to make such contractual commitments. (As a matter of policy, that distinction is frequently unjustified,

because even though the federal government may not contractually commit to make specified volume purchases, GSA schedule contractors know that the federal government as a whole will make purchases in excess of the purchases of any single large commercial customer.)  Morsell also knew that GSA negotiators would not accept "legacy" pricing from an expired high volume contract as non-comparable to federal government sales.  Indeed, a commercial customer who had made large volume purchases in the past, and was now ordering smaller amounts without a specific volume purchase requirement, would be directly comparable to the federal government, which purchased tens of millions of dollars of products from Symantec every year without a specific volume commitment.

### EXAMPLE OF "LEGACY" DISCOUNTS

32.    As one example of such legacy deals, Morsell saw that Symantec had offered deep discounts to Liberty Mutual Insurance Company in deals from 2003 on.  When she researched those deals, she learned from a salesperson identified in the SalesForce database that Liberty Mutual had not had a minimum volume contract since an old deal expired roughly ten years before, but that Symantec had routinely offered Liberty Mutual "legacy" pricing based on that expired contract.  This information reveals that Symantec submitted inaccurate and incomplete descriptions of its commercial sales practices in negotiations leading to GSA's agreement to the existing GSA Schedule Contract, because Symantec did not disclose its practice of granting legacy discounts, or the frequency of those discounts.

### MORSELL'S CHART OF POTENTIAL PRC-TRIGGERING DEALS

33.    From her review of the 2010-2011 sales data, and her research on discounted deals in the SalesForce database, Morsell saw other comments and explanations from Symantec salespeople demonstrating that Symantec had no corporate culture or procedures designed to

ensure compliance with Symantec's Price Reduction Clause reporting obligations. In the normal course of her job duties, and months before she contacted counsel to consider taking the serious step of making a whistleblower disclosure, Morsell prepared a chart of potential Price Reduction Clause-triggering deals from the 2010-2011 sales data she reviewed. Morsell told her management about that chart.

MORSELL RESEARCHES PRICE LIST DISCREPANCIES

34.     As part of her research into Symantec's commercial sales practices and its past representations to GSA, Morsell learned that when the existing GSA Schedule began, Symantec had a variety of price lists for different buying programs. Symantec had separate price lists for buying programs where customers were willing to make high volume purchase commitments over a specific period of time, described at various times by Symantec as "Enterprise," "Elite," or "Eflex" programs. Symantec had an Express commercial price list for customers who did not make large volume purchase commitments. Symantec also had a separate Government price list. Morsell saw that Symantec had persuaded GSA that its Express price list was the most comparable to government purchases under the GSA Schedule. Morsell also saw that in correspondence with GSA leading to award of the existing GSA Schedule Contract, Symantec had provided an Excel spreadsheet showing that its government price list prices were always equal to, or lower than, its commercial Express list prices. The existing GSA Schedule Contract applied the agreed GSA discounts of 10% for security software, 27.5% for availability software, 28.5-35% for Backup Exec software, and 5% for support services to the Government price list to create a GSA price list.

35.     As Symantec represented to GSA, when the existing GSA Schedule Contract began, the Government and commercial Express price lists had the same discount bands: Bands

A-F with different unit list prices depending on the number of units or authorized users purchased (band A for the smallest purchases, going up to band F for larger purchases); and band S for the purchase of Server-wide licenses.

36.     During her research in connection with preparing Symantec's application to renew its GSA Schedule contract, Morsell learned that in approximately May 2008, Symantec had simplified its Government price list by collapsing discount bands A-D into a new band A, and collapsing discount bands E-F into a new band H.  The new list prices under those discount bands sometimes were higher than the commercial Express list prices for purchases of the same volume or number of authorized users.

