## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel*. **LORI MORSELL,** | |
| **Plaintiff,** | |
| **v.** | **C.A. No. 12-0800 (RC)** |
| **SYMANTEC CORPORATION,** | |
| **Defendant.** | |

## DEFENDANT SYMANTEC'S MOTION TO DISMISS THE UNITED STATES', CALIFORNIA'S, FLORIDA'S, AND RELATOR'S OMNIBUS AND RESTATED COMPLAINT AND COMPLAINT IN INTERVENTION AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

David L. Douglass (D.C. Bar No. 447157)
Jonathan S. Aronie (D.C. Bar No.443151)
Anne B. Perry (D.C. Bar No. 447930)
SHEPPARD MULLIN RICHTER &
 HAMPTON LLP
2099 Pennsylvania Ave., NW, Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1900
Fax (202) 747-1901
ddouglass@sheppardmullin.com
jaronie@sheppardmullin.com
aperry@sheppardmullin.com

*Attorneys for Symantec Corporation*

Dated: December 9, 2014

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ......................................................................................... i

TABLE OF AUTHORITIES ................................................................................ iii

SUMMARY OF ARGUMENT ..............................................................................1

FACTUAL BACKGROUND ..................................................................................5

I.  The Contract Negotiation Followed The Regulatory Framework For A
    GSA MAS Schedule Offer, Negotiation, And Award .......................................5

II. Symantec Met Its Price Reduction Clause Obligations ...................................10

LEGAL STANDARD ...........................................................................................11

ARGUMENT .........................................................................................................11

I.  The Complaint Fails To Plead A Plausible Scheme By Which Symantec
    Knowingly Violated The False Claims Act .....................................................11

    A.  The Complaint Fails To Satisfy Rule 8(A)'s Requirement To Allege
        Facts That State A Plausible Claim To Relief .........................................14

    B.  The Complaint Fails To Plausibly Connect Symantec's Alleged
        Misrepresentations And Omissions To The Contracting Officer's
        Decision To Accept Symantec's Offer .....................................................16

    C.  The Government's Knowledge That Symantec Intended To Offer Better
        Discounts To Commercial Customers Precludes A Claim That Symantec
        Lied .........................................................................................................19

    D.  The Government's Failure To Address The Contracting Officer's Price
        Negotiation Memorandum Further Renders The Complaint's Allegations
        Implausible ..............................................................................................22

II. The Complaint Also Fails To Meet The Heightened Pleading
    Requirement Of Rule 9(B) ..............................................................................25

    A.  The Allegations Do Not Permit An Inference That Symantec's CSP
        Disclosures Were Knowingly False .........................................................26

    B.  The Complaint Fails To Sufficiently Plead That Symantec's
        Representations Concerning Its eSPA System Were Knowingly False Or
        Material To The Contract Award ..............................................................28

III. The Complaint Fails To Allege Specifically That Symantec Knowingly
     Submitted False Claims In Violation Of The Price Reduction Clause .............30

IV. The Government Fails To Allege Fraudulent Claims For Payment With
    The Required Specificity .................................................................................33

V.      The Complaint Fails To Allege With Particularity That The Modifications
        Submitted During Contract Performance Were Objectively False Or
        Material ........................................................................................................36

VI.     The Complaint's Allegations Do Not Plausibly Allege A Reverse False
        Claim .............................................................................................................38

VII.    The State Claims Must Be Dismissed Under Rules 8(a) And 9(b)...................39

        A.      California ............................................................................................39

                1.      California's Claims Fail Under FRCP 12(b)(6).........................39

                1.      California's Claims Fail Under FRCP 9(b) ...............................41

        B.      Florida's Allegations Fail To Plead The Elements As To False Claims
                Or False Statements ............................................................................41

        C.      New York' Allegations Fail To Plead The Elements As To False Claims
                Or False Statements ............................................................................42

VIII.   The Complaint's Negligent Misrepresentation And Breach Of Contract
        Claims Are Not Properly Before This Court ...................................................43

IX.     The Payment By Mistake And Unjust Enrichment Claims Fail Under Rule
        12(B)(6).........................................................................................................44

        CONCLUSION...............................................................................................45

TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Aschcroft v. Iqbal*
    556 U.S. 662 (2009)..........................................................................................................*passim*

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007)........................................................................................................3,14,40

*Bender, v. N. Am. Telecommc'ns, Inc.*
    686 F.Supp.2d 46 (D.D.C. 2010) .................................................................................33

*City of Harper Woods v. Olver*
    589 F.3d 1292 (D.C. Cir. 2009) ...........................................................................11, 26

*Elemary v. Holzmann*
    533 F.Supp.2d 116 (D.D.C. 2008) .............................................................................33

*Federal Crop Ins. Corp. v. Merrill*
    332 U.S. 380 (1947)......................................................................................................24

*Gonzalez-Vera v. Townley*
    597 F.Supp.2d 98 (D.D.C. 2009) ...............................................................................31

*Kaempe v. Myers*
    367 F.3d 958 (D.C. Cir. 2004) ...................................................................................11

*Luckey v. Baxter Healthcare Corp.*
    183 F.3d 730 (7th Cir. 1999) ................................................................................12, 19

*Safeco Ins. Co. of Am. v. Burr*
    551 U.S. 47 (2007)........................................................................................................32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    551 U.S. 308 (2007)........................................................................................................6

*United States ex rel. Bain v. Georgia Gulf Corp.*
    386 F.3d 648 (5th Cir. 2004) .....................................................................................38

*United States ex rel. Bender v. N. Am. Telecomms., Inc.*
    750 F.Supp.2d 1 (D.D.C. 2010) .............................................................................4,25

*United States ex rel. Bettis v. Odebrecht Contractors of California, Inc.*
    297 F.Supp.2d 272 (D.D.C. 2004) ...........................................................................12

*United States ex rel. Digital Healthcare, Inc. v. Affiliated Computer Servs., Inc.*
    778 F.Supp.2d 37 (D.D.C. 2011) ........................................................................33

*United States ex. rel. Durcholz v. FKW, Inc.*
    189 F.3d 542 (7th Cir. 1999) .............................................................................20

*United States ex rel. Ervin & Associates, Inc. v. Hamilton Sec. Grp.*
    298 F.Supp.2d 91 (D.D.C. 2004) ..................................................................13, 29

*United States ex rel. Fago v. M&T Mortgage. Corp.*
    518 F.Supp.2d 108 (D.D.C. 2007) ......................................................................13

*United States ex rel. Folliard v. CDW Tech. Servs., Inc.*
    722 F.Supp.2d 20 (D.D.C. 2010) ........................................................................36

*United States ex rel. Folliard v. Govplace*
    930 F.Supp.2d 123 (D.D.C. 2013) ......................................................................12

*United States ex rel. Harris v. Bernad*
    275 F.Supp.2d 1 (D.D.C. 2003) ..........................................................................12

*United States ex rel. Head v. Kane Co.*
    798 F.Supp.2d 193 (D.D.C. 2011) ......................................................................14

*United States ex rel. Hood v. Satory Global, Inc.*
    946 F.Supp.2d 69 (D.D.C. 2013) ........................................................................12

*United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*
    530 F.3d 980 (D.C. Cir. 2008) .........................................................21, 27, 32, 37

*United States ex rel. K & R Ltd. P'ship v. Massachusetts Hous. Fin. Agency*
    456 F.Supp.2d 46 (D.D.C. 2006) ........................................................................12

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*
    360 F.3d 220 (1st Cir. 2004) ..............................................................................25

*United States ex rel. Lamers v. City of Green Bay*
    168 F.3d 1013 (7th Cir. 1999) .......................................................................15, 32

*United States ex rel. Mikes v. Straus*
    274 F.3d 697 (2d Cir. 2001) ...............................................................................16

*United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co.*
    81 F.3d 240 (D.C. Cir. 1996) .............................................................................44

*United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*
    612 F.3d 724 (4th Cir. 2010) ........................................................................43

*United States ex rel. Piacentile v. Sanofi Synthelabo, Inc.*
    No. 05-2927, 2010 WL 5466043 (D.N.J. Dec. 30, 2010)........................................39

*United States ex rel. Pogue v. Diabetes Treatment Centers of Am., Inc.*
    238 F.Supp.2d 258 (D.D.C. 2002) ..................................................................25

*United States ex rel. Purcell v. MWI Corp.*
    254 F.Supp.2d 69 (D.D.C. 2003) ...................................................................44

*United States ex rel. Siewick v. Jamieson Science and Eng'g, Inc.*
    214 F.3d 1372 (D.C. Cir. 2000) .....................................................................13

*United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*
    472 F.3d 702 (10th Cir. 2006) ......................................................................41

*United States ex rel. Thomas v. Siemens AG*
    991 F.Supp.2d 540 (E.D. Pa. 2014) *aff'd* (3d Cir. Nov. 25, 2014) ..............................16, 19, 21

*United States ex rel. Totten v. Bombardier Corp.*
    380 F.3d 488 (D.C. Cir. 2004) ...................................................................13, 21

*United States ex rel. Vigil v. Nelnet, Inc.*
    639 F.3d 791 (8th Cir. 2011) ........................................................................38

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*
    389 F.3d 1251 (D.C. Cir. 2004) ...............................................................26, 29, 33

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,*
    525 F.3d at 378 (4th Cir. 2008)..................................................................25, 36

*United States ex rel. Windsor v. DynCorp, Inc.*
    895 F.Supp. 844 (E.D. Va. 1995) ...................................................................16

*United States ex rel. Yesudian v. Howard Univ.*
    153 F.3d 731 (D.C. Cir. 1998) .......................................................................38

*United States v. Am. Nat'l Red Cross* (*Hoyte ex rel. United States*),
    518 F.3d 61, 67 (D.C. Cir. 2008) ...................................................................38

*United States v. DRC, Inc.*
    856 F.Supp.2d 159 (D.D.C. 2012) ..................................................................37

*United States v. First Choice Armor & Equip., Inc.*
   808 F.Supp.2d 68 (D.D.C. 2011) ........................................................................44, 45

*United States v. Kellogg Brown & Root Servs., Inc.*
   800 F.Supp.2d 143 (D.D.C. 2011) ...........................................................25, 44,  45

*United States v. Krizek*
   111 F.3d 934 (D.C. Cir. 1997) ........................................................................13

*United States v. Marovic*
   69 F.Supp.2d 1190 (N.D. Cal. 1999) ...............................................................43

*United States v. Science Applications International Corp. ("SAIC I")*
   555 F.Supp.2d 40 (D.D.C. 2008) ................................................................33, 45

*United States v. Sci. Applications Int'l Corp. ("SAIC II")*
   626 F.3d 1257 (D.C. Cir. 2010) .............................................................. 13, 33, 37

*United States v. Toyobo Co.*
   811 F.Supp.2d 37 (D.D.C. 2011) ................................................................37, 42

*Ward v. D.C. Dep't of Youth Rehab. Servs.*
   768 F.Supp.2d 117 (D.D.C. 2011) ..................................................................6, 22

