UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, LORI MORSELL, *et al.* | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| SYMANTEC CORPORATION, | ) ) ) |
| Defendant. | ) ) ) |

Civil Action No. 12-0800 (RC)

_____

## UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

By and through its undersigned counsel, Plaintiff the United States of America ("United States" or "Government") respectfully moves for partial summary judgment under Federal Rule of Civil Procedure 56(a) on certain issues of formation, breach, and falsity to streamline this matter for discovery and future litigation.  Specifically, the United States moves for summary judgment on the following portions of its claims in this matter:

1.  The Multiple Award Schedule ("MAS") contract between Symantec Corporation ("Symantec") and the General Services Administration ("GSA"), No. GS-35F-0240T (the "Contract"), was a valid and enforceable written agreement.

2.  The commercial sales practices ("CSPs") disclosed by Symantec to GSA during negotiation of the Contract were false for purposes of the False Claims Act ("FCA"), and breached the Contract, in that the chart in the CSPs purporting to describe the frequency and depth of non-published discounts offered to commercial customers in 2005 (the "Frequency Chart") was inaccurate.

3.  Symantec's CSPs were also false and breached the Contract because they inaccurately stated that non-published discounts given by Symantec to

commercial customers were approved by management through a tool known as eSPA.

4.      Symantec's CSPs were also false and breached the Contract because they failed to disclose numerous back-end rebate programs that Symantec offered to its customers at the time the parties entered into the Contract.

5.      Symantec made additional false statements to GSA when it expressly directed GSA to use Symantec's CSPs in the negotiation and award of MAS contracts held by held by Carahsoft Technology Corp. ("Carahsoft") and UNICOM Government, Inc. (f/k/a GTSI) ("UNICOM/GTSI"), through with they sold Symantec products.

6.      Symantec breached the price reduction clause ("PRC") in the Contract by failing to disclose changes from the practices disclosed in CSPs regarding (i) the depth and frequency of non-published discounts given to commercial customers, and (ii) back-end rebate programs.

7.      Symantec's periodic certifications that its CSPs remained complete and accurate were false as they failed to disclose changes in (i) the depth and frequency of non-published discounts given to commercial customers, (ii) management approval processes for non-published discounts, and (iii) back-end rebate programs.

In support of this Motion, the United States respectfully refers the Court to the accompanying Memorandum of Points and Authorities, Statement of Undisputed Material Facts, and attached exhibits, the last of which the United States has sought to file provisionally under seal to allow Symantec an opportunity to review them for potentially confidential information before they are disclosed on the Court's public docket.

Dated: February 23, 2015
Washington, DC

Respectfully submitted,

JOYCE R. BRANDA
Acting Assistant Attorney General

RONALD C. MACHEN JR., D.C. Bar #447889
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division, U.S. Attorney's Office


By: _____/s/_____
      BRIAN P. HUDAK
      Assistant United States Attorney
      555 Fourth Street, NW
      Washington, DC 20530
      (202) 252-2549

MICHAEL D. GRANSTON
SARA MCLEAN
DAVID WISEMAN
DANIEL A. SCHIFFER
Attorneys, Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, DC  20044
(202) 305-8586

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, LORI MORSELL, *et al.* )<br><br>Plaintiffs, )<br><br>v. )<br><br>SYMANTEC CORPORATION, )<br><br>Defendant. ) | Civil Action No. 12-0800 (RC) |

UNITED STATES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

JOYCE R. BRANDA
Acting Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney

DANIEL F. VAN HORN
BRIAN P. HUDAK
Assistant United States Attorneys

MICHAEL D. GRANSTON
SARA MCLEAN
DAVID WISEMAN
DANIEL A. SCHIFFER
Attorneys, Commercial Litigation Branch

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS .................................................................................... 3

I.     BACKGROUND ON GSA'S MULTIPLE AWARD SCHEDULE
PROGRAM. ................................................................................... 3

    A.    When Negotiating MAS Contracts, Offerors are Required to Make
Complete and Accurate Disclosures of Their Pricing and
Discounting Policies and Practices. .......................................... 5

    B.    The Price Reductions Clause Requires MAS Contractors to Provide
the Government with Improvements to the Commercial Pricing and
Discounts Set Forth in Their Disclosures. ................................. 6

II.    PRIOR TO THE CONTRACT, SYMANTEC'S PREDECESSOR
(VERITAS) HELD A GSA MAS CONTRACT. ................................... 8

III.    SYMANTEC PURPORTED TO DISCLOSE ITS COMMERCIAL SALES
AND DISCOUNTING PRACTICES TO GSA DURING NEGOTIATION
OF THE CONTRACT. ........................................................................ 9

    A.    Symantec's Initial Disclosures Provided Certain Information
Regarding Its Non-Published and Standard Discounting Practices. ......... 10

    B.    Symantec's Supplemented its Initial Disclosures During Contract
Negotiations Through the October 2006 Presentation. ............................. 12

    C.    Symantec Further Supplemented Its Disclosures in Late-2006. ............... 14

    D.    Symantec Told GSA that All Commercial Sales and Discounting
Practices Had Been Fully Disclosed. ....................................... 15

IV.    SYMANTEC'S CSPS WERE FALSE IN SEVERAL UNDISPUTED
RESPECTS. ..................................................................................... 16

    A.    Based On Symantec's Own 2005 Sales Data, Symantec's Frequency
Chart Was False. ....................................................................... 16

    B.    Based On Symantec's Own 2005 Sales Data, Symantec's
Representations Regarding Its Approval Processes For Non-
Standard Discounts Were False. ............................................... 18

    C.    Symantec Offered Various Rebate Programs, Which It Failed To
Disclose To GSA. ..................................................................... 18

V.      SYMANTEC DIRECTED GSA TO RELY ON ITS FALSE CSPS AS
        BASES FOR NEGOTIATING CONTRACTS WITH THE AUTHORIZED
        RESELLERS.......................................................................................... 20

VI.     SYMANTEC AGREED THAT ALL COMMERCIAL CUSTOMERS
        WERE THE BASIS OF AWARD FOR PRC PURPOSES.................................. 20

VII.    DURING THE LIFE OF THE CONTRACT SYMANTEC SUBMITTED
        CLAIMS FOR PAYMENT AND PERIODIC CERTIFICATIONS THAT
        ITS PRE-AWARD CSPS REMAINED ACCURATE........................................ 21

VIII.   SYMANTEC VIOLATED THE PRC AND ITS PERIODIC
        CERTIFICATIONS WERE FALSE IN SEVERAL UNDISPUTED
        RESPECTS. ........................................................................................ 22

        A.      Symantec Failed to Update the Frequency Chart or Otherwise Notify
                GSA That The Frequency of Its Deep Discounts Changed During
                Performance of the Contract. .................................................... 23

        B.      Symantec Failed to Inform GSA That Non-Standard Discounts Were
                Being Given Without Approval Through eSPA and SFDC, the
                Internal Controls Symantec Portrayed as Monitoring its Non-
                Standard Discounts. .................................................................. 24

        C.      Symantec Failed to Inform GSA of its Rebating Programs During the
                Life of the Contract................................................................... 24

IX.     SYMANTEC'S INTERNAL AUDITS FURTHER IDENTIFIED
        SYMANTEC'S HAPHAZARD DISCOUNTING PRACTICES. ....................... 27

THE UNITED STATES' CLAIMS IN THIS ACTION ............................................. 28

ARGUMENT.................................................................................................. 30

I.      SUMMARY JUDGMENT STANDARD............................................... 31

II.     ELEMENTS OF THE UNITED STATES' BREACH OF CONTRACT
        AND FCA CLAIMS. ........................................................................ 33

        A.      Elements of a Breach of Contract Claim. .................................... 33

        B.      Elements of FCA Claims. .......................................................... 33

        C.      Elements of a Negligent Misrepresentation Claim. ...................... 37

III.    THE CONTRACT IS A VALID, ENFORCEABLE WRITTEN
        AGREEMENT BETWEEN SYMANTEC AND GSA, WHICH
        ESTABLISHED DUTIES. ................................................................... 37

IV.    SYMANTEC'S CSPS WERE FALSE IN CERTAIN UNDISPUTED RESPECTS. ................................................................................................ 39

V.    SYMANTEC USED THE FALSE CSPS NOT ONLY FOR ITS OWN CONTRACT, BUT ALSO FOR THE MAS CONTRACTS OF THE AUTHORIZED RESELLERS. ............................................................................ 41

VI.    SYMANTEC VIOLATED THE PRC IN CERTAIN UNDISPUTED RESPECTS. ................................................................................................ 41

VII.    SYMANTEC'S PERIODIC CERTIFICATIONS WERE FALSE IN CERTAIN UNDISPUTED RESPECTS. ................................................................ 42

CONCLUSION ......................................................................................................... 44

By and through its undersigned counsel, the United States of America ("United States" or "Government") respectfully submits this memorandum of points and authorities in support of its motion for partial summary judgment against Defendant Symantec Corporation ("Symantec"). The United States moves for summary judgment on certain threshold issues to streamline this matter for discovery and future litigation. The United States respectfully submits that there exists no genuine issue of material fact as to the issues described herein.

## PRELIMINARY STATEMENT

As Justice Holmes noted nearly a century ago, "[m]en must turn square corners when they deal with the Government." *Rock Island A. & L.R. Co. v. United States*, 254 U.S. 141, 143 (1920). This is especially so in today's climate, where the Government increasingly relies on its partners in private industry to serve the citizens of this nation and ensure prudent expenditures of the public fisc. Here, Symantec failed to adhere to this well-established rule when it refused to disclose accurately and completely its sales practices to allow the General Services Administration ("GSA") to negotiate most-advantageous pricing for expenditures of taxpayer dollars. Symantec further betrayed the trust of the United States by failing to abide by requirements during the life of its Contract[1] designed to guarantee the continuation of most-advantageous pricing notwithstanding changes in Symantec's sales practices.

Although discovery is necessary to adduce fully facts supporting Symantec's culpable state of mind and damages stemming from its wrongful conduct, certain issues are ripe to be adjudicated at the outset. Adjudication of these issues now -- while the Court considers Symantec's unmeritorious dispositive motion -- will promote the just, speedy, and inexpensive

---

[1] The "Contract" refers to the Multiple Award Schedule contract between GSA and Symantec, No. GS-35F-0240T, which ran from January 2007 to September 2012. *See* R.41 (Omnibus Compl.) ¶ 5; Letter from Symantec of 1/25/2007, Mot. Ex. 18; Letter from GSA of 1/25/2007, Mot. Ex. 19.

resolution of this action by allowing the Court and the parties to tailor and abbreviate their discovery efforts, subsequent dispositive motions, and trial presentations.   Accordingly, the United States respectfully requests that the Court enter partial summary judgment on several issues in its favor.

*First*, there is no genuine issue of material fact that the GSA and Symantec negotiated and consummated a valid and enforceable written agreement.   Equally clear are the obligations Symantec had under the Contract (i) to disclose accurately and completely its discounting practices during negotiations and (ii) to report and offer favorable changes in those practices to GSA during the life of the Contract.   Summary judgment is ripe on these threshold contractual issues.

