**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| UNITED STATES *ex rel.* LORI MORSELL, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 12-00800 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 46, 54 |
| | : | | |
| SYMANTEC CORPORATION, | : | | |
| | : | | |
| Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

**G**RANTING IN **P**ART AND **D**ENYING IN **P**ART **D**EFENDANT'S **M**OTION TO **D**ISMISS; **D**ENYING THE **U**NITED **S**TATES' **M**OTION FOR **P**ARTIAL **S**UMMARY **J**UDGMENT

## I. INTRODUCTION

In the course of her work at Symantec Corporation, Lori Morsell came to believe that her employer had violated certain contractual obligations to the United States. She subsequently filed this *qui tam* action as Relator against Symantec under the False Claims Act. The United States, California, and Florida intervened, and Relator elected to assert claims on behalf of New York. All plaintiffs filed a joint complaint. Presently before the Court are Symantec's motion to dismiss the complaint and the United States' motion for partial summary judgment. Because the United States adequately pleads all of its claims but California, Florida, and Relator fail to do so, the Court grants in part and denies in part Symantec's motion to dismiss. Because there are genuine disputes of material fact as to all issues presented in the United States' motion for partial summary judgment, the Court denies that motion in full.

## II.  FACTUAL BACKGROUND[1]

### A.  Negotiation of the Contract

Symantec Corporation provides software and services in the areas of security, storage,

and backup.  *See* Omnibus and Restated Complaint and Complaint in Intervention ("Omnibus

Complaint") ¶ 20, ECF No. 41.  The instant dispute arises out of Symantec's negotiation and

performance of a Multiple Award Schedule ("MAS") contract for supplying a range of products,

licenses, and services to the federal government (the "Contract" or "GSA Contract").  *See id.* ¶¶

21, 55, 56.

MAS contracts enable the General Services Administration ("GSA") to streamline federal

government procurement by providing pre-negotiated maximum prices and other terms that

govern all subsequent purchases covered by the contract.  *See id.* ¶¶ 33–35.  The GSA establishes

federal regulations governing solicitations, negotiations, and contracts executed under the MAS

program.  *See id.* ¶¶ 39–52.  These regulations prescribe standard questions contained in MAS

solicitations, in response to which the offeror must disclose certain information in a Commercial

Sales Practice Format, known as the offeror's "CSPs."  *See id.* ¶¶ 41–42; 48 C.F.R. § 515.408

(MAS Requests for Information); *id.* § 515.408, fig. § 515.4 (Instructions for the Commercial

Sales Practices Format).  Additionally, an offeror seeking an MAS contract must provide

information that is "current, accurate, and complete" as of fourteen calendar days prior to

submission.  *See id.* § 515.408, fig. 515.4.  For their part, GSA contracting officers are required

---

[1] Because the majority of the Court's analysis concerns Symantec's motion to dismiss, *see infra* Part IV, the Court's factual background assumes the truth of the well-pleaded factual allegations in the Omnibus Complaint, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and draws on documents referenced in and integral to the complaint, *see Marshall v. Honeywell Tech. Solutions, Inc.*, 536 F. Supp. 2d 59, 65 (D.D.C. 2008).  In connection with the United States' motion for partial summary judgment, the parties have proffered evidence underlying various disputes of fact; to simplify the factual background, the Court will reserve discussion of that evidence for its analysis below.  *See infra* Part V.

to "seek to obtain the offeror's best price (the best price given to the most favored customer)." *Id.* § 538.270(a).  To this end, contracting officers must "compare the terms and conditions of the [offeror's response to the] MAS solicitation with the terms and conditions of agreements with the offeror's commercial customers."  *Id.* § 538.270(c); *see also* Omnibus Compl. ¶¶ 31–52 (reviewing MAS regulatory scheme).

In February 2006, in response to the GSA's solicitation for the Contract, Symantec submitted an initial offer containing its CSPs.  *See* Omnibus Compl. ¶¶ 41, 58.  Consistent with applicable regulations, the solicitation asked in Question 3 whether the discounts and concessions offered by Symantec to the Government were "equal to or better than [its] best price . . . offered to any customer acquiring the same items regardless of quantity or terms and conditions."  Omnibus Compl. ¶ 59; CSPs, Def.'s Attach. A, ECF No. 46-1.[2]  In response to this question, Symantec checked the box for "NO."  *Id.*

Question 4(a) directed Symantec to disclose information in the standard CSP format about its discounting practices.  *See* CSPs, Def.'s Attach. A.  To comply with this requirement, Symantec attached several charts.  *See* Omnibus Compl. ¶ 61.  One chart purported to describe the frequency of non-published discounts by magnitude for 2005 sales ("Frequency Chart").  *See id.* ¶ 64.a.  The Frequency Chart showed that in 2005, Symantec offered non-published discounts of over 40% only very rarely—less than 3% of the time.  *See id.* ¶ 65.  Moreover, the chart showed that in 0.02% of sales, Symantec offered discounts ranging from 91-100%.  *See* CSPs, Def.'s Attach. A.

---

[2] Question 3 reads in full: "Based on your written discounting policies (standard commercial sales practices in the event you do not have written discounting policies), are the discounts and any concessions which you offer the Government equal to or better than your best price (discount and concessions in any combination) offered to any customer acquiring the same items regardless of quantity or terms and conditions? YES ___ NO ___."  Omnibus Compl. ¶ 59; CSPs, Def.'s Attach. A.

The Frequency Chart, however, included numerous *published* discounts, in addition to the non-published discounts it purported to reflect.  This erroneous inclusion of published discounts caused Symantec to understate the frequency of discounts above 40% (and, for the same reason, to inflate the frequency of discounts below 40%).  *See* Omnibus Compl. ¶¶ 101, 102.  Had the Frequency Chart included only *non*-published discounts, it would have shown that in 2005, Symantec provided non-published discounts above 40% over 20% of the time—not merely 3%.  *See id.* ¶ 103.  Symantec knew of the Frequency Chart's inclusion of published discounts, among other inaccuracies.  *See id.* ¶¶ 108–12.

A second chart purported to set forth the types of reasons for Symantec's non-published discounts and the frequency of each type ("Reason Code Chart").  *See id.* ¶ 64.b.  According to the Reason Code Chart, a sizeable plurality (47%) of non-standard discounts resulted from proration of service agreements and adjustments to enterprise license agreements, and Symantec offered non-standard discounts for "other" reasons not specified in the chart relatively infrequently—only 7% of the time.  *See id.* ¶¶ 67, 68; *see also* CSPs, Def.'s Attach. A.  A third chart purported to report the level of management approval required at various discount magnitudes ("Management Approval Chart").  *See* Omnibus Compl. ¶ 64.c.  For instance, according to the Management Approval Chart, all discounts greater than 50% required approval by a Regional Vice President.  *See id.* ¶ 69.

In actuality, however, both the Reason Code Chart and Management Approval Chart were inaccurate.  The charts were generated using data from "eSPA"—Symantec's system for approving non-published discounts.  *See id.* ¶¶ 81, 99.[3]  In 2005, however, over 9,000

_____

[3] The Omnibus Complaint also alleges that Symantec submitted a separate chart explaining management approval for non-published discounts for *services*, similar to the Management Approval Chart, which covered only *products* and other items.  *See* Omnibus

commercial orders receiving non-published discounts were not processed through the eSPA

system.  *See id.* ¶ 99.  Accordingly, neither the Reason Code Chart nor Management Approval

Chart accounted for these orders.  Symantec knew at the time that eSPA was an ineffective

system for monitoring discounts.  *See id.* ¶¶ 100, 104–07.

Question 4(b) asked whether "any deviations" from Symantec's disclosed policies and

practices "ever result in better discounts (lower prices) or concessions than indicated."  *Id.* ¶ 59;

CSPs, Def.'s Attach. A.[4]  Symantec responded "NO."  *Id.*  The February 2006 offer containing

the CSPs was signed by Symantec's Senior Director of Public Sector Business Operations Kim

Bradbury.  *See* Omnibus Compl. ¶ 56.

During the subsequent MAS contract negotiation, Bradbury submitted various materials

to GSA contracting officer Gwen Dixon elaborating on the pricing offered by Symantec.  In

October 2006, Bradbury emailed Dixon a presentation purporting to give "an overview of new

discounting policies and procedures for all products sold by Symantec Corporation" ("October

2006 Presentation").  *Id.* ¶ 72.  The October 2006 Presentation mentioned five buying

programs—(a) Express, (b) Government, (c) Academic, (d) Rewards, and (e) Enterprise

Options—along with the requirements for purchasing at different pricing levels or "bands"

within each program.  *Id.* ¶¶ 73–75.  According to the October 2006 Presentation, in order to

obtain Rewards program pricing, customers had to accumulate points based on the volume of

their purchases and were required to make a minimum initial purchase amounting to 6,000

---

Compl. ¶ 91.  To the extent that the services chart is relevant to the issues addressed in this
Memorandum Opinion, the Court herein refers collectively to both charts as the "Management
Approval Chart."

[4] Question 4(b) reads in full: "Do any deviations from your written policies or standard
commercial sales practices disclosed in the above chart ever result in better discounts (lower
prices) or concession than indicated? YES ___ NO ___. If YES, explain deviations in accordance
with the instructions at Figure 515.4-2, which is provided in this solicitation for your
convenience."  Omnibus Compl. ¶ 59; CSPs, Def.'s Attach. A.

points.  *See id.* ¶¶ 78, 79.  The points, moreover, expired after two years.  *See id.* ¶ 80.  Bradbury

also provided Dixon with documents stating that Symantec's "Government buying program"

enjoyed a discount of 0% to 16% off of "Commercial MSRP."  *Id.* ¶ 87.[5]  Lastly, Bradbury

averred that "[a]ny deviations from published discounts require management approval," and that

"[d]eviations must be documented and approved in accordance with . . . guidelines," such as

meeting competition and market segment penetration.  *Id.* ¶ 90.

       These disclosures were allegedly false or incomplete.  First, the "Commercial MSRP"

that Symantec used as a baseline for communicating the offered discounts was derived solely

from the Express program pricelist and did not reflect prices for all of Symantec's commercial

customers.  *See id.* ¶ 88.  Symantec further failed to disclose to the GSA that pricing under the

Rewards buying program was better than that offered through the Express, Government, and

Academic programs.  *See id.* ¶¶ 76–77, 85, 115.  Symantec also did not explain how customers

accumulated points, or how easily commercial customers could qualify for Rewards pricing by

earning at worst one point for every five dollars spent.  *See id.* ¶ 116.  Symantec did not disclose

documented exceptions to the Rewards program rules—the minimum initial purchase

requirement, points needed to enjoy better pricing bands, and the two-year validity period for

points.  *See id.* ¶ 118.  Lastly, Symantec failed to disclose any information about its rebate

programs.  *See id.* ¶¶ 62, 77, 123.  Symantec had contemporaneous knowledge of all of these

inaccuracies.  *See id.* ¶¶ 119–26.

       On January 25, 2007, Symantec sent Dixon its Final Proposal Revision for the Contract.

*See id.* ¶ 93.[6]  Symantec stated therein that "all commercial business practices have been fully

---

     [5] "MSRP" stands for "manufacturer's suggested retail price."

     [6] The Omnibus Complaint refers to this document as the "Final Proposed Revision."
Omnibus Compl. ¶ 93.  The Court uses the title "Final Proposal Revision," which appears in the

disclosed and are current, accurate and complete as of the conclusion of the negotiation," and certified "that the discounts, pricing and/or rates given to the government are either equal to and/or greater than what is granted to any commercial and/or Government customer under similar terms and conditions." *Id.* ¶ 94.  Symantec also proposed that the GSA receive these discounts off of published pricelists: (i) for hardware appliance, enterprise availability, backup executive, and security products and services, Symantec offered the GSA pricing at between 5% and 35% off of Government End User MSRP; and (ii) for training, professional, managed security, and technical support services, Symantec offered the GSA pricing at between 5% and 10% off of "Commercial MSRP." *Id.* ¶ 95.  That same day, the GSA accepted Symantec's offer as revised by the Final Proposal Revision, thereby executing the Contract.  *See id.* ¶ 96.

