UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* LORI MORSELL, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 12-0800 (RC) |
| SYMANTEC CORPORATION, | ) ) | |
| Defendant. | ) ) | |

**UNITED STATES', CALIFORNIA'S, FLORIDA'S,
AND RELATOR'S FIRST AMENDED OMNIBUS AND
RESTATED COMPLAINT AND COMPLAINT IN INTERVENTION**

On July 18, 2014, the United States of America ("United States" or "Government") notified the Court of its decision to intervene and proceed with this action as to Relator's claims under the federal False Claims Act ("FCA"). The United States, having intervened in this civil action and pursuant to 31 U.S.C. § 3730(b)(4)(A), filed its Complaint in Intervention against Symantec Corporation ("Symantec") on October 3, 2014. On September 16, 2014, the People of the State of California ("California") and the State of Florida ("Florida") notified the Court of their decisions to intervene in this action under their respective state false claims statutes and related laws. On September 16, 2014, the State of New York ("New York" and with California and Florida, the "States") declined to intervene in this action and subsequently Relator notified the Court of her intention to pursue the claims of New York on its behalf. On October 16, 2014, the United States and the States (collectively, "Plaintiffs") filed an Omnibus and Restated Complaint and Complaint in Intervention ("Initial Omnibus Complaint"), which consolidated all of Plaintiffs' allegations in a single pleading.

On December 9, 2014, Symantec filed a motion to dismiss the Initial Omnibus Complaint. R.46.  On September 10, 2015, this Court denied Symantec's motion to dismiss as to the United States' claims, but granted the Motion with respect to the States' claims.  R.64.  In so doing, the Court granted the States leave to file amended claims by October 12, 2015.

To facilitate the just, speedy, and inexpensive resolution of this action and for the convenience of the parties and the Court, Plaintiffs respectfully submit this First Amended Omnibus and Restated Complaint and Complaint in Intervention, which supersedes all previously filed complaints in this action.  The portions of this Complaint concerning the United States are identical to those previously asserted, and thus, are mere restatements of allegations and claims though paragraph numbers may have changed due to amendments to the States' allegations and claims.  The portions of this Complaint concerning California, Florida, and New York are amended pursuant to this Court's September 10, 2015, Order.  Plaintiffs hereby allege as follows:

1.      The United States brings this action against Symantec pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and under common law theories of liability, seeking damages, treble damages, and civil penalties as provided by law.

2.      California brings this action against Symantec pursuant to the California False Claims Act ("CFCA"), California Government Code section 12650 *et. seq.*, seeking damages, treble damages, and civil penalties.

3.      Florida brings this action against Symantec pursuant to the Florida False Claims Act ("FFCA"), Fla. Stat. § 68.082, *et seq.*, seeking damages, treble damages, and civil penalties.

4.      Relator brings this action on behalf of New York pursuant to the New York False Claims Act ("NYFCA"), N.Y. St. Fin. Law § 189, seeking damages, treble damages, and civil penalties.

5.     Symantec knowingly submitted false statements to the General Services Administration ("GSA") and made false claims to the Government in connection with the negotiation and performance of its Multiple Award Schedule ("MAS") Contract with GSA, No. GS-35F-0240T (the "Contract"), which lasted from January 2007 to September 2012.

6.     Specifically, Symantec perpetrated a scheme to charge the Government prices far exceeding those offered to its commercial customers, despite clear language in the Contract that required Symantec to (i) disclose accurately and completely its commercial sales practices and discounting policies during negotiation of the Contract and (ii) offer the Government prices as favorable as, or better than, those offered to Symantec's commercial customers during performance of the Contract.

7.     As discussed in detail below, Symantec's wrongful scheme took several forms. First, Symantec failed to provide GSA with a complete and accurate disclosure of its non-published or non-standard discounting policies.  Second, during negotiation of the Contract, Symantec failed to provide GSA with a complete and accurate description of its standard discounting, in particular its "Rewards" buying program -- a program that offered commercial customers greatly reduced pricing on Symantec products -- and its extensive rebates to commercial customers.  Third, Symantec violated the Contract's price reduction clause ("PRC"), which required it to maintain a favorable discount relationship between the Government's prices and those offered to commercial customers, by regularly giving commercial customers discounts far below those offered and disclosed to the Government.

8.     Symantec undertook this false and fraudulent scheme knowing its disclosures to the Government -- its single largest customer -- were materially incomplete and inaccurate and

knowing that it lacked any adequate system of internal controls to ensure compliance with the PRC.

9.     Indeed, Symantec, the fourth largest software developer in the world in 2013 based on revenues, neither developed nor implemented any software in its purchasing system to automatically ensure its pricing to GSA and commercial customers complied with the requirements of its Contract.

10.     Additionally, despite knowing its disclosures were inaccurate and false and knowing it lacked any appropriate system of internal controls to ensure compliance with its PRC, Symantec routinely made false express certifications to GSA that its initial disclosures of commercial sales and discounting practices had not changed.

11.     Lastly, Symantec compounded the injuries it inflicted on the Government by knowingly directing its distributors and other software resellers to rely on Symantec's materially false and incomplete disclosures to negotiate pricing under these third-parties' own MAS contracts.  That is, Symantec caused its distributors and other software resellers to make false statements and false claims on their own contracts by directing them to use Symantec's knowingly false disclosures.

12.     In sum, Symantec knowingly submitted and caused to be submitted false statements and false claims by overcharging the Government for items it purchased using the terms of the Contract and in reliance on the Contract.  These actions caused great harm to the United States, resulting in millions of dollars of damages.

13.     As California's contracts with Symantec resellers explicitly incorporated federal government pricing or relied on Symantec-approved discounts that mirror federal government pricing, Symantec's misrepresentations to the United States caused Symantec resellers to make

misrepresentations to California when entering California contracts and each time a claim for payment was submitted. Symantec knew that its resellers made these misrepresentations to California and structured the discounts offered to California not to exceed the discounts provided to GSA.

14.     Florida purchased products from Symantec's GSA Contract including directly from Symantec and indirectly through authorized resellers.  Symantec knew that Florida made purchases of Symantec products under its GSA Contract and reported its Florida sales to GSA. Symantec also knew that Florida relied on the fraudulent pricing information provided to GSA that set inflated prices for Symantec products on its GSA Contract.  Consequently, Symantec knowingly submitted and caused to be submitted false statements and false claims to Florida by overcharging for items Florida purchased directly or indirectly from Symantec under Symantec's GSA Contract.

15.     Symantec similarly entered into a contract with New York, which had an independent price reduction clause. New York's discounts were generally less favorable than GSA's discounts from Symantec. During the New York contract, Symantec failed to disclose the deep discounts routinely offered to commercial customers.  By violating the New York contract's price reduction clause, Symantec knowingly submitted false statements and claims as detailed below.

## JURISDICTION, VENUE, AND PARTIES

16.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1345, as this action is brought by the United States, and 31 U.S.C. § 3730(a), as the Government asserts claims arising under the FCA.

17.     This Court has jurisdiction over the state law claims of Florida and California and Relator's claims on behalf of New York pursuant to 31 U.S.C. § 3732(b).

18.     This Court also has supplemental jurisdiction over the States' state law claims pursuant to 31 U.S.C. § 1367.

19.     Venue is proper in this District under 31 U.S.C. § 3732(a), because Symantec transacted and continues to transact business in the District of Columbia and because Symantec committed acts proscribed by the FCA in this District.

20.     Defendant Symantec Corporation is a Delaware corporation with its principal place of business in Mountain View, California.  Symantec is a Fortune 500 company, a member of the Standard & Poor's 500 stock market index, and, according to *Forbes* magazine, is the fourth largest software company in the world as measured by revenues in 2013, during which Symantec reported $6.8 billion in annual revenues.  Symantec sells a variety of software, appliance products, and professional services in the areas of security, storage, backup, and availability.  Symantec's notable product lines include Norton Antivirus, Veritas, and VeriSign.

21.     Plaintiff, the United States of America, through the General Services Administration, supplies products and communications for Government offices, provides transportation and office space to federal employees, and develops Government-wide cost-minimizing policies and programs and other management tasks.  One such cost-minimizing policy is GSA's use of schedule contracts, including the Multiple Award Schedule, through which other Government agencies procure goods and services.

22.     Plaintiff, California, through the California Department of General Services ("DGS"), supplies state-wide cost-minimizing procurement policies and provides purchasing services.  One such cost-minimizing policy is DGS's use of Leveraged Procurement Agreements, which rely on prices established in GSA schedule contracts, to allow California state and local government agencies to efficiently procure goods and services.

23.     Plaintiff, Florida, acts in this action through the Office of the Attorney General, Department of Legal Affairs.

24.     Relator Lori Morsell, who brings this action on behalf of the State of New York, has been a Symantec employee since March 2011 and is currently on paid administrative leave. Previously, Morsell managed and administered for Symantec the Contract and relations with business partners who sold Symantec products on their own GSA MAS contracts.

## FEDERAL STATUTORY AND REGULATORY FRAMEWORK

### The False Claims Act

25.     Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the FCA is the primary tool with which the United States combats false claims and fraud against the Government and protects the public fisc.

26.     The FCA provides for the award of treble damages and civil penalties for, among other acts, (i) knowingly or recklessly submitting, or causing the submission of, false or fraudulent claims for payment to the United States Government, (ii) knowingly or recklessly using a false record or making a false statement material to a claim, and (iii) knowingly or recklessly concealing or failing to disclose obligations to pay the Government.

27.     The FCA, as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), provides, in part, that anyone who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000
and not more than $10,000, as adjusted [for inflation] . . ., plus 3 times the amount
of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1)(A)-(B), (G).

28.     For purposes of the FCA, "the terms 'knowing' and 'knowingly' -- (A) mean that a person, with respect to information -- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud[.]"  31 U.S.C. § 3729(b)(1).

29.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to a range of $5,500 to $11,000 per violation (*i.e.,* for each false claim, false record, or false statement) for violations occurring on or after September 29, 1999.

30.     The FCA was amended pursuant to FERA.  Pursuant to its terms, the FERA amendments to the false statement provisions (31 U.S.C. § 3729(a)(1)(B)) were retroactive and apply to all claims in this action.  FERA's other amendments were effective as of the date of enactment, May 20, 2009.  As applied to this matter, and except as noted herein, the FERA amended FCA is largely consistent with the pre-FERA FCA, and thus, solely for convenience, the Government cites herein the current version of the statute unless otherwise noted.

**GSA's Multiple Award Schedule Program**

31.     Executive agencies of the United States may procure products and services only through full and open competition, unless they meet certain exceptions.  41 U.S.C. § 3301(a)(1).

32.     The competitive bidding process, and the negotiation of contractual terms, is often a lengthy and costly process.

33.     In order to expedite the procurement process for executive agencies and contractors wishing to sell products to executive agencies, GSA, through the Federal Acquisition Service, solicits, negotiates, awards, and administers MAS contracts to procure products and services for federal agencies.  40 U.S.C. § 501(b), 48 C.F.R. § 8.402.

34.     Under the MAS program, GSA negotiates the maximum prices and other contract terms that will apply to subsequent orders placed for all items that are covered by the MAS contract.  Once those maximum prices are set, agencies can make purchases at those prices, or at even better prices, subject to those other contract terms.

35.     The pre-negotiation of the terms of sale for a large number of products and services under the MAS program saves significant administrative costs for Government agencies ordering off of MAS contract schedules and for contractors wishing to sell products to the Government.

36.     The MAS program allows the Government to obtain commercial supplies and services at prices associated with volume buying.  48 C.F.R. § 8.402.

37.     Additionally, agencies placing orders under MAS contracts are considered to meet the requirements of full and open competition.  48 C.F.R. § 8.404(a).

38.     Contractors benefit from the MAS program because their products are more widely available to federal agencies, and because the program makes it easier for federal agencies to place orders.

39.     The Administrator of GSA establishes the procedures that govern the MAS program, including the requirements that contractors must follow in order to participate in the program.  40 U.S.C. §§ 121(c), 501(b)(2).  These rules and regulations are set forth in the Federal Acquisition Regulation ("FAR") and the General Services Administration Acquisition Regulation ("GSAR").

40.     GSA initiates the MAS process by publishing a contract solicitation.   Interested

contractors then submit offers under the solicitation to GSA.   Any contractor that enters into an

MAS contract with the Government must abide by (1) the obligations that are outlined in the

Government's solicitation; (2) the FAR and GSAR clauses and provisions that are incorporated

into the contract; (3) any additional requirements negotiated between the parties; and (4) any other

general federal contracting requirements set forth in the applicable regulations.

**A.      When Negotiating MAS Contracts, Offerors are Required to Make Complete and
         Accurate Disclosures of Their Pricing and Discounting Policies and Practices.**

41.     The MAS contract solicitation requires prospective contractors to provide GSA

with extensive information about their commercial sales and discounting practices, including

prices and discounts -- both standard and nonstandard -- offered by the contractor to commercial

customers.   This information is provided in a "Commercial Sales Practice Format" and is often

referred to as an offeror's "CSPs."   48 C.F.R. § 515.408 (MAS Requests for Information); 48

C.F.R. § 515.408, Figure 515.4 (Instructions for the Commercial Sales Practices Format).

42.     The information disclosed in CSPs is often supplemented by other representations

contained in correspondence from offerors to GSA contracting officers.   At bottom, GSA requires

offerors during MAS contract negotiations to provide pricing and discounting information that is

current, accurate, and complete.   48 C.F.R. § 515.408, Figure 515.4.

43.     Contractors are instructed to complete one disclosure for each Special Item Number

("SIN") at issue.   A SIN is "a group of generically similar (but not identical) supplies or services

that are intended to serve the same general purpose or function."   48 C.F.R. § 8.401.   A single

disclosure can contain information on more than one SIN so long as the "information is the same."

48 C.F.R. § 515.408.

44.     The MAS solicitation also instructed that, in providing CSPs, offerors should obey the following: "Net prices or discounts off of other price lists should be expressed as percentage discounts from the price list which is the basis of your offer.  If the discount disclosed is a combination of various discounts (prompt payment, quantity, etc.), the percentage should be broken out for each type of discount."

45.     The information contained in CSPs is material to a GSA contracting officer's decision to award an MAS contract.  Contracting officers rely on the accuracy, truthfulness, and completeness of the information provided by the offeror regarding its commercial sales and discount practices in negotiating the terms of a MAS contract.

46.     Pursuant to 48 C.F.R. § 538.270(a), GSA contracting officers are required to "seek to obtain the offeror's best price (the best price given to the most favored customer)."  In negotiating the terms of an MAS contract, the contracting officer must determine whether the price offered to GSA is reasonable by "compar[ing] the terms and conditions of the [offeror's response to the] MAS solicitation with the terms and conditions of agreements with the offeror's commercial customers."  48 C.F.R. § 538.270(c).

47.     MAS contracts provide that if, subsequent to formation of the contract, GSA discovers that the prices in a contract or modification were inflated due to the contractor's failure to provide current, accurate, and complete information, or to update that information, the Government is entitled to a reduction in the price of each order issued pursuant to the MAS contract.  48 C.F.R. § 552.215-72.  The amount of the reduction is the amount by which the Government orders were inflated as a result of the inaccurate or undisclosed information.  *Id.*

**B.** **The Price Reductions Clause Requires MAS Contractors to Provide the Government with Improvements to the Commercial Pricing and Discounts Set Forth in Their Disclosures.**

48.     The regulations governing MAS contracts also include a mechanism that is known

as the "Price Reductions Clause."  The PRC, 48 C.F.R. § 552.238-75, states as follows:

> (a) Before award of a contract, the Contracting Officer and the Offeror will agree upon (1) the customer (or category of customers) which will be the basis of award, and (2) the Government's price or discount relationship to the identified customer (or category of customers).  This relationship shall be maintained throughout the contract period.  Any change in the Contractor's commercial pricing or discount arrangement applicable to the identified customer (or category of customers) which disturbs this relationship shall constitute a price reduction.
>
> (b) During the contract period, the Contractor shall report to the Contracting Officer all price reductions to the customer (or category of customers) that was the basis of award.  The Contractor's report shall include an explanation of the conditions under which the reductions were made.
>
> (c)(1) A price reduction shall apply to purchases under this contract if, after the date negotiations conclude, the Contractor --
>
> > (i) Revises the commercial catalog, pricelist, schedule or other document upon which the contract award was predicated to reduce prices;
> >
> > (ii) Grants more favorable discounts or terms and conditions than those contained in the commercial catalog, pricelist, schedule or other documents upon which contract award was predicated; or
> >
> > (iii) Grants special discounts to the customer (or category of customers) that formed the basis of award, and the change disturbs the price/discount relationship of the Government to the customer (or category of customers) that was the basis of award.

