# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| *ex rel.* LORI MORSELL, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.: 12-800 (RC) |
| | : | |
| v. | : | Re Document Nos. 125, 127 |
| | : | |
| SYMANTEC CORPORATION, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

This case began as a *qui tam* action by Lori Morsell, an employee at Symantec

Corporation ("Symantec"),[1] who came to believe that her employer had violated certain

contractual obligations to the United States. She filed an action as Relator against Symantec

under the False Claims Act ("FCA"). The United States ("the Government") intervened, along

with California and Florida, and Morsell elected to assert claims on behalf of New York State.

In brief, these governments claim that, in the process of setting pre-negotiated maximum prices

for government purchasers with the General Services Administration, Symantec overcharged

them by misrepresenting the existence of certain prices and discounts that were available to

---

[1] The defendant has filed a Notice of Name Change, ECF No. 180, with the Court, indicating that its name is now NortonLifeLock Incorporated. The Court intends to refer to the defendant by this new name going forward. However, all briefing on the instant motions predates the name change, and this Opinion extensively addresses the historical actions of the defendant at times when it was named Symantec. For the sake of consistency and clarity, therefore, the Court will refer to the defendant as Symantec throughout this opinion and the accompanying order.

Symantec's private customers and by consequently failing to offer government purchasers the same low prices these customers received.  *See generally United States ex rel. Morsell v. Symantec Corp.*, 130 F. Supp. 3d 106, 110–15 (D.D.C. 2015) (ECF No. 65) (summarizing the allegations raised at an earlier stage of this litigation, the essential details of which remain unchanged in the operative complaint).

The operative First Amended Omnibus and Restated Complaint (the "Omnibus Complaint"), ECF No. 70, brings fifteen counts against Symantec.  Five are claims brought by the Government under the FCA (Counts I through V); four are common law claims by the Government (Counts VI through IX); two each are brought by California (Counts X and XI) and Florida (Counts XII and XIII) under state false claims statutes; and the remaining three are brought by Morsell on behalf of New York State, also under a state statute (Counts XIV through XVI).  In the instant motions, Symantec seeks summary judgment in its favor on all claims.  The Government seeks partial summary judgment.  The Government asks the Court to find Symantec liable for the common law violations, leaving only the question of damages open for trial on these claims.  It further asks the Court to resolve "threshold elements" of its False Claims Act claims, primarily the falsity of Symantec's claims and the materiality of its alleged false statements, leaving the knowledge and damages elements for trial.

The Court grants each motion in part and denies each in part.  Overall, the extensive discovery record in this case makes for a complex factual pattern.  There are pieces of evidence pointing both ways on most of the central questions in the case and genuine disputes of material fact abound.  The Government has proven it is entitled to summary judgment on some discrete elements of certain claims, but it has not shown the absence of a dispute of material fact on any of the core factual questions underlying the vast majority of the Counts.  Symantec is entitled to

summary judgment on two common-law quasi-contract claims which, as a matter of law, can no longer coexist with the Government's breach of contract claim. Otherwise it has failed to prove as a matter of law that a reasonable jury could not find against it on any of the particular claims it faces.

The Court's opinion is organized as follows: First, the Court provides the relevant background, including the regulatory framework for the relevant government contracts, details on Symantec's pricing policies in general, the factual and procedural history of this dispute, and the relevant legal standards. Second, the Court addresses the Government's claims for breach of contract. This claim provides the clearest mechanism for presenting the core factual disputes in the case in an organized manner. Third, the Court addresses the government's other claims. Fourth and finally, the Court turns to address Symantec's motion.

## I. BACKGROUND

Symantec Corporation is an infrastructure software firm that "help[s its] customers protect their infrastructure, information, and interactions by delivering software and services that address risks to information security, availability, and information technology, or IT, systems performance." United States' Resp. to Symantec Corp.'s Statement of Undisputed Material Facts ("U.S. Resp. SMF") ¶ 3, ECF No. 139-1. This dispute arises out of Symantec's negotiation and performance of a Multiple Award Schedule ("MAS") contract with the General Services Administration ("GSA"), through which Symantec supplied a range of products, licenses, and services to the federal government.

### A. Regulatory Framework

MAS contracts enable the GSA to streamline federal government procurement by providing pre-negotiated maximum prices and other terms that govern all subsequent purchases

3

covered by the contract.  Def. Symantec Corp.'s Statement of Genuine Issues Necessary to be

Litigated in Resp. to the Gov't's Statement of Undisputed Issues of Material Facts in Supp. of its

Mot. for Summ. J. ("Sym. Resp. SMF") ¶ 1, ECF No. 137-2.  The GSA establishes federal

regulations governing solicitations, negotiations, and contracts executed under the MAS

program.  When the GSA awards a schedule contract, it "has already determined the prices of

supplies and fixed-price services, and rates for services offered at hourly rates, under schedule

contracts to be fair and reasonable."  48 C.F.R. § 8.404(d).  This means that, for the most part,

agencies placing orders under the schedule contract "are not required to make a separate

determination of fair and reasonable pricing."  *Id.*; *see also* U.S. Resp. SMF. ¶ 6a (agreeing that

48 C.F.R. § 8.405-2(d) requires purchasers to undertake a price evaluation, "considering the level

of effort and the mix of labor proposed . . . and . . . determining that the total price is

reasonable").  However, agencies making orders under a MAS contract "may seek additional

discounts before placing an order."  48 C.F.R. § 8.404(d).  The arrangement is meant to be

mutually beneficial, with the MAS obviating the need for each agency to individually shop

around for the best prices, while also helping suppliers with schedule contracts to do a higher

volume of business with the government than they could if they had to negotiate a new contract

each time.  *See* United States Mot. Summ. J. ("U.S. MSJ") Ex. 6, GSA MAS Program Desk

Reference ("Desk Reference") at 16–17, ECF No. 130-6.

The MAS program is authorized under two statutes: Title III of the Federal Property and

Administrative Services Act of 1949, 41 U.S.C. § 251 *et seq.*, and Title 40, 40 U.S.C. § 501.  The

program is additionally governed by Title 48 of the Code of Federal Regulations, which is also

known as the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 8.402 *et seq.  See* Desk

Reference at 13.  Additional regulations establishing procedures to be followed by contracting

GSA officers are found in the GSA Acquisition Regulation ("GSAR"), 48 C.F.R. § 501.101 *et seq.*, the entirety of which is also incorporated into the GSA Acquisition Manual ("GSAM"), U.S. MSJ Ex. 9, GSAM (July 2004), ECF No. 130-9.  Because the GSAM "consolidates" GSA's "agency acquisition rules and guidance" and presents them "in one document to eliminate the burden of checking multiple sources," the Court primarily refers to the GSAM rather than to the underlying regulations.  GSAM at i.

GSA regulations prescribe standard questions contained in a MAS solicitation, in response to which an offeror must disclose certain information in a Commercial Sales Practices Format, known as the offeror's "CSPs."  GSAM at 515-7 ("Commercial Sales Practices Format" or "CSPs Form"); *id.* at 515-8 fig.515.4-2 (Instructions for the Commercial Sales Practices Format).  The CSPs Form provides that an offeror seeking a MAS contract must provide information that is "current, accurate, and complete" as of fourteen calendar days prior to submission.  *Id.*  The offeror is also told "you must . . . disclose any changes in your price list(s), discounts and/or discounting policies which occur after the offer is submitted, but before the close of negotiations," and, "[i]f your discount practices vary by model or product line, the discount information should be by model or product line as appropriate."  *Id.*

Prospective offerors are also required to make certain representations and to provide details about their discounting policies.  Question 3 on the CSPs Form asks whether the discounts and concessions the offeror is offering the Government are "equal to or better than [its] best price . . . offered to any customer acquiring the same items regardless of quantity or terms and conditions?"  *Id.* at 515-7.  Question 4(a) requires disclosure of information about discounting policies, and question 4(b) asks whether "any deviations from [these] written policies or standard commercial sales practices ever result in better discounts (lower prices) or

concessions than indicated?" *Id.*  A chart below question 4 must be filled out with details about the lowest discounts the offeror makes available—whether these are offered to the government or other customers.  *Id.* at 515-8 (containing instructions for filling out the chart on the previous page).  The information about discounts can also be presented "in an alternative format developed by the offeror." *Id.* at 515-7.  When the offeror is a reseller, it must also disclose information about its manufacturer/supplier's practices, including details about what discounts the reseller itself receives.  *Id.*  In addition to obtaining the information requested on a CSPs Form, a contracting officer "may require additional supporting information, but only to the extent necessary to determine whether the price(s) offered is fair and reasonable." *Id.* at 515-6.  To account for the fact that, over time, offerors may want to adjust what products they offer under their MAS contract, all contracts include a "Modifications Clause" explaining that offerors must submit the same kind of discount information they submitted in their initial CSPs each time they add new items.  *Id.* at 552-43.

The GSAM does not require GSA officers to obtain the offeror's best price in every single case, but it emphasizes that this is always the goal.  Negotiators are required to "seek to obtain the offeror's best price (the best price given to the most favored customer)," but with the understanding that "the Government recognizes that the terms and conditions of commercial sales vary and there may be legitimate reasons why the best price is not achieved" in any given negotiation.  *Id.* at 538-1 (GSAR § 538.270).  A contracting officer "may award a contract containing pricing which is less favorable than the best price the offeror extends to any commercial customer for similar purchases" if the officer determines that "prices offered to the Government are fair and reasonable" and that the "[a]ward is otherwise in the best interest of the government." *Id.*  Nonetheless, the officer must always "compare the terms and conditions of

6

the [offeror's response to the] MAS solicitation with the terms and conditions of agreements with the offeror's commercial customers. *Id.*

The contracting officer is further instructed to "determine that the offered prices are fair and reasonable" before awarding a contract. *Id.* The officer should "[d]ocument the negotiation and [her] determination using FAR 15.406-3 as guidance." *Id.* (citing 48 C.F.R. § 15.406-3). The officer should also "[s]tate clearly in the award document the price/discount relationship between the Government and the identified commercial customer[s] . . . on which the award is predicated." *Id.* Contracting officers exercise significant discretion in judgment in making final agreements, but also work collaboratively with supervisors, managers, and other groups at GSA. *See* U.S. Resp. SMF ¶ 50.

GSA officials are instructed to include in all contracts two clauses designed to ensure that the prices negotiated for government purchasers are appropriately advantageous and that they remain so. The first of these is a Price Adjustment Clause ("PAC") reserving to the Government the right to reduce unilaterally the price of a contract if the Government determines the offeror failed to provide "current, accurate, and complete" information, or to disclose changes that occurred after its initial submission. GSAM at 552-12. This reduction can equal the amount of the overpayment plus interest. *Id.* The second is a Price Reduction Clause ("PRC"), which is designed to account for changes in the offeror's pricing over the life of the MAS contract. *Id.* at 552-39. The PRC requires that GSA and the offeror agree on a customer or category of customers that will serve essentially as a baseline for the government's discounts. *See id.* The offeror must keep the contracting officer appraised of prices being offered to that customer or category of customers throughout the life of the MAS contract, and PRC ensures that the Government's prices are reduced if this customer or category of customers is given lower pricing

7

or increased discounts.  *Id.*  The PRC identifies certain events which trigger price reductions when they occur, and certain exceptions to these triggers.  *Id.*  (These are discussed in more detail *infra*).

### B. Symantec's Discounting Policies

Before reviewing the contracting process between Symantec and GSA, a brief overview of Symantec's discounting policies—to the extent they can be established—is necessary.  For each of its products and services Symantec established a Base Manufacturer's Suggested Retail Price ("MSRP") which could be reduced depending on "standard, published program discounts attributable to [(a)] the buying program . . . and [(b) the] band within that program at which the sale was transacted."  Sym. Resp. SMF ¶¶ 39–40.  A "band" was, essentially, a pricing tier.  *See, e.g.*, Sym. Resp. SMF ¶ 40; U.S. Resp. SMF ¶ 30.  Different sets of bands existed for different buying programs, and Symantec, eventually, had five buying programs: Express, Government, Academic, Rewards, and Enterprise Options.  U.S. MSJ Ex. 30 ("October 2006 Presentation"), ECF No. 130-27.  The band in which the purchase occurred would determine a "Banded MSRP."  Sym. Resp. SMF ¶ 40.

For the Express, Government, and Academic programs, minimum license quantities corresponded to certain "Band Levels."  *See* October 2006 Presentation at 8, 14, 18.  For the Rewards program, on the other hand, band levels were based on a points system; points could be accumulated with each purchase and accumulating more points would enable customers to "move to a higher discount tier."  *Id.* at 22–23.  It is undisputed that "[p]ricing under Rewards was more advantageous than that offered under any of the transactional programs for comparable bands."  Sym. Resp. SMF ¶ 85.

Additional standard discounts were available to resellers, distributors, and original equipment manufacturers ("OEMs")—purchasers who were not purchasing Symantec's products as end users. *Id.* ¶ 41. Symantec emphasizes that these discounts were not automatic, as these customers had to meet certain "terms and conditions." *Id.* After these discounts were applied— if applicable—the end result was a "Buy Price" or "Standard Buy Price." *Id.* (not disputing this point).

Prices could be reduced below even the Banded MSRP or Standard Buy Price when non-standard discounts were applied. *Id.* ¶ 42. These were "deal specific non-published discounts." *Id.* ¶ 43. The Government explains that, for channel partners—purchasers who would resell the products rather than use them themselves—these discounts "were provided based on the attributes and circumstances of the end user ultimately purchasing the product." *Id.* ¶ 44.[2] The parties dispute the extent to which Symantec had or followed any written policies or guidance explaining when non-standard discounts should be available or how large they should be. *See id.* ¶ 45; United States' Mem. of Points and Auths. in Supp. of its Mot. for Summ. J. ("U.S. MSJ") at 21, ECF No. 128-1.

Symantec also had rebate programs that were available to certain channel partners. Sym. Resp. SMF ¶ 46; U.S. MSJ Ex. 43, Sym. Resps. to U.S. 1st RFAs ("Sym. Resps. 1st RFAs")

---

[2] Symantec purports to dispute this, but only says, by way of explanation, that "non-standard discounts were given *to the channel partners and for their benefit*, not for the benefit of an end user." *Id.* (emphasis added). This statement about the purpose of non-standard discounts is not inconsistent with the Government's statement about their basis; accordingly, the Court finds the Government's statement that they were based on the characteristics of an end user to be undisputed. *See* Local Civ. R. 7(h)(1) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."); *see also* Symantec Corp.'s Statement of Undisputed Material Facts ("Sym. SMF"), ECF No. 126-3 (failing to raise at any point the issue of the purpose or intended beneficiaries of non-standard discount).

¶ 11, ECF No. 130-43.  The parties dispute whether Symantec ever disclosed its rebating practices to GSA as well as whether agencies ordering under the GSA schedule would qualify for rebate programs.  U.S. Resp. SMF ¶¶ 35a–b.

### C. Symantec's Disclosures and Contract

In 2005, Symantec merged with Veritas Software Corporation ("Veritas").  U.S. Resp. SMF ¶ 9a.  At that time, Symantec products were available through a GSA Schedule contract held by another firm, immixTechnology, Inc., and Veritas products were available through a GSA Schedule contract that was held by Veritas and set to expire at the end of 2006.  *Id.* ¶ 10. Symantec decided to obtain its own GSA Schedule contract which would cover both Veritas and Symantec products.  *Id.* ¶ 11.  A former Veritas employee, Kim Bradbury, became Symantec's Senior Director of Public Sector Business Operations and was "primarily responsible for preparing Symantec's offer for a GSA Schedule contract," which she began preparing in or around January 2006.  *Id.* ¶¶ 10, 12a.  Bradbury was "an experienced GSA Schedule contract administrator" who had worked on government contracts for over two decades.  *Id.* ¶ 10.  During the negotiations on Symantec's MAS contract, Bradbury submitted various materials to GSA contracting officers elaborating on the pricing offered by Symantec.  According to the Government, Symantec made numerous misrepresentations during this process, including providing incomplete, outdated, and misleading data and disclosures.  *See* U.S. MSJ at 2–3.

Bradbury submitted Symantec's initial offer on February 28, 2006, in response to a solicitation numbered FCIS-JB-090001-B.  U.S. Resp. SMF ¶ 19 (citing Sym. MSJ Ex. 17, ECF No. 126-21); *see also* U.S. MSJ Ex. 67 ("Initial Offer"), ECF No. 131-17 (more complete version).  This submission included responses to the CSPs Form questions from the GRAM, discussed *supra*.  Symantec answered "NO" to question 3 ("Based on your written discounting

policies . . . are the discounts which you offer the Government equal to or better than your best price . . . offered to any customer acquiring the same items . . . ?"). Initial Offer at 82. Symantec also answered "NO" to question 4(b) ("Do any deviations from your written policies or standard commercial practices . . . ever result in better discounts (lower prices) or concessions than indicated."). *Id.*

For question 4(a) Symantec referred to attached sheets of disclosures of discount policies. *Id.* Attached charts included a chart titled "Summary of Non-Published Discounts offered by SKU [(stock keeping unit number)] for sales in 2005" (the "Frequency Chart"), which listed categories of customers, discount ranges, quantities sold with discounts in those ranges, and percentages of occurrences. *Id.* at 88–89. The Frequency Chart reflected only Symantec security products, not the Veritas line of products that were now going to be sold by Symantec. *See* Sym. Resp. SMF ¶ 66 (conceding this fact despite ostensibly disputing the Government's statement). Another chart was titled "Non-Published Discounts" and listed figures for how often certain discount reason codes—for example "Competitive Price Match," "Quarter end discount," or "Customer Satisfaction Issue"—had been applied to non-published discounts. Initial Offer at 90 (the "Reason Code Chart"). The government contends that both of these charts contained misrepresentations. *See* U.S. Resp. SMF ¶¶ 23d–24a.

Symantec first supplemented its offer in June of 2006. U.S. MSJ Ex. 1, Bradbury 30(b)(6) Tr. at 108, ECF No. 130-1. On June 22, Bradbury sent an email to GSA saying that she had mailed GSA a physical copy of "an updated pricelist submission reflecting all Symantec Products and Services included in the June 2006 commercial pricelist" via Federal Express. U.S. MSJ Ex. 63 ("June 2006 Supplement"), ECF No. 131-13. This email identified "two major product categories" offered by Symantec, "Security products" that Symantec had always offered

and "Availability Products" that had previously been sold by Veritas but which were now offered by Symantec.  *Id.*  The email explained that the pricelist was based on the Immix GSA contract on which Symantec products were available and on Veritas's expiring contract.  *Id.*  Symantec's intent, Bradbury explained, was to essentially merge these contracts into one new Symantec contract covering Security products and former Veritas products.  *Id.*

One factual dispute in this case is over what Symantec actually sent to GSA in its Federal Express package in June 2006, and specifically whether discount frequency data for Veritas products was included.  The Government does not dispute that, in the spring of 2006, Symantec collected this data and prepared it in a format similar to the Frequency Chart Symantec had provided for their own products in the Initial Offer.  U.S. Resp. SMF ¶ 27(b).  The parties disagree, though, on whether the Veritas discount frequency data was ever actually provided to GSA.  *Id.* ¶¶ 27(a), (c).

Symantec provided GSA with several more pieces of information in October 2006.  First, on October 5, Bradbury emailed GSA officer Gwen Dixon a presentation which she described as "an overview of the new discounting policies and procedures for all products sold by Symantec Corporation."  October 2006 Presentation at 2.  The October 2006 Presentation outlined the five "Buying Programs" described above.  *See id.*  Dixon responded to the presentation by saying she was "confused" and that she wanted to discuss the discounting policies with Bradbury at a meeting the two had scheduled for October 11.  U.S. MSJ Ex. 78, 10/9/2006 email, ECF No. 131-28; U.S. Resp. SMF ¶ 31a.

