# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      :
*ex rel.* LORI MORSELL, *et al.*,      :
                                  :
      Plaintiffs,      :      Civil Action No.: 12-800 (RC)
                                    :
      v.      :      Re Documents Nos.: 105, 118, 124
                                    :
SYMANTEC CORPORATION,      :
                                    :
      Defendant.      :

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION TO STRIKE THE EXPERT DESIGNATION AND EXPERT TESTIMONY OF CHARLES HARRIS AND GRANTING IN PART AND DENYING IN PART THE UNITED STATES' MOTION TO EXCLUDE PERSONS DESIGNATED BY SYMANTEC TO PROVIDE EXPERT TESTIMONY

This case began as a *qui tam* action by Lori Morsell, an employee at the Defendant corporation who came to believe that her employer had violated certain contractual obligations to the United States. She filed an action as Relator under the False Claims Act ("FCA") against Symantec Corporation, which is now known as NortonLifeLock, Inc. ("Norton" or "Symantec/Norton"). The United States ("the Government") intervened, along with California and Florida, and Ms. Morsell elected to assert claims on behalf of New York State. In brief, these governments claim that, in the process of setting pre-negotiated maximum prices for government purchasers with the General Services Administration ("GSA"), the Defendant overcharged them by misrepresenting the existence of certain prices and discounts that were available to its private customers and by consequently failing to offer government purchasers the same low prices these customers received. *See generally* Mem. Op. Granting in Part and

Denying in Part Def.'s Mot. for Summ. J. and Granting in Part and Denying in Part the United States' Mot. for Summ. J. ("MSJs Op."), ECF No. 184.

This opinion addresses a pair of motions concerning three experts that the parties have put forward. The Defendant has moved to strike the expert designation and testimony of the Government's expert Charles Harris. Symantec Corp.'s Mot. to Strike the Expert Designation and Expert Test. of Charles Harris and Supp. Statement of P. & A. ("Def.'s Mot."), ECF No. 124. The United States has moved to exclude two persons designated by the Defendant to provide expert testimony, Bill Gormley and Larry Allen, Jr. U.S. Mem. of P. & A. in Supp. of its Mot. to Exclude Persons Designated by Symantec to Provide Expert Test. ("U.S. Mot."), ECF No. 106-2. Both motions were opposed, and both are now ripe for decision.

In both motions, the moving party makes essentially the same argument: that its adversary is attempting to introduce improper expert testimony that consists of legal conclusions and argumentation rather than proper expert analysis rooted in reliable principles and methods. To a large extent, the Court agrees, though not entirely. The Court agrees with Norton that the Government's expert is improper and will exclude him. The Court agrees with the Government that much of what Norton's experts will say is likewise improper. However, some of their proposed testimony is proper, so they will not be excluded outright.

## I. BACKGROUND

A detailed version of the undisputed facts of this case is available in the Court's recent Memorandum Opinion addressing the parties' motions for summary judgment and partial summary judgment. MSJs Op. at 3–19. For purposes of this opinion the Court will only describe some of the basic disputes in this case that are most relevant to the proposed testimony at issue in these motions.

The central dispute in this case concerns the Defendant's obligations under a Multiple Awards Schedule ("MAS") that it negotiated with GSA and entered into in 2006 and early 2007. These contracts enable GSA to streamline federal government procurement by providing pre-negotiated maximum prices and other terms that govern all subsequent purchases covered by the contract. The MAS program is authorized under two statutes: Title III of the Federal Property and Administrative Services Act of 1949, 41 U.S.C. § 251 *et seq.*, and Title 40, 40 U.S.C. § 501. The program is additionally governed by Title 48 of the Code of Federal Regulations, which is also known as the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 8.402 *et seq. See* U.S. Mot. for Partial Summ. J. ("U.S. MSJ") Ex. 6, GSA MAS Program Desk Reference ("Desk Reference") at 13, ECF No. 130-6. Additional regulations establishing procedures to be followed by contracting GSA officers are found in the GSA Acquisition Regulation ("GSAR"), 48 C.F.R. § 501.101 *et seq.*, the entirety of which is also incorporated into the GSA Acquisition Manual ("GSAM"), U.S. MSJ Ex. 9, GSAM (July 2004), ECF No. 130-9.

GSA regulations prescribe standard questions contained in a MAS solicitation, in response to which an offeror must disclose certain information in a Commercial Sales Practices Format, known as the offeror's "CSPs." GSAM at 515-7 ("Commercial Sales Practices Format" or "CSPs Form"); *id.* at 515-8, fig.515.4-2 (Instructions for the Commercial Sales Practices Format). The CSPs Form instructions provide that an offeror seeking a MAS contract must provide information that is "current, accurate, and complete" as of fourteen calendar days prior to submission. *Id.* at 515-8. The offeror is also told "[y]ou must . . . disclose any changes in your price list(s), discounts and/or discounting policies which occur after the offer is submitted, but before the close of negotiations," and, "[i]f your discount practices vary by model or product line, the discount information should be by model or product line as appropriate." *Id.*

The GSAM does not require GSA officers to obtain the offeror's best price in every single case, but it emphasizes that this is always the goal. Negotiators are required to "seek to obtain the offeror's best price (the best price given to the most favored customer)," but with the understanding that "the Government recognizes that the terms and conditions of commercial sales vary and there may be legitimate reasons why the best price is not achieved" in any given negotiation. *Id.* at 538-1 (GSAR § 538.270). A contracting officer "may award a contract containing pricing which is less favorable than the best price the offeror extends to any commercial customer for similar purchases" if the officer determines that "prices offered to the Government are fair and reasonable" and that the "[a]ward is otherwise in the best interest of the Government." *Id.* Nonetheless, the officer must always "compare the terms and conditions of the [offeror's response to the] MAS solicitation with the terms and conditions of agreements with the offeror's commercial customers. *Id.*

GSA officials are instructed to include in all contracts two clauses designed to ensure that the prices negotiated for government purchasers are appropriately advantageous and that they remain so. The first of these is a Price Adjustment Clause ("PAC") reserving to the Government the right to reduce unilaterally the price of a contract if the Government determines the offeror failed to provide "current, accurate, and complete" information, or to disclose changes that occurred after its initial submission. GSAM at 552-12. This reduction can equal the amount of the overpayment plus interest. *Id.* The second is a Price Reduction Clause ("PRC"), which is designed to account for changes in the offeror's pricing over the life of the MAS contract. *Id.* at 552-39. The PRC requires that GSA and the offeror agree on a customer or category of customers that will serve essentially as a baseline for the government's discounts. *See id.* The offeror must keep the contracting officer appraised of prices being offered to that customer or

category of customers throughout the life of the MAS contract, and PRC ensures that the Government's prices are reduced if this customer or category of customers is given lower pricing or increased discounts. *Id.* The PRC identifies certain events which trigger price reductions when they occur, and certain exceptions to these triggers. *Id.* at 552-39–552-40.