37.     A comparison of Symantec's list prices for selected months reveals that Symantec's collapsing of the Government price list discount bands resulted in higher list prices for government customers than commercial Express customers for numerous products. Comparing Express and Government price lists to the GSA Schedule price lists for selected months reveals that Symantec's collapsing of the Government price list discount bands resulted in higher list prices for government customers than commercial Express customers for numerous products.  A chart comparing Symantec's Government price lists to commercial Express price lists is attached as Exhibit 3.

38.     Morsell learned that Symantec had not analyzed the effect of these Government price list changes on the comparative structure between its Government and commercial Express price lists.  Symantec provided the new Government price lists to GSA, but did not tell GSA that collapsing the discount bands on the Government price list resulted in higher list prices for hundreds of products in comparison to Symantec's commercial price lists. While Symantec submitted price reduction modifications throughout the contract period for list price reductions,

these did not correct the discrepancies created by the collapsing of the bands. GSA's contract officer would have had to spend days doing a detailed comparison of the new price lists to discover the discrepancies described above.

39.     Morsell brought her general concern about the discrepancies between the commercial Express and Government price lists to the attention of her supervisors.

## ANALYSIS OF CHANGES IN COMMERCIAL
## SALES PRACTICES FROM 2010-2011 SALES DATA

40.     An analysis of the sales data from July 1, 2010-June 30, 2011 that Morsell reviewed in connection with preparing Symantec's application to renew its GSA Schedule contract revealed that Symantec commercial sales practices differed markedly from the CSP disclosures it made in 2006. The CSP chart that Symantec submitted to GSA in 2006 said that in 88% of its sales transactions, Symantec had offered discounts from 31-40% off list prices, and had offered discounts from 41-100% off list only 2% of the time.

41.     The 2010-2011 sales data shows that Symantec actually offered much deeper discounts far more frequently. Spreadsheets analyzing the discounts on Symantec's direct sales to commercial customers, and its sales to partners and resellers, are attached as Exhibit 4. Symantec offered direct commercial customers discounts greater than 50% in 97% of sales of SKUs by line items. Symantec offered direct commercial customers discounts greater than 80% off list in over 75% of sales of SKUs by line items.

42.     Symantec did not disclose to GSA the discrepancies between its 2006 CSP disclosures and its ongoing commercial sales practices. To the contrary, Symantec falsely represented in numerous modifications submitted to GSA between 2007 and September 2011 that its commercial sales practices had not changed. This information also reveals that Symantec

made inaccurate and incomplete disclosures of its commercial sales practices in negotiations that led to GSA's entry into the existing GSA Schedule Contract.

## MORSELL LEARNS THAT SYMANTEC'S CONSULTING DIVISION WAS NOT MONITORING FOR PRC COMPLIANCE

43.     Symantec's existing GSA Schedule Contract included SIN 132-51 for Information Technology Professional Services, at a 5% discount off list prices. As she worked on preparing Symantec's application to renew its GSA Schedule contract, Morsell contacted Symantec's consulting division for information about its commercial sales practices. She spoke to Robin Diaz and Brian Bicknell, supervisors in Symantec's consulting division. Both Diaz and Bicknell were surprised to hear from Morsell. They told Morsell that the consulting division had not been informed that it needed to monitor its commercial pricing for GSA PRC compliance. They told Morsell that the consulting division granted discounts from 30-40% for some commercial customers, and that no one had ever asked them to report such deals for the purpose of PRC compliance. This information reveals that Symantec made inaccurate and incomplete disclosures of its commercial sales practices in the negotiations that led GSA to enter into the existing GSA Schedule Contract.

44.     Morsell reviewed consulting transactions in the sales data for 7/1/10-6/30/11, and saw deeply discounted consulting deals to commercial customers, including discounts as high as 62% off list prices. A chart of the consulting division's bookings for that period, reflecting those deep discounts to commercial customers, is attached as Exhibit 5. Morsell also learned that the consulting division was not reporting all of its GSA Schedule sales for IFF reporting, and that Symantec's IFF funding reports to GSA had failed to capture over $5.3 million in GSA schedule sales between April 2009 and September 2011.