*Williams v. Savage*
   569 F.Supp.2d 99 (D.D.C. 2008) ....................................................................11

*Wynne v. United Techs. Corp.*
   463 F.3d 1261 (Fed. Cir. 2006)........................................................................44

*X Corp. v. Doe*
   816 F.Supp. 1086 (E.D. Va. 1993) ..................................................................27

<u>Statutes</u>

31 U.S.C. § 3729(a) ........................................................................................12, 38

31 U.S.C. § 3729(b) ............................................................................................13

41 U.S.C. §§ 7101 *et seq.*..................................................................................43

41 U.S.C. § 7102(a) .............................................................................................43

41 U.S.C. § 7103(a)(4)(B) ...................................................................................44

Other Authorities

48 C.F.R. § 8.402(a)...........................................................................................................6

48 C.F.R. § 15.405(a)........................................................................................................16

48 C.F.R. § 15.406-3...................................................................................................22, 29

48 C.F.R. § 52.203-13.......................................................................................................28

48 C.F.R. § 52.233-1.........................................................................................................43

48 C.F.R. § 515.408........................................................................................................6, 8

48 C.F.R. § 538.270....................................................................................................17, 19

48 C.F.R. § 552.212-70(a)................................................................................................23

48 C.F.R. § 552.238-75..........................................................................................10, 21, 30

Fed.R.Civ.P. 8(a) ...................................................................................... *passim*

Fed.R.Civ.P. 9(b) ...................................................................................... *passim*

Fed.R.Civ.P.12(b) (6)................................................................................. *passim*

## SUMMARY OF ARGUMENT

The Government, Intervening States, and Relator (collectively "the Government") contend that Symantec Corporation ("Symantec") devised and perpetrated a nearly year-long scheme to defraud the General Services Administration ("GSA") through an elaborate series of misrepresentations to obtain a contract that Symantec could as easily have won through good-faith negotiations. They then claim that Symantec continued this fraud through a series of false statements and claims arising from its alleged knowing failure to give the GSA the best price it gave any of its commercial customers, regardless of the nature of the customer's business relationship to Symantec or the terms or size of the customer's purchases.

The Complaint combines (1) claims by the United States under the Federal False Claims Act ("FCA"), common law claims for negligent misrepresentation and breach of contract, and equitable claims for unjust enrichment and payment by mistake with (2) claims under the false claims acts of California, Florida, and New York, respectively.  These claims arise from alleged (1) false statements Symantec knowingly made during negotiation of a GSA Multiple Award Schedule ("MAS") contract (the "Contract"), which was effective from January 2007 to October 2012, and (2) claims for payment under the Contract and (3) the allegedly derivative state procurement contracts.

In support of these claims, the sprawling 80-page Complaint crafts a story of how Symantec, a successful multi-billion dollar a year Fortune 500 commercial company, conjured an elaborate scheme to lie to the GSA in order to fraudulently obtain a contract that was worth but a fraction - less than one-quarter of one-percent - of the Company's annual revenues.  The Complaint further accuses Symantec of violating the False Claims Act by violating the Price Reduction Clause ("PRC") and knowingly filing false certifications of contract

compliance.  While the Complaint tells an all-too-familiar tale of corporate greed at taxpayer expense, the facts simply do not support that narrative.  Disregarding the legal conclusions and bare allegations, as this Court must do, objective examination of the Complaint reveals that the factual allegations fail to meet the standards for plausibility and specificity set forth in Fed.R.Civ.P. 8(a) and 9(b), respectively, for the claims asserted.

As described in the Complaint, the GSA MAS contract at issue in this litigation resulted from protracted, arms-length negotiations between the GSA Contracting Officer, Ms. Gwen Dixon, and Symantec that were governed by the detailed Federal Acquisition Regulations ("FAR") and the GSA Acquisition Regulations ("GSAR").  The Complaint summarizes the extensive disclosures made to the Contracting Officer, including voluminous disclosures of Symantec's pricing and discounting polices that formed the basis for the agreed-upon contract terms.  Those disclosures were supplemented by substantial volumes of additional information provided by Symantec in numerous face-to-face meetings and email communications with Ms. Dixon.  Through these disclosures and other responses to Ms. Dixon's questions, Symantec informed her that, among other things:  (1) Symantec offered more favorable pricing to other customers than it was offering the Government; (2) Symantec's standard discounting policies included substantial non-published discounts (up to, and including, 100%); and (3) Symantec offered different buying programs, including the Rewards Program discussed at length in the Complaint.  Based on the information provided in Symantec's disclosures and in response to her questions, Ms. Dixon determined Symantec's offer to be "fair and reasonable" to both the Government and the contractor.

The Government reinterprets the undisputed facts to tell a different story - one that, at its core, goes directly to Symantec's fitness as a Government contractor, and impugns not only the

integrity of the Company and its employees, but also the judgment of its own Contracting

Officer, Ms. Dixon.  The Supreme Court has made crystal clear, however, that the Complaint

must "state a claim to relief that is plausible on its face." *Aschcroft v. Iqbal*, 556 U.S. 662, 678

(2009). The "plausibility" standard contemplated in *Iqbal* "asks for more than a sheer possibility

that a defendant has acted unlawfully." *Id.*   Stripped of its "bare assertions" and "[t]hreadbare

recitals of the elements of an [FCA] cause of action, supported by mere conclusory statements,"

the Complaint fails to state a plausible claim for relief sufficient to survive a motion to

dismiss. *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).

Section I of this Motion addresses the Complaint's failure to plausibly allege the knowing

misrepresentations that induced the Contracting Officer to accept Symantec's offer.  That failure

requires the dismissal of Counts II, III, and IV, alleging false statements by Symantec.  Fatal to

the Government's claims, the Complaint fails to to allege any facts that would establish the

misrepresentations, even if made, were material to Ms. Dixon's acceptance of Symantec's offer.

The fact or number of false statements alleged is irrelevant absent factual allegations concerning

how they influenced the Contracting Officer's decision.  Bare allegations that the information is

generally material to the government are insufficient. They must be tailored to the specific

contract at issue.  Because this Complaint offers not a single factual allegation concerning how

Ms. Dixon was influenced by the misrepresentations and omissions alleged, it fails to plead an

essential element of False Claims Act liability and must be dismissed.

Section II demonstrates that even assuming the plausibility standard was met, which it is

not, the Government fails to meet the heightened pleading standard of Fed.R.Civ.P. 9(b)

applicable to False Claims Act allegations.  To satisfy Rule 9(b), the Government must "set out

the details of the specific scheme, supply the time, place, and content of the false representations,

and link that scheme to claims for payment." *U.S. ex rel. Bender v. N. Am. Telecomms., Inc.*, 750 F.Supp.2d 1, 6 (D.D.C. 2010). Yet the Complaint does not come close to pleading its fraudulent inducement allegations with the requisite specificity. Specifically, the Government fails to allege the identity of those who made the allegedly false statements and fails to plead the time, date, place and fraudulent elements of the claims alleged to be false.

As set forth in Sections III and IV, the allegations related to Contract performance (Count I) also fail to satisfy Rules 8(a) and 9(b) by not plausibly alleging that Symantec knowingly submitted false claims in violation of the PRC and by pleading facts in a manner that is improperly vague and lacking sufficient details. To establish Symantec made false statements or submitted false claims related to the PRC, the Government's interpretation must be based on the only objectively reasonable interpretation of Symantec's obligations. The PRC allegations, however, are rooted in a reading of the regulation that Symantec asserts is incorrect or, at the very least, debatable. And to the extent the Complaint includes alleged examples of PRC triggering transactions, the Government fails to provide sufficient detail on these transactions or explain why or how they trigger the PRC. In sum, the Complaint fails to sufficiently and specifically allege the elements of FCA liability arising from Symantec's PRC obligations.

Similarly deficient, as reflected in Sections V and VI below, are the Government's allegations related to contract modifications and "reverse false claims." The Complaint fails to allege with particularity that the modifications submitted during contract performance were objectively false or material and, in terms of its reverse false claims allegations, fails to plead facts sufficient to elevate the Complaint's claims of false payments beyond an improper "unassessed potential penalty" as presently alleged.

Finally, as explained in Sections VII-IX, bootstrapped onto the federal FCA allegations are a series of common law claims (Claims VI-IX) and claims against Symantec asserted by California, Florida, and on behalf of New York (Counts X-XVI).  The state claims, described herein at Section VII, are derivative of the alleged false claims and false statements made under Symantec's GSA Schedule contract, and to the extent that these federal claims are insufficient to survive a motion to dismiss, the state claims must fall as well.  Additionally, each of the state claims is deficiently pled for multiple independent reasons and must be dismissed on those grounds standing alone.   Section VIII explains that the Government's negligent misrepresentation (Count VI) and breach of contract (Count VII) claims are beyond the jurisdiction of this Court and should be dismissed.   Section IX concludes this motion by demonstrating that the Complaint's unjust enrichment (Count VII) and payment by mistake (Count IX) claims fail as a matter of law as they are inconsistent with the express contract that forms the predicate to the entirety of the Government's case.

## FACTUAL BACKGROUND

I.      **The Contract Negotiation Followed The Regulatory Framework For A GSA MAS Schedule Offer, Negotiation, And Award**

For purposes of challenging the sufficiency of the pleadings, Symantec accepts the Complaint's factual allegations, documents relied on in the Complaint, and matters that may be

judicially noticed.[1]  In 2004, Symantec announced its agreement to acquire VERITAS Software Corporation ("VERITAS").  Compl. ¶ 53.  Veritas held a GSA MAS contract through which it sold enterprise and backup products and services, term software licenses, software maintenance services, training courses, and information technology services to the Government.  *Id*. Symantec thereafter sought ways to continue to serve its government customers and "responded to the GSA MAS solicitation seeking a new MAS contract" directly with GSA.  *Id*. ¶ 55.

The process for responding to a GSA MAS solicitation is governed by Subpart 8.4 of the FAR, and the GSAR.  As described in FAR §8.402, the MAS program is intended to be a "simplified process" whereby the government may purchase commercial supplies and services. 48 C.F.R. § 8.402(a).  With respect to an offeror's response to a GSA solicitation, those regulations direct:

> (2) The offeror shall submit information in the format provided in this solicitation in accordance with the instructions at Figure 515.4 of the GSA Acquisition Regulation (48 CFR 515-2), or submit information in the offeror's own format.

> (3) Any additional supporting information requested by the contracting officer. The contracting officer may require additional supporting information, but only to the extent necessary to determine whether the price(s) offered is fair and reasonable.

48 C.F.R. §515.408(a) (2) and (3).

---

[1]   In ruling on a motion to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents *incorporated into the complaint by reference*, and matters of which a court may take judicial notice." *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322–23 (2007) (emphasis added). The court may consider "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ward v. D.C. Dep't of Youth Rehab. Servs*., 768 F.Supp.2d 117, 119-20 (D.D.C. 2011) (citations and internal quotation marks omitted).