*Second*, there exists no genuine issue of material fact that the commercial sales practices ("CSPs") Symantec disclosed to GSA during negotiation of the Contract were false and incomplete in certain respects, including with regards to the Frequency Chart (defined below), systems for approving non-standard discounts, and rebate programs.[2]

*Third,* it is also undisputed that Symantec expressly directed GSA to use these false CSPs in the negotiation and award of MAS contracts held by Carahsoft Technology Corp. ("Carahsoft") and UNICOM Government, Inc. (f/k/a GTSI) ("UNICOM/GTSI") (collectively, the "Authorized Resellers").   That is, Symantec "made" the false statements in its CSPs not only on its Contract but also with regards to the contracts of the Authorized Resellers.

*Fourth*, there is no genuine debate that Symantec's CSPs grew increasingly false during the life of the Contract.   That is, not only did the CSPs inaccurately describe Symantec's

---

[2]   The Government moves at the threshold only on certain theories of falsity, which are beyond dispute at this early stage.   The Government alleges that Symantec's statements and claims were false for other reasons, which are not the subject to this Motion and which the Government reserves for future litigation.

practices at Contract award, but Symantec's practices changed through the life of the Contract. Nonetheless, Symantec reaffirmed continually that its CSPs remained accurate and complete.

*Fifth, and lastly,* Symantec's failure to inform GSA that its CSPs were inaccurate, and that its practices during performance of the Contract had changed, violated the Contract's Price Reduction Clause ("PRC").

For these reasons, which are described in detail below, the Court should enter partial summary judgment resolving these issues in the Government's favor to streamline this litigation.

## STATEMENT OF FACTS

### I.    BACKGROUND ON GSA'S MULTIPLE AWARD SCHEDULE PROGRAM.

Executive agencies of the United States may procure products and services only through full and open competition, unless they meet certain exceptions.  41 U.S.C. § 3301(a)(1).  In order to expedite the procurement process for Executive agencies, and contractors wishing to sell products to executive agencies, GSA solicits, negotiates, awards, and administers Multiple Award Schedule ("MAS") contracts to procure products and services for federal agencies.  40 U.S.C. § 501(b); FAR § 8.402.[3]

Under the MAS program, GSA negotiates the maximum prices and other contract terms that will apply to subsequent orders placed for all items that are covered by the MAS contract. *See* GSA MAS Desk Reference (Fall 2013) at 16-17, enclosed herewith as Exhibit 1 ("Mot. Ex. 1").  Once those maximum prices are set, agencies can make purchases at those prices, or at even better prices, subject to other MAS contract terms.  *Id.*

The pre-negotiation of the terms of sale for a large number of products and services under the MAS program saves significant administrative costs for Government agencies ordering off of

---

[3]    Chapter 1 of Title 48 of the Code of Federal Regulations is referred to as the Federal Acquisition Regulation or "FAR."

MAS contract schedules and for contractors wishing to sell products to the Government. *Id.* at 4, 14. The MAS program allows the Government to obtain commercial supplies and services at prices associated with volume buying. *Id.* at 4, 17-18; FAR § 8.402. Additionally, agencies placing orders under MAS contracts are considered to meet the requirements of full and open competition. GSA MAS Desk Reference at 16, Mot. Ex. 1; FAR § 8.404(a). Contractors benefit from the MAS program because their products are more widely available to federal agencies and because the program makes it easier for federal agencies to place orders with them. *See generally* GSA MAS Desk Reference at 6, 16-17, Mot. Ex. 1.

The Administrator of GSA establishes the procedures that govern the MAS program, including the requirements that contractors must follow in order to participate in the program. 40 U.S.C. §§ 121(c), 501(b)(2). These rules and regulations are set forth in the Federal Acquisition Regulation ("FAR") and the General Services Administration Acquisition Regulation ("GSAR").[4] *See generally* GSA MAS Desk Reference at 8, 13, Mot. Ex. 1; GSA Acquisition Manual ("GSAM") (July 2004) at i, Mot. Ex. 2; GSAR §§ 501.101 to 104.

GSA initiates the MAS process by publishing a contract solicitation. GSA MAS Desk Reference at 18-20, Mot. Ex. 1. Interested contractors then submit offers under the solicitation to GSA. *Id.* Any contractor that enters into an MAS contract with the Government must abide by (1) the obligations that are outlined in the Government's solicitation; (2) the FAR and GSAR clauses and provisions that are incorporated into the contract; (3) any additional requirements negotiated between the parties; and (4) any other general federal contracting requirements set forth in the applicable regulations. *Id.*; GSAR § 501.104.

---

[4]     The GSAR is codified at Chapter 5 of Title 48 of the Code of Federal Regulations and is included in the GSAM.

**A.      When Negotiating MAS Contracts, Offerors are Required to Make Complete and Accurate Disclosures of Their Pricing and Discounting Policies and Practices.**

The MAS contract solicitation requires prospective contractors to provide GSA with extensive information about their commercial sales and discounting practices, including prices and discounts -- both standard and nonstandard -- offered by the contractor to commercial customers.  GSAR § 515.408.  This information is provided in a "Commercial Sales Practice Format" and is often referred to as an offeror's "CSPs."  *Id.* (MAS Requests for Information); *id.* at (b), Figure 515.4-2 (Instructions for the Commercial Sales Practices Format); GSAM at 515-6 to 515-8, Mot. Ex. 2 (containing GSAR).   The information disclosed in CSPs is often supplemented by other representations contained in subsequent correspondence from offerors to GSA contracting officers.  *See generally* GSAR § 515.408(a)(3).  Indeed, an offeror is required to "disclose any changes in [its] price list(s), discounts and/or discounting policies which occur after the offer is submitted, but before the close of negotiations."  *Id.* at (b), Figure 515.4-2 (Instructions for the Commercial Sales Practices Format); GSAM at 515-6 to 515-8, Mot. Ex. 2 (containing GSAR).   At bottom, GSA requires offerors during pre-award MAS contract negotiations to provide pricing and discounting information that is current, accurate, and complete.  GSAR § 515.408, Figure 515.4-2; GSAM at 515-7 to 515-8, Mot. Ex. 2.[5]

Contractors are instructed to complete a disclosure for each Special Item Number ("SIN") at issue.  *Id.*  A SIN is "a group of generically similar (but not identical) supplies or services that are intended to serve the same general purpose or function."  FAR § 8.401.  A single disclosure can contain information on more than one SIN so long as the "information is the same."  GSAR

---

[5]      As discussed below, GSA has adopted broad definitions of the terms "discount" and price "concession" and offerors are required to make disclosures using these broad definitions.  GSAR § 552.212-70(a); *see infra* at 10.

§ 515.408.  The MAS solicitation also instructs offerors to obey the following in submitting

CSPs:

> Net prices or discounts off of other price lists should be expressed as percentage
> discounts from the price list which is the basis of your offer.  If the discount
> disclosed is a combination of various discounts (prompt payment, quantity, etc.),
> the percentage should be broken out for each type of discount.

GSAR § 515.408, Figure 515.4-2 (note to Column 2); *see also* GSAM at 515-8, Mot. Ex. 2

(containing same).

Pursuant to GSAR Section 538.270(a), GSA contracting officers are required to "seek to

obtain the offeror's best price (the best price given to the most favored customer)."  *Id.*  In

negotiating the terms of an MAS contract, the contracting officer must determine whether the

price offered to GSA is reasonable by "compar[ing] the terms and conditions of the [offeror's

response to the] MAS solicitation with the terms and conditions of agreements with the offeror's

commercial customers."  GSAR § 538.270(c).

MAS contracts also provide that if, subsequent to formation of the contract, GSA

discovers that the prices in a contract or modification were inflated due to the contractor's failure

to provide current, accurate, and complete information, or to update that information, the

Government may unilaterally reduce the contract's prices.  GSAR § 552.215-72.  The amount of

the reduction may equal the amount by which the Government orders were inflated as a result of

the inaccurate or undisclosed information plus accrued interest.  *Id.*

**B.**     **The Price Reductions Clause Requires MAS Contractors to Provide the**
        **Government with Improvements to the Commercial Pricing and Discounts Set**
        **<u>Forth in Their Disclosures.</u>**

Regulations governing MAS contracts also require that such contracts include a pricing

mechanism known as the "Price Reductions Clause."  GSAR § 552.238-75.  The PRC provides,

in relevant part, as follows:

(a) Before award of a contract, the Contracting Officer and the Offeror will agree upon (1) the customer (or category of customers) which will be the basis of award, and (2) the Government's price or discount relationship to the identified customer (or category of customers).   This relationship shall be maintained throughout the contract period.   Any change in the Contractor's commercial pricing or discount arrangement applicable to the identified customer (or category of customers) which disturbs this relationship shall constitute a price reduction.

(b) During the contract period, the Contractor shall report to the Contracting Officer all price reductions to the customer (or category of customers) that was the basis of award.   The Contractor's report shall include an explanation of the conditions under which the reductions were made.

(c)(1) A price reduction shall apply to purchases under this contract if, after the date negotiations conclude, the Contractor --

> (i) Revises the commercial catalog, pricelist, schedule or other document upon which the contract award was predicated to reduce prices;
>
> (ii) Grants more favorable discounts or terms and conditions than those contained in the commercial catalog, pricelist, schedule or other documents upon which contract award was predicated; or
>
> (iii) Grants special discounts to the customer (or category of customers) that formed the basis of award, and the change disturbs the price/discount relationship of the Government to the customer (or category of customers) that was the basis of award.

*Id.*  That is, the PRC requires the relevant GSA contracting officer and the offeror to agree upon (1) the customer or category of customers which will be known as the "Basis of Award" customer or customers, respectively, and (2) a fixed relationship between the prices that the offeror gives to the Basis of Award customer and those that it gives to the Government.  *Id.* at (a).  If, during the period that the contract is in effect, the contractor, *inter alia*, (i) offers the Basis of Award customer prices, discounts, or other terms that are better than those it previously offered to the Basis of Award customer or (ii) favorably changes the sales and discounting practices disclosed during negotiations, the prices, discounts, or other terms that are offered to the Government must be adjusted accordingly.  *Id.* at (c).  Any such change offered by the Contractor to the Basis of Award customer must be reported to the Government no later than 15

days after its effective date, and the resulting change in prices on products sold to the Government is effective retroactive to the date on which the change in price was offered to the Basis of Award customer.  *Id.* at (c)(2), (f).

The PRC further provides that "the contractor [sic] will be modified to reflect any price reduction which becomes applicable in accordance with this clause."  *Id.* at (g).  Contractors are responsible for complying with the Price Reductions Clause, including reporting price reductions and extending improved pricing and discounts to government customers when the PRC requires. *See id.*

Orders under MAS contracts are submitted by executive agencies directly to contractors such as Symantec.  FAR § 8.406-1.  GSA does not independently receive information about commercial transactions that might trigger a contractor's PRC obligations.  *See generally* GSAR § 552.238-75(b).  GSA is not typically involved in other federal agencies' processes of placing specific orders against MAS contracts.  *See generally* GSA MAS Desk Reference at 41, Mot. Ex. 1.