Incorporated into the Contract is a standard mechanism known as the "Price Reductions Clause," which helps ensure that the GSA continues to receive favorable pricing and terms during the performance of an MAS contract.  The Clause provides:

> (a)     Before award of a contract, the Contracting Officer and the Offeror will agree upon (1) the customer (or category of customers) which will be the basis of award, and (2) the Government's price or discount relationship to the identified customer (or category of customers). This relationship shall be maintained through out the contract period.  Any change in the Contractor's commercial pricing or discount arrangement applicable to the identified customer (or category of customers) which disturbs this relationship shall constitute a price reduction.

> (b)     During the contract period, the Contractor shall report to the Contracting Officer all price reductions to the customer (or category of customers) that was the basis of award. The Contractor's report shall include an explanation of the conditions under which the reductions were made.

---

actual document, attached as Exhibit 18 to the United States' Motion for Partial Summary Judgment.  *See* Final Proposal Revision, U.S. Ex. 18, ECF No. 55-19.

(c)    (1) A price reduction shall apply to purchases under this
contract if, after the date negotiations conclude, the Contractor—

   (i)    Revises the commercial catalog, pricelist, schedule
          or other document upon which contract award was
          predicated to reduce prices;

   (ii)   Grants more favorable discounts or terms and
          conditions than those contained in the commercial
          catalog, pricelist, schedule or other documents upon
          which contract award was predicated; or

   (iii)  Grants special discounts to the customer (or
          category of customers) that formed the basis of
          award, and the change disturbs the price/discount
          relationship of the Government to the customer (or
          category of customers) that was the basis of award.

(2) The Contractor shall offer the price reduction to the
Government with the same effective date, and for the same
time period, as extended to the commercial customer (or
category of customers)

48 C.F.R. § 552.238–75(a)–(c); *see also* Omnibus Compl. ¶¶ 48–52.  Additionally, the Price

Reduction Clause requires contractors to notify the Government of any price reduction "as soon

as possible, but not later than 15 calendar days after its effective date," 48 C.F.R. § 552.238–

75(f), and to modify the contract "to reflect any price reduction which becomes applicable," *id.* §

552.238–75(g).  In accordance with the Price Reduction Clause, and by the terms of the Final

Proposal Revision, Symantec and the GSA agreed that the Contract's "basis of award" would be

Symantec's "commercial class of customers."  *See* Omnibus Compl. ¶¶ 127–28.

## B.  Performance of the Contract

The Contract was in effect from January 2007 through September 2012.  *See id.* ¶ 5.

During the life of the Contract, Symantec made numerous claims for payment under the Contract

or derivative agreements.  *See id.* ¶ 134.

Meanwhile, Symantec extended more favorable pricing to numerous similarly situated

commercial customers.  This better pricing resulted from non-published discounts, *see id.* ¶ 135,

the Rewards buying program, *see id.* ¶ 144, exceptions and modifications to Express and Rewards buying program terms, *see id.* ¶¶ 146–57, and rebates, *see id.* ¶¶ 158–60.  Based on the volume of purchases made, the Government would have qualified for the best pricing under the Rewards program within days of entering into the Contract.  *See id.* ¶¶ 140–43.  Symantec neither informed the GSA of the better pricing offered to its commercial customers nor adjusted the Government's pricing under the Contract to match discounts enjoyed by those commercial customers.  *See id.* ¶¶ 133, 135, 145, 157, 160.  Lastly, Symantec's discounting practices during the life of the Contract departed significantly from the Frequency Chart's representation.  *See id.* ¶¶ 137–39.

Rather than disclose any of these circumstances to the GSA, Symantec, in the course of requesting modifications to the Contract, repeatedly certified to the GSA that its previously disclosed commercial sales practices "ha[d] not changed."  *Id.* ¶¶ 182–83.  While making these certifications, Symantec's management knew that Symantec lacked systems for maintaining the relationship between the GSA's and commercial pricing, that Symantec's discounting programs were in a state of disarray, that commercial customers were in fact receiving better pricing than Symantec, and that sales representatives received no training on the Contract's requirements.  *See id.* ¶¶ 161–80, 185.  Symantec's false and inaccurate initial disclosures, violations of the Price Reduction Clause, and certifications that its initial disclosures remained unchanged caused the Government to overpay for Symantec products by millions of dollars on sales directly made by Symantec under the Contract.  *See id.* ¶¶ 186–87.

Additionally, Symantec authorized the GSA and certain independent resellers to use its CSPs and other disclosures in negotiating their own MAS contracts for the sale of Symantec products.  *See id.* ¶¶ 189–96.  The resellers subsequently made numerous inflated claims for

payment under those MAS contracts.  *See id.* ¶¶ 195–96.  Accordingly, Symantec caused the

Government to overpay by millions of dollars for Symantec products purchased from the

resellers.  *See id.* ¶ 197.

### C.  State Contracts

#### 1.  California

To expedite state agencies' procurement, the California Department of General Services

("DGS") solicits, negotiates, and awards Leveraged Procurement Agreements ("LPAs").  *See id.*

¶ 203.  Two types of LPAs govern procurement of information technology products and

services—(1) California Multiple Award Schedule ("CMAS") contracts and (2) Software

License Program ("SLP") contracts.  *Id.* ¶ 205.  The pricing and terms of CMAS and SLP

contracts are not usually negotiated or solicited competitively by California; instead, they are

generally based upon previously awarded federal GSA MAS contracts, though agencies may

attempt to negotiate better pricing and terms.  *Id.* ¶¶ 207–08, 214–17.

Beginning as early as March 2009, Symantec authorized certain independent resellers to

respond to a CMAS solicitation by offering Symantec products covered by the GSA Contract.

*See id.* ¶ 220.  Similarly, in as early as December 2009, Symantec submitted an SLP Letter of

Offer to DGS to supply Symantec products, through certain resellers, at discounts mirroring

those enjoyed by the GSA under the GSA Contract.  *See id.* ¶ 223.  Specifically, the SLP Letter

of Offer states that, subject to certain conditions, Symantec "will extend to the Authorized

Resellers the discount levels identified in Exhibit B," which lists discounts ranging from 5% to

35%.  SLP Letter of Offer, Def.'s Attach. D, ECF No. 46-4.  The Letter also states that "[t]he

State shall be responsible for independently negotiating the final purchase price and payment

terms with its Authorized Resellers."  *Id.*  Ultimately, DGS awarded CMAS and SLP contracts to

numerous resellers.  *See* Omnibus Compl. ¶¶ 221, 224.  Those resellers, in turn, sold Symantec

products to various California agencies.  *See id.* ¶¶ 226–37.

## 2.  Florida

In April 2006, the Division of State Purchasing of Florida's Department of Management

Services issued a purchasing memorandum authorizing state agencies to procure products and

services under the GSA's "Schedule 70," which covers information technology software.  *See id.*

¶ 241; Florida State Purchasing Mem. No. 2 (2005–06), Def.'s Attach. E, ECF No. 46-5.

Subsequently, Florida made purchases of Symantec products, and at least into 2011, Symantec

failed to disclose the fact that it offered larger discounts to commercial customers than it did for

orders placed by Florida.  *See* Omnibus Compl. ¶¶ 241–42, 322.  Symantec also used or allowed

to be used certain records or statements in connection with claims presented to Florida—

including its initial disclosures to the GSA, applications to modify the Contract with the GSA,

and certain "bills and GSA pricing information."  *Id.* ¶ 325.

## 3.  New York

In November 2000, Veritas Software, which Symantec acquired between 2005 and 2006,

executed a contract with New York for the sale of software licenses and services ("New York

Contract").  *See id.* ¶¶ 54, 243.  The New York Contract based its pricing on Veritas's, and later

Symantec's, "U.S. commercial price lists," and extended to New York a 22.5% discount on

software and a 5.5% discount on related services.  *See id.* ¶ 243.  The New York Contract also

contained a price reduction clause that required Veritas, and later Symantec, to match price

reductions extended to "its customers generally or to similarly situated government customers"

and special offers or promotions "generally offer[ed] . . . to other customers . . . for a similar

quantity."  *Id.*  In 2006, Veritas assigned the New York Contract to Symantec, which certified

that it would maintain the pricing terms.  *See id.* ¶ 244.  During the life of the New York

Contract, which expired in November 2010, Veritas and Symantec offered to similarly situated

commercial customers more favorable pricing than that enjoyed by New York.  *See id.* ¶¶ 245–

47.

### D.  Procedural History

Lori Morsell has been a Symantec employee since March 2011.  *See id.* ¶ 24.  After

joining the company, she managed the GSA Contract and relations with business partners that

sold Symantec products under their own MAS contracts.  *Id.*  In this capacity, she became aware

of the above-described conduct and attempted unsuccessfully to change Symantec's practices.

*See id.* ¶¶ 172, 174–75.

In May 2012, Morsell, as Relator on behalf of the United States, filed her initial

complaint against Symantec.  *See generally* Compl., ECF No. 1.  Subsequently, the United States

and the States of California and Florida elected to intervene.  *See* ECF Nos. 21, 28, 29.  Although

the State of New York declined to intervene, *see* ECF No. 27, Relator elected to proceed on its

behalf, *see* ECF No. 40; *see also* 13 N.Y.C.R.R. § 400.4(c)(1).  In October 2014, the United

States, California, Florida, and Relator on behalf of New York filed their joint Omnibus

Complaint, which superseded all previous complaints.  *See* Omnibus Compl. 1.

In the Omnibus Complaint, the United States brings several claims against Symantec

under the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA").  Count I alleges that

Symantec knowingly presented false claims, in violation of § 3729(a)(1)(A).  *See* Omnibus

Compl. ¶¶ 248–55.  Count II alleges that Symantec knowingly made false statements material to

its false claims, in violation of § 3729(a)(1)(B).  *See id.* ¶¶ 256–62.  In Count III, the United

States contends that Symantec caused certain independent resellers to present false claims, in

violation of § 3729(a)(1)(A).  *See id.* ¶¶ 263–71.  Count IV alleges that Symantec caused

independent resellers to make false statements material to false claims, in violation of

§ 3729(a)(1)(B).  *See id.* ¶¶ 272–79.  Lastly, Count V alleges that Symantec concealed its

obligations to the United States, in violation of § 3729(a)(1)(G).  *See id.* ¶¶ 280–85.

Additionally, the United States asserts against Symantec a series of common-law claims—

negligent misrepresentation, *id.* ¶¶ 286–91 (Count VI), breach of contract, *id.* ¶¶ 292–97 (Count

VII), unjust enrichment, *id.* ¶¶ 298–300 (Count VIII), and payment by mistake, *id.* ¶¶ 301–03

(Count IX).

     California, Florida, and Relator on behalf of New York each allege that Symantec

violated their respective state false claims statutes.  *See id.* ¶¶ 304–39 (Counts X–XVI).  By way

of relief, the United States, California, Florida, and New York (through Relator) each seek

damages, treble damages, and civil penalties under the statutes applicable to their claims.  *See id.*

at 77–78.  Relator seeks a share of the recoveries of the United States and the States under the

respective federal and state statutes.  *See id.* at 78.

     Symantec subsequently moved to dismiss the Omnibus Complaint in its entirety.  *See*

Mot. Dismiss, ECF No. 46.  The United States then moved for partial summary judgment on

certain elements of its FCA and contractual claims.  *See* U.S. Mot. Partial Summ. J., ECF No.

54.[7]  Both motions are now fully briefed.

---

     [7] Additionally, after the parties briefed both motions, the United States filed a notice of
supplemental authority, which the Court has considered.  *See* ECF No. 63.

## III.  LEGAL STANDARDS

### A.  Rule 12(b)(6)

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests.  Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  A court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor.  *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.

### B.  Rule 9(b)

Plaintiffs bringing claims under the FCA must satisfy the additional pleading requirements of Rule 9(b).  *See United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542,

551–52 (D.C. Cir. 2002).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must

state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged

generally."  *Id.*  Reading Rule 9(b) together with Rule 8's requirement that allegations be "short

and plain," Fed. R. Civ. P. 8(a)(2), the D.C. Circuit has required plaintiffs to "state the time,

place and content of the false misrepresentations, the fact misrepresented and what was retained

or given up as a consequence of the fraud," and to "identify individuals allegedly involved in the

fraud," *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1256

(D.C. Cir. 2004) (citation omitted).