49.     The PRC regulations thus require the GSA contracting officer and the offeror to

agree upon (1) the customer or category of customers which will be known as the "Basis of Award"

customer or customers, respectively, and (2) a fixed relationship between the prices that the offeror

gives to the Basis of Award customer and those that it gives to the Government.  If, during the

period that the contract is in effect, the Contractor, *inter alia*, (i) offers the Basis of Award customer

prices, discounts, or other terms that are better than those it previously offered to the Basis of

Award customer or (ii) favorably changes the sales and discounting practices disclosed during negotiations, the prices, discounts, or other terms that are offered to the Government must be adjusted accordingly.  Any such change offered by the Contractor to the Basis of Award customer must be reported to the Government no later than 15 days after its effective date, and the resulting change in prices on products sold to the Government is effective retroactive to the date on which the change in price was offered to the Basis of Award customer.  48 C.F.R. § 552.238-75(f).

50.     The PRC further provides that "the contractor [sic] will be modified to reflect any price reduction which becomes applicable in accordance with this clause."  48 C.F.R. § 552.238-75(g).

51.     Contractors are responsible for complying with the Price Reductions Clause, including reporting price reductions, and extending improved pricing and discounts to government customers when the PRC requires.

52.     Orders under MAS contracts are submitted by executive agencies directly to contractors such as Symantec.  48 C.F.R. § 8.406-1.  GSA does not independently receive information about commercial transactions that might trigger a contractor's PRC obligations.  GSA is also not involved in the ordering process when Government customers from other federal agencies make purchases under a MAS contract.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

53.     In late-2004, Symantec announced its agreement to acquire VERITAS Software Corporation ("VERITAS").  At that time, VERITAS held a GSA MAS contract under which it sold enterprise and backup products and services to the Government through SINs 132-32 (Term Software Licenses), 132-34 (Maintenance of Software as a Service), 132-50 (Training Courses), and 132-51 (Information Technology Professional Services).  VERITAS's point of contact for its

MAS contract was Ms. Kim Bradbury, who was VERITAS's Government Business Operations Manager at the time.

54.     In 2005 and 2006, as VERITAS's operations were folded into those of Symantec, Symantec explored avenues to continue a MAS contract with GSA under which it could sell Symantec's products after the VERITAS merger.  The VERITAS MAS contract, as amended, was set to expire on December 31, 2006.

55.     Because Symantec acquired VERITAS, Symantec did not simply renew or novate VERITAS's MAS contract and instead responded to the GSA MAS solicitation seeking a new MAS contract, which ultimately led to the Contract at issue in this action.

56.     Symantec submitted its initial offer for the Contract by letter dated February 28, 2006, seeking to sell products and services on SINs 132-8 (Purchase of New Equipment), 132-12 (Maintenance of Equipment, Repair Services and/or Repair/Spare Parts), 132-32 (Term Software Licenses), 132-33 (Perpetual Software Licenses), 132-34 (Maintenance of Software as a Service), 132-50 (Training Courses), and 132-51 (Information Technology Professional Services). Bradbury, who had assumed a role at Symantec similar to the one she held at VERITAS, signed the letter as Symantec's Senior Director of Public Sector Business Operations.

I.     **Symantec Purported to Disclose its Commercial Sales and Discounting Practices to GSA During Negotiation of the Contract.**

57.     As part of its initial, February 2006 offer, Symantec included CSPs.  Thereafter, Symantec provided certain supplemental information regarding its commercial and discounting practices during the negotiation of the Contract.

A.     **Symantec's Initial Disclosures Provided Certain Information Regarding Its Non-Published and Standard Discounting Practices.**

58.     Symantec's February 2006 offer provided information regarding its business practices in two different forms: (a) answers to standard questions posed in the MAS solicitation;

and (b) Symantec's CSPs or information generated and provided by Symantec purporting to convey its commercial sales and discounting practices.

59.     In its answers to standard MAS questions, Symantec answered "NO" to each of the following questions:

> (3)   Based on your written discounting policies (standard commercial sales practices in the event you do not have written discounting policies), are the discounts and any concessions which you offer the Government equal to or better than your best price (discount and concessions in any combination) offered to any customer acquiring the same items regardless of quantity or terms and conditions? . . .

> (b)   Do any deviations from your written policies or standard commercial sales practices disclosed in [your CSPs] ever result in better discounts (lower prices) or concessions than indicated?

60.     These questions referenced the definitions of "concession" and "discount" then found at GSAR 552.212-70, which stated:

> "Concession," as used in this solicitation, means a benefit, enhancement or privilege (other than a discount), which either reduces the overall cost of a customer's acquisition or encourages a customer to consummate a purchase. Concessions include, but are not limited to freight allowance, extended warranty, extended price guarantees, free installation and bonus goods.

> "Discount," as used in this solicitation, means a reduction to catalog prices (published or unpublished). Discounts include, but are not limited to, rebates, quantity discounts, purchase option credits, and any other terms or conditions (other than concessions) which reduce the amount of money a customer ultimately pays for goods or services ordered or received. Any net price lower than the list price is considered a "discount" by the percentage difference from the list price to the net price.

GSAR 552.212-70(a) (Oct. 1, 2006), 48 C.F.R. § 552.212-70(a) (Oct. 1, 2006).

61.     Consistent with its answer to Question (3), Symantec submitted CSPs that disclosed standard (or published) discounts offered to resellers and distributors, which varied based on product type but generally fell in the range of 30% to 40% off of MSRP.  Symantec also disclosed

standard discounts for academic customers (generally 20% to 40% off of MSRP) and "elite" buying program customers (generally 5% to 20% off of MSRP).

62.     Symantec's disclosure of standard discounts did not include any mention of or any information concerning its Rewards buying program or any disclosure of rebating policies or rebates to commercial customers.

63.     In addition, Symantec purported to provide certain information regarding "non-published" or non-standard discounts contrary to its above noted answer that it offered no discounts beyond those in its written policies or standard commercial sales practices.

64.     Symantec's disclosure of "non-published" discounts consisted of three charts:

a.      a chart entitled "G.4(4) Summary of Non-Published Discounts offered by SKU for sales in 2005," which purported to describe the frequency of non-published discounts at various depths offered on product sales occurring during 2005 (the "Frequency Chart");

b.      a chart entitled "G.4(4) Non-Published Discounts" with a heading of "Discount Reason Codes," which purported to describe the reasons for Symantec's non-published discounts and the frequency of each (the "Reason Code Chart"); and

c.      a chart entitled "G.4(4) Non-Published Discounts" with a heading of "Management Discount Approval Levels," which purported to describe the level of management approval needed for various depths of discounts (the "Management Approval Chart").

65.     Symantec's Frequency Chart described that when non-published discounts were offered, those discounts amounted to a discount of less than forty percent 97.688% of the time.

Put another way, Symantec stated to GSA that when it offered a non-published discount it provided a discount greater than forty percent less than 3% of the time.

66.     Symantec's Frequency Chart purported to convey information regarding non-published discounts on sales made in 2005 without limitations.  For example, Symantec did not indicate its Frequency Chart was based only on (a) sales of security products, (b) sales that occurred during the second through fourth quarters of 2005 (*i.e.*, the Frequency Chart omitted sales from the first quarter of 2005), or (c) sales of products that continued to be offered as of February 2006.

67.     Symantec's Reason Code Chart stated that in 2005 it provided 47% of all non-published discounts based on "Pro-rated Maintenance / Subscription" and "Enterprise License Agreement / True up Non-Compliance" -- that is a sizeable plurality of non-standard discounts were due to the proration of service agreements and adjustments to enterprise license agreements.

68.     The Reason Code Chart also stated that Symantec offered non-published discounts for reasons beyond those listed in the chart only 7% of the time.

69.     Symantec's Management Approval Chart indicated that any non-published discounts deeper than 30% must be approved by a successively higher level of executive depending on the level of the discount.  For example, Symantec represented that discounts greater than 50% off of list price had to be approved by a Regional Vice President.

**B.      Symantec's Supplemented its Initial Disclosures During Contract Negotiations Through the October 2006 Presentation.**

70.     From February 2006 to September 2006, Symantec submitted to GSA certain ministerial updates concerning its offer.

71.     Thereafter, in September 2006, Bradbury emailed GSA inquiring as to the status of Symantec's offer and expressing urgency in concluding the Contract in the near future due to the expiration of the VERITAS MAS contract and the finalization of the VERITAS merger.

72.     On October 5, 2006, Bradbury emailed the GSA contracting officer for Symantec's Contract, Ms. Gwen Dixon, and provided a presentation (the "October 2006 Presentation") that purported to provide "an overview of new discounting policies and procedures for all products sold by Symantec Corporation."

73.     The October 2006 Presentation mentioned five buying programs: (a) Express, (b) Government, (c) Academic, (d) Rewards, and (e) Enterprise Options.

74.     The October 2006 Presentation described certain aspects of each program including (i) the targeted customers, (ii) the requirements to purchase at different "bands" or pricing levels within a program, and (iii) certain terms and conditions.

75.     The October 2006 Presentation noted that the Express, Government, Academic, and Rewards programs had pricing bands named "A" to "E" and that Express, Government, and Academic had additional bands named "F" to "H" and "S."

76.     Although the Presentation described the names and volume or "point" requirements for bands under the Express, Government, Academic, and Rewards programs, the Presentation did not indicate that bands with the same letter names in different programs had different pricing nor did it explain that pricing under the Rewards bands was more favorable than pricing under Express, Academic, or Government bands.

77.     The Presentation also provided no information on the comparative pricing between buying programs, including the Rewards program, and no information on rebate programs or rebates offered to commercial customers.

78.     For the Rewards program, the October 2006 Presentation described the program's pricing to be based on the accumulation of points based on the volume of purchases and that points were used to determine the applicable pricing band.

79.     The Presentation further described that a customer had to make a minimum initial purchase equaling 6,000 points to participate in the Rewards program.

80.     The Presentation also described that under the Rewards program points accumulated for up to 2 years and expired at the close of that period.

81.     Although the October 2006 Presentation again indicated that non-published discounts were available through approvals using a system known as "eSPA."

**C.      Symantec Further Supplemented Its Disclosures in Late-2006.**

82.     On October 9, 2006, Dixon wrote Bradbury with a series of questions regarding Symantec's offer and CSPs and separately emailed Bradbury expressing confusion regarding the October 2006 Presentation.

83.     On October 11, 2006, Dixon and Bradbury met to discuss Symantec's offer.  At no time did Bradbury inform Dixon that the pricing under the Rewards program was more favorable than that offered through the Express or Government programs or that Symantec would waive the Rewards program's initial purchase or point requirements for commercial customers.

84.     On October 20, 2006, Bradbury emailed Dixon in response to Dixon's list of questions from October 9, 2006, and items discussed during the October 11, 2006, meeting.

85.     Although Bradbury's October 20, 2006, email and attachments purported to include various comparisons reflecting "discounts to all categories of customers," it did not disclose anything about how pricing for the Rewards program compared to pricing under Symantec's other buying programs.

86.     After October 20, 2006, Bradbury updated this discount comparison chart to include comparisons of pricing between: (a) Symantec's GSA offer; (b) Symantec's Government buying program; (c) Symantec's Academic buying program; (d) distributor discounts; (e) reseller discounts; and (f) Symantec's "Commercial MSRP."

87.     For example, Symantec's discount comparison chart noted that Government End User MSRPs were discounted between 0% and 16% off of Commercial MSRPs depending on product category -- *i.e.*, Symantec's "Government buying program" had standard discount of 0% to 16% off of Commercial MSRP.

88.     Unbeknownst to GSA at the time, Symantec used its Express program pricelist to generate its "Commercial MSRP," instead of basing that MSRP on prices offered to all customers in its "commercial class of customers," which category became the Basis of Award for the Contract.

89.     At no time prior to the execution of the Contract did Symantec provide Dixon or any other GSA contracting personnel a comparison of pricing between the GSA offer and the Rewards buying program or disclose the exceptions to the Rewards buying program that gave commercial customers other discounts by allowing them to purchase from bands for which they were unqualified.

90.     On October 20, 2006, Bradbury provided additional information regarding Symantec's non-published discounts, including a further description of Symantec's rigorous approval process for them.  Specifically, Bradbury wrote:

> Any deviations from published discounts require management approval. Deviations must be documented and approved in accordance with the following guidelines: As previously disclosed to GSA as part of Symantec's established discounting policies, the Worldwide Sales discounting tool referred to as "eSPA" was established to allow Symantec the flexibility to respond to competition.  This process provides non-standard competitive pricing to strategic accounts by

requiring commitments from the identified account for annual quantity purchases, or to meet one of the follow guidelines; which are provided as examples:

1.  To meet market competition or displace a named competitor at a customer site;

2.  Customers who agree to standardize on Symantec products and services;

3.  New Market or market segment penetration;

4.  Educational, including prime contractors, or Charitable organizations or institutes;

5.  Introduction of new product and services through more aggressive discounts in exchange for press or customer references.

91.     Bradbury then provided a management discount approval chart for professional services similar to the Management Approval Chart in Symantec's initial disclosures for products and other items, which indicated that any non-published discounts above 20% on professional services required approval of the Regional Vice President, Consulting Services.

92.     Although the parties continued to exchange correspondence on other issues concerning Symantec's offer after Bradbury's October 20, 2006, letter, Symantec provided no further information to Dixon or GSA contracting personnel on the Rewards program, rebates or rebate practices, or Symantec's non-published discounts before execution of the Contract.

**D.     Symantec Told GSA that All Commercial Sales and Discounting Practices Had Been Fully Disclosed.**

93.     On January 25, 2007, Symantec sent Dixon its Final Proposed Revision ("FPR") of its offer for the Contract.

94.     In the FPR, Symantec stated that "all commercial business practices have been fully disclosed and are current, accurate and complete as of the conclusion of the negotiation," certified "that the discounts, pricing and/or rates given to the government are either equal to and/or greater than what is granted to any commercial and/or Government customer under similar terms and

conditions," and represented "that all data submitted is accurate, current, and complete representations as of 1/22/07."

95.     In the FPR, Symantec proposed for GSA to receive discounts off of published pricelists as follows: (i) for hardware appliance, enterprise availability, backup executive, and security products and services Symantec offered GSA pricing at between 5% and 35% off of Government End User MSRP depending on the product category and SIN; and (ii) for training, professional, managed security, and technical support services Symantec offered GSA pricing at between 5% and 10% off of "Commercial MSRP" depending on the product line and SIN.

96.     GSA accepted Symantec's offer as revised through its FPR by letter dated January 25, 2007, thereby executing the Contract.

## II.     Symantec's Disclosures of its Commercial and Discounting Practices Were Knowingly Inaccurate and Incomplete.

### A.     Symantec's Disclosures Regarding Non-Published Discounts Were Knowingly False.

97.     In sum, during negotiation of the Contract, Symantec disclosed the following regarding its non-standard discounts:

a.      That all non-published discounts went through an approval system then named eSPA as indicated in Bradbury's October 20, 2006, letter;

b.      That Symantec only offered non-published discounts after such discounts were approved by appropriate management officials as indicated in Bradbury's October 20, 2006, letter and the Management Approval Chart;

c.      That when it offered non-published discounts on sales in 2005 those discounts amounted to a discount of less than forty percent 97.688% of the time as indicated on the Frequency Chart; and

    d.      That Symantec offered non-published discounts for the reasons stated in the Reason Code Chart as supplemented by Bradbury's October 20, 2006, letter.  Specifically, 47% of all non-published discounts on sales in 2005 were offered due to the proration of service agreements and adjustments to enterprise license agreements and that less than 7% of non-published discounts were offered for reasons not specifically identified on the Reason Code Chart.