The parties agree that, at the October 11 meeting, Dixon, Bradbury and Kari Reinhardt, another Symantec employee, discussed the Rewards program.  *See* U.S. Resp. SMF ¶¶ 31b–33c. They disagree significantly, though, in how they characterize the meeting, specifically with

regard to whether Bradbury and the October 2006 Presentation provided Dixon with accurate and truthful information about the Rewards program and how it would be implemented. *See id.* ¶¶ 31b–34b.  The parties agree that Dixon walked away from the meeting believing that GSA could not comply with the Rewards program — but the Government maintains that this was due to misrepresentations made by Symantec. *Id.* ¶ 34a.

At the meeting, Dixon and Bradbury reviewed an administrative letter outlining "additional information and corrections" required by GSA.  U.S. MSJ Ex. 81 ("Administrative Letter") at 2–3, ECF No. 131-31.  Symantec responded to this letter by means of a set of documents emailed by Bradbury on October 20.  U.S. MSJ Ex. 82 ("October 2006 Supplement"), ECF No. 131-32; *see also* Sym. Resp. SMF ¶ 68 ("Symantec's response was not an update or a supplement to its offer.").  Several of the relevant inquiries from GSA and responses from Symantec were the following:

- GSA requested further clarification regarding the CSPs Symantec had provided. Administrative Letter at 4.  In response, Symantec noted that its discounting policies had been submitted already, including during the October 11 meeting; it provided an "[u]pdated comparison pricelist" that it said "reflect[ed] discounts and sell price for each item offered" and compared "commercial MSRP, Academic price, Government Price, Distributor Price, Value Added Reseller price, [and] proposed GSA price."  Oct. 2006 Supp. at 50, 52–59; *see also* U.S. Resp. SMF ¶ 37a.

- GSA asked why Symantec had stated that the maximum order for each group of related products—called a "Special Item Number" or "SIN"—was $100,000 instead of the $500,000 default figure in the solicitation.  Administrative Letter at 6; *see* FAR § 8.401 (defining Special Item Number).  Symantec responded, puzzlingly, that "Symantec agrees to lower the order

limitation." Oct. 2006 Supp. at 47. It added that "[t]his will be reflected in our [best and final offer] and the Pricelist Term and Conditions." *Id.*

- GSA asked whether Symantec was "taking exception to any solicitation terms and conditions," and if so, why? Administrative Letter at 7. Symantec provided a list of exceptions. Oct. 2006 Supp. at 10.

- GSA asked, "Does Symantec offer better rates and/or terms and conditions to other customers? If yes, please provide pricing information." Administrative Letter at 7. Symantec confirmed that GSA would not be getting its best prices, explaining that non-standard discounts had to be approved by management, and that Symantec's "eSPA" discounting tool allowed Symantec the flexibility to "provide[] non-standard competitive pricing to strategic accounts by requiring commitments from the identified account for annual quantity purchases or to meet one of [several] guidelines." U.S. Resp. SMF ¶ 36 (quoting Oct. 2006 Supp. at 49). These reasons for non-standard discounts included meeting competition, serving customers who agreed "to standardize on Symantec products and services," penetrating new markets, academic or charitable customers, or introducing new products. *Id.* (quoting Oct. 2006 Supp. at 49). Also in the October 2006 Supplement, Symantec agreed to the terms of a new modified version (called a "refresh") of the GSA Schedule 70 contract solicitation. Oct. 2006 Supp. at 61.

Dixon and Bradbury exchanged a few more emails and documents in the final two months of 2006. Bradbury sent a "revised subcontracting plan" on November 30 and an updated pricelist on December 2, 2006, along with "updated terms and conditions" and a summary of discounts. U.S. MSJ Exs. 83–84, ECF Nos. 131-33 to -34.[3] On December 7, Bradbury sent a

---

[3] These emails have been filed as exhibits without the referenced attachments and the Government has not explained whether these attachments were never produced or whether they were produced but the Government chose not to file them.

revised version of those pages from the MAS Solicitation on which Symantec had responded to the questions about its CSPs.  U.S. MSJ Ex. 86, ECF No. 131-36.  Bradbury explained at her 30(b)(6) deposition that this update was made because Symantec had overestimated its annual sales to the government and now needed to reduce that figure.  *See* U.S. Opp'n to Sym. MSJ ("U.S. Opp'n") Ex. 1o, Bradbury 30(b)(6) Tr. at 167–68, ECF No. 141-1.

Dixon and Bradbury had been hoping to conclude negotiations and have a new contract up by the end of the year.  *See* U.S. Resp. SMF ¶¶ 38–39.  In December, Dixon advised Bradbury that Symantec should consider seeking an extension of Veritas's expiring contract, because it did not look as though they would have the new contract ready before the end of the year.  *Id.*  ¶ 40.

On January 24, 2007, Bradbury sent Dixon what she described as "a summary of the Symantec discounting policies and a list of the difference in terms and conditions between Distributors, Resellers, and GSA end users" (the "Discount Relationship Chart").  U.S. MSJ Ex. 88, ECF No. 131-38; *see* U.S. Resp. SMF ¶ 42.  The Discount Relationship Chart lists product categories and compares percentage discounts (or ranges of percentage discounts) for each category for (a) GSA's proposed contract, (b) Government end users; (c) Academic end users; (d) distributors; and (e) resellers.  *See* Discount Relationship Chart.  A second sub chart gives the names of certain discounts and defines them.  *Id.*  The chart also contains lists of "Distributor/Reseller Terms and Conditions" and "Additional Terms and Conditions Imposed on Symantec by GSA Customers."  *Id.*  These lists do not describe these terms in any detail, but simply list items like "Maintain Product Inventory" (Distributor/Reseller) or "Trade Agreements Compliance" (imposed by GSA).  *Id.*

On January 25, 2007, Symantec Submitted its Final Proposal Revision ("FPR") with respect to Solicitation No. FCIS-JB-980001B. U.S. MSJ Ex. 7 ("Sym. FPR"), ECF No. 130-7. This document listed discounts that the Government would receive off of Commercial MSRP for different product categories. *Id.* at 3–5. The FPR also stated: "Symantec Corporation states that all commercial business practices have been fully disclosed and are current, accurate and complete as of the conclusion of negotiation." *Id.* It also included a certification from Symantec "that the discounts, pricing and/or rates given to the Government are either equal to and/or greater than what is granted to any commercial and/or Government customer under similar terms and conditions." *Id.* at 7. It also included a statement that "Symantec Corporation hereby agrees that the basis for negotiation and award for the offer is predicated on Symantec['s] commercial class of customers." *Id.* at 2.

Dixon accepted Symantec's offer. *See* Sym. MSJ Ex. 4, 2/2/2007 Bradbury email attaching contract ("2/2/2007 Contract") at 6 (showing Dixon's signature on contract), ECF No. 130-4; U.S. MSJ Ex. 1, Bradbury 30(b)(6) Tr. at 367. During the life of the contract, Symantec repeatedly sent GSA letters of authorization allowing that information Symantec had provided to GSA in support of its contract could be used by GSA and resellers of Symantec products when those resellers were negotiating their own contracts with GSA. *See* U.S. MSJ Ex. 199, ECF No. 133-49 (collecting authorization letters from Symantec to GSA). Symantec also periodically represented to GSA, when making modifications to its contract, that its CSPs had not changed. *See* U.S. MSJ Ex. 173, Periodic Certifications, ECF No. 133-23 (collecting letters regarding modifications).

16

**D. Procedural History**

Relator Lori Morsell began working at Symantec in March 2011 and was responsible for administering the firm's GSA Schedule contract.  U.S. Resp. SMF ¶ 88a.  She filed the initial complaint in this case in May 2012, alleging that "Symantec provided false, incomplete and inaccurate information to the government regarding its commercial pricing practices . . . in 2006 and 2007," that "during the performance of the contract Symantec breached its contractual obligations" to communicate and offer discounts to the government that were being offered to other customers, and that "in order to obtain modifications to the contract, Symantec reiterated and confirmed false statements" made previously.  Compl. at 3, ECF No. 1.  The United States intervened in July 2014, and the states of California and New York followed suit shortly thereafter.  U.S. Notice of Election to Intervene, ECF No. 21; Calif. Notice of Election to Intervene, ECF No. 28; Fla. Notice of Election to Intervene, ECF No. 29.

In late 2014 Symantec moved to dismiss all parties claims against it.  ECF No. 46. Shortly thereafter, the United States moved for partial summary judgment.  ECF No. 54.  The Court issued a combined Memorandum Opinion addressing both motions. *Symantec*, 130 F. Supp. 3d 106 (ECF No. 65).  In it the Court denied the Government's motion and granted Symantec's in part while also denying it in part.  *Id.*  The Court granted Symantec's motion only with respect to the claims brought by California, Florida, and Morsell, because it found that they had failed to state claims.  *Id.* at 126.  At the same time, the Court granted the states and Morsell leave to amend their complaints, *id.*, which they did in the now-operative complaint, United States', California's, Florida's, and Relator's First Am. Omnibus and Restated Compl. and Compl. in Intervention ("Omnibus Complaint"), ECF No. 70.

The Omnibus Complaint outlines nine counts brought by the Government, two each from California and Florida, and three from Morsell on behalf of New York state. The Government's first five claims are brought under the FCA. The remaining four arise under common law. California and Florida each bring two claims under their respective state law–equivalents to the FCA. Morsell does the same for New York and adds an additional claim based on state contracts.

Originally enacted during the Civil War to combat unscrupulous government contractors, the FCA enables a *qui tam* plaintiff, known as a Relator, to initiate a civil action on behalf of the United States to recover monies paid on account of false or fraudulent claims. *See* 31 U.S.C. § 3730; *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 146–47 (D.D.C. 2011). The FCA as amended creates several forms of liability. Among these is liability for "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), as well as for "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B). Count I alleges that Symantec knowingly presented false claims in violation of § 3729(a)(1)(A). Omnibus Compl. ¶¶ 288–95. Count II alleges that Symantec knowingly made false statements material to false claims in violation of § 3729(a)(1)(B). *Id.* ¶¶ 296–302. Count III alleges that Symantec caused independent resellers to make false claims, again in violation of § 3729(a)(1)(A), *id.* ¶¶ 303–11, and Count IV alleges that Symantec caused resellers to make false statements material to false claims in violation of § 3729(a)(1)(B), *id.* ¶¶ 312–19. Count V, brought under another provision of the FCA, § 3729(a)(1)(G), alleges that Symantec knowingly concealed and improperly avoided paying its obligations to the government (reverse false claims). *Id.* ¶¶ 320–25. The Government's five

18

common-law claims are for negligent misrepresentation, *id.* ¶¶ 326–31 (Count VI), breach of contract, *id.* ¶¶ 332–37 (Count VII), unjust enrichment, *id.* ¶¶ 338–40 (Count VIII), and payment by mistake, *id.* ¶¶ 341–43 (Count IX).  California, Florida, and Morsell on behalf of New York each allege that Symantec violated their respective state false claims statutes.  *See id.* ¶¶ 344–410 (Counts X through XVI).

The Government seeks damages, including treble damages available under the FCA, in an amount to be determined at trial, along with civil penalties.  *Id.* at 89.  The states each seek damages, also including treble damages as available under their state statutes, and civil penalties. *Id.* at 89–90.  Relator Morsell seeks a share of the recoveries of all plaintiffs, plus fees and costs. *Id.* at 90.

Symantec has moved to for summary judgment on all counts.  Def. Symantec Corp.'s Mot. for Summ. J., ECF No. 125.  The Government has moved for partial summary judgment. U.S. Mot. for Partial Summ. J., ECF No. 127.  California, Florida, and Morsell have opposed Symantec's motion but have not filed a motion of their own.  *See* States' Opp'n to Sym. MSJ, ECF No. 140-1.  The two motions have been fully briefed and are both ripe for decision.

### E. Legal Standard

Summary judgment is appropriate only where the summary judgment "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable standard."  *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006).  "[T]he [C]ourt must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law."  *Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C.

2012) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).  "[N]either party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion."  *Hodes v. U.S. Dep't of Treasury*, 967 F. Supp. 2d 369, 373 (D.D.C. 2013) (quoting *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989)).  "If the Court determines that one party is not entitled to summary judgment, it changes tack on the cross motion and gives the unsuccessful movant all of the favorable factual inferences that it has just given to the movant's opponent."  *Trudel v. SunTrust Bank*, 288 F. Supp. 3d 329, 245 (D.D.C. 2018).  "It is nonetheless still possible for a court to deny summary judgment to both sides."  *Id.*

The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A "material" fact is one capable of affecting the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial.  *See Celotex*, 477 U.S. at 324.  In determining whether a genuine issue exists, a court must refrain from making credibility determinations or weighing the evidence; rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255; *see also Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).  "In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the

materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute." *United States v. Dynamic Visions, Inc.*, 220 F. Supp. 3d 16, 19–20 (D.D.C. 2016) (citing Fed. R. Civ. P. 56(c)(1)).

Finally, this Court has supplemented Rule 56 with Local Civil Rule 7(h), pursuant to which a party filing a motion for summary judgment must include a statement of material facts as to which that party contends there is no genuine dispute. *See also Herbert v. Architect of Capitol*, 766 F. Supp. 2d 59, 63–64 (D.D.C. 2011). "The party opposing the motion must, in turn, submit a statement enumerating all material facts which the party contends are genuinely disputed." *Id.* at 63 (citing LCvR 7(h)(1)). This local rule "places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996). Accordingly, "evidence laying dormant in the record is not enough, for the district court is not obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material disputed fact." *Potter v. District of Columbia*, 558 F.3d 542, 550 (D.C. Cir. 2009) (quotation marks omitted).

## II. THE UNITED STATES' MOTION - BREACH OF CONTRACT CLAIM

The Court begins by addressing the Government's request for summary judgment on Symantec's liability for breach of contract. The Government alleges that Symantec breached the agreement between the parties in three ways: by violating CSPs disclosure obligations, by violating the PRC, and by violating the Modifications clause. The parties agree that to establish a breach of contract under the governing federal law the government would need to show "(1) a

valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a

breach of that duty; and (4) damages caused by the breach."  U.S. MSJ at 84 (quoting *Red Lake*

*Band of Chippewa Indians v. U.S. Dep't of Interior*, 624 F. Supp. 2d 1, 12 (D.D.C. 2009)

(applying federal law)); Symantec Corp.'s Opp'n to U.S. MSJ ("Sym. Opp'n") at 14–15, ECF

No. 137-1 (same).  The Government seeks summary judgment on the first three elements, which

would establish liability.  U.S. MSJ at 85.  Symantec opposes summary judgment on all three.

Sym. Opp'n at 14–61.  Symantec further argues in its own motion (addressed separately below)

that it is entitled to summary judgment on the breach claim.  Sym. MSJ at 91–95.

### A. Existence of a Valid Contract

"The party alleging a contract must show a mutual intent to contract including an offer,

an acceptance, and consideration passing between the parties."  *Thermalon Indus., Ltd. v. United*

*States*, 34 Fed. Cl. 411, 414 (1995).  "In addition, the party must demonstrate that the

government representative who entered or ratified the agreement had authority to bind the United

States in contract."  *Id.*  The Government says that there was a legally binding contract because

"[t]here is no dispute that Symantec submitted an offer for a GSA MAS schedule 70 contract . . .

that Dixon accepted that offer as ultimately supplemented by Symantec's FPR[,]" that "Dixon

had the authority to bind the United States to the Contract" and that "the Contract was plainly

supported by consideration."  U.S. MSJ at 85.  Dixon's authority to bind the United States is,

indeed, undisputed, Sym. Resp. SMF ¶ 138, and Symantec has not argued that there was no

consideration.  Symantec's argument is only that the Government has not proven the existence of

a valid and enforceable contract.  Sym. Opp'n at 15–18.[4]

---

[4] At the outset, the Government argues that Symantec waived this argument by failing to
identify it in response to an interrogatory asking for "each and every legal and factual basis,
reason, or other rationale for [Symantec's] contention that the Contract is not legally binding on,

Bradbury testified pursuant to Rule 30(b)(6) on behalf of Symantec.  *See* Fed. R. Civ. P.

30(b)(6) (authorizing a corporation to designate "officers director or managing agents . . . who

consent to testify on its behalf").  In the course of her deposition she reviewed an email and

accompanying attachments that she sent on February 2, 2007, which, she explained, contained

much of the contract between Symantec and the GSA.  In the email itself she wrote, "[t]his

contract is fully executed so no further action is required by Symantec."  2/2/2007 Contract at 3.

At her deposition, Ms. Bradbury agreed that, by means of this email she was "sending around

[portions of] the executed GSA schedule contract."  U.S. Reply in Further Supp. of U.S. MSJ

("U.S. Reply") Ex. 1r, Bradbury 30(b)(6) Tr. at 19, ECF No. 145-1.[5]  She explained that the

attachments to the email did not include the submissions Symantec had made to GSA, but only

included "what [GSA] sent back . . . a copy of the RFP."  *Id.*  Together, she said, "the RFP and

the proposal submission becomes your contract in its entirety."  *Id.*; *see also id.* at 31 ("[T]he

---

or enforceable as to, Symantec or GSA."  U.S. Reply in Further Supp. of its MSJ ("U.S. Reply")
at 4, ECF No. 144-1 (quoting U.S. Reply Ex. 295, Def. Symantec Corp.'s Resp. to U.S. Second
Set of Interrogatories, ECF No. 145-41).  The Government points only to one district court
opinion, from outside this Circuit, in support of its argument that failure to raise a defense in
response to an interrogatory can constitute a waiver of that defense.  Because Symantec did
arguably raise the issue in its Answer to the Omnibus Complaint and because at least one opinion
from this Court holds that failure to raise a defense in an interrogatory does not constitute
waiver, the Court finds that Symantec did enough to preserve its argument.  Symantec Corp.'s
Answer to First Am. Omnibus and Restated Compl. and Compl. in Intervention at 48, ECF No.
78 ("The GSA schedule is void and voidable because there was no meeting of the minds as to
material terms to form a contract between the parties."); *see Inversora Murten, S.A. v.
Energoprojekt Holding Co.*, 671 F. Supp. 2d 152, 156 (D.D.C. 2009) (holding that a defense was
not waived when it was not raised in response to an interrogatory because interrogatories are not
responsive pleadings).  Because the argument fails on the merits, the Government is not
prejudiced by the Court's consideration of it.

[5] In briefing these motions, the parties filed excerpts of deposition transcripts in
piecemeal fashion, and as a result excerpts from the same deposition can be found in multiple
exhibits.  To avoid confusion, the Court provides full citations with exhibit and electronic filing
numbers each time it cites to any of these.

information that we submitted as far as—as part of our proposal, that was also part of the contract."); U.S. MSJ Ex. 1, Bradbury 30(b)(6) Tr. at 64 (testifying that she did not believe there were any documents other than the 2/2/2007 attachments and CSPs disclosures that "in Symantec's mind in February of 2007 . . . contain[ed] terms of its GSA schedule contract."). In its briefing, Symantec quotes some of this same testimony. Sym. Opp'n at 18.[6]  Symantec thus agrees in its briefing and in its representative's testimony, that the contract is comprised of these two sets of documents: the RFP attached to the 2/2/2007 Contract email and the CSPs disclosures ("proposal submissions") made by Symantec.[7]  The question of contract formation thus turns on whether the parties agree on what set of documents constitute the CSPs disclosures.