The operative First Amended Omnibus and Restated Complaint (the "Omnibus Complaint"), ECF No. 70, outlines nine counts brought by the Government, two each from California and Florida, and three from Morsell on behalf of New York state. The Government's first five claims are brought under the FCA. The remaining four arise under common law. California and Florida each bring two claims under their respective state law–equivalents to the FCA. Morsell does the same for New York and adds an additional claim based on state contracts.

The FCA enables a *qui tam* plaintiff, known as a Relator, to initiate a civil action on behalf of the United States to recover monies paid on account of false or fraudulent claims. *See* 31 U.S.C. § 3730; *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp.2d 143, 146–47 (D.D.C. 2011). The FCA as amended creates several forms of liability. Among these is liability for "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), as well as for "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B). Count I alleges that the Defendant knowingly presented false claims in violation of § 3729(a)(1)(A). Omnibus Compl. ¶¶ 288–95. Count II alleges that the Defendant knowingly made false statements material to false claims in violation of § 3729(a)(1)(B). *Id.* ¶¶ 296–302. Count III alleges that the Defendant caused independent resellers to make false claims, again in violation of § 3729(a)(1)(A), *id.* ¶¶ 303–11,

and Count IV alleges that the Defendant caused resellers to make false statements material to false claims in violation of § 3729(a)(1)(B), *id.* ¶¶ 312–19. Count V, brought under another provision of the FCA, § 3729(a)(1)(G), alleges that the Defendant knowingly concealed and improperly avoided paying its obligations to the government (reverse false claims). *Id.* ¶¶ 320–25. The Government's five common-law claims are for negligent misrepresentation, *id.* ¶¶ 326–31 (Count VI), breach of contract, *id.* ¶¶ 332–37 (Count VII), unjust enrichment, *id.* ¶¶ 338–40 (Count VIII), and payment by mistake, *id.* ¶¶ 341–43 (Count IX). California, Florida, and Morsell on behalf of New York each allege that the Defendant violated their respective state false claims statutes. *See id.* ¶¶ 344–410 (Counts X through XVI).

As plead in the Omnibus Complaint and as argued by the Government throughout this litigation, most of these claims depend at least in part on whether Symantec/Norton breached its contractual obligations to make "current, accurate, and complete" CSPs disclosures, GSAM at 552-12 (PAC), and on whether it breached the PRC. Count VII is a common law breach of contract claim in which the Government sues directly over these alleged breaches, Omnibus Complaint ¶¶ 332–37, but the same breaches underly other claims. For example, the FCA claim in Count I alleges that Symantec submitted claims to the Government that were "materially false" for reasons including "implied representations regarding its compliance with the material terms of the Contract, including that the initial disclosures were accurate and complete and that it continued to abide by the Contract's PRC." Omnibus Compl. ¶¶ 290–91. Whether the Defendant fulfilled its contractual obligations regarding CSPs disclosures and whether it breached the PRC are therefore among the central legal questions in this case, upon which much of the Defendant's liability will depend.

## II. LEGAL STANDARD

The Defendant's motion is styled as a motion to strike Harris's expert designation and to exclude his expert testimony, while the Government's is styled as a motion to exclude the Defendant's experts. The distinction between a motion to strike and a motion to exclude makes for little practical difference in the Court's consideration of the motions. A motion to exclude an expert or an expert's testimony asks the Court to disallow that expert from testifying in front of the jury at trial. *See United States v. Machado-Erazo*, 901 F.3d 326, 336–37 (D.C. Cir. 2018). A motion to strike an expert's testimony and designation in advance of trial is framed in a backward-looking manner and focuses somewhat more on material already in the record, but it seeks the same relief regarding testimony at trial. *See United States v. Davis*, 863 F.3d 894, 907–08 (D.C. Cir. 2017). For both motions, the question is whether the proposed testimony—much of which has been previewed in the experts' reports—is proper expert testimony that could be presented at trial.

Federal Rule of Evidence 702 provides that qualified expert testimony is admissible if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. A witness may qualify as an expert through knowledge, skill, experience, training or education. *Id.* "In general, Rule 702 has been interpreted to favor admissibility." *Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 10 (D.D.C. 2011) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993)). "The degree of 'knowledge, skill, experience, training or education' required to qualify an expert witness 'is only that necessary to [e]nsure that the witness's

testimony "assist" the trier of fact.'" *Id.* at 11 (quoting *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981) (noting that the weight of the evidence is a matter to be assessed by the trier of fact)). "[I]t is not necessary that the witness be recognized as a leading authority in the field in question . . . ." 29 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 6264.1 (2015). "[T]he 'help' requirement [from Rule 702] is satisfied where the expert testimony advances the trier of fact's understanding to any degree." *Id.*

"The Rule requires trial courts to assume a 'gatekeeping role,' ensuring that the methodology underlying an expert's testimony is valid and the expert's conclusions are based on 'good grounds.'" *Chesapeake Climate Action Network v. Export-Import Bank of the U.S.*, 78 F. Supp. 3d 208, 219 (D.D.C. 2015) (quoting *Daubert*, 509 U.S. at 590–97). "The trial court's gatekeeping obligation applies not only to scientific testimony but to all expert testimony." *Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 6 (D.D.C. 2002) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999)). The court's analysis is "flexible" and it has "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 141–42 (citing *General Electric Co. v. Joiner*, 522 U.S. 136, 143 (1997)). Trial courts may apply a variety of factors in assessing reliability, including whether the expert's technique can be tested or has been subject to peer review, the existence and maintenance of standards and controls, and whether the technique has been generally accepted in the scientific community. *See Groobert*, 219 F. Supp. 2d at 6 (citing *Daubert*, 509 U.S. at 593–94).

Pursuant to Rule 702, *Daubert*, and its progeny, when determining the admissibility of expert testimony, the Court must consider: (1) whether the testimony is based upon sufficient facts and data; (2) whether the testimony is the product of reliable principles and methods, i.e.

whether the reasoning and methodology underlying the expert's opinion is scientifically valid; and (3) whether the witness has applied the principles and methods reliably to the facts of the case. *See generally Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996). Once the court is satisfied that the witness is an expert within the meaning of Rule 702, "[u]nder *Daubert* the district court is required to address two questions, first whether the expert's testimony is based on 'scientific knowledge,' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Meister* v. *Med. Eng'g Corp.*, 267 F.3d 1123, 1126 (D.C. Cir. 2001) (quoting *Daubert*, 509 U.S. at 592).