45.     Morsell told her supervisors about the lack of PRC compliance in the consulting division, and recommended that Symantec not include consulting services in its renewal application.  Her supervisors agreed.

## NON-COMPLIANCE WITH TRADE AGREEMENT ACT

46.     Symantec's existing GSA Schedule Contract contained the following term:

8. Trade Agreements Act of 1979, as amended: All items are U.S. made end products, designated country end products, Caribbean Basin country end products, Canadian end products, or a NAFTA end product as defined in the clause entitled "Trade Agreements Act" FAR 52.2255 as amended, as designated ("US") per www.gsaadvantage.gov.

47.     Morsell learned that Symantec bought some of the products on its GSA Schedule from China and other countries that did not qualify under the Trade Agreement Act of 1979 ("TAA").  Morsell began asking questions about TAA compliance, and did her best to get non-compliant products removed from the GSA Schedule.  Morsell related her concerns about TAA compliance to her supervisors. Symantec still does not have an adequate control system in place to ensure TAA compliance.   This information reveals that Symantec made inaccurate and incomplete representations about TAA compliance in negotiations that led GSA to enter into the existing GSA Schedule Contract.

## NON-COMPLIANCE WITH SECTION 508

48.     Symantec's   existing   GSA   Schedule   Contract   contained   the   following representation:

I certify that in accordance with 508 of the Rehabilitation Act of 1973, as amended (29 U.S.C. 794d), FAR 39.2, and the Architectural and Transportation Barriers Compliance Board Electronic and Information Technology (EIT) Accessibility Standards (36 CFR 1194) General Services Administration (GSA), that all IT hardware/software/services are 508 compliant.

49.     Morsell learned that before she started Symantec only sporadically checked for Section 508 compliance and had no systems in place to ensure that its GSA Schedule products were compliant with Section 508. After speaking to Symantec sales people, Morsell learned that some products on the GSA schedule did not have Voluntary Product Accessibility Templates ("VPAT"). When Morsell reviewed some of the VPATs, she saw that not all of the products were passing Section 508's accessibility requirements. She related her concerns about Section 508 compliance to her supervisors. Since that time, Symantec has placed more emphasis on Section 508 compliance.   This information reveals that Symantec made inaccurate and incomplete representations about Section 508 compliance in negotiations that led GSA to enter into the existing GSA Schedule Contract.

## PRE-2007 CONDUCT

50.     In December, 2004, Symantec announced plans to acquire Veritas Software, another large, publicly-traded software company. The two companies consummated their merger in mid-2005.

51.     Veritas had its own GSA schedule contract in place before and after the merger. Morsell inherited some incomplete Veritas GSA schedule contract files when she began working at Symantec. Those files revealed that, based on its CSP disclosures, Veritas offered GSA discounts of 27.5% off MSRP for enterprise software, and 5% off MSRP for enterprise services. Veritas offered GSA 35% off MSRP for its Backup Exec and VIP products and services. Veritas' correspondence with GSA prior to award of Veritas' GSA schedule contract indicated that Veritas "agrees to monitor and report price reductions in accordance with the terms of the contract. VERITAS agrees to notify the Contracting Officer if more favorable price reductions and/or terms and conditions are offered to the categories of customers which was the basis of

award, and make an equal adjustment to the prices and/or terms and conditions applicable to the Pricelist."

52.     Symantec included Veritas products on its GSA schedule when it entered into the existing GSA Schedule Contract in 2007. Those products are frequently identified in Symantec's systems with the code VRTS. When Morsell did her research on legacy pricing deals, she saw that Veritas had offered legacy pricing on expired volume-commitment contracts to Liberty Mutual Insurance Company beginning in 2003.  Those deals appear to directly contradict Veritas' contractual commitment to monitor its commercial deals for PRC reductions.