As a threshold step, the instructions at Figure 515.4 required Symantec to answer the following question:

> (3) Based on your written discounting policies (standard commercial sales practices in the event you do not have written discounting policies), are the discounts and any concessions which you offer the Government equal to or better than your best price (discount and concessions in any combination) offered to any customer acquiring the same items regardless of quantity or terms and conditions? YES__ NO__ (See definition of "concession" and "discount" in 552.212-70.)

Symantec responded "NO," clearly disclosing the Government was not going to be receiving Symantec's best pricing.  *See* Compl. ¶ 59; *see also* Attachment A, Commercial Sales Practice Format.  To the contrary, Symantec disclosed that it provided its commercial customers with "discounts and … concessions" better than those it was offering the Government.

Symantec was then required to disclose limited information regarding its commercial policies or practices:

> (4)(a) Based on your written discounting policies (standard commercial sales practices in the event you do not have written discounting policies), provide information as requested for each SIN (or group of SINs for which the information is the same) in accordance with the instructions at Figure 515.4, which is provided in this solicitation for your convenience. The information should be provided in the chart below or in an equivalent format developed by the offeror. Rows should be added to accommodate as many customers as required.

In response to Question 4(a), Symantec provided 13 pages detailing its discounts and pricing information.  *See* Attachment A, Commercial Sales Practice Format ("CSPF").  As the Government admits, Symantec disclosed standard commercial discounts in the range of 30 to 40%, standard academic discounts of 20 to 40%, and an elite buying program discount of 5 to 20% off of MSRP.  *See* Compl. ¶ 61.  Symantec augmented its pricing and discounting disclosures with three charts describing its non-published discounts *Id.* ¶ 64.  Those charts

disclosed that Symantec provided discounts of greater than 40%, including non-published discounts up to and including 100%. *Id.* ¶ 61. *See also* Attachment A, CSPF.

Symantec was next required to respond to the following question:

> (4)(b) Do any deviations from your written policies or standard commercial sales practices disclosed in the above chart ever result in better discounts (lower prices) or concessions than indicated? YES_ NO_. If YES, explain deviations in accordance with the instructions at Figure 515.4, which is provided in this solicitation for your convenience.

Symantec answered "NO," indicating that it did not deviate from its disclosed "practices," which included providing non-published discounts up to 100%.

Thus, Symantec's initial disclosures, as required by the regulations, revealed that other customers would receive better prices than Symantec was offering the Government but these better prices were not attributable to deviations from Symantec's "written policies or standard commercial sales practices."

Symantec was not obligated to provide additional "supporting information" unless requested by the Contracting Officer and then "only to the extent necessary to determine whether the price(s) offered is fair and reasonable." *See* 48 C.F.R. §515.408(a) (3). To the extent Symantec changed its disclosed discounts and/or discounting policies after the offer was submitted, it was required to disclose those changes "before the close of negotiations." *See* 48 C.F.R. §515.408, Figure 515.4—Instructions for Commercial Sales Practices Format. Symantec did precisely that on October 5, 2006, when Symantec's contract manager, Kim Bradbury, emailed the GSA Contracting Officer, Gwen Dixon, a presentation providing an "overview of new discounting policies and procedures for all products sold by Symantec Corporation." Compl. ¶ 72. While the Complaint alleges that Symantec's initial disclosures did not include its Rewards Program, the Complaint later admits that this pre-award, October presentation disclosed

-8-

five buying programs, including Rewards: (a) Express, (b) Government, (c) Academic, (d) Rewards and (e) Enterprise Options. The presentation also described "requirements to purchase at different 'bands' or pricing levels with a program, and certain terms and conditions." *Id*. ¶¶ 74.

Consistent with the process presented by the regulations, Ms. Dixon responded with questions to Ms. Bradbury "regarding Symantec's offer and CSPs and, separately, emailed Ms. Bradbury expressing confusion regarding the October 2006 Presentation." *Id*. ¶ 82. The parties then met in person on October 11 to discuss the materials provided and the overall offer. *Id*. ¶ 83.

On October 20, Ms. Bradbury emailed a collection of documents in direct response to the questions posed by Ms. Dixon in her October 9 email and during the October 11 meeting. *Id*. ¶ 84. These documents contained, in part, a discount comparison chart, *Id*. ¶¶ 85-86, and additional information related to Symantec's discounting practices. *Id*. ¶ 90. These materials included in part, an explanation that, to allow "Symantec the flexibility to respond to competition," the Company "provides non-standard-competitive pricing discounts to strategic accounts by requiring commitments from the identified account for annual quantity purchases." *Id*. The responsive materials also described Symantec's use of competitive pricing to meet certain "guidelines" and included specific examples of reasons that "non-published" discounts were offered (*e.g.*, "To meet market competition or displace a named competitor at a customer site" and "New Market or market segment penetration"). *Id*.

In sum, as of November 2006, Symantec had disclosed to the Government the following:

1. Symantec offered more favorable pricing to its other customers than it was offering the government;

2. Symantec's standard discounting policies included offering non-published discounts;

3. Symantec offered five different buying programs: (a) Express, (b) Government, (c) Academic, (d) Rewards, and (e) Enterprise Options.

4. Symantec offered additional discounts to further a variety of business objectives; and

5. Symantec offered discounts that ranged from 0 to 100%.

Each of these disclosures was permitted by the applicable regulations and all were within the Contracting Officer's authority to accept.

## II.  Symantec Met Its Price Reduction Clause Obligations

The Price Reduction Clause ("PRC") requires that, before contract award, the GSA Contracting Officer and the vendor agree upon "(1) the customer (or category of customers) which will be the **basis of award**, and (2) the Government's price or discount relationship to the identified customer (or category of customers)."  48 C.F.R. § 552.238-75(a) (emphasis in original).  In its Final Proposal Revision ("FPR"), Symantec, with the concurrence of Ms. Dixon, agreed to use its "commercial class of customers" as the Basis of Award customer for purposes of the PRC.

With respect to the price/discount relationship to the Basis of Award customer, Symantec offered the Government discounts ranging from 5% to 35% from the Government End User MSRP for "hardware appliance, enterprise availability, backup executive and security products and services," and between 5% and 10% off of "Commercial MSRP" for training, professional, managed security, and technical support services.  The amount of the discount depended on the

product category and Special Item Number ("SIN").[2]  Compl. ¶ 95.  As the Government admits, the PRC is not triggered unless Symantec offered its commercial class of customers discounts that altered the "Government's price or discount relationship to the identified customer (or category of customers)."  Compl. ¶ 48.

## LEGAL STANDARD

Federal Rule of Civil Procedure Rule 12(b)(6) requires this Court to dismiss the Complaint if it fails to set forth all of the necessary elements of the claims asserted.  "A Rule 12(b) (6) motion tests the legal sufficiency of a complaint."  *Williams v. Savage*, 569 F.Supp.2d 99, 109 (D.D.C. 2008).  "Though the court construes the complaint liberally in the plaintiff's favor, it need not accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations."  *City of Harper Woods v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009).  In ruling on a motion to dismiss, the Court is entitled to consider the facts alleged in the complaint, exhibits attached or incorporated by reference, and matters about which the court may take judicial notice.  *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (considering content of documents on motion to dismiss where complaint relied on documents' terms and where documents were judicially noticeable).

## ARGUMENT

**I.    The Complaint Fails To Plead A Plausible Scheme By Which Symantec Knowingly Violated The False Claims Act**

To establish an FCA claim, the Government must prove that Symantec (1) presented a claim to the federal government for payment, (2) which was false, and (3) which the defendant

---

[2]    GSA Schedule Special Item Numbers (SINs) serve to categorize and group similar products, services, and solutions together to aid in the acquisition process.

knew was false.  *See* 31 U.S.C. § 3729(a)(1); *United States ex rel. Harris v. Bernad*, 275 F.Supp.2d 1, 5-6 (D.D.C. 2003).  In order to state a claim under FCA section 3729(a)(1)(B), "a plaintiff must allege that (1) the defendant made or used a 'record or statement;' (2) the record or statement was false; (3) the defendant knew it was false; and (4) the record or statement was 'material' to a false or fraudulent claim."  *United States ex rel. Hood v. Satory Global, Inc.,* 946 F.Supp.2d 69, 85 (D.D.C. 2013).  Put simply, the FCA penalizes the presentation of a "false or fraudulent claim for payment" or the use of "a false record or statement material to a false or fraudulent claim[.]"  31 U.S.C. § 3729(a)(1).

Liability under the FCA does not arise unless falsity, scienter, and materiality are each established.  *See, e.g., United States ex rel. Folliard v. Govplace*, 930 F.Supp.2d 123, 127, 136 (D.D.C. 2013) (defendant was not liable under the FCA where the Government failed to establish scienter).  A contractor's actual compliance with the relevant regulations cannot constitute falsity under the FCA irrespective of whether the contractor could have exceeded the requirements.  *Luckey v. Baxter Healthcare Corp.,* 183 F.3d 730, 732 (7th Cir. 1999) ("Luckey could persuade the Food and Drug Administration to require more or different testing; but when a supplier complies with the existing regulations, it is entitled to represent to the government (and the world) that it has done so, without facing a claim of deception.").  The plaintiff "bears the burden of establishing that the claim or statement submitted to the Government was false." *United States ex rel. K & R Ltd. P'ship v. Massachusetts Hous. Fin. Agency*, 456 F.Supp.2d 46, 55 (D.D.C. 2006).  "In short, the claim must be a lie[.]"  *United States ex rel. Bettis v. Odebrecht Contractors of California, Inc.*, 297 F.Supp.2d 272, 277-78 (D.D.C. 2004) (citations omitted).

Under the FCA, a defendant acts "'knowingly' if he '(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts

in reckless disregard of the truth or falsity of the information.'" *United States ex rel. Siewick v. Jamieson Science and Eng'g, Inc*., 214 F.3d 1372, 1376 (D.C. Cir. 2000) (quoting 31 U.S.C. § 3729(b)). The scienter requirement ensures that "FCA liability attaches only for false or fraudulent claims and not for accidental or even negligent breaches of contract." *United States v. Sci. Applications Int'l Corp. ("SAIC II")*, 626 F.3d 1257, 1261 (D.C. Cir. 2010). While scienter can extend to "reckless disregard," the "best reading of the [False Claims] Act defines reckless disregard as an extension of gross negligence," in fact, as an "extreme form of gross negligence." *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997); *United States ex rel. Ervin & Associates, Inc. v. Hamilton Sec. Grp*., 298 F.Supp.2d 91, 100-01 (D.D.C. 2004). Where disputed legal issues arise from vague provisions or regulations, a contractor's decision to act on its interpretation cannot result in his filing a "knowingly" false claim. *See e.g., Jamieson Sci. & Eng'g, Inc.*, 214 F.3d at 1378 (recognizing policy perils of using the FCA as a means of federal contract enforcement). As such, "if the claimant has told the [government official] pertinent facts that would, in the absence of such disclosure, make a claim fraudulent, it seems that the claimant has not 'knowingly' presented a false claim". *United States ex rel. Totten v. Bombardier Corp*., 380 F.3d 488, 496 (D.C. Cir. 2004).