## II.   PRIOR TO THE CONTRACT, SYMANTEC'S PREDECESSOR (VERITAS) HELD A GSA MAS CONTRACT.

In late-2004, Symantec announced its agreement to acquire VERITAS Software Corporation ("VERITAS").  *See* N.Y. Times Article of 12/17/2004, Mot. Ex. 3.  At that time, VERITAS held a GSA MAS contract under which it sold enterprise and backup products and services to the Government through SINs 132-32 (Term Software Licenses), 132-34 (Maintenance of Software as a Service), 132-50 (Training Courses), and 132-51 (Information Technology Professional Services).  Excerpt from Veritas Terms & Conditions of 1/4/2005, Mot. Ex. 4.  VERITAS's point of contact for its MAS contract was Ms. Kim Bradbury, who was

VERITAS's Government Business Operations Manager at the time. Veritas Letter of 7/3/2001 (unsigned), Mot. Ex. 5.

In 2005 and 2006, as VERITAS's operations were folded into those of Symantec, Symantec explored avenues to continue a MAS contract with GSA under which it could sell Symantec's products after the VERITAS merger. *See* Email chain of 9/12/2006 at 2-3, Mot. Ex. 6. The VERITAS MAS contract, as amended, was set to expire on December 31, 2006. *See id.*; Excerpt from Veritas Terms & Conditions of 3/7/2006, Mot. Ex. 7. Because Symantec acquired VERITAS, Symantec did not simply renew or novate VERITAS's MAS contract and instead responded to the GSA MAS solicitation seeking a new MAS contract (Email from Bradbury of 6/22/2006, Mot. Ex. 8), which ultimately led to the Contract at issue in this action. *Id.*

Symantec submitted its initial offer for the Contract by letter dated February 28, 2006, seeking to sell products and services on SINs 132-8 (Purchase of New Equipment), 132-12 (Maintenance of Equipment, Repair Services and/or Repair/Spare Parts), 132-32 (Term Software Licenses), 132-33 (Perpetual Software Licenses), 132-34 (Maintenance of Software as a Service), 132-50 (Training Courses), and 132-51 (Information Technology Professional Services). Symantec Letter of 2/28/2006, Mot. Ex. 9. Bradbury, who had assumed a role at Symantec similar to the one she held at VERITAS, signed the letter as Symantec's Senior Director of Public Sector Business Operations. *Id.*

## III. SYMANTEC PURPORTED TO DISCLOSE ITS COMMERCIAL SALES AND DISCOUNTING PRACTICES TO GSA DURING NEGOTIATION OF THE CONTRACT.

As part of its initial, February 2006 offer, Symantec included CSPs. *See* Initial CSPs, Mot. Ex. 10. Thereafter, Symantec provided certain supplemental information regarding its commercial and discounting practices during the negotiation of the Contract.

A.     **Symantec's Initial Disclosures Provided Certain Information Regarding Its Non-Published and Standard Discounting Practices.**

Symantec's February 2006 offer provided information regarding its business practices in two different forms: (a) answers to standard questions posed in the MAS solicitation; and (b) Symantec's CSPs or information generated and provided by Symantec purporting to convey its commercial sales and discounting practices. *See* Initial CSPs at 2, Mot. Ex. 10.  In its answers to standard MAS questions, Symantec answered "NO" to each of the following questions:

> (3)   Based on your written discounting policies (standard commercial sales practices in the event you do not have written discounting policies), are the discounts and any concessions which you offer the Government equal to or better than your best price (discount and concessions in any combination) offered to any customer acquiring the same items regardless of quantity or terms and conditions? . . .
>
> (b)  Do any deviations from your written policies or standard commercial sales practices disclosed in [your CSPs] ever result in better discounts (lower prices) or concessions than indicated?

*Id.*  These questions referenced the definitions of "concession" and "discount" found at GSAR Section 552.212-70, which stated:

> "Concession," as used in this solicitation, means a benefit, enhancement or privilege (other than a discount), which either reduces the overall cost of a customer's acquisition or encourages a customer to consummate a purchase. Concessions include, but are not limited to freight allowance, extended warranty, extended price guarantees, free installation and bonus goods.
>
> "Discount," as used in this solicitation, means a reduction to catalog prices (published or unpublished). Discounts include, but are not limited to, rebates, quantity discounts, purchase option credits, and any other terms or conditions (other than concessions) which reduce the amount of money a customer ultimately pays for goods or services ordered or received. Any net price lower than the list price is considered a "discount" by the percentage difference from the list price to the net price.

GSAR § 552.212-70(a) (Oct. 1, 2006).

Consistent with its answer to Question (3), Symantec submitted CSPs that disclosed standard (or published) discounts offered to resellers and distributors, which varied based on

product type but generally fell in the range of 30% to 40% off of MSRP. Initial CSPs at 7-10, 12, Mot. Ex. 10. Symantec also disclosed standard discounts for academic customers (generally 20% to 40% off of MSRP) and "elite" buying program customers (generally 5% to 20% off of MSRP). Initial CSPs at 11-12, 14, Mot. Ex. 10. The standard discount disclosure in Symantec's initial CSPs did not include any disclosure of rebating policies or rebates to commercial customers. *See generally* Initial CSPs, Mot. Ex. 10.

Symantec additionally purported to provide certain information regarding "non-published" or non-standard discounts contrary to its above noted answer that it offered no discounts beyond those in its written policies or standard commercial sales practices. *See* Initial CSPs at 4-6, Mot. Ex. 10. Symantec's disclosure of "non-published" discounts consisted of three charts:

a.   a chart entitled "G.4(4) Summary of Non-Published Discounts offered by SKU for sales in 2005," which purported to describe the frequency of non-published discounts at various depths offered on product sales occurring during 2005 (the "Frequency Chart") (*id.* at 4-5);

b.   a chart entitled "G.4(4) Non-Published Discounts" with a heading of "Discount Reason Codes," which purported to describe the reasons for Symantec's non-published discounts and the frequency of each reason (the "Reason Code Chart") (*id.* at 6); and

c.   a chart entitled "G.4(4) Non-Published Discounts" with a heading of "Management Discount Approval Levels," which purported to describe the level of management approval needed for various depths of discounts (the "Management Approval Chart") (*id.* at 6).

- 11 -

Symantec's Frequency Chart described that when non-published discounts were offered, those discounts amounted to a discount of less than forty percent 97.688% of the time.  Initial CSPs at 4-5, Mot. Ex. 10.  Put another way, Symantec stated to GSA that when it offered a non-published discount it provided a discount greater than forty percent less than 3% of the time.  *Id.* Symantec's Frequency Chart purported to convey information regarding non-published discounts "for sales in 2005," without limitation.  *Id.*

Symantec's Management Approval Chart indicated that any non-published discounts deeper than 30% must be approved by a successively higher level of executive depending on the level of the discount.  *Id.* at 6.  For example, Symantec represented that discounts greater than 50% off of list price had to be approved by a Regional Vice President.  *Id.*

### B.  Symantec's Supplemented its Initial Disclosures During Contract Negotiations Through the October 2006 Presentation.

From February 2006 to September 2006, Symantec submitted to GSA certain, largely administrative, updates concerning its offer.  *See generally* Email chain of 9/12/2006 at 2-4, Mot. Ex. 6; Bradbury Letter of 6/21/2006, Mot. Ex. 11.  Thereafter, in September 2006, Bradbury emailed GSA inquiring as to the status of Symantec's offer and expressing urgency in concluding the Contract in the near future due to the expiration of the VERITAS MAS contract and the finalization of the VERITAS merger.  Email chain of 9/12/2006 at 1, Mot. Ex. 6.

On October 5, 2006, Bradbury also emailed the then GSA Contracting Officer for Symantec's Contract, Ms. Gwen Dixon, and provided a presentation (the "October 2006 Presentation") that purported to provide "an overview of new discounting policies and procedures for all products sold by Symantec Corporation."  Bradbury Email of 10/5/2006, Mot. Ex. 12 (attaching 10/2006 Presentation, Mot. Ex. 13).  The October 2006 Presentation mentioned five buying programs: (a) Express, (b) Government, (c) Academic, (d) Rewards, and (e)

Enterprise Options.   10/2006 Presentation at 2, 9, 13, Mot. Ex. 13.   The October 2006 Presentation described certain aspects of each program including (i) the targeted customers, (ii) the requirements to purchase at different "bands" or pricing levels within a program, and (iii) certain terms and conditions.   *See, e.g., id.* at 4-8 (Express), 10-12 (Government), 14-16 (Academic), 18-22 (Rewards).   The October 2006 Presentation noted that the Express, Government, Academic, and Rewards programs had pricing bands named "A" to "E" and that Express, Government, and Academic had additional bands named "F" to "H" and "S."  *Id.*

Although the Presentation described the names and purchase volume or "point" requirements for bands under the Express, Government, Academic, and Rewards programs, the Presentation did not indicate that bands with the same letter names in different programs had different pricing nor did it explain that pricing under the Rewards bands was more favorable than pricing under Express, Academic, or Government bands.  *See generally id.*  The Presentation also provided no information on the comparative pricing between buying programs, including the Rewards program, and no information on rebate programs or rebates offered to commercial customers.  *Id.*

For the Rewards program, the October 2006 Presentation described the program's pricing to be based on the accumulation of points based on the volume of purchases and stated that points were used to determine the applicable pricing band.  *Id.* at 18-22.  The Presentation further described that a customer had to make a minimum initial purchase equaling 6,000 points to participate in the Rewards program.  *Id.*   The Presentation also described that under the Rewards program points accumulated for up to 2 years and expired at the close of that period.  *Id.*[6]

---

[6]     Although the United States believes that Symantec failed to disclose key aspects of the Rewards program rendering its statements and claims false, the United States does not seek summary judgment on that allegation at this time and reserves the issue for further litigation.

### C.   Symantec Further Supplemented Its Disclosures in Late-2006.

On October 11, 2006, Dixon and Bradbury met to discuss Symantec's offer.   Dixon Email of 10/11/2006 with attachment, Mot. Ex. 14.   At that meeting, Dixon gave Bradbury a letter containing a series of questions regarding Symantec's offer and CSPs.   *Id.* (attaching Letter of 10/9/2006).

On October 20, 2006, Bradbury emailed Dixon in response to Dixon's list of questions from October 9, 2006, and items discussed during the October 11, 2006, meeting.   Bradbury Email of 10/20/2006, Mot. Ex. 15 (attaching Supplemental Response, Mot. Ex. 16).   In this exchange, Symantec provided additional information regarding Symantec's non-published discounts, including a further description of Symantec's rigorous approval process for them. Supplemental Response, Mot. Ex. 16.   Specifically, Symantec wrote:

> Any deviations from published discounts require management approval. Deviations must be documented and approved in accordance with the following guidelines: As previously disclosed to GSA as part of Symantec's established discounting policies, the Worldwide Sales discounting tool referred to as "eSPA" was established to allow Symantec the flexibility to respond to competition.  This process provides non-standard competitive pricing to strategic accounts by requiring commitments from the identified account for annual quantity purchases, or to meet one of the following guidelines; which are provided as examples:
>
> 1.     To meet market competition or displace a named competitor at a customer site;
>
> 2.     Customers who agree to standardize on Symantec products and services;
>
> 3.     New Market or market segment penetration;
>
> 4.     Educational, including prime contractors, or Charitable organizations or institutes;
>
> 5.     Introduction of new product and services through more aggressive discounts in exchange for press or customer references.