### C.  Rule 56

A court may grant summary judgment when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A party moving for summary judgment bears the "initial responsibility" of

demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(c).  In determining whether a genuine issue

exists, a court must refrain from making credibility determinations or weighing the evidence;

rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be

drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### IV.  SYMANTEC'S MOTION TO DISMISS

In its motion to dismiss, Symantec proffers a range of reasons why the Omnibus

Complaint's allegations are deficient.  As to all of the Government's FCA claims, the Court

denies the motion to dismiss.  *See infra* Part IV.A.  Because California, Florida, and Relator on

behalf of New York have failed to state claims under their respective state statutes, the Court

dismisses their claims but grants them leave to amend their allegations. *See infra* Part IV.B.

Lastly, the Court denies the motion to dismiss as to the Government's negligent

misrepresentation, breach of contract, unjust enrichment, and payment by mistake claims. *See*

*infra* Part IV.C, IV.D.

### A.  United States' FCA Claims

In Counts I through V, the United States (the "Government") asserts several claims

against Symantec under the FCA. *See* Omnibus Compl. ¶¶ 248–85.  Originally enacted during

the Civil War to combat unscrupulous government contractors, the FCA enables a *qui tam*

plaintiff, known as a Relator, to initiate a civil action on behalf of the United States to recover

monies paid on account of false or fraudulent claims. *See* 31 U.S.C. § 3730; *United States v.*

*Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 146–47 (D.D.C. 2011).  As pertinent to

this case, the FCA, as amended, creates liability for "any person who . . . knowingly presents, or

causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. §

3729(a)(1)(A); "knowingly makes, uses, or causes to be made or used, a false record or statement

material to a false or fraudulent claim," *id.* § 3729(a)(1)(B); or "knowingly conceals or

knowingly and improperly avoids or decreases an obligation to pay or transmit money or

property to the Government," *id.* § 3729(a)(1)(G).[8]

---

[8] This Memorandum Opinion's analysis is governed throughout by the FCA as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"). *See* FERA, Pub. L. No. 111–21, 123 Stat. 1617 (2009).  The Government expressly invokes the post-FERA FCA as to Count V, which alleges that Symantec unlawfully concealed its obligations to the Government. *See* Omnibus Compl. ¶ 67.  The Government also asserts that the post-FERA "false statements" provision, codified at 31 U.S.C. § 3729(a)(1)(B), applies retroactively to all conduct in this case, and that for other FCA provisions, FERA did not materially change any element of liability. *See id.* ¶ 30.  For purposes of this motion, the Court assumes that the post-FERA version of the FCA governs all claims in this action because Symantec has not moved to dismiss any claims on the basis that the FERA amendments do not apply. *See* Mot. Dismiss 12, 38 (citing post-FERA FCA).

1.  Presenting or Causing to Be Presented False Claims (Counts I and III)

In Count I, the Government alleges that Symantec knowingly presented false claims for payment under the Contract, in violation of 31 U.S.C. § 3729(a)(1)(A).  *See* Omnibus Compl. ¶¶ 248–55.  In Count III, the Government contends that Symantec caused its independent resellers to make false claims by allowing the resellers to use the false disclosures that it used in its own negotiations with the GSA, in violation of the same FCA provision.  *See id.* ¶¶ 263–71.

Section 3729(a)(1)(A) creates liability for "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  Claims under this FCA provision are known as "presentment" claims.  *See United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 117 (D.D.C. 2014).  The elements of presentment claims are that: "(1) the defendant submitted or caused to be submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false."  *See id.* at 121–22 (citation and alteration omitted).  In the case of the "paradigmatic . . . factually false claim," a claimant "submits information that is untrue on its face."  *Kellogg Brown & Root Servs.*, 800 F. Supp. 2d at 154 (citation omitted).[9]  But a claim need not be facially false to trigger liability under § 3729(a)(1)(A).  *See United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006).  Rather, courts have developed two theories of legal "falsity"—the implied certification theory and the fraudulent inducement theory.  *See id.* at 1170–74; *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 786–88 (4th Cir. 1999) (reviewing theories).

---

[9] "Claim" means "any request or demand . . . for money or property" that is presented to an officer or agent of the United States.  31 U.S.C. § 3729(b)(2)(A).  Here, the parties do not dispute that the Omnibus Complaint adequately alleges that Symantec submitted numerous "claims" to the Government under the Contract or that Symantec's resellers did the same under their own contracts.  *See* Omnibus Compl. ¶¶ 134, 195–96.

As the Court explains below, Count I survives Symantec's motion to dismiss under either the implied certification or fraudulent inducement theory.  *See infra* Part IV.A.1.a.  The Court also denies the motion to dismiss Count III given Symantec's failure to address two elements of this indirect presentment claim—causation and false claims.  *See infra* Part IV.A.1.b.

### a.  Presentment Claim (Count I)

Although the motion to dismiss is hardly a model of clarity, to the extent that Symantec seeks dismissal of the presentment claim in Count I under both the implied certification and fraudulent inducement theories, the Court rejects Symantec's arguments as to both theories.[10]

The implied certification theory proceeds from the premise that a defendant can be liable under § 3729(a)(1)(A) for presenting a claim for payment that "rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term."  *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) ("*SAIC*").  Certifications need not be express; under the implied certification theory, a party can incur liability for making claims under a contract while "withh[olding] information about its noncompliance with material contractual requirements."  *Id.* at 1269.  Courts applying the implied certification theory still must ensure that claims satisfy both materiality and knowledge requirements.  A plaintiff must establish that the breached legal requirement was "a material condition of the contract" or regulation under which the defendant made its claim for payment.  *Id.*; *see also id.* at 1271 (explaining that the plaintiff must establish that "compliance with the legal requirement in question is material to the government's decision to pay").  While the

---

[10] Symantec's motion cites in passing both the implied certification and fraudulent inducement theories but neglects to analyze either of the two theories with any amount of structure or clarity.  *See* Mot. Dismiss 34, 37 (referencing implied certification theory); *id.* at 4, 14, 19 (referencing fraudulent inducement theory).  This deficient briefing alone is grounds for denying Symantec's motion, though the Court below explains why the Omnibus Complaint's allegations are sufficient under both theories.

"existence of express contractual language specifically linking compliance to eligibility for payment may well constitute dispositive evidence of materiality," such language is not a "necessary condition" for liability under the implied certification theory.  *Id.* at 1269.[11] Likewise, the knowledge requirement helps "ensure that ordinary breaches of contract are not converted into FCA liability."  *Id.* at 1271.  The requisite knowledge has two dimensions: The plaintiff must show that the defendant "knows (1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay."  *Id.*; *see also United States ex rel. Heath v. AT & T*, 791 F.3d 112, 125 (D.C. Cir. 2015) (explaining that plaintiff alleged that defendant "knew that compliance was a material and express condition for reimbursement").

The Government has adequately alleged each element of its presentment claim under the implied certification theory.  The Omnibus Complaint alleges that when making claims for payment under the Contract, Symantec impliedly certified that its pricing continued to comply with the Price Reduction Clause.  *See id.* ¶¶ 250–51; *see also* 48 C.F.R. § 552.238–75(a)–(c), (f), (g).  But according to the Omnibus Complaint, these implied certifications were false: Symantec routinely failed to disclose more favorable pricing extended to similarly situated commercial customers and to adjust the Government's pricing accordingly.  *See* Omnibus Compl. ¶¶ 135–60.  As for materiality, given that the central goal of the MAS program is allegedly to ensure that the Government receives a reasonable price for products and services, the Omnibus Complaint supports a plausible inference that compliance with the Price Reduction Clause by maintaining the agreed-upon "discount relationship" with commercial customers is "material to the

---

[11] The parties assume, as will this Court, that, at least for purposes of this motion, the question of whether a contractual or regulatory requirement is "material" to a decision to pay under the implied certification theory mirrors the inquiry into whether a statement is "material" to a false claim under § 3729(a)(1)(B).  *See SAIC*, 626 F.3d at 1271; *accord* Mot. Dismiss 13.

government's decision to pay." *SAIC*, 626 F.3d at 1271; *see also* Omnibus Compl. ¶¶ 31–47, 94;

48 C.F.R. §§ 538.270, 552.238–75(a); *cf. United States v. Triple Canopy, Inc.*, 775 F.3d 628,

637–38 (4th Cir. 2015) (reversing dismissal of implied certification presentment claim and

concluding that materiality was adequately alleged where "common sense strongly suggests that

the Government's decision to pay a contractor for providing base security in an active combat

zone would be influenced by knowledge that the guards could not, for lack of a better term, shoot

straight"). Lastly, because knowledge "may be alleged generally" at this stage in the litigation,

Fed. R. Civ. P. 9(b), the Government's general allegation suffices, *see* Omnibus Compl. ¶ 253

("Symantec . . . had actual knowledge that [its] claims were false or acted with deliberate

ignorance or reckless disregard as to their falsity . . . .").[12]

Under the fraudulent inducement theory, liability attaches under § 3729(a)(1)(A) "for

each claim submitted to the Government under a contract which was procured by fraud, even in

the absence of evidence that the claims were fraudulent in themselves." *United States ex rel.*

---

[12] Symantec makes four arguments that seem to address the implied certification theory: Symantec challenges the Government's allegations that its certifications of compliance with the Price Reduction Clause were (1) false and (2) made knowingly; (3) argues that the Omnibus Complaint does not satisfy the particularity requirement of Rule 9(b); and (4) asserts that liability is negated by the allegation that the Government was aware of the falsity. The Court rejects all of these arguments as meritless—whether they pertain to the implied certification theory or any other FCA claim or theory of liability. *See United States ex rel. Shemesh v. CA, Inc.*, No. 09-cv-1600, 2015 WL 1447755, at *8 (D.D.C. 2015) ("*Shemesh II*") (rejecting defendant's argument that FCA claim should be dismissed for insufficient allegation of knowledge given lack of "relevant materials to assess whether [defendant's] position on its disclosure obligations is objectively reasonable"); *Heath*, 791 F.3d at 126 (explaining that "the precise details of individual claims are not, as a categorical rule, an indispensable requirement of a viable [FCA] complaint" because the "central question" under Rule 9(b) is "whether the complaint alleges 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted'" (citation omitted)). In particular, regarding Symantec's "government knowledge" defense, even assuming (without deciding) that such a defense exists under the FCA, the Court concludes that the Omnibus Complaint alleges at most that the GSA understood that Symantec on rare occasions offered better pricing to certain commercial customers, not that the GSA was aware that those customers were similarly situated such that Price Reduction Clause obligations would be triggered.

*Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005) (applying theory to "claims" under pre-FERA FCA).  Congress expressly recognized this theory when it amended the FCA in 1986, explaining that "each and every claim submitted under a contract . . . which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim."  *Id.* (quoting S. Rep. No. 99–345, at 9 (1986)).

The Court has doubts as to whether the Government can press its presentment claim under the fraudulent inducement theory given an inconsistency in the way courts have described what this theory requires.  In *Bettis*, the D.C. Circuit explained that the theory applies where a contract was "procured by fraud," suggesting a causal link between the defendant's fraud and the contract's formation.  *Bettis*, 393 F.3d at 1326; *see also Tran*, 53 F. Supp. 3d at 130.  By contrast, other courts have held that the fraudulent inducement theory requires that "a party mak[e] promises at the time of contracting that it *intends to break*."  *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 196 (D.D.C. 2011) (emphasis added); *see also United States ex rel. Frascella v. Oracle Corp.*, 751 F. Supp. 2d 842, 855 (E.D. Va. 2010).  Although the Omnibus Complaint's allegations readily support an inference of causation or reliance, the Government does not appear to allege that Symantec had any intent to break its promises.  *See* Omnibus Compl. ¶ 253 (alleging "knowledge" of the claims' falsity or "deliberate ignorance or reckless disregard as to their falsity").

The Court, however, need not resolve this inconsistency in the fraudulent inducement theory jurisprudence because Symantec does not invoke the "intent" formulation of that theory— or any formulation, for that matter.  Given that Symantec bears the burden to demonstrate that the Government has failed to state a claim, its deficient briefing provides a sufficient basis for

denying its motion as to the fraudulent inducement theory. *See Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 24 F. Supp. 3d 32, 48 n.10 (D.D.C. 2014) ("All federal courts are in agreement that the burden is on the moving party in a Rule 12(b)(6) motion to prove that no legally cognizable claim for relief exists[.]" (alterations and citation omitted)).[13]

For the foregoing reasons, the Court denies the motion to dismiss as to Count I under the implied certification and fraudulent inducement theories.