98.      Each of these representations was false.

99.      Over 9,000 commercial orders with U.S. customers that received non-published discounts in 2005 did not go through eSPA.  As such, for these orders, Symantec maintained neither a record of management approval nor the reason for the non-published discount.  As examples:

    a.      On April 22, 2005, May Department Stores purchased 127 licenses of certain antivirus multi-tier solution licenses from Symantec for $106.68, as part of order number 13422868.  The extended standard buy price, including published discounts, for these licenses applicable to May Department Stores was $1551.94.  As such, this purchase received a non-published discount of 93.13%.  Despite receiving a substantial non-published discount, there is no record of this transaction in Symantec's eSPA database.

    b.      On August 22, 2005, Five Brothers, a mortgage default management company, purchased 30 licenses of certain anti-spam products from Symantec for $251.70, as part of order number 13782889.  The extended standard buy price, including published discounts, for these licenses applicable to Five Brothers was $465.90.  As such, this purchase received a non-published discount of 45.98%.  Despite

receiving a substantial non-published discount, there is no record of this transaction in Symantec's eSPA database.

c.      On September 22, 2005, Cognex Corp., a manufacturer of machine vision systems, purchased 500 licenses of certain Symantec antivirus software for $345, as part of order number 13894538.  The extended standard buy price, including published discounts, for these licenses applicable to Cognex Corp. was $4,160.  As such, this purchase received a non-published discount of 91.71%.  Despite receiving a substantial non-published discount, there is no record of this transaction in Symantec's eSPA database.

d.      On November 14, 2005, MedImmune LLC, a biotechnology development company, purchased 800 licenses of certain Symantec antivirus software for $2,216, as part of order number 14028183.  The extended standard buy price, including published discounts, for these licenses applicable to MedImmune, was $6,656.  As such, this purchase received a non-published discount of 66.71%.  Despite receiving a substantial non-published discount, there is no record of this transaction in Symantec's eSPA database.

e.      On December 30, 2005, Andersen Corporation, a door and window manufacturer, purchased 5,000 licenses of certain Symantec anti-spam software for $1,100, as part of order number 14148389.  The extended standard buy price, including published discounts, for this software applicable to Anderson Corporation was $40,150.  As such, this purchase received a non-published discount of 97.26%.  Despite receiving a substantial non-published discount, there is no record of this transaction in Symantec's eSPA database.

100.    Because these deals did not go through eSPA, they did not receive management approvals and, thus, no reason code was ever provided for them, which renders the Management Approval Chart and Reason Code Chart materially false.

101.    Symantec's Frequency Chart was also materially false.  Unbeknownst to GSA, that chart -- which purportedly described the frequency of non-published discounts at various discount ranges -- included a host of published discounts, including standard, published distributor and reseller discounts in the 30-40% discount range.

102.    The inclusion of these standard, published discounts created a false picture that nearly all non-published discounts occurred below 40%.

103.    Had Symantec included only non-published discounts (as it purported to do), GSA contracting personnel would have learned that when Symantec offered non-published discounts, it did so at levels greater than forty percent more than 20% of the time (instead of the less than 3% indicated in the Frequency Chart).

104.    Symantec knew that the above representations were false or recklessly disregarded the truth or falsity of them.

105.    Symantec knew that its eSPA system did little to control or record commercial discounting while it was negotiating its Contract.  For example, in August 2006, Symantec executives noted the lack of scrutiny given to sales that went through eSPA -- noting that a mere 0.61% of all requested non-published discounts (worldwide) were rejected through eSPA. Nonetheless, those executives proposed eliminating parallel approvals in eSPA even though they knew that Symantec's commercial sales teams may "discount to the point of being unprofitable."

106.    Additionally, in various internal presentations during 2006, Bradbury herself noted that not all concessions or discounts were approved through eSPA, writing "some exceptions are approved by email outside eSPA."

107.    Further, each quarter Symantec would generate statistics for each sales team reviewing the prior quarter sales and identifying issues that made sales "unclean" or not compliant with Symantec's published policies.  Routinely, the public sales force, including Bradbury, would receive notices that sales were unclean because they were "Missing eSPA" approvals, "Pricing discrepancy -- any discounting must have an approved eSPA/SFDC," "approvals issue," and "SKU/Pricing Issue."

108.    Bradbury further knew that the Frequency Chart was misleading, incomplete, and inaccurate.

109.    First, in requesting data for the Frequency Chart, Bradbury specifically limited her request to data for "Symantec Security products and services only."  The exclusion of non-published discounts on other product lines (*e.g.*, hardware appliance, enterprise availability, and backup executive products and services) was never disclosed to GSA.

110.    Second, when she received the Frequency Chart data, she learned that the data was limited to non-published discounts in 2005 on products that remained on Symantec's 2006 pricelist instead of reflecting all non-standard discounts given during 2005.  This limitation was also omitted from disclosures to GSA.

111.    Third, the data only included five line items from the first quarter of 2005.  Symantec never disclosed to GSA that it generated the Frequency Chart from data for only the last three quarters of 2005.

112.    Third, and lastly, Bradbury knew that although the Frequency Chart purported to disclose only non-published discounts, it in fact included many standard discounts to distributors and resellers in the 30% to 40% discount range.  The inclusion of these standard discounts made it appear that Symantec's non-published discounts were largely confined to less desirable levels and much closer to the discounts GSA ultimately agreed to accept through the FPR.  For example, on February 24, 2006, Bradbury wrote in an email as follows:

> This is not every transaction for every product we sold in 2005.  It is only the products that will be included in our offer based on the February 2006 pricelist. We're suspecting that most of the SKUs in the 30%-40% range are distributors. We'll be looking at each customer today.

**B.    Symantec's Disclosures Regarding the Rewards Program Were Knowingly False and Incomplete.**

113.    During negotiation of the Contract, Symantec disclosed the following about its Rewards program:

a.    the Rewards program had bands named "A" to "E," as did the Express, Government, and Academic programs;

b.    Under the Rewards program, points were used to determine the applicable pricing band for a purchase, instead of the number of products in a particular order used in the Express, Government, and Academic programs;

c.    Rewards program points accumulated based on the volume of purchases a customer made over time;

d.    A customer had to make a minimum initial purchase equaling 6,000 points to participate in the Rewards program; and

e.    Points under the Rewards program accumulated for up to 2 years and expired at the close of that period.

114. A number of these specific representations were untrue and these disclosures were demonstrably incomplete.

115. Most importantly, nowhere did Symantec disclose to GSA that pricing under the Rewards program was better than that offered through the Express, Government, and Academic programs and that pricing on Rewards bands "A" to "E" was superior to pricing on identically named bands under the Express, Government, and Academic programs.

116. Also, nowhere did Symantec describe how points were accumulated, leaving GSA contracting officials unaware of how easily commercial customers could qualify for the Rewards program even had they known the Rewards program offered significantly better prices.

117. In actuality, Rewards customers accrued Rewards points based on point values assigned by Symantec to individual SKUs, earning at worst one point for every five dollars spent.

118. Further, Symantec failed to disclose that there were documented exceptions to each requirement in the Rewards program. For example, Symantec excepted certain customers from (i) the minimum initial purchase requirement, (ii) the points requirements for more favorable bands, and (iii) the expiration of points after a two-year period.

119. The incomplete and inaccurate nature of these disclosures was well known to Symantec.

120. Bradbury received and maintained in her own electronic files a document dated November 6, 2006, which listed numerous available exceptions to the Rewards program requirements, including (i) "lower or waive minimum initial order for" each Rewards band, and (ii) "waive Rewards annual releveling."

121. In an August 2006 presentation given to Symantec sales managers -- including Bradbury and Kari Reinhardt (another Symantec Public Sector official) -- Symantec instructed its

sales force on buying programs, including Express and Rewards.  In that presentation, on a slide entitled "Rewards vs Express -- Key selling points," Symantec officials informed Symantec's sales managers (including Bradbury) that the Rewards program offered "increased discounts" and "better pricing."  Nonetheless, no one at Symantec informed Dixon or other GSA contracting personnel that the Rewards program offered more favorable pricing than that offered to the Government.

122.    As explained in detail below, based on its volume of purchases, the Government would have qualified for Rewards Band E -- the most favorable Rewards pricing -- almost immediately after executing the Contract.

### C.    Symantec's Disclosures Regarding its Rebate Practices Were Knowingly False and Incomplete.

123.    At no point did Symantec disclose any information concerning any rebate programs available to commercial customers.  This was false and incomplete.

124.    In 2005, Symantec had various rebate programs that offered "partners" additional incentives to sell or use Symantec items.

125.    As Symantec executives put it in an October 25, 2011, risk management document "Rebate is a back-end payment to a partner and is used to reward partners for achieving set quotas, objectives or to help drive a partner's loyalty or behavior."

126.    Bradbury and other Symantec Public Sector officials knew of these partner rebates at the time they negotiated the Contract, but never disclosed any information on Symantec's rebate programs to GSA.

### III.    Symantec Agreed that All Commercial Customers Were the Basis of Award for PRC Purposes.

127.    As described above, in negotiating a MAS contract, GSA and an offeror agree on a customer or category of customers to serve as the Basis of Award for PRC purposes.

128.     In Symantec's FPR, it agreed to use its "commercial class of customers" as the Basis of Award.  In no way did Symantec limit this "commercial class of customers" to exclude commercial customers buying under the Rewards program.

129.     Thereafter, as discussed above, Symantec agreed in the FPR to offer and maintain GSA prices in a manner that was equal to discounts off of pricing offered to commercial customers depending on the product category and SIN.

130.     Under the PRC, Symantec was obligated to maintain these negotiated discount relationships between GSA prices and those offered to commercial customers.  If Symantec favorably changed the prices and discounts offered to commercial customers, Symantec was obligated to similarly adjust its GSA prices.  Also, if Symantec changed favorably its commercial sales and discounting practices disclosed to GSA during negotiations, it was obligated to similarly provide GSA the benefit of that favorable change.

131.     Symantec implicitly certified its compliance with the PRC each time it made a claim for payment under the Contract because compliance with the PRC is a core and material term of MAS contracts.

132.     These implied certifications were false and Symantec overcharged the United States each time it made a claim for payment under the Contract because it violated the PRC and charged the Government prices over and above those allowed by the PRC.

**IV.     Symantec Violated the PRC By Failing to Report and Offer to The Government <u>Price Reductions it Offered to its Commercial Customers.</u>**

133.     Symantec violated the PRC by providing commercial customers, but not the Government, (i) non-standard discounts beyond, and different from, those disclosed during Contract negotiations, (ii) Rewards pricing and rebates, and (iii) deep discounts not reflected in its

disclosed policies, including exceptions to band and buying program requirements and prerequisites.

134. For example, Symantec made the following claims under the Contract and/or on Blanket Purchase Agreements ("BPAs") or other contractual arrangements based on the terms of the Contract, which were inflated and false because prior to each of these claims Symantec offered these same categories of products to commercial customers at prices more favorable than those disclosed by Symantec to the Government while failing to report and offer the same prices to the Government.

a.  On February 8, 2007, the Government placed Order No. 15394996 with Symantec under the Contract for certain goods. Symantec filled that order and charged the Government a total of at least $7,851.71.

b.  On September 11, 2007, the Government placed Order No. 15797115 with Symantec under the Contract for certain goods. Symantec filled that order and charged the Government a total of at least $51,252.00.

c.  On March 27, 2008, the Government placed Order No. 511958005 with Symantec under the Contract for certain goods. Symantec filled that order and charged the Government a total of at least $60,621.00.

d.  On December 4, 2008, the Government placed Order No. 16576471 with Symantec under the Contract for certain goods. Symantec filled that order and charged the Government a total of at least $1,116.15.

e.  On October 2, 2009, the Government placed Order No. 17046490 with Symantec under the Contract for certain goods. Symantec filled that order and charged the Government a total of at least $52,193.88.

f.     On March 19, 2010, the Government placed Order No. 17285781 with Symantec under the Contract for certain goods.  Symantec filled that order and charged the Government a total of at least $438,700.00.

g.     On November 24, 2010, the Government placed Order No. 513374131 with Symantec under the Contract for certain goods.  Symantec filled that order and charged the Government a total of at least $61,129.49.

h.     On September 29, 2010, the Government placed Order No. 513371946 with Symantec under the Contract for certain goods.  Symantec filled that order and charged the Government a total of at least $11,862.26.

i.     On December 23, 2011, the Government placed Order No. 514195192 with Symantec under the Contract for certain goods.  Symantec filled that order and charged the Government a total of at least $15,441.86.

**A.     Symantec's Non-Published Discounting During Contract Performance Was Materially Different from that Disclosed During Negotiations.**

135.     Symantec offered deep non-standard discounts that failed to adhere to the internal processes disclosed during negotiations and maintain the price relationship required by the PRC. For example, Symantec made the following sales at pricing below that disclosed to GSA yet these sales obtained no approval as non-published discounts through eSPA or its successor, the SalesForce.com ("SFDC") application.

a.     On May 1, 2007, CVS Pharmacy Inc. (Order No. 15556108) purchased certain items off of Express Band S at discounts exceeding 89% off of the GSA Band S price for the same items.  This non-standard discount was not approved in SFDC.

b.     On August 9, 2007, Indianapolis Power & Light Co. (Order No. 15739961) purchased certain items off of Express Band S at discounts exceeding 81% off of

the GSA Band S price for the same items.  This non-standard discount was not approved in SFDC.

c.  On January 10, 2008, Prairie Nuclear Generating Plant (Order No. 16005054) purchased certain items off of Express Band S, which exceeded 72% off of the GSA Band S price for the same item. This non-standard discount was not approved in SFDC.

d.  On July 18, 2008, Lehman Brothers Lease and Finance, Ltd., (Order No. 511926289) purchased certain items off Express Band S, which exceeded 98% off of the GSA Band S price for the same item. This non-standard discount was not approved in SFDC.

e.  On December 17 and 18, 2008, Metavante Corp. (Order No. 16598756) purchased certain items off of Express Band S, one of which at a discount exceeding 95% off of the GSA Band S price for the same item.  This non-standard discount was not approved in SFDC.

f.  On July 14, 2009, General Electric Co. (Order No. 16917652) purchased certain items off of Express Band S at discounts exceeding 78% off of the GSA Band S price for the same items.  This non-standard discount was not approved in SFDC.

g.  On August 31, 2009, First Energy Service Co. (Order No. 16993322) purchased certain items off of Express Band S at discounts exceeding 75-90% off of the GSA Band S price for the same items.  This non-standard discount was not approved in SFDC.

h.  On June 14, 2010, Fair Isaac Corporation (Order No. 17402982) purchased certain items off of Express Band S, one of which at a discount exceeding 79% off of the

GSA Band S price for the same item.  This non-standard discount was not approved in SFDC.

i.  On December 15, 2010, Motorola Inc. (Order No. 17629712) purchased certain items off of Express Band S at discounts exceeding 98% off of the GSA Band S price for the same items.  This non-standard discount was not approved in SFDC.

136.   Symantec never disclosed these sales to GSA or adjusted GSA prices as required by the PRC with regard to these sales.

137.   Further, even had the Frequency Chart been accurate based on Symantec's 2005 sales (which it was not for the reasons described above), that chart did not reflect the significantly more favorable commercial sales and discounting practices Symantec employed in performing the Contract.

138.   During the Contract's performance and based solely on non-published discounts approved through SFDC (eSPA's successor), when Symantec offered non-standard discounts, they exceeded forty percent more than 32.33% of the time.  This was a material departure from the discounting practices disclosed in the Frequency Chart, which stated only 3% of non-standard discounts exceeded forty percent.  Symantec granted more favorable discounts than it disclosed in the document upon which the Contract was based and changed the relative pricing between GSA prices and the Contract's basis of award customers, triggering the PRC.  Symantec failed to report its price reductions and extend their benefits to the United States.

139.   Similarly, the Reason Code Chart inaccurately described the discounting practices employed by Symantec.  During the Contract's performance and based solely on SFDC information, non-standard discounts due to the proration of service agreements and adjustments to enterprise license agreements comprised less than 2% of the reasons for these discounts -- a far

departure from the 47% disclosed in the Reason Code Chart.  Further, reasons not listed in the Reason Code Chart swelled to over 26% of the basis for non-standard discounting from the 7% listed in the chart.  This too granted more favorable discounts than those disclosed in the documents upon which the Contract was predicated and changed the relative pricing between GSA prices and the Contract's basis of award customers, triggering the PRC.  Symantec again failed to report its price reductions and extend their benefits to the United States.