Again, Bradbury's 30(b)(6) testimony settles the question.  At her deposition, the Government's attorney painstakingly walked through the documentation produced by Symantec to GSA over the course of their negotiations in 2006 and early 2007.  They created a "stack" of the following documents: (a) Symantec's Initial Offer from February 2006; (b) the June 2006 Supplement; (c) the October 2006 Presentation; (d) the October 2006 Supplement; (e) the updated pricelist from December 2, 2006; (f) the revised sales estimates from December 7; and (g) the Discount Relationship Chart from January 24, 2007.  U.S. Opp'n Ex. 1o, Bradbury 30(b)(6) Tr. at 77–180; *see also* U.S. Reply at 8, ECF No. 144-1 (providing more specific

---

[6] Symantec makes a disingenuous use of ellipses in its Opposition brief to mischaracterize the Government's characterization of Ms. Bradbury's testimony.  *Compare* Sym. Opp'n at 17 (suggesting the Government claimed Ms. Bradbury "agreed 'these documents . . . contained the terms of the contract'" (internal quotations omitted, ellipses in original)), *with* U.S. MSJ at 4 (saying instead that she "agreed 'these documents' . . . *along with CSPs* contained the terms of the contract" (emphasis added)).

[7] Symantec also suggests that the terms of the contract cannot be proven because the attachments to the 2/7/2007 email do not include any contract modifications.  Sym. Opp'n at 17. As the Government points out, the contract had only just been formed at the time of the email, so no modifications would have occurred yet and, furthermore, the Government never suggested that this was anything more than the initial version of the contract.  U.S. Reply at 6.

citations).  As they went through the documents, Bradbury noted at a few points that certain

documents—almost exclusively price lists[8]—had been produced to GSA but were not included

in the exhibits.  *See* U.S. Opp'n Ex. 1o at 92–93, 152–55, 159, 161, 177.  Speaking for

Symantec, she then represented that—aside from the documents in the "stack" and the handful of

identified missing documents (most of which were frequently updated price lists)—Symantec

was not "aware of anything else that it provided GSA during negotiation of the contract

concerning its pricing and discounting practice."  *Id.* at 179.

      The parties thus agreed on a universe of documents constituting the contract, although

several of these have gone unproduced or only vaguely identified.  A contract with terms spread

across a number of documents is far from the ideal of a single mutually signed document, but it

is not unheard of as a form of contract.  *See, e.g.*, *Int'l Longshore & Warehouse Union v. NLRB*,

890 F.3d 1100, 1105 & n.3 (D.C. Cir. 2018) (addressing a collective bargaining agreement

comprised of several documents); *Superior Oil Co. v. Udall*, 409 F.2d 1115, 1121 (D.C. Cir.

1969) ("[A] valid contract can be spelled out of multiple papers, some unsigned, if they are

referred to in a signed document and thus become incorporated by reference.").  More

specifically, finding the terms of a MAS contract across a variety of sources is not inconsistent

with past practice in this Court.  *See U.S. ex rel. Westrick v. Second Chance Body Armor Inc.*,

128 F. Supp. 3d 1, 12 (D.D.C. 2015) ("Any term alleged to be a part of the [MAS] contractual

agreement between GSA and [the defendant], then, must be found in the government's

---

[8] The only items other than price lists that were identified as having been sent to GSA but were not included in the production and exhibits were four enclosures sent in response to the Administrative Letter in October.  These were: (1) "Additional information regarding the scope of services for past performance records as Federal Reserve bank and U.S. Army network"; (2) "two copies of solicitation pages 83 through 153"; (3) "a copy of shrink wrap commercial training courses descriptions"; and (4) a "[c]opy of shrink wrap professional services agreement and statements of work for consulting services."  *See* U.S. Opp'n Ex. 1o at 152, 154–55.

solicitation, [the Defendant]'s offer, the 'Award/Contract' letter, or a subsequent modification of the contract."). And general principles of contract formation emphasize that parties must agree to the *material* terms of their agreements for a contract to be formed. *See, e.g.*, *Am. Capital Corp. v. United States*, 58 Fed. Cl. 398, 408 (2010) (citing Restatement 2d of Contracts § 33 (1981) ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.")).

For the same reasons, Symantec's allegation that the Government "admits GSA lost part of Symantec's contract file," Sym. Opp'n at 16, is not an obstacle to contract formation, even if it is true. At this post-discovery stage, the necessary proof can be—and has been—made using materials produced by Symantec along with whatever the Government had in its own files. *Cf. Grimes v. District of Columbia*, 794 F.3d 83, 95 (D.C. Cir. 2015) (noting that while the "plaintiff[] bears the burden of proof on her claims . . . some of the information needed to carry that burden is likely obtainable only through discovery from opposing parties"). While the Government bears the burden of establishing a contract, and thus the burden of directing the Court to proof of its existence, the Government is not required to carry that burden exclusively by relying on its own production, especially after discovery has been conducted. Furthermore, although the Government agrees that "portions of GSA's contracting file . . . were misplaced," it also points the Court to versions of many key documents in this case that came from its own production. U.S. Reply at 14–15 (citing U.S. Reply Exs. 296–306, ECF Nos. 145-42 to -52). The Government might be unable to prove the existence of some particular term of the contract—if it turns out one of the missing documents is central to one of its claims—but it has carried its burden of proving the existence of *a* contract, primarily through Bradbury's 30(b)(6)

testimony.  Because the parties agree on the universe of documents that contain the terms of the contract, there is no genuine dispute of material fact with regard to whether a contract exists.

## B. Duty and Breach

The Government alleges three breaches by Symantec with regard to which it says there is no dispute of material fact at this stage: (1) breach of CSP Disclosure obligations; (2) breach of PRC obligations; and (3) breach of Modifications Clause obligations.  U.S. MSJ at 85–93.  Symantec challenges that, for each of these alleged breaches, there is a genuine dispute of fact as to what its obligations were and as to whether it breached those obligations.  Sym. Opp'n at 18–61.  For the sake of organizational clarity, the Court will address each of the three alleged breaches in turn and will consider, for each, first the duty element and then the breach element.

To the extent that the parties dispute what the contract requires, the Court reiterates the principles of contract interpretation laid out in its ruling on the Government's earlier Motion for Partial Summary Judgment.  *Symantec*, 130 F.3d at 138.  In interpreting a contract, courts must "begin with the plain language" and "give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning."  *Armour of Am. v. United States*, 96 Fed. Cl. 726, 737 (2010) (citation omitted).  That is, "[w]hen the terms of a contract are clear and unambiguous, there is no need to resort to extrinsic evidence for its interpretation."  *Id.*  But "extrinsic evidence will be allowed to interpret an ambiguous clause," so long as such evidence supports an interpretation that "gives meaning to all [of the contract's] provisions" and is not used to "rea[d] a term into an agreement that is not found there."  *Id.* at 738 (citations omitted).  "An ambiguity, however, is not generated merely because the parties differ in their respective interpretations, but occurs when the contract is susceptible to more than one reasonable interpretation."  *W & F Bldg. Maintenance Co., Inc. v. United States*, 56 Fed. Cl.

27

62, 69 (2003).  Contract interpretation is a matter of law, *see, e.g.*, *Greco v. Dep't of the Army*, 852 F.2d 558, 560 (Fed. Cir. 1988), but if the parties disagree about how to read an ambiguous clause and if each party identifies evidence supporting its own interpretation, this may constitute a dispute of fact over what the parties mutually intended at the outset.  *Symantec*, 130 F. Supp. 3d at 139–40 & n.39.  Summary judgment cannot be granted under such circumstances.  *See Celotex*, 477 U.S. at 323–24.

### 1. Commercial Sales Practices Disclosures

The Government says that Symantec was obligated "to ensure its disclosures of its CSPs were current, accurate, and complete within 14 days of the award of the Contract" and that it breached these requirements.  U.S. MSJ at 85.  The Government identifies a number of ways in which Symantec's submissions were "inaccurate and incomplete."  *Id.* at 86.  Symantec disputes each of these.  First, though, Symantec argues that it did not have a duty to make CSPs disclosures under the contract.

Symantec argues that the obligation to disclose CSP information is "a pre-award regulatory requirement and does not arise from the GSA Schedule contract itself."  Sym. Opp'n at 19; *see also* Sym. MSJ at 92–93 (making the same argument).  This is incorrect.  An offeror's CSPs disclosure obligations come from two points in the GSAM, as incorporated into every GSA MAS contract: the Commercial Sales Practices Format and the PAC.  While the GSAM does collect regulations that require disclosure of CSPs before an award, it also instructs contracting officers to incorporate these disclosure obligations into the final contract.  *See* GSAM at 515-6 ("Insert the following format for [CSPs] in the exhibits or attachments section of the solicitation *and resulting contract* . . . ." (emphasis added)); *id.* at 552-12 (requiring insertion of the PAC).  Further, Symantec, through Bradbury's rule 30(b)(6) testimony, agreed that these documents containing these incorporated obligations were part of the contract.  *See* U.S. Reply

Ex. 1r, Bradbury 30(b)(6) Tr. at 19, ECF No. 145-1 (identifying the RFP attached to the 2/2/2007 email as part of the contract); *see also* 2/2/2007 Contract at 26–37, 223–24 (containing Commercial Sales Practices Format and PAC).

When an offeror reports—as Symantec did—that it is not giving the Government discounts and concessions equal to its lowest price offered to any customer acquiring the same items, the offeror is then instructed to disclose:

> written policies or standard sales practices for all customers or customer categories to whom [it] sell[s] at a price (discounts and concessions in combination) that is equal to or better than the price(s) offered to the Government under this solicitation or with which the Offeror has a current agreement to sell at a discount which equals or exceeds the discount(s) offered under this solicitation.

GSAM at 515-8 (Commercial Sales Practices Format instructions); Initial Offer at 82 (Symantec responding "NO" to question 3). The PAC preserves GSA's right to "reduce the price of [a] contract or contract modification" if the contracting officer determines the contractor "failed to (1) [p]rovide information required by [the] solicitation/contract . . . ; or (2) [s]ubmit information that was current, accurate, and complete; or (3) [d]isclose changes in the [c]ontrator's commercial pricelist(s), discounts or discounting policies . . . ." GSAM at 552-12. There is thus no genuine dispute that these disclosure obligations exist as part of the contract between the parties.

Symantec challenged its CSP disclosure obligations only broadly. It argued that they were not part of the contract but has not challenged whether they require what the Government says they require in more specific terms. (For example, Symantec does not say the CSPs would not require that the data in the Frequency Chart be truthful.) The Government is therefore entitled to summary judgment on the duty element of the first breach it alleges. The Court now turns to each of the specific ways in which the Government alleges the CSP disclosure

obligations were breached.  These fall into four categories: challenges relating to (a) the

Frequency Chart; (b) Buying Program disclosures; (c) non-standard discount disclosures; and (d)

rebating policies and practices.[9]

       *a.   The Frequency Chart*

       The Frequency Chart was presented as a "Summary of Non-Published Discounts offered

by SKU for sales in 2005," and was submitted as part of Symantec's Initial Offer in February

2006.  Initial Offer at 88–89.  It reports that 88% of Symantec's discounts were in the 31–40%

range.  *Id.* at 88.  The Government argues that the Frequency Chart was a breach of Symantec's

CSPs disclosure obligations because it was false in three ways.  First, the Government says the

Frequency Chart "was flooded with standard discounts, omitted sales for which non-standard

discounts could have been calculated, and failed to contain sales of Symantec's availability line

of products."  U.S. MSJ at 86 (citing U.S. MSJ at 37–38).  The Government fails to prove the

absence of a genuine dispute of material fact on this point for the same reason it failed to do so in

its first motion for summary judgment.  *See Symantec*, 130 F. Supp. 3d at 133–35.  Specifically,

although the Government points to considerable evidence tending to show that the Frequency

Chart erroneously treats many published channel partner discounts as if they were non-published

discounts, the Government has pointed to "no record evidence establish[ing] the magnitude of

the erroneously included published discounts."  *Id.* at 134.  Without evidence suggesting that the

published discounts that should have been excluded were large enough that they would have

made a difference in the final chart, the fact that they were included does not make the chart

---

[9] The Government also argues, in its opening brief, that Symantec breached is CSPs disclosure obligations by falsely estimating its GSA sales, or, more specifically, by falsely revising its estimate of those sales in December 2006.  U.S. MSJ at 50–51, 86.  In its reply brief, however, the Government disclaims having moved on this issue.  U.S. Reply at 30 n.16. Accordingly, the Court need not address it at this time.

false.  *See id.* at 134 & n. 32.  The Government attempts to overcome this shortcoming with calculations by its expert that purport to "correct" the Frequency Chart.  U.S. MSJ Ex. 73, Exp. Rep. of Allison I. Holt, Ph.D. ("Holt Rep.") at 16–17, ECF No. 131-23.  But these calculations fail to establish the absence of a genuine dispute because they rely on assumptions about how to identify certain sales.  These assumptions, while perhaps reasonable, are not so obvious that a reasonable jury could not find them unwarranted.

Second, the Government says the Frequency Chart is false because its creator, outside consultant Matt Percival (who also happened to be Bradbury's brother), U.S. Resp. SMF ¶ 17a, did not have a full set of Symantec's pricelists, and that Percival consequently excluded many items from his analysis because he could not calculate their discounts.  U.S. MSJ at 38.  It is undisputed that, in assembling the discount frequency data, Percival encountered some products for which he lacked MSRPs, and that additional spreadsheets with prices were provided to him in late February 2006.  U.S. Resp. SMF ¶ 17b.  The Government's expert, Dr. Holt, purports to correct whatever errors remained after he received these additional lists, but her description of how she obtained and used a more complete pricelist is highly conclusory and provides no detail beyond very different final figures.  Holt Rep. at 18–19.  There is no suggestion of what errors Pervical made, beyond the simple fact that he missed thousands of items on the pricelists and that Dr. Holt found them.  The Court is unclear about how Percival erred so greatly or how Dr. Holt corrected for it.  The Court also cannot tell how the assumptions Dr. Holt makes earlier in the report affect the calculation at this stage of her analysis.  The Court therefore cannot say that there is no genuine dispute of fact on this point without finding Dr. Holt to be credible, and the Court cannot make that evaluation on a motion for summary judgment.  To the extent that

evidence supporting and explaining Dr. Holt's view lies somewhere in the record, the
Government has failed in its obligation to direct the Court's attention to that evidence.

The Government also argues that the Frequency Chart is false because it only accounts
for sales of "security products"—those products that had always been sold by Symantec—and
leaves out the Veritas products that Symantec acquired in 2005 and which would become part of
Symantec's MAS Schedule Contract.  U.S. MSJ at 38.  There is no dispute that the Veritas line
was not included in the Frequency Chart.  Sym. Resp. SMF ¶ 66 (ostensibly disputing the
Government's statement of fact but acknowledging that the Frequency Chart sent in February
2006 did not account for Veritas products).  There is also no dispute that, starting in April 2006,
Percival collected the relevant Veritas data, corresponded with Bradbury about it, and prepared it
in a format similar to the Frequency Chart.  U.S. Resp. SMF ¶ 27b.

Symantec says that it provided the Veritas discount frequency data to GSA in June 2006,
but it cites only to Bradbury's testimony to this effect and does not cite any documentary
evidence showing that the data was sent.  *Id.* ¶ 27c.  The Government disputes this, and the Court
finds the Government's evidence compelling in this regard.  *Id.*  To start, Bradbury's assertion
that the data was sent is inconsistent with her other testimony she provided, and is unsupported
by the June 2006 Supplement.  *See* U.S. Opp'n Ex. 67, Bradbury Tr. at 212, ECF No. 141-8 ("I
can't remember what was in the box."); *id.* at 213 (description by Bradbury of her normal
practice of listing all enclosures on a cover letter or email); June 2006 Supplement, ECF No.
131-13 (cover email accompanying supplement, not mentioning Veritas frequency data); U.S.
MSJ Ex. 75, ECF No. 131-25 (cover letter accompanying supplement, not mentioning Veritas
frequency data); *see also* U.S. MSJ Ex. 45, Bradbury Aff. ¶ 26, ECF No. 130-45 (describing the
June 2006 supplement and making no mention of Veritas frequency data).  Most compelling in

this regard is an email sent by Percival to Bradbury on June 28, 2006 in which he appears to still
be working on a chart presenting the Veritas frequency data, days after the June 2006
Supplement was shipped.  U.S. MSJ Ex. 97, ECF No. 131-47.

It is beyond dispute that the Veritas discount frequency data was not included in the
Frequency Chart, and a reasonable jury could not find otherwise because the parties agree on this
point.  In that regard, at least, the Frequency Chart was decidedly incomplete.  And Symantec
does not dispute that it was obligated to turn over discount frequency data for the Veritas
products that would be sold on the contract.  Likewise, there does not appear to be any genuine
dispute regarding whether the Veritas frequency data was sent as part of the June 2006
Supplement.  Symantec points to nothing beyond Bradbury's testimony in support of its position
on this issue, and that testimony is internally inconsistent, and belied by the documentary record.

Nonetheless, the Government has not established the lack of a genuine dispute of fact on
this point because it is not established that the Frequency Chart and the June 2006 Supplement
are the only times Symantec could have provided this information.  Bradbury's testimony is not
entirely consistent, but at one point she explains first that "[Symantec] did submit the Veritas
data in June" but then clarified: "[Symantec] disclosed this data, but then we also summarized
data when we—we had to update data and summarize data when we actually sat down with
[Dixon].  So there were multiple submissions.  We were constantly resubmitting."  Sym. Opp'n
Ex. B4, Bradbury Tr. at 197–98, ECF No. 137-8.  Specifically, she suggests that the data might
have been sent along with updated price lists.  *Id.* at 198 ("[T]he price list changes so often and it
takes so long for your GSA contract to be awarded . . . so you're constantly resubmitting data.").

This calls into question whether the Veritas data was submitted at a later date or was
disclosed in person during a meeting with Dixon.  The Court is not certain that, if the data was

submitted, it would have been produced.  Symantec, through Bradbury's 30(b)(6) deposition, identified several submissions of price lists that the Government was apparently unable to locate, but which Symantec understood to be part of the contract.  *See* U.S. MSJ Ex. 1, Bradbury 30(b)(6) Tr. at 178–79, ECF No. 130-1 (reviewing documents missing from the "stack" of contractual documents).  And the Government acknowledges that "portions of the CSPs" went missing from GSA's contracting file.  U.S. Reply at 10.  A reasonable jury might conclude that, as Bradbury suggests, Veritas discount data was sent later on, especially because the Government agrees that Percival was working on assembling this data in the proper format, *see* U.S. Resp. SMF ¶ 27b.  The jury might reasonably wonder why Symantec would bother preparing the data if it were going to be kept secret.  Accordingly, the Government is not entitled to summary judgment on this point, or on the issue of the falsity of the Frequency Chart more broadly.

       *b.*  *Buying Program Disclosures*

The Government next argues that the October 2006 Presentation describing Symantec's five buying programs was inaccurate in three respects.  According to the Government, the Presentation (1) falsely identified four contract features—co-termination of maintenance contracts, auto-renewal, iClick, and subsidiaries' usage of a parent company's Symantec Agreement Number or "SAN" to track sales—as prerequisites for participation in the Rewards buying program when, in reality, they were not required; (2) "incorrectly stated that pricing was dependent on band thresholds Symantec routinely ignored"; and (3) "failed to inform GSA that pricing was substantially better under the Rewards program."  U.S. MSJ at 86.  The Court can address these alleged misrepresentations collectively at this stage because the dispute of material fact surrounding the disclosure of buying program information in October 2006 is so clear.