"Expert testimony that consists of legal conclusions cannot properly assist the trier of fact" in either "'understand[ing] the evidence' or . . . 'determin[ing] a fact in issue.'" *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) (quoting Fed. R. Evid. 702)); *see also United States ex rel. Mossey v. Pal-Tech, Inc.*, 231 F. Supp. 2d 94, 98 (D.D.C. 2002) ("[E]xpert testimony consisting of legal conclusions will not be permitted because such testimony merely states what result should be reached . . . ."). Thus, while "an expert may offer his opinion as to *facts* that, if found, would support a conclusion that the legal standard at issue was satisfied," an expert "may not testify as to whether the legal standard has been satisfied." *Burkhart*, 112 F.3d at 1212–13 (emphasis added). This limitation, the Circuit has explained, is consistent with the Federal Rules' advisory committee notes, which explain that an expert may not offer "'opinions which would merely tell the jury what result to reach,' or which are 'phrased in terms of inadequately explored legal criteria.'" *Id.* at 1212 (quoting Fed. R. Evid. 704 advisory committee's note). "[T]he line between an inadmissible legal conclusion and admissible assistance to the trier of fact in understanding the evidence or in determining a fact in issue is not always bright." *Id.* An expert's testimony is likely to constitute a legal conclusion

where "it track[s] the language of the applicable statute" and uses terms that "ha[ve] a specialized legal meaning that [are] more precise than the lay understanding of the term." *Id.* In *Burkhart* itself, for example, the D.C. Circuit held that the district court abused its discretion by permitting an expert witness to testify that the Washington Metropolitan Area Transit Authority and a transit police officer had violated the ADA by failing to provide the plaintiff—who was deaf—with communication that was "as effective" as the communication provided to other individuals. *Id.* at 1213.

"The burden is on the proponent of [expert] testimony to show by a preponderance of the evidence that the proffered expert witness is qualified, that his proposed testimony would be useful to the finder of fact, and that the testimony is reliable." *Sykes v. Napolitano*, 634 F. Supp. 2d 1, 6 (D.D.C. 2009) (citing *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001)). Even if the proposed testimony is proper and relevant, the Court may nonetheless exclude it "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see Bazarian Int'l Fin. Assocs., LLC v. Desarrolos Aerohotelco, C.A.*, 315 F. Supp. 3d 101, 128 (D.D.C. 2018) (analyzing expert testimony under Rule 403).

## III. ANALYSIS

### A. Defendant's Motion to Exclude the Government's Expert

Norton has moved to strike the expert designation and to exclude the expert testimony of the Government's expert Charles Harris. *See* Def.'s Mot. at 5.[1] According to the Expert

---

[1] Because the Defendant's motion does not include page numbers, the Court's citations to this motion reference the page numbers generated by the Court's CM/ECF system.

Summary he produced, he has been an audit manager at GSA since 2003 and has worked as a GSA auditor, with minimal interruption, since 1987. *See* Def.'s Mot. Ex. 1, Expert Summary of Charles E. Harris ("Harris Rep.") at 1–2, ECF No. 124-1. Harris says he "ha[s] a detailed understanding of the manner in which GSA audits [MAS] contracts, including to identify transactions that violate the [PRC]." *Id.* at 1. According to the Government, "[t]estimony by a career GSA auditor with decades of experience reviewing MAS contracts and contractors' transactional data to flag potential PRC violations will assist the trier of fact to make the factual determinations necessary to calculate damages to the United States" and "will allow the trier of fact to understand why GSA would flag individual commercial transactions as potential PRC violations." U.S. Opp'n to Def.'s Mot. ("U.S. Opp'n") at 4, ECF No. 138.

Harris describes the data he reviewed as follows: He was asked by the Government's counsel to review Norton/Symantec sales data assembled by another Government expert, Dr. Allison Holt. *See* Harris Rep. at 2. Dr. Holt had filtered out certain types of transactions, using "conservative assumptions" about the Defendant's liability. *Id.* The data that Harris received from Dr. Holt "included only those sales on which a commercial customer received a non-standard discount from Symantec," *id.* at 3 (footnote omitted), and Dr. Holt had "compiled data from various available datasets to gather note fields and other pieces of transactional data . . . that might be relevant to consider in identifying whether any sales transaction violated Symantec's PRC," *id.* at 4. The Government's counsel directed Harris's attention to certain excerpted fields from this larger dataset, but provided him "[t]he complete collection of data assembled by Dr. Holt" for his review." *Id.*

After the data was all processed in this way, Harris's analysis began, and primarily involved addressing two questions. First, he evaluated "[w]hether [he] believed that a

transaction triggered a price reduction under the PRC in light of the terms of Symantec's [Final Proposal Revision ("FPR")] and any other items [he] would typically review in a pre- or post-award audit." *Id.* at 5. Second, in relation to the same materials, he would make an assumption, favorable to Symantec, that certain deals were excluded from PRC coverage, and would then consider again "whether [he] believed a transaction triggered a price reduction." *Id.* Specifically, during this second stage of analysis, Harris assumed that Symantec/Norton's October 2006 Supplement responding to an Administrative Letter from GSA had exempted certain types of deals from PRC coverage when it explained that these particular types of deals were deals for which Symantec would give "better rates and/or terms and conditions" than it was offering the Government. *Id.*; U.S. MSJ Ex. 82 at 49 (the "October 2006 Supplement"), ECF No. 131-32.[2] Harris's Summary concludes with his determination that certain transactions he flagged "triggered a price reduction under the PRC in light of Symantec's FPR" and that "had these transactions been identified in a pre-or post-award audit of Symantec's GSA contract a GSA auditor would have referred them for contractual actions to the relevant Contracting Officer." Harris Rep. at 8. Assuming the suggested carve-out did not change these conclusions. *Id.* at 8–9.

Norton argues that Harris's testimony should be excluded and his expert designation stricken because these opinions are legal conclusions and thus not admissible as expert testimony. Def.'s Mot. at 11–15. The Court agrees. Harris would testify, in essence, that it is his expert opinion that Norton/Symantec committed violations of the PRC. This testimony

---

[2] Harris's Expert Summary cites to a different version of the relevant document, *see* Harris Rep. at 5, but the Court was not able to locate a version of the October 2006 Supplement with the Bates stamp numbering Harris cites. The cited version is attached to the United States' Motion for Partial Summary Judgment and, as far as the Court can tell, it is identical to the document Harris used, at least with regard to reflecting the basis for the alleged carve-out.

would be a legal conclusion because it "states what result should be reached." *Mossey*, 231 F. Supp. 2d at 98. It crosses over the line between testimony "as to facts that, if found would support a conclusion that the legal standard at issue was satisfied" and is instead testimony stating "whether the legal standard has been satisfied." *Burkhart*, 112 F.3d at 1212–13. "An expert witness may not deliver legal conclusions on domestic law, for legal principles are outside the witness' area of expertise under Federal Rule of Evidence 702." *Weston v. Wash. Metro. Area Transit Auth.*, 78 F.3d 682, 684 n.4 (D.C. Cir. 1996).

Harris's testimony would be comparable to the testimony excluded by the D.C. Circuit in *Burkhart*. *See Burkhart*, 112 F.3d at 1212–13. As the Court has explained, whether Symantec breached the PRC is among the questions directly posed by Count VII of the Omnibus Complaint, alleging breach of contract. Omnibus Compl. ¶¶ 332–37. An affirmative answer would also fulfill the falsity element that the Government is required to prove for most of its other claims. As this Court has said before:

> While courts have at times permitted greater leeway and allowed expert testimony, couched in legal conclusions, when such testimony would assist the factfinder in navigating the complex legal regime at issue, those courts have been careful to caution that an expert may *not* testify about how the application of those legal standards should cut in the *particular case* before them.