53.     Similarly, Symantec had its own GSA schedule contracts in place before it entered into the existing GSA Schedule Contract in 2007.  Morsell's experience with Symantec's culture, where there were no systems in place to comply with the basic requirements of a GSA schedule contracts, strongly indicated to her that Veritas and Symantec violated the basic conditions of their pre-2007 GSA schedule contracts.

## MORSELL'S GROWING CONCERNS ABOUT SYMANTEC'S NON-COMPLIANCE

54.     The more she learned, the more Morsell realized that Symantec did not have systems in place to comply with the basic requirements of its existing GSA Schedule Contract. In approximately September 2011, and based on her research for the GSA Schedule renewal application, Morsell stopped representing in modifications that Symantec's commercial sales practices had not changed.

55.     Morsell expressed her concerns about Symantec's lack of basic contract compliance to her supervisors in stronger and stronger terms in late 2011 and early 2012.  She turned over the 7/1/10-6/30/11 sales data to GSA IG auditors as part of a routine pre-award audit,

and warned her supervisors that the pre-award audit might uncover some of Symantec's compliance problems, and might trigger an audit of Symantec's past performance.

56.     Over time, Morsell realized that Symantec did not have the culture or systems in place to allow her to bring Symantec into compliance. Morsell felt overwhelmed. She was one person, trying to gather information and educate the company about compliance issues, trying to research commercial sales practices, review product lists for TAA and Section 508 compliance, process modifications, figure out how to do PRC compliance where it had not been done before. Ultimately, she began to recommend that Symantec not renew its GSA contract. She told the company that if it withdrew its renewal application, the pre-award audit would terminate, and perhaps GSA would not audit past performance. Her supervisors expressed concerns about the audit process, and ultimately decided not to renew the GSA Schedule contract.

57.     Symantec withdrew its renewal application in April 2012.

## SYMANTEC CAUSED RESELLERS TO SUBMIT FALSE CLAIMS

58.     Symantec allowed resellers, including, but not limited to, Synnex, DLT Solutions, Dell, Carahsoft, Ingram, and Emergent, to sell products and services from its GSA Schedule contract. Symantec's failure to disclose to the United States the discounts and other pricing practices that it routinely offered to commercial customers for its software products caused its resellers to submit false claims to GSA. From January 25, 2007, through the first quarter of 2012, the United States has paid Symantec's resellers approximately $142,983,279 on purchases of Symantec's GSA schedule products.

59.     To satisfy FRCP 9(b), a representative sample of false claims submitted to the United States by Symantec's resellers is attached as Exhibit 6. In each of these transactions, Symantec's resellers submitted invoices containing or incorporating the prices for items on the spreadsheet. Each of those invoices was a false statement because the GSA schedule prices Symantec

listed failed to disclose the differences between its CSP disclosure filed with GSA in 2006 and Symantec's actual sales practices, failed to disclose that Symantec did not monitor for price reduction clause, TAA, or Section 508 compliance, and failed to disclose that Symantec offered comparable commercial customers much greater discounts.  These are just representative examples of numerous inflated invoices resulting in false claims on the United States

## LISTS OF GOVERNMENT CONTRACTS AND DAMAGES CALCULATIONS

60.     Between January 25, 2007, through the first quarter of 2012, the United States directly paid Symantec approximately $72,054,687 for Symantec GSA schedule products.  To satisfy FRCP 9(b), a representative sample of false claims that Symantec submitted to the United States is attached as Exhibit 7. In each of these transactions, Symantec submitted invoices containing or incorporating the prices for items on the spreadsheet. Each of those invoices was a false statement because the GSA schedule prices Symantec listed failed to disclose the differences between its CSP disclosure filed with GSA in 2006 and Symantec's actual sales practices, failed to disclose that Symantec did not monitor for price reduction clause, TAA, or Section 508 compliance, and failed to disclose that Symantec offered comparable commercial customers much greater discounts.  These are just representative examples of numerous inflated invoices resulting in false claims on the United States.