Finally, the FCA materiality prong requires the government "prove by a preponderance of the evidence that compliance with the legal requirement in question is material to the government's decision to pay." *SAIC II*, 626 F.3d at 1271. To that end, "a false statement is material if it has a natural tendency to influence agency action or is capable of influencing agency action." *United States ex rel. Fago v. M&T Mortgage. Corp.*, 518 F.Supp.2d 108, 118 (D.D.C. 2007) (quotation and other citation omitted).

-13-

**A.      The Complaint Fails To Satisfy Rule 8(A)'s Requirement To Allege Facts That State A Plausible Claim To Relief**

The Complaint alleges that Symantec's knowingly false statements induced Ms. Dixon to accept Symantec's offer.  This "fraud in the inducement" theory is intended to support the claims for relief in Counts II, III, IV, and VI, and is the underlying theory upon which the state claims are premised in Counts XII, XIII, XIV, XV, and XVI.  To satisfy Fed.R.Civ.P. 8(a), however, the Complaint must "state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at  678 (allegations are not plausible when there is an obvious alternative explanation); *Twombly*, 550 U.S. at 567 (allegations are not plausible when there is an "obvious alternative explanation"). The Complaint must plead facts that are "more than 'merely consistent with' a defendant's liability; 'the pleaded factual content must allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *United States ex rel. Head v. Kane Co*., 798 F.Supp.2d 193 (D.D.C. 2011) (quoting *Iqbal*, 556 U.S. at 663 (internal alterations omitted)). Factual allegations, although assumed to be true, must still "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

The Supreme Court adopted the "plausibility" requirement specifically to protect defendants from the costs of groundless claims.  *Id. at* 557–58 ("[S]omething beyond the mere possibility of loss causation must be alleged, lest a plaintiff with 'a largely groundless claim' be allowed to 'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).  Those protections are especially important for defendants faced with the potentially staggering costs of litigating FCA cases.  The unique procedures applicable to FCA cases can subject defendants to substantial document production costs and legal fees, even before litigation is filed.  Indeed, Symantec produced "hundreds of thousands of pages of documents,"

-14-

*see* Consent Motion For An Extension of Time to File Complaint in Intervention, Docket No. 30 at p. 2, even before the litigation was initiated.  It now faces the expense of protracted litigation, the cloud that hangs over a defendant accused of fraudulent conduct, and exposure to treble damages, per claim penalties of $5,000-$11,000 dollars, and liability for the relator's attorneys' fees.  The allegations that Symantec obtained the Contract by deceiving Ms. Dixon must be more plausible than the obvious alternative explanation; namely, that the Contract was the product of good faith—even if imperfect—negotiations between Ms. Dixon and Ms. Bradbury.

In *Iqbal* the Court distilled from the lengthy allegations, the "nub" of the respondent's complaint.  *Iqbal*, 556 U.S. at 679.  Here analysis of the Complaint's general allegations concerning the protracted contact negotiations reveals that the "nub" of the Government's complaint is that Symantec did not fully disclose the facts, nature, and benefits of one of its discounting programs, thus purportedly depriving the contracting officer of information that would have allowed her to obtain a more favorable contract.  The Complaint identifies information it contends was misrepresented or omitted during negotiations concerning the nature, benefits and frequency of its discounting programs, the effectiveness of its eSPA system, and the existence of rebates to its resellers; yet it does not offer a single factual allegation that Ms. Bradbury knowingly omitted or misrepresented any facts while engaged in the year-long negotiations or how the alleged false statements influenced Ms. Dixon's decision.  It is well recognized that "the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations.  The FCA is a fraud prevention statute; violations of [agency] regulations are not fraud unless the violator knowingly lies to the government about them." *United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1020 (7th Cir. 1999).  "[N]ot every false statement made to a government entity constitutes a 'false claim' under the Act."

*United States ex rel. Windsor v. DynCorp, Inc.*, 895 F.Supp. 844, 850 (E.D. Va. 1995). There is liability "only for fraudulent activity or claims that cause or would cause economic loss to the government." *United States ex rel. Thomas v. Siemens AG*, 991 F.Supp.2d 540, 569 (E.D. Pa. 2014) *aff'd*, (3d Cir. Nov. 25, 2014). Symantec can be liable for an omission only if it caused the Contracting Officer to accept Symantec's offer. *Id.*; *see also United States ex rel. Mikes v. Straus*, 274 F.3d 697, 695 (2d Cir. 2001) (finding the FCA "does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions.").

The Complaint's recitation of facts and events paints a portrait of the normal give and take of contract negotiations between the parties, where information is disclosed, questions are asked, and answers provided. Nowhere does the Complaint allege that Symantec failed to provide what was asked of it during the course of negotiations. As such, far from describing acts commensurate with an alleged fraudulent scheme, the more plausible interpretation is that Symantec's disclosure and negotiation efforts were made in good faith based on a reasonable understanding of the regulations and Ms. Dixon's questions and concerns.

**B. The Complaint Fails To Plausibly Connect Symantec's Alleged Misrepresentations And Omissions To The Contracting Officer's Decision To Accept Symantec's Offer**

In negotiating a "fair and reasonable" price, "the contracting officer is responsible for exercising the requisite judgment to reach a negotiated settlement with the offeror and is *solely responsible* for the final price agreement." 48 C.F.R. §15.405(a) (emphasis added). Additionally, the FAR reminds Contracting Officers to avoid becoming "preoccupied with any single element and [that they] should balance the contract type, cost, and profit or fee negotiated to achieve a total result—a price that is fair and reasonable to both the Government ***and the contractor***." *Id*. (emphasis added). Consequently, to plead that any omissions or

misrepresentations were material to the government, **the Complaint must allege they were material to Ms. Dixon, yet it fails to do so.**

In fact, the Complaint wholly ignores Ms. Dixon's regulatory obligation to make this fairness determination.  This is a fatal omission because the Contracting Officer must balance the interest of the Government *and the contractor* when determining whether a proposed contract pricing arrangement is fair and reasonable.  This reality supports the plausible conclusion that Ms. Dixon chose to accept an offer that did not constitute the best price.   Indeed, GSA Contracting Officers are specifically directed as follows:

> You may award a contract containing pricing which is less favorable than the best price the offeror extends to any commercial customer for similar purchases if you make a determination that both of the following conditions exist:
>
> > (1)   The prices offered to the Government are **fair and reasonable** even though comparable discounts were not negotiated;
> > (2)   Award is otherwise in the best interest of the Government.

48 C.F.R. §538.270(c)(7) (emphasis added). [3]

The disclosures provided by Symantec and recited in the Complaint provided sufficient information for Ms. Dixon to understand that Symantec offered different pricing programs, such as Express and Rewards, which had different eligibility requirements and different discounts. *See, e.g.*, Compl. ¶¶ 78-80.  Additionally, the Complaint admits that in response to Ms. Dixon's questions, Compl. ¶ 82, Ms. Bradbury advised her that the Company "provides non-standard-

---

[3]    The GSAM, found at 48 C.F.R. §538, *et seq.*, incorporates the General Services Administration Acquisition Regulation (GSAR) as well as internal agency acquisition policy. The GSAR contains agency acquisition policies and practices, contract clauses, solicitation provisions, and forms that control the relationship between GSA and contractors and prospective contractors.

competitive pricing discounts to strategic accounts by requiring commitments from the identified account for annual quantity purchases" and that non-standard pricing was offered to meet specific corporate objectives (*e.g.*, "To meet market competition or displace a named competitor at a customer site" and "New Market or market segment penetration"). Compl. ¶ 90. It is implausible that Ms. Dixon would seek, let alone insist upon, discounts equivalent to those offered to differently situated customers or that would adversely affect Symantec's ability to service its commercial customers. To do so would have been both unfair and unreasonable to Symantec, and thus inconsistent with the regulations and good contracting practices intended to entice contractors to perform well. It is instead more plausible that Ms. Dixon exercised her "sole authority" to select a pricing program that met the Government's objectives, *i.e.*, Express, and did not demand that Symantec offer the Government pricing inconsistent with its established commercial practices because to do so would have been contrary to established regulations and policies.

The facts alleged in the Complaint are consistent with a decision by Ms. Dixon that she found that Symantec's offer was fair to both parties—as any contract should be. Because the Complaint makes no allegations concerning how Ms. Dixon determined fairness to Symantec, it fails to allege how any omissions or purported misrepresentations were material to the decision she was required to make.

In order to reach her final award decision, a Contracting Officer is directed to consider a host of factors including the aggregate volume of anticipated purchases, any combination of discounts and concessions offered to commercial customers, and, importantly:

> Any other relevant information, including differences between the MAS solicitation and commercial terms and conditions that may

warrant differentials between the offer and the discounts offered to the most favored commercial customer(s).

48 C.F.R. §538.270(c)(7). Ms. Dixon had the authority to ask for whatever data she wanted or needed to make her determination, and she, in fact, requested significant additional information, which the Complaint concedes was provided. *See, e.g.*, Compl ¶¶ 82-84. With its buying programs already disclosed to the government, it is more plausible that the reason additional buying program information was not provided, *e.g.* further details regarding the Rewards Program, was for the simple reason that Ms. Dixon already had determined the program was not comparable to the Government's terms and conditions or the manner in which her customers purchased.

While the Complaint alleges that certain information is generally material to the government's determination, *see e.g.* Compl. ¶¶ 45-46, as noted above, it pleads around the only relevant question: what disclosures were material to Ms. Dixon's evaluation of Symantec's offer? Absent a single factual allegation that Symantec's alleged false statements influenced Ms. Dixon, the Complaint does nothing more than describe a hypothetical scenario. "[T]he FCA requires the plaintiff in a fraudulent inducement case to establish that the decision to award a contract was actually, not just potentially, based on a false statement." *Siemens AG*, 991 F.Supp.2d at 571; *see also Luckey* 183 F.3d at 732-33 (holding that if a claim is not "material to the United States' buying decision," it is not actionable under the FCA). As in *Iqbal*, the Complaint does not "nudge" its claims "across the line from conceivable to plausible." *Iqbal* 556 U.S. 680 at 570.

**C.    The Government's Knowledge That Symantec Intended To Offer Better Discounts To Commercial Customers Precludes A Claim That Symantec Lied**

-19-

The Contracting Officer's knowledge that Symantec intended to continue giving commercial customers better prices than it gave the Government negates any inference that Symantec's representations were knowingly false.  It is well-settled that a contractor "cannot be said to have knowingly presented a fraudulent or false claim" when "the government knows and approves of the particulars of [the] claim . . . before that claim is presented."  *United States ex. rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999).  "In such a case, the Government's knowledge effectively negates the fraud or falsity required by the FCA."  *Id.*  That is precisely what the Complaint alleges occurred.