*Id.* at 4.  Symantec then provided a management discount approval chart for professional services similar to the Management Approval Chart in Symantec's initial disclosures for products and

other items, which indicated that any non-published discounts above 20% on professional services required approval of the Regional Vice President, Consulting Services.  *Id.*

Although the parties continued to exchange correspondence on other issues concerning Symantec's offer after Symantec's October 20, 2006, letter, Symantec provided no further information to Dixon or GSA contracting personnel regarding Symantec's rebates, rebate practices, or non-published discounts before execution of the Contract.  *See generally* Emails from 10/24/2006 to 1/24/2007, Mot. Ex. 17.

### D. Symantec Told GSA that All Commercial Sales and Discounting Practices Had Been Fully Disclosed.

On January 25, 2007, Symantec sent Dixon its Final Proposal Revision ("FPR") of its offer for the Contract.  Symantec Letter of 1/25/2007 ("FPR"), Mot. Ex. 18.  In the FPR, Symantec stated that "all commercial business practices have been fully disclosed and are current, accurate and complete as of the conclusion of the negotiation," *id.* at 1, certified "that the discounts, pricing and/or rates given to the government are either equal to and/or greater than what is granted to any commercial and/or Government customer under similar terms and conditions," *id.* at 6, and represented "that all data submitted is accurate, current, and complete representations as of 1/22/07."  *Id.* at 6.

In the FPR, Symantec proposed for GSA to receive discounts off of published pricelists as follows: (i) for hardware appliance, enterprise availability, backup executive, and security products and services Symantec offered GSA pricing at between 5% and 35% off of Government End User MSRP depending on the product category and SIN; and (ii) for training, professional, managed security, and technical support services Symantec offered GSA pricing at between 5% and 10% off of "Commercial MSRP" depending on the product line and SIN.  *Id.* at 2-4.  GSA

accepted Symantec's offer as revised through its FPR by letter dated January 25, 2007, thereby executing the Contract.  GSA Letter of 1/25/2007, Mot. Ex. 19.

## IV.   SYMANTEC'S CSPs WERE FALSE IN SEVERAL UNDISPUTED RESPECTS.

Symantec's CSPs were indisputably false in numerous respects, including (i) the Frequency Chart inaccurately depicted the non-standard discounting Symantec offered on sales made during 2005; (ii) contrary to Symantec's assertions, numerous non-standard discounts offered in 2005 did not receive appropriate management approvals through eSPA; and (iii) Symantec failed to disclose its rebating programs.

### A.   Based On Symantec's Own 2005 Sales Data, Symantec's Frequency Chart Was False.

During the course of the Government's investigation, Symantec produced sales data for its non-federal sales during 2005 and the eSPA approvals for 2005 sales that it used to generate the Frequency Chart.  *See* Robinson Decl. ¶ 6, Mot. Ex. 20.[7]  Plaintiffs took this data and performed simple, layperson analyses of it in Microsoft Excel as described in the Declaration of Lance Robinson.  *See* Robinson Decl. ¶¶ 6-11, Mot. Ex. 20.  Specifically, Plaintiffs (i) removed zero and negative dollar sales from the sales data; (ii) compared the sales data to the eSPA information to ascertain for each sale the respective customer's "Standard Buy Price," or price including any published discounts;[8] and (iii) using simple math, computed the "non-published" discount between the Standard Buy Price (*i.e.*, each customer's published price) and the sales

---

[7]      Although the Contract required Symantec to maintain records involving transactions related to the Contract for 3 years after its termination (GSA Refresh #17 at 59, cl. D.1(d), Mot. Ex. 21), Symantec claimed during the Government's investigation that it now lacks access to robust 2005 sales information directly from its then-existing recordkeeping systems.  Hudak Decl. at 13, ¶ E, Mot. Ex. 22.

[8]      Symantec similarly failed to maintain or has yet to produce commercial pricelist information for 2005, though again such information was plainly responsive to the Government's investigative demands.  Consequently, Plaintiffs used eSPA data to retrieve Standard Buy Prices for Symantec's sales during 2005 where available.  Robinson Decl. ¶¶ 10.b to 10.d, Mot. Ex. 20.

price listed in the sales data.  *Id.*  As detailed in the Robinson Declaration, Symantec's sales data

is inconsistent with the Frequency Chart; below is a chart comparing the two.

| Non-Published Discount Range | Frequency Chart Disclosure | 2005 Sales Data Results |
|---|---|---|
| 0-10% | 0.008% | 49.17% |
| 11-20% | 4.000% | 9.52% |
| 21-30% | 5.680% | 13.11% |
| 31-40% | 88.000% | 6.59% |
| 41-50% | 0.900% | 8.90% |
| 51-60% | 0.300% | 4.22% |
| 61-70% | 0.200% | 2.57% |
| 71-80% | 0.200% | 4.25% |
| 81-90% | 0.200% | 0.68% |
| 91-100% | 0.020% | 0.99% |

*Id.*  Notably, the Frequency Chart in Symantec's CSPs stated that of those receiving non-

published discounts, their discount was rarely above 40% (only 1.82% of non-published

discounts exceeded this amount).  *See* Initial CSPs at 4-5, Mot. Ex. 20.  Whereas, Symantec's

sales data reveals that fully 21.61% of those receiving non-published discounts in 2005, had

discounts greater than 40%.  Robinson Decl. ¶¶ 10-11, Mot. Ex. 20.

These discrepancies may in part be explained by undisclosed aspects of the data used to

generate the Frequency Chart.  For example, although Symantec entitled the Frequency Chart

"Summary of Non-Published Discounts offered by SKU or sales in 2005," the data used to create

the Frequency Chart did not encompass all 2005 sales, but instead just sales of products that

Symantec intended at the time to offer under its Contract.  *See* Bradbury Email of 2/24/2006,

Mot. Ex. 23.  Symantec never disclosed this limitation to GSA.  *See generally* Initial CSPs at 4-5, Mot. Ex. 10.  Further, although the Frequency Chart was purportedly limited to a disclosure of non-published discounts,[9] it included published discounts offered to distributors, especially in the 31-40% discount range.  *See* Bradbury Email of 2/24/2006, Mot. Ex. 23.  This served to flood the Chart with irrelevant sales making it appear that non-published discounts were almost always offered at levels below 40%.  *See supra* at 17.  Notably, the non-standard discounts offered to GSA and agreed to in the Contract all ranged below this 40% level.  FPR at 2-4, Mot. Ex. 18.

> ### B.     Based On Symantec's Own 2005 Sales Data, Symantec's Representations Regarding Its Approval Processes For Non-Standard Discounts Were False.

Using the 2005 sales data and eSPA information produced by Symantec, Plaintiffs again used simple Excel operations to ascertain whether the 2005 sales that had a non-published discount received an approval through eSPA.  *See* Robinson Decl. ¶ 12-13, Mot. Ex. 20.  As described above, Symantec represented that any deviations from its published prices required approval through eSPA.  *See supra* at 14.  Plaintiffs were unable to identify approvals in eSPA for 11,836 line items on 8,627 unique orders that received non-published discounts during 2005. *See* Robinson Decl. ¶¶ 12.c to 12.e, Mot. Ex. 20.

> ### C.     Symantec Offered Various Rebate Programs, Which It Failed To Disclose To GSA.

At or shortly before it executed the Contract, Symantec offered certain rebate programs to commercial customers, which it did not disclose to GSA in its CSPs.  For example, Symantec offered an Opportunity Registration Program ("ORP") back-end rebate program, which Symantec marketed as a method for resellers to earn rebates on new opportunities they identified.  *See* Symantec Email of 10/2/2007 with attachments, Mot. Ex. 24 (attaching ORP

---

[9]      As described, Symantec included other charts purporting to detail published or standard discounts in its CSPs.  *See supra* at 10-11.

rebate program flyers from late-2006 and early-2007). Specifically, around the time the Contract closed, Symantec allowed its partners to earn up to 7% cash rebates for transactions on eligible products. *Id.* Symantec failed to disclose this discount or price concession practice in its CSPs. *See generally* Initial CSPs, Mot. Ex. 10.

At this time, Symantec also offered rebates to distributors and resellers of its products to government customers. Specifically, Symantec paid rebates to five distributors or resellers -- including Carahsoft and UNICOM/GTSI -- amounting to 5% of sales on licenses they sold to GSA customers either on the Contract or their own MAS contracts. *See* Symantec Email of 10/11/2007 with attachment, Mot. Ex. 25 (attaching slides indicating rebates and termination of GSA rebate program as of 1/1/2008); Symantec Email of 10/7/2006, Mot. Ex. 26 (discussing plans to terminate GSA rebate program due to other rebate programs); Symantec Email of 1/6/2009, Mot. Ex. 27 (discussing prior GSA rebate program). Symantec failed to disclose this price concession practice in its CSPs. *See generally* Initial CSPs, Mot. Ex. 10.

Further, before it entered into the Contract, Symantec created the Partner Rebate Program ("PRP"). *See* Symantec Partner Program Requirement of 4/2007, Mot. Ex. 28; Sampling of Monthly Partner Rebates Emails, Mot. Ex. 29 (reflecting November and December 2006 rebate statements). The PRP provided tiered rebates to partners based on their volume of sales of eligible products, capping out at 4% of sales. *See id.* Every month Symantec would internally circulate a worksheet detailing the PRP and ORP "backend only" rebates each partner was slated to receive via email from the email address "Partner Rebates <partner_rebates@symantec. com>." *See, e.g.,* Sampling of Monthly Partner Rebates Emails, Mot. Ex. 29. Symantec failed to disclose this discount or price concession practice in its CSPs. *See generally* Initial CSPs, Mot. Ex. 10.

V.     SYMANTEC DIRECTED GSA TO RELY ON ITS FALSE CSPs AS BASES FOR
       NEGOTIATING CONTRACTS WITH THE AUTHORIZED RESELLERS.

In addition to Symantec's own contracting activities, Symantec expressly told GSA to

rely upon its CSPs in negotiating UNICOM/GTSI and Carahsoft's GSA MAS contracts.  *See*

Symantec Letters re: Use of CSPs, Mot. Ex. 30.  That is, when the Authorized Resellers needed

to provide GSA pricing and discounting information for Symantec products, Symantec penned

letters to GSA directing GSA to rely on Symantec's CSPs that it submitted during the pre-award

period of its own Contract.  *Id.*  For example, on December 15, 2009, Symantec wrote GSA's IT

Acquisition Center as follows.