### b. Indirect Presentment Claim (Count III)

In Count III, the Government alleges that Symantec caused its resellers to submit false claims by providing the resellers with the "false information Symantec provided GSA during negotiation of the Contract" that in turn inflated pricing for Symantec products under the resellers' own MAS contracts. *See* Omnibus Compl. ¶¶ 263–71.

Count III asserts an indirect presentment claim under § 3729(a)(1)(A). The elements of such claims are that: "(1) the defendant . . . caused to be submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false." *See Tran*, 53 F. Supp. 3d at 121–22 (citation and alteration omitted). As with Count I, knowledge is adequately alleged. *See* Omnibus Compl. ¶¶ 268–69. Accordingly, the remaining elements that the Government must plead to support Count III are causation and false claims.

The Court declines to dismiss Count III. First, Symantec's motion contains no discussion of whether the Omnibus Complaint sufficiently alleges a causal link between Symantec's actions

---

[13] In reply, Symantec asserts that the fraudulent inducement theory requires "prompt non-performance" of the contract at issue, and that the Omnibus Complaint contains no such allegation. *See* Def.'s Reply to U.S. 11; *see also Tran*, 53 F. Supp. 3d at 132 (reviewing other circuits' case law on prompt non-performance requirement and assuming, without deciding, that prompt non-performance is required under the fraudulent inducement theory). This argument is waived by Symantec's failure to press it in its opening brief. *See Walker v. Pharm. Research & Mfrs. of Am.*, 461 F. Supp. 2d 52, 58 n.9 (D.D.C. 2006).

and its reseller's claims.  *See United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 48 (D.D.C. 2011) ("For a plaintiff to allege a cause of action under § 3729(a)(1)'s 'causes to be presented' prong, it must allege that the defendant's conduct was 'at least a substantial factor in causing, if not the but-for cause of, submission of false claims.'" (citation omitted)).[14]  As for falsity, Symantec devotes much attention in its briefing to why the Omnibus Complaint's allegations cannot support an inference that *its own* claims were false, but nowhere does Symantec make the same argument with respect to *its resellers'* claims.  *Compare* Mot. Dismiss 3, 16 (contending that Count III must be dismissed for failure to allege that Symantec caused or induced the "Contracting Officer to *accept Symantec's offer*" (emphasis added)), *with* Omnibus Compl. ¶¶ 263–71 (alleging that *resellers*' claims were inflated).

    Given Symantec's deficient briefing, the Court denies the motion as to Count III.


    2.  Making or Causing Resellers to Make False Statements Material to False Claims (Counts II and IV)


    In Count II, the Government alleges that Symantec knowingly made false records or statements material to false claims, in violation of 31 U.S.C. § 3729(a)(1)(B).  *See* Omnibus Compl. ¶¶ 256–62.  In Count IV, the Government alleges that Symantec knowingly caused its resellers to make false records or statements material to false claims, in violation of the same FCA provision.  *See id.* ¶¶ 272–79.

---

    [14] In reply, Symantec contends that the Government has failed to adequately allege causation under § 3729(a)(1)(A), (B), and (G).  *See* Def.'s Reply to U.S. 1, 3, 6.  Because new arguments asserted in reply are waived, the Court declines to consider Symantec's causation argument.  *See Walker*, 461 F. Supp. 2d at 58 n.9.  In any event, Symantec's wholly conclusory assertion that causation is not adequately alleged would not enable it to carry its burden.  *See Intelsat USA Sales Corp.*, 24 F. Supp. 3d at 48 n.10; Def.'s Reply to U.S. 6.

Section 3729(a)(1)(B) establishes liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).  To state such a "false statements" claim, "a plaintiff must allege that (1) the defendant made or used [or caused to be made or used] a 'record or statement;' (2) the record or statement was false; (3) the defendant knew it was false; and (4) the record or statement was 'material' to a false or fraudulent claim."  *United States ex rel. Hood v. Satory Global, Inc.*, 946 F. Supp. 2d 69, 85 (D.D.C. 2013).[15]  The false statements provision is "designed to prevent those who make false records or statements . . . from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval." *Totten*, 380 F.3d at 501.

As amended by FERA, the FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  The D.C. Circuit has concluded that a causal link between the false statement and false claim would suffice to satisfy this standard.  *See Heath*, 791 F.3d at 124–25 (finding sufficient, under the implied certification theory, the allegation that had government-appointed fund administrator known of noncompliance, it would not have made payments).  But actual causation is not *necessary* to establish FCA liability.  In applying the identical definition of "material" under a criminal statute, the D.C. Circuit concluded that "the question of materiality is not to be answered by reference only to the specific circumstances of the case at hand."  *United States v. Moore*, 612 F.3d 698, 701 (D.C. Cir. 2010) (applying materiality standard under 18

---

[15] The plaintiff must also allege that the defendant knew that the record or statement was *material* to a false claim.  *Cf. SAIC*, 626 F.3d at 1271 (requiring, under implied certification theory, knowledge of materiality of compliance); *Heath*, 791 F.3d at 124 (same).

U.S.C. § 1001).[16]  That is, "a statement need not actually influence [the government] in order to be material."  *Id.*; *see also U.S. ex rel. Feldman v. van Gorp*, 697 F.3d 78, 95 (2d Cir. 2012) (interpreting FCA materiality test as "objective" and not requiring proof of actual reliance).  Put differently, "[a] statement or omission is 'capable of influencing' a decision even if those who make the decision are negligent and fail to appreciate the statement's significance."  *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) (interpreting materiality under FCA); *accord Feldman*, 697 F.3d at 95.

In seeking the dismissal of Counts II and IV, Symantec contends that the Omnibus Complaint fails to allege that the company made or caused its resellers to make any "false" records or statements, that the company acted "knowingly," and that such statements, even if knowingly false, were "material" to a false claim.  *See* Mot. Dismiss 14–19; *Hood*, 946 F. Supp. 2d at 85.  At most, in Symantec's view, the facts alleged represent the sometimes messy "give and take of contract negotiations," and that "the more plausible interpretation" is that Symantec acted "in good faith."  Mot. Dismiss 16.

For the reasons given below, the Court concludes that the Omnibus Complaint's allegations are sufficient as to all of the records or statements at issue.  First, the Omnibus Complaint sufficiently alleges the falsity of numerous records or statements concerning discounting practices that Symantec used or caused its resellers to use.  In response to Question 4(b) of the initial MAS contract solicitation, which asked whether "any deviations" from Symantec's disclosed policies and practices "ever result in better discounts (lower prices) or concessions than indicated," Symantec answered "NO," when in fact deviations did enable

---

[16] In *Moore*, the D.C. Circuit interpreted "material" under 18 U.S.C. § 1001.  In contrast to the FCA, 18 U.S.C. § 1001 does not expressly define material, but the courts had adopted the same definition as that codified in the FCA—that "a statement is material if it has a natural tendency to influence, or is capable of influencing" an agency's action.  *Moore*, 612 F.3d at 701.

Symantec to extend discounts on a more frequent and flexible basis than indicated.  Omnibus

Compl. ¶ 59; CSPs, Def.'s Attach. A.[17]  As for the Frequency Chart, the Government alleges that

the inclusion of numerous published discounts understated the frequency of discounts exceeding

40%.  *See* Omnibus Compl. ¶¶ 101, 102.  Symantec averred in the Final Proposal Revision to the

Contract that it had disclosed in up-to-date, accurate form "all commercial business practices"

and certified that the Government's discounts and pricing are "equal to and/or greater than what

is granted to any commercial and/or Government customer under similar terms and conditions."

*Id.* ¶ 94.  But these statements were allegedly false because Symantec misrepresented

comparative pricing among its standard buying programs, *id.* ¶¶ 75–77, failed to disclose the full

terms of its Rewards buying program (and their generous, flexible exceptions) and rebate

policies, *see id.* ¶¶ 78–80, 83, 92, 115–18, 123–26, and failed to explain that the GSA's 16%

discount off of "Commercial MSRP" was actually a discount off of only the Express program

pricelist, *see id.* ¶ 88.  Lastly, the Omnibus Complaint alleges that when requesting various

modifications to the Contract, Symantec repeatedly certified to the GSA that its previously

disclosed commercial sales practices "ha[d] not changed," when in fact those initial disclosures

were false from the start.  *Id.* ¶¶ 182–83.

The Omnibus Complaint also plausibly alleges falsity as to records or statements

concerning Symantec's discount controls—the Reason Code Chart, the Management Approval

Chart, and Symantec's statement that "[a]ny deviations from published discounts require

---

[17] Regarding Question 4(b), Symantec explains that the discounts and concessions "indicated" in the Frequency Chart included discounts ranging up to 100%; by Symantec's logic, then, it was perfectly truthful to state that deviations from policies never resulted in discounts *exceeding 100%.  See* Mot. Dismiss 8.  While Symantec's reading of Question 4(b) may ultimately be accepted by a finder of fact, the Government has advanced a reasonable reading, which suffices on this motion to dismiss.  *Cf. supra* Part IV.A.1.a (finding that Government advanced reasonable reading of Price Reduction Clause).

management approval." *Id.* ¶ 90.  According to the Omnibus Complaint, although the two charts

purported to provide data for *all* non-published discounts in 2005, they actually reflected only

those non-published discounts approved through Symantec's eSPA system, *see id.* ¶ 81, and in

2005, over 9,000 commercial orders were not processed through that system, *see id.* ¶ 99.

Additionally, the fact that several large non-published discounts received no management

approval at all renders false both the Management Approval Chart and Symantec's statement that

all non-published discounts required such approval.  *See id.* ¶ 90.[18]

      Second, the Omnibus Complaint adequately alleges that each of these false records or

statements was "material" to Symantec's false claims.  Because the GSA contracting officer

must reach decisions by "compar[ing] the terms and conditions of the [offeror's response to the]

MAS solicitation with the terms and conditions of agreements with the offeror's commercial

customers," 48 C.F.R. § 538.270(c), the records or statements bearing on Symantec's pricing and

discount practices have the potential to impact a GSA contracting officer's ability to "seek to

obtain the offeror's best price," *id.* § 538.270(a); *see also Shemesh I*, 2015 WL 1446547, at *9

("Considering that the pricelist was the basis for the negotiated price, defendant's argument that

misrepresenting CA's pricelist is immaterial to the government's decision to pay a certain

contract price is puzzling at best.").[19]  Accordingly, each false record or statement has "a natural

---

[18] The Omnibus Complaint's allegations as to management approval are imprecise.  With respect to five discounts not processed through eSPA ranging from 45% to 96% off list price, the Government contends both that Symantec did not "maintai[n] . . . a record of management approval," Omnibus Compl. ¶ 99, and that those transactions "did not receive management approvals" at all, *id.* ¶ 100.  Under either allegation, the Court's analysis would be the same.

[19] Given that the Omnibus Complaint adequately alleges each of these regulatory obligations, Symantec's contention that the Omnibus Complaint "makes no allegations concerning how Ms. Dixon determined fairness to Symantec" is completely unfounded.  *See* Mot. Dismiss 18.

tendency to influence," or is "capable of influencing, the payment or receipt of money."  31 U.S.C. § 3729(b)(4); *see also Feldman*, 697 F.3d at 95.

Likewise, the Omnibus Complaint sufficiently alleges that the inaccuracies in the records or statements concerning Symantec's discount controls were "material" to false claims.  To be sure, as Symantec emphasizes, the Government does not allege that discount controls were expressly required by the Contract or applicable regulations, or that the GSA inquired into the robustness of such systems.  But the Omnibus Complaint does allege that the Price Reduction Clause obligated Symantec to monitor its discounting practices closely.  *See* Omnibus Compl. ¶¶ 48–52.  Given that the Government plainly would be reluctant to contract with a party unable to comply with contractual terms, the Omnibus Complaint permits a plausible inference that the inaccurate representations concerning Symantec's discount controls could have "a natural tendency to influence, or be capable of influencing" the GSA's decision.  31 U.S.C. § 3729(b)(4); *cf. SAIC*, 626 F.3d at 1269 (explaining under implied certification theory that evidence of parties' mutual understanding that "payment was conditional on compliance" could suffice to establish materiality of contractual provision).[20]

Because the Omnibus Complaint adequately alleges that Symantec knowingly used or caused to be used records or statements that were false and material to false claims, the Court denies the motion to dismiss Counts II and IV.[21]

---

[20] As to Count IV, Symantec does not contend that the Omnibus Complaint fails to allege that any records or statements were material to the *resellers*' false claims.  The Court thus has no occasion to consider materiality in this context.