**B.      Symantec Offered Undisclosed Rewards Pricing to Commercial Customers, Which Altered the Pricing Relationship Between GSA and the Basis of Award Customers.**

140.    As noted above, based on volumes, the Government would have qualified for the best pricing under the Rewards program (Band E) within days of entering into the Contract.

141.    Under the stated terms of the Rewards program a customer had to make a qualifying initial purchase of 6,000 points or greater and accumulate a total of 100,000 points thereafter to qualify for Rewards Band E pricing.  The amount of points differed from product to product, but, at a minimum, five dollars spent by customers equaled one point.

142.    Consequently, even had Symantec rigorously applied the stated requirements for the Rewards program (which it did not as noted below), to qualify for Rewards Band E, the Government would have merely needed to have an initial qualifying purchase of greater than $30,000 and total purchases of $500,000.

143.    On March 14, 2007, the Government purchased more than $100,000 of products in a single purchase, and by March 30, 2007, the Government had purchased more than $500,000 in products since its initial qualifying purchase.  Consequently, as of March 31, 2007, the Government qualified for Rewards Band E pricing.

144.    Nonetheless, Symantec never offered the Government that pricing, yet continued to offer it to commercial customers, including, but not limited to, the following examples:

a.       On April 9, 2007, Blizzard Entertainment, Inc., purchased certain items (Order No. 15515715) off of Rewards Band E at prices between 48% and 61% off of the GSA prices for the same items.   Symantec's sales data reflects no eSPA or SFDC approval for this discount.

b.       On December 28, 2007, Wachovia Corporation purchased certain items (Order No. 15989581) off of Rewards Band E at prices roughly 63% off of GSA prices for the same items.   Symantec's sales data reflects no eSPA or SFDC approval for this discount.

c.       On November 26, 2008, Carlson Companies, Inc., purchased certain items (Order No. 16569095) off of Rewards Band E at prices exceeding 77% off of the GSA Band S price for the same items. Symantec's sales data reflects no eSPA or SFDC approval for this discount.

d.       On April 6, 2009, American Systems Corporation purchased certain items (Order No. 16769512) off of Rewards Band E at prices exceeding 95% off of the GSA Band S price for the same items. Symantec's sales data reflects no eSPA or SFDC approval for this discount.

e.       On July 13, 2009, American International Group, Inc., purchased certain items (Order No. 16917382) off of Rewards Band E at prices between 83% and 90% off of the GSA Band S prices for the same items.  Symantec's sales data reflects no eSPA or SFDC approval for this discount.

f.       On May 14, 2010, Abbot Laboratories, Inc., purchased certain items (Order No. 17363488) off of Rewards Band E at prices roughly between  74% and 89% off of

the GSA Band S prices for the same items.  Symantec's sales data reflects no eSPA or SFDC approval for this discount.

145.    Symantec's failure to disclose these sales and provide corresponding discounts to the Government violated the PRC and rendered Symantec's claims after March 30, 2007, materially false for this reason alone.

**C.    Symantec Offered Undisclosed Exceptions to Buying Program and Band Requirements, Which Gave Basis of Award Customers More Favorable Pricing.**

146.    In addition to providing commercial customers undisclosed non-published discounts and undisclosed Rewards pricing, Symantec violated the PRC by creating undisclosed exceptions to its buying program and band requirements, which in effect gave commercial customers better discounts without reporting them and passing them on to the United States.

147.    During negotiation of the Contract, Symantec explained that under the Express buying program the number of items purchased in a single order determined the pricing band for the order.   For example, in the October 2006 Presentation, Symantec explained that a customer had to purchase (i) 5 items to get Band A pricing; (ii) 25 items for Band B; (iii) 50 items for Band C; (iv) 100 items for Band D; (v) 250 items for Band E; (vi) 500 items for Band F; (vii) 1,000 items for Band G; and (viii) more than 2,500 items for Band H.  During negotiation of the Contract, Symantec never disclosed to GSA that it created exceptions to these banding requirements for commercial customers.

148.    Nonetheless, during performance of the contract, Symantec routinely waived Express band requirements, permitting commercial customers to purchase under more favorable Express pricing bands, including on the following instances, which are provided as examples:

a.    On February 2, 2007, CB Wholesale Inc., through Symantec's distributor Tech Data Product Management, Inc., purchased one item under the Express program

(Order No. 15384399) but received Band B pricing, which Symantec disclosed as being reserved for orders of more than 25 items.  Symantec's sales data reflects no eSPA or SFDC approval for this order.

b.       On April 4, 2007, Daubert Law Firm LLC, through Symantec's distributor Tech Data Product Management, Inc., purchased nine items under the Express program (Order No. 15506525) but received Band C pricing, which Symantec disclosed as being reserved for orders of more than 50 items.  Symantec's sales data reflects no eSPA or SFDC approval for this order.

c.       On May 31, 2007, Navis Technologies, through Symantec's distributor Tech Data Product Management, Inc., purchased 15 items under the Express program (Order No. 15612484) but received Band D pricing, which Symantec disclosed as being reserved for orders of more than 100 items.  Symantec's sales data reflects no eSPA or SFDC approval for this order.

d.       On June 29, 2007, Sam Galloway Ford, Inc., through Symantec's distributor Synnex US, purchased 50 items under the Express program (Order No. 15670183) but received Band E pricing, which Symantec disclosed as being reserved for orders of more than 250 items.  Symantec's sales data reflects no eSPA or SFDC approval for this order.

e.       On January 4, 2008, Visionx Inc., through Symantec's distributor Ingram Micro Corp., purchased 200 items under the Express Program (Order No. 15994854) but received Band F pricing, which Symantec disclosed as being reserved for orders of 500 or more items. Symantec's sales data reflects no eSPA or SFDC approval for this order.

f.      On January 5, 2009, Schooldude.com, Inc., through Symantec's distributor Ingram Micro Corp., purchased 342 items under the Express Program (Order No. 16621397) but received Band F pricing, which Symantec disclosed as being reserved for orders of 500 or more items. Symantec's sales data reflects no eSPA or SFDC approval for this order.

g.      On December 26, 2007, National Machinery, LLC, through Symantec's distributor Ingram Micro Corp., purchased 175 items under the Express program (Order No. 15983347) but received Band G pricing, which Symantec disclosed as being reserved for orders of more than 1,000 items. Symantec's sales data reflects no eSPA or SFDC approval for this order.

h.      On November 7, 2008, Cybercity Teleservices LTD, through Symantec's distributor Ingram Micro Corp., purchased 850 items under the Express program (Order No. 16541066) but received Band H pricing, which Symantec disclosed as being reserved for orders of more than 2,500 items. Symantec's sales data reflects no eSPA or SFDC approval for this order.

149.    Similarly, during negotiation of the Contract, Symantec explained that under the Rewards buying program the number of accumulated points after an initial qualifying purchased determined the pricing band for the order.  For example, in the October 2006 Presentation, Symantec explained that a customer had to have accumulated (i) 6,000 points to get Band A pricing; (ii) 12,000 points for Band B; (iii) 20,000 points for Band C; (iv) 50,000 points for Band D; and (v) more than 100,000 points for Band E.  Symantec further represented that Rewards points were re-leveled every two years.  During negotiation of the Contract, Symantec never disclosed to GSA that it created exceptions to these banding requirements or waived its re-leveling policy.

150.    Nonetheless, during performance of the contract, Symantec routinely waived Rewards band requirements and point re-leveling, permitting commercial customers to purchase under more favorable Rewards pricing bands and accumulate points during periods longer than two years.

151.    During negotiation of the Contract, Symantec explained that for a customer to qualify for the Rewards buying program it had to make a qualifying order of more than 6,000 points (or at most $30,000 dollars).  Symantec never disclosed to GSA that it created exceptions to this program requirement for commercial customers.

152.    Nonetheless, during performance of the contract, Symantec routinely waived the Rewards program initial purchase requirement, permitting commercial customers to purchase at favorable prices under the Rewards program even though they did not qualify.

153.    In May 2008, Symantec further altered the pricing relationship between GSA pricing and prices offered to commercial customers through the Express program.

154.    Specifically, Symantec eliminated Bands B to G in its Government buying program, which, as noted above, was a point of reference used to ascertain GSA pricing.  By collapsing these bands, Symantec's GSA pricelist was revised so that (i) purchases of one server license received Band S pricing; (ii) purchases of 5-249 user licenses received Band A pricing; and (iii) purchases of more than 250 user licenses received Band H pricing.

155.    Symantec did not, however, similarly collapse the Express or Rewards bands.

156.    As a result of these changes, Symantec altered the pricing relationship between goods offered under GSA Band A for orders between 25 and 249 units (which were previously covered by Bands B to E) and goods offered under Express Bands B to E in a manner that became less favorable to GSA.

157.     Symantec neither disclosed this significant change in commercial sales practices to GSA nor passed along the resulting price reductions to the United States.

### D.     Symantec Offered Undisclosed Rebates to Commercial Partners.

158.     In addition to the above, Symantec violated the PRC by giving rebates to commercial customers without reporting them and giving like rebates to the United States.

159.     Symantec failed to disclose any information concerning rebating policies or practices to GSA during negotiation of the Contract.

160.     When Symantec routinely offered rebates to its commercial partners, it granted more favorable terms than those disclosed in the documents upon which the Contract was based and improved pricing to its commercial class of customers, thereby triggering the PRC. Nonetheless, Symantec failed to report and pass along these price reductions to the United States.

## V.     Symantec Knowingly and Recklessly Violated the PRC By Failing to Implement <u>Any System Sufficient to Monitor Its Contractual Compliance.</u>

161.     Symantec committed the above noted PRC violations knowingly and recklessly. Symantec senior management were well aware that (a) Symantec lacked any automatic system to enforce the relationship between GSA and commercial pricing or disclose and offer reductions, (b) Symantec's discounting programs were out of control and widely abused, (c) the Rewards program offered substantially better pricing than the Express and Government programs, the programs Symantec used to set GSA prices, (d) sales were often "unclean" or failed to comply with Symantec's written policies and discount approval systems, (e) discounts processed through eSPA or SFDC were routinely approved for reasons different from those reflected in the inputted reason code, and (f) commercial sales representatives received no training on the requirements of the Contract, including its reporting or pricing obligations.

162.    Although Symantec was a large and sophisticated software company and the Government being Symantec's single largest customer, Symantec failed to devise and implement any automatic mechanism in its sales and ordering systems to ensure that it adhered to the practices disclosed during negotiation of the Contract and the requirements of the Contract.

163.    High-ranking Symantec officials knew that Symantec's systems for monitoring and controlling discounts were materially flawed.  In addition to the above described quarterly reports -- which informed sales managers that sizeable portions of sales were "unclean," because, among other reasons, they failed to comply with approval requirements for non-standard discounts -- Symantec commissioned a wide-scale internal audit of its discounting practices.

164.    The final report from that audit, which was produced in December 2010, noted, among other things, that Symantec had a "lack of defined discounting strategy," "inadequate data sources for discount reporting / monitoring," and a "lack of formalized communication between the commercial and federal sales team for GSA discount changes."

165.    The December 2010 audit report went on to note specifically that (i) "system limitations and technical problems" prevented Symantec from generating "complete, accurate, and consistent data" for the discounts it provided; (ii) "[t]he data used for discounting analysis of historical deals lacks the completeness, context, and consistency that would be needed to drive informed decisions by Senior Management;" (iii) "discounts are sometimes being discussed and/or promised to customers prior to being formally approval in SFDC;" and (iv) "[n]ot having the current discounting policies could result in providing GSA entities improper discount percentages which violates the GSA agreement and consequently has a potential of Symantec paying restitution and/or penalties."

166.    In the December 2010 audit report, Symantec's internal auditors suggested various remedial measures to address the issues they identified.

167.    Symantec never disclosed the December 2010 audit report or its findings to GSA.

168.    In June 2011, Symantec's internal auditors prepared a follow-up audit report to track the previously identified issues and the progress of the suggested remedial measures.  The auditors noted that Symantec had yet to generate sufficient data sources for discount reporting and monitoring and had yet to implement a new global discounting policy to address the issues raised by the auditors in December 2010.

169.    Symantec never disclosed the June 2011 audit report or its findings to GSA.

170.    In August 2012, in connection with a management initiative named "Project Mustang" aimed at implementing new discounting parameters, Symantec again recognized that it was discounting rampantly and without management approval.  Specifically, Symantec staff noted that "Symantec has earned a reputation for discounting their deals readily and deeply . . . Reps and Managers do not have access to the relevant information to ensure their pricing discussions are sound, resulting in rubber stamp approvals on discount requests.  Current mechanisms in place to manage the approval of additional discounts no longer meets (sic) the needs of the business."

171.    Symantec again failed to disclose these observations to GSA.

172.    Additionally, after joining Symantec in March 2011, Morsell became familiar with Symantec's systems and discovered that Symantec lacked any systems sufficient to ensure compliance with its PRC obligations.  Morsell developed a chart of potential PRC triggering deals and informed her supervisors of what she had discovered.  In response, Symantec took no discernable actions to report these findings to GSA.

173.     Soon after entering into the Contract, Symantec's public sector sales management were reminded that Rewards offered more favorable pricing than Express and Government, the programs Symantec used to calculate GSA's pricing.  Specifically, in April 2007, Bradbury and others gave a presentation at the Symantec Sales Conference, which included several slides on the Rewards program.  Those slides included specific information regarding discounts under the Rewards program, including an example of how pricing for a particular product varied between the Government and Rewards programs.  That example showed that pricing under each similarly named band was 37% to 58% less under the Rewards program as compared to the Government program -- *e.g.*, the price of the product under Rewards Band E ($14.94) was 58% off of the price under Government Band E ($25.69).

174.     Symantec executives also knew, including through reports from Morsell, that its commercial sales staff had no training on the requirements of the Contract.  The employees making sales and offering discounts to commercial customers received no training on how their discounting triggered price reductions and disclosure obligations to Symantec's single largest customer -- the United States.

175.     Symantec executives were aware of the effects of, and issues created by, the collapsing of Express program bands in May 2008 -- namely, that on orders of 5 to 249 user licenses the pricing relationship between the GSA price and commercial customers ordering under the Express program had changed.  After joining Symantec, Morsell discovered this issue and appreciated its conflict with the Contract's requirements.  Morsell alerted her supervisors to the issues and the concerns it created.

176.    Further, through sales that were presented for approval through eSPA and SFDC, Symantec's management knew that its sales representative were offering and proposing non-standard discounts for reasons other than those indicated by the reason codes in the system.

177.    For example, in SFDC sales representatives requested, and sales management approved, discounts based on customers' available funds, but labeled the reasons for those discounts on various occasions as "contract pricing," "previous purchase price match," "competitive price match," "product bundle," "multi-year incentive," "quarter end discount," and "promotion - special."  These mislabeled approvals at times resulted in non-published discounts of 70% to 85%.

178.    Symantec officials were also aware of the scope of Symantec's extensive rebate programs.

179.    In a May 2009 report entitled "Corporate Risk Assurance, US Rebates Audit, Final Report," Symantec's internal auditors noted to Symantec's executives that "[t]he total FY08 US Symantec Partner Programs (SPP) spend was $82m."

180.    Subsequently in an October 25, 2011, risk assessment, Symantec noted that "Rebates are approximately $404M globally for FY11," and that consumer and enterprise rebates in the "Americas" totaled $267 million.

## VI.    During Performance of the Contract, Symantec Knowingly Submitted False Certifications that Its Initial Disclosures Remained Complete and Accurate.

181.    Notwithstanding the conduct described above, Symantec repeatedly certified to GSA that its initial disclosures had not changed.

182.    On numerous occasions during the life of the Contract (from January 2007 to November 2012), Symantec submitted requests to modify the Contract to add or remove items, to refresh GSA pricelists, and for other administrative reasons.