The October 2006 Presentation consists primarily of bullet-point style details about Symantec's different buying programs.  *See* October 2006 Presentation.  When Bradbury emailed a copy of it to Dixon, Dixon responded by saying she was "confused" and suggested that they discuss the programs at their upcoming meeting.  U.S. MSJ Ex. 78, 10/9/2006 email, ECF No. 131-28.  The Court finds Dixon's confusion entirely understandable, as the presentation on its face provides a less-than-comprehensive explanation of how the buying programs worked.  Fundamental details like how purchases translate into point totals for the Rewards program are not explained.  Even if Dixon understood jargon—like "SAN"—that goes undefined in the presentation, she would not have known which details were requirements and which were simply options or proposals.  To take just one example, the presentation has a bullet point that reads "Auto renewing contract" on a slide with the heading "Rewards Buying Program Overview."  October 2006 Presentation at 20.  But Symantec's Buying Program Manager, Michael McGee, testified, "[T]he auto renew never came about.  There was a proposal when the program for Rewards was conceptualized.  But the infrastructure was never built."  U.S. MSJ Ex. 18, McGee Tr. at 167, ECF No. 130-18.  Reading the presentation, Dixon would never have suspected this.

Because the Presentation provides minimal evidence of the parties' mutual understandings in October 2006, the Court would have to turn to testimony concerning Bradbury and Dixon's October 11 meeting in order to evaluate whether Symantec made misrepresentations concerning the Rewards Buying Program.  There is no dispute that the buying programs were discussed at this meeting.  U.S. Resp. SMF ¶ 31a.

Bradbury testified that Dixon said GSA could not comply with the terms of the Rewards program, and that she, Bradbury "assured [Dixon] that if a GSA customer [i.e. an agency] wanted to participate in rewards, they absolutely could participate in rewards and all we had to

do was attach a rewards addendum to their order."  Sym. Opp'n Ex. B4, Bradbury Tr. at 241–43, ECF No. 137-8.  Later in the same deposition, however, Bradbury was not sure whether she had "express[ed] skepticism that GSA could comply with the rewards buying program's terms" and admitted that "rewards wasn't something that [she] was all that familiar with."  U.S. MSJ Ex. 18, Bradbury Tr. at 329, ECF No. 131-18.  The Government represents that Dixon does not recall the meeting.  Dixon does not say so directly in the deposition excerpts provided to the Court, but the Government does point to testimony in which Dixon says GSA would not have agreed to co-termination and auto renewal.  U.S. MSJ at 31; U.S. MSJ Ex. 80a, Dixon Tr. at 118–22, ECF No. 136-6.

The government disputes the extent to which Symantec provided information about the buying programs beyond what was included in the October 2006 Presentation, but the testimony from Bradbury that it cites is not inconsistent with the notion that Bradbury provided at least some explanations or clarifications.  Bradbury testified "[the presentation] is all [Dixon] had -- this is all that we gave her."  *See* U.S. Resp. SMF ¶ 31b (quoting U.S. MSJ Ex. 68, Bradbury Tr. at 241, ECF No. 131-18)).  But even if the presentation was the only document Bradbury gave to Dixon, Dixon might still have gained a different understanding—or misunderstanding—of the buying programs from her conversation with Bradbury on October 11, even if Bradbury "wasn't all that familiar" with the Rewards program.

The Government cites considerable evidence from outside the October 2006 Presentation in support of the second and third misrepresentations it alleges—those relating to band thresholds and pricing.  *See* U.S. MSJ at 46–48.  Even assuming everything the Government says is true, that Symantec did not reveal customers' ability to "jump" between bands and the advantages of Rewards pricing, the Court is still left with significant factual uncertainty as a

result of the October 11 meeting.  It remains possible, on this factual record, that Dixon had ruled out participation in the Rewards program on some other basis and that Bradbury, as a result, had no reason or obligation to discuss these additional aspects of the program.

To anticipate Symantec's motion on this same issue—addressed below—to the extent Symantec seeks to demonstrate the absence of a dispute of material fact in its favor, and to knock out any claim by the Government that it made misrepresentations about band-jumping or Rewards pricing, this too is impossible at this stage.  For Rewards pricing, the argument is the same as for disclosures concerning features of the Rewards buying program—if the jury thinks Bradbury misrepresented the program at the October 11 meeting, then Symantec could have breached its CSPs disclosure obligations by failing to say more.  Regarding band-jumping, a jury could credit the declaration of Symantec employee Gary E. Thompson purporting to explain what the Government says were impermissible band jumps, Sym. Opp'n Ex. A, Thompson Decl. ¶¶ 4–12, ECF No. 137-3, but the jury could also find his explanations not credible and could credit the Government's experts who identified the alleged band-jumping transactions in the first place.  *See* U.S. MSJ at 46–47 (citing expert declarations).

The Court simply cannot tell what conversations took place regarding the buying disclosures.  For this reason, there are genuine disputes of material fact with regard to whether Symantec misrepresented details about the Rewards program and GSA's eligibility for it in the course of their contract negotiations.  Given the inconsistencies in Bradbury's testimony, there is sufficient evidence from which a jury could draw any number of conclusions about what was or was not said.

### c.   *Non-Standard Discount Disclosures*

The Government next argues that Symantec breached is CSPs disclosure obligations by falsely representing "that non-standard discounts were [(i)] limited to strategic accounts, [(ii)] approved in eSPA [or SFDC,[10] [and (iii) provided] for competitive business reasons."  U.S. MSJ at 86.  The Government alleges that Symantec lied in the October 2006 Supplement it submitted in response to GSA's Administrative Letter.  As explained, *supra* section I.C, GSA had asked Symantec for "pricing information" for any "better rates and/or terms and conditions" it offered to other customers.  Administrative Letter at 7.  Symantec's response was:

> Information regarding deviations from existing discounting policies was provided in Symantec's original proposal submission.  Any deviations from published discounts require management approval.  Deviations must be documented and approved in accordance with the following guidelines: As previously disclosed to GSA as part of Symantec's established discounting policies, the Worldwide Sales discounting tool referred to as *"eSPA" was established to allow Symantec the flexibility to respond to competition*.  This process provides *non-standard competitive pricing to strategic accounts* by requiring commitments from the identified account for annual quantity purchases, or to meet one of the following guidelines; which are provided as examples:
>
> 1.  To meet market competition or displace a named competitor at a customer site;
> 2.  Customers who agree to standardize on Symantec products and services;
> 3.  New market or market segment penetration;
> 4.  Educational, including prime contractors, or Charitable organizations or institutes;
> 5.  Introduction of a new product and services through more aggressive discounts and in exchange for press or customer references.

Oct. 2006 Supp. at 49 (emphasis added).  The Government says this disclosure "was false at the time it was made."  U.S. MSJ at 39.

---

[10] The electronic Special Pricing Application ("eSPA") later became part of Symantec's SalesForce.Com ("SFDC").  The parties have not identified for the Court any particular document establishing this change, but they appear to agree about the shift.  *See* U.S. MSJ at 39; Sym. Opp'n at 48.

Before focusing on the three specific falsities it identifies, the Government challenges the accuracy of the disclosure more broadly by arguing that this statement does not represent Symantec's discount policy because it did not have one.  U.S. MSJ at 40.  The Government notes first that the paragraph response by Symantec is largely copied over from a 2001 FPR Veritas submitted for its MAS contract.  *Compare* Oct. 2006 Supp. at 49, *with* U.S. MSJ Ex. 61, Veritas FPR 7/3/2001 at 2, ECF No. 131-11.  Symantec's paragraph response is nearly identical to a paragraph in the Veritas submission, and the five examples given are entirely identical.  The Government also notes that Symantec's 2010 Discount Audit found that the company lacked a defined discounting strategy or any written guidance on when to offer or approve discounts.  *See* U.S. MSJ Ex. 100, ECF No. 131-50.  These two points certainly weigh in the Government's favor, but they are not enough, on their own, to warrant summary judgment.

The Government is not entitled to summary judgment on any of the three alleged falsities it identifies regarding Symantec's non-standard discounting policies as disclosed in the October 2006 Supplement.  For each, there is a genuine issue of fact that the Court cannot resolve.

*i. Approved in eSPA / SFDC*—In responding to the Government's first set of Requests for Admission ("RFAs"), Symantec admitted that there were missing or deficient entries in eSPA or SFDC for at least twenty-four sales made with non-standard discounts.[11]  And according to the Government's expert, there were over 6,500 transactions in 2005 for which Percival—the creator of the Frequency Chart—identified a non-standard discount but where there was "no corresponding approval entry in eSPA."  Holt Rep. at 21–22.  Disputing the Government's

---

[11] These admissions can be found at Sym. Resps. 1st RFAs ¶¶ 109–12, 125–28, 140–43, 156–59, 171–74, 186–89, 202–05, 218–21, 234–35, 247–50, 262–66, 278–79, 291–94, 308–11, 323–24, 336–37, 349–50, 362–63, 375–76, 388–89, 401–02, 414–15, 427–28, and 440–41, and in surrounding paragraphs.

implication that discounts not recorded in eSPA must not have been approved, Symantec points to its SOF, which in turns cites testimony explaining that if approval of a non-standard discount had not been noted in eSPA or SFDC, a member of Symantec's "Order to Cash" or "booking" team would verify with the person who submitted the order that management approval had, in fact, been received.  *See* Symantec Corp.'s Statement of Undisputed Material Facts ("Sym. SMF") ¶¶ 112–13, ECF No. 126-3 (citing Sym. MSJ Ex. 73, Thompson Tr. at 34, ECF No. 126-77; Sym. MSJ Ex. 74, Ceschini Tr. at 34–35, ECF No. 126-78).

The government has failed to establish the lack of a genuine issue of material fact on this point because the language of the October 2006 Supplement is so vague on what it promises with regard to management approval.  *See Symantec*, 130 F. Supp. 3d at 136 (denying summary judgment on this issue for the same reason).  The October 2006 Supplement says that "[a]ny deviations from published discounts require management approval" and that eSPA was developed to help respond to competitive pricing, Oct. 2006 Supp. at 49.  But nowhere does the October 2006 Supplement state that management approvals would necessarily be documented in eSPA (although eSPA does appear to have had this functionality).  The Government's reply collects testimony suggesting that eSPA and SFDC were relied upon by Symantec, U.S. Reply at 39, but, at summary judgment, the Court cannot make a credibility determination in favor of this testimony over Thompson's and Ceschini's.  The Government thus fails to meet its burden on this point.

*ii. Limited to strategic accounts*—Symantec has identified a genuine dispute of fact on this point as well, again regarding what the October 2006 supplement promises.  Symantec reads the relevant sentence as describing a process that "provides non-standard competitive pricing [either] to strategic accounts by requiring commitments from the identified account for annual

quantity purchases, *or* <u>to meet one of the following guidelines</u>, which are provided as examples[.]" Oct. 2006 Supp. at 49 (emphasis added).  The Government reads the same sentence as describing pricing offered "to strategic accounts [either] <u>by requiring commitments</u> . . . *or* <u>to meet one of the following guidelines</u>."  *Id.* (emphasis added). Symantec's grammatical construction allows for a much broader offering of non-standard discounts, since the second half of the disjunctive phrase does not require that an account be strategic.  The Court thinks the Government's preferred reading is the more natural one, but not so obviously that the sentence can be said to lack ambiguity.  The construction is awkward either way.[12]

Further, at least some of the Government's evidence works against its argument that there is no genuine dispute on this point.  The Government notes that Symantec's "designee on nonstandard discounting practices" testified that Symantec was not tracking which of its accounts were "strategic" during the relevant time period, that it was not tracking whether discounts were going to "strategic" accounts, and that no policy document or other guidance instructed Symantec's sales team to only offer non-standard discounts to "strategic" accounts. U.S. MSJ Ex. 16, Thompson 30(b)(6) Tr. at 158–59, 169–71, ECF No. 130-16.  The Government says this goes to show that Symantec was not following its policy of giving non-standard discounts only to strategic accounts, but the same testimony arguably supports Symantec's

---

[12] The Government notes that Symantec's construction yields a "mismatched list consisting of a [prepositional] phrase introduced by a noun ('to strategic accounts') followed by a phrase introduced by a verb [an infinitive form of the verb] ('to meet')."  U.S. Reply at 37. The Government's preferred construction is also mismatched, since "by requiring commitments" is an adverbial prepositional phrase modifying "provides."  "[T]o strategic accounts" plays the same grammatical role in Symantec's reading of the sentence.

argument—Symantec would not be expected to have written guidance on how to track where discounts went if it had never promised to restrict the discounts to only strategic accounts.

*iii. Provided for competitive reasons*—Again, Symantec disputes whether it promised what the government claims it promised. Symantec argues that it never claimed it would only offer non-standard discounts for competitive reasons. Sym. Opp'n at 50–51. The October 2006 Supplement says that eSPA "was established to allow Symantec the flexibility to respond to *competition*" and that "[t]his process provides non-standard *competitive* pricing . . . ." Oct. 2006 Supp. at 49 (emphasis added). The Court agrees with Symantec that this does not necessarily amount to a statement that responding to competition is the *only* reason Symantec would offer a non-standard discount. Indeed, "[t]o meet market competition" is only one of the five guideline examples of why a non-standard discount might be offered, and at least one other example ("[e]ducational . . . or Charitable organizations or institutes") is not obviously related to competition. *See id.* Additionally, as Symantec notes, the Reason Code Chart provided to GSA in February 2006 disclosed that, for example, "Quarter end discount" and "Other" were among the reasons non-published discounts had been offered in 2005. Initial Offer at 90. Accordingly, since the Contract can plausibly be read either way, and since there is evidence on both sides, summary judgment on this issue would be premature.

The Government raises four arguments against this conclusion, none of which are compelling. First, the Government argues against reading the Reason Code Chart and the October 2006 Supplement together in this way, but its arguments fail to eliminate the dispute of fact. *See* U.S. Reply at 35. The Government says the Reason Code Chart was not intended to supplement the later-disclosed October 2006 Supplement, but both were in the "stack" that Bradbury identified as constituting most of the contract between the parties. *See* U.S. Opp'n Ex.

1o, Bradbury 30(b)(6) Tr. at 77–180, ECF No. 141-1.  Second, the Government says the chart

confused Dixon and thus cannot be relied on, citing her confusion in October 2006, U.S. Reply at

35, but the fact that Dixon was confused is not a reason to draw any factual inferences about

what the parties agreed to in the Government's favor.  The summary judgment standard requires

that the Court do the opposite.  Third, the Government argues that the Reason Code Chart is

"indisputably false" because it does not include data from 2005 Veritas sales and only

summarized certain eSPA sales.  U.S. Reply at 35.  Even if these sales were left off, this would

not change the fact that *some* discounts were given for the reasons identified in the Reason Code

Chart, so it is not clear how missing Veritas sales would make any difference in this regard.

Fourth and finally, the Government points to testimony that certain non-standard discounts given

for non-competitive reasons like quarter end discounts should not have been issued.  U.S. Reply

at 36 (citing U.S. MSJ Ex. 68, Bradbury Tr. at 279–80, 294–95, ECF No. 131-18; U.S. MSJ Ex.

16, Thompson 30(b)(6) Tr. at 176–79, ECF No. 130-16; U.S. MSJ Ex. 18, McGee Tr. at 125–27,

ECF No. 130-18).  This is more compelling, but only shows that there is contradictory evidence,

with the testimony on one side and the Reason Code Chart, as part of the contract, on the other.

### d.  Rebate Practice Disclosures

The Government's last alleged breach of Symantec's CSPs disclosure obligations takes

aim at Symantec's CSPs as a whole, alleging that "as supplemented [they] were incomplete

because they made no disclosure of Symantec's rampant rebating practices."  U.S. MSJ at 86

(citing U.S. MSJ at 49–50).  The Government's argument is straightforward: "Symantec has

identified no place in its CSPs where it disclosed its Government Rebate Program, its Partner

Rebate Program, the rebate component of its Opportunity Registration Program, its rebate

agreement with [a particular government reseller customer of Symantec's] under its [blanket

purchase agreement], or its other rebating programs." *Id.* at 49–50.  This despite the fact that

Bradbury was aware that these programs existed.  *See* Bradbury Aff. ¶ 12, ECF No. 130-45

("Symantec provided Partners additional terms and conditions such as sales incentives, or

'rebates' . . . ."); U.S. MSJ Ex. 118, Deal Deck Summit Baltimore July 2006 at 5, ECF No. 132-

18 (PowerPoint presentation listing "Paid Rebates for Channel" as among Bradbury's duties);

U.S. MSJ Ex. 119, ECF No. 132-19 (email from Bradbury attaching an October 2006 newsletter

that addressed rebate programs); U.S. MSJ 120, ECF No. 132-20 (email showing Bradbury

accepting a meeting invitation relating to rebates in February 2007).[13]

      Bradbury testified that she disclosed Symantec's rebate policies to GSA and that she

discussed them with Dixon at their October 2006 meeting.  *See* Sym. Opp'n Ex. B4, Bradbury

Tr. at 56–57, 250–51, ECF No. 137-8.  The only documents Symantec points to as containing

these policies are (a) the Discount Relationship Chart and (b) copies of reseller agreements that

Bradbury claims were provided to GSA.  Sym. Opp'n at 54.  The Discount Relationship Chart

does mention "Opportunity Registration Disc[ounts]" and provides as its "[d]efinition," "No

direct sales to resellers.  Discount offered to partners that register an incremental opportunity

(new customer; no Symantec sales rep involvement)."  *See* Discount Relationship Chart.  This

does not show that Symantec disclosed its rebating practice because it does not even contain the

word "rebate," or even a related term like "back-end."  Without further explanation, no one at

---

[13] The Court previously denied the Government summary judgment on this issue on the
ground that Symantec "created a dispute of fact as to whether its failure to disclose reseller back-
end rebates rendered its CSPs and other disclosures false." *Symantec*, 130 F. Supp. 3d at 137.
Symantec has not made this argument in this round of summary judgment briefing, instead
arguing, unsuccessfully for the reasons explained, *supra*, that there was a dispute of fact as to
whether it was obligated to provide any CSPs at all.  Sym. Opp'n at 19–20; *see also id.* at 54
(arguing that rebate practices were disclosed and, again, not arguing that such disclosure was not
required).  Symantec has therefore waived the argument that formed the basis for the Court's
prior ruling in its favor on this issue.

GSA could have possibly known that this language was intended to disclose Symantec's rebate policy—let alone the terms of that policy.

This leaves only Bradbury's testimony that she discussed rebate practices with Dixon in their October meeting and provided GSA with copies of reseller agreements.  Sym. Opp'n Ex. B4, Bradbury Tr. at 56–57, 250–51, ECF No. 137-8.  The October meeting remains a black box for the Court.  As discussed above, there is a dispute of fact regarding Bradbury and Dixon's discussions at the meeting about the buying programs outlined in the October 2006 Presentation. Dixon's email saying she was "confused" by the presentation suggests that buying programs were discussed at the meeting, *see* U.S. MSJ Ex. 78, 10/9/2006 email, ECF No. 131-28, but there is no reason to conclude that rebates could not have been discussed as well.  Given how little evidence and clear testimony the Court has regarding this meeting, the Court cannot rule out the possibility, nor can the Court discount Bradbury's testimony as not credible at summary judgment.  "[A]lthough a jury may ultimately decide to credit the version of events described by [the Government] over that offered by [Bradbury and Symantec], this is not a basis upon which a court may rest in granting a motion for summary judgment."  *Desmond v. Mukasey*, 530 F.3d 944, 965 (D.C. Cir. 2008) (quoting *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005)).

To conclude the review of the alleged CSPs disclosure violations: The Government is not entitled to summary judgment on Symantec's liability for breach of its CSPs disclosure obligations because it has not demonstrated, for any of the alleged breaches it identifies, that there is no genuine dispute of fact with regard to both the duty and breach elements.

### 2. Price Reduction Clause

The Government's next alleged breach focuses on the PRC—the Price Reduction Clause that GSA includes in every MAS contract in order to account for changes in an offeror's pricing during the life of the contract.  *See* GSAM at 552-39.  The Government argues that Symantec

triggered the PRC and failed to offer price reductions that it was required to offer as a result of this triggering.  *See* U.S. MSJ at 86.  Symantec argues that its obligations under the PRC are unclear and that even if the Government's interpretation of the PRC is correct, it was not breached.  *See* Sym. Opp'n at 20, 57.