*National Association for the Deaf v. District Hospital Partners, L.P.*, No. 14-cv-1222, 2016 WL 447444, at *6 (D.D.C. Feb. 4, 2016) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294–95 (2d Cir. 1990); *United States v. Offill*, 666 F.3d 168, 174 (4th Cir. 2001)). Harris's report and proposed testimony would tell the jury exactly what result to reach on this contested issue in this particular case.

The Government argues otherwise, but it does not draw a convincing distinction between impermissible expert testimony offering legal conclusions and the testimony that it would have Harris introduce. In opposing Norton's motion to exclude, the Government says Harris will

testify only as to "whether he believed that a Symantec transaction triggered the PRC . . . such that he would have flagged the transactions" in the course of a pre- or post-award Audit. U.S. Opp'n at 6. The government says he would be qualified based on his "vast experience reviewing contracts and transactional data in the course of conducting PRC compliance audits, as well as extensive familiarity with the PRC itself and its application." *Id.* at 4; *see* Fed. R. Evid. 702 (allowing qualification based on "other specialized knowledge"). This would put Harris's testimony at a level of remove. He would testify as to his typical practice as an auditor and to whether Symantec transactions resemble those he would normally identify as possible violations, rather than testifying directly as to whether the Defendant's activity was a violation. This kind of testimony could be proper if it served to illuminate the Government's understanding of the PRC, and thus to help resolve the factual dispute over what the parties mutually intended when they agreed to the contract. *See* MSJs Op. at 45–50 (holding that unresolved disputes of material fact concerning the parties' mutual understandings of the PRC prevented summary judgment for the Government on its claim that Symantec breached the PRC). But the Government's careful phrasing of Harris's proposed testimony in its opposition brief is inconsistent with the text of Harris's actual report, in which he writes quite definitively that "It is my opinion . . . that these [flagged] transactions triggered a price reduction under the PRC in light of the terms of Symantec's FPR." Harris Rep. at 8.

The Government tried to draw a similar line during Harris's deposition. The Government's counsel asked Harris, "Is it your understanding that your role at trial will be to tell the Jury, 'Ladies and gentlemen, this is how you should interpret the contract'?" to which Harris answered "No." Def.'s Mot. Ex. 2, Deposition Tr. of Charles Harris ("Harris Tr.") at 177–78, ECF No. 124-2. By way of contrast, counsel next asked, "Instead, is it your understanding that

your role at trial will be something along the lines of, 'Ladies and gentlemen, this is the understanding I have of the contract that I applied to the sales data'?" to which Harris answered "Yes." *Id.* at 178.  The Court acknowledges there is some distinction between these two formulations, and that some of the latter might be proper expert testimony under Rule 702. However, distinguishing between the two formulations requires drawing a finer line than the Court thinks the jury can safely be asked to draw without becoming confused or misled.  The Court will therefore exclude under Rule 403 whatever borderline proper testimony Harris might be able to provide.  "In jury trials, the danger of prejudice from the presentation of expert testimony is significant because of the potential for the jury to accept an expert witness's testimony automatically." *Edmonds v. United States*, No. 05-cv-540, 2009 WL 969938, at *1 (D.D.C. Apr. 7, 2009) (citing *United States v. Addison*, 498 F.2d 741, 744 (D.C. Cir. 1974)); *United States v. Anderson*, 851 F.2d 384, 393 (D.C. Cir. 1988) ("Courts have frequently noted that there is often an inherent danger with expert testimony unduly biasing the jury because of its aura of special reliability and trust." (citation, quotation marks and alterations omitted)).  The Court thinks that in this instance there is a serious risk that the jury will credit Harris too automatically based on his work as a GSA auditor.

Furthermore, Harris's report and proposed testimony implicitly reaches legal conclusions about the meaning of the contract.  The Court has ruled twice now that the PRC is ambiguous on its face, as the terms "commercial class of customers" and "discount relationship" are both subject to more than one reasonable interpretation.  *United States ex rel. Morsell v. Symantec Corp.*, 130 F. Supp. 3d 106, 138 (D.D.C. 2015) (denying the Government's first motion for partial summary judgment); MSJ Op. at 45–50 (denying summary judgment on the issue of PRC breach in ruling on the Government's second motion for partial summary judgment).  Harris's

two-stage analysis accounts for ambiguity in "commercial class of customers," by testing both alternatives for what it might mean. He does not, however, account for the fact that "discount relationship" is ambiguous. Nor does he explain what assumptions he is making about how it should be understood. Harris's report then, implicitly and impermissibly provides a definition for "discount relationship" and interprets the contract accordingly. *See, e.g.*, *Mossey*, 231 F. Supp. 2d at 98 (excluding an expert report that "provide[d] definitions of legal and regulatory terms coupled with [the expert's] conclusions on how these terms affect[ed] [the] contract" because this would not "help the trier of fact better 'understand the evidence' or 'determine a fact in issue,'" (quoting Fed. R. Evid. 702)). If Harris were allowed to testify about conclusions he reached using a particular understanding of the disputed term "discount relationship," there would be a serious risk of misleading the jury into thinking either that the meaning of the term is not a subject of dispute or that Harris's (legal) opinion about what the term means ought to be credited.

Importantly for the Rule 403 analysis, the Court finds that the probative value of Harris's proposed testimony is significantly diminished by the availability of Dr. Holt's testimony. As explained, Harris's work in this case entailed only reviewing data that Dr. Holt had "compiled from various datasets . . . and distilled to isolate transactions that may have violated Symantec's PRC." Harris Rep. at 2. Harris was not involved in deciding what data he would review or how it was presented. *See* Harris Tr. at 74–75. Dr. Holt, on the other hand, dedicates nearly three pages of her initial report to explaining how she distilled the relevant data to identify transactions that may have triggered the PRC. U.S. MSJ Ex. 73, Expert Rep. of Allison I. Holt, Ph.D. at 29–32, ECF No. 131-23. Norton has not moved to exclude or to strike Dr. Holt's testimony, and she would be able to explain how the Government identified alleged PRC violations. She could do

this based solely on her statistical expertise, and there would be a reduced risk of her testimony misleading the jury as compared with Harris's, which might carry an inappropriate air of added authority based on his status as a GSA auditor. Because Dr. Holt's testimony is available to the Government, Harris's would add little probative value to offset the significant risk of prejudice it would introduce.