61.     In some instances, a government contracting official may have negotiated a discount below the published GSA schedule discounts offered by Symantec.  Regulations encourage contracting officials to seek discounts below the GSA schedule. However, any such negotiated discounts below the published tiered discounts were affected by a fraudulent starting point. The government contracting official seeking a discount below the GSA schedule discounts started by relying on Symantec's representations that its GSA schedule discounts were the best prices it offered to commercial customers. It is certainly more likely than not that any government contracting official

who negotiated prices below the GSA schedule discounts on any purchase would have negotiated a proportional discount if Symantec had truthfully reported its commercial discounts and the starting point in the negotiations had been a 80-99% discount, rather than the maximum discounts that Symantec published on its GSA schedule.

**COUNT I (False Claims Act)**
**(Knowingly Presenting False and Fraudulent Claims**
**For Payment without Required Disclosure of Commercial Pricing Practices)**

62.     Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

63.     Symantec acted knowingly, with actual knowledge, in deliberate ignorance, and in reckless indifference, in failing to disclose to the United States the discounts and other pricing practices that it routinely offered to commercial customers for its software products.

64.     Symantec knowingly, with actual knowledge, deliberate ignorance, and reckless indifference, submitted materially false or fraudulent claims for payment, or caused materially false or fraudulent claims for payment to be submitted by others, including, but not limited to, Symantec's resellers, to officials of the United States government, in violation of 31 U.S.C. 3729(a)(1) and (c). Each claim for payment submitted by Symantec to federal government agencies for sales of its GSA schedule products was a false claim for payment based on material failures to disclose the discounts and other pricing practices that Symantec offered its most favored commercial customers.

65.     Because of Symantec's conduct set forth above, the United States has suffered actual damages. The United States overpaid for each Symantec GSA schedule product by the amount of discounts and reductions from other commercial pricing practices that should have applied to each such purchase.

## COUNT II (False Claims Act)
## (Knowingly Making and Using False Records and
## <u>Statements without Required Disclosure of Commercial Pricing Practices</u>

66.     Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

67.     Symantec knowingly, with actual knowledge, deliberate ignorance, and reckless indifference, made, used, and caused to be made and used, false records and statements, including but not limited to the discount information submitted with Symantec's MAS contract proposal, applications to modify Symantec's MAS contract that included documents signed by Symantec executives certifying that "Symantec's Business Products for these product additions are identical to those business practices applicable to prices applicable to Symantec product currently on the GSA contract," and the pricing proposals and bills submitted to each government agency that purchased Symantec's software, to get false or fraudulent claims paid or approved by the government.

68.     Because of Symantec's conduct set forth above, the United States has suffered actual damages. The United States overpaid for each Symantec GSA schedule product by the amount of discounts and reductions from other commercial pricing practices that should have applied to each such purchase.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Lori Morsell, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against Defendant on each count of the Complaint as follows:

1.  For treble the amount of the United States' damages, plus civil penalties of $11,000 for each false claim;

2.  For all costs of this civil action; and

3.  For prejudgment interest and for such other and further relief as the Court deems just and equitable.

MOREOVER, Plaintiff Lori Morsell, on her own behalf, demands and prays that an award be made in her favor as follows: for 25 percent (25%) of the proceeds collected by the United States if the United States intervenes in and conducts this action, or for 30 percent (30%) of the proceeds if the United States does not intervene; for an amount for reasonable expenses necessarily incurred by the relator in the prosecution of this action; for all reasonable attorney's fees and costs incurred by the relator; and such other and further relief to which the relator may show herself justly entitled.

## DEMAND FOR JURY TRIAL

Plaintiff Lori demands that this case be tried before a jury.

Respectfully submitted,

Christopher B. Mead   #411598
Mark London #293548
Lance Robinson #991118
London & Mead
1225 19th Street, NW, Suite 320
Washington, DC 20036
T: (202) 331-3334
F: (202) 785-4280
cmead@londonandmead.com
Counsel for Relator Lori Morsell

May 17, 2012