The Complaint makes clear that when Ms. Dixon accepted Symantec's offer, she had received extensive information concerning Symantec's discounting programs and practices.  *See e.g.*, Compl. ¶ 61 (Symantec's CSPF submission with attachments), ¶¶ 63–69 (Symantec's disclosure of non-published discounts), ¶¶ 72–81  (Symantec's disclosure of new buying programs, including the Rewards Program), ¶¶ 82–87 (Symantec's supplementation of its disclosures).  Thus, she necessarily was or should have been aware that Symantec gave non-published discounts to commercial customers well beyond the 5% to 35% off of Government End User MSRP and the 5% to 10% off of Commercial MSRP offered to GSA in the FPR, ***including discounts of up to 100%***.  Further*,* the Rewards program upon which the Complaint relies to show violations of the PRC, as explained below, was exempted from the reach of the PRC.

Ms. Dixon also knew about the Rewards Program.  The Complaint admits the parties met in October 2006 to discuss Symantec's offer and disclosures, including the information about the Rewards Program.  *Id.* ¶ 83.  Yet nowhere in the Complaint does the Government allege that the Contracting Officer conveyed GSA's interest in pursuing the Rewards Program or requested any

additional information or clarification about that program.  Nor does the Complaint allege that Symantec proposed that its Government or GSA pricing be based off of the Rewards Program pricelist.  As such, the PRC relationship negotiated by the parties was not intended to include the discounts and prices associated with the Rewards Program and the Rewards Program was not intended to alter the "Government's price or discount relationship to the identified customer (or category of customers)."  48 C.F.R. § 552.238-75.  Accordingly, it is highly implausible, based on the facts in the Complaint, that GSA and Symantec agreed that the pricing offered to its Rewards Program customers was relevant to or intended to inform the parties' negotiated PRC pricing relationship or serve as a trigger to a price reduction.

In *United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 984 (D.C. Cir. 2008), the Court faced a claim that the defendant had fraudulently breached a statutory obligation.  Invoking the Jimi Hendrix lyric, "Is this love, baby, or is it … [just] confusion?" the Court framed the legal question as, "Is this fraud or is it, just confusion?"  *Id*. at 981.  The Court answered its own question: "[I]f the [defendant] has told the government official pertinent facts that would, in the absence of such disclosure, make a claim fraudulent, it seems that the claimant has not 'knowingly' presented a false claim."  *Id*. (citing. *Totten*, 380 F.3d at 496); *see also Siemens* AG, 991 F.Supp.2d at 583 (concluding as dispositive that the Government's advance knowledge of "higher discounts offered to commercial customers than were being offered to the Government" precluded defendant's purportedly false claims).  The Complaint admits Symantec disclosed to GSA that it gave some of its commercial customers greater discounts than those offered to the Government (through the Rewards Programs and other disclosed discounting policies and practices) and the parties understood that existence of these discounts constituted

valid exceptions not intended to trigger PRC price reductions; hence, no false claims have been adequately pled.

### D. The Government's Failure To Address The Contracting Officer's Price Negotiation Memorandum Further Renders The Complaint's Allegations Implausible

The implausibility of the Government's contention that Symantec's alleged misrepresentations or omissions influenced the Contracting Officer's decision is further revealed by the Government's failure to disclose that Ms. Dixon documented the basis for her award decision. Pursuant to regulation, Ms. Dixon memorialized her negotiation processes, goals, and findings in two memoranda, a Pre-Negotiation Memorandum ("PPNM") and a Price Negotiation Memorandum ("PNM"). These documents are required to describe, in pertinent part, "(1) the purpose of the negotiation … , (4) [t]he current status of any contractor systems (*e.g.*, purchasing, estimating, accounting, and compensation) to the extent they affected and were considered in the negotiation … , [and] (11) [d]ocumentation of fair and reasonable pricing." 48 C.F.R. § 15.406-3.

In her Pre-Negotiation Memorandum, Ms. Dixon confirms she was provided discount comparison information for a variety of Symantec customers "whom receive a discount which equals or exceeds the discount(s) offered to the Government under this solicitation" including: "Distributors," "Dealers/Resellers," "VAR/System Integ." and "Commercial End Users." *See* Pre-Negotiation Memorandum at p. 9, Attachment B.[4] Recognizing that Symantec was not

---

[4] The Court may consider "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F.Supp.2d 117, 119-20 (D.D.C. 2011) (citations and internal quotation marks omitted).

proposing to give the Government the best price, Ms. Dixon concludes that after her evaluation of the "offer and price analysis, the Government has determined that the prices offered ___are___ fair and reasonable."  *Id*. at p. 11 (emphasis in original).  The Pre-Negotiation Memorandum was approved on December 22, 2006.  *See* Price Negotiation Memorandum at p. 2, Attachment C. Ms. Dixon's finding that Symantec's offered prices and discounts were "fair and reasonable" was again memorialized at the completion of Contract negotiation and just before Contract award in Ms. Dixon's Price Negotiation Memorandum ("PNM").  *See* Price Negotiation Memorandum, Attachment C, dated January 23, 2007.  Notably, as reflected in the PNM, Ms. Dixon did not rely on any type of discount arrangement such as "quantity or aggregate discounts" in her evaluation of pricing evidencing that any such information was not relevant to her determination.  *Id.* at p. 4.

Ms. Dixon's decision and the basis therefor are critical to the Government's claims that Symantec misrepresented its MSRP, discount frequency, and pricing control measures, and failed to disclose its rebates and the discounts possible under the disclosed buying programs. The specific reasoning in Ms. Dixon's memoranda casts serious doubt on the plausibility that any alleged misrepresentations and omissions in the Complaint influenced or infected her ultimate decision.  As reflected in the memoranda, it is equally plausible that, true or not, those representations were irrelevant to her evaluation.  For example, the Complaint alleges that, part and parcel to its "wrongful scheme," Symantec failed to disclose "its extensive rebates to commercial customers."  Compl.  ¶  7.  The Complaint notes that, pursuant to 48 C.F.R. § 552.212-70(a), the "rebates" to which it refers are those that may be viewed as a "discount" that should have been included in its CSP disclosures.  If, as the Complaint alleges,

-23-

they were not disclosed, their absence from the negotiations is not identified in the PNM.  If they were questioned and misrepresentations were made, that is not alleged in the Complaint.

Finally, the Complaint fails to plead that rebates were material to Ms. Dixon's decision that the prices negotiated were fair and reasonable.  As a case in point regarding the alleged omissions, the Complaint simply fails to plead facts that would constitute the necessary causal link between the alleged rebate omission and economic harm to the Government.  While the Government need not prove its claims at the pleadings stage, the failure to allege a causal link between Symantec's alleged misrepresentations and Ms. Dixon's detailed evaluation and award decision renders the allegations speculative at best.

The plausibility requirement is intended to protect defendants from complainants that do precisely what the Government has done here, cherry-pick facts to support an otherwise implausible claim.  The Government should not be permitted to open the door to expensive, protracted, and burdensome litigation based on allegations that ignore indisputable facts contrary to the Government's contentions.  As the Supreme Court has stated, "[i]t is very well to say that those who deal with the Government should turn square corners.  But there is no reason why the square corners should constitute a one-way street."  *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 387-388 (1947).  Accordingly, Counts II, III, IV, VI, XII, XIII, XIV, XV, and XVI must be dismissed.

When viewed in its entirety, the crux of the Complaint's reasoning exemplifies flawed *post hoc ergo prompter hoc* reasoning; "after this therefore because of this." The Government has done no more than review the Contract negotiations and used results-oriented hindsight to point out statements that could have been made differently.

**II.    The Complaint Also Fails To Meet The Heightened Pleading
        Requirement Of Rule 9(B)**

Fed.R.Civ.P. 9(b) additionally requires that complaints alleging FCA claims "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). In order to satisfy Rule 9(b), the Government is required to "set out the details of the specific scheme, supply the time, place, and content of false representations, and link that scheme to claims for payment." *Bender*, 750 F.Supp.2d at 6. "[T]he purpose[s] of 9(b) as read in conjunction with Rule 8" are to ensure the complaint "is specific enough to allow [defendants] to prepare [their] defense." *United States ex rel. Pogue v. Diabetes Treatment Centers of Am., Inc.*, 238 F.Supp.2d 258, 270 (D.D.C. 2002). Thus, Rule 8(a) and 9(b) together require that the allegations that a defendant has violated the FCA must be both plausible and specific.

Apart from the Complaint's failure to plead a plausible claim, the Complaint's allegations fail to plead specifically the elements of the alleged fraud. The Complaint fails in the "details concerning the dates of the claims, the content of the forms or bills submitted, … the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices …." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp*., 360 F.3d 220, 233 (1st Cir. 2004). Courts in this Circuit have held that even claims that are "'disallowed' by the contract" are not necessarily false because "[t]he FCA 'surely cannot be construed to include a run-of-the-mill breach of contract action that is devoid of any objective falsehood.'" *United States v. Kellogg Brown & Root Servs., Inc.,* 800 F.Supp.2d 143, 155 (D.D.C. 2011) (quoting *Wilson*, 525 F.3d at 378)). Merely identifying specific sales to the Government without explaining what makes those claims "false," and without knowing why a representation is alleged to be false, does not allow Symantec to defend itself against FCA allegations. *United States ex rel. Williams v. Martin-Baker Aircraft*

*Co.,* 389 F.3d 1251, 1256 (D.C. Cir. 2004) (emphasizing the heightened pleading standard serves the purpose of "guarantee[ing] all defendants sufficient information to allow for preparation of a response" (citation omitted)).

### A.   The Allegations Do Not Permit An Inference That Symantec's CSP Disclosures Were Knowingly False

The Complaint alleges that Symantec's CSP disclosures were knowingly false with respect to its MSRP and its discount frequency.   With respect to MSRP, the Complaint alleges that, "[u]nbeknownst to GSA at the time, Symantec used its Express program pricelist to generate its 'Commercial MSRP,' instead of basing that MSRP on prices offered to all customers in its 'commercial class of customers,' which category became the Basis for Award for the Contract."  Compl. ¶ 88.  With respect to discounting frequency, the Complaint alleges that the GSA did not understand how Symantec compiled the information included in its Frequency Chart and that, had Symantec compiled the information differently, the information would have been different.  *See* Compl. ¶¶ 101-112.  The Complaint then baldly alleges, "Symantec knew that the above representations were false or recklessly disregarded the truth or falsity of them," Compl. ¶ 104, but offers no factual support or allegation thereof.  These "legal conclusions cast in the form of factual allegations" satisfy neither Rule 8(a) nor 9(b).  *City of Harper Woods v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009).