> In accordance with the above-referenced Solicitation, if the manufacturer's
> item(s) is being offered by multiple dealers / resellers, only one copy of the
> requested information should be submitted to the Government.  Symantec hereby
> authorizes the use of information provided by Symantec to GSA in support of
> GSA Contract No. GS35F0240T.  All information provided by Symantec . . . may
> be used by GSA in evaluation of any proposal submitted by the companies
> identified above [including the Authorized Resellers].

Letters re: Use of CSPs at 3 (Letter of 12/15/2009), Mot. Ex. 30.  Thereafter, pursuant to letters

of supply from Symantec, the Authorized Resellers offered Symantec products for sale on their

own MAS contracts with pricing based on Symantec's CSPs.  *See* Carahsoft Letter of Supply,

Mot. Ex. 31; UNICOM/GTSI Letter of Supply, Mot. Ex. 32.

VI.    SYMANTEC AGREED THAT ALL COMMERCIAL CUSTOMERS WERE THE
       BASIS OF AWARD FOR PRC PURPOSES.

As described above, in negotiating a MAS contract, GSA and an offeror agree on a

customer or category of customers to serve as the Basis of Award for PRC purposes.  *See supra*

at 6-8.  In Symantec's FPR, it agreed to use its "commercial class of customers" as the Basis of

Award.  FPR at 1, Mot. Ex. 18.  In no way did Symantec limit this "commercial class of

customers" to exclude commercial customers buying under the Rewards program.  *See id.*  As

discussed above (*see supra* at 15-16), Symantec agreed in the FPR to offer and maintain GSA

prices in a manner that was equal to discounts off of pricing offered to commercial customers depending on the product category and SIN. *See* FPR at 2-4, Mot. Ex. 81. The parties executed the Contract under the terms of Refresh #17 of GSA's relevant MAS solicitation. *See* FPR at 1, Mot. Ex. 18. Refresh #17, and thus the Contract, included the PRC. *See* GSA Refresh #17 at SYM01141707-08, Mot. Ex. 21.[10]

## VII.   DURING THE LIFE OF THE CONTRACT SYMANTEC SUBMITTED CLAIMS FOR PAYMENT AND PERIODIC CERTIFICATIONS THAT ITS PRE-AWARD CSPS REMAINED ACCURATE.

During the life of the Contract, Symantec reported significant sales of products and services to Government customers under the terms of the Contract, and submitted claims for payment of the same. *See* Summary of Sales under Symantec Contract, Mot. Ex. 45. Indeed, Symantec's Industrial Funding Fee ("IFF") reports -- *i.e.*, reports of IFF payments due to GSA -- listed more than $220 million in sales from the First Quarter of 2007 through the Third Quarter of 2012. *See id.*

Symantec also authorized resellers to incorporate Symantec's CSPs into the resellers' own MAS contracts. Those Authorized Resellers also reported significant sales of products and services to Government customers under the terms of their own MAS contracts, and submitted claims for payment of the same. *See* Letters re: Use of CSPs (Letter of 12/15/2009), Mot. Ex. 30; Carahsoft Letter of Supply, Mot. Ex. 31; UNICOM/GTSI Letter of Supply, Mot. Ex. 32; Summary of Carahsoft Sales of Symantec Products, Mot. Ex. 46; Summary of UNICOM/GTSI Sales of Symantec Products, Mot. Ex. 47. The prices used on these sales were based on Symantec's CSPs, which Symantec expressly told GSA to rely upon in negotiating the pricing of

---

[10]      In its FPR, Symantec also acknowledged Refresh Nos. 18, 19, and 20 of GSA's MAS solicitation and incorporated them into its offer as well. FPR at 1, Mot. Ex. 18. Refresh Nos. 18, 19, and 20 of GSA's MAS solicitation also include the PRC. *See generally* GSAR § 552.238-75.

Symantec products under the Authorized Resellers' own GSA MAS contracts.  *See supra* at 20

(citing Letters re: Use of CSPs at 3 (Letter of 12/15/2009), Mot. Ex. 30).

Lastly, during the life of the Contract, Symantec periodically sought to modify it, including to add and subtract items from its GSA pricelist.  *See* Periodic Certifications (Symantec Files), Mot. Ex. 33a; Periodic Certifications (GSA Files), Mot. Ex. 33b.  In seeking these modifications, Symantec repeatedly represented to GSA that its commercial practices had not changed from those disclosed during the pre-award Contract negotiations.  *See, e.g.,* Periodic Certifications (Symantec Files) at 1 (SYM00048279), Mot. Ex. 33a ("The commercial discounting policies and practices disclosed by Symantec under the awarded contract dated January 25, 2007 have not changed"); *id.* at 3 (SYM00048299) ("The commercial sales practices have not changed;"); *id.* at 7 ("all other prices, discounts, clauses, terms and conditions of the contract referenced above will remain the same").

## VIII.  SYMANTEC VIOLATED THE PRC AND ITS PERIODIC CERTIFICATIONS WERE FALSE IN SEVERAL UNDISPUTED RESPECTS.

Claims under or based on the Contract and Symantec's periodic certifications were false as Symantec's sales and discounting practices during the life of the Contract differed from those disclosed during negotiations.  As an initial matter, they were different because Symantec failed to accurately disclose its then-existing practices during negotiations.  *See supra* at 16-20.  That is, Symantec's claims and periodic certifications were false for the same reasons its CSPs were false.  Further, even had Symantec accurately disclosed during the pre-award negotiations its then-existing practices, Symantec's practices changed during the Contract, which Symantec failed to disclose to GSA.  Certain of these changes are undisputed based on the already well-developed record.

A.     **Symantec Failed to Update the Frequency Chart or Otherwise Notify GSA That The Frequency of Its Deep Discounts Changed During Performance of the Contract.**

Not only did the Frequency Chart fail to portray accurately Symantec's 2005 sales, Symantec's sales during the life of the Contract differed from the metrics described in the Frequency Chart.  Once again Plaintiffs took records of commercial sales produced by Symantec during the Government's investigation and applied simple, layperson Excel functions to the data to generate charts depicting the depth and frequency of Symantec's discounts from 2007 to 2012. *See* Robinson Decl. ¶¶ 14-18, Mot. Ex. 20.  The table below summarizes the results of these simple analyses.[11]

| **Discount** | **Frequency Chart** | **2007 Sales** | **2008 Sales** | **2009 Sales** | **2010 Sales** | **2011 Sales** |
|---|---|---|---|---|---|---|
| less than 40% | 97.688% | 50.92% | 51.06% | 67.71% | 67.39% | 67.62% |
| 41-100% | 1.82% | 49.08% | 48.94% | 32.29% | 32.61% | 32.38% |

*Id.* ¶ 17.  Notably, during the entire life of the Contract, those receiving discounts received them at levels of over 40% off of list price more than 39% of the time -- a sharp departure from the 1.82% of the time represented by Symantec in its Frequency Chart.  *Id.*  These simple analyses show that the depths and frequencies of Symantec's discounts during the life of the Contract departed from those described in the Frequency Chart.  *Id..*  Nonetheless, Symantec never updated its initial CSPs and never informed GSA that its discounting included deep discounts far

---

[11]     As explained in the Robinson Declaration (Robinson Decl. ¶ 16, Mot. Ex. 20), unlike the above summary of 2005 sales data, for summaries of 2007 to 2011 sales data, we did not attempt to remove standard discounts offered to resellers and distributors.  *Id.*  That is, we adopted Symantec's incorrect and false assumption underlying the Frequency Chart that standard discounts offered to resellers and distributors were properly included in a chart purporting to detail non-published discounts.  *Id.*  Even with this false assumption, Symantec's sales during the life of the Contract differed greatly from those disclosed on the Frequency Chart.

more often than it had disclosed to GSA. *See generally* Periodic Certifications (Symantec Files), Mot. Ex. 33a; Periodic Certifications (GSA Files), Mot. Ex. 33b.

**B.**     **Symantec Failed to Inform GSA That Non-Standard Discounts Were Being Given Without Approval Through eSPA and SFDC, the Internal Controls <u>Symantec Portrayed as Monitoring its Non-Standard Discounts.</u>**

During the life of the Contract, Symantec continued its practice of not seeking management approval of non-standard discounts through eSPA (or its successor, the Sales Force Dot Com system ("SFDC"), *see* Symantec Email of 3/28/2008, Mot. Ex. 34 (discussing transition)). Using simple Excel functions to compare Symantec's sales data to SFDC data, and using even the most conservative of assumptions, Plaintiffs found more than 14,000 commercial orders during the life of the Contract that received a non-published discount yet had no approval in SFDC. Robinson Decl. ¶¶ 19-21, Mot. Ex. 20. Notably, using just the automated mechanisms that Symantec purportedly used to track SFDC approvals of non-published discounts (and not the additional conservative assumptions described in the Robinson Declaration) that number grows to more than 20,000 orders for which there is no SFDC approval. *Id.* Symantec never disclosed to GSA its practice of giving non-standard discounts outside of eSPA or SFDC. *See generally* Periodic Certifications (Symantec Files), Mot. Ex. 33a; Periodic Certifications (GSA Files), Mot. Ex. 33b.

**C.**     **Symantec Failed to Inform GSA of its Rebating Programs During the Life of <u>the Contract.</u>**

Although Symantec transitioned certain public sector distributors and resellers to other undisclosed rebate programs (described below), after entering into the Contract, Symantec continued to offer specific public sector rebates to certain companies. For example, on January 18, 2008, Symantec and immixGroup ("Immix") entered into a Statement of Work ("SOW") purporting to "provide details regarding the services and support provided by immixGroup to

Symantec relating to growing and managing Symantec's Public Sector business."  Immix SOW at 2, Mot. Ex. 35.  As part of Immix's SOW, Symantec agreed to pay Immix "a fee not-to-exceed five percent (5%) of the funded net revenue to Symantec" -- *i.e.*, the revenue Symantec derived from Immix's sale of Symantec "Licensed Software and related Services[.]"  *Id.* at 3. Symantec's executives recognized that this deal was merely a method to provide a "rebate" or "back end rebate" to Immix for its sales of Symantec products to public sector clients.  Emails re: Immix's "back end rebate," Mot. Ex. 36.

After entering into the Contract, Symantec also began and continued numerous other systemic programs to provide rebates to distributors and resellers of its products.  For example, before or after entering into the Contract, Symantec created a Volume Incentive Rebate ("VIR") program to incentivize partners to sell more Symantec products.  *See* Excerpts from Presentation, "Partner Programs - Americas FY10 Update (Q1)" of 10/2/2009 at 22, Mot. Ex. 37 (noting VIR rebates in Q1 2009 totaled $7.5M).  Under this program, Symantec provided millions of dollars of rebates to resellers and distributors, including partners making sales to the federal government.  *See, e.g.,* VIR Program Audit Summary, Mot. Ex. 38; VIR Letters from VIR Program Audit, Mot. Ex. 39.  Despite creating this new rebating program, Symantec nonetheless confirmed to GSA that its sales and discounting practices had not changed from those disclosed during pre-award Contract negotiations.  *See generally* Periodic Certifications (Symantec Files), Mot. Ex. 33a; Periodic Certifications (GSA Files), Mot. Ex. 33b.