[21] As explained above, because knowledge "may be alleged generally" at this stage in the litigation, Fed. R. Civ. P. 9(b), the Omnibus Complaint's general allegations of knowledge as to each Count are sufficient, *see* Omnibus Compl. ¶¶ 260 (Count II), 277 (Count IV).  Indeed, the Government has gone beyond what is required of it at this stage, alleging a factual basis for inferring that Symantec executives either had actual knowledge or acted in reckless disregard of the falsity of their statements.  *See, e.g.*, Omnibus Compl. ¶¶ 109–12, 123–26.

### 3.   Concealing Obligations (Count V)

Count V alleges that Symantec concealed its obligations to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).  *See* Omnibus Compl. ¶¶ 280–85.

Section 3729(a)(1)(G) establishes a cause of action for "reverse" false claims, creating liability for any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G); *see also Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 88 (D.D.C. 2014).  "Obligation" is defined broadly to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3); *see also Si*, 71 F. Supp. 3d at 89 (explaining that FERA added this broad definition of "obligation" to reject the narrower interpretation that certain courts had adopted).

The Government has plausibly alleged liability for a "reverse" false claim, on the basis that Symantec knowingly failed to adjust the Contract's pricing terms as required by the Price Reduction Clause.  The Complaint alleges that internal audits in 2010 and 2011 put Symantec executives on notice that the company's undisciplined discounting practices could have led to violations of its Price Reduction Clause commitments.  *See* Omnibus Compl. ¶¶ 165, 281.  Nonetheless, Symantec allegedly concealed this knowledge and shirked its contractual duties to disclose violations and to adjust the Government's pricing upon any triggering price reduction.  *See id.* ¶¶ 282–83; *see also* 48 C.F.R. § 552.238–75(a)–(c).  In sum, the Omnibus Complaint adequately alleges that Symantec "knowingly conceal[ed] or knowingly and improperly avoid[ed]" an "obligation to pay or transmit money" to the Government "arising from an express

. . . contractual . . . relationship, . . . or from the retention of any overpayment." 31 U.S.C. §§ 3729(a)(1)(G), 3729(b)(3).

Accordingly, the Court denies Symantec's motion to dismiss Count V.

### B. State-Law Claims

In Counts X through XVI, California, Florida, and Relator on behalf of New York each allege that Symantec violated their respective state false claims statutes. *See* Omnibus Compl. ¶¶ 304–39. Symantec has moved to dismiss all of these claims. *See* Mot. Dismiss 39–43.

The Court concludes that California, Florida, and Relator have failed to state any claims. These plaintiffs each imply in cursory fashion that Symantec's alleged fraud against them is a consequence of the company's fraud against the GSA without sufficient factual allegations that support such a connection. Accordingly, the Court grants the motion to dismiss all of the state-law claims.

The Court also, however, *sua sponte* grants California, Florida, and Relator leave to amend their respective portions of the Omnibus Complaint. *Cf. Jones v. Horne*, 634 F.3d 588, 603 n.7 (D.C. Cir. 2011) (holding that under general rule that leave to amend is granted only upon motion, a district court did not abuse its discretion in failing *sua sponte* to grant such leave).[22] Should they opt to file amendments, California, Florida, and Relator are encouraged to flesh out their allegations and to tie them more precisely to the elements of liability under their respective state statutes. *See supra* Part IV.A.1, A.2 (discussing elements of federal FCA presentment and false statements claims). Below, the Court elaborates on some of the specific ways in which each of the state-law claims falls short, as identified by Symantec's motion.

---

[22] Of the state-law plaintiffs, only California mentions the possibility of an amendment, but California does not expressly seek leave to amend. *See* States' Opp'n 2 n.7.

1.  California

In Count X, California asserts that Symantec knowingly caused its independent resellers to make false claims under CMAS and SLP contracts by providing false information that it knew the resellers and DGS would use in negotiating the CMAS and SLP contracts, in violation of the California False Claims Act ("CFCA"), Cal. Gov't Code § 12651(a)(1).  *See* Omnibus Compl. ¶¶ 304–12.  Based on the same facts, in Count XI, California alleges that Symantec knowingly caused its resellers to use false statements material to their false claims under CMAS and SLP contracts, in violation of the CFCA, Cal. Gov't Code § 12651(a)(2).  *See id.* ¶¶ 313–20.

The CFCA creates liability for "[a]ny person who . . . (1) [k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval . . . [or] (2) [k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."  Cal. Gov't Code § 12651(a)(1), (2).  Because the CFCA was patterned after the federal FCA, federal decisions are "persuasive authority" in adjudicating CFCA claims.  *See United States v. Shasta Servs., Inc.*, 440 F. Supp. 2d 1108, 1111 (E.D. Cal. 2006).

With respect to both the CMAS and SLP contracts, California has failed to state either a presentment or false statements claim.  As to the presentment claim, California alleges only that Symantec authorized its resellers to respond to CMAS solicitations and that the CMAS contracts ultimately incorporated the pricing and terms of the GSA Contract.  *See* Omnibus Compl. ¶¶ 220, 222.  Similarly, with respect to the SLP contracts, the Omnibus Complaint alleges that Symantec submitted an SLP Letter of Offer to DGS to supply Symantec products through its resellers at discounts mirroring those enjoyed by the GSA under the GSA Contract and that the resellers ultimately sold Symantec products to state agencies under SLP contracts with the same pricing and terms as the GSA Contract.  *See id.* ¶¶ 223–37.  Lacking, however, is any allegation

that Symantec had the requisite *scienter*—that it "knowingly" caused its resellers to present false claims. Cal. Gov't Code § 12651(a)(1).  Indeed, there is no allegation that Symantec knew the precise pricing and terms that its resellers would offer in response to the CMAS or SLP solicitations or knew that it was causing the resellers to submit "false" claims (under any theory of falsity).  *See* Mot. Dismiss 39–40; *cf. Tran*, 53 F. Supp. 3d at 121–22 (setting forth elements of federal FCA indirect presentment claim as: "(1) the defendant . . . caused to be submitted a claim to the government, (2) the claim was false, and (3) the *defendant knew the claim was false*." (emphasis added) (citation and alteration omitted)).  As for the CFCA false statements claim, there is similarly no allegation that Symantec had knowledge that its initial disclosures were (or would be) material to its resellers' claims under the CMAS or SLP contracts; Symantec's alleged knowledge of the materiality of false records or statements related to its dealings *with the GSA* cannot support an inference that Symantec had any knowledge that those false records or statements would be material to its reseller's dealings *with California*.  *See supra* note 15.

Accordingly, the Court dismisses Counts X and XI of the Omnibus Complaint as to both the CMAS and SLP contracts.

### 2.  Florida

In Count XII, Florida asserts that Symantec presented the state with false claims, in violation of the Florida False Claims Act, Fla. Stat. § 68.082(2)(a) ("FFCA").  *See* Omnibus Compl. ¶¶ 321–23.  In Count XIII, Florida alleges that Symantec made or used, or caused to be made or used, false records or statements material to false claims, in violation of the FFCA, Fla. Stat. § 68.082(2)(b).  *See id.* ¶¶ 324–26.  The Court concludes that Florida's allegations do not state any claims under the FFCA.

The FFCA creates liability for "[a]ny person who . . . (a) [k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval . . . [or] (b) [k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." Fla. Stat. § 68.082(2)(a), (b). The definitions of "knowingly" and "material" are consistent with those of the federal FCA, *see id.* § 68.082(1)(c), (d), and the standards for FFCA liability mirror those under the federal FCA, *see United States ex rel. Schubert v. All Children's Health Sys., Inc.*, No. 8:11-CV-01687-T-27, 2013 WL 6054803, at *7 n.8 (M.D. Fla. Nov. 15, 2013).

The Court concludes that Florida's FFCA claims must be dismissed. Florida's claims rest on the purchasing memorandum issued by a state agency in 2006. *See* Florida State Purchasing Mem. No. 2 (2005–06), Def.'s Attach. E. But as Symantec explains, this internal memorandum does not mention Symantec or establish that any "legal obligation" between Florida and Symantec existed. *See* Mot. Dismiss 42. Nor is the conclusory allegation that Symantec submitted "bills and GSA pricing information" sufficient. Omnibus Compl. ¶ 325. At bottom, Florida has failed to allege the existence of any "claims"—let alone "false claims." And without alleged false claims, Florida cannot maintain presentment or false statements claims under the FFCA.

Because Florida has failed to plead plausible claims under the FFCA, the Court dismisses Counts XII and XIII of the Omnibus Complaint.

### 3. New York

Relator on behalf of New York asserts in Counts XIV and XV that Symantec presented false claims under various contracts, *see* Omnibus Compl. ¶¶ 327–35, and in Count XVI that Symantec made and used, or caused to be made and used, false records and statements material

to false claims, all in violation of the New York False Claims Act, N.Y. St. Fin. Law § 189(1)(a), (b) ("NYFCA"), *see id.* ¶¶ 336–39.

The NYFCA establishes penalties for "any person who . . . (a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval . . . [or] (b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." N.Y. St. Fin. Law § 189(1)(a), (b). "The NYFCA follows the federal [FCA] and therefore it is appropriate to look toward federal law when interpreting the New York act." *State of New York ex rel. Seiden v. Utica First Ins. Co.*, 96 A.D.3d 67, 71 (N.Y. App. Div. 2012).

The Court concludes that New York has not plausibly pleaded falsity of any claims— whether facial or legal. *See SAIC*, 626 F.3d at 1266; Mot. Dismiss 42 (contending that Omnibus Complaint fails to allege any "overpriced" claims). Although the Omnibus Complaint alleges that the New York Contract provided discounts ranging between 22.5% and 5.5%, as Symantec explains, there is no allegation of any linkage to the GSA Contract or of any wrongdoing. *See* Mot. Dismiss 42. In opposition, New York explains that because its discounts were generally less than the GSA's discounts ranging between 35% and 5%, the numerous commercial customers that allegedly received larger discounts than the GSA's necessarily received better pricing than New York did. *See* States' Opp'n 10. The problem with this theory, as Symantec explains in reply, is that the Omnibus Complaint does not allege that the New York Contract and the GSA Contract shared the same discount baseline: The New York Contract discounts were allegedly based on "U.S. commercial price lists," Omnibus Compl. ¶ 243, while the GSA Contract discounts were allegedly based on Symantec's Express program pricelist, *see id.* ¶ 88; Def.'s Reply to States 9, ECF No. 53, and the Omnibus Complaint does not allege that the two

are identical.  Accordingly, the Omnibus Complaint fails to allege any false claims, and without

false claims, New York's false statements claim also must fail.  *See* N.Y. St. Fin. Law §

189(1)(b) (creating liability for using or causing to be used a "false record or statement material

to *a false or fraudulent claim*" (emphasis added)).

Because Relator on behalf of New York has failed to plead plausible presentment or false

statements claims under the NYFCA, the Court dismisses Counts XIV, XV, and XVI of the

Omnibus Complaint.

### C.  United States' Negligent Misrepresentation and Breach of Contract Claims

In Counts VI and VII, the Government asserts against Symantec common-law negligent

misrepresentation and breach of contract claims, respectively.  *See* Omnibus Compl. ¶¶ 286–97.

In its motion to dismiss, Symantec contends that this Court lacks jurisdiction to hear these

claims.  *See* Mot. Dismiss 43.

The Court readily concludes that dismissal of these claims would be improper at this

juncture.  In its motion to dismiss, Symantec first contends that the Contract Disputes Act, 41

U.S.C. § 7101 *et seq.*, provides the exclusive remedy for claims arising from government

contracts.  *See* Mot. Dismiss 43.  Symantec then candidly concedes that actions "involving

fraud" are excepted from the Contract Disputes Act's exclusivity before going on to argue that

dismissal of Counts VI and VII is still proper because the Government has failed to allege

plausible claims under the FCA.  *See id.* (citing 41 U.S.C. § 7103(a)(4)(B)); *see also United*

*States v. First Choice Armor & Equip.*, 808 F. Supp. 2d 68, 80 (D.D.C. 2011) ("The use of this

broader language ['involving fraud'] reflects a congressional intent to except from CDA

exclusivity not only causes of action for fraud in particular, but also actions the factual bases of

which are intertwined with allegations of fraud.").  In other words, as the Government points out,

Symantec's argument for dismissal of the negligent misrepresentation and breach of contract claims in Counts VI and VII is premised on this Court's dismissal of the FCA claims.  *See* U.S. Mem. Opp'n 41.  Because the Court has not dismissed the latter claims, the Court likewise denies Symantec's motion to dismiss as to the former claims.