183.    To obtain nearly every one of these modifications, Symantec submitted a letter falsely representing that the commercial sales and discounting practices it disclosed during contract negotiations remained unchanged.  For example, Symantec made the following statements to GSA.

a.      In connection with Modification #1 to the Contract, on March 12, 2007, Reinhardt from Symantec wrote to Dixon at GSA proposing to add additional items to the Contract.   In so doing, Symantec represented "[t]he commercial discounting policies and procedures disclosed by Symantec under the awarded contract dated January 25, 2007 have not changed."

b.      In connection with Modification #5 to the Contract, on November 8, 2007, Reinhardt from Symantec wrote to Dixon at GSA proposing to add additional items to the Contract.   In so doing, Symantec represented "[t]he commercial sales practices have not changed[.]"

c.      In connection with Modification #10 to the Contract, on June 20, 2008, Reinhardt from Symantec wrote to Dixon at GSA proposing to add additional items to the Contract.  In so doing, Symantec represented "[t]he commercial sales practices have not changed[.]"

d.      In connection with Modification #15 to the Contract, on February 18, 2009, Reinhardt from Symantec wrote to Dixon at GSA proposing to add additional items to the Contract and to adjust the pricing on certain items already offered on the Contract.  In so doing, Symantec represented "[t]he commercial sales practices have not changed[.]"

e.       In connection with Modification #20 to the Contract, on October 27, 2009, Reinhardt from Symantec wrote to Patricia Molina (who had replaced Dixon as GSA's contracting officer on the Contract) at GSA proposing to add additional items to the Contract.  In so doing, Symantec represented "[t]he commercial sales practices have not changed[.]"

f.       In connection with Modification #27 to the Contract, on April 30, 2010, Reinhardt from Symantec wrote to Molina at GSA proposing to add additional items to the Contract.  In so doing, Symantec represented "[t]he commercial sales practices have not changed[.]"

184.    As described above, each of these statements was false as Symantec's practices were not unchanged from those disclosed during contract negotiations, including because: (i) the initial disclosures failed to describe material aspects of the Rewards program; (ii) the Frequency Chart was inaccurate when submitted and inaccurately described Symantec's practices during contract performance; (iii) the Reason Code Chart was inaccurate when submitted and inaccurately described Symantec's practices during contract performance; (iv) the Management Approval Chart was inaccurate when submitted and inaccurately described Symantec's practices during contract performance; (v) the initial disclosures made no mention of the Express band collapse in May 2008; and (vi) the initial disclosures made no mention of exceptions to band or program requirements, which Symantec offered its commercial customers.

185.    Symantec also either had actual knowledge of these falsities or deliberately ignored or recklessly disregarded their truth or falsity because Symantec's management knew that: (a) Symantec lacked any automatic system to maintain the relationship between GSA and commercial pricing or disclose and offer reductions, (b) Symantec's discounting programs were out of control

and widely abused, (c) the Rewards program offered substantially better pricing than the Express

and Government programs, the programs Symantec used to set GSA prices, (d) sales were often

"unclean" or failed to comply with Symantec's written policies and discount approval systems, (e)

discounts processed through eSPA or SFDC were routinely approved for reasons other than the

codes recorded, and (f) commercial sales representatives received no training on the requirements

of the Contract, including its pricing and reporting obligations.

**VII.    The United States Vastly Overpaid for Symantec Products As a Result of its False
and Fraudulent Scheme.**

186.    As a result of Symantec's knowingly false and fraudulent initial disclosures,

overcharges, failures to comply with the PRC, and express certifications that its initial disclosures

remained unchanged, the United States overpaid for Symantec products.

187.    Symantec overcharged the United States by millions of dollars on sales made

directly by Symantec to the Government under the Contract.

188.    Further, Symantec caused dealers authorized by Symantec to make sales under the

Contract to overcharge the United States by millions of dollars.

**VIII.    Symantec Inflicted Additional Harms on the United States By Causing Resellers to
Use Its Knowingly False Initial Disclosures as the Basis for Negotiating Their Own
MAS Contracts With GSA.**

189.    The harms Symantec caused the United States through its knowingly false and

fraudulent initial disclosures, overcharges, failures to comply with the PRC, and express

certifications that is practices had not changed were not limited to sales under Symantec's

Contract.  Symantec expressly authorized a number of independent resellers, who had their own

MAS contracts with GSA, to use its initial disclosures to offer Symantec products to the

Government.

190.     Symantec expressly authorized independent resellers -- including Carahsoft Technology Corp. ("Carahsoft") and UNICOM Government, Inc. (f/k/a GTSI) ("UNICOM") -- to use the disclosures it made to GSA during negotiation of the Contract as the basis for negotiating prices of Symantec products on these resellers' own MAS contracts.  These resellers further relied on Symantec's false disclosures as the basis for negotiating prices in BPAs and other contractual arrangements with the Government, which were established under these reseller's MAS contracts and expressly incorporated those terms and conditions.

191.     By letter dated May 20, 2009, from Bradbury to GSA, Symantec authorized GSA to use Symantec's commercial sales and discounting information in negotiating the contracts of Carahsoft, UNICOM, and Marzik, Inc. ("Marzik").

192.     By letter dated April 11, 2011, from Morsell to GSA, Symantec authorized GSA to use Symantec's commercial sales and discounting information in negotiating and re-negotiating the contracts of Carahsoft; Marzik; Dell Marketing LP; Dlt Solutions, LLC; EC America, Inc.; and The Winvale Group, LLC.

193.     These false and fraudulent initial disclosures were material to the prices set on these contracts, which were similarly inflated as compared to prices offered to commercial customers.

194.     In sum, Symantec knowingly caused these resellers, including Carahsoft and UNICOM, to use and submit false statements (namely the initial disclosures themselves) and false inflated claims to the Government.

195.     Symantec knowingly caused UNICOM to submit the following false claims, which are provided as examples:

a.      On May 30, 2012, the United States Secret Service placed Purchase Order No. HSSS0112J0139 with Unicom for certain Symantec products.  UNICOM filled that order and charged the Government a total of at least $2,256.00.

b.      On June 5, 2012, the Federal Emergency Management Agency placed Purchase Order No. HSFE2012J0089 with Unicom for certain Symantec products.  UNICOM filled that order and charged the Government a total of at least $6,141.02.

c.      On July 24, 2012, the Federal Emergency Management Agency placed Purchase Order No. GR00MS07202012 with Unicom for certain Symantec products.  UNICOM filled that order and charged the Government a total of at least $1,917.60.

d.      On October 12, 2012, the Department of Homeland Security placed Purchase Order No. HSHQPD12J00009 with Unicom for certain Symantec products.  UNICOM filled that order and charged the Government a total of at least $23,405.86.

e.      On December 10, 2012, the Administrative Office of the United States Courts placed Purchase Order No. USCA11F0176 with UNICOM for certain Symantec products.  Unicom filled that order and charged the Government a total of at least $50,193.93.

196.    Symantec knowingly caused Carahsoft to submit the following false claims, which are provided as examples:

a.      On February 25, 2008, the United States Office of Personnel Management placed Order No. 800959 with Carahsoft for certain Symantec products.  Carahsoft filled that order and charged the Government a total of at least $62,350.52.

b.      On March 17, 2008, the United States Department of Justice placed Order No. 801475 with Carahsoft for certain Symantec products.  Carahsoft filled that order and charged the Government a total of at least $1,352.59.

c.      On January 29, 2010, the United States Department of Justice placed Order No. 920669 with Carahsoft for certain Symantec products.  Carahsoft filled that order and charged the Government a total of at least $4,860.03.

d.      On September 17, 2012, the United States Navy Fleet Readiness Center placed Order No. 1188422 with Carahsoft for certain Symantec products.  Carahsoft filled that order and charged the Government a total of at least $988.73.

e.      On December 14, 2012, the Federal Bureau of Investigation placed Order No. 1197134 with Carahsoft for certain Symantec products.  Carahsoft filled that order and charged the Government a total of at least $893,550.00.

197.    As a result of Symantec's false initial disclosures, the United States overpaid by millions of dollars for Symantec products sold under the Carahsoft and UNICOM contracts alone.

## ALLEGATIONS RELEVANT TO ALL STATE CLAIMS

198.    At all times relevant to the Complaint, Symantec maintained and updated government price lists used internally to set prices for indirect and direct public sector sales. Symantec also maintained and updated GSA price lists.  Relator Morsell reviewed these price lists as part of her job duties at Symantec.

199.    The government price lists showed, for each product, (1) a Manufacturer's Suggested Retail Price ("MSRP"); (2) a "Buy Price" or "Standard Buy Price"; (3) a one-time reseller price; and (4) an opportunity registration buy price (an additional discount offered to the first reseller or distributor to identify the sales opportunity, offered as an incentive for marketing efforts).

200.    The GSA price list showed the GSA price for each item.

201.    The GSA price typically equaled the MSRP on the government price list less the front-end discount set forth in the GSA Contract for the particular product category.

202.    In turn, the MSRP on the government price list typically equaled the MSRP from Symantec's Express commercial price list or that price less a small front-end discount.

203.    The Standard Buy Price on the government price list was the standard channel price for distributors and certain types of resellers, and was always below the MSRP on the government price list and the GSA price.  This difference allowed Symantec's distributors and resellers to make a profit by purchasing the item at the lower Standard Buy Price from Symantec and reselling it at the higher government MSRP or GSA price to public sector customers.

204.    Symantec maintained databases that tracked individual sales of its products.

205.    For each sales entry, Symantec's sales databases had fields that reflected both the "bill to" customer and the ultimate end user, including sales made indirectly to end users through resellers and distributors.  Relator Morsell reviewed these sales database entries as part of her job duties at Symantec.

206.    Symantec employed sales representatives who worked primarily on sales to state and local government end users. These public sector sales personnel generally did not have responsibility for commercial sales and did not know when Symantec offered deeper discounts to commercial customers.

207.    This separation in Symantec's sales force contributed to a lack of corporate responsibility and ensured that deep discounts regularly offered to commercial customers would not be passed on to similarly-situated public sector customers, as required by Symantec's government contracts.

208.    Because of these pricing and business practices with distributors and resellers, Symantec knew that its public sector resellers and distributors generally purchased products from Symantec at or around the Standard Buy Price listed on the government price list, and to make standard industry profit margins, Symantec knew its resellers and distributors could not resell those products to public sector end users materially below Symantec's government MSRP.

209.    Symantec also knew that its resellers and distributors could not resell Symantec products to government customers at the more deeply discounted prices Symantec routinely offered to its commercial customers, because resellers and distributors could not then make a profit -- *i.e.*, there was no positive margin between the government Standard Buy Price and the more deeply discounted commercial prices.

210.    Symantec's sales databases captured the transaction-by-transaction detail confirming these general pricing patterns. In other words, Symantec knew that these pricing and business practices caused its resellers and distributors to sell its products to state and local government customers at prices consistent with its own inflated GSA schedule prices and not at the more deeply discounted commercial prices.

## ALLEGATIONS SPECIFIC TO CLAIMS OF THE STATE OF CALIFORNIA

### The California False Claims Act

211.    The California False Claims Act ("CFCA"), modeled after the 1986 amended version of the FCA, provides for the award of treble damages and civil penalties for, among other acts, (i) knowingly or recklessly submitting, or causing the submission of, false or fraudulent claims for payment to California, (ii) knowingly or recklessly using a false record or making a false statement material to a claim, and (iii) knowingly or recklessly concealing or failing to disclose obligations to pay the government.

212.     The CFCA, as amended on February 27, 2012, provides, in part, that anyone who commits any of the following enumerated acts shall be liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 for each violation plus three times the amount of damages that the state sustains because of the act of that person and for the costs of a civil action brought to recover any of those penalties or damages:

> (1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; or
>
> (2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

Cal. Gov't Code § 12651(a)(1), (2).

213.     For purposes of the CFCA, "the terms 'knowing' and 'knowingly' mean that a person, with respect to information, does any of the following: (A) Has actual knowledge of the information.  (B)  Acts in deliberate ignorance of the truth or falsity of the information.  (C) Acts in reckless disregard of the truth or falsity of the information.  Proof of specific intent to defraud is not required."  Cal. Gov't Code § 12561(3).

## I.     California's Procurement Program Uses Contracts That Directly Rely on Prices Provided in Federal GSA MAS Contracts.

214.     California state and local agencies may procure goods and services only through full and open competition, unless they meet certain requirements.  Cal. Pub. Cont. Code § 10340.

215.     The competitive bidding process, and the negotiation of contractual terms, is often a lengthy and costly process.

216.     To expedite the process for state and local agencies and contractors wishing to sell products to California, DGS solicits, negotiates, awards, and administers Leveraged Procurement Agreements ("LPA") that comply with California procurement codes, policies, and guidelines.

217.    LPAs allow DGS to pre-negotiate terms and conditions of sale and to leverage the State's buying power so that state and local agencies can obtain needed services in a cost-effective manner while avoiding the delay and uncertainty of the bid process.

218.    DGS provides two types of LPAs under which state and local agencies may purchase Information Technology goods and services: (1) California Multiple Award Schedule and (2) Software License Program.

A.    **The California Multiple Award Schedule Contracts Explicitly Incorporate the Terms, Conditions, and Discounts Provided in Federal GSA MAS Contracts.**

219.    DGS developed the California Multiple Award Schedule ("CMAS") pursuant to California Public Contracting Code sections 10290.1 and 12101.5, to grant state and local agencies the discretion to contract with suppliers whose goods and services are listed on the Federal GSA MAS contract.

220.    As all pricing, goods, and/or services offered through a CMAS contract must have been previously awarded on a Federal GSA MAS contract, CMAS contracts are not negotiated and established through a competitive bid process conducted by the State of California.   Instead, DGS relies on GSA's robust pricing assessment described herein to satisfy California's competitive bidding statutory requirements set forth in California Public Contract Code section 10340.

221.    The GSA schedule pricing set forth in the Federal GSA MAS serves as the base price available under a CMAS contract.   After a CMAS contract is established and subject to CMAS terms and conditions, agencies may attempt to receive a lower price by soliciting three bids for products available under a CMAS contract.   However, as a practical matter, the prices in the responsive bids typically match the GSA Schedule pricing.

222.    The term of a CMAS contract begins upon award of the CMAS contract, and technically expires on the same date as the referenced Federal GSA MAS contract.  However, CMAS adds three months to the GSA MAS contract end date to allow time for processing the CMAS contract renewal or extension.

223.    Local government agencies may use CMAS contracts unless the contractor explicitly stipulates in its CMAS contract offer that the contract is not available to local governments.  A local government agency is any city, county, district, or other local governmental body, including the California State University and University of California systems, K-12 public schools and community colleges empowered to expend public funds.

224.    To participate in the CMAS program, a supplier completes a CMAS Contract Application offering goods, services, and prices based on an existing Federal GSA MAS contract. This contract is referred to as the "base" contract.  Upon review and acceptance of the application, DGS awards to the supplier a CMAS contract, which is separate from the base contract.  The CMAS contract includes the State of California contract terms and conditions, procurement codes, policies, and guidelines.

225.    CMAS suppliers can offer goods, services, and prices from their own Federal GSA MAS contract or from a Federal GSA MAS contract held by another manufacturer or distributor. If a supplier wishes to offer goods and/or services from a Federal GSA MAS contract held by another manufacturer or distributor, that manufacturer or distributor must submit a letter to DGS stating that the supplier is an authorized reseller before DGS will approve a reseller CMAS contract.

**B.      The California Software License Program Contracts Mirror the Discounts Provided in Federal GSA MAS Contracts.**

226.    DGS developed the Software License Program pursuant to California Public Contracting Code sections 10298 and 12101.5 to grant state and local agencies the discretion to purchase proprietary software licenses and software upgrades.

227.    DGS negotiates large-volume discounts with software publishers, which mirror the discounts provided on the GSA MAS.  These discounts are then passed on to state and local agencies through SLP contracts established with authorized participating resellers.

228.    SLP contract prices, which mirror GSA schedule pricing set forth in the Federal GSA MAS, serve as the base price available under the SLP contract.   After the SLP contract is established, and subject to the terms and conditions of the SLP contracts, state and local agencies may attempt to receive a lower price by soliciting three bids for products available under an SLP contract.  However, as a practical matter, the prices in the responsive bids typically match the GSA Schedule pricing.