The PRC requires first that GSA and the offeror identify customers whose pricing will serve essentially as a baseline for GSA's:

    (a) Before award of a contract, the Contracting Officer and the Offeror will agree upon (1) the customer (or category of customers) which will be the *basis of award*, and (2) the Government's price or *discount relationship* to the identified customer (or category of customers).  This relationship shall be maintained throughout the contract period.  Any change in the Contractor's commercial pricing or discount arrangement applicable to the identified customer (or category of customers) which disturbs this relationship shall constitute a price reduction.

    (b) During the contract period, the Contractor shall report to the Contracting Officer all price reductions to the customer (or category of customers) that was the basis of award.  The Contractor's report shall include an explanation of the conditions under which the reductions were made.

GSAM at 552-39 (emphasis added).  Symantec's final signed FPR stated that "the basis for negotiation and award for the offer is predicated on Symantec['s] commercial class of customers."  Sym. FPR at 1.

The PRC then identifies three events or "triggers" that would lead to a price reduction.  First, if the offeror "[r]evises the commercial catalog, pricelist, schedule or other document upon which [the] contract award was predicated to reduce prices."  GSAM at 552-39.  Second, if the offeror "[g]rants more favorable discounts or terms and conditions" to the baseline customer(s) than those "upon which [the] contract award was predicated."  *Id.*  Third, if the offeror "[g]rants special discounts to the customer[(s)] that formed the basis of [the] award, and the change disturbs the price/discount relationship of the Government to the customer[(s)] that was the basis of [the] award."  *Id.*  If any of these triggering events occur, the offeror must notify GSA within

fifteen calendar days and must make appropriate price reductions available to the Government. *Id.* at 552-39 to 40.  There are four exceptions: the PRC is not triggered if the sale in question (1) involved an order larger than the Government's maximum order limit; (2) was made to a federal agency; (3) was made to a state or local government under the MAS contract; or (4) can be shown to have been in error.  *Id.*

When the Government first moved for summary judgment on the issue of whether Symantec had violated the PRC, the Court denied the motion on the basis of contractual ambiguity and "a dispute of material fact as to whether the parties 'mutually intended and agreed' to the Government's preferred construction of the [PRC]."  *Symantec*, 130 F. Supp. 3d at 138 (quoting *Armour of Am.*, 96 Fed. Cl. at 737).  The Court found that "commercial class of customers" and "discount relationship" were ambiguous.  *Id.*  The Government is correct that this ruling was made only "based on the incomplete, pre-discovery record before [the Court]" at that time.  *Id.*; *see* U.S. MSJ at 83.  Accordingly, the Court is open to reevaluating the issue of ambiguity in the PRC at this stage.  Unfortunately for the Government, even on this more developed record, there is enough evidence of ambiguity and little enough evidence of mutual understanding for the Court to grant summary judgment on this issue.

The Government's argument for summary judgment begins with an attempt to define "commercial class of customer"—the category that the FPR identifies as the basis for the award. *See* Sym. FPR at 1.  "Customer" is indeed defined in the Contract, in language required by the GSAM:

> A "customer" is any entity, except for the Federal Government, which acquires supplies or services from the Offeror. The term customer includes, but is not limited to, original equipment manufacturers, value added resellers, state and local governments, distributors, educational institutions . . . dealers, national accounts, and end users.

GSAM at 515-8 (CSPs Form).  The FPR is less clear about what "commercial" means.  The Government attempts to derive an agreed-upon definition from agreement about the definition of "commercial item" elsewhere in the contract.  *See* U.S. MSJ at 63 (citing MSJ Ex. 1, Bradbury 30(b)(6) Tr. at 234–35, ECF No. 130-1).  The Court is reluctant to define a term based on a definition of a related term from elsewhere in the contract and finds instead that the definition of commercial is ambiguous.

Even if the Government were correct that "commercial class of customer" refers to "Symantec's non-governmental category of customers [including] distributors and resellers," U.S. MSJ at 63, the interaction of the class of customer defined in this way with the "discount relationship" provisions of the PRC introduces too much ambiguity for the Court to say there is no dispute of fact with regard to Symantec's obligations.  The parties' agreement is decidedly ambiguous with regard to what the "discount relationship" entails and how it ought to be maintained.  The Government asserts that "Symantec's offer, through the Discount Relationship Chart and the FPR,[14] precisely stated the Price-Discount Relationship" eliminating any ambiguity.  U.S. MSJ at 65.  It then points to testimony from Bradbury's Rule 30(b)(6) deposition in which she, on behalf of Symantec, acknowledged (a) that the Discount Relationship Chart was intended to show the GSA price list in the context of other price lists for commercial customers including end users and resellers; (b) that the FPR and the Discount Relationship Chart were meant to be understood together; and (c) that Dixon used the chart to

---

[14] The Discount Relationship Chart and the FPR were both part of the contract as identified by Bradbury at her deposition.  Symantec incorrectly argues that the Discount Relationship Chart was not part of the parties' agreement.  *See* Sym. Opp'n at 28–29.  But the Discount Relationship Chart was one of the items in the "stack" Bradbury identified.  U.S. Opp'n Ex. 1o, Bradbury 30(b)(6) Tr. at 176-80, ECF No. 141-1.  And the FPR is included in the RFP attached to the 2/2/2007 Contract email.  *See* 2/27/2007 Contract at 11–16.

justify the commercial-customer basis of the award.  *See id.* at 66 (citing U.S. MSJ Ex. 1, Bradbury 30(b)(6) Tr. at 271–72, 291).

While these documents provide some evidence in the Government's favor, the Court fails to see how they "precisely state[] the Price-Discount Relationship."  *Id.* at 65.  In ruling on the Government's first Motion for Partial Summary Judgment, the Court noted the contractual ambiguity surrounding what would constitute an alteration of the "discount relationship."  *See Symantec*, 130 F. Supp. 3d at 138–39.  The Court still cannot find an unambiguous or precise answer by reading the chart in conjunction with the FPR.  The Discount Relationship Chart is ambiguous on its face.  Symantec argues that the document was meant only as a summary and was not intended to be used in calculating prices and identifying PRC triggers.  Sym. Opp'n at 30–33.  Symantec has at least some evidence supporting its view.  *See id.*  For example, in the email transmitting the chart, Bradbury described it as "a summary of the Symantec discounting policies."  *See* Discount Relationship Chart at 2.  And another Symantec employee characterized it similarly in 2009.  *See* U.S. MSJ Ex. 92, ECF No. 131-42.  Further, the Discount Relationship Chart itself contains a significant amount of information that bears no relationship to the calculation of a discount relationship, like reseller terms and conditions, academic pricing, and warranty details.  *See* Discount Relationship Chart.

This is not to say that the Court thinks that Symantec has the better explanation of the Discount Relationship Chart and of the parties' mutual obligations under the PRC.  It is only to say that there is sufficient ambiguity—particularly on the face of the contractual documents themselves—that the Court cannot say there is no dispute of fact with regard to Symantec's duty under this clause.  The Government may have more evidence amassed on its side than Symantec does, but when the central documents are so inscrutable, it is difficult for the Court to rule out

alternative readings at summary judgment.  Because the Government is not entitled to summary judgment on the duty element of this breach allegation, the Court cannot evaluate the breach element, and summary judgment is therefore denied on that as well.

### 3. Modifications Clause

The Modifications Clause inserted in every MAS Schedule Contract requires offerors to update their CSPs when adding new products to a contract.  It states that "[w]hen requesting additions," the offeror must submit, among other things, "[d]iscount information for the new item(s) or new SIN(s)."  GSAM at 552-43.  "Specifically," the offeror must "submit the information requested in *paragraphs 3 through 5* of the [CSPs Form]."  *Id.*  "If this information is the same as the initial award, a statement to that effect may be submitted instead."  *Id.*

The Government's argument on this point incorporates its prior arguments for breach of contract.  It argues that by misrepresenting its CSPs in the first place, and by periodically certifying that its sales practices had not changed, Symantec repeatedly breached its obligation to provide its *actual* CSPs each time it was making a modification.  U.S. MSJ at 78–79, 92–93.

Symantec's argument that its obligations under the Modifications Clause are unclear is unconvincing.  It claims that its duties are unclear because GSA has not defined "commercial sales practices," despite the fact that this phrase is not used in the Modifications Clause.  Sym. Opp'n at 43–44.  The Modifications Clause references "Commercial Sales Practice Format," which is unmistakably defined elsewhere in the GSAM.  Symantec also argues that it does not know what would count as a "change" to a commercial practice, but this is immaterial because the Government's argument relies not on Symantec's failure to note changes, but on its repeated failure to disclose practices that it had concealed from the beginning.  The Government is entitled to summary judgment on the duty element of this allegation.

Although Symantec's obligations are sufficiently clear, it is unclear whether Symantec breached them because any alleged breach would depend on a violation of its alleged CSP disclosure obligations, each of which has been shown to be the subject of a genuine dispute of material fact.  Because there are genuine disputes of fact regarding whether Symantec committed a breach by failing to disclose elements of its CSPs, there is likewise a genuine dispute of fact on this related breach of the Modifications Clause.

### III. THE UNITED STATES' MOTION – REMAINING CLAIMS

All the substantive discussion of the Government's motion thus far has been focused on Symantec's liability for breach of contract as alleged in Count VII of the Omnibus Complaint. As explained, disputes of material fact preclude summary judgment on Symantec's liability on Count VII.  The Court now proceeds to consider the rest of the Government's motion, in which it seeks summary judgment for liability on payment by mistake and unjust enrichment, as well as on threshold elements (i.e. falsity and materiality) of its FCA and negligent misrepresentation claims.  *See* U.S. Mot. for Partial Summ. J. at 1, ECF No. 127.  In evaluating whether summary judgment on these claims might be appropriate, the Court frequently refers back to its above discussion of the factual disputes surrounding the breach of contract claims, as the factual basis for these claims overlap significantly.

### A. False Claims Under Symantec's Contract

Claims under § 3729(a)(1)(A) are known as "presentment" claims.  *See United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 117 (D.D.C. 2014).  The elements of presentment claims are that: "(1) the defendant submitted or caused to be submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false." *Id.* at 121–22 (citation and alteration omitted).  The government argues that there is no genuine issue

of material fact that Symantec's claims were false and that those falsities were material.  U.S. MSJ at 94.

"'False claims' under the FCA take a variety of forms."  *United States. v. Science Applications Intern. Corp.* ("*SAIC*"), 626 F.3d 1257, 1266 (D.C. Cir. 2010).  "In the paradigmatic case, a claim is false because it 'involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided."  *Id.* (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001); *see also Kellogg Brown & Root Servs.*, 800 F. Supp. 2d at 154 (describing the paradigmatic claim as one where a claimant "submits information that is untrue on its face").

In addition to the paradigmatic case, courts have developed two theories of legal falsity—the implied certification theory and the fraudulent inducement theory.  The Supreme Court has endorsed an implied certification theory wherein liability arises "*at least* where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."  *Universal Health Servs., Inc. v. United States ex rel Escobar*, 136 S. Ct. 1989, 2001 (2016) (emphasis added).  The Court expressly left open whether liability could arise from false claims that lacked the "specific representations" required for the first of these conditions.  *See id.* at 2000–01.  In this Circuit, that question has been answered, and a claim can fulfill the first condition if it "merely request[s] payment" without "includ[ing] 'express contractual language specifically linking compliance to eligibility for payment.'"  *United States ex rel. Scutellaro v. Capitol Supply, Inc.*, No. 10-cv-1094, 2017 WL 1422364 at *19 (D.D.C. April 19, 2017) (quoting *SAIC*, 626 F.3d at 1269); *see also id.* at *19

52

n.23 (explaining that *Escobar* did not change the *SAIC* standard in this Circuit).  The second

condition, the withholding of information about noncompliance, is still required.  *See SAIC*, 626

F.3d at 1269.  The alternative theory of legal falsity, fraudulent inducement, allows for liability

"for each claim submitted to the Government under a contract which was procured by fraud,

even in the absence of evidence that the claims were fraudulent in themselves."  *United States ex*

*rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005)

(applying theory to "claims" under an earlier version of the FCA).

There are, in turn, "two major variations of the fraudulent inducement theory."  *United*

*States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 105 (D.D.C. 2017).  One of these "requires

that a party make[] promises at the time of contracting that it intends to break" while the other

"requires that false statements induced the government to make the initial contract or caused it to

agree on particular contract terms or modifications."  *Id.* (quotations omitted).  Here, the

government has expressly stated that it is not relying on the promises-it-intends-to-break theory.

U.S. Opp'n at 3.  Thus, the two theories of liability pursued by the Plaintiffs are the implied

certification theory and the fraudulent inducement sub-theory that looks for false statements

inducing the government to agree to a contract or particular terms or modifications.

The Government argues that claims submitted by Symantec and by resellers operating

under Symantec's contract were literally false because of breaches of Symantec's CSP, PRC, and

Modifications Clause obligations.  U.S. MSJ at 95.  Because genuine issues of material fact

preclude summary judgment on these breaches, however, the court cannot grant summary

judgment on this theory of FCA liability.  The Government's implied certification theory is not

entitled to summary judgment for the same reason, as its argument is that Symantec falsely

implied that it was complying with CSP, PRC, and Modifications Clause obligations.  *Id.* at 96.

53

Likewise for the fraudulent inducement theory, which relies on the notion that Symantec's claims were false because "false CSPs and false periodic certifications" were the basis for the prices the Government paid. *Id.* at 99. The Government has yet to establish this.

The Government also necessarily fails to establish that there are no disputed facts concerning whether any alleged falsities by Symantec were material. *See id.* at 99–103. The materiality standard is "demanding" and "cannot be found where noncompliance is minor or insubstantial," although it is not "too fact intensive" to resolve at the summary judgment stage when appropriate. *Escobar*, 136 S. Ct. at 2003, 2004 n.6. Here, resolution at summary judgment is clearly not appropriate. Without knowing which, if any, of the many possible falsities the Government will establish at trial, the Court cannot possibly judge the effect these would have had on the Government's decision to contract with Symantec. The government is thus not entitled to summary judgment on this element.

### B. False Claims Under Resellers' Contracts

The Government also seeks summary judgment on the threshold (falsity and materiality) elements of its claims that Symantec is responsible for the Government overpaying on sales of Symantec products submitted by resellers under separate contracts. These claims, Counts III and IV of the Omnibus Complaint, arise under § 3729(a)(1)(A) and § 3729(a)(1)(B). The former, as discussed, creates liability for "any person who . . . knowingly presents, or *causes to be presented*, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A) (emphasis added). The latter covers "any person who . . . knowingly makes, uses, or *causes to be made or used*, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B) (emphasis added). The Court cannot order summary judgment on the falsity and materiality of any statements that Symantec *caused* these resellers to make for the same reason it

cannot order summary judgment on the more direct FCA claims—there are disputed facts surrounding whether Symantec's CSPs and periodic certifications were, in fact, false. *See* U.S. MSJ at 103–05. Because the facts on the falsity of the underlying disclosures are in dispute, there is no way for the Court to say the resellers claims necessarily contained falsehoods, or that any such falsehoods would be material. Summary judgment on these elements is therefore also denied.

## C. "Reverse" False Claims

The Government also alleges, in Count V of the Omnibus Complaint, violations of another FCA provision, 31 U.S.C. § 3729(a)(1)(G), which establishes a cause of action for "reverse" false claims by creating liability for any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); *see Symantec*, 130 F. Supp. 3d at 125. "Obligation" is defined broadly to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statue or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). The Omnibus Complaint alleges that Symantec violated this provision by failing to notify GSA about alleged CSPs inaccuracies or PRC violations even after audit reports in 2010 and 2011 put it on explicit notice of potential violations. *See* Omnibus Compl. ¶¶ 320–35 (Count V). Again, because the underlying CSPs inaccuracies and PRC violations have yet to be established, summary judgment must be denied on the falsity and materiality elements of this "reverse" FCA claim.

### D. Common Law Claims

In addition to the breach of contract claims which have been extensively discussed, *supra*, the Government has also filed common law claims for negligent misrepresentation (Count VI), unjust enrichment (Count VIII), and payment by mistake (Count IX).  *See* Omnibus Compl. ¶¶ 326–31, 338–43.  The Government requests summary judgment on the threshold elements of these claims.  U.S. MSJ at 106–09, ECF No. 128-1.  The Court denies the motion regarding these claims as well.

#### 1. Unjust Enrichment and Payment by Mistake

As a general rule, the existence of a valid contract precludes a plaintiff from asserting unjust enrichment and payment by mistake claims, which are based on quasi-contract theories. *See United States v. First Choice Armor & Equip.*, 808 F. Supp. 2d 68, 77–78 (D.D.C. 2011) ("Allegations in a complaint that an express contract existed between the parties . . . preclude a plaintiff from proceeding on alternative theories of FCA liability and unjust enrichment or payment by mistake.").  While a plaintiff may advance quasi-contract claims in the alternative, *see United States ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 78–79 (D.D.C. 2003), these alternative claims "must be supported by, at the very least, an allegation that there is no valid contract," *see Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d at 160.  Here, the Court has determined, *supra* section II.A, that there is no genuine issue of material fact regarding the existence of a contract between Symantec and GSA.  Having sought and been granted summary judgment on that issue, there is now no place for these quasi-contract claims.  *See SAIC*, 555 F. Supp. 2d at 59–60 ("[T]here can be no claim of unjust enrichment when an express contract exists between the parties." (quoting *Albrecht v. Comm. on Employee Benefits of the Fed. Reserve Employee Benefits Sys*, 357 F.3d 62, 69 (D.C. Cir. 2004))).  Insofar as these claims are focused on the Government's relationship with Symantec, then, summary judgment is

inappropriate not only because of the factual disputes underlying the claims, but more fundamentally because these quasi-contract claims cannot be pursued.  In its earlier opinion, the Court allowed these claims to survive as to Symantec because they could be plead in the alternative, *see Symantec*, 130 F. Supp. 3d at 130, but at this stage, with the contract unambiguously established, this is not necessary.  *See infra* section IV.B.1 (granting Symantec partial summary judgment on these counts).

The Government's unjust enrichment and payment by mistake claims also include allegations that Symantec is liable under these theories for sales of its products made under resellers' GSA contracts.  These quasi-contract allegations are not extinguished by the establishment of the contract between Symantec and GSA because these aspects of Counts VII and IX are not premised on claims submitted under that now-established contract.

"The elements of a claim for payment by mistake are that plaintiff made a payment under a mistaken apprehension of fact, that defendant derived a benefit as a result of this mistaken payment, and that equity demands restitution by defendant to plaintiff."  *United States ex rel. Ryan v. Lederman*, No. 04-cv-2483, 2014 WL 1910096 at *9 (E.D.N.Y. May 13, 2014) (quotation omitted); *see also United States v. Anderson*, 271 F. Supp. 3d 950, 959 (M.D. Tenn. 2017).  To establish unjust enrichment, "the government must show that it (1) conferred a benefit on [Symantec] that (2) [Symantec] retained and (3) under the circumstances [its] retention of the benefit is unjust."  *United States ex rel. Landis v. Tailwind Sports Corp.*, 324 F. Supp. 3d 67, 75 (D.D.C. 2018) (citation omitted); *see In re APA Assessment Fee Litig.*, 766 F.3d 39 (D.C. Cir. 2014) (D.C. law standard).  The Government asks the Court to hold that there is no genuine dispute as to whether the United States mistakenly believed Symantec's CSPs were accurate and that these mistaken beliefs were material to overpayments by GSA to the resellers.  *See* U.S.

MSJ at 108.  Once again, the genuine dispute over the falsity of the CSPs and over whether Symantec committed other breaches means that the Court cannot grant summary judgment as to any element of these claims.