Finally, although the Government suggests that Harris's testimony "will *assist* the trier of fact to make the factual determinations necessary to calculate damages," U.S. Opp'n at 4 (emphasis added), the Court does not understand Harris's work to be an integral part of the Government's damages calculation. The Government explains that a third expert, "Dr. David Gulley . . . calculated damages to the United States resulting from the transactions contained in Dr. Holt's analysis." *Id.* at 1. "Dr. Gulley," the Court is told, "use[d] the transactions that Harris . . . identified" as ones that would have been flagged "to calculate the Government's damages." *Id.* at 2. Dr. Gulley's report—partially produced to the Court as an exhibit during summary judgment briefing—references calculations made "[b]ased on the dataset of PRC-triggering transactions that [Dr. Gulley] received from Charles Harris." U.S. Opp'n to Sym. MSJ Ex. 245 at 8, ECF No. 142-11. Still, the Court fails to see how Harris's work was a necessary step in the damages calculation. Harris played no role in selecting what data he reviewed, and assumed that every transaction he reviewed violated the PRC. Harris Tr. at 177 (confirming Harris's assumption "that every deal [he] reviewed contained a special discount that disturbed the price discount relationship at least as the government believes it").

It appears that Harris was essentially a middleman between Dr. Holt and Dr. Gulley, and that he simply agreed with counsel that that the transactions Dr. Holt had identified looked like the kinds of transactions he would have flagged. These transactions were passed along to Dr.

Gulley with Harris's imprimatur. Rather than having Harris testify to liability, and possibly confuse a jury with his purported expertise, the Government could instead show Dr. Gulley the transactions identified by Dr. Holt and ask him to assume liability. This would avoid confusing the legal question of liability with the factual questions to which experts may properly testify. The Government has explained that Harris's "opinions are being proffered in connection with a complex damages analysis," U.S. Opp'n at 14, but it has not argued that the damages calculation is impossible without his input. Because, as the Court understands it, there is an alternative means of introducing testimony concerning damages—though it may require an update to Dr. Gulley's report—the exclusion of Dr. Harris will not prejudice the government by seriously undermining its ability to present a calculation of damages.[3]

## B. The Government's Motion to Exclude Defendant's Experts

The Government has moved to exclude the testimony of two experts retained by Norton. Because the Government challenges their testimony on similar grounds, and because their testimony does, in fact, present many of the same problems, the Court will address these experts together. Ultimately the Court holds that some of their testimony is proper and some is improper. Rather than attempt to review these experts' reports and testimony line-by-line, the Court will endeavor to identify those arguments by the Government that are meritorious and will highlight some portions of the proposed testimony that are either proper or improper. In so doing, the Court hopes to identify the contours of proper testimony by these witnesses and to

---

[3] If the Government believes Harris's calculations are necessary to present the damages calculations made by Dr. Gulley, the Court would entertain a motion for reconsideration on this narrow basis.

streamline their testimony for trial, but to avoid constraining the Defendant's ability to put forward a case at trial by limiting these experts' testimony to statements already in the record.[4]

The first of Norton's experts that the Government challenges is Bill Gormley.  U.S. Mot. According to his expert report, Gormley worked for GSA for nearly thirty years, during which he "extensively reengineered the Schedules program," "developed the first government-wide e-commerce tools," and helped develop the CSP solicitation format.  *See* U.S. Mot. Ex. 20, Expert Rep. of Bill Gormley ("Gormley Rep.") at 3–4, ECF No. 106-22.  Gormley left GSA in 2000 and has since worked as a consultant and as a high ranking official in at least two government purchasing industry groups.  *Id.* at 4.

Gormley's expert report includes general background about GSA and the MAS Schedule contract program as well as more specific conclusions based on a review of the documentary record produced in this case.  *Id.* at 5 ("Background of the GSA Schedules Program"), 8 ("The Negotiation and Award of GSA Schedules"), 12 ("Symantec's Offer and Negotiation").  His opinions regarding the GSA-Symantec negotiating process are fairly specific including, for example, that "Symantec's CSP Disclosures adequately disclosed its discounting practices" and that "[a] reasonable contracting officer would have understood that Symantec did not intend that non-standard discounts would trigger the PRC" and "could have decided to exclude certain of Symantec's buying programs from the price negotiations."  *Id.* at 4–5 (summarizing opinions).  Gormley explains that his opinions "are based on a review of the documents that were made

---

[4] The Defendant additionally filed a Motion for Leave to Supplement the Record in Support of its Opposition to the Government's Motion, ECF No. 118, with arguments based on deposition testimony taken after it filed its Opposition to the Government's Motion.  This Motion for Leave to Supplement the Record is granted.

available and upon [his] education, training, knowledge, experience[,] and expertise regarding GSA and GSA Schedules." *Id.* at 4.

Norton's second expert is Larry Allen, Jr. U.S. Mot. Allen is the founder and president of a consulting firm and "often represent[s] GSA Schedule contract holders whom [he] assist[s] in a wide variety of GSA Schedule compliance matters." U.S. Mot. Ex. 22, Expert Rep. of Edward Larry Allen, Jr. ("Allen Rep.") at 1, ECF No. 106-24. Allen says he has "counseled GSA Schedule contractors . . . on all aspects of seeking, negotiating, and administering a GSA Schedule contract," and that this includes "conduct[ing] compliance reviews" focusing on "the many complex terms and conditions of a MAS contract, including the [PRC]." *Id.* at 2. He has "worked with government contract attorneys on GSA Schedule contract audits" and "with companies to develop, update, and assess their GSA Schedule contract compliance programs." *Id.* Allen has been an industry representative on a GSA MAS Advisory Panel, *id.* at 3–4, and also led an industry lobbying group for over ten years, *id.* at 4–5.

Like Gormley, Allen's expert report includes a combination of broad observations about GSA contracting and specific evaluations of this case. *See, e.g.*, *id.* at 8 ("Overview of an Effective GSA Schedule Compliance Program"), 19 ("Symantec's Understanding of its . . . PRC Responsibilities was Reasonable and Never Contradicted by GSA"). The portions of his report that do not focus on the facts of this case differ from comparable sections of Gormley's report in that they are much more focused on criticizing GSA. Allen's report includes, for example, a nine-page section with the heading "Compliance Challenges Created by GSA's Lack of Guidance to Contractors Regarding Schedule Compliance," which explains, among other things, that "[i]n [Allen's] experience, the lack of clear definitions and meaningful guidance from GSA, combined with the wide range of goods and services sold through GSA Schedule contracts,

makes it extremely difficult for Schedule contract holders to decipher their compliance obligations." *Id.* at 10–19; 13–14. Allen's opinions about this case are similar to Gormley's and include that "[p]rior to the award of its GSA Schedule contract, Symantec diligently sought to understand the rules governing the MAS program" and that "[i]n seeking to obtain a GSA Schedule Contract, Symantec submitted detailed CSP disclosures, with extensive supporting data, sufficient to allow a reasonable GSA [contracting officer] to negotiate a fair and reasonable GSA Schedule contract with Symantec." *Id.* at 7 ("Summary of Opinions").