Not only were these disclosures accurate, but the Government fails to support its claims that Symantec lied with specific facts that contrast Symantec's knowledge with Symantec's statements.  What alleged facts contradict Symantec's disclosures?  What did Ms. Bradbury know that demonstrates she knew her statements to be false?  What question(s) did Ms. Dixon ask that Ms. Bradbury either failed to answer or answered untruthfully?  What information did Symantec withhold that it was specifically required by regulation to disclose?  The Complaint

fails to contrast Symantec's disclosures with contemporaneous, contrary knowledge or legal obligations.

These allegations fall far short of the specificity required by Rule 9(b). First, a disclosure to the government that satisfies the regulatory obligations and responds to the contracting officer's requests is persuasive evidence that the contractor did not make a knowing misrepresentation. *X Corp. v. Doe*, 816 F.Supp. 1086, 1093-94 (E.D. Va. 1993) (finding no knowing misrepresentation where contractor disclosed to the government that it was supplying equipment that may contain remanufactured components and demonstrated that contractor made "conscientious and concerted efforts to ensure compliance with the FAR's [sic]".). Symantec disclosed to the government that it would continue to offer higher discounts to certain commercial customers than it was offering the government—up to and including 100%. Symantec made extensive disclosures concerning its discounts from MSRP, use of the Express Program pricelist, and the frequency with which it offered various levels of discounts. The Complaint alleges no facts in support of its conclusory allegation that Symantec's disclosures were contrary to law or regulation, intentionally deceptive, or objectively "unreasonable." *See United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983-84 (D.C. Cir. 2008) (finding a defendant's reasonable interpretation of its legal obligation precludes a finding that the defendant had knowledge of its falsity). The allegations are based on no more than the Government's "alternative explanation" based on its retrospective characterization of events and are neither plausible as Rule 8(a) demands nor specific as Rule 9(b) requires.

**B.      The Complaint Fails To Sufficiently Plead That Symantec's Representations Concerning Its eSPA System Were Knowingly False Or Material To The Contract Award**

The Complaint fails to allege specific facts that would permit an inference that Symantec knowingly misrepresented the use of its eSPA/SFDC system (systems that tracked proposed discounts and approvals) or that any such disclosures were material to Ms. Dixon's determination that Symantec's offer was "fair and reasonable."    The Government contends Symantec's disclosures of eSPA were "false" because Symantec represented that "*all* non-published discounts went through an approval system then named eSPA,"  Compl. ¶¶ 97-98 (emphasis added).   Directly contradicting this allegation, however, the Complaint reflects that what Symantec actually disclosed was that "[a]ny deviations from published discounts *require management approval*."   *Id.* ¶ 90   (emphasis added).   Nowhere does the Complaint cite to facts that Symantec represented that "all non-published discount" approval requests went exclusively and only through eSPA or that eSPA was the only manner by which Symantec sales staff received approval in 2005/2006.   The allegations that Symantec misrepresented the role of its eSPA system appear at best to be based on an alleged misunderstanding or mischaracterization of Symantec's representations.

Even if the Complaint did sufficiently plead that Symantec misrepresented its eSPA system, the allegations fail to satisfy the FCA's materiality elements.   The FAR expressly excludes contracts for the purchase of "commercial items" from needing an internal control system.  48 C.F.R. § 52.203-13 ("[t]his [internal control system] paragraph does not apply … for the acquisition of commercial items …"); *see also* FAS Instructional Letter 2009-06, dated August 8, 2009 ("Schedule contractors are not required to comply with this [internal control system] requirement.").   Absent any such legal obligation, any purported deficiencies regarding

its eSPA system do not establish materiality for FCA liability. *See United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251 (D.C. Cir 2004) (finding FCA claims insufficient under Rule 9(b) when alleging that defendant had 'misrepresented' facts by failing to disclose information that was not required by case or regulation). Further, in the absence of any regulatory requirement to maintain a system such as eSPA, it is unlikely that Symantec's offer would have been rejected based on the performance or even the absence of such system. If the performance of this system was a material consideration for Ms. Dixon, it is likely she would have asked questions about it. Yet, the Complaint does not allege a single related question the Contracting Officer raised. It also is likely that if it were material, as described in Section I.(D), *infra*, it would have been documented in her PPNM or PNM as one of the "contractor systems (*e.g.*, purchasing, estimating, accounting, and compensation) … considered in the negotiation." 48 C.F.R. § 15.406-3(a)(4). No such statement was included. *See* Attachment B and C (PPNM and PNM).

In fact, to the extent eSPA, or its later iteration SFDC, bears any relevance to the issues raised in the Complaint, they simply reflect Symantec's good faith effort to ensure PRC and discount discipline were maintained. The very presence of the systems and the Government's recognition that such systems were being used – regardless of the Government's *post-hoc* view of the systems' relative effectiveness – serve to negate the Government's allegations that Symantec knowingly attempted to defraud the Government. If Symantec failed to achieve perfection in its compliance efforts, that by no measure satisfies the level of intent required to prove an FCA claim. *United States v. Hamilton Secs. Grp*., 298 F.Supp.2d 91, 101 (D.D.C. 2004) (finding that reckless disregard "requires much more than errors, even egregious errors.").

**III.    The Complaint Fails To Allege Specifically That Symantec Knowingly Submitted False Claims In Violation Of The Price Reduction Clause**

Count I of the Complaint alleges that Symantec knowingly made repeated false claims premised on its PRC compliance, and overcharged the Government each time it made a claim for payment under the Contract. *See* Compl. ¶¶ 248–55. These allegations are based, however, on a mischaracterization of Symantec's PRC obligations. Additionally, the GSA's knowledge that Symantec intended to give more favorable discounts to certain commercial customers contradicts its claim that Symantec practices violated the FCA.

The PRC is designed to ensure the maintenance of the pricing structure and relationship negotiated by the GSA and the vendor prior to contract award. To that end, the PRC requires the vendor and Contracting Officer to agree upon (1) the Basis of Award customer or category of customers; ***and*** (2) the Government's price or discount ***relationship*** to the identified customer or category of customers. In accordance with the PRC, a "price reduction" is defined as "[a]ny change in the Contractor's commercial pricing or discount arrangement applicable to the identified customer (or category of customers) which disturbs this ***relationship***[.]" 48 C.F.R. § 552.238-75(a) (emphasis added). The PRC identifies three triggering events for a price reduction:

> (c)(1) A price reduction shall apply to purchases under this contract if, after the date negotiations conclude, the Contractor –
>
> > (i) Revises the commercial catalog, pricelist, schedule or other document upon which contract award was predicated to reduce prices;
> >
> > (ii) Grants more favorable discounts or terms and conditions than those contained in the commercial catalog, pricelist, schedule or other documents upon which contract award was predicated; or
> >
> > (iii) Grants special discounts to the customer (or category of customers) that formed the basis of award, and the

> change disturbs the price/discount relationship of the Government to the customer for category of customer that was the basis of award.

*Id.*

For PRC purposes, the parties identified Symantec's "commercial class of customers" as the Basis of Award customer. On that basis, the Government alleges that "[i]f Symantec favorably changed the prices and discounts offered to commercial customers, Symantec was similarly obligated to adjust its GSA prices." Compl. ¶ 130. The Complaint further alleges "if Symantec changed favorably its commercial sales and discounting practices disclosed to GSA during negotiations, it was obligated to similarly provide GSA the benefit of that favorable change." *Id.* Put differently, under the Government's reading of the PRC, *any favorable change* to the prices/discounts offered to *any commercial customer* and/or any favorable change to Symantec's commercial sales practice as disclosed to GSA triggered a price reduction. This reading is incompatible with the plain language of the regulations read a whole.

It is settled that, "statutes or regulations are to be read as a whole, with each part or section … construed in connection with every other part or section." *Gonzalez-Vera v. Townley*, 597 F.Supp.2d 98, 101 (D.D.C. 2009) (citing *American Federation of Government Employees, Local 2782 v. Federal Labor Relations Authority,* 803 F.2d 737, 740 (D.C. Cir. 1986)) (internal quotation omitted). The Government's construction of the PRC, however, focuses only on whether lower prices were offered to commercial customers and ignores that Symantec disclosed that it would offer lower prices to commercial customers. Hence, the Government's claim ignores (1) the regulatory requirement that the parties also agree to the price or discount *relationship* to the identified customer (or category of customers) and (2) that Symantec was obligated to report only those price and discount changes that altered that *relationship*.

-31-

In order to allege an FCA violation based on a failure to comply with underlying regulatory requirements, the Government must allege facts showing that Symantec's actions were (1) inconsistent with the GSA contract interpretation that the Court deems "correct," and also (2) inconsistent with Symantec's reasonable interpretation of its GSA contract obligations. In fact, in an FCA case, the Government is required to go beyond the pleading required in a simple contract dispute. It must actually allege facts showing that Symantec negotiated and/or performed its contractual obligations in a manner that is inconsistent with any objectively reasonable interpretation of the applicable contract requirements and did so with the requisite scienter. *See United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 984 (D.C. Cir. 2008); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) ("imprecise statements or differences growing out of a disputed legal question are similarly not false under the FCA").

Even if the Government's interpretation were correct, which it clearly is not, Symantec is liable only if its interpretation is also objectively incorrect. As the Supreme Court has observed:

> Where, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator.

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007). Symantec's interpretation is objectively reasonable because it considers the whole clause and the plain language of the PRC, including that the relationship between what was disclosed and negotiated versus what occurred must actually change before an updated disclosure or price reduction is required. Even if this interpretation is debatable, Symantec's actions in relation to that interpretations are not objectively false and thus cannot satisfy the FCA's falsity element.

**IV.    The Government Fails To Allege Fraudulent Claims For Payment With The Required Specificity**

The Complaint describes only a handful of transactions it characterizes as false, out of a mountain of claims submitted by Symantec pursuant to the Contract, and fails to sufficiently allege what makes the claims false and who was involved in the submission of false claims to the Government.

It is well established that, to survive dismissal, an FCA complaint must identify individuals allegedly involved in the fraud. *United States v. Science Applications International Corp. ("SAIC I"),* 555 F.Supp.2d 40, 48 (D.D.C. 2008); *United States ex rel. Digital Healthcare, Inc. v. Affiliated Computer Servs., Inc.,* 778 F.Supp.2d 37, 53 (D.D.C. 2011) (dismissing complaint under Rule 9(b) based on relator's failure to identify anyone engaged in the fraud or a single false claim).  In fact, in *Martin-Baker Aircraft Co.,* the D.C. Circuit held that it was not sufficient for a complaint to refer generally to "management" and provide a list of names without explaining the role individual defendants played in the alleged fraud.  389 F.3d 1251, 1257 (D.C. Cir. 2004).

This central deficiency is particularly problematic in light of the D.C. Circuit's rejection of the "collective knowledge" theory of scienter.  *SAIC II,* 626 F.3d at 1277.  To state an FCA claim, the plaintiff's pleading must specify which individuals knowingly submitted false claims to the Government. *See, e.g., Bender,   v. N. Am. Telecommc'ns, Inc.,* 686 F.Supp.2d 46, 54 (D.D.C. 2010) ("scattered" "references" to defendants "are insufficient to state a claim under the FCA"); *Elemary v. Holzmann,* 533 F.Supp.2d 116, 137 (D.D.C. 2008) ("Conclusory allegations that a defendant's actions were fraudulent or deceptive do not satisfy Rule 9(b).") (citation omitted).