In or about 2008, Symantec also revised its Opportunity Registration Program to include new deeper benefits.  *See* Symantec Email of 7/22/2009, Mot. Ex. 40.  Symantec again marketed this program to its commercial channel partners as a way to "earn more with combined rebates" across programs, including in combination with PRP.  *Id.*  Symantec touted that its partners

could "earn rebates of 8-24% off net bookings on Symantec business." *Id.*  Symantec likewise never disclosed the ORP rebate program to GSA and instead falsely certified that the sales and discounting information it had initially disclosed remained the same.  *See generally* Periodic Certifications (Symantec Files), Mot. Ex. 33a; Periodic Certifications (GSA Files), Mot. Ex. 33b.

Symantec also continued its PRP and continued to send monthly emails from its Partner Rewards internal mailbox.  Sampling of Monthly Partner Rebates Emails, Mot. Ex. 29. Symantec never disclosed PRP to GSA.  *See generally* Periodic Certifications (Symantec Files), Mot. Ex. 33a; Periodic Certifications (GSA Files), Mot. Ex. 33b.

By October 2009, Symantec's methods of providing price concessions to its distributors and partners amounted to a dizzying variety of 20 different programs, only two of which -- front-end published discounts based on buying programs and bands and front-end non-published discounts approved through eSPA -- Symantec had even mentioned to GSA.[12]  *See* Symantec Email of 10/21/2009 with attachment, Mot. Ex. 41 (chart containing various discounting programs).  Notably, in early 2012, Symantec undertook an internal review of its rebate programs and concluded that, from a business perspective, several areas needed improvement, including Symantec's efforts to monitor and track its rebate practices.  *See* Americas & EMEA Enterprise Rebate Programs Audit, Final Report of 3/2012, Mot. Ex. 42.  Symantec never informed GSA of its audit results or the variety of rebate programs it employed and instead persisted with its false certifications that the practices it initially disclosed remained unchanged. *See generally* Periodic Certifications (Symantec Files), Mot. Ex. 33a; Periodic Certifications (GSA Files), Mot. Ex. 33b.

---

[12]     As described above, although Symantec mentioned its published discounting and eSPA non-published discounts, it failed to provide a complete and accurate disclosure of those programs too. *See supra* at 16-20.

IX.   **SYMANTEC'S INTERNAL AUDITS FURTHER IDENTIFIED SYMANTEC'S HAPHAZARD DISCOUNTING PRACTICES.**

Symantec's internal audits further underscore the inconsistent and haphazard nature of its discounting practices.   Nonetheless, Symantec failed to supplement its CSPs, correct its erroneous periodic certifications, or provide disclosure pursuant to its PRC obligations.   In addition to the rebate audit (described above), in November 2010, Symantec's Corporate Risk Assurance component completed an internal audit of the company's discounting practices.   *See* US/LAM Discounts Audit, Final Report of 11/2010 at 2, Mot. Ex. 48.   Among other things, Symantec's audit report identified a laundry list of problems with its discounting practices, including:

> [1] a lack of overarching corporate strategies or programs to guide the application of non-standard discounts, [2] non-availability of data needed for compilation of key discount metrics and reporting, [3] no formalized management review of discounting trends and statistics, [4] unclear policies related to when and how non-standard discounts should be discussed with customers and partners, [5] no protocols or policies available to guide discount approvers in their decisions to approve or reject discount requests, and [6] informal communication channels across sales teams resulting in potential non-compliance with General Services Administration (GSA) contractual agreements . . .

> The lack of guidelines for those approving non-standard discount requests also contributes to an approval system that is inconsistent and potentially ineffective. Finally, informal communication processes between US sales teams (commercial, public sector, and sales contracts) could create a situation whereby GSA discounts are no longer competitive or in compliance with contractual terms, resulting in the possible payment of restitution and/or fines to the US government.

*Id.* at 2.   Notes from meetings occurring on this audit (which included high-ranking Symantec executives) were even more candid.   For example, notes from a July 15, 2010, meeting confirmed that discount reporting "[e]very quarter is ad-hoc.  Various groups take stab in arrears. Last analysis in December . . . wasn't even based on half of total revenues.  There is currently nothing programmatic or consistent about discount reporting."  US Discounts Audit, Meeting Notes of 7/15/2010, Mot. Ex. 49.  Moreover, notes from a July 28, 2010, meeting specifically

remarked on the fact that Symantec's commercial sales staff did not receive any GSA compliance training, describing that training as "[t]he training that was given to the Public sector sales reps and not the Commercial sales reps that need to adhere to those practices."  US Discounts Audit, Meeting Notes of 7/28/2010, Mot. Ex. 49.

## THE UNITED STATES' CLAIMS IN THIS ACTION

Based on Symantec's wrongdoing, the Government has asserted several claims in this action, which for the Court's convenience the United States summarizes below:

1.      The Government asserts a breach of contract claim based on Symantec's failures to (i) disclose accurately and completely its commercial sales and discounting practices during negotiation of the Contract; and (ii) to comply with the PRC.  R.41 (Omnibus Compl.) at Count VII.  As to the former, the Government contends that Symantec's disclosures were false as to the (a) Frequency Chart, (b) Reason Code Chart, (c) statements regarding processes used to approve non-standard discounts, (d) disclosure of the Rewards Program, and (e) disclosure of rebate programs (collectively, the "CSP Violations").  *Id.* ¶¶ 97-126.  The Government contends that Symantec violated the PRC by providing commercial customers, but not the Government, (i) non-standard discounts beyond, and different from, those disclosed during Contract negotiations, (ii) Rewards pricing, (iii) rebates, and (iv) other deep discounts not reflected in Symantec's disclosed policies, including exceptions to band and buying program requirements and prerequisites (collectively, the "PRC Violations.").  *Id.* ¶¶ 133-80.

2.      The Government asserts quasi contractual claims of unjust enrichment and payment by mistake primarily arising from Symantec's direction for GSA to use its CSPs to negotiate pricing on Symantec products offered under the Authorized Resellers' MAS

contracts.[13]   *Id.* at Counts VIII, IX.   That is, although the Government and Symantec share no privity on sales under the Authorized Resellers' agreements, Symantec's direction to use its CSPs for those agreements (which CSPs were false for the reasons noted above) and its failure to abide by its own PRC (again for the reasons noted above) led GSA to make mistaken payments that unjustly enriched Symantec on sales of Symantec products made under the Authorized Resellers' agreements.

3.      The United States asserts False Claims Act ("FCA") claims arising from claims for payment that Symantec made under the Contract.   *Id.* at Count I.   Specifically, the Government contends that (i) the CSP Violations fraudulently induced GSA to enter into the Contract with offered prices, rendering all claims thereunder false; (ii) Symantec's claims overcharged GSA customers, making them inherently false; and (iii) Symantec's claims under the Contract were false because they impliedly certified compliance with Symantec's CSP disclosure obligations and the PRC, which certifications were false due to the CSP and PRC Violations, respectively.   *Id.*

4.      The United States asserts a false statement-based FCA claim arising from statements Symantec made to GSA regarding the Contract.   *Id.* at Count II.   Specifically, the Government contends that Symantec made false statements material to false claims by virtue of (i) the CSP Violations and (ii) Symantec's continual periodic certifications during the life of the Contract that its CSPs remained complete and accurate ("Periodic Certifications").   *Id.* ¶¶ 181-85.

---

[13]      The Government also pleaded its quasi contractual claims as alternatives to its direct breach of contract claim for sales occurring on Symantec's contract.   To the extent the Court finds the Contract to be a binding written agreement, the Government's quasi contractual claims will be confined in future proceedings in this matter to allegations concerning sales on the Authorized Resellers' contracts.

5.      The United States asserts false claims and false statement-based FCA claims arising out of the Authorized Reseller's MAS contracts.  *Id.* at Counts III, IV.  That is, the Government contends that Symantec made false statements material to the Authorized Reseller's MAS contracts by expressly authorizing GSA in forming those contracts to rely on its CSPs, which were false due to the CSP Violations.  *Id.* at Count IV.  This express authorization also (i) fraudulently induced GSA to enter into the Authorized Reseller's MAS contracts with the offered prices; (ii) caused the Authorized Resellers to overcharge GSA customers (*i.e.*, make false claims); and (iii) rendered the Authorized Resellers' claims false because they impliedly and expressly certified compliance with requirements to disclose accurate commercial sales practices.  *Id.* at Count III.  That is, Symantec's express authorization caused the claims under the Authorized Reseller's MAS contracts to be false.  *Id.*

6.      The Government asserts a post-FERA (defined below) "reverse" FCA claim regarding Symantec's concealment of, and failure to disclose, its CSP Violations, its PRC Violations, and the falsity of its Periodic Certification on and after May 20, 2009, despite its knowledge of these violations learned in part through its internal audits.  *Id.* at Count V.

7.      Lastly, the Government asserts a common law negligent misrepresentation claim arising from Symantec's CSP Violations and false Periodic Certifications causing damages under both the Contract and the Authorized Reseller's MAS contracts.  *Id.* at Count VI.

## ARGUMENT

To streamline this action for discovery, the United States moves for summary judgment on certain threshold issues that are beyond dispute in this action.

As an initial matter, it is undisputed that the Contract is a valid, enforceable agreement between the parties, which obligated Symantec to fully and accurately describe its commercial sales practices and abide by the PRC.  It is equally beyond dispute that Symantec's CSPs were

false and incomplete in certain respects -- namely with regards to the Frequency Chart, statements regarding management approval processes for non-standard discounts, and the omission of rebate programs.  Symantec made these false statements not only to GSA on its own Contract but also in connection with the Authorized Resellers MAS contracts.

There also exists no genuine issue of material fact that Symantec's CSPs grew increasingly false during Symantec's performance of the Contract as Symantec's sales practices and discounting changed.  These changes rendered Symantec's periodic certifications false. Lastly, it is beyond debate that Symantec violated the PRC by failing to inform GSA of its true practices during the life of the Contract and pass along more advantageous pricing that Symantec offered to commercial customers than that disclosed to GSA.

Resolution of these issues will resolve certain elements of the Government's breach of contract, FCA, and negligent misrepresentation claims noted below and pare down this action for discovery and subsequent proceedings.

## I.      SUMMARY JUDGMENT STANDARD.

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and thus the movant is entitled to judgment as a matter of law.'" *Clemmons v. Acad. for Educ. Dev.*, --- F. Supp. 3d ---, 2014 WL 4851739, at *6 (D.D.C. Sept. 30, 2014) (Contreras, J.) (granting summary judgment, internal correction marks omitted) (quoting Fed. R. Civ. P. 56(a), and citing *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011)). "A fact is material [under the summary judgment standard] if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Clemmons*, 2014 WL 4851739, at *6 (quoting *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008), and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The Rules specifically contemplate that a party may move for partial summary judgment on certain aspects of its claims.  That is, "[a] party may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Indeed, this Court has entertained motions for partial summary as to specific elements of FCA claims.  *See United States ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 158, 174 n.6 (D.D.C. 2007) (Urbina, J.) (granting summary judgment on claim, presentment, and materiality elements of FCA false claim cause of action); *United States v. Speqtrum, Inc.*, --- F. Supp. 2d ---, 2014 WL 2620981, at *11-12 (D.D.C. Jun. 13, 2014) (Boasberg, J.) (granting partial summary judgment on certain aspects of FCA claims).