### D.  United States' Unjust Enrichment and Payment By Mistake Claims

In Count VIII, the Government alleges that Symantec was unjustly enriched "[b]y directly or indirectly obtaining Government funds to which it was not entitled."  Omnibus Compl. ¶ 300.  Similarly, in Count IX, the Government claims that Symantec received mistaken payments for its products, having led the Government to believe that its disclosures were accurate and that it was complying with the Price Reduction Clause.  *See id.* ¶¶ 301–03.  In its motion to dismiss, Symantec contends that both claims are foreclosed by the Government's allegation of the Contract's existence.  *See* Mot. Dismiss 44–45.

As a general rule, a valid contract's existence precludes a plaintiff from asserting unjust enrichment and payment by mistake claims, which are based on quasi-contract theories.  *See First Choice Armor & Equip.*, 808 F. Supp. 2d at 77–78 ("Allegations in a complaint that an express contract existed between the parties . . . preclude a plaintiff from proceeding on alternative theories of FCA liability and unjust enrichment or payment by mistake.").  While a plaintiff may advance quasi-contract claims in the alternative, *see United States ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 78–79 (D.D.C. 2003), these alternative claims "must be supported by, at the very least, an allegation that there is no valid contract," *see Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d at 160.

The Court denies the motion as to the unjust enrichment and payment by mistake claims insofar as those claims are based on payments "directly" paid to Symantec under the Contract.

Omnibus Compl. ¶ 300. To be sure, throughout the Omnibus Complaint, the Government

alleges that the Contract was valid. *See id.* ¶¶ 5, 96, 127–88. But in Counts VIII and IX, the

Government does not squarely allege such validity, instead alleging that Symantec "obtain[ed]

Government funds to which it was not entitled" and "caused the United States to make payments

for Symantec products based upon . . . mistaken beliefs" concerning Symantec's disclosures and

contractual compliance. *Id.* ¶¶ 300, 302.[23] Additionally, Symantec's argument that the Contract

was not validly formed (in opposition to the Government's motion for partial summary

judgment) makes the Government's alternative quasi-contract claims all the more reasonable.

*See Purcell*, 254 F. Supp. 2d at 78–79; *Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d at

160.

        In addition to the Government's direct purchases from Symantec, the Omnibus

Complaint also alleges that the Government purchased Symantec products through independent

resellers at prices inflated by Symantec's false disclosures. *See* Omnibus Compl. ¶¶ 189, 197.

These indirect reseller purchases also underlie the Government's unjust enrichment and payment

by mistake claims. *See id.* ¶ 300 (expressly referencing "indirec[t]" payments to Symantec), ¶

302 ("Symantec caused the United States to make payments for Symantec products . . . ."").

Moreover, the Omnibus Complaint does not allege the existence of any contract between the

Government and Symantec governing these indirect purchases. Accordingly, the Court will deny

the motion to dismiss the Government's quasi-contract claims as to the purchases of Symantec

products through independent resellers. *See First Choice Armor & Equip.*, 808 F. Supp. 2d at 78

---

[23] Although the Government asserts a presentment claim under the fraudulent inducement
theory, *see supra* Part IV.A.1.a, fraudulent inducement generally renders a contract voidable, not
void. *See, e.g.*, *Flynn v. Thibodeaux Masonry, Inc.*, 311 F. Supp. 2d 30, 43 (D.D.C. 2004)
(explaining defenses under claim for employer contributions under section 515 of ERISA); *see
also Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (Wisconsin law).

(dismissing government's quasi-contract claims as to government's direct purchases governed by alleged contract but denying motion as to purchases made by state and local authorities, for which the government provided a partial reimbursement, given that "complaint d[id] not allege an express contract between [defendant] and the government with respect to" those transactions); *Toyobo*, 811 F. Supp. 2d at 52 (denying motion to dismiss unjust enrichment claim against manufacturer of fibers for bulletproof vests, where government alleged that fiber manufacturer "indirectly" obtained benefit from government's purchases of finished vests from vest manufacturers).

Accordingly, with respect to Symantec's motion to dismiss the unjust enrichment and payment by mistake claims in Counts VIII and IX, the Court denies the motion both as to the Government's direct purchases from Symantec under the (allegedly invalid) Contract and as to the Government's indirect purchases through independent resellers.

### V.  THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

The Government has moved for partial summary judgment on certain issues in an effort to streamline future proceedings.  *See* U.S. Mot. Partial Summ. J. 1, ECF No. 54; *see also United States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cnty., N.Y.*, 668 F. Supp. 2d 548, 570–71 (S.D.N.Y. 2009) (granting partial summary judgment as to certain elements of FCA claim).  Specifically, the Government seeks summary judgment on its positions that the Contract was a valid, enforceable agreement; that Symantec's CSPs and other disclosures were false and breached the Contract in several respects; that Symantec made false statements to the GSA when it directed the GSA to use its CSPs and disclosures in negotiations with resellers; that Symantec breached the Price Reduction Clause; and that Symantec's periodic

certifications that the CSPs and disclosures remained accurate were false.  *See* U.S. Mot. Partial

Summ. J. 1–2.[24]

For the reasons given below, the Court denies the United States' motion for partial

summary judgment as to all issues.

## A.  Validity of the Contract

The Government seeks judgment on the issue that the Contract is a "valid and

enforceable written agreement."  U.S. Mot. Partial Summ. J. 1.  According to the Government,

the Contract's validity is relevant to many aspects of its FCA claims as well as its breach of

contract claim.  *See* U.S. Mem. Supp. Mot. Partial Summ. J. 37.[25]

"The party alleging a contract must show a mutual intent to contract including an offer,

an acceptance, and consideration passing between the parties."  *Thermalon Indus., Ltd. v. United*

*States*, 34 Fed. Cl. 411, 414 (1995).  "In addition, the party must demonstrate that the

government representative who entered or ratified the agreement had authority to bind the United

States in contract."  *Id.*[26]

---

[24] The Government's motion for partial summary judgment rests only on "certain theories of falsity" and reserves other falsity arguments for future proceedings.  *See* U.S. Mem. Supp. Mot. Partial Summ. J. 2 n.2.  For instance, not at issue in the motion for partial summary judgment are the Omnibus Complaint's allegations that the Frequency Chart, while purporting to reflect all sales made in 2005, was limited to Symantec Security products and services, *see* Omnibus Compl. ¶ 109, to products that remained on Symantec's 2006 pricelist, *see id.* ¶ 110, and primarily to the last three quarters of 2005, *see id.* ¶ 111.  Additionally, the Government does not seek judgment on materiality or knowledge, or that Symantec failed to disclose its Rewards program.  *See* U.S. Mem. Supp. Mot. Partial Summ. J. 13 n.6.

[25] For purposes of providing context, the Court here and below sets forth the Government's explanations of the relevance of the issues on which it seeks judgment.  The Court, however, expresses no opinion as to the correctness of those explanations.

[26] The Government contends that federal law "generally" governs disputes arising out of contracts to which the United States is a party.  U.S. Mem. Supp. Mot. Partial Summ. J. 33 n.14 (citing *Clearfield Trust Co. v. United States*, 318 U.S. 363, 365–67 (1943); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979)).  The only legal authority cited by Symantec on the issue of contract formation is *RDP Technologies, Inc. v. Cambi AS*, a case from this Court

The Government has not carried its initial burden at summary judgment to show the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 323.  Although the Government includes a passing citation in a footnote to the requirement that the Government's representative "who entered or ratified the agreement [must have] had authority to bind the United States in contract," the Government does not explain how the undisputed record evidence establishes that any individual (presumably Dixon, who accepted the Final Proposal Revision) had such authority.  *See* U.S. Mem. Supp. Mot. Partial Summ. J. 38 n.19 (quoting *Thermalon Indus.*, 34 Fed. Cl. at 414); Solicitation/Contract/Order for Commercial Items, U.S. Ex. 19, ECF No. 55-20.

Because the Government has failed to demonstrate that the undisputed record evidence shows that it is entitled to summary judgment on the issue of the Contract's formation, the Court denies the Government's motion as to this issue.[27]

## B. Falsity of CSPs and Other Disclosures

The Government moves for partial summary judgment on the issue that Symantec's CSPs and other disclosures were false in three respects—the Frequency Chart was inaccurate, Symantec falsely stated that all non-published discounts must be approved through eSPA, and

applying D.C. law.  *See* Def.'s Mem. Opp'n 20 (citing *RDP Techs., Inc. v. Cambi AS*, 800 F. Supp. 2d 127, 140 (2011)).  The Court need not decide today whether federal or D.C. law governs: Even if the Government's position were correct, it has still failed to carry its initial summary judgment burden.

[27] Because the Court concludes that the Government has failed to carry its initial summary judgment burden on the formation issue, it expresses no opinion on the Government's additional submission that because the Contract is valid, then there can also be no dispute as to the meaning of two of Symantec's obligations under the Contract—the obligations to disclose truthful CSPs and to report any single discounts larger than those enjoyed by the GSA or deviations from the Frequency Chart.  *See* U.S. Mem. Supp. Mot. Partial Summ. J. 38–39.  Moreover, the Court notes that a decision on whether a valid and enforceable written agreement exists would not result in the streamlining of future proceedings.  Accordingly, no renewed motion for summary judgment on this issue will be entertained by the Court until the conclusion of discovery.

Symantec failed to disclose back-end reseller rebate programs notwithstanding its certification that its disclosures were complete.  *See* U.S. Mot. Partial Summ. J. 1–2.  Findings on these issues, the Government contends, will resolve, in part, the falsity elements of its false statements and negligent misrepresentation claims.  *See* U.S. Mem. Supp. Mot. Partial Summ. J. 39.[28]

      For the reasons given below, the Court denies the Government's motion for partial summary judgment as to all issues related to the falsity of the CSPs and other disclosures.

### 1.  Frequency Chart

      The Government seeks judgment as to the falsity of the Frequency Chart submitted by Symantec as part of its CSPs.   *See* U.S. Mot. Partial Summ. J. 1.  The Government proffers evidence that purports to show that, in 2005, over 20% of non-standard discounts extended by Symantec—not less than 3%, as represented in the Frequency Chart—exceeded 40% in magnitude.  *See* U.S. Mem. Supp. Mot. Partial Summ. J. 16–18.  For the reasons that follow, the Court concludes that the Government has not carried its initial burden of showing "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323; *see also id.* at 330–31 (Brennan, J., dissenting on other grounds) (explaining that "ultimate burden of persuasion" to establish lack of genuine dispute of material fact "always remains on the moving party").

      In attempting to establish the Frequency Chart's falsity, the Government relies solely on the declaration of Relator's counsel Lance Robinson.  *See* U.S. Mem. Supp. Mot. Partial Summ. J. 16–18.[29]  In his declaration, Robinson describes the methodology by which he and his

---

[28] The Government also asserts that the disclosures' falsity is relevant to its breach of contract claim.  *See* U.S. Mem. Supp. Mot. Partial Summ. J. 39.  This assertion is premised on an interpretation of the Contract (specifically, the Final Proposal Revision) that the Court declines to adopt at this stage in the proceedings, as discussed above.  *See supra* note 27.

[29] Symantec contends that the Robinson declaration is inadmissible evidence on the basis that Robinson relies on hearsay and lacks personal knowledge of the content of his declaration.  *See* Def.'s Mem. Opp'n 24–26.  The Court declines to consider this argument; even if the

colleagues analyzed certain data used by Symantec in generating the Frequency Chart.  Using these data, Robinson derived a set of discount distribution figures for 2005 and ultimately concluded that the Frequency Chart falsely overstated the frequency of non-published discounts below 40%.

But this battle over percentages is illustrative of many: The devil is in the denominator.  Symantec's Frequency Chart is based on 129,630 product-specific transactions, whereas Robinson's version captures only 14,681 transactions—a mere 11% of Symantec's sample.  *Compare* Bradbury Aff. ¶ 22.h, Def.'s Ex. A, ECF No. 59-2, *with* Robinson Decl. ¶ 10.g, U.S. Ex. 20, ECF No. 55-21.[30]  Of course, a smaller sample size alone would not be fatal for the Government, if the correctness of its smaller sample were factually undisputed.