229.    Local government agencies may use SLP contracts.  A local government agency is any city, county, district, or other local governmental body, including the California State University and University of California systems, K-12 public schools and community colleges empowered to expend public funds.

230.    To participate in the SLP program, the software publisher submits an SLP Letter of Offer to DGS that offers to provide a source of supply, through authorized resellers, of software, maintenance, and technical support services at prices no more than those listed on then-current Government and Academic pricelists.  In other words, the offered prices typically mirror those prices provided on a Federal GSA MAS contract.  Upon DGS review and acceptance of the Letter

of Offer, the software publisher signs the Letter of Offer and identifies authorized resellers that can participate under the software publisher's SLP.   This forms the "contract base."

231.   Authorized resellers must then submit their own SLP Letter of Offer to DGS agreeing to provide software, maintenance, and technical support services and pricing based upon the pricing submitted by the software publisher in its SLP Letter of Offer.   Upon review and acceptance of the reseller's SLP Letter of Offer, DGS awards an SLP contract to the reseller.

**II.   Symantec Inflicted Harm on California By Authorizing Resellers to Use Its Knowingly False CSPs as the Basis for Providing Symantec Goods and Services Under Their Own Reseller CMAS and SLP Contracts with DGS.**

232.   As alleged above, Symantec knowingly and recklessly submitted to the United States false and fraudulent initial disclosures, implied certifications of compliance with the PRC, and express certifications that its initial disclosures remained current, complete, and accurate. Symantec authorized its independent resellers to provide its goods and services under CMAS and SLP contracts knowing that these contracts explicitly or implicitly relied on its GSA pricing and continuing compliance with its GSA Contract.   Symantec also knew that its resellers submitted invoices under the above CMAS and SLP contracts and that these invoices were materially false because of Symantec's fraud on GSA.

**A.   Symantec Knowingly Allowed Resellers to Use Its False CSPs as the Basis for Reseller CMAS Contracts.**

233.   In response to CMAS solicitations, Symantec expressly authorized a number of independent resellers to submit offers that included goods manufactured by Symantec and included in its Federal Contract.   As just one example, by letter dated March 12, 2009, from Reinhardt to DGS, Symantec stated that Cornerstone Technologies, LLC is "authorized to submit an offer, in response to the CMAS solicitation that includes products manufactured by Symantec."

234.    As a result of Symantec's representations, DGS awarded CMAS contracts to the following non-exclusive list of resellers: AllConnected Inc. (CMAS No. 3-09-70-1346D), Angus-Hamer, Inc. (CMAS No. 3-07-70-0877E), Applied Computer Solutions (CMAS No. 3-08-70-2007B), Aurora Enterprises (CMAS No. 3-11-70-1670T), Bear Data Solutions Inc. (CMAS No. 3-09-70-2265F), CompuCom Systems Inc. (CMAS No. 3-07-70-0040AG), Govstor, Inc. (CMAS No. 3-07-70-1629J), GTSI, Corp. (3-11-70-0002E), Spectrum Communication Cabling Services, Inc. (CMAS No. 3-09-70-0282AT), and Taborda Solutions, Inc. (3-11-70-2824B).

235.    Each of these CMAS contracts, and their predecessor contracts, explicitly incorporated the terms, conditions, and prices in Symantec's Federal Contract, or the resellers' GSA MAS contracts, which offered the same discounts as Symantec's Federal Contract.  For example, CMAS No. 3-07-70-0877E states: "See GSA schedule for the product and pricing available under this contract."  It further states: "Replace 'SYMANTEC CORPORATION' with 'ANGUS-HAMMER, INC.' where 'SYMANTEC CORPORATION' is referenced in the federal GSA multiple award Contract Terms and Conditions."

236.    Symantec's senior public sector employees, including Kimberly Bradbury and Kari Reinhardt, knew that the above-referenced CMAS contracts incorporated the terms, conditions, and prices of Symantec's GSA Contract.

237.    These employees expressly authorized resellers to enter the above-referenced CMAS contracts knowing that the terms, conditions, and prices of Symantec's GSA Contract, including the false CSPs, were material to both California's decision to enter the above-referenced CMAS contracts and to pay invoices submitted under them.

238.    For example, on January 17, 2007, Bradbury wrote to Kippy Arcara, then a Symantec state and local contracts manager: "[f]or CMAS, the partners can easily change their GSA reference to [Symantec's GSA Contract] rather than Immix."

239.    On March 21, 2007, Bradbury received a forwarded email from Carahsoft Technology Group, which states in part, "[i]n response to the GSA contract, a variety of States have decided to leverage the GSA contract in creating their own Purchasing Contracts.  Ohio, Texas, California, Florida, Louisiana, and the City of Miami Dade are some of the governments that have decided to create these contracts.  The contracts are based on GSA discounts and language, but are not a GSA contract.  In response Symantec partners with resellers, such as Carahsoft, to manage these contracts on the State and local government level . . . Therefore, when I request STS, TXMAS, CMAS, or similar contract pricing this means GSA pricing."

240.    On May 22, 2007, Bradbury received a request from reseller Angus-Hammer, Inc. regarding its proposed CMAS contract, which requested Symantec's GSA pricelist because "[e]ssentially, we have to have the complete GSA contract in order to build a CMAS based on it."

241.    On July 7, 2011, Greg Schrontz, a Symantec Channel Account Manager wrote to Dawn Foster, Symantec Public Sector Sales Associate, that the "California CMAS is based on our GSA pricing and T's & C's."

**B.    Symantec Knowingly Allowed Resellers to Use Its False CSPs as the Basis for Reseller SLP Contracts.**

242.    Beginning at least as early as December 9, 2009, Symantec submitted an SLP Letter of Offer to DGS to provide a source of supply, through Authorized Resellers, of Symantec software, maintenance, and technical support services at discounts that mirrored the discounts on Symantec's GSA Schedule Contract.  Symantec's earlier SLP offer letters either did not guarantee

a discount (e.g., SAN No. GPF010608) or guaranteed a discount only on orders for multi-year commitments or greater than $500,000 (e.g., SAN No. 2RJM4TOTH).

243.    As a result of Symantec's representations, DGS awarded SLP contracts to the following non-exclusive list of resellers: Allied Network Solutions, Inc. (SLP-10-70-0027M; SLP-12-70-0027V; SLP-14-70-0027F); Angus Hammer, Inc. (SLP-10-70-0022N; SLP-12-70-0022T; SLP-14-70-0022Y); CompuCom Systems, Inc. (SLP-10-70-0013A; SLP -12-70-0013M; SLP-14-70-0013X); CDW Government LLC (SLP-10-70-0025N; SLP-12-70-0025T); GovStor (SLP-10-70-0062B; SLP-12-70-0062D); Southland Technologies (SLP-10-70-0111A); Taborda Solutions Inc. (acquired Finish Line Solutions) (SLP-10-70-0063C); Bear Data Systems Inc. (SLP-10-70-0110A; SLP-12-70-0129B); SHI International Corp. (SLP-12-70-0003U); Aurora Systems Consulting, Inc. (SLP-11-70-033G; SLP-12-70-0033H); and En Pointe Technologies Sales, Inc. (SLP-11-70-0005Q; SLP-12-70-0005V).

244.    Symantec senior public sector employees, including Kimberly Bradbury and Kari Reinhardt, knew that each of these SLP contracts, and their predecessor contracts, mirrored the prices in Symantec's GSA Contract, or the resellers' own GSA MAS contracts, which expressly relied on Symantec's false CSPs.

245.    Bradbury and Reinhardt also knew that GSA Contract pricing and false CSPs were both material to California's decision to enter the above SLP contracts and to pay invoices submitted under them.

246.    Further, as discussed above, Symantec's Final Proposal Revision submitted to GSA on January 25, 2007, provided that: "Symantec Corporation certifies that the discounts, pricing and/or rates given to the Government are either equal to and/or greater than what is granted to any commercial *and/or Government customer* under similar terms and conditions." (Emphasis added).

Consistent with that obligation, Symantec's internal documents indicate that it limited the discounts offered to California to be no higher than the discounts offered to GSA to avoid implicating the price reduction clause in its GSA MAS contract.

247.    For example on May 18, 2010, Kari Reinhardt sent an email to Paul Lokie, Senior Director of Sales Operations in Symantec's Public Sector division, which said in part: "[t]he intent of the [SLP] letter that was signed on December 9, 2009, was to protect the discounts on the GSA schedule . . . But with the new proposed discount of 50% off, I know GSA will call, put us through an audit and pay back fees for the difference."

248.    But for Symantec's fraud on GSA, California would have received the same higher discounts that GSA should have received had Symantec truthfully disclosed its commercial sales practices and complied with the GSA price reduction clause.

**C.**     **By Allowing Resellers to Use Its Knowingly False CSPs as the Basis for Reseller Contracts, Symantec Knowingly Caused Its Authorized Resellers to Use and Submit False Statements and False Inflated Claims to California.**

249.    Symantec knowingly caused the resellers identified below to submit false claims with respect to the following sales, which are provided as examples:

250.    On June 7, 2007, California's Air Resources Board purchased $7,309.50 of Symantec products through authorized reseller Carahsoft Technology Corp. (Purchase Order No. 07-700).

251.    On November 11, 2007, California's County of San Diego purchased $4,887.79 of Symantec products through authorized reseller CompuCom Systems, Inc. (Purchase Order No. 522314-0).

252.    On December 13, 2007, California's Municipal Water District purchased $1,821.60 of Symantec products through authorized reseller Compucom Systems, Inc. (Purchase Order No. 4508224).

253.    On January 28, 2009, California's Highway Patrol purchased $23,443.32 of Symantec products through authorized reseller Govstor, LLC. (Purchased Order No. 041H8015).

254.    On December 21, 2010, California's Victim Compensation and Government Claims Board purchased $11,351.85 of Symantec products through authorized reseller Bridge Micro. (Purchase Order No. 0VCGC041).

255.    On October 17, 2011, California's Department of Public Health purchased $177.90 of Symantec products through authorized reseller Insight Public Sector (Purchase Order No. 11704-11-5530).

256.    On April 28, 2008, California's Department of Child Services purchased $6,110.00 of Symantec products through authorized reseller Carahsoft Technology Group (Purchase Order No. P-2007-251).

257.    On May 4, 2009, California's City of Huntington Beach purchased $2,866.05 of Symantec products through authorized reseller CompuCom (Purchase Order No. 89855638).

258.    On March 15, 2010, California's Department of Real Estate purchased $6,736.50 of Symantec products through authorized reseller CompuCom (Purchase Order No. SIT09-032).

259.    On May 24, 2010, California's County of Madera purchased $8,140.00 of Symantec products through authorized reseller Dell (Purchase Order No. 0900641).

260.    On January 19, 2011, California's Highway Patrol purchased $285,797.20 of Symantec products through authorized reseller Taborda Solutions (Purchase Order No. 041H0025).

261.    On November 28, 2012, California's Air Resources Board purchased $22,941.60 of Symantec products through authorized reseller Allied Network Solution, Inc. (Purchase Order No. ARB127560).

262.     California made each of these purchases at inflated prices based on Symantec's knowingly false CSPs.

263.     Symantec knew that California made these purchases at inflated prices because it authorized the discounts resellers provided to California under their respective CMAS and SLP contracts and because it tracked end-user customers, as described above.

264.     Every invoice submitted under these CMAS and/or SLP contracts explicitly or implicitly relied on the accuracy of Symantec's GSA pricing, which was false, and Symantec's continuing compliance with its GSA Contract, which did not exist.

265.     Symantec knew that: (i) its resellers submitted invoices under the above-referenced CMAS and SLP contracts; (ii) these invoices implicitly or explicitly relied on Symantec's fraudulent GSA pricing and its continuing compliance with its GSA Contract; and (iii) that these invoices were materially false because of Symantec's fraud on GSA.

266.     If Symantec had complied with the GSA MAS and its GSA Contract requirements, the United States would have received significantly higher discounts.  As California's CMAS and SLP contracts with Symantec authorized resellers incorporated the same terms, conditions and discounts as the GSA Contract, California would have received those same high discounts, which it did not.

## ALLEGATIONS SPECIFIC TO CLAIMS OF THE STATE OF FLORIDA

267.     Beginning April 12, 2006, Florida State Purchasing Memorandum No. 02 (2005-06) authorized agencies to purchase from Federal Supply Schedule 70 contracts. Symantec's GSA Contract was a Schedule 70 contract.

268.     At all times relevant to the Complaint, Symantec agreed to allow State and local entities, including Florida, to order from its GSA Contract.

269.    Beginning in 2007, Florida regularly placed orders under Symantec's GSA Contract either directly or through authorized resellers. The following are examples of such transactions:

    a.    On April 26, 2007, the Florida Department of Transportation purchased $247,253.34 of Symantec's products through authorized reseller Synnex (Order No. 21250136).

    b.    On July 2, 2010, the Florida Department of Transportation directly purchased $40,295.99 of Symantec products directly (Order No. 513256997).

    c.    On March 17, 2011, the Florida Department of Revenue directly purchased $4,028.11 of Symantec products (Order No. 513707657).

    d.    On May 25, 2011, the Florida Department of Transportation directly purchased $27,294.45 of Symantec products (Order No. 513817392).

    e.    On September 7, 2011, the Florida Department of Transportation directly purchased $718.75 of Symantec products (Order No. 514089917).

270.    Symantec knew that it sold products directly and indirectly to Florida under its GSA contract.

271.    For example, Symantec's sales database tracked end-user information and Symantec reported the above sales to Florida agencies to GSA.  By voluntarily accepting Florida's orders under its GSA Contract, Symantec submitted and caused to be submitted invoices and other billing documents to Florida, which were false because they contained inflated pricing for all of the same reasons that Symantec's sales to United States agencies were false as discussed above.

272.    Symantec knew that its CSP disclosures and continuing compliance with its GSA Contract were material to Florida's decision to pay Symantec's invoices because Florida relied on

the pricing negotiated by GSA, which pricing determined the prices that Florida paid for Symantec goods and services on its orders.

273.     Further, Bradbury maintained an internal summary of state contracts, dated August 27, 2009, which acknowledged that Florida "Uses GSA Cooperative Purchasing."  Earlier versions of this document used the same language.

274.     As alleged above, Symantec's initial CSPs were false, and it routinely violated the price reduction clause of its GSA Contract by offering deeper discounts to its commercial customers than disclosed to GSA or to Florida.  Because of Symantec's fraud on GSA, Florida paid similarly inflated prices as the United States did for Symantec's products.

## ALLEGATIONS SPECIFIC TO RELATOR'S CLAIMS
## BROUGHT ON BEHALF OF THE STATE OF NEW YORK

275.     On or about November 29, 2000, Veritas entered into a contract with the State of New York for the sale of software licenses and related services, New York State Contract No. PT57160 ("the NY Contract").

276.     Under the NY Contract, New York was to receive a 22.5% discount on software and a 5.5% discount on consulting, training, support, and maintenance.

277.     On or about November 16, 2006, Veritas assigned the NY Contract to Symantec.

278.     At all times relevant to this Complaint, Symantec maintained a single government price list, modeled on Symantec's U.S. commercial Express price list, that provided approximately the same base MSRP under both Symantec's GSA Contract and the NY Contract.

279.     Moreover, Symantec's employees understood that the New York price list was based on its GSA pricelist.

280.     For example, on October 21, 2011, Dawn Foster, a Symantec Public Sector Sales Associate, emailed Bill Barton, a Symantec Contracts Administrator, regarding "pricing on our

old NY state contract": "[the NY Contract] was based on the GSA pricing. Whenever the GSA pricelist was updated, we had an outside vendor create the NY contract pricelist based on the GSA pricelist. Lori [Morsell] has the info to the outside vendor."

281.    Section 43 to Appendix B-2 of the NY Contract contained a price reduction clause:

**b. Commercial Price List Reductions:** Where NYS Net Prices are based on a discount from Contractor's list prices, the date Contractor lowers its pricing to its customers generally or to similarly situated government customers during the Contract term; or

**c. Special Offers/Promotions Generally:** Where Contractor generally offers more advantageous special price promotions or special discount pricing to other customers during the Contract term for a similar quantity, and the maximum price or discount associated with such offer or promotion is better than the discount or net price otherwise available under this Contract, such better price or discount shall apply for similar quantity transactions for the life of such general offer or promotion.