### 2. Negligent Misrepresentation

Last, the Government seeks summary judgment on certain elements of its negligent misrepresentation claim.  U.S. MSJ at 108–09.  The parties disagree somewhat on the elements of negligent misrepresentation.  The Government argues that federal law applies.  *See* U.S. MSJ at 109 n. 61 (citing *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 308–11 (1947)).  It then points to a set of elements that the Southern District of New York identified as setting out the rule under both New York and federal common law, but which an underlying Second Circuit decision identified as merely representing New York's standard.  *See id.* at 109 (citing *Marcus v. Am. Tel. & Tel. Corp.*, 938 F. Supp. 1158, 1172 (S.D.N.Y. 1996) (citing *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 82 (2d Cir. 1980))).  Symantec cites cases applying the law of the District of Columbia in diversity suits.  *See* Sym. Opp'n at 90–93 (citing *C & E Servs., Inc. v. Ashland, Inc.*, 498 F. Supp. 2d 242, 256 (D.D.C. 2007) and *Parr v. Ebrahimian*, 70 F. Supp. 3d 123, 128–29 (D.D.C. 2014)).  The standards are similar, and the Circuit's case law on federal negligent misrepresentation claims is minimal.  The Court need not resolve the few tensions between them at this stage because the Government cannot win partial summary judgment on this claim regardless.

The Government says there is no genuine issue of material fact regarding (a) whether Symantec made misrepresentations, (b) whether Symantec had a duty, or (c) whether Symantec expected the United States would rely on its statements.  U.S. MSJ at 109.  On the first of these, the answer is obvious at this point—disputes of material fact concerning whether Symantec breached its contract make summary judgment impossible at this stage.  On the third, again, the

Court cannot determine whether Symantec would expect the United States to rely on its statements without knowing which, if any, statements were false.  Summary judgment is thus available on neither claim.

This leaves the duty element, which is a matter of some dispute.  The Government says the question is whether Symantec had a "duty to speak," U.S. MSJ at 109, while Symantec says the question is whether there was a "duty to exercise reasonable care," Sym. Opp'n at 92.  The case the Government cites for its set of elements is closer to Symantec's formulation than its own, as it requires that "the speaker [be] bound by some relation of duty or care" to the plaintiff. *Marcus*, 938 F. Supp. at 1172.  The difference is negligible here because whatever duties Symantec had arose from the Contract between the parties.  While the Court agrees that some duties under the contract have been established (duty to disclose CSPs generally, duties under the Modifications Clause), others are matters of dispute owing to ambiguity in the contract (duties under the PRC, some more specific CSP disclosure duties).  The Court's analysis of this element would mirror its analysis of the breach claims.  The Government is therefore only entitled to partial summary judgment on this one element of its negligent misrepresentation claim, to the same extent it was entitled to summary judgment on the duty element of its breach claim.

### IV. SYMANTEC CORPORATION'S MOTION

Symantec has filed its own motion, seeking summary judgment on all claims, including those claims filed by California, Florida, and Morsell under state law.

### A. False Claims Act Claims

#### 1. Fraudulent Inducement

Symantec begins its motion for summary judgment by arguing that "the undisputed material facts fail to support the allegation that Symantec fraudulently induced GSA to award a GSA schedule contract."  Sym. MSJ at 26.  It therefore seeks summary judgment on Count I and

related state law claims.  As discussed, *supra* section III.A, fraudulent inducement is one of three possible theories that can form the basis for a successful FCA claim under § 3729(a)(1)(A), along with the paradigmatic case of false claim submission and the implied certification theory. The fraudulent inducement theory requires that a claim be submitted under a contract procured by fraud, regardless of the details of the claim itself.  *See Odebrecht Contractors*, 393 F.3d at 1326.  The plaintiffs' argument under this theory is that the contract was procured by fraud because Symantec submitted false CSPs during negotiations.  *See* U.S. MSJ at 96–99; *see also DynCorp Int'l*, 523 F. Supp. 3d at 105 (explaining this sub-theory of fraudulent inducement).[15] In this first section of its motion, Symantec argues that the plaintiffs cannot show the contract was procured by fraud.

Symantec's first argument against the fraudulent inducement theory is that the plaintiffs cannot show that Symantec's CSPs were false.  *See* Sym. MSJ at 28–34.  As the Court has explained, the Government put forward evidence supporting each of the ways it alleges the CSPs were false and there are genuine disputes of material fact on this issue.  *See supra* Section II.B.1. To be entitled to summary judgment, Symantec would need to establish the lack of a genuine dispute of material fact regarding each and every way in which the plaintiffs have alleged the CSPs were false, misleading, or incomplete.  Symantec has come nowhere close to doing this.

Next, Symantec argues that, even if it did make false statements, the plaintiffs cannot establish that it did so knowingly.  The defendant's knowledge of the falsity of the claims is an element of an FCA presentment claim.  *See Computer Scis. Corp.*, 53 F. Supp. 3d at 121–22.

---

[15] At the outset, Symantec also argues that the plaintiffs cannot show Symantec made a promise it intended to break.  Sym. MSJ at 28.  As discussed, *supra* section III.A, this a distinct sub-theory on which a fraudulent inducement claim could be based and is one that the Government has expressly stated that it is not pursuing.  *See* U.S. Opp'n at 3 (citing U.S. MSJ at 96–99).

"An entity acts knowingly under the FCA by (1) having actual knowledge, (2) acting in deliberate ignorance, or (3) acting in reckless disregard." *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015) (quotation omitted).  In the context of common law fraud, the D.C. Circuit has suggested that it may be difficult for a court to resolve the knowledge requirement as a matter of law.  See *U.S. v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009) (citing *United States v. Avant*, 275 F.2d 650, 653 (D.C. Cir. 1960) ("Since knowledge is subjective it is always difficult, and sometimes impossible, to establish by direct evidence of the mental processes or state of mind of the accused.  Hence the law permits a jury to find knowledge of the falsity based on reasonable inferences from concrete facts in evidence.")).

As the moving party on this issue, Symantec bears the initial burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quotation omitted).  On this issue, Symantec refers the Court only to twelve paragraphs in its SMF.  Sym. MSJ at 35 (citing Sym. SMF ¶¶ 12–18, 23, 27, 42–44).  These paragraphs describe how many portions of the CSPs were assembled.

This falls well below what Symantec would need to do in order to rule out any dispute of material fact on whether it knowingly breached its CSPs disclosure obligations.  The Government disputes much of what Symantec claims in the paragraphs it cites.  *See* U.S. Resp. SMF ¶¶ 12–18, 23, 27, 42–44.  But the Court does not need to evaluate whether these disputes are genuine because even if the Court assumes the truth of everything Symantec has cited, genuine issues of fact remain.  The material Symantec cites does not explain how Bradbury, Percival, and others knew that what they were putting together was truthful, it only details how the material was assembled.  This would not eliminate disputes of material fact when weighed

against the Government's considerable evidence suggesting that the CSPs were not truthful.  Any evidence of untruthfulness is also evidence of knowledge of untruthfulness, because each of the inadequacies in the CSPs make it at least somewhat more likely that Symantec knew about at least some inadequacies in the CSPs.  *See* Fed. R. Evid. 401.

Further, some of the alleged falsities in the CSPs are barely addressed in what Symantec cites here.  A single example is enough to defeat the motion for summary judgment so, the Court will review just one.  Symantec is alleged to have concealed its rebate practices.  In the cited paragraphs, all Symantec says about these is that the Discount Relationship Chart "listed Opportunity Registration rebates offered to Symantec resellers and distributors."  Sym. SMF ¶ 43.  As discussed above, the Court seriously doubts that this oblique reference on a chart was sufficient to truthfully disclose rebating practices.  *See supra* section II.B.1.d.  Simply pointing out that the rebate program was mentioned at one point does not eliminate any dispute as to whether Symantec knew its rebate practice disclosures were inadequate across the board.

Symantec therefore fails to clear the high bar of showing a lack of genuine dispute of material fact on the question of its knowledge of the alleged flaws in its CSPs.  Scienter is "a fact-intensive inquiry" in an FCA suit, so it is hardly surprising that it cannot be resolved at summary judgment.  *See United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 120 (D.D.C. 2003).

Symantec's final argument regarding fraudulent inducement concerns materiality and states that the plaintiffs "cannot establish a causal link between Symantec's alleged false statements and the GSA Schedule contract formation."  Sym. MSJ at 35.  The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment

or receipt of money or property."  31 U.S.C. § 3729(b)(4); *see Escobar*, 136 S. Ct. at 2002.[16]

"[T]he Government's decision to expressly identify a provision as a condition of payment is

relevant, but not automatically dispositive."  *Escobar*, 136 S. Ct. at 2003.  "Likewise, proof of

materiality can include, but is not necessarily limited to, evidence that the defendant knows that

the Government consistently refuses to pay claims in the mine run of cases based on

noncompliance with the particular statutory, regulatory, or contractual requirement."  *Id.*

It goes almost without saying that Symantec's CSPs, which were exchanged over the

course of a year, in response to a GSA solicitation, and which were the subject of considerable

discussion, would tend to influence GSA's contracting decision.  The Court has already said that

CSPs are material to GSA's decisions, when it denied Symantec's motion to dismiss.  The Court

said:

> Because the GSA contracting officer must reach decisions by "compar[ing] the
> terms and conditions of the [offeror's response to the] MAS solicitation with the
> terms and conditions of agreements with the offeror's commercial customers,"
> [GSAR] § 538.270(c), the records or statements bearing on Symantec's pricing and
> discount practices have the potential to impact a GSA contracting officer's ability
> to "seek to obtain the offeror's best price," *id.* § 538.270(a) . . . .  Accordingly, each
> false record or statement has "a natural tendency to influence," or is "capable of
> influencing, the payment or receipt of money."  31 U.S.C. 3729(b)(4)[.]

*Symantec*, 130 F. Supp. 3d at 124–5.

The Court's decision on the motion to dismiss predated *Escobar*, but nothing the

Supreme Court said in that case changes the analysis here.  Symantec seems to argue otherwise

---

[16] Symantec misstates the law on the issue of materiality.  It first cites a pre-*Escobar* district court case in which a government witness categorically testified that certain data was not considered when contract modifications were made. Sym. MSJ at 35 (citing *United States ex rel. Westrick v. Second Chance Body Armor Inc.*, 128 F. Supp. 3d 1, 19 (D.D.C. 2015)).  It then inexplicably cites a Title VII retaliation case for a generalized tort law standard.  *Id.* (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525 (2013)).  The former is easily distinguished, and the latter is almost wholly irrelevant when weighed against a statutory definition and relatively recent Supreme Court opinion on the same topic.

and to suggest that the Government has asserted the kind of "*per se* materiality" forbidden by *Escobar*. *See* Sym. MSJ at 35–36.  *Escobar* does hold that "statutory, regulatory, and contractual requirements are not automatically material, even if they are labeled conditions of payment" and that "[t]he materiality standard is demanding."  *Escobar*, 136 S. Ct. at 2001, 2003. In this case, the Government has met that standard because its allegations against Symantec are more than "garden-variety breaches of contract or regulatory violations."  *Id.* at 2003.  *Escobar* says that a misrepresentation cannot be material "merely because the Government designates compliance . . . as a condition for payment" or because the Government "has the option to decline to pay if it knew."  *Id.*  CSP disclosure obligations are integrally connected to the Government's determinations of what it will pay on a MAS schedule contract.  They are not garden-variety regulations but establish the requirements for disclosures that will form the basis for a contract's entire pricing scheme.  The case laid out by the Government is more like what *Escobar* describes as having taken place in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), in which "[t]he government's money would never have been" paid out if it had known of the violation.  *Escobar*, 136 S. Ct. at 2003 (quoting *Marcus*, 317 U.S. at 543).  If, in the course of litigation, it turns out that the misrepresentations the Government can actually prove are only "minor or insubstantial," *id.*, Symantec can renew the argument that *Escobar* requires more for materiality.  As it stands now, though, the misrepresentations that remain the subject of genuine disputes are substantial enough to meet the materiality threshold.

Symantec argues that Dixon had discretion to evaluate the proposed contract and that she wrote in a Pre-Negotiation Memorandum that she had conducted market research to conclude that the prices offered by Symantec were fair and reasonable.  Sym. MSJ at 36–37 (citing Sym. SMF ¶¶ 50, 52 (citing Sym. MSJ Ex. A.47, Pre-Negotiation Memorandum at 11, ECF No. 126-

51)).  Nothing about the language of the Pre-Negotiation Memorandum suggests that this independent research was relied on to the exclusion of the CSPs, and in fact the CSPs are discussed in the preceding pages of the Memorandum.  *See* Pre-Negotiation Memorandum at 8–9.  Dixon would not have referenced them in this memorandum if they had not been "capable of influencing" the deal in some way.

### 2. False Statements Material to False Claims

Symantec next challenges whether the plaintiffs can establish that it made knowingly false statements material to false claims, and thus that it is entitled to summary judgment on Count II and corresponding state claims.  *See* Sym. MSJ at 37.  Symantec first argues that the plaintiffs cannot establish that Symantec's CSPs were false.  As Symantec explains, "The allegedly false statements that form the basis for Plaintiffs' claims in Counts II, XI, XIII and XVI are the same allegedly false statements that underlie Plaintiffs' claims under the fraudulent inducement theory, as set forth in Counts I, X, XII and XV."  *Id.*  Consequently, as has been explained, there are genuine issues of material fact that preclude summary judgment for either side on this issue.

Symantec then argues that the plaintiffs cannot establish that Symantec's CSPs were material to GSA's decision to form the contract and to pay on claims.  *See* Sym. MSJ at 38. *Escobar* and the FCA's definition are relevant again, and, for the reasons just explained, summary judgment is not appropriate.  Here Symantec makes a highly counterintuitive argument that CSP errors are generally not a concern to GSA and that there are other processes for addressing them that were not followed in this case.  *See* Sym. MSJ at 39–42; *id.* at 41 (citing *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 102 (D.D.C. 2017) (finding that disagreement over "a routine element of the contracting process" that can be addressed through "established procedure" are less likely to "warrant condemnation as 'false' under the [FCA]").

65

The Government, however, points to extensive evidence suggesting that it does, in fact, take CSP errors quite seriously. *See* U.S. Opp'n at 34–37. For example, GSA's Office of the Inspector General has reported to Congress on the success of its preaward audits of potential contract partners and their disclosures, which are reported to have saved "hundreds of millions of dollars annually." *Id.* at 36 (citing U.S. MSJ Ex. 211, GSA OIG Semiannual Reports (Excepts) at 10, 30, 41, 56, 73, 89, 107, 121, 135, 149, 162, 176, ECF No. 133-61. Likewise, the Department of Justice has brought FCA cases—like this one—yielding millions in damages. U.S. MSJ Ex. 212, Press Release: Oracle America to Pay United States $46 Million to resolve False Claims Act Allegations Against Sun Microsystems, ECF No. 133-62. And, of course, as the Government notes, the PRC and Price Adjustment Clause are additional regulatory mechanisms that the Government has put in place in order to bolster the intended role of CSPs as guarantees of low prices. U.S. Opp'n at 35 (citing GSAM at 552-39, 552-12).

The CSPs' relevance is obvious and undeniable. The very existence of the CSPs disclosure requirements and the GSAM's instructions to incorporate them into every MAS Schedule contract that GSA negotiates suggests that they will have at least some influence in shaping GSA's decisions. The Court remains convinced by the logic of its earlier decision that they are, in fact, material. Summary judgment on this issue is therefore denied.

### 3. Implied Certification

Symantec's next argument returns to the presentment claim in Count I, and focuses on the implied certification theory of liability. *See* Sym. MSJ at 44–46. Symantec argues that its invoices contained no "'specific representations' regarding the goods or services provided" that were false, Sym. MSJ at 46, but *Escobar* does not require this. *Escobar* allows that payment codes that are misleading in context can be actionable as "misleading half-truths." *Escobar*, 136 S. Ct. at 2000–01. As explained, *supra* section III.A, the implied certification theory under

66

*Escobar* allows for liability where a defendant's "failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S. Ct. at 2001. Further, in the D.C. Circuit there is no requirement for "express contractual language specifically linking compliance to eligibility for payment." *Capitol Supply, Inc.*, 2017 WL 1422364 at *19 & n.23 (quoting *SAIC*, 626 F.3d at 1296). CSP disclosure obligations, the PRC, and the Modifications Clause were all part of Symantec's contract with GSA, and it is entirely consistent with *Escobar*'s description of actionable "half-truths" for the plaintiffs to allege, as they have, that Symantec's invoices implied compliance with the contract and contained pricing that implied consistency with these provisions.

The Government then argues that the plaintiffs cannot show the breach, materiality, and scienter elements required under the implied certification theory. *See* Sym. MSJ at 46–56. Symantec briefly argues that plaintiffs cannot prove these three elements based on the allegedly false CSPs. *Id.* at 46–47. The Court has already addressed these arguments and found them lacking. There are genuine disputes of material fact regarding "(1) [whether] Symantec's CSP disclosures during negotiation of the GSA Schedule contract were false," *id.* at 46, *see supra* section II.B.1; "(2) [whether] Symantec knew its CSPs were false," Sym. MSJ at 46–47, *see supra* section IV.A.1 (finding that Symantec's explanation of how its CSPs were assembled fail to eliminate disputes of genuine fact on the knowledge element); and "(3) [whether] Symantec's [alleged] CSPs [violations] were material," Sym. MSJ at 47, *see supra* section IV.A.1 (finding that the alleged violations, if true, would meet *Escobar*'s materiality threshold).

Next Symantec makes analogous arguments with reference to allegations of PRC breaches. Summary judgment for Symantec would be premature on these as well, for essentially the same reasons it would be premature to award it to the Government on the same issues. The

Court has explained that the contractual language establishing the parties' duties under the PRC is ambiguous, and that each side has some evidence in its favor. *See supra* section II.B.2. The Court cannot say at this stage whether the PRC was breached. *See id.* PRC violations would necessarily have been material to payments, because regardless of the precise details of how the price-discount relationship would be calculated, the entire point of the PRC was to require price reductions when appropriate. If prices were not properly reduced when required under the PRC, this would obviously and necessarily be material to overpayments by the plaintiffs.

The knowledge element requires somewhat more explanation. Symantec argues that because the PRC is ambiguous, it escapes liability because the undisputed material facts show that it interpreted the ambiguous clause in a reasonable way and was never warned away from that interpretation. Sym. MSJ at 53–54 (citing *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 283–89 (D.C. Cir. 2015)). Symantec's interpretation that the "commercial class of customers" excludes resellers and distributors and that the "discount relationship" does not take into account non-standard discounts is a reasonable way to read the text of the contract. *See Symantec*, 130 F. Supp. at 138–39. Merely putting forward a reasonable alternative interpretation of the text, however, is not enough, as it only shows facial ambiguity. "While it is true that an innocent misinterpretation or a disputed interpretation of a contract cannot, *standing alone*, support a FCA claim, a deliberate or knowing misinterpretation, even if 'reasonable,' can give rise to FCA liability." *United States v. Newman*, No. 16-cv-1169, 2017 WL 3575848, at *8 (D.D.C. Aug. 17, 2017) (quoting *United States ex rel. Chilcott v. KBR, Inc.*, No. 09-cv-4018, 2013 WL 5781660, at *6 (C.D. Ill. Oct. 25, 2013)). "[A] claimant cannot avoid liability by manufacturing an after-the-fact reasonable interpretation of an ambiguous provision." *United State ex rel. Bahnsen v. Boston Sci. Neuormodulation Corp.*, No. 11-cv-1210, 2017 WL

6403864, at *9 (D.N.J. Dec. 15, 2017) (citing *United States ex rel. Phalp v. Lincare Holdings*, 857 F.3d 1148, 1155 (11th Cir. 2017) ("[A] court must determine whether the defendant actually knew or should have known that its conduct violated a regulation in light of any ambiguity at the time of the alleged violation.")).  To win summary judgment on this argument, then, Symantec would have to show that the lack of any dispute as to whether it held its favored interpretations at the time the contract was formed.