*1. Opinions Concerning Contract Interpretation*

The Government first presents several arguments for why testimony that it characterizes as "Allen and Gormley's interpretations of the basis of award category and discount relationship in the Contract" between GSA and Symantec should not be admitted. U.S. Mot. at 20. Their first argument in this regard is familiar. The Government argues that Gormley and Allen, as experts, cannot offer interpretations of the contract between GSA and Symantec because interpretation of contracts and the underlying regulations is a legal issue. *Id.* at 21–23. Norton's response is to say that Gormley and Allen will not "offer their own interpretations" of the contract but will instead speak only to "agency and industry usage." Def. Symantec Corp.'s Mem. of P. & A. in Opp'n to U.S. Mot. ("Def.'s Opp'n") at 32, ECF No. 108. Both parties state the law more or less correctly. An expert "should not be permitted to testify regarding the meaning of [a] contract between the parties" but may be "permitted to testify regarding the meaning of contract terms when the meaning depends on industry practice." *SEC v. Johnson*, 525 F. Supp. 2d 66, 70 (D.D.C. 2007) (citations omitted). The D.C. Circuit has specifically said that an expert may testify as to "the common usage of . . . terms in the government contracts

industry." *United States v. Safavian*, 528 F.3d 957, 967 (D.C. Cir. 2008). The relevant question, then, is on which side of this line Gormley's and Allen's testimony would fall.

Much of what Gormley and Allen said in their reports and depositions is improper testimony regarding the meaning of the contract between the parties. At his deposition, Allen agreed that, as far as he was aware, "there is . . . not an industry standard that defines something different than what the solicitation says" for the term "customer." U.S. Mot. Ex. 21, Allen Tr. ("Allen Tr.") at 173, ECF No. 106-23. Gormley likewise acknowledged that "commercial class of customers" was not "an industry term of art" and that he did not consult any "industry standard definition." U.S. Mot. Ex. 19, Gormley Tr. ("Gormley Tr.") at 315–16, ECF No. 106-21. To the extent their testimony would rely on any particular definitions of these terms, then, such testimony is inappropriate—like Harris's—because "provid[ing] definitions of legal and regulatory terms coupled with [the expert's] conclusions on how these terms affect [the] contract" does not help the jury. *Mossey*, 231 F. Supp. 2d at 98. Similarly, Allen opines on what "Symantec understood the Commercial Class of Customers [Basis of Award]" to entail, citing the deposition transcript of Symantec's lead negotiator, Kim Bradbury. Allen Rep. at 19. This is improper testimony as to the meaning of the contract between the parties. Furthermore, by interpreting Bradbury's testimony this opinion also arguably usurps the role of the jury as the finder of fact. *See United States v. Libby*, 461 F. Supp. 2d 3, 7 (D.D.C. 2006) (holding in a criminal case that "[e]xpert testimony will . . . be precluded if [it] would usurp the jury's role as the final arbiter of the facts, such as testimony on witness credibility and state of mind").

Elsewhere in its Motion, the Government asks the Court to exclude as impermissible "Gormley's opinions as to what a reasonable contracting officer could have done or would have understood are unreliable and would not assist a jury." U.S. Mot. at 43. The Government argues

that opinions like "[a] reasonable contracting officer would have understood that Symantec did not intend that non-standard discounts would trigger the PRC," Gormley Rep. at 5, are simply "a rephrasing of . . . inadmissible contract interpretation opinions," U.S. Mot. at 43. There is a subtle difference between stating outright what a contract means and stating how it could reasonably be interpreted, but nonetheless the Court agrees with the broader point that this testimony would not help the jury because it is too similar to the improper testimony just outlined. "Expert testimony, like all other evidence, may be excluded under Rule 403 if it would confuse or mislead the trier of fact . . . ." *Edmonds*, 2009 WL 969938, at *1; *see* Fed. R. Evid. 403.

Although testimony about reasonability or about the meaning of the contract between the parties is improper, other opinions offered by these experts do appear to be properly grounded in their experiential understandings of "the common usage of . . . terms in the government contracts industry." *Safavian*, 528 F.3d at 967. Gormley and Allen may properly testify in this regard. For example, Gormley may properly testify that "[i]n [his] experience, a broad Basis of Award customer or category of customers like 'all commercial customers' . . . is not typical in GSA Schedules held by large companies." Gormley Rep. at 18. Likewise Allen can testify that "[he] ha[s] seen contractors and [contracting officers] agree on a wide variety of [bases of awards], including single customers, groups of customers, pricing programs, and pricelists." Allen Rep. at 20. Testimony like this is based on the experts' personal experiences in the industry and does not purport to directly interpret the contract or to know what was in the minds of GSA or Symantec. *See Johnson*, 525 F. Supp. 2d at 69 n.3 (admitting testimony regarding industry custom "drawn from many years of experience" and "significant research"). The Government will be free to challenge this testimony on cross-examination and can point to the specific facts

and documents produced in this case that may be at odds with the experts' more general experiential testimony. Moreover, GSA fact witnesses may testify about their experiences to the extent they are different.

The Government puts forward a few additional arguments against any contract interpretation testimony, arguing that Allen and Gormley's contract interpretation testimony should additionally be excluded because it is not based in accepted standards or methods, lacks reliability, and does not qualify under the standard for experiential experts.[5] U.S. Mot. at 25–27. The focus on "standards or methods" is somewhat misplaced, because, as the Government seems to recognize, an expert "may . . . be qualified on the basis of his or her practical experience or training." *Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 196 (D.D.C. 2015) (quoting *Robinson*, 75 F. Supp. 3d at197–98). Rule 702 requires that an expert be qualified to testify on the basis of "knowledge, skill, experience, training, or education[,]" and thus the rule encompasses "not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called skilled witnesses, such as bankers or landowners testifying to land values." Fed. R. Evid. 702 advisory committee's note (1972) (internal quotation marks and citation omitted).

"[I]n a variety of cases involving experts whose experience forms the basis of their opinions," courts have allowed expert testimony based on a "methodology" involving "observ[ing] the relevant evidence and appl[ying] their specialized knowledge to the case at

---

[5] The Government additionally argues that "[t]he methods employed by Allen and Gormley are . . . contradicted by publications made by GSA and the private industry." U.S. Mot. at 27. The Court is relatively less concerned about this than about some of the other problems the Government identifies because expert testimony with a weak basis in fact can be addressed through cross-examination. *See Robinson v. District of Columbia*, 75 F. Supp. 3d 190, 200–01 (D.D.C. 2014); *see also United States v. Williams*, 212 F.3d 1305, 1310 (D.C. Cir. 2000).

hand." *Heller v. District of Columbia*, 952 F. Supp. 2d 133, 141 (D.D.C. 2013) (quotations

omitted); *see also, e.g.*, *id.* at 142 (admitting testimony based on "each expert's professional

judgment obtained through long experience in the field"). To the extent that any contract

interpretation testimony is grounded in this kind of experiential methodology and is not improper

legal opinion, the Court will permit it. This may describe only a narrow category. Again the

broader principle is that testimony about industry usage or common practice is acceptable and

testimony specific to the Defendant's contract is not, because Allen and Gormley have general

industry experience rather than any particular knowledge of this Contract, or of the inner

workings of any particular contracting officer's mind.

### 2. Opinions Concerning the Sufficiency of CSPs Disclosures

Second, the Government argues that the Court should exclude any opinions from

Gormley or Allen as to whether Symantec's CSP disclosures were "adequate" or "sufficient."