-33-

In this regard the Complaint alleges that "**Symantec** implicitly certified its compliance with the PRC each time it made a claim for payment under the Contract because compliance with the PRC is a core and material term of MAS contracts."  Compl. ¶ 131.  However, the Complaint is devoid of any specifics regarding the individuals that allegedly submitted knowingly false claims to the Government, including their identity, how they falsified the claims, and what their state of mind was at the time of the submission of the claim.  Because the Government has failed to identify the individuals who purportedly knew that Symantec was in violation of the PRC yet nevertheless submitted claims for payment to the Government with the requisite intent to defraud, it has failed to allege with sufficient specificity that Symantec submitted fraudulent claims for payment under this theory of liability.

Additionally, as evidence of the purported PRC violations, in Paragraphs 135 and 144 of the Complaint, the Government offers a laundry list of (1) Express Band S sales at pricing below the GSA Band price for the same items; and (2) Rewards Band E sales at prices below the GSA prices for the same items, which it claims were unreported in eSPA (or SFDC), yet were required to be reported for PRC purposes.  Compl. ¶¶ 135, 144.  Even disregarding the inapplicability of the Rewards Program to the PRC relationship, *see* Section III.B, *infra*, the Complaint fails to identify the products, the purchase price, the purchase volume, whether the products were available on schedule, whether the clause was triggered when the same product was purchased by a GSA customer, and the actual discount received for the products purchased.  Absent such rudimentary specificity, the Complaint's snapshot of cherry-picked commercial sales fails to provide Symantec sufficient detail in assessing what was knowingly and materially false about these sales or how these sales affected the agreed upon pricing relationship under the PRC.

The commercial sales identified as reflecting PRC violations suffer from the same pleading deficiencies.  The Complaint identifies nine claims that allegedly violated the PRC because "prior to each of these claims Symantec offered these same categories of products to commercial customers at prices more favorable than those disclosed by Symantec to the Government while failing to report and offer the same prices to the Government." Compl. ¶¶ 134 a-i.  The Complaint does not allege, however, that these purchases by the Government were made under Symantec's GSA Contract at issue.  Rather, it alleges they were made under the GSA Contract "or other contractual arrangements based on the terms of the Contract." *Id.* ¶ 134.  The Complaint does not allege any specific "other contractual arrangement" or even to which of the myriad contract "terms" the Government is referring.

Even assuming these other agreements and arrangements were "based on the terms of the Contract," the Complaint does not allege the terms were identical or that they were under the GSA Contract.  Those other arrangements could well have had different or additional provisions that would not trigger a price reduction.  The PRC, for example, applies only to orders issued under the GSA Schedule, and, thus, identifying the contract pursuant to which the sale was made is necessary.  This is essential because the Government does not and cannot allege that the prices negotiated between Symantec and GSA extended to contracts that were independently negotiated between Symantec and other government agencies.  There is also no allegation that any of these orders were priced in excess of the applicable price as prescribed by the GSA Contract.

Finally, although the purpose of a GSA contract is to facilitate acquisition of commercial items, the government is not foreclosed from purchasing commercial items under other, non-GSA schedule contract vehicles.  Obviously, these purchases would be independent of the price negotiation undertaken by the vendor and the GSA and not subject to the pricing conditions

afforded GSA sales.   Therefore, for multiple reasons, the Government has failed to provide sufficient particularity to allege what rendered the specifically identified transactions false.  *See, e.g., United States ex rel. Folliard v. CDW Tech. Servs., Inc.,* 722 F.Supp.2d 20, 36 (D.D.C. 2010) (dismissing claim based on failure to sufficiently identify government sales affected by the alleged fraud).

## V.   The Complaint Fails To Allege With Particularity That The Modifications Submitted During Contract Performance Were Objectively False Or Material

The Government asserts that, because Symantec failed to adequately disclose its sales practices during negotiations, and these practices changed after award, its later statements on contract modifications that "'[t]he commercial discounting policies and procedures disclosed by Symantec under the awarded contract dated January 25, 2007 have not changed'" are false statements.  Compl. ¶¶ 181-185.  This theory fails to plead an FCA claim with particularity.

Even if Symantec had, in fact, offered greater discounts than those disclosed in its CSP, the Government does not explain how that would render the contract modification language above objectively false.  The Government's theory relies on a reading of the above language as referring to actual discount figures.  But that is not what the plain language says.  The statement refers explicitly to the "policies and practices" described in the CSPs, not to specific disclosed discounts.  For example, Symantec's CSP includes a disclosure that Symantec's practices included offering non-published discounts up to 100%.  *See* Attachment A, CSP Disclosures. There is no assertion that these practices changed during the life of the Contract.  The language meant that Symantec's "policies and practices" related to commercial discounts had not changed from those originally disclosed.  Because there is no allegation that Symantec failed to comply with an objectively reasonable interpretation of the statement's language, the Government has not properly plead either the falsity or scienter elements of an FCA claim.  *See, e.g., Wilson*, 525

F.3d at 376; *Mass. Hous. Fin. Agency*, 530 F.3d at 984 (holding FCA plaintiffs cannot establish scienter where defendants' interpretation of ambiguous contract language was plausible).

Similarly, the Complaint fails to recognize that the frequency of the disclosed discounts, which may have varied over time with the market, *see, e.g.,* Compl. ¶¶ 64, 97, is distinct from the "policies and procedures" disclosed in Symantec's CSP.  The Complaint does not allege that any of these "policies and procedures" materially changed over the course of contract performance.  Absent specifics, the Complaint is relegated to nondescript qualifiers such as "material aspects" or "inaccurate" to describe the basis from which the changes were purportedly to be measured.  Where "FCA liability is to be premised on an implied false certification of compliance with [a] contractual term, the term must be clear and unambiguous." *United States v. DRC, Inc.,* 856 F.Supp.2d 159, 170 (D.D.C. 2012) (emphasis added).  In the absence of such an express contractual term, materiality "must rest" on facts showing that "'both parties to the contract understood that payment was conditional on compliance with the requirement at issue.'" *Id.* at ¶ 167, 171 (quoting *SAIC II*, 626 F.3d at 1271); *see also United States v. Toyobo Co.*, 811 F.Supp.2d 37, 46 (D.D.C. 2011) (dismissing the FCA claim where "complaint does not allege facts that support an inference that either the government or [defendant] understood to be a condition of payment the requirement that [product at issue] satisfy a five-year warranty").  The Government makes no such allegations in its Complaint.

Finally, as explained in Section I.C, *infra*, the Government's knowledge that Symantec did not intend to match the discounts it provided certain commercial customers negates potential liability premised on making a knowingly false statement because such statements could not have been material.

**VI.      The Complaint's Allegations Do Not Plausibly Allege A Reverse False Claim**

The "reverse false claims" provision of the FCA imposes liability on a defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).  Count V of the Complaint alleges in conclusory fashion that unnamed "Symantec executives became increasingly aware of the material false claims Symantec had made under the contract" and thus "knowingly concealed and improperly avoided obligations to pay or transmit to the government" the alleged overpayments.  Compl. ¶ 281-283.  This description fails to provide any detail as to the who, what, or when of the potential false claims Symantec allegedly submitted, let alone the executives who were specifically aware that false claims had been submitted.  Absent those specifics, to the extent the Government believes the alleged PRC violations oblige Symantec "to pay or transmit money," without more detail as to the alleged violations, the Government pleads nothing more than "an unassessed potential penalty."  The D.C. Circuit has twice held that "an unassessed potential penalty for regulatory noncompliance does not constitute an obligation that gives rise to a viable FCA claim."  *United States v. Am. Nat'l Red Cross* (*Hoyte ex rel. United States*), 518 F.3d 61, 67 (D.C. Cir. 2008) (citing *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 744 (D.C. Cir. 1998)); *see also United States ex rel. Vigil v. Nelnet, Inc.,* 639 F.3d 791, 801 (8th Cir. 2011) (holding that potential or contingent obligation to pay the government fines or penalties which have not been levied or assessed does not give rise to a reverse false claim); *accord United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 657 (5th Cir. 2004).  Count V relies on bare conclusions that cannot survive scrutiny and it accordingly must

be dismissed.  *See, e.g., United States ex rel. Piacentile v. Sanofi Synthelabo, Inc.*, No. 05-2927, 2010 WL 5466043, at *9 (D.N.J. Dec. 30, 2010) (dismissing reverse false claim count where the relator did "not allege any existing obligation on the part of the defendants").

## VII.   The State Claims Must Be Dismissed Under Rules 8(a) And 9(b)

The claims against Symantec set forth by California, Florida, and on behalf of New York, like those related to Symantec resellers, are derivative of the alleged false statements and false claims under the GSA Schedule Contract.  Insofar as the Complaint fails to adequately present claims under the federal FCA, the derivative state and reseller-based claims also necessarily fail to survive this motion to dismiss.  Additionally, the state claims are independently insufficient to survive a motion to dismiss.

### A.    California

#### 1.    California's Claims Fail Under FRCP 12(b)(6)

To the extent that California's claims relate to Software License Program Contracts ("SLP Contracts") between California and third-party resellers, California alleges that, beginning at least as early as December 2009, Symantec submitted an SLP Letter of Offer to California that ultimately caused California to award SLP Contracts to a number of resellers.  Compl. ¶¶ 223-24.  According to the Complaint, the SLP contracts "mirrored the prices in Symantec's Federal Contract … which expressly relied on Symantec's false CSPs," thereby denying California the best available price.  Compl. ¶ 225.  The SLP Letter of Offer on which California relies, however, makes no mention of the GSA Contract and expressly provides that the "State shall be responsible for independently negotiating the final purchase price and payment terms with its Authorized Resellers."  *See* Attachment D (SLP Offer).  Under the plain language of the SLP letter, California's SLP was not derivative of the GSA contract or any pricing agreement from

Symantec.  Consequently, the allegations in counts X and XI fail to state a claim upon which relief can be granted.

With respect to its California Multiple Award Schedule contracts ("CMAS contracts"), California had an independent opportunity to seek a better price than those provided under the GSA MAS Contract.  According to the Complaint, after Symantec authorizes certain resellers to make offers and an initial agreement is established, "agencies may attempt to receive a lower price by soliciting three bids for products available under a CMAS contract."  Compl. ¶ 208. The Complaint suggests that "as a practical matter" CMAS prices "match the GSA Schedule pricing," but California does not state that it did, in fact, rely on the GSA Schedule pricing or communicated to Symantec that it intended to do so.  Furthermore, even had California relied on GSA Schedule pricing, as there was no direct contract between California and Symantec, there can be no allegation that Symantec knew that California would rely or even suspected that it would rely on the price Symantec offered to GSA.  In reaching its purchasing decisions, California either received pricing it found to be the most reasonable or the State failed to avail itself of the opportunity to seek better pricing; thus, in either scenario, the State cannot claim harm based on the actions of Symantec.