"When Rule 56 is invoked, the moving party has the initial burden of demonstrating the absence of a genuine dispute as to any material fact."  *Clemmons*, 2014 WL 4851739, at *6 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "Once the moving party has met its burden, to defeat the motion the nonmoving party must designate 'specific facts showing that there is a genuine issue for trial.'"  *Clemmons*, 2014 WL 4851739, at *6 (quoting *Celotex*, 477 U.S. at 324).  "Although the Court must view this evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, the nonmoving party must show more than 'the mere existence of a scintilla of evidence in support of' his position -- 'there must be evidence on which the jury could reasonably find for the nonmoving party.'" *Clemmons*, 2014 WL 4851739, at *6 (quoting *Anderson*, 477 U.S. at 252) (other citations, quotation marks, and correction marks omitted).  "Moreover, the nonmoving party 'may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for trial.'"  *Clemmons*, 2014 WL 4851739, at *6 (quoting *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987)).

## II.     ELEMENTS OF THE UNITED STATES' BREACH OF CONTRACT AND FCA CLAIMS.

### A.     Elements of a Breach of Contract Claim.

Under federal law,[14] the elements of a breach of contract claim are: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." *Red Lake Band of Chippewa Indians v. U.S. Dep't of Interior*, 624 F. Supp. 2d 1, 12 (D.D.C. 2009) (Kollar-Kotelly, J.) (granting, in part, plaintiff's motion for summary judgment on contract claim).

### B.     Elements of FCA Claims.

Relevant to this action are three provisions, or causes of action, under the federal FCA: (a) the false claim provision, (b) the false statements or records provision, and (c) the concealment or "reverse" false claims provision.

#### 1.     False Claim FCA Claim.

Here, to succeed under the "false claim" provision, the United States must establish the following elements (i) Symantec presented, or caused to be presented, a claim; (ii) that was false; and (iii) that Symantec acted knowingly.  31 U.S.C. § 3729(a)(1)(A);[15] *United States ex rel.*

---

[14]     Federal law, instead of the law of a state, generally governs contractual disputes where the United States is a party.  *See Clearfield Trust Co. v. United States*, 318 U.S. 363, 365-67 (1943); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979).

[15]     The Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009, amended the Federal FCA.  Pursuant to its terms, the FERA amendments to the "false claims" provision of the FCA apply to conduct occurring on or after May 20, 2009.  *See* FERA, Pub. L. No. 111-21, sec. 4(f), 123 Stat. 1617, 1625 (2009).  Relevant to the "false claims" provision, FERA relaxed the FCA's presentment requirement to include not only claims presented to the United States but also to persons who have received federal funds.  *See* S. Rep. 111-10, at 10-11, 2009 U.S.C.C.A.N. 430, 438 (2009).  Although this action concerns claims both before and after this date, because the Government alleges that all relevant claims here were presented directly to the United States (and not an intermediary), this change is immaterial to this matter.  As such, solely for convenience, the Government cites the current version of the statute herein unless otherwise noted.

*Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 26 (D.D.C. 2010) (Huvelle, J.) (citing *United States ex rel. Westrick v. 2d Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 135 (D.D.C. 2010)).

The Government may establish falsity in at least three ways.  *First*, the Government may show that the claim is factually or inherently false -- *e.g.*, when a claim contains "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided," *United States v. Sci. Applications Int'l. Corp. ("SAIC")*, 626 F.3d 1257, 1266 (D.C. Cir. 2010), or when it overcharges the United States for goods or services provided. *United States ex rel. Hood v. Satory Global, Inc.*, 946 F. Supp. 2d 69, 83 (D.D.C. 2013) (Collyer, J.) (describing cases where contractor bills for work not performed or overcharges for serviced provided as "paradigmatic FCA claims," which "clearly fall within the scope of the FCA") (citing *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 197 n.13 (D.D.C. 2011) (Kessler, J.)); *see also United States v. Bouchey*, 860 F. Supp. 890, 893 (D.D.C. 1994) (invoices overcharging for consulting services were inherently false claims).

*Second*, a claim may also be false because it contains an express or implied certification of compliance with applicable requirements. *Id.*  If the Government relies on an implied certification theory, the Government must also establish that the implied falsities (*i.e.*, the requirements allegedly violated) were "material to the government's decision to pay." *SAIC*, 626 F.3d at 1271.

*Third, and lastly*, a claim may be false because the contract under which it was made was procured through fraud -- *i.e.*, the fraudulent inducement theory.  *See, e.g., United States ex rel. Tran v. Computer Sci. Corp.*, --- F. Supp. 2d ---, 2014 WL 2989948, at *17 (D.D.C. July 3, 2014) (Brown Jackson, J.) ("The viability of an allegation of fraudulent inducement in violation of the

FCA is well-established. . . . 'each and every claim submitted under a contract or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct constitutes a false claim'").[16]

### 2.   FCA False Statements Claim.

To succeed on a false statement or record cause of action under the FERA amended FCA, the Government must show (i) Symantec made, used, or caused to be made or used a statement or record that was false; (ii) that the statement was material to a false claim; and (iii) that Symantec acted knowingly.  31 U.S.C. § 3729(a)(1)(B); *United States ex rel. Landis v. Tailwind Sports Corp.*, --- F. Supp. 2d ---, 2014 WL 2772907, at *23 (D.D.C. Jun. 19, 2014) (Wilkins, J.).[17]

---

[16]   Quoting *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005) (internal correction marks omitted) (quoting S. Rep. 99-345, at 9, U.S.C.C.A.N. 5266, 5274 (1986)); *see also United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 197 (D.C. Cir. 1995) (noting theory, describing it as the "original misrepresentation tainted every subsequent claim made in relation to the contract"); *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 49 (D.D.C. 2011) (Roberts, J.) ("Even in the absence of allegations that the claims themselves were false, however, claims alleged to have been submitted under a contract procured by fraud can be actionable."); *Head*, 798 F. Supp. 2d at 196 ("Fraudulent inducement claims consist of claims submitted to the Government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves.") (internal quotation and correction marks omitted); *United States ex rel. Hockett v. Columbia / HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 70 n.33 (D.D.C. 2007) (Lamberth, C.J.) ("While the bills or invoices submitted under a fraudulently induced contract may be true as far as they go, they are said to be permeated with the taint of the original, fraudulently induced contract, and are thus false claims themselves.").

[17]   As recognized by *Landis*, 2014 WL 2772907, at *22-25, the weight of Circuit authority has held the FERA amendments regarding the materiality of false statements are applicable to all causes of action pending on or after June 7, 2008.  *Id.* (interpreting the term "claim" in FERA's enactment provision as meaning "cause of action" and not "claim for payment," collecting cases from Sixth, Seventh, Second, and Fifth Circuits); *see also Pencheng Si v. Laogai Res. Found.*, --- F. Supp. 3d ---, 2014 WL 5446487, *8 (D.D.C. Oct. 14, 2014) (Brown Jackson, J.) (observing that FERA false statement amendments apply to "FCA suits . . . that were pending on June 7, 2008"); *but see United States ex rel. Barko v. Halliburton Co.*, 952 F. Supp. 2d 108, 118 n.94 (D.D.C. 2013) (Gwin, J.); *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 48 n.6 (D.D.C. 2011)

### 3.      Concealment or "Reverse" FCA Claim.

To prevail under the FCA's FERA-amended "reverse" false claims provision, the Government must show (i) that Symantec concealed, avoided, or decreased; (ii) an obligation to pay the United States; and (iii) did so knowingly.  31 U.S.C. § 3729(a)(1)(G).  An "obligation" to pay the United States "means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).

### 4.      FCA Materiality Standard.

Under both the pre- and post-FERA FCA, a falsity is material if "it has a natural tendency to influence agency action or is capable of influencing agency action."  *United States ex rel. Fago v. M & T Mort. Corp.*, 518 F. Supp. 2d 108, 118 (D.D.C. 2007) (Kessler, J.) (applying pre-FERA FCA) (quoting *United States ex rel. Berge v. Bd. of Trs. of Univ. of Ala.*, 104 F.3d 1453, 1460 (4th Cir. 1997)); *see also Hays v. Hoffman*, 325 F.3d 982, 992 (8th Cir. 2003) (applying pre-FERA FCA, "false claims were material if they were capable of influencing the government's payment decision") (internal quotation marks omitted); 31 U.S.C. § 3729(b)(4) (post-FERA FCA, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property").

---

(Roberts, J.).  In any event, as the FERA false statement amendments concern issues of materiality (not falsity) this distinction is not relevant to the issues on this Motion.

C.     **Elements of a Negligent Misrepresentation Claim.**

Under federal law,[18] to prevail on a claim of negligent misrepresentation the United States must show that Symantec (a) was negligent in expressing inaccurate statements, (b) owed a duty to the United States to speak, (c) expected the United States to rely on the statements, and that the United States did rely on them, and (d) caused the United States injuries.  *Marcus v. AT&T Corp.*, 938 F. Supp. 1158, 1172 (S.D.N.Y. 1996) (discussing elements of negligent misrepresentation claim under federal law); *see also Parr v. Ebrahimian*, --- F. Supp. 3d ---, 2014 WL 4828198, at *3 (D.D.C. Sept. 30, 2014) (Friedman, J.) (applying similar D.C. law rules); Restatement (Second) of Torts § 552 (1977).

III.   **THE CONTRACT IS A VALID, ENFORCEABLE WRITTEN AGREEMENT BETWEEN SYMANTEC AND GSA, WHICH ESTABLISHED DUTIES.**

It is clear that the Contract is a valid and enforceable written agreement between the parties, which created certain obligations for Symantec, including an obligation to disclose accurately and completely discounts and concessions offered to commercial customers and to abide by the terms of the PRC.  Resolution of these issues will (i) resolve the first two elements of the Government's breach of contract claim (*see supra* at 26, ¶ 1), and (ii) establish the contractual standards against which to judge the Government's remaining claims stemming from the CSP Violations, the PRC Violations, and the false Periodic Certifications (*id.* ¶¶ 3-7).

"The party alleging a contract must show a mutual intent to contract including an offer, an acceptance, and consideration passing between the parties." *Thermalon Indus., Ltd. v. United*

---

[18]     Federal law governs the pendent common law tort claims asserted by the United States. *See, e.g., United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 308-11 (1947) (a uniform rule of federal law applies to the United States' tort claims).