Rather than show the lack of a genuine dispute of fact about this smaller sample, however, Robinson's declaration all but creates such a dispute.  At the outset, there seems to be no dispute over how non-published discounts are generally defined and calculated (in theory): Non-published discounts are reductions off of Standard Buy Price, which in turn reflects published discounts off of MSRP.  *See* Pricing waterfall, Ex. B to McGee Aff., Def.'s Ex. M, ECF No. 59-14; Robinson Decl. ¶¶ 8–10, U.S. Ex. 20.  The parties diverge, however, in their calculation of non-published discounts for purposes of this motion.  Bradbury calculated such discounts by subtracting from MSRP the final sales prices (found in monthly price lists)—a methodology that Symantec appears to concede wrongly caused its calculated non-published discounts to include published discounts.  *See* Bradbury Aff. ¶ 22, Def.'s Ex. A; U.S. Reply 17

---

Robinson declaration were admissible, the Government has still failed to show the absence of a genuine dispute of material fact.

[30] Robinson's declaration refers to "line items" in Symantec's sales records.  Each line item represents a specific product purchased as part of a particular order.  Here, the Court uses the term "product-specific transaction."

(citing Def.'s Mem. Opp'n 27–28).  Robinson, recognizing that the monthly price lists contained

no Standard Buy Prices, opted to begin his analysis by extracting Standard Buy Prices from a

table containing records of orders approved through the eSPA system.  *See* Robinson Decl.

¶10.b–d, U.S. Ex. 20; *id.* ¶ 8 ("By comparing Standard Buy Price to the actual selling price . . . ,

we are able to calculate the true non-published discount—i.e., the discount provided by

Symantec to customers above and beyond published discounts . . . .").  But the problem with

Robinson's approach is that many transactions were apparently not processed through the eSPA

system (as the Government itself alleges); ultimately, cross-referencing the eSPA data enabled

Robinson to retrieve a Standard Buy Price for only 195,617 out of the total 331,562 transactions

in Symantec's 2005 sales records.  *See id.* ¶ 10.d.  Put differently, Robinson *excluded over 40%*

of Symantec's 2005 product-specific transactions at the first step of his analysis for no reason

other than the fact that Symantec's eSPA database did not happen to contain the Standard Buy

Price for those transactions.  Moreover, the number of transactions excluded by Robinson—

135,945—exceeds the difference between Symantec's and Robinson's sample size—114,949.

Whether the inclusion of an additional 114,949 transactions in Robinson's calculations (if

Standard Buy Prices for those transactions had been available from another source) would have

shown the Frequency Chart to be "true" is anyone's guess, and on the Government's motion for

partial summary judgment, this Court must draw inferences in Symantec's favor.  The

Government's attempt to demonstrate the Frequency Chart's falsity is thus flawed from the

start.[31]

---

[31] Symantec's critique of Robinson's analysis consists primarily of vague, conclusory
suggestions of inaccuracies.  *See, e.g.*, Def.'s Mem. Opp'n 27 (assailing Relator's counsel's
declaration as "premised on an inaccurate understanding of the underlying data upon which his
conclusions are based").  In particular, Symantec's contention that the Government relies on "a
method [for deriving the Frequency Chart] far different from that employed by Symantec"

To be sure, Symantec does not seem to dispute the fact that because it relied on the 2005 monthly price lists, it wrongly calculated the magnitude of non-published discounts based off of MSRP, instead of Standard Buy Price—a methodology that potentially caused Symantec to overstate the magnitude of all non-published discounts in the Frequency Chart by the size of any published discounts. *See* U.S. Reply 17 ("Symantec's own Opposition confirms that it included published discounts as well."). But because the FCA does not penalize mathematical errors, the Government must do more than poke holes in Symantec's *calculations*. *See id.* ("A correct *calculation* would necessarily be different than the erroneous one used by Symantec." (emphasis added)). Rather, it must show a lack of genuine dispute as to the falsity of the resulting *record or statement*—*i.e.*, the Frequency Chart itself. *See* 31 U.S.C. § 3729(a)(1)(B). Here, the Government fails to proffer any evidence showing that the use of MSRP necessarily rendered the Frequency Chart false: That is, even if all of the discounts in the Frequency Chart were indeed inflated by the amount of Symantec's published discounts, the discount distribution presented therein could still be true, because no record evidence establishes the magnitude of the erroneously included published discounts.[32] Given that a reasonable jury could still find the

---

entirely misses the point: Symantec must show that the Government's method is factually *wrong*—and thus an inaccurate benchmark for assessing the Frequency Chart's truth or falsity— not merely different. *Id.* But because the Government has not discharged its initial burden to show the absence of a dispute of fact, the Court will conclude that a genuine dispute of material fact remains. *See Celotex*, 447 U.S. at 330–31 (Brennan, J., dissenting on other grounds).

[32] Assume, for example, that for all transactions represented in the Frequency Chart, all published discounts were less than 10%, and that all transactions occurred at the highest discounts possible consistent with that Chart—*i.e.*, all 11 sales in the 0-10% discount range actually occurred at a discount of 10%, that all 5,352 sales in the 10-20% range actually occurred at a discount of 20%, and so forth. Under such assumptions, correcting for Symantec's reliance on MSRP instead of Standard Buy Price (reducing *all discounts* by less than 10%) would have no impact on the distribution presented by the Frequency Chart. Of course, the "illustrative" and "hypothetical" pricing waterfall suggests that published discounts could be much larger than 10%, *see* Pricing waterfall, Ex. B to McGee Aff., Def.'s Ex. M, but there is no record evidence that the published discounts associated with any of the specific transactions represented in the

figures in the Frequency Chart to be true (at least on the record presently before the Court), the Government is not entitled to summary judgment.

At bottom, both the Government's and Symantec's Frequency Chart analyses suffer from significant shortcomings. Even if the Government's approach were superior to Symantec's in certain respects and even if data limitations do not enable a perfect analysis, at summary judgment, in particular prior to any discovery being had, the Government cannot prevail by showing merely that it opted for a better, but still materially limited, approach. Because the Government moves for summary judgment as the party that would bear the burden of proof at trial on the *falsity* of the Frequency Chart, it must introduce evidence that precludes a contrary finding by a reasonable jury. *Cf. Celotex*, 477 U.S. at 331 (Brennan, J., dissenting on other grounds) ("If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence—using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial."). If any gaps in the data or in the Government's methodology could support a finding that the Frequency Chart was *not false*, then the task of deciding falsity must fall to a jury, not this Court. Because there remains a genuine dispute of material fact as to the Frequency Chart's falsity, the Court denies the Government's motion for partial summary judgment as to this issue.[33]

---

Frequency Chart in fact exceeded 10%. Certain record evidence suggests that Symantec actually extended published discounts upwards of 30% to certain resellers, *see* Morsell letter of Sept. 8, 2011, U.S. Ex. 33b, ECF No. 55-35, but the record does not show that these transactions would not have been excluded from the Frequency Chart for reasons upon which the parties seem to agree (*e.g.*, international sales), *see* Robinson Decl. ¶ 10.f, U.S. Ex. 20; Bradbury Aff. ¶ 22.g, Def.'s Ex. A.

[33] Furthermore, even if the Court did not have the above-referenced reservations about Robinson's analysis, it would be disinclined to grant summary judgment based on such analysis without giving Symantec the opportunity to take discovery about it and, ultimately, depose the person providing the opinion.

## 2.  Statement Concerning eSPA

The Government also seeks judgment as to the falsity of Symantec's disclosures insofar as they "inaccurately stated that non-published discounts given by Symantec to commercial customers were approved by management through a tool known as eSPA."  U.S. Mot. Partial Summ. J. 1–2; *see also* U.S. Mem. Supp. Mot. Partial Summ. J. 40.  Again, the Court concludes that the Government is not entitled to summary judgment.

At the outset, the Court construes the Government's motion as seeking judgment only on the falsity of Symantec's representation that all non-published discounts must be approved through eSPA, not on the falsity of the Reason Code Chart or Management Approval Chart.  To the extent that the Government does seek judgment as to the falsity of the charts,[34] the Court readily denies the motion: The charts do not represent that all discounts were approved through eSPA; indeed, the term "eSPA" appears nowhere in the charts.  Additionally, on their face, the charts—which appear under the heading "Non-Published Discounts" and respective sub-headings "Discount Reason Codes" and "Management Discount Approval Levels"—do not purport to represent *all* of Symantec's non-published discounts, though they could be interpreted in this way.  *See* CSPs, U.S. Ex. 10, ECF No. 55-11.

Turning to the statement at issue, the Court concludes that Symantec has created a genuine dispute of material fact as to whether the company even represented in the first place that all non-published discounts must be approved through eSPA.  The representation at issue

---

[34] Certain language in the motion could suggest that the Government seeks judgment as to the falsity of the Reason Code Chart and Management Approval Chart.  *See, e.g.*, U.S. Mem. Supp. Mot. Partial Summ. J. 40 (arguing that Symantec's "express representation" was false and explaining it was "facially important to provide GSA comfort that . . . Symantec's non-standard discounts were controlled, reported, and confined to the remote occasions and specific circumstances disclosed on the Frequency Chart and Reason Code Chart"); *id.* at 18 (attacking truth of Symantec's "representations" regarding its discount controls); *id.* at 11–12 (explaining Reason Code Chart and Management Approval Chart).

appears in the below paragraph, part of Bradbury's October 9, 2006, response to various

inquiries from Dixon:

> Does Symantec Corporation offer better rates and/or terms and conditions to other customers?  If yes, please provide pricing information.
>
> Symantec Response: Information regarding deviations from existing discounting policies was provided in Symantec's original proposal submission.  *Any deviations from published discounts require management approval.  Deviations must be documented and approved in accordance with the following guidelines: As previously disclosed to GSA as part of Symantec's established discounting policies, the Worldwide Sales discounting tool referred to as "eSPA" was established to allow Symantec the flexibility to respond to competition.*  This process provides non-standard competitive pricing to strategic accounts by requiring commitments from the identified account for annual quantity purchases, or to meet one of the following guidelines; which are provided as examples:
> 1. To meet market competition or displace a named competitor at a customer site;
> 2. Customers who agree to standardize on Symantec products and services;
> 3. New market or market segment penetration;
> 4. Educational, including prime contractors, or [c]haritable organizations or institutes;
> 5. Introduction of a new product and services through more aggressive discounts and in exchange for press or customer references.

Oct. 9, 2006 Response, U.S. Ex. 16, ECF No. 55-17 (emphasis added).  As Symantec explains in

opposition, although the explanation quoted above states that all deviations from published

discounts "require management approval," a reasonable juror could conclude that the company

did not aver that such approval must happen through the eSPA system, which is described only

as a "Worldwide Sales discounting tool" that provides "the flexibility to respond to competition."

*Id.*  Moreover, the mandatory "guidelines" in accordance with which all "[d]eviations must be

documented and approved" could be interpreted as referring not to eSPA, but to the five

enumerated "guidelines" below the umbrella paragraph.  *Id.*[35]

Given that a dispute of fact exists as to whether Symantec actually represented that all

non-published discounts must be approved through eSPA, there is necessarily a dispute of fact as

to the falsity of any such representation.  Accordingly, the Court denies the Government's

motion for partial summary judgment as to this issue.

### 3.  Disclosure of Rebate Programs

The Government further moves for judgment on the falsity of Symantec's CSPs and

disclosures, on the grounds that Symantec failed to disclose certain back-end reseller rebate

programs.  *See* U.S. Mot. Partial Summ. J. 2.[36]  The Court concludes that Symantec has created a

dispute of material fact that precludes summary judgment.

The Court prefaces its analysis by explaining the Government's theory of falsity as it

applies to Symantec's alleged failure to disclose its back-end reseller rebates.  The Government

does not allege that this non-disclosure itself was "false."  Rather, the Government claims that

Symantec's omission renders false the company's other representations about its disclosures'

*completeness*.  For instance, Symantec averred in its Final Proposal Revision that "all

commercial business practices have been *fully disclosed* and are *current, accurate and complete*

as of the conclusion of [the] negotiation."  Final Proposal Revision SYM00396765, Def.'s Ex. G,

ECF No. 59-8 (emphasis added); *see also* U.S. Reply 24 (pointing to this "unequivocal statement

---

[35] In further support of its reading, Symantec cites its draft best and final offer, which
contains similar language.  *See* Symantec Best and Final Offer Letter SYM00370748, Def.'s Ex.
E, ECF No. 59-6.