282.    When Symantec added new products to the NY Contract it repeatedly certified that: "[a]ll pricing for new products being added to this contract are in accordance with the discounts negotiated under the terms of the referenced contract."

283.    The NY Contract expired on November 28, 2010.

284.    Between January 1, 2007 and November 28, 2010, New York paid over $25.9 million under the NY Contract.

285.    As detailed above, beginning at least as early as January 2007, Symantec violated the NY Contract's price reduction clause by routinely providing commercial customers, that ordered under similar terms and condition as New York, with pricing more favorable than New York's through: (i) non-standard discounts, including exceptions to band and buying program requirements, that exceeded the discounts available under the New York contract; (ii) Rewards pricing; and (iii) rebates.

286.     Symantec hid its commercial discounting practices from New York and breached the NY Contract's price reduction clause by failing to offer New York the greater discounts routinely given to commercial customers.

287.     Consequently, Symantec submitted, or caused resellers to submit, false invoices at inflated prices to New York in violation of the New York False Claims Act, N.Y. St. Fin. Law § 189(1)(a) and (b). The following false claims are provided as examples:

a.       In the first half of 2008, NYS Workers Compensation Board purchased six quantity of VRTS NETBACKUP CLIENT APPLICATION AND DATABASE PACK 6.5 LNX TIER 2 ESSENTIAL 12 MONTHS GOV BAND S (SKU 12528646). New York's pricelist in effect at the time of this sale listed the MSRP for SKU 12528646 as $389.85. New York paid $368.00, which equals a 5.5% standard discount. Symantec's GSA pricelist in effect at the time of this sale listed the MSRP for SKU 12528646 as $389.85.

b.       In the first half of 2009, Suffolk County Department of IT purchased six quantity of VRTS NETBACKUP STANDARD CLIENT 6.5 XPLAT STD LIC GOV BAND S (SKU 12527147). New York's pricelist in effect at the time of this sale listed the MSRP for SKU 12527147 as $595.00. New York paid $461.00, which equals a 22.5% standard discount. Symantec's GSA pricelist in effect at the time of this sale listed the MSRP for SKU 12527147 $595.00.

c.       In the second half of 2009, Nassau Boces purchased one quantity of VRTS NETBACKUP OPTION SHARED STORAGE OPTION FOR TAPE 6.5 XPLAT STD LIC GOV BAND S (SKU 12777321). New York's pricelist in effect at the time of this sale listed the MSRP for SKU 12777321 as $2,000. New York paid $1,550.00, which equals a

22.5% standard discount. Symantec's GSA pricelist in effect at the time of this sale listed the MSRP for SKU 12777321 as $2,000.

d.      In the first half of 2010, Suffolk County District Attorney Office purchased one quantity of SYMC BACKUP EXEC SERVER 12.5 WIN ML CD MEDIA KIT (SKU 14173720). New York's pricelist in effect at the time of this sale listed the MSRP for SKU 14173720 as $50.00. New York paid $39.00, which equals a 22.5% standard discount. Symantec's GSA pricelist in effect at the time of this sale listed the MSRP for SKU 14173720 as $50.00.

e.      In the first half of 2010, Broome- Tioga BOCES purchased one quantity of VRTS NETBACKUP CLIENT APPLICATION AND DATABASE PACK 6.5 WIN TIER 1 STD LIC GOV BAND S (SKU 12528101). New York's pricelist in effect at the time of this sale listed the MSRP for SKU 12528101 as $1,295.00. New York paid $1,003.63, which equals a 22.5% standard discount. Symantec's GSA pricelist in effect at the time of this sale listed the MSRP for SKU 12528101 as $1,295.00.

f.      In the second half of 2010, NYS Insurance Fund purchased four quantity of SYMC NETBACKUP OPTION LIBRARY BASED TAPE DRIVE 7.0 XPLAT 1 DRIVE RENEWAL ESSENTIAL 12 MONTHS GOV BAND S (SKU 20942263). New York's pricelist in effect at the time of this sale listed the MSRP for SKU 20942263 as $690.00. New York paid $652.00, which equals a 5.5% standard discount. Symantec's GSA pricelist in effect at the time of this sale listed the MSRP for SKU 20942263 as $690.00.

## COUNT I -- FEDERAL FALSE CLAIMS ACT -- FALSE CLAIMS
### 31 U.S.C. § 3729(a)(1)(A)
(By The United States Against Symantec)

288.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 197 above as if fully set forth herein.

289.     As described above, Symantec made, or caused to be made, claims to the Government under its Contract and contractual arrangements, including BPAs, based on the Contract -- namely, demands for and receipt of funds for orders fulfilled and arranged directly by Symantec and by dealers authorized by Symantec to make sales using its Contract.

290.     In each of these claims, Symantec overcharged the Government and made implied representations regarding its compliance with the material terms of the Contract, including that the initial disclosures it made during negotiations were accurate and complete and that it continued to abide by the Contract's PRC.

291.     These claims overcharged the United States and were materially false for the many reasons described above, including but not limited to:

a.      Symantec's initial disclosures were inaccurate and incomplete when Symantec made them because they gave inaccurate and incomplete information concerning Symantec's non-published discount practices, Rewards buying program, and rebate practices.

b.      Symantec failed to comply with the PRC because the non-published discounts Symantec offered during performance of the Contract were materially different than those described in the initial disclosures, standard pricing offered to commercial customers was materially different than that described in the initial disclosures (including because Symantec failed to disclose the advantageous nature of pricing under the Rewards program), and Symantec offered exceptions to stated band and buying program requirements, which were never disclosed during contract negotiations.

292.    Symantec's false and inflated claims were material, as they led the Government to make payments that, absent the falsity, it may not have made.

293.    Symantec, through Bradbury and other senior management officials, had actual knowledge that these claims were false or acted with deliberate ignorance or reckless disregard as to their falsity as evidenced, in part, by the facts described above.

294.    As a result of Symantec's false claims, which it and authorized dealers submitted during the life of the Contract from January 2007 to November 2012, the United States was damaged in an amount to be determined at trial.

295.    The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act.

## COUNT II -- FEDERAL FALSE CLAIMS ACT -- FALSE STATEMENTS
### 31 U.S.C. § 3729(a)(1)(B)
(By the United States Against Symantec)

296.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 197 above as if fully set forth herein.

297.    As described above, Symantec made false statements during the negotiation of the Contract regarding its commercial sales and discounting practices and during the performance of the contract by stating that the commercial sales and discounting practices it disclosed during negotiations remained unchanged.

298.    These statements were false for the many reasons described above, including but not limited to:

a.    Symantec's initial disclosures were inaccurate and incomplete when Symantec made them because they gave inaccurate and incomplete information concerning Symantec's non-published discount practices, Rewards buying program, and rebate practices.

b.      Symantec's certifications that its discounting practices had not changed were false and incomplete because the non-published discounts Symantec offered during performance of the Contract were materially different than those described in the initial disclosures, standard pricing offered to commercial customers was materially different than that described in the initial disclosures (including because Symantec failed to disclose rebates and the advantageous commercial pricing under the Rewards program), and Symantec offered exceptions to stated band and buying program requirements, which were never disclosed during contract negotiations.

299.    Symantec's false statements were material to its false claims as they had a natural tendency to influence and were capable of influencing the Government to make payments that, absent the falsity, it may not have made.

300.    Symantec, through Bradbury and other senior management officials, actually knew these statements were false or acted with deliberate ignorance or reckless disregard as to their falsity as evidenced, in part, by the facts described above.

301.    As a result of Symantec's false statements, which it made during contract negotiations from February 2006 to January 2007 and during the life of the Contract from January 2007 to November 2012, the United States was damaged in an amount to be determined at trial.

302.    The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act.

### COUNT III -- FEDERAL FALSE CLAIMS ACT -- CAUSING FALSE CLAIMS
**31 U.S.C. § 3729(a)(1)(A)**
(By The United States Against Symantec)

303.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 197 above as if fully set forth herein.

304.    As described above, Symantec authorized certain independent resellers, including Carahsoft and UNICOM, to offer Symantec products on their own MAS contracts with GSA and contractual arrangements, including BPAs, based on those MAS contracts.

305.    In so doing, Symantec caused these independent resellers to use the knowingly false information Symantec provided GSA during negotiation of the Contract as the basis for negotiating prices of Symantec products on these independent MAS contracts and related contractual arrangements.

306.    These independent resellers made claims to the Government -- namely, demands for and receipt of funds for orders under their contracts.

307.    These claims overcharged the United States and were for the reasons described above materially false claims.

308.    Symantec caused these false claims of independent resellers to be submitted in that Symantec provided these independent resellers and GSA false information concerning its commercial sales and discounting practices that it knew the independent resellers and GSA would use to negotiate pricing under the independent resellers' contracts.

309.    Symantec, through Bradbury and other senior management officials, acted with actual knowledge the information provided to these independent resellers and GSA concerning its commercial sales and discounting practices was false (or with deliberate ignorance or reckless disregard as to its falsity) as evidenced, in part, by the facts described above.

310.    As a result of Symantec causing false claims, which have been submitted to GSA from January 2007 to the present, the United States was damaged in an amount to be determined at trial.

311.   The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act.

## COUNT IV -- FEDERAL FALSE CLAIMS ACT -- CAUSING FALSE STATEMENTS
### 31 U.S.C. § 3729(a)(1)(B)
(By the United States Against Symantec)

312.   The United States incorporates by reference the allegations set forth in Paragraphs 1 to 197 above as if fully set forth herein.

313.   As described above, Symantec authorized certain independent resellers, including Carahsoft and UNICOM, to offer Symantec products on their own MAS contracts with GSA and contractual arrangements based on those MAS contracts.

314.   In so doing, Symantec caused these independent resellers and GSA to use the knowingly false information Symantec provided GSA during negotiation of the Contract as the basis for negotiating prices of Symantec products on these independent MAS contracts and related contractual arrangements.

315.   These statements were false for the many reasons described above, including that Symantec's initial disclosures were inaccurate and incomplete when Symantec made them because they gave inaccurate and incomplete information concerning Symantec's non-published discount practices, Rewards buying program, and rebates.

316.   These false statements were material to false claims, as they had a natural tendency to influence and were capable of influencing the Government to make payments that, absent the falsity, it may not have made.

317.   Symantec, through Bradbury and other senior management officials, actually knew these statements were false or acted with deliberate ignorance or reckless disregard as to their falsity as evidenced, in part, by the facts described above.

318.    As a result of these false statements the United States was damaged in an amount to be determined at trial.

319.    The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act.

### COUNT V -- POST-FERA FEDERAL FALSE CLAIMS ACT -- CONCEALING OBLIGATIONS
### 31 U.S.C. § 3729(a)(1)(G)
(By the United States Against Symantec)

320.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 197 above as if fully set forth herein.

321.    As described above, during performance of the Contract, Symantec executives became increasingly aware of the material false claims and statements Symantec had made under the Contract, including through the December 2010 and July 2011 audit reports.

322.    Nonetheless, on and after May 20, 2009, Symantec concealed this knowledge and made no disclosures to GSA that the following were materially false and inaccurate (i) its initial discounts during the negotiation of the Contract regarding its commercial sales and discounting practices; and (ii) its express certifications that its initial  disclosures remained unchanged. Symantec further made no disclosure that it had failed to comply with the PRC and that it had submitted inflated claims to the Government under the Contract.

323.    By concealing its knowledge of these falsities Symantec knowingly concealed and improperly avoided obligations to pay or transmit funds to the Government, namely the overpayments stemming from its false disclosures, certifications, and PRC violations.

324.    As a result of Symantec's knowing concealment and improper avoidance, the United States was damaged in an amount to be determined at trial.

325. The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act.

### COUNT VI -- COMMON LAW -- NEGLIGENT MISREPRESENTATION
(By the United States Against Symantec)

326. The United States incorporates by reference the allegations set forth in Paragraphs 1 to 197 above as if fully set forth herein.

327. As described above, Symantec made misrepresentations during the negotiation of the Contract regarding its commercial sales and discounting practices and during the performance of the contract by repeatedly certifying that its policies and practices had not changed.

328. These representations were false for the many reasons described above, including but not limited to:

a.  Symantec's initial disclosures were inaccurate and incomplete when Symantec made them because they gave inaccurate and incomplete information concerning Symantec's non-published discount practices, Rewards buying program, and rebate practices.

b.  Symantec's certifications that its practices and policies had not changed were false and incomplete because the non-published discounts Symantec offered during performance of the Contract were materially different than those described in the initial disclosures, standard pricing offered to commercial customers was materially different than that described in the initial disclosures (including because Symantec failed to disclose the advantageous nature of pricing under the Rewards program), and Symantec offered exceptions to stated band and buying program requirements, which were never disclosed during contract negotiations.

329.     Symantec, through Bradbury and other senior management officials, acted at least negligently as to the falsity of these statements as evidenced, in part, by the facts described above.

330.     Symantec's misrepresentations, which it made during contract negotiations from February 2006 to January 2007 and during the life of the Contract from January 2007 to November 2012, caused the United States to pay sums to Symantec to which it was not entitled.

331.     As a result of Symantec's misrepresentations, the United States was damaged in an amount to be determined at trial.

## COUNT VII -- COMMON LAW -- BREACH OF CONTRACT
(By the United States Against Symantec)

332.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 197 above as if fully set forth herein.

333.     The Contract was a valid written agreement between the United States and Symantec supported by adequate consideration.

334.     Under the Contract, Symantec agreed to provide complete and accurate information concerning its commercial sales and discounting practices and to abide by the PRC.

335.     Symantec materially breached the Contract by failing to provide complete and accurate information concerning its commercial sales and discounting practices and by failing to abide by the PRC.

336.     Symantec's breaches of these provisions caused the Government to remit funds to Symantec to which Symantec was not entitled.

337.     Based on Symantec's breaches of the Contract the United States was damaged in an amount to be determined at trial.

## COUNT VIII -- COMMON LAW -- UNJUST ENRICHMENT
(By the United States Against Symantec)

338.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 197 above as if fully set forth herein.

339.    This is a claim for the recovery of monies by which Symantec has been unjustly enriched.

340.    By directly or indirectly obtaining Government funds to which it was not entitled, Symantec was unjustly enriched and is liable to account and pay such amounts, or the proceeds or profits therefrom, to the United States in an amount to be determined at trial.

## COUNT IX -- COMMON LAW -- PAYMENT BY MISTAKE
(By the United States Against Symantec)

341.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 197 above as if fully set forth herein.

342.    Symantec caused the United States to make payments for Symantec products based upon the United States' mistaken beliefs that Symantec's commercial sales and discounting practices had been fully and accurately disclosed in its initial disclosures and that they had not changed and/or that Symantec was complying with the PRC.

343.    As a result of those mistaken payments, the United States has sustained damages in an amount to be determined at trial.

## COUNT X -- CALIFORNIA FALSE CLAIMS ACT -- FALSE CLAIMS
### Cal. Gov't Code § 12651(A)(1)
(By California Against Symantec)

344.    California incorporates by reference allegations as set forth in Paragraphs 1 to 266 above as if fully set forth herein.

345.    As described above, Symantec authorized certain independent resellers to offer Symantec products through their own CMAS and SLP contracts with California.

346.     In so doing, Symantec caused these independent resellers to use the knowingly false information Symantec provided GSA during the negotiation of the Federal Contract as the basis for prices of Symantec goods and services provided under CMAS and SLP contracts.

347.     These independent resellers made claims to California – namely, demands for and receipt of funds for orders under their contracts.

348.     These claims overcharged California and were for the reasons described above materially false claims.

349.     Symantec knew that its inflated and false prices were material to California's decisions to pay for Symantec products, including the amounts that California paid for Symantec products.

350.     Symantec caused these false claims of independent resellers to be submitted in that Symantec expressly authorized these independent resellers to sell goods and services to California using CMAS and SLP contracts, and in that Symantec provided GSA and these independent resellers false information concerning its commercial sales and discounting practices that it knew the independent resellers and DGS would use to negotiate pricing under the independent resellers' contracts.