The Government's evidence concerning Symantec's December 2010 internal audit raises enough questions about this defense to preclude summary judgment for Symantec on the knowledge element.  The Audit concluded that "[t]he lack of guidelines for those approving non-standard discount requests could contribute to an approval system that is inconsistent and potentially detrimental to achieving financial goals. . . . [I]nformal communication processes between US sales teams . . . could create a situation whereby GSA discounts are no longer competitive or in compliance with contractual terms . . . ."  U.S. MSJ Ex. 100, 12/7/2010 email attaching audit ("2010 Discounts Audit") at 2, ECF No. 131-50.  The audit suggests that Symantec did not truly believe non-standard discounts were immaterial to the PRC.

The Government also notes that the timeline Symantec puts forward is questionable.  Symantec has pointed to only a single document, from 2010, that purportedly demonstrates that Symantec understood "commercial class of customers" the way it says it did while negotiating with GSA in 2006 and 2007.  U.S. Opp'n at 57; Sym. MSJ at 49 (referencing Sym. MSJ Ex. 60, Bradbury 3/30/2010 email, ECF No. 126-64).  Still more inconsistently, Bradbury testified that, when meeting with Dixon in October, the two agreed on who was in the "commercial class of customer," U.S. Opp'n Ex. 1, Bradbury 30(b)(6) Tr. at 269–70, ECF No. 136-1, but this phrase

was not used in writing until January 2007, *see* U.S. MSJ at 56–57 (citing U.S. MSJ Ex. 136,

1/25/2007 Bradbury email at 3, ECF No. 132-36 (attaching revised draft of FPR)).

These inconsistencies, which represent only some of the Government's evidence on this

point, are sufficient to demonstrate that there are genuine disputes of material fact regarding

whether Symantec truly interpreted "commercial class of customers" to exclude resellers and

distributors.  Summary judgment for Symantec on this element is therefore denied.

### 4. False Statements Material to False Claims

Symantec next asserts that the plaintiffs cannot prove that it knowingly made false

statements material to false claims under § 3729(a)(1)(B) when it periodically certified that its

CSPs had not changed (Count II).  Sym. MSJ at 56–59; *see also* Periodic Certifications, ECF No.

133-23.  All but one of the periodic certifications sent by Symantec to GSA asserted that

discounting policies and procedures disclosed by Symantec in 2007 had not changed.  *See*

Periodic Certifications.  Whether that statement is false will necessarily depend on the accuracy

of the 2007 CSPs disclosures.  Because the truthfulness of those disclosures is the subject of

genuine disputes of material fact, so too is the truthfulness of the disclosures reaffirming their

accuracy.  The knowledge element is similarly still open.  Symantec suggests that the periodic

certifications could only be untruthful if they concealed changes to CSPs, but if Symantec's

CSPs were knowingly false in the first place, the periodic certifications could be untruthful as

reaffirmations of this initial knowing falsehood.  And summary judgment for Symantec on

materiality is again inappropriate for the simple reason that even considering the "demanding"

materiality standard set in *Escobar*, 136 S. Ct. at 2003, the Plaintiffs have demonstrated genuine

disputes of fact regarding the truthfulness of a wide swath of the documentation upon which

GSA's pricing was based.  There is therefore a genuine dispute of fact as to whether these

misrepresentations, if proven, "ha[d] a natural tendency to influence, or be capable of

influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4) (defining

"material").  Symantec is therefore denied summary judgment on Count II.

5. Causation of Resellers' False Claims and False Statements

Symantec next challenges Counts III and IV and argues that the undisputed material facts

fail to support allegations that Symantec knowingly caused the resellers and distributors to

present false claims (Count III), Sym. MSJ at 59–62, and to make false statements material to

those false claims (Count IV), *id.* at 62–63.  Symantec first argues briefly that the Government

lacks evidence supporting the notion that Symantec's CSPs were knowingly false in the first

place.  *Id.* at 60 (Count III), 62 (Count IV).  As the Court has noted, the accuracy of Symantec's

CSPs and Symantec's knowledge of any inaccuracies are both the subject of genuine disputes of

material fact.

Symantec next addresses the causation element, and again fails to establish the absence of

a genuine dispute of material fact.  "For a plaintiff to allege a cause of action under

§ 3729(a)(1)'s 'causes to be presented' prong, it must allege that the defendant's conduct was 'at

least a substantial factor in causing, if not the but-for cause of, submission of false claims.'"

*Symantec*, 130 F. Supp. 3d at 122 (quoting *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 48

(D.D.C. 2011)).  It is undisputed that Symantec authorized the use of its CSPs in negotiating

schedule contracts with resellers in 2009 and 2010.  U.S. Resp. SMF ¶ 131.

Symantec says that "[t]he Government has not produced any evidence that Symantec's

2006 CSPs had any influence whatsoever in the negotiation of prices for Symantec products on

any reseller GSA Schedule contracts."  Sym. MSJ at 61.  This is not the case, as the Government

cites—among other things—(1) email threads in which Bradbury tells resellers or GSA itself that

GSA ought to look to the CSPs Symantec already submitted to determine pricing for Symantec

products on other contracts, U.S. MSJ Exs. 200, 201, ECF Nos.  133-50, -51; (2) Bradbury's

71

30(b)(6) testimony that "we did authorize GSA to use the CSP that we submitted to support our own contract to evaluate the offers by these companies," Errata Ex. 1a, Bradbury 30(b)(6) Tr. at 320, ECF No. 136-1; and (3) another Symantec employee's testimony agreeing that he "understood that there was a direct correlation between the pricing submissions that Symantec made to GSA and what the reseller pricing would be in their direct sales through their own GSA contracts," Errata Ex. 38a, Muscarella Tr. at 114, ECF No. 136-4.  The email threads are most damaging to Symantec's case here, because they show Symantec was aware that GSA would not move forward on approving a  reseller's contract without receiving an additional copy of Symantec's CSPs.  *See* U.S. MSJ Exs. 200 at 4 (showing a reseller emailing Symantec to say "GSA is ready to approve [the reselleer's] Symantec GSA Schedule; however they can **not** proceed without Symantec forwarding your CSPs . . . ." (emphasis in original)).  It is too soon to say whether this makes Symantec's conduct a "substantial" factor in causing the submission of allegedly false claims, but it is clear enough that there is evidence from which a reasonable jury could find as much.  For the same reason it is at least an open question whether Symantec's CSPs were material to the resellers' allegedly false claims as outlined in Count IV.  Summary judgment is therefore denied to Symantec on both Counts III and IV.

### 6. "Reverse" False Claims

Symantec also seeks summary judgment in its favor on the Government's "reverse" FCA claim (Count V).  Sym. MSJ at 63–67.  This claim alleges that Symantec "knowingly conceal[ed] or knowingly and improperly avoid[ed] or decreas[ed] an obligation to pay or transmit money or property to the Government," 31 U.S.C. § 3729(a)(1)(G), by failing to notify GSA about alleged CSPs inaccuracies or PRC violations even after audit reports in 2010 and 2011 put Symantec on notice of the violations.  *See* Omnibus Compl. ¶¶ 320–35.

Symantec's first argument on Count V is that the Government cannot demonstrate an existing obligation.  Sym. MSJ at 64–65.  An "obligation" is defined broadly as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3); *see also Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014) (rejecting a narrower interpretation of "obligation").  Courts have rejected "reverse" FCA claims wherein the "obligation [arises] out of Defendant's concealment of their allegedly fraudulent activity"—where the "reverse" claim would merely duplicate the presentment claim.  *Si*, 71 F. Supp. 3d at 97; *see also Symantec*, 130 F. Supp. 3d at 125–26.  Symantec argues that its alleged violation falls in this category, but the Court already essentially rejected this theory, and remains convinced of its prior analysis.  *See Symantec*, 130 F. Supp. 3d at 125–26.  Count V focuses on Symantec's concealment of its knowledge of PRC violations and its failure to adjust its pricing as required by the PRC.  *See* Omnibus Compl. ¶ 321–23 (alleging that Symantec concealed its awareness of false claims, as demonstrated in 2010 and 2011 audit reports).  This is not the same as a duplicative argument that, for example, that Symantec concealed its real CSPs.  The 2010 Discounts Audit and a 2011 follow-up audit themselves provide sufficient evidence to preclude summary judgment on the Government's theory on this Count.  2010 Discounts Audit; U.S. MSJ Ex. 185, 6/28/2011 email attaching Discounts Follow-Up Audit ("2011 Follow-Up Audit"), ECF No. 133-35.

Symantec's second argument on Count V is that the Government cannot establish knowing concealment.  Sym. MSJ at 65–67.  Again, the Court needs only to look to the text of the 2010 Discounts Audit to determine that evidence establishing a genuine dispute of fact exists on this point.  *See, e.g.*, 2010 Discounts Audit at 2.  (noting that the "lack of guidelines . . . could

contributes to an approval system that is inconsistent and potentially detrimental" and that "informal communication processes . . . could create a situation whereby GSA discounts are no longer competitive or in compliance with contractual terms . . . ."). Summary judgment on Count V is therefore denied as well.

### 7. Proximate Cause

Symantec's final argument for summary judgment on the federal FCA claims—and one which it also argues on the state false claims counts—is that the plaintiffs cannot prove that Symantec's CSPs were the proximate cause of the injuries suffered by the governments. Sym. MSJ at 67–73. Causation under the FCA requires proximate cause, not merely "but for" cause. *See United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 200 (D.C. Cir. 1995); *see also Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017) ("It is a well established principle of [the common] law that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause. We assume Congress is familiar with the common-law rule and does not mean to displace it *sub silentio* in federal causes of action." (citation and quotations omitted)). What exactly proximate cause requires depends on the cause of action, but, in general, it requires that an injury be foreseeable, and that there be some degree of direct relation between the alleged misconduct and the injury. *See Bank of Am. Corp.*, 137 S. Ct. at 1305–06.

Symantec has failed to demonstrate the absence of a genuine dispute of material fact regarding proximate causation. It claims that "Plaintiffs have unearthed no evidence that different figures in, for example, the . . . discount frequency chart in the CSPs, could have caused any change in the prices negotiated by the parties." Sym. MSJ at 70. This is not remotely true, as the entire regulatory framework for GSA contract negotiations suggests that the figures provided in an offeror's CSPs will impact the prices that are ultimately negotiated. GSA

negotiators are required to "seek to obtain the offeror's best price (the best price given to the most favored customer)."  GSAM at 538-1.  They need not always achieve the best price but must "determine that the offered prices are fair and reasonable" before contracting.  *Id.*  It is intuitive that higher reported prices in CSPs will foreseeably lead to the Government paying higher prices, and the chain of causation from misleading CSPs to higher prices is not at all extended.  *See Bank of Am. Corp.*, 137 S. Ct. at 1306.  The plaintiffs will have to prove in more detail the connection between specific falsehoods and specific damage figures, but the regulatory framework alone is enough ground for the Court to conclude that, assuming the falsehoods are proven, the Government would have enough evidence from which a reasonable jury could find causation.  Summary judgment on this issue is therefore denied to Symantec as well.

### B. Common Law Claims

Symantec also moves for summary judgment on all four of the United States' common law claims, Counts VI, VII, VIII, and IX.

#### 1. Unjust Enrichment and Payment by Mistake

Symantec is entitled to partial summary judgment on the Government's claims for unjust enrichment (Count VIII) and payment by mistake (Count IX).  As the Court explained, *supra* section III.D.1, these are quasi-contract theories of liability.  Insofar as these claims seek to recover for unjust enrichment and payment by mistake based on transactions between the United States and Symantec that are covered by the contract between those two parties, Symantec is entitled to summary judgment.  The Court granted summary judgment to the United States on the issue of contract formation so, because a contract exists between the Government and Symantec, the Government is precluded from also proceeding on quasi-contract theories for the same damages.

As also explained previously, the United States may still recover under unjust enrichment and payment by mistake with regard to the resellers' contracts. Symantec has also moved for summary judgment on this aspect of the claim, though it did not draw the distinction until its reply brief. *See* Sym. MSJ at 95–99; Sym. Reply at 34–35. Symantec argues that "the Government has failed to demonstrate either GSA's reliance on, or the materiality of, Symantec's alleged CSP misrepresentations" with regard to the resellers' contracts. Sym. Reply at 34. As explained, *supra* section IV.A.5, the Government has identified evidence from which a reasonable jury could find reliance and materiality. For the same reasons that Symantec is not entitled to summary judgment on Counts III and IV, it is also not entitled to summary judgment on what remains of these quasi-contract actions.

### 2. Negligent Misrepresentation

Symantec has moved for summary judgment on the Government's negligent misrepresentation claim.[17] The Court has already granted the Government partial summary judgment on the duty element of negligent misrepresentation, denied it on issues of falsity and reliance. *See supra* section III.D.2. For the same reasons regarding disputes of material fact, Symantec cannot win summary judgment on falsity, duty, or reliance. On falsity, summary judgment is impossible because of the extent of factual disputes concerning whether Symantec breached its contract, particularly with regard to its CSPs disclosures, and because the Government has presented significant evidence in its favor. On duty, the Government is entitled to summary judgment to the same extent it was entitled to summary judgment on the duty element of its breach claim, on those duties that have been established (duty to disclose CSPs

---

[17] As discussed, *supra* section III.D.2, Symantec mistakenly presents a list of elements for negligent misrepresentation under District of Columbia law when, in fact, federal law governs this case.

generally, duties under the Modifications Clause).  The remaining alleged duties are matters of genuine dispute owing to ambiguities in the contract (duties under the PRC, some more specific CSP disclosure duties).  *See supra* section III.D.2.  On reliance, the Government's evidence that it based Schedule prices on CSPs—discussed most extensively in the context of the materiality element of the FCA claims, *see* section IV.A.1—is also at least some evidence of reliance, and serves to create a genuine dispute of fact on this issue.  Further, as was the case for the Government's motion, it is difficult to resolve reliance one way or the other when the misrepresentations that the Government claims it relied on are still unproven.

Symantec also argues that it is entitled to summary judgment on the issue of proximate causation but the same disputes of material fact relating to causation that preclude summary judgment on the Federal FCA claims also preclude it on this common law claim.  *See supra* section IV.A.7.  The Court therefore denies Symantec summary judgment on Count VI.

### 3. Breach of Contract

Symantec also moves for summary judgment on the breach of contract claim that the Court addressed in detail at the outset of this motion.  The Court has already ruled (1) that a valid contract exists between the parties; (2) that Symantec's CSPs disclosure obligations and Modifications Clause obligations—but not its PRC obligations—have been established as a matter of law; and (3) that genuine questions of material fact precluded summary judgment on whether Symantec breached any of these three obligations.  *Supra* part II.  The Government did not move for summary judgment on the remaining element of breach—causation—but that, too, has been addressed in the context of the federal FCA claims, *supra* section IV.A.7.  Symantec's causation / damages argument relating to the Government's claim for breach is the same, and in fact refers back to earlier argumentation in its briefing which the Court has already found

unconvincing.  For all these reasons previously explained, summary judgment on the breach of contract claim is denied.

### C. State Law Claims

Symantec has additionally moved for summary judgment on all claims brought by California, Florida, and Relator Lori Morsell on behalf of New York State (collectively "the States").  The States filed a separate brief in opposition to Symantec's Motion, which incorporates by reference the United States' Opposition.  States' Opp'n to Sym. Corp.'s Mot. for Summ. J. ("States' Opp'n") at 1, ECF No. 140-1.  Some of the grounds on which Symantec moved for summary judgment on the federal FCA claims also applied to certain of the state claims.  Because all of these were denied, the Court will not address them again here, but will focus only on the "separate and independent bases" for summary judgment that Symantec argues in Part IX of its opening brief.  Sym. MSJ at 73–88.  The Court addresses each state's claims in turn.

### 1. California Claims

California state and local agencies make purchases under certain statutory restrictions designed to ensure fair and open competition.  *See* Cal. Pub. Cont. Code § 10340; Resp. of States to Sym. SMF ("States' Resp. SMF") ¶ 152, ECF No. 140-2.  The California Department of General Services ("DGS") is authorized to administer state-wide procurement statutes and policies.  States' Resp. SMF ¶ 152.  Two statewide buying programs are the California Multiple Award Schedule ("CMAS") program and the Software License Program ("SLP").  *See* Calif. Pub. Cont. Code § 10290.1 *et seq.* (CMAS); *id.* §§ 10298, 12101.5 (SLP).  Symantec and DGS negotiated four SLP Letters of Offer, dated July 2006, August 2006, December 2009, and June 2010.  States Resp. SMF ¶ 159; *see* Sym. MSJ Exs. 115–18, ECF Nos. 126-119 to -122 (Letters of Offer).

California's claims are brought under the CFCA, which creates liability for "[a]ny person who . . . (1) [k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval . . . [or] (2) [k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." Cal Gov't Code § 12651(a)(1), (2). Because the CFCA was patterned after the federal FCA, federal decisions are "persuasive authority" in adjudicating CFCA claims. *See United States v. Shasta Servs., Inc.*, 440 F. Supp. 2d 1108, 1111 (E.D. Cal. 2006).

In Count X of the Complaint, California alleges that Symantec "caused . . . independent resellers to use the knowingly false information Symantec provided to GSA during the negotiation of [its] Federal Contract as the basis for prices of Symantec goods and services provided under CMAS and SLP contracts," that these resellers made claims to California, and that the claims overcharged the State and were materially false. Omnibus Compl. ¶ 346–48. Symantec argues that it is entitled to summary judgment on Count X because California lacks evidence of a relationship between the alleged false claims and Symantec's GSA schedule contract. Sym. MSJ at 75–77. To establish this, Symantec first argues that the undisputed material facts show that there is no relationship between the SLP Letters of Offer and Symantec's GSA Schedule contract. *Id.* at 75. In support, Symantec points to portions of its SMF citing (a) the DGS website; (b) deposition testimony from SLP Manager Steve Lower, Sym. MSJ Ex. 114, Lower Tr. at 13–15, ECF No. 126-118; (c) its own responses to certain of California's Requests for Admission; and (d) the four Letters of Offer, which it suggests comparing with the signed FPR. *See* Sym. MSJ at 75 (citing Sym. SMF ¶¶ 157–60).

Even the evidence Symantec cites is not universally helpful to its case. As California notes, in the earliest Letter of Offer the four base discounts listed for which corresponding

discount figures exist in the FPR, the discounts are identical.  *Compare* Sym. MSJ Ex. 115 at Ex. B, ECF No. 126-119, *with* Sym. FPR at 2–3.  Likewise, Lower's testimony states explicitly that there is a relationship between SLP pricing and GSA schedule pricing, as he explained that GSA prices are a "ceiling" for SLP prices.  Lower Tr. at 14 ("What I ask them for is their GSA pricing, and then we negotiate below that . . . .  [T]his is a more aggressive program, so we expect them to come in more aggressive.").  California cites additional evidence to establish a relationship, but even considering only the evidence put forward by Symantec, there is an obvious relationship between Symantec's schedule pricing and California's SLP pricing.

Symantec also argues that "California's own records establish that many [CMAS] contracts were not based—directly or indirectly—on Symantec's GSA Schedule contract," and that certain of the CMAS contracts identified in the complaint predated Symantec's GSA Schedule contract.  Sym. MSJ at 76.  Again, a Symantec employee has testified otherwise, explaining that pricing could be based on Symantec CSPs that GSA already had in 2006, before the Symantec MAS contract was finalized.  States' Opp'n Ex. 15, Barton Tr. at 199–201, ECF No. 140-18.