U.S. Mot. at 34–37. The Government explains that both of the Defendant's experts agree that

the PAC, which requires "current, accurate, and complete" disclosures, GSAM at 552-12, sets a

standard for CSPs disclosures, U.S. Mot. at 34–35 (citing Allen Tr. at 44–45; Gormley Tr. at 80,

374). The Government then makes assertions along the lines of "Symantec's CSP Disclosures

adequately disclosed its discounting practices," Gormley Rep. at 4, or "Symantec submitted

detailed CSP disclosures . . . sufficient to allow a reasonable GSA [contracting officer] to

negotiate[,]" Allen Rep. at 7. At the same time, though, the experts claim to be "offering no

opinions as [to] the accuracy or completeness of Symantec's CSPs." U.S. Mot. at 35 (citing

Allen Tr. at 45–46; Gormley Tr. at 81, 215–16, 255–59, 373–74). The Government says that the

experts' opinions about the CSPs' sufficiency are based on an incorrect or nonexistent standard.

*Id.* at 36–37. Norton argues in response that testimony as to sufficiency or detail of the

disclosures will be relevant for purposes of determining whether any deficiencies in the CSPs were material. *See* Def.'s Opp'n at 34.

The Court agrees with the Government that Allen and Gormley's opinions concerning the adequacy or sufficiency of Symantec's CSPs will be almost entirely irrelevant. The relevant question in this case is whether the CSPs were "current, accurate, and complete." *See* GSAM at 552-12. To be sure, if Allen and Gormley had spoken directly to that question, the Government would have moved to exclude the testimony as offering a legal conclusion, and the Court would likely have agreed. The shift to speaking in terms of sufficiency, adequacy, or level of detail does not suffice to salvage this expert evaluation of the CSPs because it makes experts' testimony about the CSPs confusing and likely prejudicial.

This testimony will not be allowed because it is likely to confuse and mislead the jury. *See Edmonds*, 2009 WL 969938, at *1; Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). As the Court has stated, there is a "significant" risk during a jury trial that "the jury [will] accept an expert witness's testimony automatically." *Id.* (citing *Addison*, 498 F.2d at 744). The jury is likely to hear and interpret testimony averring the quality of Symantec's CSPs as testimony that the CSPs met the regulatory and contractual standard of "current, accurate, and complete." Allen and Gormley use language that is almost synonymous with the legal standard. It is unrealistic to ask jurors to carefully distinguish between, for example, the notion that the CSPs "adequately disclosed . . . discounting practices" and the notion that Symantec's CSPs were "accurate and complete."

Additionally, neither Allen nor Gormley appears sufficiently familiar with Symantec's pricing and discount policies to testify about whether they were disclosed in sufficient detail by the CSPs. Each disclaimed any expertise regarding the specifics of Symantec's pricing. Allen Tr. at 21; Gormley Tr. at 73. The Government also argues that the experts failed to review a number of relevant materials in the record regarding Symantec's pricing and discounting practices. U.S. Mot. at 36–37. Were this the only shortcoming with their testimony on CSPs, the Court might say the issue could be better addressed through cross-examination. *See supra* n.5 (citing *Williams*, 212 F.3d at 1310). As it stands, though, the lack of demonstrated knowledge of Symantec's policies cuts against the probative value of the testimony under the Rule 403 balancing test.

Although the Court will not allow testimony directly commenting on whether Symantec's CSPs were sufficient, adequate, or detailed, Allen and Gormley do have experience sufficient to qualify them to make some comments regarding CSP disclosures generally. *See Rothe Dev., Inc.*, 107 F. Supp. 3d at 196 (discussing expert qualifications based on experience). Gormley helped develop the CSPs format while at GSA. Gormley Rep. at 3–4. He also worked as a GSA contracting officer. *Id.* at 3. This experience qualifies him to offer testimony on, for example, what CSP disclosures generally look like or on how GSA uses them. Allen's experience is less direct. He does not say he has ever reviewed or worked with CSPs, but he says he "assisted GSA with the creation of the CSP format" and that his firm offered comments while the format was being developed. Allen Rep. at 6. This experience is not quite as strong a basis for expert testimony as Gormley's experience is, but it is enough that the Court cannot say Allen lacks any basis to opine on CSPs generally.

The bottom line when it comes to CSPs testimony by Allen and Gormley is very similar to the bottom line regarding contract interpretation. These experts are qualified based on their experience in the industry to offer general opinions on typical practice, but may not say or even intimate that Symantec's CSPs met any particular standard. Gormley can explain, for example, the purposes behind CSP disclosure requirements, and can describe how a contracting officer uses them, based on his experience. Gormley Rep. at 8–9. He may also testify, as he did in his report, based on his "experience," to "longstanding practice" at GSA. *Id.* at 19. He may not, however, testify as to what a contracting officer could or would make of Symantec's particular disclosures, or offer comparative testimony describing how Symantec's disclosures compare to those of "typical vendor[s]." *See, e.g.*, *id.* at 16. Based on the career experience he describes in his report, the Court has reason to question whether Allen has the experience necessary to say properly as much about CSPs as Gormley, but Allen may also give similar general testimony about industry practice. The Government will have the opportunity to cross examine both experts and to challenge their degrees of experience and familiarity with different aspects of the MAS contracting process. *See Williams*, 212 F.3d at 1310 ("[T]rial judges generally rely on the structural check of cross-examination in permitting opinion testimony with a weak foundation . . . .").

### 3. Remaining Opinions

The Government's remaining arguments are an assortment of challenges to the remaining sections of Gormley's and Allen's testimony. The Government asks the Court to exclude "Allen's personal opinions on the sufficiency of GSA's training concerning the MAS program." U.S. Mot. at 37. His report explains in detail what Allen describes as "compliance challenges created by GSA's lack of guidance to contractors regarding schedule compliance." Allen Rep. at

10; *see id.* at 10–19.  The Court agrees with the Government that this testimony is irrelevant to this case and should be excluded under Rule 401.  U.S. Mot. at 39 (citing Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable . . . ; and (b) the fact is of consequence in determining the action.")).  This case is about whether the Defendant violated its obligations under a contract that it entered into with GSA, it is not about whether GSA does enough to educate potential contractors about what they will be getting into if they participate in the MAS program.  At no point has the Defendant raised any sort of affirmative defense that would absolve it of liability based on insufficient compliance guidance from GSA.  Nor does the Defendant explain in its Opposition how this testimony would be relevant.

Furthermore, the suggestion that Symantec did not know what it was getting into is completely at odds with the picture the Defendant painted for the Court in its recent Motion for Summary Judgment.  The Defendant's brief supporting that motion *began* by arguing that the "most glaring and irremediable flaw" in the Government's case was "their failure to take into account the knowledge, expertise, or discussions by the two women who negotiated the contract" who were both "thoroughly versed in GSA contracting requirements, expertise they acquired through years of negotiating and administering GSA Schedule contracts."  Symantec Corp.'s Statement of P. & A. in Supp. of its Mot. for Summ. J. ("Sym MSJ") at 1, ECF No. 126-2.  The Defendant also told the Court that its lead negotiator, Bradbury, was "an experienced GSA Schedule contract administrator" who had "'received . . . a lot of training about government contracting' and 'worked in government contracts for [her] entire career,' which started in 1981."  Def. Symantec Corp.'s Statement of Undisputed Material Facts in Supp. of its MSJ ¶ 10, ECF No. 126-3 (alterations in original) (citations omitted).