Based entirely on communications regarding would-be resellers with whom the State was expected subsequently to negotiate pricing, California concludes that Symantec violated some undefined legal obligation – essentially basing its claim on an unsupported "fraud in the ether" theory of liability.  These "mere conclusory statements of misconduct are not enough to make out a cause of action against a defendant."  *Twombly*, 550 U.S. at 555.

1.    California's Claims Fail Under FRCP 9(b)

As discussed above, the Complaint alleges that the extent of Symantec's involvement in the submission of allegedly fraudulent claims to California was that the Company authorized certain resellers to do business with the State.  The Complaint does not, however, include an allegation that Symantec schemed with its resellers to win state contracts, nor does it include any allegation of an affirmative act by Symantec that led to California's acceptance and execution of contracts with resellers; indeed, Symantec made no representations nor submitted any claims to California beyond the aforementioned offer letter that specifically disavowed any intent to negotiate a price with the State.

Under Rule 9(b), a plaintiff's allegations of causation should be read under "a standard that strikes the appropriate balance between shielding from liability parties who merely fail to prevent the fraudulent acts of others, and ensuring that liability attaches for 'affirmative acts' that do cause or assist the presentation of a fraudulent claim."  *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 715 (10th Cir. 2006).  Given the chasms that must be leapt between Symantec's authorization letter, the resellers' submissions of allegedly false claims, and California's eventual decision to rely on them independent of their own required due diligence, any attenuated linkage in Counts X and XI fails to meet the specificity requirements of Rule 9(b).

**B.    Florida's Allegations Fail To Plead The Elements As To False Claims Or False Statements**

Based on the facts alleged, Florida fails to state a claim upon which relief can be granted and, therefore, the State's counts (counts XII and XIII) should be dismissed under Rule 12(b)(6).  The State Purchasing Memorandum "pursuant to" which Florida claims to have placed orders from Symantec is an administrative memorandum from the Florida Division of State Purchasing

to the relevant state agencies regarding "use of cooperative agreements, particularly for purchases of information technology," and includes information on GSA Schedule 70 purchases. Compl. ¶ 241; *See also* Attachment E, FL State Purchasing Memorandum.  This internal state document does not mention Symantec, does not reference even a hint of a legal obligation established between Florida and any company – let alone Symantec – and is not plead as having legal effect.   By merely asserting that Symantec violated some unidentified best practice by providing, among other things, unidentified "bills and GSA pricing information" to Florida, the State fails to plead "factual content that allows the court to draw the reasonable inference that [Symantec] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  In other words, Florida fails to provide "more than an unadorned, the defendant-unlawfully-harmed-me accusation" and its claims should be dismissed under Rule 12(b)(6).  *Id.*

## C.   New York' Allegations Fail To Plead The Elements As To False Claims Or False Statements

The allegations raised on behalf of New York make no mention of the GSA Contract, and instead rely on an New York Contract, under which the State "received a 22.5% discount on software and a 5.5.% discount on consulting, training, support, and maintenance." Compl. ¶ 243. The NY Allegations subsequently claim that "[d]uring the life of the NY Contract, Veritas and Symantec routinely offered deeper discounts to commercial customers who placed orders comparable to New York's." Compl. ¶ 247.  Despite this "routine" practice, however, Relator does not point to a single specific purchase that even allegedly could have been overpriced or is related to the GSA negotiations or contract at issue in its Complaint.  Given that Relator gives no indication as to which orders, if any, may have been overpriced, Symantec's only option is to simply "just deny that they have done anything wrong." *Toyobo*, 811 F.Supp.2d at 44 (internal citations omitted).  The Complaint provides no indicia as to where Symantec should look to find

further information on these "routine" sales.  Put another way, Symantec does not have the "time, place, and content of the false representations" and thus has no opportunity to "defend against the charge."  *Id*.  Therefore, Relator fails to meet the requirements of Rule 9(b) for Counts XIV, XV and XVI.

## VIII.   The Complaint's Negligent Misrepresentation And Breach Of Contract Claims Are Not Properly Before This Court

To the extent Counts I-IV are dismissed, the negligent misrepresentation claim (Count VI) and the breach of contract claim (Count VII) should be dismissed because, under the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101 *et seq.*, this Court does not have jurisdiction over breach of contract claims arising from a government contract.  Here, there is no question that the CDA applies to claims arising from Symantec's GSA Contract. *See* 41 U.S.C. § 7102(a) (the CDA applies to disputes arising from contracts "made by an executive agency … for procurement of services"); *see also* 48 C.F.R. § 52.233-1 ("This contract is subject to 41 U.S.C. chapter 71, Contract Disputes.").  Besides, "Congress crafted the FCA to deal with fraud, not ordinary contractual disputes." *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co*., 612 F.3d 724, 726 (4th Cir. 2010).

The CDA contains an exception to the mandatory jurisdiction provisions for contract actions "involving fraud." 41 U.S.C. § 7103(a)(4)(B); *see United States v. Marovic*, 69 F.Supp.2d 1190, 1193 (N.D. Cal. 1999), *aff'd sub nom.*, *United States v. Reagan*, 242 F.3d 385 (9th Cir. 2000).  But, as set forth above, the Government's allegations do not set out a cognizable FCA claim, and accordingly the negligent misrepresentation and breach of contract claims are devoid of any allegation of fraud.  Any breach of contract action the Government wishes to pursue should be filed in the Civilian Board of Contract Appeals or the Court of Federal Claims, which routinely adjudicate disputes related to GSA Schedule Contract provisions.  *See, e.g.,*

*Wynne v. United Techs. Corp.*, 463 F.3d 1261, 1262 (Fed. Cir. 2006) (affirming dismissal of defective pricing claims).

## IX.  The Payment By Mistake And Unjust Enrichment Claims Fail Under Rule 12(B)(6)

Contrary to clear precedent, the Government pleads claims for payment by mistake and unjust enrichment under Counts VIII and IX, while simultaneously acknowledging that there is an express contract covering the dispute.  Courts in this Circuit have repeatedly held that a plaintiff's allegations of the existence of an express contract require dismissal of quasi-contract claims such as payment by mistake and unjust enrichment.  *See, e.g., United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co.*, 81 F.3d 240, 247 (D.C. Cir. 1996) ("[A] claim of unjust enrichment rests on quasi-contract and is available only in the absence of a contract, either actual or implied in fact ….."); *United States v. First Choice Armor & Equip., Inc.*, 808 F.Supp.2d 68, 77-78 (D.D.C. 2011) ("Allegations in a complaint that an express contract existed between the parties, therefore, preclude a plaintiff from proceeding on alternative theories of FCA liability and unjust enrichment or payment by mistake" (citing *United States ex rel. Purcell v. MWI Corp.*, 254 F.Supp.2d 69, 79 (D.D.C. 2003)); *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F.Supp.2d 143, 160 (D.D.C. 2011) ("Here, the unjust enrichment and payment by mistake claims must be supported by, at the very least, an allegation that there is no valid contract.").

After predicating the entirety of its case on an express contract between Symantec and the GSA, the Government chooses to incorporate its contract-related allegations into its claims of unjust enrichment and payment by mistake.  *See* Compl. ¶¶ 298, 301 ("The United States incorporates by reference the allegations set forth in Paragraphs 1 to 197 above as if fully set forth herein.").  According to Paragraph 5 of the Complaint: "Symantec knowingly submitted

false statements to the General Services Administration ("GSA") and made false claims to the Government in connection with the negotiation and performance of its Multiple Award Schedule ("MAS") Contract with GSA, No. GS-35F-0240T (the 'Contract'), which lasted from January 2007 to September 2012." Each of its theories of alleged wrongdoing, and 14 of its 16 counts, involves purported breaches of "the Contract." Compl. ¶¶ 7, 57-297, 304-339. Nowhere does the Government challenge the validity of the Contract between GSA and Symantec and, therefore, it may not plead the equitable claims of payment by mistake and unjust enrichment, even as alternative claims. *See, e.g., Kellogg Brown & Root Servs., Inc.*, 800 F.Supp.2d at 160 (dismissing claims for payment by mistake and unjust enrichment and rejecting the Government's argument that it is permitted to plead in the alternative as "'unavailing'" because those "claims must be supported by, at the very least, an allegation that there is no valid contract" (quoting *SAIC I*, 555 F.Supp. 2d at 59)); *First Choice Armor & Equip., Inc.*, 808 F.Supp.2d at 78 (dismissing alternative claims of unjust enrichment and payment by mistake in an FCA case where "the government acknowledges that its complaint alleges the existence of an express contract").

## CONCLUSION

Despite the length of the Government's Complaint and the amount of time it had to uncover the purported fraud for which it so desperately digs, the Government's allegations are as facially implausible as they are factually insufficient. Contrary to the Complaint's jaundiced portrayal of Symantec as a company bent on defrauding the government, the facts it outlines reflect a far more plausible truth: Symantec negotiated in good faith for the opportunity to sell quality products and the Government Contracting Officer determined that the proposed prices, while not the lowest possible prices, were nonetheless both fair and reasonable. Eight years

later, the Government is attempting to distort the long and arduous negotiation process, twist Symantec's multiple disclosures, malign the actions of Symantec and GSA's-own contracting officer, and recast the agreed upon Contractual terms and conditions in an ill-fitting attempt to tailor a claim of fraud. What's more, the Government fails to support its allegations with the specific facts necessary to identify any alleged fraudulent claims for payment, or any submissions, disclosures, or statements made - or omitted - during contract performance that were objectively false or material.  At best, the Complaint's FCA allegations reflect the Department of Justices' and Relator's second guessing the sound business judgment of the GSA contracting officer with their own, post hoc, business judgment.  This is not the intent of the FCA.  Accordingly, the Government's FCA claims, and their derivative state and common law claims, fail to meet the plausibility and specificity requirements of Rules 8(a) and 9(b) warranting dismissal with prejudice.

Respectfully Submitted

_____/s/ David L. Douglass_
David L. Douglass (D.C. Bar No. 447157)
Jonathan S. Aronie (D.C. Bar No.443151)
Anne B. Perry (D.C. Bar No. 447930)
SHEPPARD MULLIN RICHTER &
 HAMPTON LLP
2099 Pennsylvania Ave., NW, Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1900
Fax (202) 747-1901
ddouglass@sheppardmullin.com
jaronie@sheppardmullin.com
aperry@sheppardmullin.com

Dated: December 9, 2014

*Attorneys for Symantec Corporation*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 9, 2014, the foregoing Motion To Dismiss The United States', California's, Florida's, And Relator's Omnibus And Restated Complaint And Complaint In Intervention and Supporting Memorandum Of Points And Authorities, and a proposed Order, which were filed through the ECF system, will be sent electronically to all registered participants.


/s/ *David L. Douglass*

DAVID L. DOUGLASS