*States*, 34 Fed. Cl. 411, 414 (1995) (citing *Fincke v. United States*, 675 F.2d 289, 295 (1982)).[19] Applying this standard here, there is no debate that the Contract is valid and enforceable.  The FPR by its terms is an offer, which GSA promptly accepted through a letter with the same date. *Supra* at 15-16.  Further, the Contract was plainly supported by consideration as a matter of Government contract law.  *See Locke v. United States*, 151 Ct. Cl. 262, 261 (1960) (finding as to Federal Supply Schedule contracts, "It is now beyond question that contracts for requirements do not lack mutuality and are enforceable. In every case it is the reasonable expectation by both parties that there will be requirements on which the bargain is grounded.").  Consequently, the Contract is an enforceable agreement.

It is also beyond dispute that the Contract obligated Symantec to disclose to GSA accurately and completely its discounts and concessions offered to commercial customers during negotiation of the Contract.  As described in elaborate detail above (*see supra* at 3-6, 10-12), the terms of the MAS solicitation (including authorities and directions incorporated therein) required Symantec to disclose its written discounting policies or commercial sales practices, and any deviations from those policies or practices, for all customers who received better pricing than that offered to the Government "regardless of quantity or terms and conditions."  Initial CSPs at 2, Mot. Ex. 10; *supra* at 3-6, 10-12.  The Contract further obligated Symantec to update these disclosures up through the execution of the Contract (*supra* at 5-6), and Symantec expressly stated that its "commercial business practices ha[d] been fully disclosed and [were] current, accurate and complete as of the conclusion of negotiation."  FPR at 1, Mot. Ex. 18.

---

[19]    Where a party seeks to bring a contractual claim against the United States, that party must also show that "the government representative who entered or ratified the agreement had authority to bind the United States in contract."  *Termalon Indus.*, 34 Fed. Cl. at 414.

There also exists no genuine issue of material fact that the Contract through the PRC obligated Symantec to report all price reductions and other favorable changes in the terms and conditions that Symantec provided to its "commercial class of customers," which was the basis of award for the Contract.  FPR at 1, Mot. Ex. 18.  That is, the Contract obligated Symantec to report favorable changes during the life of the Contract from those disclosed in negotiations, including regarding (i) the depth and frequency of non-published discounts offered to commercial customers; (ii) the processes used to approve non-published discounts; and (iii) rebate programs.  *Supra* at 6-8, 20-21 (discussing PRC).  The PRC also indisputably required Symantec to pass along to the Government favorable changes in prices, concessions, and discounts.  *Id.*

These provisions bound Symantec as a matter of law.  Accordingly, summary judgment is now proper on these issues.  *See generally Red Lake*, 624 F. Supp. 2d at 15 ("Contract interpretation is a question of law and thus presents an appropriate question for resolution on summary judgment."); *Greco v. Dep't of the Army*, 852 F.2d 558, 560 (Fed. Cir. 1988) (the "principle that interpretation of the terms of a contract is a question of law" is well-settled).

## IV. SYMANTEC'S CSPS WERE FALSE IN CERTAIN UNDISPUTED RESPECTS.

As described above, the undisputed facts already existing in the record conclusively reveal as false (i) the Frequency Chart, (ii) Symantec's statements regarding management approvals of non-standard discounts, and (iii) the absence of any disclosure of rebate programs.  Summary judgment on these issues will resolve, in part, (a) the falsity elements of the Government's false statement FCA claims and its negligent misrepresentation claim, regarding the CSP Violations (*see supra* at 27-28, ¶¶ 3-4, 7); and (b) the breach element of the Government's breach of contract claim regarding the CSP Violations (*id.* ¶ 1).

*First*, there exists no genuine issue of material fact that the Frequency Chart inaccurately described Symantec's non-standard discounting on commercial sales made in 2005. As described above, although Symantec represented that more than 97% of its non-standard discounts fell below 40% off of published prices, in actuality more than 21% of its non-standard discounts exceeded that threshold. *Supra* at 16-18. As such, the Frequency Chart was factually false. Further, the falsity in the Frequency Chart breached the Contract, which required Symantec to disclose accurately and completely its non-standard discounting practices. *Supra* at 16-18.

*Second*, it is undisputed that Symantec often gave non-standard discounts to commercial customers without obtaining approvals through eSPA or SFDC. *Supra* at 18. This was contrary to its express representation that "[a]ny deviations from published discounts require management approval. Deviations *must be* documented and approved in accordance with the following guidelines," which Symantec then indicated included the use of "the Worldwide Sales discounting tool referred to as 'eSPA[.]'" Supplemental Response at 4, Mot. Ex. 16 (emphasis added). While the Government leaves for another day summary judgment as to the materiality of these representations, they are facially important to provide GSA comfort that the wide variety and deep nature of Symantec's non-standard discounts were controlled, reported, and confined to the remote occasions and specific circumstances disclosed on the Frequency Chart and Reason Code Chart, respectively. Today, however, it is clear that Symantec's representations in this regard were factually false and breached the Contract.

*Third, and lastly*, nowhere did Symantec disclose any rebate program, let alone provide details as to the nature and depth of rebates provided to customers. This was false as Symantec's own documents show that it had at least three rebate programs, including specific rebate

practices for resellers of Symantec products to GSA.  *Supra* at 18-20.  That is, in addition to its commercial rebating programs, at the time of award Symantec employed a practice to reduce prices to GSA resellers by giving them a backend rebate.  *Id.*  Symantec's failure to disclose this price concession prevented GSA from demanding that it be passed along to Government customers.  Accordingly, Symantec's omission of rebate practices rendered its CSPs factually false and breached the Contract.

## V.   SYMANTEC USED THE FALSE CSPS NOT ONLY FOR ITS OWN CONTRACT, BUT ALSO FOR THE MAS CONTRACTS OF THE AUTHORIZED RESELLERS.

It is also undisputed that Symantec directed GSA to use its false CSPs in negotiations with the Authorized Dealers concerning Symantec products on their schedule contracts.  *Supra* at 20.  That is Symantec made or used, or caused to be made or used, the statements and records contained in its CSPs in connection with the Authorized Dealers' contracts, which statements and records were false.  31 U.S.C. § 3729(a)(2) (pre-FERA); 31 U.S.C. § 3729(a)(1)(B) (post-FERA).  Accordingly, summary judgment is proper on this issue.  By granting summary judgment on this issue the Court will resolve the "making or using" element and, in part, the falsity element of the Government's false statement FCA claims predicated on the Authorized Dealers' MAS contracts.  *Supra* at 27-28, ¶ 5.

## VI.   SYMANTEC VIOLATED THE PRC IN CERTAIN UNDISPUTED RESPECTS.

Symantec's misconduct is not confined to defective pricing theories.  Rather, the already robust record also conclusively shows that Symantec violated the PRC by failing to report and pass along discounts associated with (i) non-published discounts more favorable and different than those disclosed in the Frequency Chart and (ii) rebates, which were never disclosed.  Summary judgment on these issues will resolve, in part, the breach element of the Government's breach of contract claim regarding the PRC Violations.

Symantec's own sales data reveals that the depth and frequency of its non-standard discounts during the life of the Contract bore little resemblance to that disclosed in the Frequency Chart.    Indeed, as noted above, during the life of the Contract, Symantec's commercial customers that got discounts at levels of over 40% off of list price more than 39% of the time -- a sharp departure from the 1.82% of the time represented by Symantec in its Frequency Chart.  *Supra* at 23.  As such, the failure to disclose and offer enhanced non-standard discounting to the United States breached the Contract's PRC provision.  *See, e.g., United States ex rel. Frascella v. Oracle Corp.*, 751 F. Supp. 2d 842, 854-56 (E.D. Va. 2010) (finding viable breach of contract claim based on allegation that company "used 'non-standard' discounts much more frequently that it initially admitted").

Further, Symantec also violated the PRC by failing to report and offer to GSA its ever evolving set of rebate practices.  *Supra* at 23-25.  For example, Symantec failed to notify and provide GSA access to the VIR program, which allowed customers to receive rebates based on the volume of purchases they made or caused to be made.  *Id.*  The failure of Symantec, at the very least, to keep GSA abreast of rebate offers breached the Contract's PRC.

## VII.    SYMANTEC'S PERIODIC CERTIFICATIONS WERE FALSE IN CERTAIN UNDISPUTED RESPECTS.

The materials Symantec produced during the Government's investigation of this matter also create no genuine issue that Symantec's Periodic Certifications were false because they certified that Symantec's Initial CSPs remained accurate when (i) the Frequency Chart failed to depict Symantec's practices of giving deep, non-standard discounts during the life of the Contract; (ii) Symantec often gave deep, non-standard discounts without management approval; and (iii) Symantec continued and devised new methods of providing rebates.    Summary judgment on these issues will resolve, in part, the falsity elements of the Government's false

statement FCA claims (*see supra* at 27, ¶ 4), and its negligent misrepresentation claim (*id.* at 28, ¶ 7), regarding the Periodic Certifications.

As described in detail above, Symantec's practices during the life of the Contract differed greatly from those described in the CSPs.  The frequency of Symantec's deep non-standard discounts during the life of the Contract were different from those disclosed in the Frequency Chart.  *See supra* at 22-23.  Symantec gave non-standard discounts without getting management approval through eSPA and SFDC, contrary to representations in its CSPs.  *Id.*  Symantec also continued and created new rebate programs but never disclosed them to GSA.  *Id.*  Nonetheless, Symantec routinely certified that its CSPs remained accurate and complete.  *See* Periodic Certifications (Symantec Files), Mot. Ex. 33a; Periodic Certifications (GSA Files), Mot. Ex. 33b. Therefore, these Periodic Certifications were false.

\*   \*   \*

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should enter summary judgment in favor of the United States on the issues described above.  By resolving these issues now, the only remaining issues in this action will be:

1.      Were Symantec's statements also false (and did Symantec breach the Contract) due to its improper disclosures concerning the Rewards Program, the Reason Code Chart, and exceptions of band and buying program requirements?

2.      Were Symantec's false statements material to Government decisions to pay?

3.      Were Symantec's claims under the Contract false, including under factual falsity, implied certification, or fraud-in-the-inducement theories?

4.      Did Symantec act knowingly with regards to its false statements and claims?

5.      What damages did the Government suffer regarding Symantec's falsities?  And,

6.      How many materially false claims did Symantec make or cause to be made to the United States for civil penalties purposes?

As such, resolution of this Motion will promote the just speedy and inexpensive resolution of this action.  A proposed order is enclosed herewith.

\*      \*      \*

Dated: February 23, 2015
        Washington, DC

Respectfully submitted,

JOYCE R. BRANDA
Acting Assistant Attorney General

RONALD C. MACHEN JR., D.C. Bar #447889
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division, U.S. Attorney's Office

By: ___/s/_____
        BRIAN P. HUDAK
        Assistant United States Attorney
        555 Fourth Street, NW
        Washington, DC 20530
        (202) 252-2549

MICHAEL D. GRANSTON
SARA MCLEAN
DAVID WISEMAN
DANIEL A. SCHIFFER
Attorneys, Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, DC  20044
(202) 305-8586

*Attorneys for the United States of America*