[36] The Omnibus Complaint repeatedly alleges that Symantec failed to disclose *any*
information about rebates, and that this *total* omission rendered the disclosures false.  *See*
Omnibus Compl. ¶¶ 62, 77, 123, 126.  But elsewhere, the Omnibus Complaint alleges that
Symantec's rebate-related disclosures were "inaccurate and incomplete."  *Id.* ¶¶ 251, 258.  The
Court's analysis proceeds under the latter, broader allegation.

made in [Symantec's] FPR" and arguing that, on account of Symantec's failure to disclose the back-end rebates, "[t]here exists no genuine issue of material fact that *this statement* was false and that Symantec's Periodic Certifications (which verified the continuing veracity of its FPR) were false" (emphasis added)).  Accordingly, in order for the Government to obtain summary judgment under its theory of falsity, it must demonstrate the absence of any dispute that a "complete" disclosure necessarily would have included information about the back-end reseller rebates at issue.

The Court concludes that Symantec has created such a dispute by pointing to record evidence suggesting that back-end reseller rebates did not in fact fall within the scope of its disclosures or of the parties' negotiation.  Bradbury's affidavit states that she was told by Dixon in October 2006 that "GSA does not purchase as a distributor or reseller and that programs or discounts targeted specifically at distributors or resellers (such as Symantec's 'rebate' programs used to incentivize Partner sales) were no longer applicable to GSA."  Bradbury Aff. ¶ 37, Def.'s Ex. A.  Similarly, Dixon's own notes, viewed in the light most favorable to Symantec, indicate that she understood the relevant comparator customers to be "Commercial End Users" rather than resellers or distributors.  Price Negotiation Memorandum 5, Def.'s Ex. F, ECF No. 59-7.  If reseller back-end rebates were in fact outside the scope of the Contract negotiations, a jury could find that Symantec's failure to disclose such rebates did not render false the company's statement in its Final Proposal Revision that its disclosures were "current, accurate and complete"—or any other similar statement claiming that its disclosures were complete.  Final Proposal Revision SYM00396765, Def.'s Ex. G; *cf. Hindo v. Univ. of Health Sciences/The Chicago Med. Sch.*, 65 F.3d 608, 613 (7th Cir. 1995) (explaining, with respect to false claims, that the "claim must be a lie"); *accord United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 297 F. Supp. 2d

272, 277 (D.D.C. 2004), *aff'd*, 393 F.3d 1321 (D.C. Cir. 2005).  Put differently, under the Government's own theory of falsity, a jury could conclude that an offeror's obligation to disclose "all commercial business practices" is necessarily limited to those business practices that the GSA and the offeror agree are within the scope of the negotiation at hand.

Because Symantec has created a dispute of fact as to whether its failure to disclose reseller back-end rebates rendered its CSPs and other disclosures false, the Court denies the Government's motion for partial summary judgment as to this issue.[37]

### C.  Violation of Price Reduction Clause

The Government seeks judgment that Symantec violated the Price Reduction Clause by failing to disclose discounts either larger than those extended to the GSA or that departed from the Frequency Chart's distribution, and to adjust the GSA's pricing under the Contract accordingly.  *See* U.S. Mot. Partial Summ. J. 2.  Such a finding, according to the Government, would resolve part of its breach of contract claim.  *See* U.S. Mem. Supp. Mot. Partial Summ. J. 41–42.[38]

For the reasons given below, the Court concludes that Symantec has created a genuine dispute of material fact both as to the parties' contemporaneous understanding of the Price Reduction Clause when the Contract was concluded and as to the extent of Symantec's compliance with that Clause (even under the Government's interpretation).

---

[37] Because the Court concludes that Symantec has created a dispute of fact as to whether back-end reseller rebates were relevant at all to its CSPs, the Court has no occasion to consider whether there is a dispute of fact over the nature of certain rebates disclosed by Symantec—*i.e.*, whether the disclosed rebates were back-end or front-end rebates.  *See* U.S. Reply 23–24.

[38] Summary judgment on a Price Reduction Clause violation would presumably also support the Government's presentment claim under the implied certification theory.  *See supra* Part IV.A.1.a.

In interpreting a contract, courts must "begin with the plain language" and "give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Armour of Am. v. United States*, 96 Fed. Cl. 726, 737 (2010) (citation omitted). That is, "[w]hen the terms of a contract are clear and unambiguous, there is no need to resort to extrinsic evidence for its interpretation." *Id.* But "extrinsic evidence will be allowed to interpret an ambiguous clause," so long as such evidence supports an interpretation that "gives meaning to all [of the contract's] provisions" and is not used to "rea[d] a term into an agreement that is not found there." *Id.* at 738 (citations omitted). "An ambiguity, however, is not generated merely because the parties differ in their respective interpretations, but occurs when the contract is susceptible to more than one reasonable interpretation." *W & F Bldg. Maintenance Co., Inc. v. United States*, 56 Fed. Cl. 62, 69 (2003).[39]

Here, based on the incomplete, pre-discovery record before it, the Court concludes that there is a dispute of material fact as to whether the parties "mutually intended and agreed" to the Government's preferred construction of the Price Reduction Clause. *Armour of Am.*, 96 Fed. Cl. at 737. At the outset, the Court finds that the Price Reduction Clause's language is ambiguous because it is "susceptible to more than one reasonable interpretation." *Id.* The parties have advanced reasonable interpretations of (at least) two ambiguous terms under the Clause— "commercial class of customers," who served as the basis of award, and, relatedly, the "discount relationship" that Symantec was obligated to maintain with those customers. The Government reads "commercial class of customers" to mean all parties to which Symantec sells its products and services including resellers and distributors, and contends that the "discount relationship" is

---

[39] The Government is correct that contract interpretation is a "question of law." *See* U.S. Mem. Supp. Mot. Partial Summ. J. 39 (quoting *Greco v. Dep't of the Army*, 852 F.2d 558, 560 (Fed. Cir. 1988)). But that is beside the point; here, Symantec has created a factual dispute precluding this Court from deciding the legal question in favor of the Government.

altered (thereby triggering the Price Reduction Clause) whenever a single customer receives better pricing than the GSA under similar terms and conditions or when the discount distribution departs from the Frequency Chart's representations. *See* U.S. Mem. Supp. Mot. Partial Summ. J. 20–21, 23–26. Symantec maintains that "commercial class of customers" excludes resellers and distributors, Def.'s Mem. Opp'n 34, and that changes in the "discount relationship" cannot be effected by any non-published discounts given that Symantec disclosed the existence of certain such discounts, *see id.* 22–23. Because the Clause is ambiguous in these respects, extrinsic evidence serves to give its terms meaning. *See Armour of Am.*, 96 Fed. Cl. at 737–38. But both parties have proffered evidence from the Contract's negotiation that favors their reading of the Clause.[40] Accordingly, there remains a dispute of fact about how the parties interpreted the Price Reduction Clause during negotiations that, in turn, can inform an understanding of Symantec's obligations under the Clause.

Even if the Government were correct that the Price Reduction Clause at least obligated Symantec to disclose a pattern of discounts that deviated from the Frequency Chart, there remains a dispute of material fact as to whether Symantec actually failed to do so. In its motion for partial summary judgment, the Government again relies on Robinson's declaration. *See* U.S. Mem. Supp. Mot. Partial Summ. J. 23–24. In relevant part, Robinson explains how he generated

---

[40] *Compare* Bradbury email of Jan. 24, 2007 at 8–9, U.S. Ex. 17 (confirming definitions of "Commercial MSRP" and "Government End User Discount Off Commercial MSRP" without limitations related to resellers or disclosed non-published discounts); Bradbury email of Feb. 2, 2006, U.S. Reply Ex. 53, ECF No. 62-3 ("Commercial is defined as any entity other than the Federal Government."), *with* Symantec Best and Final Offer Letter SYM00370749, Def.'s Ex. E (listing exclusions from Price Reduction Clause including "[n]on-standard discounts offered to commercial customers"); Bradbury Aff. ¶ 50, Def.'s Ex. A (explaining understanding that under the Price Reduction Clause, Symantec would "retain the commercial flexibility to offer 'non-standard competitive pricing to strategic accounts'"); Pre-Negotiation Memorandum 9, Def.'s Ex. D, ECF No. 59-5 (indicating that at least certain "Commercial End Users" receive discounts that "equa[l] or excee[d]" those offered to the GSA).

charts purporting to show the frequency of Symantec's discounts at various magnitudes from 2007 to 2011 and then compared these charts to the Frequency Chart.  *See* Robinson Decl. ¶¶ 14–18, U.S. Ex. 20.   Again, however, the Government fails to show the lack of a dispute of material fact.  *See Celotex*, 477 U.S. at 323 (discussing movant's initial burden of showing "the absence of a genuine issue of material fact").   In his declaration, Robinson candidly admits that Symantec's 2007–2011 sales data contained only MSRP, not Standard Buy Price, for each (or most) of its product-specific transactions.  *See* Robinson Decl. ¶ 16, U.S. Ex. 20.  As a result, his analysis was "limited" because the discounts that he calculated were the sum of published and non-published discounts.  *Id.*  By Robinson's own admission, then, the record contains no evidence showing Symantec's *non-published* discount distributions—isolated from published discounts—during the life of the Contract.  Accordingly, a reasonable jury could reject out of hand Robinson's analysis of Symantec's 2007–2011 sales data and conclude that the Government has failed to demonstrate the falsity of the Frequency Chart's representations.[41]

Because, based on the current record, there are factual disputes both as to the parties' contemporaneous understanding of the Price Reduction Clause and as to whether Symantec complied with that Clause (even as the Government would prefer to construe it) at least at this pre-discovery stage of the case, the Court denies the Government's motion insofar as it seeks judgment that Symantec violated the Clause.

---

[41] The Government contends that incorporating both published and non-published discounts into its 2007–2011 sales analysis is justified because the Frequency Chart, too, encompassed both published and non-published discounts.  *See* U.S. Mem. Supp. Mot. Partial Summ. J. 23 n.11.  The problem with the Government's theory, however, is that it rests on an assumption for which there is no record evidence—that is, that the *relative* magnitude of published and non-published discounts remained constant between 2005 (the year to which Symantec's initial disclosures pertained) and 2007–2011 (the life of the Contract).

### D. Falsity of Certifications and Falsity of Statements Whose Usage Was Authorized by Symantec

The Government moves for partial summary judgment on two final issues—the falsity of the disclosures that Symantec authorized the GSA to use in negotiations with resellers, and the falsity of Symantec's certifications that its disclosures remained accurate.  *See* U.S. Mot. Partial Summ. J. 2.  According to the Government, the former issue would resolve the "making or using" element and, in part, the falsity element of the Government's false statement FCA claims based on the reseller contracts, *see* U.S. Mem. Supp. Mot. Partial Summ. J. 41, while the latter issue would resolve the falsity element of the Government's false statement claim based on the certifications and its negligent misrepresentation claim, *see id.* at 42–43.

The parties agree that both of these issues, as presented at this juncture in the Government's motion, are premised on the falsity of Symantec's disclosures—the Frequency Chart, its representation about eSPA, and its failure to disclose certain back-end rebates.  *See* U.S. Mem. Supp. Mot. Partial Summ. J. 41–42; Def.'s Mem. Opp'n 34.  The Court has already concluded there are genuine disputes of material fact concerning the falsity of these disclosures. *See supra* Part V.B.  Accordingly, the Court denies the Government's motion for partial summary judgment on the falsity of the disclosures that Symantec authorized the GSA to use in negotiations with resellers, and the falsity of Symantec's certifications that its disclosures remained accurate.

### VI.  CONCLUSION

For the foregoing reasons, Symantec's motion to dismiss (ECF No. 46) is **GRANTED IN PART** and **DENIED IN PART**, and the Government's motion for partial summary judgment

(ECF No. 54) is **DENIED**.  An Order consistent with this Memorandum Opinion is separately

and contemporaneously issued.

Dated:  September 10, 2015                                        RUDOLPH CONTRERAS
                                                                  United States District Judge