351.     Symantec, through Reinhardt and other senior management officials, acted with actual knowledge in providing false information to GSA, these independent resellers and DGS concerning its commercial sales and discounting practices (or with deliberate ignorance or reckless disregard as to its falsity), as evidenced, in part, by the facts described above.

352.     As a result of Symantec causing false claims, which have been submitted to DGS from January 2007 to 2012, California was damaged in an amount to be determined at trial.

353.     California is entitled to treble damages plus a civil penalty for each violation of the California False Claims Act.

### COUNT XI – CALIFORNIA FALSE CLAIMS ACT –
### FALSE RECORDS AND STATEMENTS
#### Cal. Gov't Code § 12651(a)(2)
(By California Against Symantec)

354.     California incorporates by reference allegations as set forth in Paragraphs 1 to 266 above as if fully set forth herein.

355.     As described above, Symantec authorized certain independent resellers to offer Symantec goods and services through their own CMAS and or SLP contracts based on Symantec's GSA MAS.

356.     In so doing, Symantec caused these independent resellers to use the knowingly false information Symantec provided GSA during the negotiation of the Federal Contract as the basis for prices of Symantec goods and services provided under CMAS and SLP contracts.

357.     These statements were false for the many reasons described above, including that Symantec's initial disclosures were inaccurate and incomplete when Symantec made them because they gave inaccurate and incomplete information concerning Symantec's non-published discount practices, Rewards buying program, and rebates.

358.     These false statements were material to the false claims, as they had a natural tendency to influence and were capable of influencing California to make payments that, absent the falsity, it may not have made.

359.     Symantec, through Reinhardt and other senior management officials, actually knew these statements were false or acted with deliberate ignorance or reckless disregard as to their falsity as evidenced, in part, by the facts above.

360.     As a result of these false statements, California was damaged in an amount to be determined at trial.

361.     California is entitled to treble damages plus a civil penalty for each violation of the California False Claims Act.

### COUNT XII -- FLORIDA FALSE CLAIMS ACT -- FALSE CLAIMS
(By Florida Against Symantec)

362.     Florida incorporates by reference the allegations set forth in Paragraphs 1 to 210 and 267 to 274 above as if fully set forth herein.

363.     As described above, Symantec allowed Florida state government entities to purchase products directly from Symantec on Symantec's Federal Contract.

364.     In so doing, Symantec used the knowingly false information Symantec provided to GSA during the negotiation of the Federal Contract as the basis for prices of Symantec goods and services sold to Florida under Symantec's Federal Contract.

365.     As a result, Symantec made claims to Florida – namely, demands for and receipt of funds for direct orders under Symantec's Federal Contract.

366.     These claims overcharged Florida and were for the reasons described above materially false claims.

367.     Symantec knew that its inflated and false prices were material to Florida's decisions to pay for Symantec products, including the amounts that Florida paid for Symantec products.

368.     Symantec caused resellers authorized to sell its products under Symantec's Federal Contract to submit false claims in that Symantec expressly authorized these independent resellers to sell goods and services under its Federal Contract, and in that Symantec provided GSA and these independent resellers false information concerning its commercial sales and discounting

practices that it knew formed the basis of pricing under its Federal Contract and sales to Florida under that contract.

369.    Symantec knowingly presented or caused to be presented (including through its resellers) false or fraudulent claims for payment or approval by Florida in violation of Fla. Stat. § 68.082(2)(a) when it did not disclose the discounts and other pricing practices provided to its most favored commercial customers, despite its clear legal obligation to do so.

370.    Because of Symantec's conduct as set forth above, Florida has sustained actual damages.

371.    Florida is entitled to treble damages plus a civil penalty for each violation of the Florida False Claims Act.

### COUNT XIII -- FLORIDA FALSE CLAIMS ACT -- FALSE RECORDS OR STATEMENTS
(By Florida Against Symantec)

372.    Florida incorporates by reference the allegations set forth in Paragraphs 1 to 210 and 267 to 274 above as if fully set forth herein.

373.    Symantec knowingly made, used, or caused to be made or used, false records or statements that were material to false or fraudulent claims presented to Florida in violation of Fla. Stat. § 68.082(2)(b). Those material false records or statements include, but are not limited to, the discount information submitted with Symantec's GSA schedule contract proposal, applications to modify Symantec's GSA schedule contract that included documents signed by Symantec executives certifying that "Symantec's Business Products for these product additions are identical to those business practices applicable to prices applicable to Symantec product currently on the GSA contract," and the bills and GSA pricing information submitted to Florida.

374.    Symantec used the knowingly false information it provided GSA during the negotiation of the Federal Contract as the basis for prices of Symantec goods and services provided to Florida under Symantec's Federal Contract.

375.    These statements were false for the many reasons described above, including that Symantec's initial disclosures were inaccurate and incomplete when Symantec made them because they gave inaccurate and incomplete information concerning Symantec's non-published discount practices, Rewards buying program, and rebates.

376.    These false statements were material to the false claims, as they had a natural tendency to influence and were capable of influencing Florida to make payments that, absent the falsity, it may not have made.

377.    Symantec, through Reinhardt and other senior management officials, actually knew these statements were false or acted with deliberate ignorance or reckless disregard as to their falsity as evidenced, in part, by the facts above.

378.    Because of Symantec's conduct as set forth above, Florida has sustained actual damages.

379.    Florida is entitled to treble damages plus a civil penalty for each violation of the Florida False Claims Act.

**COUNT XIV -- NEW YORK FALSE CLAIMS ACT --**
**FALSE CLAIMS UNDER STATE CONTRACTS**
(By Relator for New York Against Symantec)

380.    Relator on behalf of New York incorporates by reference the allegations set forth in Paragraphs 1 to 210 and 275 to 287 above as if fully set forth herein.

381.    Symantec knowingly presented or caused to be submitted false or fraudulent claims for payment to New York in violation of New York's False Claims Act, N.Y. St. Fin. Law § 189(1)(a).

382.     Each claim for payment submitted by Symantec to New York for sales of Symantec products under the New York Contract was a false claim for payment based on material failures to disclose the discounts and other pricing practices that Symantec offered its most favored commercial customers and was required to offer New York.

383.     Symantec used the knowingly false information Symantec provided to GSA during the negotiation of the Federal Contract as the basis for prices of Symantec goods and services sold to New York under Symantec's Federal Contract.

384.     As a result, Symantec made claims to New York – namely, demands for and receipt of funds for direct orders under Symantec's New York Contract, and for orders to resellers authorized to sell Symantec products under Symantec's New York Contract.

385.     These claims overcharged New York and were for the reasons described above materially false claims.

386.     Symantec knew that its inflated and false prices were material to New York's decisions to pay for Symantec products, including the amounts that New York paid for Symantec products.

387.     Symantec caused resellers authorized to sell its products under Symantec's Federal Contract and New York Contract to submit false claims in that Symantec expressly authorized these independent resellers to sell goods and services under its Federal Contract, and in that Symantec provided GSA and these independent resellers false information concerning its commercial sales and discounting practices that it knew formed the basis of pricing under its New York Contract and sales to New York under that contract.

388.     Symantec knowingly presented or caused to be presented (including through its resellers) false or fraudulent claims for payment or approval by New York under New York's False

Claims Act when it did not disclose the discounts and other pricing practices provided to its most favored commercial customers, despite its clear legal obligation to do so.

389.    Because of Symantec's conduct as set forth above, New York has sustained actual damages. New York overpaid for each product bought the New York Contract by the amount of the discounts and reductions from other commercial pricing practices that should have applied to each such purchase.

390.    New York is entitled to treble damages plus a civil penalty for each violation of the New York False Claims Act.

### COUNT XV -- NEW YORK FALSE CLAIMS ACT -- FALSE CLAIMS UNDER THE GSA CONTRACT
(By Relator for New York Against Symantec)

391.    Relator on behalf of New York incorporates by reference the allegations set forth in Paragraphs 1 to 210 and 275 to 287 above as if fully set forth herein.

392.    New York's agencies and local governments directly ordered products from Symantec under Symantec's Federal Contract. New York also purchased Symantec products from resellers authorized to sell Symantec products under Symantec's Federal Contract or under the resellers' own GSA contracts, which in turn relied on Symantec's pricing disclosures to GSA.

393.    In so doing, Symantec used the knowingly false information Symantec provided to GSA during the negotiation of the Federal Contract as the basis for prices of Symantec goods and services sold to New York under Symantec's Federal Contract.

394.    As a result, Symantec made claims to New York – namely, demands for and receipt of funds for direct orders under Symantec's Federal Contract, and caused its authorized resellers to make similar claims to New York.

395.    These claims overcharged New York and were for the reasons described above materially false claims.

396.     Symantec knew that its inflated and false prices were material to New York's decisions to pay for Symantec products, including the amounts that New York paid for Symantec products.

397.     Symantec caused resellers authorized to sell its products under Symantec's Federal Contract to submit false claims in that Symantec expressly authorized these independent resellers to sell goods and services under its Federal Contract, and in that Symantec provided GSA and these independent resellers false information concerning its commercial sales and discounting practices that it knew formed the basis of pricing under its Federal Contract and sales to New York under that contract.

398.     Symantec knowingly presented or caused to be presented (including through its resellers) false or fraudulent claims for payment or approval by New York in violation of the New York False Claims Act when it did not disclose the discounts and other pricing practices provided to its most favored commercial customers, despite its clear legal obligation to do so.

399.     Symantec acted knowingly, with actual knowledge, in deliberate ignorance, and in reckless indifference, in failing to disclose to the United States and New York the discounts and other pricing practices that it routinely offered to commercial customers for its software products, in violation of New York False Claims Act, N.Y. St. Fin. Law § 189(1)(a)..

400.     Because of Symantec's conduct as set forth above, New York has sustained actual damages Each claim for payment submitted by Symantec or its resellers to New York agencies and local governments for sales of its GSA schedule products was a false claim for payment based on material failures to disclose the discounts and other pricing practices that Symantec offered its most favored commercial customers.

401.     New York is entitled to treble damages plus a civil penalty for each violation of the

New York False Claims Act

## COUNT XVI -- NEW YORK FALSE CLAIMS ACT --
## FALSE RECORDS AND STATEMENTS UNDER THE GSA CONTRACT
(By Relator for New York Against Symantec)

402.     Relator on behalf of New York incorporates by reference the allegations set forth

in Paragraphs 1 to 210 and 275 to 287 above as if fully set forth herein.

403.     New York's agencies and local governments directly ordered products from

Symantec and its reseller's GSA schedule contracts.

404.     Symantec knowingly, with actual knowledge, deliberate ignorance, and reckless

indifference, made, used, and caused to be made and used, false records and statements, including,

but not limited to, the discount information submitted with Symantec's GSA schedule contract

proposal, applications to modify Symantec's GSA schedule contract that included documents

signed by Symantec executives certifying that "Symantec's Business Products for these product

additions are identical to those business practices applicable to prices applicable to Symantec

product currently on the GSA contract," and the pricing proposals and bills submitted to each New

York agency and local government that purchased Symantec's software, to get false or fraudulent

claims paid or approved by New York in violation of N.Y. St. Fin. Law § 189(1)(b).

405.     Symantec used the knowingly false information it provided GSA during the

negotiation of the Federal Contract as the basis for prices of Symantec goods and services provided

to New York under Symantec's Federal Contract and the New York Contract.

406.     These statements were false for the many reasons described above, including that

Symantec's initial disclosures were inaccurate and incomplete when Symantec made them because

they gave inaccurate and incomplete information concerning Symantec's non-published discount

practices, Rewards buying program, and rebates.

407.    These false statements were material to the false claims, as they had a natural tendency to influence and were capable of influencing Florida to make payments that, absent the falsity, it may not have made.

408.    Symantec, through Reinhardt and other senior management officials, actually knew these statements were false or acted with deliberate ignorance or reckless disregard as to their falsity as evidenced, in part, by the facts above.

409.    Because of Symantec's conduct set forth above, New York has suffered actual damages. New York overpaid for each Symantec GSA schedule product by the amount of discounts and reductions from other commercial pricing practices that should have applied to each such purchase.

410.    New York is entitled to treble damages plus a civil penalty for each violation of the New York False Claims Act.

*    *    *

## PRAYER FOR RELIEF

WHEREFORE, the United States, California, Florida, and Relator on behalf of New York requests that this Court enter judgment in their favor and award them the following relief:

A.     To the United States, the amount of the United States damages to be determined at trial;

B.     To the United States, treble damages pursuant to the Federal False Claims Act in an amount to be determined at trial;

C.     To the United States, civil penalties pursuant to the Federal False Claims Act for each false claim and false statement made by Symantec not to exceed $11,000 per false claim or false statement;

D.     To California, the amount of damages incurred by California and its political subdivisions in an amount to be determined at trial;

E.     To California, treble damages pursuant to the California False Claims Act in an amount to be determined at trial;

F.     To California, civil penalties pursuant to the California False Claims Act for each false claim and false statement made by Symantec not to exceed $11,000 per false claim or false statement;

G.     To Florida, the amount of its damages to be determined at trial;

H.     To Florida, treble damages pursuant to the Florida False Claims Act in an amount to be determined at trial;

I.     To Florida, civil penalties pursuant to the Florida False Claims Act for each false claim and false statement made by Symantec not to exceed $11,000 per false claim or false statement;

J.     To Florida, reasonable attorneys' fees and costs permitted by law;

K.      To New York, the amount of its damages to be determined at trial;

L.      To New York, treble damages pursuant to the New York False Claims Act in an amount to be determined at trial;

M.      To New York, civil penalties pursuant to the New York False Claims Act for each false claim and false statement made by Symantec not to exceed $12,000 per false claim or false statement;

N.      To Relator, a share of the recoveries of the United States and the States in this action as provided under, and pursuant to, the Federal False Claims Act, the California False Claims Act, the Florida False Claims Act, and the New York False Claims Act, respectively;

O.      To Relator, reasonable attorneys' fees and costs permitted by law;

P.      To all Plaintiffs, interest, costs, and other recoverable expenses permitted by law; and

Q.      To all Plaintiffs, such other relief as may be just and appropriate.


**Plaintiffs Demand A Trial By Jury On All Claims So Triable**

Respectfully submitted,

*As to the Preface, Paragraphs 1 to 197, Counts I to IX, and the United States' Prayer for Relief,*

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

VINCENT H. COHEN, JR., D.C. Bar #471489
Acting United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:             /s/
     BRIAN P. HUDAK
     Assistant United States Attorney
     555 Fourth Street, NW
     Washington, DC 20530
     (202) 252-2549

MICHAEL D. GRANSTON
SARA MCLEAN
DAVID WISEMAN
DANIEL A. SCHIFFER
Attorneys, Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, DC  20044
(202) 305-8586

*Attorneys for the United States of America*

*As to the Preface, Paragraphs 1 to 266, Counts X and XI, and California's Prayer for Relief,*

KAMALA D. HARRIS
Attorney General of California

JACQUELINE DALE
Supervising Deputy Attorney General

By:             /s/
     RACHEL COLES
     Deputy Attorney General
     California Department of Justice
     1300 "I" Street
     Sacramento, CA 95814
     916-322-1272

*Attorneys for the People of the State of California*

*As to the Preface, Paragraphs 1 to 210 and 267 to 274, Counts XII and XIII, and Florida's Prayer for Relief,*

PAMELA JO BONDI
Attorney General of the State of Florida

By:             /s/
     RUSSELL S. KENT, Florida Bar No. 20257
     Special Counsel for Litigation
     Office of the Attorney General
     The Capitol, PL-01
     Tallahassee, Florida
     (850) 414-3300

*Attorneys for the State of Florida*

*As to the Preface and Relator's Prayer for Relief, and on behalf of New York as to the Preface, Paragraphs 1 to 210 and 275 to 287, Counts XIV to XVI, and New York's Prayer for Relief,*

LONDON & MEAD

_____/s/_____
CHRISTOPHER B. MEAD, D.C. Bar #411598
MARK LONDON, D.C. Bar #293548
LANCE ROBINSON, D.C. Bar #991118
1225 19th Street, NW, Suite 320
Washington, DC 20036
(202) 331-3334

*Attorneys for Relator Lori Morsell*


Dated:  October 8, 2015