Symantec's final argument on Count X is that California has failed to produce certain CMAS and SLP contracts.  Sym. MSJ at 77.  Symantec does not suggest that all relevant contracts are missing so, even if some are, this alone would be no reason to grant summary judgment on the claim.  Missing contracts could make proof of damages under those contracts more challenging, if not impossible—though California suggests it can make the requisite proof, States' Opp'n at 10.  This would affect the measure of damages, but, because even Symantec acknowledges the existence of at least some contracts that could be used to establish liability, missing contracts are no reason to award summary judgment on this Count.

Symantec also seeks summary judgment on Count XI, in which California alleges that, having "authorized . . . independent resellers to offer Symantec goods and services through their own CMAS and[/]or SLP contracts based on Symantec's GSA MAS," Symantec "caused these independent resellers to use the knowingly false information Symantec provided GSA . . . as the basis for prices for Symantec goods and services" under California Contracts, thus causing them to make false statements material to false claims.  Omnibus Compl. ¶¶ 356–58.  Symantec argues that "[t]here is no evidence . . . that Symantec *ever* authorized any resellers to use Symantec's CSPs as the basis for providing Symantec goods and services under the reseller's own CMAS and SLP contracts with DGS."  Sym. MSJ at 78.

Symantec's argument seems to misunderstand or misrepresent California's claim.  The claim is not that Symantec authorized the use of CSPs, but that it authorized the use of Symantec's GSA MAS, which, according to the plaintiffs, was fraudulently obtained because of the inadequate CSPs.  Omnibus Compl. ¶ 356.  California agrees that "DGS does not review a manufacturer's CSPs" but instead "relies on GSA prices that were negotiated by GSA based on the manufacturer's CSPs, and that GSA has determined are fair and reasonable."  States' Resp. SMF ¶ 161.  The relevant CFCA provision creates liability for a corporation that "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."  Cal Gov't Code § 12651(a)(2).  Even though the CSPs submitted to GSA were not directly used in the negotiation of the CMAS contract, those CSPs would still be material to CMAS contracts because CSPs influence GSA pricing which, in turn, serves as ceiling for CMAS pricing.  Summary judgment is therefore denied to Symantec on Count XI as well.

## 2. Florida Claims

The relevant government purchasing programs in Florida are governed by an April 2006

Purchasing Memorandum issued by the Florida Department of Managerial Services ("the Florida

Memorandum"). *See* States' Resp. SMF ¶ 181 (citing U.S. MSJ Ex. 139, State Purchasing

Memorandum No. 02 (2005–06), ECF No. 126-143). The Florida Memorandum authorizes

Florida agencies to purchase from GSA contracts like Symantec's for purchases under $10

million. *Id.* ¶¶ 181–82. Agencies must seek multiple quotes for purchases above certain values

and are encouraged to negotiate for better pricing when possible. *Id.* ¶¶ 182–83.

The Florida False Claims Act ("FFCA") is similar to the FCA and to California's. It

creates liability for "[a]ny person who: (a) [k]nowingly presents or causes to be presented a false

or fraudulent claim for payment or approval; [or] (b) [k]nowingly makes, uses, or causes to be

made or used a false record or statement material to a false or fraudulent claim." Fla. Stat.

§ 68.082(2). "Material" is defined as "having a natural tendency to influence, or be capable of

influencing, the payment or receipt of money or property." *Id.* § 68.082(1)(d). Standards of

liability under the FFCA mirror those under the federal FCA. *See United States ex rel. Schubert

v. All Children's Health Sys., Inc.*, No. 11-cv-1687, 2013 WL 6054803 at *7 n.8 (M.D. Fla. Nov.

15, 2013).

The first of Florida's claims—Count XII of the Omnibus Complaint—is that "Symantec

allowed Florida state government entities to purchase products directly from Symantec on

Symantec's Federal Contract" and that as a result of "the knowingly false information Symantec

provided to GSA . . . Symantec made claims to Florida" which "overcharged Florida and

were . . . materially false" in violation of the Florida False Claims Act. Omnibus Compl.

¶¶ 363–66. Florida's second claim—Count XIII—alleges that Symantec "made, used, or caused

to be made or used false records or statements" material to false claims in violation of Fla. Stat.

§ 68.082(2)(b).  Omnibus Compl. ¶ 373.  Specifically, Florida alleges that "the knowingly false information [Symantec] provided to GSA during the negotiation of the Federal Contract" was material to false claims submitted to Florida.  *Id.* ¶¶ 373–74.  Symantec seeks summary judgment on these claims by arguing that Florida has no evidence on four issues: (1) whether "any Florida agency ever relied on Symantec's GSA Schedule contract pricing" or that of a reseller; (2) whether "any representation made by Symantec to GSA was material to any Florida agency decision to purchase"; (3) whether "any representation made by Symantec to GSA was relied upon by any Florida agency"; and (4) whether "Symantec knew any Florida agency was relying on any disclosure Symantec made to GSA."  Sym. MSJ at 79.

In response, Florida has demonstrated a genuine dispute of material fact on each of these points.  For evidence on the first and fourth, Florida directs the Court to Symantec's own documents, which reflect that, from 2007 to 2012, Symantec documents indicated that Florida "[u]ses GSA Cooperative Purchasing."  States' Resp. SMF ¶ 196 (citing, *e.g.*, States' Opp'n Exs. 50, 51, 55, 67, 68, 69, ECF Nos. 140-52, -53, -56, -68, -69, -70).  A Symantec PowerPoint from 2009 detailing contracts held by Carahsoft (a reseller) also indicates that Florida "[u]ses GSA cooperative purchasing" for "[a]ll products on GSA."  States' Opp'n Ex. 66, Carahsoft SLED Contracts PowerPoint at 2, ECF No, 140-67.  This is at least some evidence that Symantec knew that Florida agencies were purchasing off of Symantec's GSA schedule.  Symantec's second and third points are really arguments about materiality, not about whether the evidence exists.  "Material" is defined broadly in the FFCA—as in the other statutes the Court has considered— and it is obvious that the representations Symantec made to GSA in 2006 and 2007 in negotiating that contract would "influence or be capable of influencing" Florida's later transactions under that same contract.  Fla. Stat. 68.082(1)(d).   Symantec also argues that Florida cannot prove

causation, Sym. MSJ at 80, but the suggested connection between Symantec's alleged misrepresentations, the GSA contract, and Florida's purchases are enough to survive summary judgment on this issue.

More broadly, Symantec claims that "Florida has *failed to produce even a single document* in this case!"  Sym. MSJ at 79 (emphasis and exclamation in original).  By way of explanation, Florida has produced a 2016 email exchange between counsel for Symantec and the Florida Office of the Attorney General in which a lawyer in the Attorney General's office explains the challenges posed by Symantec's proposed discovery and suggests a compromise proposal designed to save costs and to determine whether the cost of producing documentation for all Florida purchases would be reasonable in proportion to those documents' relevance. States' Opp'n Ex. 57, ECF No. 140-58.  Florida represents that "Counsel for Symantec never responded to this email and never subsequently requested that Florida produce the proposed documents."  States' Opp'n at 27.  Symantec does not dispute these representations in its reply brief, and the Court sees no indication in the record that Symantec ever raised this discovery dispute with the Court.  A report by a statistical expert on behalf of Florida suggests that Florida's damages can be calculated based only on sales data produced by Symantec.  *See* States' Opp'n Ex. 58, Expert Report of Dr. Jamie M. Baldwin at 2–3, ECF No. 140-59; *see also id.* at app'x B (listing data sources).  Florida may have a harder time than GSA or the other states to prove damages because it has apparently not produced any of its own documentation, but—more importantly for the instant motion—Symantec has not explained what element of its claims Florida will be unable to prove because it did not produce any documents.  Accordingly, Symantec has failed to carry its burden in seeking summary judgment on Florida's claims. Summary judgment on those claims is accordingly denied.

3. Relator's Claims on behalf of New York

Symantec also seeks summary judgment on the claims that Relator Morsell is bringing on behalf of New York State. *See* N.Y.C.R.R. § 400.4(c). The New York False Claims Act ("NYFCA"), N.Y. St. Fin. Law § 189(1)(a) is, again, similar to the other False Claims Acts in this case. It creates liability for "any person who (a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; [or] (b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 189(1). Like the other state statutes, "The NYFCA follows the federal [FCA] and therefore it is appropriate to look toward federal law when interpreting the New York act.'' *State of New York ex rel. Seiden v. Utica First Ins. Co.*, 96 A.D.3d 67, 71 (N.Y. App. Div.2012).

In New York, the New York State Office of General Services "creates centralized contracts for commodities or services, pursuant to which an agency may issue a purchase order directly to the contractor without prior approval of the State and under which State agencies are encouraged to negotiate more favorable pricing." States. Resp. SMF ¶ 203. Veritas entered into such a contract with New York in 2000 (the "NY Contract") for the sale of software licenses and related services. *Id.* ¶ 202; States' Opp'n Ex. 27, NY Contract, ECF No. 140-29. With New York's consent, the contract was assigned to Symantec in November 2006. *Id.*

The first of Morsell's counts—Count XIV of the Omnibus Complaint—is focused on the NY Contract, and alleges that Symantec submitted false claims under that contract and caused resellers to do the same. *See* Omnibus Compl. ¶¶ 380–90. In response to Count XIV, Symantec argues that "[t]he undisputed factual record is clear" that Symantec "did not submit or cause to be submitted a single false claim to New York[;]" that Symantec lacked the requisite scienter; and that the allegedly false claims and statements were not material to New York's decisions. Sym. MSJ at 82. The Court address each argument in turn.

Morsell intends to prove that false claims were submitted by proving that Symantec violated the NY Contract's "Best Pricing Offer" clause ("BPOC"). *See* States' Opp'n at 15. The BPOC says that "Price Decreases shall take effect automatically during the Contract term and apply to Purchase Orders submitted on or after" certain events. NY Contract App'x B-2 at 8, SYM778751. One such event is described as follows:

> Where Contractor generally offers more advantageous special price promotions or special discount pricing to other customers during the Contract term for a similar quantity, and the maximum price or discount associated with such offer or promotion is better than the discount or net price otherwise available under this Contract, such better price or discount shall apply for similar quantity transactions for the life of such general offer or promotion.

*Id.* The parties agree that "to establish a violation of [the BPOC], Relator must demonstrate that Symantec (1) 'generally offer[ed] more advantageous special price promotions or special discount pricing to other customers [(2)] during the Contract term for a similar quantity, and [(3)] the maximum price or discount associated with such offer or promotion is better than the discount or net price otherwise available under th[e] Contract' and (4) then apply that 'such better price or discount' to a 'similar quantity transactions for the life of such general offer or promotion.'" States' Opp'n at 16 (quoting Sym. MSJ at 82–83). The Omnibus Complaint alleges that Symantec violated the BPOC by giving commercial customers "non-standard discounts, including exceptions to band and buying program requirements," Rewards program pricing, and rebates that were not available to the state under the NY Contract. Omnibus Compl. ¶ 285.

Symantec's first argument against Count XIV—that Symantec cannot prove false claims were submitted—is that Morsell cannot show that these superior discounts, pricing, and rebates were offered. Sym. MSJ at 83. Symantec argues that any non-standard discounts "were not 'generally offered'" but "were unique offers to individual customers, typically for a single order,

and subject to management approval." *Id.*  The Court agrees with Morsell, *see* States' Opp'n at 17, that "unique offers to individual customers" would seem to qualify as the sort of "special discount pricing to other customers" that the BPOC requires matching, and that the question therefore turns on whether these discounts were "generally offered."

  As discussed, *supra* Section II.B.1.c, there are serious disputes of material fact regarding when Symantec offered non-standard discounts and whether they were actually offered in the limited circumstances Symantec claims.  This earlier discussion of the subject was in the context of the Government's motion for partial summary judgment, but the genuine disputes of fact run both ways.  The evidence that weighed in the Government's favor now shows that there could be a basis for a reasonable jury to disbelieve Symantec's characterization of non-standard discounts as being applied in anything approaching a consistent or regimented fashion.  As the Court noted, when addressing the Government's arguments about non-standard discounts, there is evidence that Symantec did not comply with its purported discounting policies, including, among other things, the fact that Symantec's Reason Code Chart, Initial Offer at 90, suggested that discounts were given for reasons inconsistent with Symantec's purported policies.  *See* U.S. MSJ Ex. 68, Bradbury Tr. at 279–80, 294–94, ECF No. 131-18 (explaining that certain discounts would not have been appropriate); U.S. MSJ Ex. 16, Thompson 30(b)(6) Tr. at 176–79, ECF No. 130-16 (same); *see also* 2010 Discounts Audit at 2.  Morsell has also offered an expert declaration calculating non-standard discounts, the credibility of which the Court may not assess at this stage.  States' Opp'n Ex. 30, Decl. of Seth R. Fliegler ("Fliegler Decl."), ECF No. 140-32.

As a result, the Court cannot say that Morsell is necessarily unable to prove that non-standard discounts were "generally offered."[18]

Symantec's second argument against Count XIV is that Morsell cannot prove Symantec had the requisite scienter to violate the New York FCA because it has no "evidence that Symantec knowingly failed to pass along discounts to NY based on non-standard discounts," Rewards pricing, or rebates. Sym. MSJ at 84–85. The NYFCA specifically defines "knowing and knowingly" to include not just a person who "has actual knowledge" of particular information but also a person who "acts in deliberate ignorance of the truth or falsity of the information" or "acts in reckless disregard to the truth or falsity of the information." N.Y. State Fin. Law § 188(3). Morsell has pointed to evidence showing a dispute of fact regarding whether Symantec was at least, reckless with regard to its compliance. Here, again, Morsell can rely on the just-reviewed evidence of inconsistencies between Symantec's purported policies and its actual practice regarding non-standard discounts—the 2010 Audit and testimony of Symantec officials. This is enough evidence to show a genuine dispute of material fact on, at least, a recklessness theory.

Symantec's final argument against Count XIV is that Morsell cannot prove any false claims were material to New York State's decision to any payment decisions. Sym. MSJ at 85. Symantec's three-sentence argument on this topic does not address the NYFCA's definition of "material," which is "having a natural tendency to influence, or be capable of influencing the

---

[18] Symantec further argues that the Rewards buying program "was conditioned upon agreeing to . . . unique . . . terms and conditions" and that rebates "were offered only to resellers and distributors who met the terms and conditions necessary." Sym. MSJ at 83. Morsell does not respond to these arguments directly, but the dispute of genuine fact on non-standard discounting policies and the additional evidence provided by the expert report is enough to avoid summary judgment.

payment or receipt of money or property."  N.Y. State Fin. Law § 188(5); *see* Sym. MSJ at 85.
This is the same broad definition of materiality that the Court saw in the FCA and the Florida
FCA.  Even if it were somehow narrower, though, the BPOC requires automatic price reductions
when it is triggered.  NY Contract App'x B-2 at 8, SYM778751 ("Price Decreases shall take
effect automatically . . . .").  If Symantec were violating the BPOC, New York would necessarily
be overpaying.  This would make the violation and the resulting false claim material under the
NYFCA, since the automatic price decreases required by the BPOC would qualify under
*Escobar*, 136 S. Ct. at 2003, as more than "garden-variety" breaches without a clear enough
connection to payments.  Symantec's motion for summary judgment is therefore denied as to
Count XIV.

Morsell's Counts XV and XVI focus on the GSA Contract.  Count XV alleges that
Symantec submitted false claims to New York and caused reseller Carahsoft to do the same
when New York ordered under Symantec's and Carahsoft's GSA Contracts.  Omnibus Compl.
¶¶ 391–401.  Count XVI alleges that Symantec made or used false records—the CSPs and other
documentation it submitted to GSA—which were material to the false claims submitted to New
York by Symantec and its resellers.  *Id.* ¶¶ 402–10.  Symantec argues that Morsell has no
evidence (1) that "any New York agency ever relied on Symantec's GSA Schedule contract
pricing" or that of any reseller; (2) that any representation Symantec made to GSA were
"material to any New York agency decision to purchase Symantec products from Symantec's
GSA Schedule contracts" or those of resellers; (3) that any New York agency ever relied on any
representation Symantec made to GSA; or (4) that Symantec knew any New York agency was
relying on Symantec's disclosures to GSA when these agencies were purchasing from GSA
Contracts.  Sym. MSJ at 86–87.

Although Symantec argues in the alternative that Morsell's pleadings lack sufficient detail concerning New York's purchases under the GSA Contracts,[19] it does not suggest that Morsell lacks evidence of these purchases.  In her responsive statement of material fact, Morsell disputed Symantec's contention that she "has not identified any New York purchases allegedly made through Symantec's GSA Schedule," noting that the relevant underlying data was produced to her expert, whom Symantec had the opportunity to depose.  States' Resp. SMF ¶ 214 (citing Fliegler Decl.).  As far as the Court can tell, that data does not appear to have been filed with the Court, but given that Symantec has not suggested that the sales cannot be established, the Court has no reason to doubt that there is at least a dispute of material fact regarding whether such sales occurred.

With a genuine dispute of material fact on the issue of whether New York made purchases on the GSA Contracts thus established, much of the Symantec's primary arguments falls into place

---

[19] Symantec alternatively argues that Morsell failed to plead any details concerning New York's purchases on the GSA Contracts and that it is therefore entitled to judgment on the pleadings under Rule 12(c).  Sym. MSJ at 87 (citing Fed. R. Civ. P. 12(c)).  A party moving for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure must demonstrate that no material fact is in dispute and that it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 12(c); *Haynesworth v. Miller*, 820 F.2d 1245, 1249 n.11 (D.C. Cir. 1987), *overruled on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006).  The court must accept the non-movant's allegations as true and draw all reasonable inferences in the non-movant's favor.  *See Mpoy v. Rhee*, 758 F.3d 285, 287 (D.C. Cir. 2014); *Haynesworth*, 820 F.2d at 1249 n. 11.  The Court denies this alternative argument on the ground that it overstates what is required of a complaint in an FCA case.  "The D.C. Circuit has taken a generous approach to pleadings in the FCA context, finding that a complaint is not deficient even if it fails to set out a prima facie case as an initial matter."  *United States v. Kellog Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 154 (D.D.C. 2011) (quotations omitted).  "The point of [Fed. R. Civ. P.] 9(b)," which establishes heightened pleading standards for fraud, "is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process."  *United States ex rel. Heath v. AT&T Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015).  It does not "dictate adherence to a preordained checklist of 'must have' allegations."  *Id.*  Given that Symantec filed this 12(c) motion after the close of discovery, it cannot credibly argue that it was deprived of the opportunity to prepare a response and to warrant further process.

along the same lines as the Court's analysis for California and Florida: if there is evidence that New York made purchases on the GSA Contracts, there is also evidence that New York relied on the prices set on those contracts; Symantec's representations to GSA were material because they were the basis for these prices, and New York agencies relied on them for the same reason. This leaves the knowledge requirement. Morsell points out that Symantec's contract with GSA disclosed that state and local governments could place orders on the GSA Contract, if Symantec accepted them, and that all provisions of the GSA Contract would apply. *See* 2/2/2007 Contract at 74. This, plus the apparently unchallenged evidence used by Morsell's expert in his calculations—apparently "invoices," States' Resp. SMF ¶ 214—is enough to establish a dispute of material fact on the question whether Symantec knew that New York was placing orders on the GSA Contracts. Summary judgment is therefore denied on Counts XV and XVI.

## V. CONCLUSION

For the foregoing reasons, the United States' Motion for Partial Summary Judgment (ECF No. 127) is **GRANTED IN PART AND DENIED IN PART** and Symantec's Motion for Summary Judgment (ECF No. 125) is likewise **GRANTED IN PART AND DENIED IN PART**. An Order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 30, 2020                                    RUDOLPH CONTRERAS
                                                         United States District Judge