The Government also challenges "Allen's opinions regarding Symantec's general compliance program and methods to track price list changes." U.S. Mot. at 40; *see id.* at 40–43. This refers to two different portions of Allen's testimony. The Government's reference to opinions regarding the "general compliance program" refers to Allen's discussion of Department of Justice guidance. Allen Rep. at 10; *see* U.S. Mot. at 40 (citing Allen Tr. at 304–08). The Court agrees with the Government that this testimony is not relevant. Allen has acknowledged that these compliance programs are "not specifically tailored to the schedules program" and that they do not set standards for complying with any of the regulatory obligations at issue in this case. Allen Tr. at 305–08. And even if marginally relevant, it would be excluded under Rule 403 as its presentation would result in "undue delay, [and] wasting [of] time." Fed. R. Evid. 403.

Allen's opinions on "Symantec's . . . methods to track price list changes," U.S. Mot. at 40, refers to a different section of his report. This section describes "thorough and significant steps" taken by Symantec in preparation of seeking a GSA Schedule contract, including acquiring Veritas Software Corp. and tasking Bradbury with preparing Symantec's proposal. Allen Rep. at 25–26. He then devotes over a dozen pages of his report to explaining his opinion "that Symantec's policies, practices, systems, and personnel, collectively met or exceeded reasonable industry standards for GSA Schedule contract compliance." *Id.* at 33; *see id.* at 33–48. This opinion is based on his review of documents and deposition testimony produced in this case, and is "informed by [Allen's] knowledge and experience." *Id.* at 33. The Government does not challenge this testimony as irrelevant, but as based in no reliable methodology, and as not appreciative of the full factual record of the case. *See* U.S. Reply in Further Supp. of its Mot. to Exclude ("U.S. Reply.") at 16 n.9, ECF No. 109; U.S. Mot. at 42–43. The latter objection is immaterial because the Government could confront Allen during cross-examination with any

portions of the factual record that it believes he has overlooked, *Williams*, 212 F.3d at 1310, but the Court shares the Government's concern about the lack of a proper foundation for opinion testimony regarding whether Symantec met "reasonable industry standards."

An expert need not employ a rigorous analytical methodology if the expert is instead "qualified on the basis of his or her practical experience or training." *Rothe Dev., Inc.*, 107 F. Supp. 3d at 196 (quoting *Robinson*, 75 F. Supp. 3d at 197). But "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note; *see also Arias v. DynCorp.*, 928 F. Supp. 2d 10, 15–16 (D.D.C. 2013). Testimony of the sort that Allen would provide must therefore be based on something more than mere reference to "experience." In *United States v. Second Chance Body Armor*, 289 F. Supp. 3d 145 (D.D.C. 2018), for instance, expert testimony was excluded in part because the expert "d[id] not cite any accepted industry standards or relevant articles in either of his reports, relying instead solely on documents and testimony from th[e] case." *Id.* at 176. Similarly, when evaluating negligence, courts generally do not accept expert testimony on what is reasonable practice in a given industry based solely on an expert's own evaluation. *See, e.g. Beckwith v. Interstate Mgmt. Co.*, 82 F. Supp. 3d 255, 262–64 (D.D.C. 2015) (declining to credit an expert declaration purporting to articulate a standard of care in the hotel industry because it contained only "generalized references to industry standards" but did not articulate "the substantive *content* of any standard of care" (quotation and internal citations omitted)). In that context, "[t]he expert must proffer a specific, articulable (and articulated) standard." *Briggs v. Wash. Metro. Area Transit Auth.*, 481

F.3d 839, 846 (D.C. Cir. 2007) (applying D.C. law) (quotation marks and internal citations omitted).

Allen's testimony about whether Symantec's methodologies meet reasonable industry standards will be excluded because it lacks a reliable basis. Allen testified that he did not look to industry publications or peer-reviewed journals for the "reasonable industry standards" he discusses in his report, but identified such standards based only on his own experience. Allen Tr. at 364–65. He also fails to connect his evaluation of Symantec's methods to his past experience in the industry—the relevant sections of his Report only discuss Symantec and reference Allen's experience only in passing. *See* Allen Rep. at 25–48. It cites only to documents in the record and does not even include any discussion of industry practices outside of Symantec's own. This testimony will therefore be excluded.

Finally, the Government challenges remaining opinions offered by Gormley not covered by its previous objections. U.S. Mot. at 43–44. The first of these, concerning "Gormley's opinions as to what a reasonable contracting officer could have done or would have understood," *id.* at 43, has already been addressed. The second challenges "Gormley's opinions on what is reasonable to infer from the facts of the case." *Id.* at 44. The Government does not identify any particular testimony that it seeks to exclude on this basis, but the Court agrees, as it must, with the cited Circuit precedent stating that "where the jury is just as competent to consider and weigh the evidence as is an expert witness and just as well qualified to draw the necessary conclusions therefrom, it is improper to use opinion evidence for the purpose." *Gilmore v. Palestinian Interim Self-Government Auth.*, 843 F.3d 958, 973 (D.C. Cir. 2016) (quoting *Henkel v. Varner*, 138 F.2d 934, 935 (D.C. Cir. 1943)). The determining factor for whether Gormley is able to testify as to inferences he has drawn will be the qualifying language in the quoted rule: it

depends on whether the jury is "just as competent" to draw the same inference. *Id.* In its Reply, the Government suggests that one piece of inferential reasoning that it would like excluded involves conclusions Gormley draws from the phrase "see attached" in an email. U.S. Reply at 18 (citing Def.'s Opp'n at 28 (citing Gormley Rep. at 22)). The Court agrees that this inference seems to depend on general familiarity with email communications much more than it does on any industry-specific expertise. This is consequently not proper expert testimony. The Court cannot say, though, that Gormley may draw no inferences from the facts of the case, because it seems entirely possible that his experience with GSA Schedule contracts might allow him to draw some inferences that the jury could not reach on its own. The Government will, of course, have the opportunity to challenge any inferences through cross-examination and to cast doubt on those not truly based in expertise.

## III. CONCLUSION

For the foregoing reasons, the Defendant's Motion to Strike the Expert Designation and Expert Testimony of Charles Harris, ECF No. 124, is GRANTED; the United States' Motion to Exclude Persons Designated by Symantec to Provide Expert Testimony, ECF No. 105, is GRANTED IN PART AND DENIED IN PART; and the Defendant's Motion for Leave to Supplement the Record in Support of its Opposition to the United States' Motion to Exclude, ECF No. 118, is GRANTED. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 30, 2020

RUDOLPH CONTRERAS
United States District Judge