# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | : | | |
| LORI MORSELL, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 12-800 (RC) |
| | : | | |
| v. | : | | |
| | : | Re Doc. Nos.: | 298, 299, 348, 354 |
| NORTONLIFELOCK, INC. | : | | |
| (f/k/a SYMANTEC CORPORATION), | : | | |
| | : | | |
| Defendant. | : | | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Relator Lori Morsell brought this *qui tam* action in 2012 alleging that her employer, Symantec,[1] had violated the False Claims Act in connection with General Services Administration ("GSA") Schedule contract. At the heart of this case is Symantec's practice, like many large companies, of offering non-standard discounts above and beyond its standard list prices in order to achieve more sales, and whether that was appropriately disclosed to GSA during the negotiations and the life of the contract. This case has been exhaustively litigated since then, and eventually culminated in a four-week bench trial in February and March 2022. Following the trial, the parties submitted proposed findings of fact and conclusions of law, as well as subsequent briefs in opposition. The Court now makes its Findings of Fact and Conclusions of Law, as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure. For the reasons discussed in detail below, the Court will enter partial judgment in favor of the United

---

[1] During the litigation, Symantec's name changed to NortonLifeLock. Because the relevant events and much of the deposition testimony refers to the company by its prior name, the Court will either refer to the Defendant as "Norton" or "Symantec" based on the relevant time period being discussed.

States in the amount of $1,299,950.16 in damages and penalties, and partial judgment to California in the amount of $379,500 in penalties.

## I.  BACKGROUND

For clarity in following the Court's specific findings of fact and conclusions of law, the Court first provides a brief overview of the facts underlying this case and a summary of the case's procedural history and current posture.

### A.  Factual Overview

Symantec began negotiations with the GSA in 2006 for a GSA Multiple Award Schedule ("MAS") contract, which is a pre-approved pricelist from which federal agencies can purchase commercial goods without independently analyzing whether the prices are fair and reasonable. Like all government contracts, MAS contracts are subject to extensive rules and regulations set by the government, including many standard clauses.  At the same time, each MAS contract is the product of a bilateral negotiation between the contractor and GSA that sets its own discounts and key terms.

The negotiators of the particular contract at issue here were Gwendolyn Dixon, the contracting officer for GSA, and Kimberly Bradbury, a Symantec employee.  During that negotiation, Bradbury provided Dixon with large amounts of information, including information about Symantec's sales and discounting practices.  As the Court will explain in more detail, not all of that information was accurate and complete, as it is required to be by GSA's standard contracting terms.  The information did, however, make clear that GSA was not being offered Symantec's best price in all circumstances and that Symantec offered non-standard discounts to commercial customers for a variety of reasons.

2

After negotiations, the parties eventually signed the final contract on January 25, 2007. Among other things, the final contract specified that Symantec's "basis of award customer," to whom GSA's discounts were tied, was Symantec's entire "commercial class of customers." The final agreement also incorporated a chart of Symantec's various discounts from which the parties could calculate the "price/discount relationship" and thereby ensure that GSA's relationship to the basis of award customer remained stable. The final version also specified that GSA was only receiving Symantec's best price "under similar terms and conditions."

During the life of the contract, Symantec continued offering non-standard discounts to commercial customers, often exceeding 90% even on relatively small sales. Symantec did not report those discounts to GSA or offer it a corresponding price reduction, and in fact routinely certified that its sales practices had not changed. Problems started to become apparent around the time that GSA initiated a pre-award audit in connection with the contract's renewal. After Morsell, who had by that time joined Symantec, eventually raised concerns internally about compliance with the GSA contract, Symantec decided to cancel its contract altogether. A post-award audit was initiated but eventually gave way to the present litigation.

### B.  Procedural History

This case began as a *qui tam* action brought by Lori Morsell, a Symantec employee, who came to believe that the company had violated certain contractual obligations to the United States. She filed an action as Relator against Symantec under the False Claims Act ("FCA") in May 2012. *See* Compl., ECF No. 1. The United States intervened, as did the States of California and Florida, and Morsell elected to assert claims on behalf of New York State. *See* United States' Notice of Election to Intervene, ECF No. 21; Notice of the People of the State of California of Election to Intervene, ECF No. 28; Notice of Election to Intervene by State of

Florida, ECF No. 29; Notification that Relator Intends to Proceed with Action on Behalf of New

York State, ECF No. 40.  The United States, Florida, California, and Morsell on behalf of New

York filed an Omnibus Complaint asserting all their collective claims in October 2014.  *See*

United States', California's, Florida's, & Relator's Omnibus & Restated Compl. in Intervention,

ECF No. 41.

### 1.   Dispositive Motions

Symantec then moved to dismiss, and the United States moved for partial summary

judgment.  *See* ECF Nos. 46, 54.  The Court issued a combined Memorandum Opinion

addressing both motions, which denied the Government's motion and granted Symantec's

motion in part while also denying it in part.  *United States ex rel. Morsell v. Symantec Corp.*, 130

F. Supp. 3d 106, 110 (D.D.C. 2015) ("MTD Mem. Op.").  The Court found that California,

Florida, and Morsell had failed to state claims, but granted them leave to amend their complaints.

*Id.* at 126.  They did so, and the operative Omnibus Complaint includes nine counts brought by

the United States, two each from California and Florida, and three from Morsell on behalf of

New York.  *See* United States', California's, Florida's, and Relator's First Am. Omnibus &

Restated Compl. & Compl. in Intervention ("Omnibus Compl."), ECF No. 70.  Discovery was

extensive, spanning from November 2015 to March 2019, with multiple extensions.  *See*

Scheduling Order, ECF No. 75; Min. Order of Oct. 31, 2018 (granting final extension of

expert discovery).

At the close of discovery, Symantec moved for summary judgment and the United States

moved for partial summary judgment, and the Court granted in part and denied in part both

motions.  *See United States ex rel. Morsell v. Symantec Corp.*, 471 F. Supp. 3d 257, 267 (D.D.C.

2020), *reconsideration denied sub nom. United States ex rel. Morsell v. NortonLifeLock, Inc.*,

560 F. Supp. 3d 32 (D.D.C. 2021) ("MSJ Mem. Op.").  Specifically, the Court determined that

the United States was entitled to summary judgment on some of the discrete elements of its

breach of contract and negligent misrepresentation claims, namely the existence of a valid

contract and a duty on the part of Symantec with respect to the Commercial Sales Practices

Disclosures and the Modifications Clause, but it determined that material issues of fact remained

with respect to the remaining breach-of-contract elements and the remaining claims.  *Id.* at 281–

95, 297, 299.  The Court also granted partial summary judgment to Symantec on the claims of

unjust enrichment and payment by mistake between Symantec and the United States because the

existence of a valid contract between those parties precluded those quasi-contract claims, but it

allowed those counts to proceed with respect to sales between the United States and the resellers.

*Id.* at 309.[2]

## 2. Evidentiary Pretrial Motions

On the same day the Court issued its summary judgment opinion, it issued a separate

opinion addressing two cross-motions seeking to exclude certain experts.  *United States ex rel.*

*Morsell v. Symantec Corp.*, No. 12-cv-800, 2020 WL 1508904, at *1 (D.D.C. Mar. 30, 2020)

("Expert Mem. Op.").  Relevant here, the Court excluded the testimony of one of the United

States' proposed experts, Charles Harris, who would have testified that he evaluated a dataset of

transactions and made a determination about whether or not the transaction triggered the price

reduction clause as he understood it.  *Id.* at *6.

---

[2] Norton moved for reconsideration of that opinion, which the Court denied in August
2021.  *United States ex rel. Morsell v. NortonLifeLock, Inc.*, 560 F. Supp. 3d 32, 36 (D.D.C.
2021) ("Recons. Op.").  Another motion for reconsideration filed by Norton was likewise denied
in September 2021.  *See* Min. Order of Sept. 10, 2021.

The Court agreed with Norton that the proposed testimony crossed the line into improper legal conclusions and risked confusing or misleading the jury. *Id.* at *6–7. In so holding, it summarized its reasoning:

> It appears that Harris was essentially a middleman between Dr. Holt and Dr. Gulley, and that he simply agreed with counsel that the transactions Dr. Holt had identified looked like the kinds of transactions he would have flagged. These transactions were passed along to Dr. Gulley with Harris's imprimatur. Rather than having Harris testify to liability, and possibly confuse a jury with his purported expertise, the Government could instead show Dr. Gulley the transactions identified by Dr. Holt and ask him to assume liability. This would avoid confusing the legal question of liability with the factual questions to which experts may properly testify. The Government has explained that Harris's "opinions are being proffered in connection with a complex damages analysis," but it has not argued that the damages calculation is impossible without his input. Because, as the Court understands it, there is an alternative means of introducing testimony concerning damages—though it may require an update to Dr. Gulley's report—the exclusion of Dr. Harris will not prejudice the government by seriously undermining its ability to present a calculation of damages.

*Id.* at *8 (record citation omitted). The Court further noted that it would entertain a narrow motion for reconsideration if the United States believed Harris's opinion was in fact necessary to its damages calculation, *id.* at *8 n.3, but the United States did not file one—even after the trial was converted from a jury trial to a bench trial, *see* Stipulation Withdrawing Jury Demand & Dismissing Mot. Bifurcate, ECF No. 233.

The parties submitted numerous motions *in limine* prior to trial, as well, which the Court resolved in August 2021. *See United States ex rel. Morsell v. NortonLifeLock, Inc.*, 567 F. Supp. 3d 248, 256–57 (D.D.C. 2021) ("MIL Mem. Op."). Among other evidentiary determinations, the Court denied Norton's motion to exclude the testimony of the United States' damages expert, Dr. Gulley, on the basis that it improperly relied on the stricken opinions of Harris. *Id.* at *277. The Court stated that:

> Gulley appears to have relied on Harris only to determine which transactions Gulley should consider in his calculations, and the Government plans to prove that same information using different evidence. It is unnecessary for Gulley to update his

> report merely to clarify that the transactions he considered are now provided as an assumption by the Government—to be proved by the Government at trial—rather than provided by Harris. If the Government does fail to prove that the transactions considered by Gulley were the right ones to consider, the Government's claim may fail on its own for lack of proof.

*Id.* That opinion also partially granted the motions *in limine* of both sides on other grounds, limiting the scope of the proposed expert testimony to some extent. *Id.* at 283. The parties revised their demonstrative exhibits in accordance with the Court's ruling, and the Court resolved an additional motion *in limine* regarding those changes in January 2022. *United States ex rel. Morsell v. NortonLifeLock, Inc.*, No. 12-cv-800, 2022 WL 278773, at *1 (D.D.C. Jan. 31, 2022).

### 2. Pretrial Resolution of Florida's and New York's Claims

Prior to the commencement of trial, the state of Florida and Norton reached an agreement resulting in a stipulated dismissal with prejudice of Florida's claims in September 2021. *See* Stipulation of Vol. Dismissal with Prejudice by Florida, ECF No. 267. Although the bench trial had been set to begin shortly thereafter, it was continued in light of the ongoing health risks of the COVID-19 pandemic. At the start of the rescheduled bench trial in February 2022, the parties informed the Court that the Relator and Norton had reached a tentative settlement of the New York claims, and would therefore refrain from presenting New York's case while the agreement was finalized. Tr. at 4:18–25. Morsell later voluntarily dismissed her claims asserted on behalf of New York. *See* Stipulation of Vol. Dismissal with Prejudice, ECF No. 358.

### C. Bench Trial

The Court conducted a four-week bench trial from February 28, 2022 to March 24, 2022. During that time, the parties presented testimony from thirty-one witnesses both in person and by video. In an effort to call each witness only once, the parties reached an agreement to limit scope objections on cross examination. *See* Tr. at 9:15–25. Both parties likewise introduced a

7

substantial volume of exhibits and designated deposition testimony for the Court's consideration over the course of the trial.

At the close of the United States' case and California's case, Norton moved for judgment under Federal Rule of Procedure 52(c).  *See* Motions for Judgment, ECF Nos. 298, 299.  Also during trial, Norton raised multiple objections to testimony and evidence related to the excluded expert testimony of Harris.  The Court deferred ruling on those objections and ordered additional post-trial briefing on the subject, *see* Min. Order of April 4, 2022 (setting post-trial briefing schedule), which the parties have provided, *see* NortonLifeLock, Inc.'s Br. Supp. Objections to Evidence Reflecting Legal Concls. of Charles Harris ("Norton's Harris Br."), ECF No. 303; United States' Resp. to Norton's Trial Objections to United States' Summ. Exs. 1, 4, & 5 & Dr. Gulley's Testimony that Relies Thereon ("U.S.'s Harris Br."), ECF No. 339; NortonLifeLock, Inc.'s Reply Supp. Objections to Evidence Reflecting Legal Concls. of Charles Harris ("Norton's Harris Reply"), ECF No. 341.

Following the close of trial, each party submitted proposed findings of fact and conclusions of law.  *See* United States' Proposed Findings Fact & Concl. Law ("U.S.'s Prop. FF&CL"), ECF No. 347; NortonLifeLock, Inc.'s Proposed Findings Fact & Concl. Law for the United States' Claims ("Norton's Prop. Fed. FF&CL"), ECF No. 345; State of California's Proposed Findings Fact & Concl. Law ("Cal.'s Prop. FF&CL"), ECF No. 344; NortonLifeLock, Inc.'s Proposed Findings Fact & Concl. Law for California's Claims ("Norton's Prop. Cal. FF&CL"), ECF No. 346.  The parties have also responded to each other's filings.  *See* California's Resps. to NortonLifeLock's Proposed Findings Fact & Concl. Law for Cal. Claims ("Cal.'s Resp."), ECF No. 349; United States' Resp. to Norton's Prop. Findings Fact & Concl. Law ("U.S.'s Resp."), ECF No. 350; NortonLifeLock, Inc.'s Resp. to United States' Proposed

Findings Fact & Concl. Law ("Norton's U.S. Resp."), ECF No. 351; NortonLifeLock, Inc.'s Resp. to Cal.'s Proposed Findings Fact & Concl. Law ("Norton's Cal. Resp."), ECF No. 352.

In addition, Norton has moved to strike two appendices to the United States' Proposed Findings of Fact and Conclusions of Law on the same basis as its prior objections to the Harris testimony, and that motion is likewise ripe. *See* NortonLifeLock, Inc.'s Mot. Strike Appendices to United States' Proposed Findings Fact & Concl. Law ("Norton's 1st Mot. Strike"), ECF No. 348; United States' Opp'n to Norton's Mot. Strike Appendices to United States' Proposed Findings Fact & Concl. Law ("Opp'n 1st Mot. Strike"), ECF No. 353; NortonLifeLock, Inc.'s Reply Supp. Mot. Strike Appendices to United States' Proposed Findings Fact & Concl. Law ("Reply 1st Mot. Strike"), ECF No. 355; NortonLifeLock, Inc.'s Mot. Strike Appendices C & A.1 through A.15 to United States' Post-Trial Submissions ("Norton's 2d Mot. Strike"), ECF No. 354; United States' Opp'n to Norton's 2d Mot. Strike (Opp'n 2d Mot. Strike"), ECF No. 356; NortonLifeLock, Inc.'s Reply Supp. Mot. Strike Appendices C & A.1 Through A.15 to United States' Post-Trial Submissions ("Norton's 2d Mot. Strike Reply"), ECF No. 357.

## II. LEGAL STANDARDS

### A. Rule 52(a) of the Federal Rules of Civil Procedure

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, in an action tried without a jury, the Court "must find the facts specifically and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). The Court's "[f]indings and conclusions may be incorporated in any opinion or memorandum of decision the court may file." *Defenders of Wildlife, Inc. v. Endangered Species Scientific Auth.*, 659 F.2d 168, 176 (D.C. Cir. 1981); *see also* Fed. R. Civ. P. 52(a)(1) ("The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court.").

The Court's findings must be "sufficient to indicate the factual basis for the ultimate conclusion." *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 422 (1943); *see also Lyles v. United States*, 759 F.2d 941, 943 (D.C. Cir. 1985) ("One of [Rule 52(a)'s] chief purposes is to aid the appellate court by affording it a clear understanding of the ground or basis of the decision of the trial court." (internal quotation omitted)).   "But the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts."  Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment; *accord Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. DE C.V.*, 188 F. Supp. 3d 22, 34 (D.D.C. 2016); *Wise v. United States*, 145 F. Supp. 3d 53, 57 (D.D.C. 2015); *Moore v. Hartman*, 102 F. Supp. 3d 35, 65 (D.D.C. 2015).  The Court is neither "require[d]" nor "encourage[d]" "to assert the negative of each rejected contention as well as the affirmative of those which they find to be correct."  *Schilling v. Schwitzer-Cummins Co.*, 142 F.2d 82, 84 (D.C. Cir. 1944); *Paleteria La Michoacana*, 188 F. Supp. 3d at 34.  Similarly, "the court need not 'address every factual contention and argumentative detail raised by the parties,' or 'discuss all evidence presented at trial.'"  *Moore*, 102 F. Supp. 3d at 65 (quoting *Mayagüez v. Corporación Para El Desarrollo Del Oeste*, 824 F. Supp. 2d 289, 295 (D.P.R. 2011); *see also Wise*, 145 F. Supp. 3d at 57 ("[T]he Court need not address all the evidence presented at trial, and must simply make findings sufficient to allow the appellate court to conduct a meaningful review.").

In accordance with these standards, the Court has cited portions of the record, including trial testimony, trial exhibits, and designated deposition testimony, to support its findings of fact. The Court has not, however, exhaustively identified every portion of the record upon which it has relied to make its findings of fact, and the omission of a citation to a particular portion of the

record does not necessarily mean that the Court did not rely on that portion to make its findings of fact.  Rather, the Court has considered the record in its entirety, including the Court's own determination of witnesses' credibility, and its citations to portions of the record are primarily intended to provide helpful references for the basis of its findings.  The Court has also not noted every instance in which a finding it adopts was purportedly disputed by a party but in which that disputing party failed to make a substantive argument against the finding.  The Court has addressed those substantive arguments that present a material dispute of fact.  The Court therefore has not addressed most instances in which a party purported to dispute a proposed finding but only raised legal arguments concerning the legal consequences or implications of the proposed finding, without actually challenging the validity of the fact.  Legal arguments are addressed in the Court's conclusions of law section.

## B.  Burden of Proof

The parties agree that as in most civil trials, the plaintiffs must prove each element of their case "by a preponderance of the evidence."  Norton's Prop. Fed. FF&CL at 64; U.S.'s Prop. FF&CL at 103.  That same burden applies across the claims in this case.  *See* 31 U.S.C. § 3731(d) ("[T]he United States shall be required to prove all essential elements of the [FCA] action, including damages, by a preponderance of the evidence."); *Pryor v. United States*, 85 Fed. Cl. 97, 104 (2008) (applying preponderance of evidence standard to federal contract claims); Cal. Gov't Code § 12654(c) (California False Claims Act).  "In the simplest of terms, preponderance of the evidence means more likely than not[.]"  *La Botz v. Fed. Election Comm'n*, 889 F. Supp. 2d 51, 59 (D.D.C. 2012).  The standard "demands only 51% certainty."  *Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 453 n.139 (D.C. Cir. 1980).

### C.  False Claims Act

"Originally enacted during the Civil War to combat unscrupulous government contractors, the FCA enables a *qui tam* plaintiff, known as a Relator, to initiate a civil action on behalf of the United States to recover monies paid on account of false or fraudulent claims." *MSJ Mem. Op.*, 471 F. Supp. 3d at 275–76 (citing 31 U.S.C. § 3730; *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 146–47 (D.D.C. 2011)).  The FCA, as amended, creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B), or "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government," *id.* § 3729(a)(1)(G).  These three types of liability are referred to as "presentment" claims, "false statement" claims, and "reverse" false claims, respectively.  "Knowingly" is defined under the act to encompass actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information, *id.* at § 3729(b)(1)(A), and "material" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property," *id.* § 3729(b)(4).

#### 1.  Presentment Claims

Claims under § 3729(a)(1)(A) are known as "presentment" claims.  *See United States ex rel. Tran v. Computer Scis. Corp. ("Tran")*, 53 F. Supp. 3d 104, 117 (D.D.C. 2014).  The elements of presentment claims are that: "(1) the defendant submitted or caused to be submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false."  *Id.* at 121–22 (citation and alteration omitted).  "In the paradigmatic case, a claim is false because it 'involves an incorrect description of goods or services provided or a request for

reimbursement for goods or services never provided.'" *United States. v. Science Applications Intern. Corp. ("SAIC")*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)).  In addition to the paradigmatic case, courts have developed two theories of legal falsity—the implied certification theory and the fraudulent inducement theory.

The Supreme Court has endorsed an implied certification theory, meaning that "if [a] claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, . . . the defendant has made a misrepresentation that renders the claim 'false or fraudulent' under § 3729(a)(1)(A)" "at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Universal Health Servs., Inc. v. United States ex rel. Escobar ("Escobar")*, 579 U.S. 176, 180, 190 (2016).  The Court expressly left open whether liability could arise from false claims that lacked the "specific representations" required for the first of these conditions.  *See id.* at 188–89.  In this Circuit, a claim need not necessarily "express contractual language specifically linking compliance to eligibility for payment," but it "must show that the contractor withheld information about its noncompliance with material contractual requirements." *SAIC*, 626 F.3d at 1269; *see also United States ex rel. Scutellaro v. Capitol Supply, Inc.*, No. 10-cv-1094, 2017 WL 1422364 at *19 n.23 (D.D.C. April 19, 2017) (explaining that *Escobar* did not change the *SAIC* standard in this Circuit).  The withheld information about noncompliance must meet the "demanding" standard for materiality, which requires more than simply showing that "compliance with a particular statutory, regulatory, or contractual requirement [is] a

13

condition of payment" or "that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Escobar*, 579 U.S. at 194.

The final theory of legal falsity, fraudulent inducement, allows for liability "for each claim submitted to the Government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves." *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005) (applying theory to "claims" under an earlier version of the FCA). One recognized variation of the fraudulent inducement theory "requires that false statements induced the government to make the initial contract or caused it to agree on particular contract terms or modifications." *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 105 (D.D.C. 2017) (internal citation omitted).

## 2.   False Statement Claims

In contrast to "presentment" claims, false statement claims under § 3729(a)(1)(B) create liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). The required elements are that "(1) the defendant made or used [or caused to be made or used] a 'record or statement;' (2) the record or statement was false; (3) the defendant knew it was false; and (4) the record or statement was 'material' to a false or fraudulent claim." *United States ex rel. Hood v. Satory Global, Inc.*, 946 F. Supp. 2d 69, 85 (D.D.C.2013). The false statements provision is "designed to prevent those who make false records or statements . . . from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval." *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 501 (D.C. Cir. 2004).

### 3.   Reverse False Claims

31 U.S.C. § 3729(a)(1)(G) establishes a cause of action for "reverse" false claims by creating liability for any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  "Obligation" is defined broadly to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).[3]

### D. Contract Claims

"Courts must . . . apply the federal common law of contracts to the interpretation of contracts with the federal government."  *Red Lake Band of Chippewa Indians v. U.S. Dep't of Interior*, 624 F. Supp. 2d 1, 12 (D.D.C. 2009).  Under federal common law, the elements of a breach of contract claim are "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  *Id.*; *see also Pryor v. United States*, 85 Fed. Cl. 97, 104 (2008) (same).  With respect to the fourth element, "[o]nly once Plaintiff has proven that it in fact suffered a loss (i.e., suffered damages), such that Defendants are liable for a breach of contract claim, does the Court move to the next stage—i.e., the damages determination stage."  *Red Lake Band of Chippewa Indians*, 624 F.

---

[3] Several portions of the FCA, including this definition, were amended as part of the Fraud Enforcement and Recovery Act of 2009 ("FERA").  *See* FERA, Pub. L. No. 111–21, 123 Stat. 1617 (2009).  By its terms, the FERA amendments only apply (at earliest) to claims pending on or after June 7, 2008, which falls in the middle of the relevant contract period here. However, both parties appear to agree that the FERA amendments do not alter the substantive analysis because all claims were presented directly to the United States rather than through an intermediary.  *See* United States' Mem. P. & A. Supp. Mot. Summ. J. at 93 n.54, ECF No. 128-1 (making this point).

Supp. 2d at 13.  Therefore, "a plaintiff need only show that 'responsibility for damages is clear,' not that 'the amount thereof be ascertainable with absolute exactness or mathematical precision.'"  *Id.* (citations omitted).

### E.  Negligent Misrepresentation

The parties agree, and the Court has already determined, that federal law applies to the negligent misrepresentation claim.[4]  *See MSJ Mem. Op.*, 471 F. Supp. 3d at 309 n.17.  They continue, however, to formulate the relevant standard slightly differently.  The United States formulates the standards as (1) negligence in expressing inaccurate statements, (2) a duty to speak, (3) expectation that the United States would rely on the statements, and (4) that the United States relied on the statements and was harmed.  U.S.'s Prop. FF&CL at 111 (citing *Marcus v. AT&T Corp.*, 938 F. Supp. 1158, 1172 (S.D.N.Y. 1996); *Parr v. Ebrahimian*, 70 F. Supp. 3d 123, 128–29 (D.D.C. 2014); & Restatement (Second) of Torts § 552 (1977)).  Norton formulates the standard as "(1) a misrepresentation by defendant; (2) justifiable reliance by the plaintiff; and (3) damage from that reliance."  Norton's Prop. Fed. FF&CL at 90 (citing *La Crosse Garment Mfg. Co. v. United States*, 432 F.2d 1377, 1381–82 (Ct. Cl. 1970)).

---

[4] It is undisputable that the "obligations to and rights of the United States under its contracts are governed exclusively by federal law."  *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988).  Although negligent misrepresentation is traditionally a tort, here it is closely related to the formation and performance of a federal procurement contract, thus implicating uniquely federal interests.  *See id.* at 505–06 (applying federal common law on question of liability for a third party procurement contractor); *see also United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979) ("[F]ederal law governs questions involving the rights of the United States arising under nationwide federal programs.").  At least one other court has held that a uniform rule of federal law should govern a negligent misrepresentation claim by the federal government relating to the disbursement of federal housing funds as part of a nationwide program.  *See United States ex rel. Mei Ling v. City of Los Angeles*, No. 11-cv-974, 2018 WL 3814498, at *29–31 (C.D. Cal. July 25, 2018).

Another case cited by Norton, *United States ex rel. Mei Ling v. City of Los Angeles*, determined in a similar context that the Second Restatement of Torts provided the proper rule for negligent misrepresentation claims under federal common law. *United States ex rel. Mei Ling v. City of Los Angeles*, No. 11-cv-974, 2018 WL 3814498 at *31–32, (C.D. Cal. July 25, 2018). The Restatement provides that:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977). "To prevail on a negligent misrepresentation claim under the Restatement's rules, a plaintiff 'must present some evidence establishing the element of causation, in the sense of actual and justifiable reliance upon misrepresentations or omissions of material fact.'" *Mei Ling*, 2018 WL 3814498, at *32 (quoting *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 964 (9th Cir. 1990)).

The Court perceives that these different formulations largely align and considers it prudent to draw primarily on the Second Restatement, which "is a widely cited authority that can be applied across varied jurisdictions and ensure consistent adjudication of negligent misrepresentation claims." *Id.* at *31. Synthesizing the various formulations, the Court will apply the following elements of the negligent misrepresentation claim: (1) a duty to exercise reasonable care or competence in obtaining or communicating information, (2) a misrepresentation of that information, where (3) the defendant understood the plaintiff would rely upon the information, and (4) the plaintiff actually and justifiably relied upon the information, (5) resulting in harm to the plaintiff.

### F.  California Law

The California False Claims Act ("CFCA") was modeled after the federal FCA, making federal decisions "persuasive authority" in adjudicating CFCA claims.  *See United States v. Shasta Servs., Inc.*, 440 F. Supp. 2d 1108, 1111 (E.D. Cal. 2006); *MSJ Mem. Op.*, 471 F. Supp. 3d at 310.  Like the federal FCA, the CFCA creates liability for "[a]ny person who . . . (1) [k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval . . . [or] (2) [k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."  Cal. Gov't Code § 12651(a)(1), (2).

## III.  FINDINGS OF FACT

### A. United States

#### 1. The Regulatory Framework

1. The GSA is an executive agency tasked with supporting the operations of the federal government through acquisition, property management, and procurement of other goods and services.  *See* 40 U.S.C. § 301; Tr. at 2840:20–22 (Morrison).  To expedite the procurement process for agencies and contractors, GSA solicits, negotiates, awards, and administers MAS contracts.  40 U.S.C. § 501(b); FAR § 8.402.

2. MAS contracts are "indefinite delivery/indefinite quantity contracts" for various products and services used by the federal government.  Tr. at 2841:8–11 (Morrison).  The MAS program is designed both to streamline government purchasing and leverage the federal government's buying power.  *Id.* at 2841:11–14.  Put simply, the federal government collectively is a major purchaser of goods and services, but it would lose both efficiency and negotiating power if each governmental unit had to negotiate independently each time it wanted to buy common goods and services such as desks, notepads, or computer software.  By collectively negotiating in advance

to make common goods and services available through a MAS contract, GSA can achieve a better price and make purchasing more efficient for the numerous federal government components. *See also* U.S. Ex. 493 (PIB 97-14) at 2 ("As a representative of the taxpayers, the primary objective of the contract specialist is to buy competitively and wisely.").

3. The MAS program is governed by a complex statutory and regulatory framework, including Title 48 of the Code of Federal Regulations, which is also known as the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 8.402 *et seq.* Additional regulations establishing procedures to be followed by GSA contracting officers are found in the GSA Acquisition Regulation ("GSAR"), 48 C.F.R. § 501.101 *et seq.*, the entirety of which is also incorporated into the GSA Acquisition Manual ("GSAM"), U.S. Ex. 342 (2004 GSAM). Authorized Contracting Officers and Contracting Specialists negotiate MAS contracts on GSA's behalf, and only Contracting Officers have the authority to bind the federal government. Tr. at 2841:15–22 (Morrison).

4. The GSAM instructs Contracting Officers to "seek to obtain the offeror's best price" while also recognizing "that the terms and conditions of commercial sales vary and there may be legitimate reasons why the best price is not achieved." GSAM § 538.270(a). The GSAM includes a list of factors for Contracting Officers to consider when determining price negotiation objectives, such as volume of sales, discounts offered to commercial customers, and length of the contract period. *Id.* § 538.270(c)(1–7). It instructs Contracting Officers that "[i]f the best price is not offered to the Government, you should ask the offeror to identify and explain the reason for any differences." *Id.* § 538.270(c)(7). A Contracting Officer may award a MAS contract with a less favorable price than the best price as long as "(1) The prices offered to the Government are fair and reasonable, even though comparable discounts were not negotiated" and the "(2) Award is otherwise in the best interest of the Government." *Id.* § 538.270(d).

5. Contracting Officers exercise broad discretion to determine whether an award is fair and reasonable.  Tr. at 2907:4–14, 2910:5–7 (Morrison).

2. Negotiation and Structure of GSA MAS Contracts

6. GSA publicly posts an invitation for contractors to submit solicitations for MAS contracts. Tr. at 2844:3–10 (Morrison).  The solicitation requires certain information and clauses that are later included in the contract.  *Id.* at 2844:6–9.

7. Of key importance in the information provided with the solicitation are the "Commercial Sales Practices," or "CSP" disclosures.  *See* GSAM § 515.408 (standard format for the CSP disclosures).  The CSP Form instructions provide that the offeror must provide information that is "current, accurate, and complete" as of fourteen calendar days prior to submission.  *Id.*, Figure 515.4-2.  The offeror is also told "[y]ou must . . . disclose any changes in your price list(s), discounts and/or discounting policies which occur after the offer is submitted, but before the close of negotiations," and, "[i]f your discount practices vary by model or product line, the discount information should be by model or product line as appropriate."  *Id.*

8. The standard CSP Form asks offerors whether the discounts and concessions offered to the Government are "equal to or better than your best price . . . offered to any customer acquiring the same items regardless of quantity or terms and conditions?"  *Id.* § 515.408.  Question 4(a) requires disclosure of information about discounting policies, and question 4(b) asks whether "any deviations from [these] written policies or standard commercial sales practices . . . ever result in better discounts (lower prices) or concessions than indicated?"  *Id.*

9. A chart below question 4 must be filled out with details about the lowest discounts the offeror makes available—whether these are offered to the government or other customers.  *Id.*

(containing instructions for filling out the chart).  The information about discounts can also be presented "in an equivalent format developed by the offeror."  *Id.*

10.   After receiving a solicitation, a Contracting Officer reviews it to ensure that all the required information was received and will notify the offeror if the solicitation is incomplete.  Tr. at 2920:20–2921:2 (Morrison).  The Contracting Officer then reviews the materials, does a pricing analysis, and prepares a pre-negotiation memorandum.  *Id.* at 2921:25–2922:10.

11.   During the course of evaluating the offer and negotiating, a Contracting Officer may request clarification or additional information for anything they do not understand.  *Id.* at 2913:17–24.

12.   Following negotiation, the Contracting Officer writes a post-negotiation memorandum memorializing the agreement that has been reached.  *Id.* at 2914:18–23.

13.   All MAS contracts also contain standard clauses designed to ensure that the prices negotiated for government purchasers are appropriately advantageous at the time of negotiation and that they remain so during the life of the contract.

14.   The first of these, the Price Adjustment Clause, reads in relevant part:

> (a) The Government, at its election, may reduce the price of this contract or contract modification if the Contracting Officer determines after award of this contract or contract modification that the price negotiated was increased by a significant amount because the Contractor failed to: (1) Provide information required by this solicitation/contract or otherwise requested by the Government; or (2) Submit information that was current, accurate, and complete; or (3) Disclose changes in the Contractor's commercial pricelist(s), discounts or discounting policies which occurred after the original submission and prior to the completion of negotiations.

GSAM § 552.215-72.

15.   Violations of the Price Adjustment Clause are typically identified during an audit.  Tr. at 2855:17–22 (Morrison).  GSA cares about those violations and brings enforcement actions to recover overpaid amounts on this basis.  *Id.* at 2856:14–2857:4.

16.    During the life of the MAS contract, the contractor may submit changes to the contract, such as adding or deleting items or reducing prices.  GSAM § 552.243-72(a)–(b).  The relevant provision governing these requested changes, the "Modifications Clause," requires the contractor to submit either updated CSPs for the new items or provide confirmation that the previous CSPs have not changed.  *Id.* at 552.243-72(b)(ii) ("[S]ubmit the information requested in paragraphs 3 through 5 of the Commercial Sales Practice Format.  If this information is the same as the initial award, a statement to that effect may be submitted instead."); *see also* Tr. at 2857:10–24 (Morrison) (confirming that contractors must submit updated CSPs or affirm that the CSPs have not changed when submitting modifications).

17.    The designated 30(b)(6) witness for GSA, John Walsh, agreed that if certain non-standard discounting reasons were disclosed in the CSPs and the actual practices were consistent with those disclosures, it would not constitute a price reduction.  In the hypothetical provided during the deposition, GSA agreed that "if an offeror tells GSA in the CSP that it deviates from standard pricing to satisfy a disgruntled customer, and then an IG auditor comes upon such a deviation during an audit, then as you just said, that that wouldn't trigger the price reductions clause."  JX001 at 92:6–11 (Walsh Dep.).  Walsh further agreed that if the contractor disclosed that such discounts occurred "a hundred times a year," it would not constitute a change to a commercial practice to do so 101 times in a year during the life of the contract.  *Id.* at 92:19–93:20.  Although at some point any variations from those disclosures would become a "change" to the commercial sales practices, GSA further admitted that it does not provide guidance to contractors on where to draw that line.  *Id.* at 99:9–100:3.  However, Walsh separately stated that the disclosures would not "necessarily impact the price reduction clause of the contract."  *Id.* at 95:2–4.

18.   The final relevant clause is the Price Reduction Clause ("PRC"), which is designed to account for changes in the offeror's pricing over the life of the MAS contract.  GSAM § 552.238-75.  The PRC requires that GSA and the offeror agree on a customer or category of customers that will serve essentially as a point of comparison for the government's discounts. *See id.* § 552.238-75(a).  The offeror must keep the Contracting Officer apprised of prices being offered to that customer or category of customers throughout the life of the MAS contract, and PRC ensures that the Government's prices are reduced if this customer or category of customers is given lower pricing or increased discounts.  *Id.* § 552.238-75(b)–(c).

19.   The PRC identifies three events which trigger price reductions when they occur.  *Id.* § 552.238-75(c)(1).  The first "PRC trigger" occurs when the contractor "[r]evises the . . . pricelist . . . upon which contract award was predicated to reduce prices." *Id.* § 552.238-75(c)(1)(i).

20.   The second PRC trigger occurs when the contractor "[g]rants more favorable discounts or terms and conditions than those contained in the commercial catalog, pricelist, schedule or other documents upon which contract award was predicated."  *Id.* § 552.238-75(c)(1)(ii).

21.   The third PRC trigger occurs when the contractor "[g]rants special discounts to the customer (or category of customers) that formed the basis of award, and the change disturbs the price/discount relationship of the Government to the customer (or category of customers) that was the basis of award."  *Id.* § 552.238-75(c)(1)(iii).

22.   The PRC clause also identifies certain exceptions to those triggers, including sales that exceed the agreed-upon "maximum order threshold" for that contract.  *Id.* § 552.238-75(d).

23.   When a price reduction occurs, the GSAM obligates the contractor to offer the price reduction to eligible GSA purchases "with the same effective date, and for the same time period,

as extended to the commercial customer (or category of customers)."

GSAM § 552.238-75(c)(2).

24.    The Court provides a highly simplified example to demonstrate this concept: an MAS contract provides for the sale of widgets to GSA for $10, and the basis of award is Customer A, who purchases widgets for only $8.  If, during the life of the contract, the contractor sells widgets to Customer A for only $7, the discount relationship has been disturbed, and GSA is entitled to a proportional discount on its own sales price.  If, however, that discount was given to Customer A for a single large order exceeding the Maximum Order Threshold, the PRC would not be triggered.

### B. Defendant NortonLifeLock

#### 1. The Veritas/Symantec Merger and Legacy GSA MAS Contracts

25.    Symantec was an early leader in computer security software.  Tr. at 239:14–19 (McGee).  It sold security products that helped customers keep their information safe from hackers, viruses, and other threats.  *Id.* at 804: 2–4 (Robbins).

26.    Symantec acquired Veritas, a company that specialized in data backup and availability.  *Id.* at 240:23–241:3 (McGee).  The merger of the two companies was announced in 2005, *id.* at 1714:2–3 (Bradbury), and finalized in early November 2006, U.S. Ex. 57.

27.    Prior to the merger, Veritas had a GSA MAS contract for its availability products.  That contract had been negotiated by Kimberly Bradbury, then a Veritas employee, with the assistance of Kari Reinhardt, whom Bradbury hired to assist her in preparing the offer.  Tr. at 2024:1–2025:5 (Bradbury).  The Veritas GSA contract was set to expire in December 2006.  *Id.* at 2067:7–9.

28.    Prior to the merger, legacy Symantec did not have a direct MAS contract with GSA; rather, it sold Symantec products through the GSA contract of one of its resellers, Immix.  *Id.* at 2067:10–18.

29.    In October 2005, Symantec made the decision to pursue a direct GSA contract rather than use the Immix contract.  *Id.* at 2068:6–9 (Bradbury); U.S. Ex. 518.

30.    The initial offer for GSA included only legacy Symantec products.  *Id.* at 1094:15–16 (Reinhardt); *id.* at 2070:15–2071:13 (Bradbury).  As the expiration for the Veritas contract neared, however, Symantec updated its offer to include the Veritas products, as well.  *Id.* at 2071:10–17 (Bradbury).

### 2. Symantec's Pricing Practices

#### a. The "Pricing Waterfall"

31.    One helpful visualization of how Symantec's pricing practices work was the "pricing waterfall."  The pricing waterfall was more of a conceptual tool than an actual policy, but the Court and numerous witnesses referenced it and agreed with its theoretical accuracy when discussing Symantec's pricing techniques, and the Court agrees that visual element is helpful to understanding the overall pricing structure.  *Id.* at 485:16–23 (Knox).  The Court therefore includes the below demonstrative exhibit for the purpose of explaining Symantec's pricing practices:



U.S. Demon. Ex. 1.

### b. Buying Program "Band" Discounts

32.   The first column in the pricing waterfall, "Base MSRP," is the suggested retail price prior to any discounts.  McGee Aff. ¶ 6, U.S. Ex. 1833.  The next column, Banded MSRP, is the price after applying the "band" discounts that the customer was entitled to for a given purchase under the relevant buying program.

33.   As the Veritas–Symantec merger finalized, the company rolled out new buying programs that became effective in November 2006.  U.S. Ex. 7B (slides describing new programs).

34.   "Express" was the most basic program.  Within Express, there were nine different "band levels" that provided for more favorable pricing based on the order volume.  *Id.* at 2–4.  The Express program was designed for commercial end users that were not government or academic.  Tr. at 160:23–161:5 (McGee).

35.   Separate from Express, there were also "Government" and "Academic" buying programs that provided similar banded discounts based on purchase volume.  U.S. Ex. 7B at 2, 12, 16.

36.   The Express, Academic, and Government programs were all order-specific, meaning the relevant band and discount was determined by the volume of each order alone.  Tr. at 161:6–11, 22–25 (McGee); U.S. Ex. 7B at 16.

37.   In contrast, the "Rewards" buying program was akin to a frequent flyer program, in which customers accumulated points across multiple orders that allowed them to achieve progressively more favorable bands of pricing.  U.S. Ex. 7B at 18–22.  The customer's points were tracked across purchases using the customer's unique "SAN" number and expired two years later.  *Id.*; Tr. at 163:2–13 (McGee).

38.   The pricing under the Rewards program was more favorable than the Express program, with the lowest band of Rewards discounts approximately picking up where the highest band of Express discounts left off.  Tr. at 204:2–10, 18–21 (McGee).

39.   Finally, the most advantageous buying program was Enterprise.  There were multiple programs within Enterprise, including site licenses and Enterprise Flex, under which customers made a large up-front payment and debited downloads of Symantec products from that credit.  U.S. Ex. 7B at 24–26; Tr. at 212:10–213:25 (McGee).  The discounts for Enterprise Flex were negotiated off of Base MSRP rather than a specific band.  Tr. at 214:1–4 (McGee).

*c. Channel Margins*

40.   Most of Symantec's sales were not made directly between Symantec and an end user; rather, they were made through distributors, resellers, and original equipment manufacturers, collectively known as "channel partners."  Tr. at 244:25–245:2, 245:14–23 (McGee) (estimating that approximately 80–90% of Symantec's sales during the life of the GSA contract went through channel partners).

41.   Those channel partners received an additional discount off of the banded MSRP that accounted for their profit margin.  *Id.* at 615:19–616:1 (Cochran); *id.* at 149:6–21 (McGee).

Symantec preferred to make sales through the channel partners because those entities provided additional services such as credit checks and storing inventory. *Id.* at 246:7–11 (McGee).

42.   In some instances, channel partners operated in a one-tier model, where resellers sold directly, and in other instances resellers purchased from distributors and received an additional channel margin. *Id.* at 150:3–8, 246:18–25.

43.   The "standard buy price" was the price for a product after factoring in the applicable channel margins and buying program discounts. *Id.* at 151:4–8.

*d. eSPA and Non-Standard Discounting*

44.   In addition to the buying program and channel discounts, Symantec's sales team offered deal-specific "non-standard" discounts. *Id.* at 151:9–15.

45.   Non-standard discounts required approval, with higher overall discounts requiring progressively higher levels of discount approval authority from management in sales leadership and finance. *Id.* at 250:2–17. The level of approval authority required was based on the total percentage discount off of Base MSRP for the order as a whole. U.S. Ex. 229B at SYM439069.

46.   Non-standard discount approvals were processed through a system known as "eSPA," the functionality of which was later transferred to a platform called SFDC.[5] Tr. at 494:1–4 (Knox); *id.* at 152:2–17 (McGee). Specially negotiated terms and conditions were approved through a separate system called "eSTA."[6] *Id.* at 494:17–22 (Knox).

---

[5] There was some disagreement among the witnesses as to whether eSPA stood for "Electronic Special Pricing Application" or "Electronic Special Pricing Authorization," but any difference is immaterial. For ease of reference, the Court refers to this program, both before and after its shift to the SFDC platform, only as "eSPA."

[6] The function provided by eSTA was likewise later moved to another program called SymArt, *see* Tr. at 199:22–25 (McGee), but the Court refers to both programs merely as "eSTA."

47.   Symantec's policies and guidelines for non-standard discounting were memorialized and circulated in various iterations of its "Global Discount Authority Guidelines."  U.S. Ex. 229B (2008 version); U.S. Ex. 1474 (2010 version).

48.   Most requests that were submitted in eSPA were approved, but that was in part because there had been prior negotiations with the approver and the sales representative.  Tr. at 765:22–766:2 (Simon) ("I can tell you the ones that hit my desk, you know, I'm sure most of them were approved because there had been prior conversations.  I wasn't seeing it for the first time.  There had been verbal negotiations back and forth to make sure it was something that both the customer can support and I can support.").

49.   After a deal was made, orders were booked through a separate department called "Orders to Cash"[7] that ensured that all the correct information was entered into Symantec's sales system, Oracle ERP.  Tr. at 170:19–23 (McGee).  If an order contained a non-standard discount, it would need to have an eSPA number indicating approval, otherwise the transaction would be automatically put on hold and could not proceed until the correct approval was obtained and entered into the field by a member of the Orders to Cash team.  *Id.* at 694:2–695:1 (Thompson).

50.   The Orders to Cash team conducted frequent internal and external audits.  *Id.* at 698:15–699:16.

*e. Rebates*

51.   Finally, Symantec routinely offered back-end rebates to resellers as an incentive, usually as a percentage of total volume sales from the previous quarter.  *See* Tr. at 618:17–22 (Cochran).

---

[7] The Orders to Cash group changed names at various points during the life of the contract, *see* Tr. at 683:17–21 (Thompson), but for simplicity's sake the Court refers to it only as Orders to Cash.

52.   Some of those rebates were offered as incentives for registering new "opportunities" with Symantec.  *See* U.S. Ex. 186C (flyer advertising rebate programs).  Some of those back-end rebates were as high as 16%.  *See id.* (advertising the opportunity registration rebates for Platinum partners as having a 12% opportunity registration rebate and 4% partner program rebate, combined with the 8% front-end rebate, for a total of 24%).

53.   One rebate program, operated during 2006 and 2007, was known as the GSA Master Aggregator Rebate program, which gave a 5% rebate to certain resellers where they acted as a distributor in connection with a GSA sale (i.e., where another reseller was the direct seller and that reseller used DLT, Carahsoft, or UNICOM to process the transaction).  That specific rebate ended when the GSA Master Aggregator program was revamped in 2008.  U.S. Ex. 187B (slides describing changes to program); U.S. Ex. 189 (email addressed to Bradbury regarding changes to program).

54.   Rebates varied by reseller and some of the rebate programs changed during the life of the contract.  *See* U.S. Ex. 397B at 12–19 (chart summarizing rebate programs in Symantec discovery response).

### 3. SKUs and Overall Sales Practices

55.   Symantec assigned an identifier to each product known as a "stock-keeping number," or "SKU."  However, each product had a different SKU for every band of every buying program.  Tr. at 209:11–15 (McGee); *id.* at 592:15–18 (Pugh).

56.   The result of this SKU-labeling process was that each product had numerous SKUs, sometimes over 30.  Tr. at 593:1–11 (Pugh).  After the merger with Veritas, the total number of SKUs ballooned from about 100,000 to over 600,000.  *Id.* at 496:4–7 (Knox).

57.   The total number of SKUs declined somewhat thereafter, but remained in the hundreds of thousands, which was astronomically high when compared with similar competitors in the market.  *See id.* at 236:3–4 (McGee) (commenting that Symantec's total number of SKUs was "ridiculous"); U.S. Ex. 1180 (identifying the number of SKUs as a business problem in a 2010 presentation and noting that at the time Symantec had twice as many SKUs as its top ten competitors combined).

58.   Complicating matters, the eight-digit SKUs in effect at the time of the merger were assigned without any particular pattern, meaning that there was no way to track a single product across different bands and buying programs.  Tr. at 231:23–232:5 (McGee).

59.   An alphanumeric "intelligent SKU" system was rolled out in approximately 2010 that allowed users to discern key information about the product as well as the program and pricing bands, but those SKUs were assigned on a going-forward basis only.  U.S. Ex. 122 (Symantec guide explaining the intelligent SKU rollout).

60.   During the entire life of the GSA contract, Symantec did not have any functionality in its systems that allowed it to track a single product—and therefore its pricing—across SKUs.  U.S. Ex. 400 ¶¶ 56–58 (admissions of Symantec).

### C. The GSA-Symantec Negotiations

61.   The Court heard extensive testimony from the key individuals involved with the preparation and negotiation of Symantec's GSA contract: Kimberly Bradbury, Kari Reinhardt, Gwendolyn Dixon, and Matthew Percival.  Reinhardt and Dixon had little to no recollection of the events so many years ago, so while their testimony was credible, it added relatively little beyond the documentary evidence.  Percival's testimony was credible and informative with respect to the limited role he played.

62.     Bradbury had by far the best recollection of events and testified in detail over several days. Although the Court credits her testimony in many respects, it discounts it in others.  Specifically, the Court believes that a good deal of Bradbury's remarkably clear memory resulted from her own post-hoc reconstruction and rationalization of the relevant events and was shaped by her own desire for self-preservation.  Throughout her testimony Bradbury was often defensive and refused to acknowledge even minor error.  Some of her assertions were inconsistent with prior testimony and other aspects of the record.  Contemporaneous emails in the record also suggest that she was less than forthright when she thought it served her interests.  Accordingly, the Court gives comparatively less weight to her testimony.

### 1. The Initial Offer

63.     Symantec submitted its initial offer for a GSA MAS contract on February 28, 2006.  *See* U.S. Ex. 4A (initial offer).  The initial offer included only legacy Symantec products, not Veritas products.  Tr. at 1508:22–25 (Bradbury).

64.     The initial offer contained the following:

    a.  A cover letter, U.S. Ex. 4A at 2–3;

    b.  A Standard Form 1449 for solicitations, *id.* at 4–5;

    c.  Pages 3 through 82 of the standard solicitation terms and questions, and Symantec's responses, *id.* at 6–86;

    d.  A chart entitled "G.4(4) Summary of Non-Published Discounts offered by SKU for sales in 2005," which depicts the total quantity of line items sold and percentage of occurrences for each discount decile from 0–10% to 90–100%, *id.* at 87–88;

    e.  A chart entitled "Discount Reason Codes" on the same page as a chart entitled "Management Discount Approval Levels," *id.* at 89;

    f.  Pages depicting the standard channel margin discounts offered to resellers and distributors under Symantec's then-existing buying programs, *id.* at 90–101;

    g.  A proposed GSA pricelist, *id.* at 102;

    h.  A past performance document, *id.* at 103–04;

    i.  A summary of Symantec's proposed exceptions to the standard terms of the solicitation, *id.* at 105–06;

    j.  A small business plan, *id.* at 107–14;

    k.  Symantec's standard OEM, authorized distributor, and authorized reseller agreements, *id.* at 115–50; and

    l.  Pricelists for Symantec's Elite Commit, Elite Forecast, Value, and Value Government pricelists, *id.* at 151–54.

65.   Among the pages responding to the standard solicitation questions was the "Commercial Sales Practices Format." *Id.* at 80–83. Question 2 of that section asked Symantec for its projected annual sales to the government for each SIN. *Id.* at 80. In the initial offer, that section estimated a total of just over $19 million in sales, divided as follows:

| Special Item No. | 132-3 | Leasing of Equipment | $0 |
|---|---|---|---|
| Special Item No. | 132-4 | Daily / Short Term Rental | $0 |
| Special Item No. | 132-8 | Purchase of Equipment | $1,000,000 |
| Special Item No. | 132-12 | Maintenance of Equipment, Repair Service, and Repair Parts/Spare Parts | $500,000 |
| Special Item No. | 132-32 | Term Software Licenses | $NSP |
| Special Item No. | 132-33 | Perpetual Software Licenses | $13,000,000 |
| Special Item No. | 132-34 | Maintenance of Software | $2,990,000 |
| Special Item No. | 132-50 | Training Courses | $410,000 |
| Special Item No. | 132-51 | Information Technology Professional Services | $1,170,000 |
| Special Item No. | 132-52 | Electronic Commerce Services | $0 |
| Special Item No. | 132-53 | Telecommunication Transmission Services | $0 |
| Special Item No. | 132-60 | Authentication Products and Service | $0 |

*Id.* at 80–81.

66.   Question 3 in that section asked, "[b]ased on your written discounting policies (standard commercial sales practices in the event you do not have written discounting policies), are the

discounts and any concessions which you offer to the Government equal to or better than your best price (discount and concessions in any combination) offered to any customer acquiring the same items regardless of quantity or terms and conditions?"  Symantec answered "no" to that question.  *Id.* at 81.

67.   The next question, 4(a), requested information about written discounting and commercial sales practices for each SIN in the provided chart "or in an equivalent format."  *Id.*  The chart format, which contained columns for customer, discount, quantity/volume, FOB term, and concessions, was not completed in the initial offer.  *Id.*  Instead, the annotation read "Reference Attached Sheets."  *Id.*

68.   The next question in the CSP Format, 4(b), asked whether "any deviations from your written policies or standard commercial sales practices disclosed in the above chart ever result in better discounts (lower prices) or concessions than indicated?"  *Id.*  That question was answered "no."  *Id.*

69.   The attached pages did not correspond to the same format as the chart.  Rather, there were pages about discounts offered to distributors and resellers and discounts offered under the different bands of the buying programs in effect at that time.  *Id.* at 87–102.  The first of those attachments was titled "G.4(4) Summary of Non-Published Discounts offered by SKU for sales in 2005."  *Id.* at 87–88.  Referred to during trial by the shorthand "Frequency Chart," this spreadsheet provided information on the total quantity of SKUs sold, percentage of occurrences, and category of customer, grouped by decile from 0–100%.  *Id.*  According to the chart, the discounts were consistently distributed in a "bell curve" shape, with the vast majority of discounts (88%) occurring in the 31–40% range.  *Id.*

70.   The Frequency Chart was prepared by Matthew Percival, an outside consultant and Bradbury's brother.  Tr. at 1710:14–16, 2068:18–22 (Bradbury).  Percival's background was in software engineering and he had no specific expertise on GSA regulatory compliance.  Tr. at 1200:1–13 (Percival).

71.   Percival compiled the chart by merging sales data with multiple pricelists to calculate discounts.  *Id.* at 1204:2–5.  He did not know about the built-in band discounts provided to customers or the channel margin discounts provided to resellers and distributors.  *Id.* at 1219:12–1220:5 (not recalling at trial but acknowledging prior deposition testimony to that effect).

72.   Although the title in the submission stated that it summarized "non-published" discounts, the chart in fact contained both standard and non-standard discounts.  This makes perfect sense given the information that was provided to Percival and his lack of knowledge about the difference between standard and non-standard discounts.  *See id.* at 1222:9–14.  Indeed, when submitting his findings to Bradbury, Percival represented only that the chart was a "discount distribution" in the general sense.  *See* U.S. Ex. 46 (initial email sending Percival results to Bradbury).

73.   When she first received the results, Bradbury identified the standard discounts to distributors as the most likely reason for the high concentration of discounts in the 30–40% range in an email forwarding those results internally.  U.S. Ex. 47.  However, Bradbury testified that when she opened the underlying data, she only found the names of end user customers, with no indication of whether the sale was direct or made through a channel.  Tr. at 1724:14–1725:6 (Bradbury).  After determining that no distributor names appeared in the data, she appears to have simply assumed that they were not included and labeled the chart accordingly.  *See id.* at 1710:17–19 (Bradbury acknowledging that she believed she added the heading herself).

74.   That assumption was irresponsible at best.  Bradbury was aware that Symantec tracked the

end user even for sales through distributors, *id.* at 1725:19–25, and had herself requested that

"[s]ales to distributors, OEMs, [value-added resellers] and end users" be included in the data sent

to Percival, U.S. Ex. 38.

75.   The Government's expert, Dr. Holt, recreated Percival's chart using the Symantec sales

data in order to demonstrate how he reached those numbers.  Tr. at 3453:9–12 (Holt).  The Court

found Dr. Holt's analysis to be reliable, thorough, and informative.  In her attempt to recreate the

table, Dr. Holt determined that Percival had included individual line items separately rather than

at the order level, removed international transactions, excluded items where the SKU did not

appear on the pricelist, dropped all items with a 0% discount (meaning no discount), treated all

sales as direct and calculated the discount off of banded MSRP, and did not include the Veritas

data.  *Id.* at 3457:24–3459:11.

76.   Many of those choices were reasonable under the circumstances.  The problem was that the

inclusion of a large number of standard channel margin discounts made it an unreliable

representation of how often Symantec varied from its *formal* discounting policies.  Nevertheless,

in the form that it was provided to GSA, the Frequency Chart falsely purported to summarize

"non-published" discounts despite the fact that Percival had not intended it to do so and

Bradbury had reason to believe it did not.  Furthermore, the underlying data was never disclosed

to GSA.  Tr. at 1726:19–24 (Bradbury).  It was, in a word, inaccurate.

77.   Dr. Holt's "corrected" Frequency chart further illustrates why the Frequency Chart was

misleading.  Because the data did not track whether a given sale was a direct or channel sale, Dr.

Holt excluded any sales that exactly matched the standard buy price (the channel partner price)

under the assumption that those sales were, in fact, to channel partners.  Tr. at 3461:12–25

(Holt).  Then, if the sale price fell between MSRP and standard buy price, Holt calculated the discount off of MSRP, and if the sales price was less than the standard buy price, assumed that a channel discount had applied and calculated the discount off of standard buy price.  *Id.* at 3462:1–10.  Those assumptions were reasonable under the circumstances and in fact conservative, as they would have reduced the calculated discount for direct sales that were more generous than the standard buy price.

78.   After adding in additional pricelists and the Veritas products, the corrected Frequency Chart showed a much more evenly distributed range of discounts across deciles, as opposed to the large bell curve in the 30–40% range that appeared in Percival's Frequency Chart.  *Id.* at 3462:11–3464:1.  As Dr. Holt explained through her testimony with the aid of a visual demonstrative, the side-by-side comparison of the Percival and Corrected Frequency Charts appears as follows:

| Discount Range | Percival Frequency Chart | | Fully Corrected 2005 Frequency Chart | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| 0 to 10 | 11 | 0.008% | 6,436 | 12.03% |
| 10 to 20 | 5,352 | 4% | 12,844 | 24.00% |
| 20 to 30 | 7,361 | 5.68% | 5,592 | 10.45% |
| 30 to 40 | 114,557 | 88% | 8,798 | 16.44% |
| 40 to 50 | 1,134 | 0.9% | 8,236 | 15.39% |
| 50 to 60 | 369 | 0.3% | 4,987 | 9.32% |
| 60 to 70 | 206 | 0.2% | 2,879 | 5.38% |
| 70 to 80 | 322 | 0.2% | 1,901 | 3.55% |
| 80 to 90 | 287 | 0.2% | 1,189 | 2.22% |
| 90 to 100 | 31 | 0.0% | 646 | 1.21% |
| Total SKUs | 129,360 | | 53,508 | |

Slide 11 of Dr. Holt's testimony, U.S. Demon. 5.

79.   Although the percentages in the corrected chart are still fairly low across the board, it is clear that there are substantially more transactions in the high discount deciles than were disclosed to GSA, even though the total number of transactions is lower.

80.   Norton's expert, Mr. Tucker, criticized Dr. Holt's inclusion of the Veritas products, which had generally higher discounts than the legacy Symantec products, and Dr. Holt's exclusion of the many line items that she believed did not receive a non-standard discount, as "really completely different transactions."  Tr. at 4307:10–24 (Tucker).  The question is not so much which chart came closer to the absolute truth, however, but rather whether it accurately depicted what it claimed to show.  The Percival Frequency Chart purported to depict non-published discounts, but it was distorted by a large number of standard channel margin discounts. Although the Veritas products were not submitted with the initial offer, as explained below, the Frequency Chart was never updated, making the failure to disclose them misleading.

81.   In addition to the Frequency Chart, the initial offer included a chart giving the percentage of occurrences of each "Discount Reason Code[]" for the non-published discounts.  U.S. Ex. 4A at 89.  That same page included the management approval required for progressive discount percentages off of list price.  *Id.*

82.   The categories on that list were: Pro-rated Appliance Add-ons, Pro-rated Maintenance / Subscription, Contract Pricing, Competitive Price Match, Quarter end discount, Other, Customer Satisfaction Issue, Product Bundle, Enterprise License Agreement/True up Non-Com[p]liance, Previous Purchase Price Match, Error Quoted an old pricelist, Non-Profit, Promotional Special - New Product, and Multi-year Incentive.  *Id.*  Most of those reasons can be deemed "competitive" but a few clearly can not, such as "quarter end discount," which was indicated to occur 3% of the time and "non-profit" which occurred 1% of the time.  *Id.*  Others are essentially opaque labels

that provide very little information, such as "contract pricing," and "other." *Id.* Perhaps unsurprisingly, one Symantec approver explained that the codes "told me very little" about the justification for the discount at issue. Tr. at 757:10–12 (Simon).

83.   Bradbury prepared the Reason Code Chart herself, with assistance from Reinhardt, by exporting data from eSPA and using Excel to categorize and group the reason codes. U.S. Ex. 1832 ¶ 22(c) (Bradbury Affidavit). This chart, which accompanied the Frequency Chart, makes it abundantly clear that the title "Non-Published Discounts" referred to non-standard discounts approved in eSPA. However, the data in the two charts did not line up. The Percival Frequency Chart listed 129,630 line items, but the eSPA data Bradbury used to compile the Reason Code Chart had only 6,954. *Compare* U.S. Ex. 4A at 87–88 (Frequency Chart), *with* U.S. Ex. 41 (2005 eSPA data relied on by Bradbury). This is yet another reason Bradbury was, or should have been, aware that the Percival Frequency Chart contained standard discounts in addition to non-standard ones.

### 2. The Supplemented Offer

84.   In April 2006, Symantec decided to update its submission to include the Veritas products rather than renewing the existing Veritas GSA contract that was set to expire at the end of the year. U.S. Ex. 49. Around that time, Reinhardt reached out to Percival requesting that he provide an updated summary of the discounting policies for the Veritas products as well. *Id.*

85.   On June 21, 2006, Symantec sent GSA its updated submission that added the Veritas products. U.S. Ex. 53 (email informing GSA contracting officer Boulware of the updated submission). The June Supplement was stamped "received" by GSA on June 23, 2006. U.S. Ex. 5B. The only three documents included in the June Supplement were a legacy-Symantec

proposed GSA pricelist, a Veritas proposed GSA pricelist, and a "discount key" with the

following proposed GSA discounts:

**Discount Key**

| Symantec Products | Discount |
|---|---|
| Hardware / Appliances | 7% |
| Equipment Maintenance | 4% |
| Licensed Software, Media & Docs. | 27% |
| Support Services | 4% |
| Training | 6% |
| Consulting | 6% |

| VERITAS Products | Discount |
|---|---|
| Enterprise Licensed Software, Media & Docs. | 27.68% |
| VIP / BE Software | 35.16% |
| Support Services | 5.24% |
| Training | 5.24% |
| Consulting | 5.24% |

*See* U.S. Ex. 4C at 83 (receipt-stamped copy of the discount key in GSA file); Tr. at 910:12–24

(Reinhardt) (agreeing that she believed the two pricelists and discount key were the attachments

to the June Supplement and did not recall any others); U.S. Ex. 52 (email from Reinhardt

confirming that "[a]ll 10 pounds, 9.4 ounces *of price list* is on the way to GSA" (emphasis

added)).

86.    Although Bradbury stated at one point that she believed the June Supplement contained

"the discount policies for Veritas," the Court does not credit that particular statement.  *See*

2100:1–3; 2216:13–16 (Bradbury).  When pressed on redirect, Bradbury dialed back her prior

certainty. *Id.* at 2217:10–21.  The failure to mention any additional attachment or updated CSPs

in the emails and cover letter connected to the June Supplement makes it doubtful that such

information was included.  Moreover, even though Reinhardt had asked Percival to prepare a

discount summary for the Veritas products in April, emails demonstrate that Percival continued

to respond with updated charts on June 28, 2006—a week after the June Supplement had already

been sent to GSA.  U.S. Ex. 54A.

### 3. The October Supplement and Meeting

87.   After the June Supplement, Bradbury continued to reach out to the assigned GSA contract specialist, Boulware, but was not able to set up a meeting.  *See* U.S. Ex. 57 (email chain following up during August and September).  At some point during that period, Dixon took over responsibility from Boulware for the Symantec solicitation.  *Id.*

88.   On October 5, 2006, Bradbury emailed Dixon to let her know that as a result of the merger, Symantec was updating its buying programs.  U.S. Ex. 7A (email sending October Supplement).  Bradbury attached a PowerPoint presentation explaining the new buying programs that would become effective November 8, 2006 and indicated that Symantec would "be updating our offer to reflect the new product SKUs and the new discounting policies."  *Id.*; U.S. Ex. 7B (attachment).  That PowerPoint described in general terms the Express, Rewards, and Enterprise buying programs that were soon to take effect, but it did not include pricing under the respective programs.  U.S. Ex. 7B.

89.   On October 9, 2006, Dixon responded that she was "confused" and that they should discuss the policies at the "meeting on Wednesday."  U.S. Ex. 58.

90.   Dixon and Bradbury subsequently met in person on Wednesday, October 11, 2006.  Tr. at 1517:19–21 (Bradbury).  Reinhardt was not present at the October meeting.  *Id.* at 1517:22–1518:1.

91.   Dixon had no recollection whatsoever of that meeting.  *Id.* at 3151:24–25 (Dixon).  Bradbury recalled Dixon bringing the hard copies of the submission up to that point and that they went through those materials together.  *Id.* at 1518:11–22 (Bradbury).  Bradbury recalled that they went through the buying program PowerPoint and discussed the Rewards program, and that Dixon quickly discarded the Reward program as an option after learning about the requirements

for participation. *Id.* at 1616:14–25, 1626:7–10. Bradbury did not recall whether GSA ever

received a pricelist or any other information that indicated just how favorable the Rewards

pricing was compared to Express, *id*. at 1626:11–25, but Symantec admitted that "[a]t no point

during the negotiation of the contract did Symantec disclose to GSA the pricing provided under

the Rewards buying program," *see* U.S. Ex. 400 ¶ 22 (request for this admission); Tr. at 1629:1–

25 (noting that Symantec changed its response to the relevant question to admit during the

corporate designee deposition).

92.    Bradbury also testified that they did not begin price negotiations at that meeting. *Id.* at

1520:1–2. She also claims, however, that at that meeting Dixon ruled out using distributors,

resellers, and original equipment manufacturers as the relevant class of customer for the basis of

award. *Id.* at 1522:6–1523:1 (discussing deposition testimony to that effect). Bradbury's

testimony is uncorroborated anywhere else, and she backtracked on her level of certainty when

pressed on this point. *See id.* at 1520:10–11 ("She said that GSA was not entitled to that class of

customer."); *id.* at 1522:6–11 ("[S]he decided that GSA was not that -- that class of customer;

that they were not a distributor, they were not a reseller, they were not an OEM."). Even if

credited, a statement that GSA was not entitled to the same discounts as channel partners is

different from excluding them from the basis of award. Thus, to the extent that a discussion of

definition of those channel partners occurred that day, the Court does not believe it involved an

unequivocal exclusion of those categories from what would later become the basis of award.

93.    Shortly after the October 11 meeting, Dixon sent Bradbury an email expressing pleasure at

the progress they had made and attaching an administrative letter that they had discussed in the

meeting. U.S. Ex. 59B. That letter included a list of deficiencies that Dixon concluded were

missing from Symantec's solicitation. U.S. Ex. 59A. One item on that list, titled "G.4

Commercial Sales Practices (CSP-1)," stated "clarification is needed for the insertion sheets/discounts Symantec has provided along with the commercial sales and projected sales." *Id.* at 2.  It also included a list of questions, one of which was "Does Symantec Corporation offer better rates and/or terms and conditions to other customers?  If yes, please provide pricing information." *Id.* at 5.

94.   Bradbury replied by email on October 20, 2006, providing several documents and a response letter.  U.S. Ex. 8A.  In response to the request to provide the completed CSP-1 form, Symantec wrote "Commercial discounting policies were submitted with Symantec's initial offer, updated offer and during meeting on October 11, 2006.  Updated comparison pricelist is included with this submission . . . ." *Id.* at SYM382004.  The comparison price sheets reflected discounts for "commercial MSRP, Academic price, Government Price, Distributor Price, Value Added Reseller price, [and] proposed GSA price." *Id.*

95.   In response to the question about whether other customers receive better prices or concessions, Symantec wrote:

> Any deviations from published discounts require management approval. Deviations must be documented and approved in accordance with the following guidelines: As previously disclosed to GSA as part of Symantec's established discounting policies, the Worldwide Sales discounting tool referred to as "eSPA" was established to allow Symantec the flexibility to respond to competition. This process provides non-standard competitive pricing to strategic accounts by requiring commitments from the identified account for annual quantity purchases, or to meet one of the following guidelines; which are provided as examples:
> 1. To meet market competition or displace a named competitor at a customer site;
> 2. Customers who agree to standardize on Symantec products and services;
> 3. New Market or market segment penetration;
> 4. Educational, including prime contractors, or Charitable organizations or institutes;
> 5. Introduction of new product and services through more aggressive discounts in exchange for press or customer references.

*Id.* at SYM382003.

96.    Although the text of this explanation was largely copy-pasted from previous

submissions that Bradbury had worked on at Compaq and Veritas, Tr. at 1749:6–9

(Bradbury), it accurately reflected the function of the eSPA system for non-standard

discounts.  *See id.* at 760:22–761:1 (Simon) (testifying when reviewing the description at

DX 23 that it was an accurate description of Symantec's non-standard discounting

practices).  Symantec's sales team, perhaps predictably, took a broad view of what

constituted market competition or strategic customers.  *See* Tr. at 798:24–25 (Robbins)

("Every sales rep I've ever talked to will tell me, 'Hey, this account is strategic to me.'");

*id.* at 761:7–10 (Simon) ("[D]id everyone within Symantec, to your knowledge, have the

exact same idea of what constituted a strategic account?  A. I'm quite sure they didn't.");

*id.* at 260:10–13 (McGee) (agreeing that "different sales teams could have different views

of . . . whether any given account was a strategic account").

97.    However, the wording of this section further underscores the inaccuracy of the

Frequency Chart, which in theory should have disclosed the frequency and depth of the

non-standard, non-published discounts approved through eSPA, but in fact contained a

significant number of standard channel partner discounts.

98.    Also in that administrative letter, Dixon noted that "[t]he maximum order . . . is

$500,000 for the SIN's [sic] Symantec Corporation is offering.  Why has Symantec

Corporation stated $100,000?"  U.S. Ex. 59A at 4.  In the October Supplement

responding to that question, Bradbury simply wrote that "Symantec agrees to lower the

order limitation."  U.S. Ex. 8A at SYM00382001.  Bradbury acknowledged in her

testimony that part of the goal for seeking a lower maximum order threshold was "to

provide Symantec flexibility to offer non-standard discounts on large orders with large

customers who purchased more than a hundred thousand dollars at a time." Tr. at

1733:16–22 (Bradbury). Bradbury had also sought an even lower maximum order

threshold on the Veritas contract she had previously negotiated, which that contracting

officer had rejected because they "[knew] that the threshold will be used as a way to offer

commercial customers better discounts and circumvent the price reduction clause." U.S. Ex.

76. Still, there was some benefit for GSA in a lower threshold because government

purchasers were required to ask for a higher discount on purchasers over the maximum order

threshold. Tr. at 1732:25–1733:3 (Bradbury). In any event, Dixon must have agreed,

because the proposed threshold made it into the final contract.

### 4. The November Meeting and Follow-Up Disclosures

99.   Dixon then reviewed the October Supplement and met with her supervisors about the offer.

U.S. Ex. 64. On November 29, 2006, she reached out to Bradbury with additional concerns, and

suggested postponing their meeting that was scheduled the next day. *Id.*

100.   One of Dixon's questions was why Symantec had estimated annual sales at $19 million

when a sales report only showed prior sales of $3 million. *Id.* She noted that based on the

projected sales, Symantec would need to undergo a pre-award audit. *Id.* Bradbury understood

that projected sales over $10 million would trigger an EEO audit. Tr. at 2280:3–6 (Bradbury).

101.   In response to that email, Bradbury suggested that they meet in person to go over Dixon's

questions. U.S. Ex. 64.

102.   Bradbury, Reinhardt, and Dixon attended the November 30, 2006 meeting the next day. Tr.

at 920:9–17 (Reinhardt). At that meeting, they discussed Dixon's concerns and went over the

comparison pricelists that had been provided in the October Supplement. *See* Tr. at 2133:19–

2135:8 (Bradbury).

103.  Bradbury sent Dixon additional information as a follow-up to their meeting on December 2, 2006.  DX 103 (email).  Among other attachments, she included an updated comparison pricelist for the new buying programs.  DX 103.01 (attachment).  The email and attachment alike contained a summary list of proposed GSA discounts, which were calculated off of "commercial MSRP" or "Gov Price," depending on the product.  *Id.*; DX 103.

104.  Bradbury also testified that she discussed the projected sales estimate with Dixon during the November meeting.  Tr. at 2137:11–18.  Bradbury explained that she told Dixon they based the estimate off of the Immix sales.  *Id.*  Bradbury also testified that at that meeting, Dixon asked her to lower the projected sales below $10 million to avoid an audit.  *Id.* at 2137:16–18, 2227:24–25 ("She told me to revise the numbers because she didn't want the audit.  Not me.").  Although Dixon did not remember any specific details regarding the meeting or the Symantec contract, when asked whether she ever told Bradbury to estimate sales under $10 million in order to avoid an EEO audit, she stated in no uncertain terms that "[w]e wouldn't do that, sir."  *Id.* at 3135:25–3136:3 (Dixon).  In contrast, she agreed that there was nothing improper about asking Symantec why its projected sales were inconsistent with its submitted financial records.  *Id.* at 3186:2–14.

105.  In fact, Bradbury did revise the projected sales to be just under $10 million.  *Id.* at 1840:2–5 (Bradbury).  She even used an excel spreadsheet to reduce her previous estimates proportionally so that they added up to exactly $9.9 million.  *Id.* at 1840:6–14; U.S. Ex. 67 (spreadsheet).  She submitted the revised estimate to Dixon by email on December 7, 2006.  *See* U.S. Ex. 10A (email); U.S. Ex. 10B (attachment with revised estimate).

106.  The Court concludes that Dixon did *not* instruct Bradbury to alter the sales estimate and discredits any assertions by Bradbury to the contrary.[8]  Rather, the Court believes the following occurred: Dixon raised a concern that the estimates were too high based on the information that she had, and Bradbury validated that concern by reasoning to Dixon that the sales might actually be lower than had been the case under the Immix contract because Symantec planned to provide additional letters of supply, meaning the proposed contract would not be the only avenue for GSA sales of Symantec products.  Dixon may have been satisfied with that response, but her tacit acceptance was far from an instruction to provide inaccurate information.  *See* Tr. at 1842:9–16 (Bradbury) (testifying that she did not recall any follow-up on the revision, favorable or unfavorable).

107.  What's more, Bradbury failed to bring to Dixon's attention that the $19 million estimate included in the initial offer submission was only for legacy Symantec products and had not been updated after the Veritas products were added.  In an internal email from that summer, Bradbury noted that the existing Veritas GSA contract accounted for $50 million in sales each year, and that she anticipated a projected $70 million in annual sales under the combined GSA contract— approximately $50 million plus $19 million.  Tr. at 1835:3–7, 18–25.

---

[8] Further undermining Bradbury's credibility on this point and bolstering the Court's view that this recollection is Bradbury's post-hoc rationalization, is the fact that such a major assertion was not found anywhere in her deposition testimony.  *See* Tr. at 2235:1–13 ("Q. You don't mention in response to [the deposition question] Ms. Dixon asked me to decrease them, correct?  A. Correct. Q. But that's exactly what you responded to Mr. Douglass when he asked you the exact same question yesterday, correct? A. Because I -- of course she asked me to do it. Why else would I have done it?  Q. To avoid the review?  A. In this testimony I was telling you how I could justify in my mind that there was going to be more than one GSA contract to lower it to $10 million.  I was going through my mental process of how I could justify lowering it.  You did not ask me if she told me to do it, but that's exact -- she obviously told me to do it.  Why else would I have done it?").

108.  In light of the information available to Bradbury, the revision of the projected sales estimates was knowingly false.

### 5. The Pre-Negotiation Memorandum

109.  Dixon wrote a "pre-negotiation memorandum," memorializing her objectives for the negotiation, that was dated December 22, 2006.  U.S. Ex. 70 at 12.

110.  In that memorandum, Dixon relied on the $9.9 million sales estimate to determine that an EEO audit was not required.  *Id.* at 6.

111.  The memorandum also stated the following: "Based on the foregoing, it has been determined that the best discount is offered to Symantec Corporation Government customer under this proposal.  Therefore, for the purpose of the price reduction clause, commercial customer *shall* be the customer for which the resultant award shall be predicated upon."  *Id.* at 11.

112.  That memorandum also noted that a better or equal price was offered to "Distributors, Dealers/Resellers, VAR/System Integ., OEM, State and Local Govern, Educational & Nonprofits, National & Corporate, Commercial End Users, Other Government" and that price information had been provided for those categories of customer.  *Id.* at 9.  In that section, the memo stated "[s]ee attached reference page under tab G.4 CSP."  *Id.*

113.  At another point in the memorandum, Dixon wrote that she had conducted an independent price analysis and determined that Symantec's proposed GSA prices were "fair and reasonable."  *Id.* at 11.

114.  Dixon included her high, intermediate, and low price objectives for the negotiation as follows:

<u>HIGH OBJECTIVE</u>:  Receive discount Symantec offers its best customer

<u>INTERMEDIATE OBJECTIVE</u>:  Receive discount Symantec offers its best customer less the accepted percentage over,  for instance if Symantec can justify higher discounts offered to another customer, the Government will accept percentage that is justified.

<u>LOW OBJECTIVE</u>:  Accept discounts offered, the Government is equal to best customer.

Rationale:  Government desires to be equal to of better than most favored customer.

*Id.* at 12.

115.  Overall, the Court finds the Pre-Negotiation Memorandum to have minimal evidentiary value, given that it is internally contradictory in places, contains many boilerplate phrases, and lacks significant detail.  Further, Dixon confirmed in relation to the later Price Negotiation Memorandum that she routinely used templates for the memoranda or copy-pasted from other memoranda.  Tr. at 3137:9–16.  Given Dixon's lack of specific recollection about this memorandum, the Court does not afford it significant weight.

116.  There was some urgency within Symantec around the time of the negotiations because the Veritas GSA contract was set to expire at the end of December.  *See* U.S. Ex. 68 (stating in a December 8, 2006 email from Bradbury to Dixon that "[o]ur customers are starting to panic a little"); Tr. at 1830:20–22 (Bradbury) ("Q. Folks within Symantec were also getting antsy to get a contract awarded.  Correct?  A. I'm sure.").

117.  Bradbury had previously made overly optimistic representations to Symantec leadership about how long it would take to get a new GSA contract awarded.  *See* Tr. At 1821:12–1823:16 (reviewing an October 2005 email chain, U.S. Ex. 518, in which Symantec's Joe Muscarella relayed a "plan . . . to have Kim and her team submit a mod to GSA in the December timeframe with the hopes to have all products on our SYMC GSA schedule effective April 1st"); U.S. Ex. 62

at SYM00766165 (stating in bold in an October 2006 email that "We anticipate a new GSA contract award by November 24th").

118.  Bradbury was able to get a one-month extension of the Veritas contract that would last through the end of January 2007.  U.S. Ex. 69; Tr. at 1831:21–1832:3 (Bradbury).

6. The Draft Final Proposal Revision and the January Meeting

119.  Bradbury drafted a "Best and Final Offer," or "BAFO"[9] letter in December 2006.  *See* U.S. Ex. 11 (draft BAFO dated December 2006).  She then submitted it to Symantec's in-house counsel, David Freedman and David Kessler, for their review, who in turn engaged outside counsel to review it as well.  Tr. at 1793:20–1794:2 (Bradbury).  The legal team made some changes, and eventually Freedman informed Bradbury that it was approved for submission on January 3, 2007.  U.S. Ex. 575.

120.  Bradbury sent the draft BAFO letter to Dixon on January 11, 2007.  U.S. Ex. 16A.

121.  The BAFO Letter offered different proposed discounts for each SIN category that were all "based upon Symantec'[s] commercial pricelist dated January 2007" and that were calculated as a percentage off of either "commercial MSRP" or "Government End User MSRP."  U.S. Ex. 16B at SYM370747–48.

122.  In that draft, Bradbury specified one of three different "basis of award" for each SIN as well, either "Government End Users," "Authorized Distributors," or "Partner Level A."  *Id.* at SYM370745–46.  She testified the variation was only because there was no available end user pricelist for some of the categories.  Tr. at 2140:25–2142:12 (Bradbury).

---

[9] The terms "Best and Final Offer" and "Final Proposal Revision" were used interchangeably for the final negotiation documents, but for clarity the Court refers to Bradbury's January 11, 2007 proposal as the "draft BAFO," Dixon's January 25, 2007 version as the "draft FPR," and the final signed version as the "final FPR."

123.  Bradbury's draft BAFO included a section entitled "Price Reduction Monitoring" which

stated in part:

> Discounts offered by Symantec under the following circumstances will have no effect on the fair and reasonable prices included on the GSA contract, nor would they invoke the price reduction clause:
> 1. Sales made to commercial customers under firm, fixed-price definite quantity contracts with specified delivery in excess of the maximum order threshold specified in the Pricelist;
> 2. Non-standard discounts offered to commercial customers as defined above;
> 3. Transactional based discounts on specific GSA orders;
> 4. Non-GSA sales made to Federal Government Agencies; including sales made to Government prime contractors for the purpose of resale to the Federal Government under indefinite delivery, indefinite quantity agreements;
> 5. Sales caused by error in quotation or billing.

U.S. Ex. 16B at SYM370749.

124.  That same language appeared in a June 2006 email sent to Bradbury from a reseller with a

GSA contract, boasting "Look what I just slipped by [the Contracting Officer]."  U.S. Ex. 80; Tr.

at 1817:1–14 (confirming the names in the email).  Bradbury responded to that email "Good

job!"  U.S. Ex. 80.  When questioned about this email at trial, Bradbury was evasive, claiming

that exceptions 1, 3, and 5 were standard PRC exceptions and that the reseller was only

highlighting exception 4, which "wasn't even an issue" when the Symantec contract was being

negotiated.  Tr. at 1818:3–15 (Bradbury).  When asked about exception 2, she only responded

"I'm assuming he got in all of the stuff.  I don't see his letter."  *Id*. at 1820:6–7.  Based on

Bradbury's evasive testimony, the context of the email, and the fact that Bradbury included the

same verbatim language in the draft BAFO, the Court concludes that she was also attempting to

slip the broad PRC exception in item 2 by Dixon.

125.  Finally, the draft BAFO contained a conclusion paragraph that stated, "We are confident

that this Final Proposal Revision provides the Government with fair and reasonable prices for

Symantec Products."  U.S. Ex. 16B at SYM370750.

126.  Bradbury and Dixon met soon thereafter to go over the BAFO offer.  Tr. at 1841:11–23 (Bradbury).  Bradbury did not have a specific recollection about discussing the PRC in that meeting.  *Id.* at 1842:14–16.  She did, however, recall going over the comparison pricelists and recalled that Dixon requested a summary that showed how GSA's discounts fit into the larger pricing structure instead of the lengthy pricelists.  *Id.* at 1843:6–14.  Dixon also requested explanation of the differences in terms and conditions that justified distributors and resellers receiving better discounts than GSA.  *Id.* at 1843:15–19.

127.  Bradbury sent a follow-up email on January 24, 2007 that responded to those two concerns. U.S. Ex. 3A.  The attached chart, referred to during trial as the "Discount Relationship Chart," provided a list of terms and conditions applicable to resellers as well as the following chart:

| Product Category | Proposed GSA Discount off Commercial MSRP | Government End User Discount off Commercial MSRP | Academic/Education End User Discount off Commercial MSRP | Distributor Discount off Commercial MSRP | Reseller Discount off Commercial MSRP | Product Warranty | SIN |
|---|---|---|---|---|---|---|---|
| Enterprise Availability License | 27.50% | 0% | 0% | 38% | 30% | 90 Days | 132-33 |
| Enterprise Availability Maintenance Su | 5% | 0% | 0% | 18% | 18% | 30 Days | 132-34 |
| Professional Services - Consulting | 5% | 0% | 0% | 20% | 15% | 30 Days | 132-51 |
| Training | 5% | 0% | 0% | 18% | 15% | 30 Days | 132-50 |
| Managed Security Services | 10% | 0% | 0% | 30% | 30% | 30 Days | 132-34 |
| Technical Support Services | 5% | 0% | 0% | 15% | 12% | 30 Days | 132-34 |
| Backup Exec License | 36% | 0-16% | 0-16% | 45% | 8% (Opportunity Reg) | 90 Days | 132-33 |
| Backup Exec Maintenance | 36% | 0-16% | 0-16% | 45% | 8% (Opportunity Reg) | | |
| Security Products | 10% | 2-4% | 20-40% | 23-35% | 8% (Opportunity Reg) | 90 Days | 132-33, 132-32 |
| Security Services | 10% | 2-4% | 20-40% | 23-35% | 8% (Opportunity Reg) | 30 Days | 132-34 |
| Appliances - Hardware and Maintenance Maintenance | 10% | 4% | 20% | 25% | 8% (Opportunity Reg) | 30 Days   Hdwr = 1 Year   Svs = 30 | 132-12 |
| Bundle License + Maintenance | 20% | 4% | 20% | 25% | 8% (Opportunity Reg) | Days | 132-08 |
| Hardware Appliance | 10% | 0% | 0% | 30% | 8% (Opportunity Reg) | 1 Year | 132-08 |

U.S. Ex. 3B.

### 7. The Price Negotiation Memo

128.  Dixon prepared a "Price Negotiation Memorandum" memorializing the negotiations on January 23, 2007.  U.S. Ex. 71.  The Price Negotiation Memorandum was an internal GSA document intended to memorialize the negotiation.  Tr. at 3204:12–18 (Molina).

129.  Dixon's Price Negotiation Memorandum stated that the total value of the contract was $9.5 million and that negotiations had been held on January 22, 2007 with Bradbury.  U.S. Ex. 71 at 1–2.

130.  The portion of the memorandum titled "summary of proposal with negotiation results" appears to have been inadvertently copied from a wholly unrelated contract.  *Id.* at 5; Tr. at 3137:9–24 (Dixon) (confirming that the error was possible and that she did not believe there was any connection between Symantec and the other company, TalleyGenicom).

131.  In fact, Dixon completed a Price Negotiation Memorandum for a company called TalleyGenicom around the same time, and the respective portions of each memorandum are identical.  *Compare* U.S. Ex. 71 at 5 (Symantec Memorandum), *with* U.S. Ex. 344 at 5 (TalleyGenicom Memorandum).  The Court determines that this section is just as it appears to be—an accident.  It therefore draws no conclusions from that portion, including the reference to "commercial end users" being the basis of award.

### 8. The Last-Minute Changes to the Final FPR

132.  The next day, January 25, 2007, Bradbury learned that she would be receiving a revised BAFO from GSA and alerted Jim Russell, the Vice President of Public Sector at Symantec, Russell's assistant, and Freedman.  U.S. Ex. 18.  In that email, she noted that she was not sure what changes GSA would make, but that she would run it by the legal team before sending it to Russell for his signature. *Id.*

133.  A few minutes later, Bradbury emailed Percival and Reinhardt asking for a GSA pricelist with the discounting off of commercial MSRP, which she defined as Express pricing.  U.S. Ex. 19.

134.  Dixon sent her revised Final Proposal Revision at 8:49 a.m.[10] on January 25, 2007.  U.S.

Ex. 20A (email); U.S. Ex. 20B (attachment).  Dixon's draft Final Proposal Revision was

significantly different from Bradbury's draft BAFO.

135.  The draft FPR eliminated the "Commercial Discounts" section that had described eSPA and

the "Price Reduction Monitoring" section, where Bradbury had proposed exceptions to the PRC

for any non-standard discounts Symantec offered under that policy.  *See generally* U.S. Ex. 20B

(draft FPR).

136.  The concluding section now stated not that the prices were fair and reasonable, but that "the

discounts . . . given to the Government are either equal to and/or greater than what is granted to

any commercial and/or Government customer."  *Id.* at 6.

137.  The separate references to different basis of award customers were removed, and instead

the first page stated, "the basis for negotiation and award for the offer is predicated on Symantec

commercial class of customers."  *Id.* at 1.

138.  Bradbury reviewed and responded with a quick question within minutes.  *See* U.S. Ex. 22

(asking at 8:56 a.m., "should I change the reference to refresh #17 to #19?" and one minute later,

at 8:57 a.m., saying "Nevermind . . . [p]lease disregard").

139.  At some point within approximately the next forty minutes, Bradbury and Dixon spoke by

phone.  Tr. at 1857:23–1858:1.

140.  During that call, Dixon informed Bradbury that the format of the agreement had to match

Dixon's template, and that provisions that did not match the template had to be taken out or else

---

[10] As was made clear at trial, several emails were produced in discovery with the time stamp of a
different time zone.  The Court references here the timing in Eastern Standard Time, which all
parties agree is correct.

Dixon would not make an award.  Tr. at 1858:10–19 (Bradbury); *see also id.* at 1865:2–3 ("It

was like take it or leave it and I'm not going to make an award.").

141.  Bradbury testified that she understood that Dixon changed the basis of award because she

did not want the different categories listed out and was merely "going to call them commercial

class of customers.  They were all part of the commercial class of customers." *Id.* at 1854:25–

1855:3.

142.  However, Dixon did agree to make a few small changes to the draft FPR.  She agreed to a

change in language from certifying that products were manufactured in the U.S. to language

saying that products were made in the U.S. *or* a Trade Agreement Act-compliant country.  *See*

*id.* at 1860:10–1861:1 (acknowledging the change); U.S. Ex. 23B at 2 (revised FPR).  Following

a sentence that had stated that no exceptions had been taken by Symantec, the final FPR added

the phrase "[a] statement of clarification was provided by Symantec dated December 12, 2006."

U.S. Ex. 23B at 2.  That statement of clarification—a list of exceptions taken to certain FAR

clauses—was resent by Bradbury to Dixon a few minutes later.  U.S. Ex. 25A (email); U.S. Ex.

25B (attachment).

143.  Most significantly to the case at hand, Dixon agreed to modify the phrase in the closure that

stated "the discounts . . . given to the Government are either equal to and/or greater than what is

granted to any commercial and/or government customer."  Tr. at 1863:25–1864:6 (Bradbury).

The revised version added the clause "under similar terms and conditions." *Id.*  Bradbury

testified that she proposed the change because "there's no way that we could certify that [GSA

was] getting the best discount to any commercial customers . . . . [W]e have eSPA . . . . We can't

agree to that." *Id.* at 1864:1–3.

144.  The inclusion of that language meant that GSA was not guaranteed the best price; rather, "one would have to compare the terms and conditions of a commercial sale to the terms and conditions of the GSA sale to determine if they're comparable for price reduction clause purposes."  JX 001 at 214:2–11 (GSA 30(b)(6)).

145.  Bradbury sent Dixon a revision "with the changes we discussed" at 9:41 a.m.  U.S. Ex. 23A.

146.  One minute *after* sending the revised FPR to Dixon, she reached out to Freedman, Symantec's in-house counsel, and sent him the revised version.  U.S. Ex. 24A (email); U.S. Ex. 24B (attachment).  In her email to Freedman, she wrote, "The format is a little different, but enclosed is the letter."  U.S. Ex. 24A.

147.  At 10:07 a.m., Dixon responded that the revisions were acceptable and requested a signed copy in order to award the contract number.  U.S. Ex. 26.

148.  Exactly one hour and one minute after having been sent the revised FPR, at 10:43 a.m., Freedman responded, "Approved."  U.S. Ex. 27.

149.  Freedman testified that had Bradbury flagged the substantive changes in the document, his usual practice would have been to review them more carefully and consult someone with more knowledge on GSA contracts.  Tr. at 2369:13–25 (Freedman).  Instead, he trusted Bradbury's judgment that the changes were merely to the formatting.  *Id.* at 2370:7–10.  What's more, Freedman was located on the West Coast at the time.  *Id.* at 2353:5.  That means he received the revisions at 6:42 a.m. local time and sent his approval at 7:43 a.m. local time, making it even more improbable that he reviewed it in any level of detail or discussed it with Bradbury or anyone else before approving.

150.  Two minutes after receiving Freedman's approval, Bradbury sent it on to Russell, saying: "Attached is the [Final FPR] along with legal approval.  The discounts are identified below. Please print, sign, and return . . . . I will return to GSA this morning."  U.S. Ex. 28.

151.  The discounts listed in that email reflected another change, which was that some of the GSA discounts were calculated off of Government MSRP rather than Commercial MSRP.  *Id.* Bradbury recognized that change and updated the Discount Relationship Chart, which had previously been calculated entirely off of "Commercial MSRP" to reflect "exactly what was in the FPR."  Tr. at 1470:16.  Bradbury became significantly argumentative on this point and insisted that there was no meaningful difference, but the Court doubts she would have made the change in her email and Excel file if it was truly the same.

152.  At 11:00 a.m., Bradbury emailed Dixon to let her know that legal had approved and that Russell would be stepping out of a meeting to sign it.  U.S. Ex. 29.

153.  At 11:18 a.m., Bradbury sent the Final FPR, signed by Russell, to Dixon by email.  U.S. Ex. 30.

154.  Dixon notified Bradbury that Symantec's GSA contract was assigned contract number GS-35F-0240T and was effective as of that date, January 25, 2007.  U.S. Ex. 579.

155.  Dixon noticed an error in the letterhead on January 29, and Bradbury updated the first page at her request that day.  U.S. Ex. 34.  Dixon faxed Bradbury a signed SF-1449 and a welcome letter on February 2, 2007.  U.S. Ex. 35A.

### D. The Contract Period

1. Molina is Assigned as Contracting Officer

156.  In March 2009, the administration of Symantec's GSA Schedule contract was transferred from Dixon to another GSA Contracting Officer, Patricia Molina.  Tr. at 3221:14–16 (Molina);

U.S. Ex. 221.  Molina was an experienced contracting officer whose supervisor from that time period opined that she was "stellar" and the "strongest contracting officer" in the branch.  Tr. at 2840:7–16 (Morrison).  The Court found Molina to be knowledgeable and forthright, and her testimony credible and helpful.

157.  Molina reviewed the file for the Symantec GSA contract when it was assigned to her but could not locate any per-SIN CSPs.  *Id.* at 3222:10–17 (Molina).

158.  Shortly after Molina took over administration of the Symantec contract, Bradbury emailed her a copy of the Discount Relationship Chart, saying, "Attached is the Discounting Policy chart Symantec submitted to GSA at the time of negotiations.  It was the basis for determining the category of customer in the Symantec FPR."  U.S. Ex. 321A.

159.  When Molina asked Reinhardt in November 2009 "Why do your distributors receive a larger standard discount than GSA[?]" and "Why doesn't GSA receive a non-std discount?" Reinhardt again sent her the Discount Relationship Chart and noted that it explained the differences in terms and conditions between GSA and channel partners.  U.S. Ex. 479.

160.  Although the Discount Relationship Chart was not part of the FPR, Bradbury admitted that it "explained things," Tr. at 1455:21–1456:6 (Bradbury), and Molina understood it to reflect the price discount relationship, *id.* at 3224:19–21 (Molina).

161.  Molina utilized the Discount Relationship Chart when administering Symantec's GSA contract to evaluate modifications and invoices.  *Id.* at 3225:1–5.  She testified that other GSA contracts also had similar charts and that she utilized them in the same way.  *Id.* at 3230:11–16. For example, in her internal memorandum documenting a modification that extended a GSA price reduction based on changes to the commercial pricelist, Molina noted that "Symantec's Basis of Award (BOA) category of customer is commercial customers.  See the attached for

discounts between GSA and Symantec's commercial customers"—and attached the Discount Relationship Chart.  U.S. Ex. 245 at US-GSA-00003221–22; *see also* U.S. Ex. 248 at US-GSA-00003363 (including the same phrase for Modification 40).

### 2. Bradbury Leaves Symantec

162.  Bradbury was in charge of administering the GSA contract and ensuring compliance up until April 2010, when she was laid off.  Tr. at 1423:3–5 (Bradbury).

163.  Reinhardt was in charge of administrative tasks related to the GSA contract, primarily submitting modifications and updating the GSA pricelist.  Tr. at 966:10–22 (Reinhardt).  As a part of that process, she was responsible for certifying that the previously disclosed CSPs remained consistent.  *Id.* at 967:24–968:9.

164.  Even while she remained at the company, Bradbury did not play any active role in preparing the modifications or confirming that the CSPs had not changed. *Id.* at 1953:7–14 (Bradbury).  Reinhardt only passively monitored for information that CSPs had changed and did not conduct any affirmative research such as analyzing sales data or inquiring internally at Symantec.  *See id.* at 968:22–980:18, 1005:9–14.

165.  Bradbury was laid off by her supervisor at the time, Gigi Schumm, the Vice President for Public Sector at Symantec.  *Id.* at 2669:16–24, 2674:4 (Schumm).  Schumm testified that she found Bradbury "antagonistic and hard to work with."  *Id.* at 2673:25–2674:2; *see also id.* at 2703:12–25 ("Ms. Bradbury was . . . hard to work with, antagonistic, not a team player, and at the same time I was really looking for somebody in that role who would be my second in command, kind of my chief of staff.  She refused to come to the office . . . . and I just came to understand that she was just -- we were never going to have that relationship where she would be my second in command . . . .").

166.  Schumm never took any steps to familiarize herself with the terms of the GSA contract or the history of its negotiations because she believed that Bradbury, with the legal support of Freedman, was able to monitor compliance.  *Id.* 2671:10–25.

167.  Paul Lokie was hired to replace Bradbury, as well as expand Bradbury's role to include sales operations, in May 2010.  *Id.* at 2453:23–25, 2455:2–5 (Lokie).

168.  After Bradbury was laid off, Reinhardt continued to perform the same administrative tasks and did not assume any additional compliance or monitoring tasks with respect to the GSA contract.  *Id.* at 928:10–16 (Reinhardt).  Although she did not recall at trial whether anyone was ultimately responsible for PRC compliance after Bradbury's departure, in her deposition testimony Reinhardt acknowledged that "[i]t was ultimately me, I guess."  *Id.* at 928:17–929:10.

169.  Reinhardt's supervisor, Lokie, believed that compliance with the terms of the GSA contract, including the PRC, was Reinhardt's responsibility.  *Id.* at 2456:4–13 (Lokie).  He further stated that monitoring changes in commercial sales practices was not his day-to-day responsibility, and that if it was part of the GSA Schedule contract, it would have been Reinhardt's responsibility.  *Id.* at 2457:6–16.  Lokie also did not double check the information that Reinhardt was providing to GSA in those modifications in his role as a supervisor.  *Id.* at 2457:20–24.  In fact, Lokie did not recall receiving any training on even basic elements of Symantec's GSA contract such as the basis of award customer, despite having presumably been hired in part to replace Bradbury.  *Id.* at 2458:4–16.

170.  Reinhardt went on maternity leave starting in October 2010.  Before leaving, Reinhardt put together instructions for another Symantec employee, Dawn Foster, to be able to submit the modifications in her absence.  *Id.* at 1148:18–1149:5 (Reinhardt); U.S. Ex. 1243 (email advising

Molina of Reinhardt's upcoming leave).  Reinhardt returned only briefly in January 2011 before putting in her notice and leaving for another position.  Tr. at 1038:23–1039:1 (Reinhardt).

171.  Schumm was at a loss when it came to pinpointing who at Symantec had responsibility for ensuring compliance with the GSA contract.  She understood Bradbury's "team" to be in charge of compliance and thought that Reinhardt had primary responsibility after Bradbury was terminated, but that Lokie had responsibility while Reinhardt was on leave and after Reinhardt left.  *Id.* at 2674:17–2676:16.  Schumm insisted that "Symantec had systems in place to monitor the discounting practices" but did not know whether any human being was monitoring the information in those systems and never inquired.  *Id.* 2678:5–2679:8.

172.  The Court perceives that Bradbury's termination was largely motivated by interpersonal reasons and that none of the supervisors in the department thought through the ramifications for GSA compliance.  Reinhardt, who had only served in a secondary role and had responsibility for administrative tasks, had the entire responsibility for the GSA contract essentially dumped in her lap—but without clear guidance about what her role and responsibilities were.  Nor did she receive adequate supervision for those tasks, as neither Lokie nor Schumm placed a priority on GSA compliance or even made an effort to understand the nuances of Symantec's GSA contract.

173.  Morsell began working at Symantec in March 2011.  Symantec's Answer to Am. Omnibus Compl. ¶ 24, ECF No. 78 (admitting that Morsell "has been employed by Symantec since March 2011").  Her job responsibilities included submitting modifications, reporting IFF, handling a CAV, renewing the GSA contract, and preparing for an audit.  JX 004 at 89:19–90:7 (Morsell Dep.).

174.  Morsell took a leave of absence starting in June 2012.  Tr. at 2570:1–3 (Barton).  Bill Barton was a state and local contract administrator at Symantec who filled in for Morsell during

her leave of absence and until the GSA contract was cancelled in September 2012.  *Id.* at

2570:15–18; *see also* U.S. Ex. 1684 (June 20, 2012 email from Lokie informing the public sector

team that Barton would be assuming responsibility for the GSA contract administration).  Barton

nevertheless did not believe it was his responsibility to monitor Symantec's compliance with the

PRC during that time and was not aware of anyone who did have that responsibility.  *See* Tr. at

2571:6–2572:14 (acknowledging the truthfulness of his deposition testimony on those points).

### 3. Pricelist Updates and Understanding of PRC During Life of the Contract

175.  During most of the life of the contract, Reinhardt worked with Percival to update the GSA

pricelist whenever Symantec updated its pricelists.  Tr. 966:20–22 (Reinhardt).  Whenever

Symantec updated one of the relevant pricelists, Percival used a specially designed software

program to import the pricelist into the database, apply the pre-determined discounts to the new

list price, and if applicable, calculate the new GSA price.  Tr. 1294:12–25 (Percival).

176.  Symantec submitted numerous modifications to the GSA pricelist multiple times over the

life of the contract.  *See* U.S. Exs. 206, 211, 214, 216, 219–20, 222, 224, 233–34, 239, 242.

Some of these contract modifications passed along price reductions to GSA under the Price

Reductions Clause.  *See* DXs 33–34, 39, 44, 47.

177.  Pricelists were updated as soon as GSA approved a modification, which would take

between four to eight weeks.  Tr. 1149:14–19 (Reinhardt).

178.  With each modification, Symantec provided a certification that "[t]he commercial

discounting policies and procedures disclosed by Symantec under the awarded contract dated

January 25, 2007 have not changed."  *See, e.g.*, U.S. Ex. 206.

179.  When submitting those modifications, Reinhardt did not take any steps to actively ensure

that her certification that commercial sales practices had not changed was accurate.  Tr. at

968:22–981:18, 1004:13–1005:14 (Reinhardt) (agreeing for a series of nearly identical certifications that she did not do any independent analysis, review data, or reach out to anyone else at Symantec in order to verify that the certification had changed).  Reinhardt monitored an internal website to learn about pricelist changes, *id.* at 1149:25–1150:5, but did not seek out information about changes in non-standard discounting or rebates and instead waited passively to be informed of them, *id.* at 1005:9–14.

180.  Documents from the relevant time period also shed light on the contemporaneous understandings of Bradbury, Reinhardt, and others at Symantec as related to the GSA contract:

a.      In January 2008, Bradbury advised that where a reseller that would not "commit to an initial order of any value," discounts needed to be based on individual rather than cumulative orders "[i]n order to avoid the price reduction clause on our GSA contract." U.S. Ex. 159 at SYM00364922.  This demonstrates that Bradbury understood sales to resellers to implicate the PRC, at least where terms and conditions such as initial order value were the same.

b. In August 2008, a reseller sought to acquire Symantec products for its own internal use, and Bradbury wrote that because the sale was considered commercial and the discounts "exceed any discounts we offer to GSA . . . in order to avoid a price reduction on GSA going forward, the Agreement . . . will have to include an upfront and/or annual commitment that is non-cancellable."  U.S. Ex. 89 at SYM00362822.  She noted that the proposed site license would satisfy those requirements.  *Id.* at SYM00362822–23.

c.      In a December 2008 email, Bradbury admonished a sales representative who was requesting an additional 5% discount off of the distributor price for a sale to a government end user, saying, "You even indicate that there's no competition . . . that just kills us with

GSA.  This will trigger a GSA price reduction which we have discussed with you many times."  U.S. Ex. 164 at SYM01617690.  She then suggested adding a specific clause stating that the discount was to displace a named competitor.  *Id.* at SYM01617691.  This shows that Bradbury understood sales to resellers, even those reselling to government end users, to trigger the PRC.  On the other hand, it also demonstrates that Bradbury believed special approvals for competitive reasons would insulate the sale from the PRC.

d. In spring 2009, on an email involving Reinhardt and Knox, another public sector employee, Deborah Vaughn, informed a sales representative that he needed approval for a proposed discount of 67% off MSRP rather than 50% off of the distributor buy price as he believed for a deal negotiated between Symantec and a state government agency.  U.S. Ex. 93 at SYM00892587.  Vaughn wrote, "Please note that this will trigger a price reduction with GSA . . . so please provide in SymArt a compelling event for the price reduction so we can show our auditors[,] [f]or example, to meet competitive pricing, or a customer satisfaction issue, etc. . . ."  *Id.* at SYM00892586.  In a later email regarding the same deal, Bradbury confirmed that the Texas sales representative "knows that if we offer Texas pricing better than GSA it will trigger a price reduction on GSA."  U.S. Ex. 985 at SYM01392707.  This chain confirms that Bradbury and the public sector team understood sales to state and local governments to trigger the PRC, but again thought that the concern could be ameliorated with an eSPA approval.

e.    A March 2010 email from Bradbury to three public sector employees (Reinhardt, Foster, and Vaughn) explained, "[b]elow is the GSA price reduction clause along with my redline comments specific to Symantec's GSA contract" to provide them with guidance for how to respond when state and local sales representatives "ask for clarification as to why

they cannot offer [state and local] customer[s] a better discount or more favorable terms and conditions than GSA customers." U.S. Ex. 1126. In that email, Bradbury stated that academic customers were not part of the Basis of Award, and that the Basis of Award was "the Government Price List for products and maintenance and the commercial price list for Professional Services." *Id.* In that email, Bradbury indicated that the second PRC trigger would be implicated "if Symantec offers higher discounts than GSA and/or better terms and conditions to [state and local] customers . . . includ[ing] waiving the minimum order thresholds applicable to discount bands." *Id.* It also stated that the third PRC trigger would be implicated by "[d]iscounts to [state and local] customers under the Government Pricelist that are greater than the discounts to GSA, disturbs the price/discount relationship . . . ." *Id.*

f.    That same email identified several carve-outs to the PRC, including sales over the maximum order threshold. *Id.* It also included the following:

> Symantec also stated in its proposal that the following discounts to non-GSA customer shall not constitute a price reduction:

> Information regarding deviations from existing discounting policies was provided in Symantec's original proposal submission. Any deviations from published discounts require management approval. Deviations must be documented and approved in accordance with the following guidelines: As previously disclosed to GSA as part of Symantec's established discounting policies, the Worldwide Sales discounting tool referred to as "eSPA" was established to allow Symantec the flexibility to respond to competition. This process provides non-standard competitive pricing to strategic accounts by requiring commitments from the identified account for annual quantity purchases, or to meet one of the following guidelines; which are provided as examples:
> (Note: these below examples should be included in any SymART request for [state and local] discounts especially when the order doesn't exceed the Maximum Order Threshold)

>    1.  To meet market competition or displace a named competitor at customer site;

2.  Customers who agree to standardize on Symantec products and services;
3.  New market or market segment penetration;
4.  Educational, including prime contractors, or Charitable organizations or institutes;
5.  Introduction of a new product and services through more aggressive discounts and in exchange for press or customer references.

*Id.* This description makes clear that Bradbury believed—and instructed others who relied on her guidance—that sales with non-standard discounts documented in eSPA or eSTA did not trigger the PRC, at least under those conditions.

181.  Ms. Morsell likewise understood during her time at Symantec that non-standard discounts approved in eSPA for one of the disclosed reasons would not trigger the PRC. *See* DX 45 (stating in an August 2011 email to Harris that "[o]nly discount requests that meet one of the deviations statements provided to GSA during negotiations are approved").

### 4. CAV Visits

182.  During the life of the contract, GSA conducted "Contractor Assistance Visits.," colloquially referred to as "CAVs" or "CAV Audits."  CAVs are conducted as interviews, lasting between 2 to 5 hours, during which the industrial operations analyst asks the contractor a series of questions to determine if the contractor has an understanding of its contractual requirements and evaluate whether the contractor has processes in place to ensure compliance.  U.S. Ex. 405 at 4 (2008 CAV Manual); U.S. Ex. 409 at 4 (2011 CAV Manual).

183.  Despite the colloquial name, CAVs are not audits.  They are conducted by industrial operations analysts who have minimal audit background. Tr. at 2965:8–2966:5 (Brady).

184.  CAVs are not designed to determine compliance with the PRC.  *Id.* at 2972:23–24; U.S. Ex. 405 at 35.  The Industrial Operations Analyst only asks whether the contractor knows their basis of award and has documentation identifying the basis of award, and if the contractor "has a

system in place that monitors the pricing and discount relationship."  Ex. 405 at 36; Ex. 409 at 45.

185.  Symantec had at least two CAVs during the life of the GSA contract, one in January 2009 and another in May 2011.  U.S. Ex. 897 (2009 CAV Report); U.S. Ex. 1440 (2011 CAV Report).

186.  Bradbury handled the January 2009 CAV on behalf of Symantec.  U.S. Ex. 897 at 1.  The Report of the January 2009 CAV indicated that Symantec was aware of its Basis of Award and "ha[d] a system in place to monitor the 'Basis of Award' discount relationship."  *Id.* at 3.  In the narrative section for "Basis of Award Findings," the Industrial Operations Analyst wrote "[t]he contractor insures [sic] that they do not discount at or below their GSA approved pricing to any non GSA sales."  *Id.*

187.  The May 2011 CAV was handled by Morsell.  U.S. Ex. 1440 at 1.  The report of that visit again answered "yes" to both Basis of Award questions and noted that the Basis of Award had been verified by reference to the FPR and SF-1449.  *Id.* at 3.  It also noted that Symantec had "an effective monitoring system in place" and that GSA MAS refresher training was being developed within Symantec.  *Id.*

### 5. Internal Audit

188.  From July through October 2010, Symantec's Corporate Risk Assurance Team completed an internal audit on Symantec's discounting policies.  U.S. Ex. 264B at 2 (Discounts Audit Report).  Steve Berney was the lead person conducting that audit.  Tr. at 277:11–17 (Berney).

189.  That audit was originally intended to examine discounting policies and guidelines, particularly Symantec's non-standard discounting policies.  *Id.* at 288:16–19.  At some point during the audit interviews, the topic of the GSA contract came up and Berney discussed it with his boss, Andrew Eacott.  *Id.* at 313:4–11.  At Eacott's direction, Berney included a "light

inquiry" into the GSA contract in the discounting audit.  *Id.* at 313:10–14.  Early in his light inquiry, he was directed to Freedman and Lokie, who in turn directed him to Reinhardt.  *Id.* at 316:6–317:10.

190.  Berney and his colleague on the internal audit team, Sandra Amarante, held a meeting with public sector sales team members, including Reinhardt and Lokie, on July 28, 2010.  U.S. Ex. 259 (meeting minutes).  They also followed up with Reinhardt and Lokie after the meeting, collecting and reviewing various documents related to the GSA contract in the following weeks. U.S. Ex. 1207; U.S. Ex. 288.

191.  The final Discount Audit report was sent on December 7, 2010 to several individuals, including Schumm and Reinhardt.  U.S. Ex. 264A.

192.  The report included several findings that implicated GSA compliance concerns.  The executive summary noted:

> [I]nformal communication processes between US sales teams (commercial, public sector, and sales contracts) could create a situation whereby GSA discounts are no longer competitive or in compliance with contractual terms, resulting in the possible payment of restitution and/or fines to the US government.  For clarification, the GSA is an agency that ensures the government receives a discount that is at or above the average discount being offered to a company's non-government customers.  The lack of reporting, guidelines and communication identified in the audit findings increases the risk of non-compliance with our contract with the GSA.

U.S. Ex. 264B at 2.

193.  The report also found that Symantec lacked "documented corporate strategies, goals, or objectives that can be used to effectively guide the discounting practices of Symantec's US sales force," and that creating a formalized discounting program was "not realistic at this point in time" given the complexity of Symantec's sales operations.  *Id.* at 4.  Relatedly, the report found that there was inadequate data for historic discounting and suggested the key measure of adding Base MSRP as a data field in the bookings database, and that discount reporting and monitoring,

was done on an ad hoc basis. *Id.* at 5–6. The Audit Report also raised concerns with the process for approving non-standard discounts, finding that approvals were inconsistent and often poorly documented. *Id.* at 8.

194. Finally, the report raised the concern that a lack of formalized communication between the commercial and federal sales teams resulted in the public sector team not learning about price changes until after the fact and recommended including the public sector team on the "Channel Notifications" distribution list. *Id.* at 9. That recommendation was completed in September 2010. *Id.*

195. The report was not sent to Freedman and he was not notified of the findings, although he agreed at trial that it would have given him cause for concern if he had received them. Tr. at 2401:8–14, 2402:18–20 (Freedman). Lokie likewise did not recall seeing the report. *Id.* at 2461:1–5 (Lokie). Reinhardt was one of the recipients of the email and agreed that "any information on [Symantec's] discounting policies would have been important [for her] to know." *Id.* at 1041:7–14 (Reinhardt). However, the report was sent while she was on leave and she did not recall reviewing it when she returned. *Id.* at 1039:18–23 ("[W]hen I came back from leave . . . first day I came back, I put my two weeks' notice in and I had hundreds of emails. So this could have very well been overlooked.").

196. In sum, despite raising major red flags for GSA compliance, none of the recipients of the report took steps to follow up on those red flags.

### 6. Cancellation of the Contract

197. Not long after Morsell began working at Symantec, she started to have concerns about Symantec's compliance with the GSA contract. She raised those concerns with her supervisor, Lokie, and her second-level supervisor, Schumm, sometime in 2011. Tr. at 2682:6–23

(Schumm).  Schumm asked Morsell to provide more data about the discounting policies that concerned her, and Morsell told Schumm that she was having difficulty assembling comprehensive data about discounting practices.  *Id.* at 2689:23–2690:4.

198.  In July 2011, GSA's Office of Inspector General sent Symantec a letter informing Symantec that GSA would be performing a pre-award audit of the CSP information that Symantec would be submitting in connection with the upcoming extension of the GSA contract. DX 637 at US-GSA-00213260–62.

199.  Molina expressed concerns around this time, as well.  In September 2011, she responded to a modification request submitted by Morsell asking why some invoices to channel partners indicated a higher discount than the discount percentages in the CSP.  U.S. Ex. 106 at SYM01355276.  Although Morsell noted that one invoice included an additional discount based on order volume, Molina noted that "the Government is also ordering a large dollar volume" and "the CSP does not reflect that the [Most Favored Customer]/[Basis of Award] receives additional discounts due to an order volume."  *Id.* at SYM01355274–75.  Molina concluded that those invoices appeared to be PRC violations, but that GSA could "handle [them] during the audit." *Id.* at SYM01355274.  Molina likewise confirmed in her testimony that GSA would not typically terminate a contract at that point over a potential violation but would instead address the violations during the upcoming audit.  Tr. At 3250:16–22 (Molina).

200.  Also in September 2011, Morsell asked Molina to send her the original CSPs, noting that Morsell only had the Discount Relationship Chart.  DX 673 at SYM01351185.  Molina responded that she did not have the per-SIN CSPs, either, and Morsell observed that it was possible that Symantec had not submitted per-SIN CSPs with the original offer.  *Id.* at SYM01351184; Tr. at 3252:19–3254:2 (Molina).

201.  Symantec submitted its renewal package for the GSA contract on November 29, 2011.  *See*
U.S. Ex. 297A (first of several emails attaching renewal package).

202.  Molina did not review the renewal package because she was waiting for the pre-award audit
to be completed.  Tr. at 3261:18–23 (Molina).  The pre-award audit was never completed,
however, because Symantec never provided the GSA Auditor with the data GSA was requesting.
*Id.* at 3030:13–16 (Harris); U.S. Ex. 1613 (email from March 2012 noting that "Symantec's
inability to provide usable sales data, to date, has delayed our planned preaward examination").

203.  Instead, Symantec provided written notice to GSA on April 30, 2012 that Symantec would
be cancelling its GSA contract altogether, effective 30 days from the notification.  U.S. Ex.
300B.  Because the contract was cancelled, GSA also cancelled the pending pre-award audit for
the renewal.  U.S. Ex. 482.

204.  The stated explanation for the cancellation was to "align[] with Symantec's commercial
business strategy to flow sales through our partner network."  U.S. Ex. 300B.

205.  An email from Lokie to Schumm dated April 24, 2012 sent a draft cancellation letter and
noted that Lokie was "comfortable with the recommendation" but that Schumm was "struggling
with this decision because of lack of data."  U.S. Ex. 299 at 1.  After receiving input from legal
counsel Freedman, Schumm agreed to cancel the renewal submission two days later.  U.S. Ex.
1629 at 1.

206.  Schumm testified that terminating the GSA contract was "largely a business decision"
based both on the fact that Symantec already had well-known resellers that could sell Symantec
products on their own GSA schedule contracts and the fact that Morsell had raised concerns that
Schumm did not fully understand.  Tr. at 2706:6–24 (Schumm).  She therefore determined that

"it was just a risk/reward kind of decision that I felt like there would not be a significant risk to our government business to not hold the schedule." *Id.*

207.  Symantec's GSA contract terminated at the end of September 2012.  *Id.* at 2570:12–14 (Barton); U.S. Ex. 2177B at 2 ("Operations Update" presentation noting that "Symantec's GSA . . . contract expired September 30, 2012").

208.  A slide deck providing an "Operations Update" from late 2012 explained that "[d]espite the expiration of our GSA contract, Symantec still needs to maintain discipline with its discounting practices" because Symantec submitted CSPs in connection with reseller letters of supply and "not properly or fully disclosing our discounts" could give rise to FCA liability.  U.S. Ex. 2177B at 4.

209.  Although GSA had not yet conducted the pre-award audit, because of the unusually abrupt cancellation and awareness of some discounts in the data that might indicate PRC violations, GSA decided to open a post-award audit to investigate Symantec's compliance with the PRC.  Tr. at 3062:2–17 (Harris).  On May 15, 2012, GSA's OIG informed Symantec that it would be opening the post-award audit.  DX 641 at US-GSA-00221417.

210.  During 2012 and early 2013, Symantec met with and provided information to GSA's OIG team in conjunction with the post-award audit.  *See* U.S. Ex. 1800 (answering questions in a January 2011 email and referencing earlier presentations the previous November).  The post-award audit was eventually ceased, however, and GSA's OIG instead assisted the government in the present case.  Tr. at 3002:25–3003:7 (Harris).

### E. Damages

211.  The Court heard expert testimony from two experts for the United States, Dr. Holt and Dr. Gulley, one expert for California, Dr. Nye, and one expert for Norton, Mr. Tucker.  It discusses

the United States' experts first, along with Mr. Tucker's criticisms of their work, and discusses

the damages evidence for California in a later section.

### 1. Testimony of Dr. Holt

212.  In addition to recreating and correcting Percival's Frequency Chart, as discussed above, Dr.

Holt also conducted analyses to: 1) Create similar frequency charts for other years; 2) Determine

transactions where "band jumping" occurred, meaning that the deal corresponded to a higher

band than the order volume or accumulated points entitled it to; 3) Match product SKUs across

bands and programs for single products; 4) Create a data set of transactions that potentially

violated the PRC based on counsel's assumptions; and 5) Group the transactions identified as

potential violations with the other line items sold in the same order.  Tr. at 3447:10–3448:3

(Holt).

213.  Following the same process that she had used to create the "Corrected Frequency Chart,"

Dr. Holt created Frequency Charts for the subsequent years that the contract was in effect, 2007–

2012.  *Id.* at 3449:15–18.  The data used for the 2007–2102 charts indicated the type of

customer, obviating the need for any assumptions about which sales were to channel partners.

*Id.* at 3471:25–3472:9.  When those decile distributions were plotted alongside each other and

the Percival Frequency Chart, the Percival Chart's curve was the clear outlier.



Slide 25 of Dr. Holt's testimony, U.S. Demon. 5; Tr. at 3475:4–19.

214. Dr. Holt also broke down the discount ranges into the 0–40% and 40–100% ranges for each of those years in order to emphasize the contrast between the Percival Chart (in which over 98% of discounts were under 40%) and the actual distribution (which was generally more in the 60–70% range). *See* Slide 23 of Holt's Testimony, U.S. Demon. 5. Mr. Tucker took issue with the use of the 40% cutoff, testifying that a 35% or 30% cutoff would have been more consistent with the GSA discounts that were in fact negotiated and that gives a "much different impression" of the discount distribution. Tr. at 4309:20–4311:23 (Tucker). The Court considers this disagreement entirely beside the point. Not only is it just two different ways of depicting the same data, GSA was provided with and evaluated a decile chart during the negotiations. Any dispute between the parties about the best way to present that distribution after the fact is immaterial.

215. With respect to the "band jumping" analysis, Dr. Holt combined data showing Rewards points accumulation, as well as "conversion" points and manually added points, to create a total of running points for customers at a given time, and compared that to sales data for purchases of

less than $100,000 under the Rewards program to determine how many of those purchases were at higher—and more advantageous—bands than the point total the customer was entitled to. Tr. at 3480:6–3483:3 (Holt). She identified 15,101 line items that were sold at a band one level higher than the Rewards points indicated; 6,983 line items sold at two bands higher; 1,899 line items sold at three bands higher; and 1,138 line items sold at four bands higher. *Id.* at 3483:20–23.

216. Dr. Holt conducted a similar analysis to identify band jumping on Government and Express pricelists (excluding GSA sales) where the sales price was for a more advantageous band than the order quantity would have qualified for. In both cases, Dr. Holt identified a significant number of line items that were sold at a higher band price than the volume quantity of the order entitled the purchaser to receive. *Id.* at 3486:23–3488:15.

217. With respect to the SKU comparison chart, Dr. Holt matched different SKUs for the same product to create a key that would allow for simple comparison—the kind of "Rosetta's Stone" that Symantec lacked. That was relatively straightforward with the new SKUs, where the first 11 digits identified the product, and the final two digits indicated the buying program and band. *Id.* at 3494:15–17. For the old SKUs, though, Dr. Holt had to use the product descriptions in the "SYMOM" data, which were often abbreviated or inconsistent, to generate a consistent SKU root. *Id.* at 3495:25–3496:22. She then used the cleaned up SKU description roots to assign a unique identifier for each combination in SYMOM. *Id.* at 3496:24–3497:15. The result of this complicated and sometimes manual review was a SKU Comparison Chart that allows the user to identify the relevant SKUs for each product. U.S. Ex. 368.

218. Next, Dr. Holt created a dataset of sales that potentially violated the PRC, referred to as the "Potential PRC Sales Chart." She started by using Symantec's sales data to filter out

irrelevant sales, such as retail sales, invoice-only sales, and non-U.S. sales.  Tr. at 3502:22–

3503:13 (Holt).  She then further filtered the data to include only line items that received a non-

standard discount, products that were on GSA's pricelist, orders less than $100,000, and only

Rewards and Express sales, and she excluded sales where the channel indicated Government or

Educational.  *Id.* at 3504:2–3505:4.  She then merged that filtered dataset with several other

datasets such as comment and reason fields from eSPA/SFDC data, any comments from the

Oracle sales data, the assigned SIN, product group, and "bucket" provided by counsel, and

several different SKUs from the SKU comparison chart.  *Id.* at 3505:17–3507:3.

219.  The resulting dataset of line items—which spanned three Excel sheets due to its size—

represented the universe of potential PRC violations.  U.S. Exs. 1958, 1959, 1960.  In those

datasets, Dr. Holt identified over 16,000 line item entries that did not have an eSPA or SFDC

entry.  Tr. at 3518:25–3519:4 (Holt).  Dr. Holt did not rely in any way on Mr. Harris when

compiling that data.  *Id.* at 3589:21–23.

220.  Norton's expert, Mr. Tucker, had criticized Dr. Holt's analysis in part because it was done

on a line item level rather than an order level.  In response, Dr. Holt also assembled two order

level charts using a similar technique, one for commercial transactions and one for the

government buying program that excluded federal purchasers.  *Id.* at 3524:24–3525:12.  This

chart added back in line items that had been excluded in the previous data set because they did

not receive a non-standard discount and calculated the discount for the entire collective order.

*Id.* at 3525:23–3526:11.  Dr. Holt could not, however, match the items to buckets in this

approach because a single order might contain different categories of products.  *Id.* at 3527:15–

22.

221.  For both the line item and order level charts, the United States added two more columns indicating whether or not each given line item should be included in Dr. Gulley's damages calculations based on two different theories of liability.  U.S. Summ. Ex. 1.  Those columns were originally derived by the work product of Harris, the excluded expert.  Tr. at 3640:21–22 (Holt).

### 2. Testimony of Dr. Gulley

222.  The United States' damages expert, Dr. Gulley, testified at length about the damages calculations he performed in this case.  Dr. Gulley performed his calculations with two different data sets that were compiled by Dr. Holt and narrowed down by the United States.  Dr. Gulley did not independently assess the liability assumptions provided by counsel.  Tr. at 3713:1–16 (Gulley).

223.  The "FPR Review" data set included transactions that the United States believes violated the PRC, meaning they were the transactions on which Symantec offered deep non-standard discounts to commercial customers on standard orders under the maximum order threshold of $100,000.  U.S.'s Prop. FF&CL ¶ 488; U.S. Summ. Ex. 1.

224.  The "FPR Plus Review" dataset included, according to the United States, transactions with deep non-standard discounts to commercial customers that either had no eSPA entry or whose eSPA entry was based on reasons dissimilar to those disclosed during negotiations.  U.S.'s Prop. FF&CL ¶ 493; U.S. Summ. Ex. 1.

225.  Despite the rather confusing nomenclature, the "FPR Plus" dataset was actually more generous to Norton because it excluded transactions based on the eSPA non-standard discounting practices that were disclosed to GSA, such as sales made for competitive reasons that had an eSPA approval.  In fact, Bradbury testified that she understood transactions without an eSPA would trigger a price reduction.  Tr. at 1936:20–24 (Bradbury) ("Would a nonstandard discount

to a customer in Symantec's commercial class of customers on an order less than the maximum

order threshold that did not have an eSPA trigger a price reduction under Symantec's PRC?  A. It

would . . . .").  In other words, the FPR Plus dataset more closely aligned with Symantec's own

subjective understanding of the PRC as it applied to the contract.

226.  Within each of those datasets, Dr. Gulley used two separate methodologies referred to as

the "Base MSRP Method" and the "Banded MSRP Method."  As the names suggest, the Base

MSRP Method compared the actual sale price with the Base MSRP to measure discounting,

whereas the Banded MSRP Method compared the actual sale price with the standard buy price

(after calculating buying programs and channel discounts).  Tr. at 3715:12–3716:7 (Gulley).

227.  Dr. Gulley first compiled a set of actual GSA sales of Symantec products by using IFF

sales data, filtering out non-GSA purchases, and merged it with additional information from the

SKU comparison chart and Symantec's pricelists.  *Id.* at 3718:2–3720:4 (Gulley); Slide 10 of Dr.

Gulley's Testimony, U.S. Demon. Ex. 6.

228.  The way Dr. Gulley calculated the "should have received" discount varied between the

Base and Banded MSRP Methods.  In the Base method, Dr. Gulley used a basic algebraic

formula: that the ratio between the price the government paid and the actual price charged to

commercial customers should have equaled the ratio between the identified GSA discount and

the identified commercial discount on the Discount Relationship Chart.

$$\frac{P_A}{P_B} = \frac{1 - D_C}{1 - D_D}$$
$P_A$ = the price the government should have paid (SHP Price);
$P_B$ = the actual price Symantec charged commercial customers;
$D_C$ = the contractual discount for GSA in the Contract; and
$D_D$ = the discount for commercial customers identified in the Contract.

Slide 20 of Gulley Testimony, U.S. Demon. 6; Tr. at 3729:5–21 (Gulley).

229.  The right-hand side of that formula, for which the different variables are available in the

Discount Relationship Chart, can be simplified to a single number referred to by Dr. Gulley as

the "Discount Relationship," or "$R_C$."  Tr. at 3729:23–3730:7 (Gulley).  So, for example, for a

SIN where the GSA discount was 27.5% off Commercial MSRP and the Distributor Discount

was 38% off Commercial MSRP, the Discount Relationship would be 1.1694: the ratio of (1-

0.275)/(1-0.380).  *Id.* at 3731:10–21 (walking through the example on Slides 21–22).

230.  Because the comparison of the prices paid by GSA and the applicable commercial customer

should, in theory, have the same discount relationship, Dr. Gulley was able to solve for the price

GSA should have paid by multiplying the actual commercial customer price by the discount

relationship.  Or, in mathematical terms, $P_A = P_B * R_C$.  *Id.* at 3730:8–12.

231.  Where there were ranges in the applicable commercial customer discounts, Dr. Gulley used

the highest discount.  This was the most conservative estimate, because a higher commercial

discount would lead to a lower discount relationship ratio, and therefore a lower "should have

paid" GSA price.  *Id.* at 3735:24–3737:20 (explaining and providing an example).

232.  The process for calculating the should-have-paid discount was similar in the Banded

Method, except that in the Banded method Dr. Gulley assumed that the discounts for distributors

and resellers in the Discount Relationship Chart were the channel discounts and calculated off of

standard buy price instead of base MSRP.  *Id.* at 3739:5–10.

233.  Of course, the multitude of sales to both GSA and commercial customers did not neatly

align.  On the instruction of counsel, Dr. Gulley therefore grouped the sales data into

"buckets"—unique combinations of SIN, product category, and quarter.  *Id.* at 3720:16–21

(Gulley); Slide 13 of Gulley's Testimony, U.S. Demon. 6; U.S. Ex. 1923 (bucket look-up table).

This allowed him to group products by type and time so that the comparisons between GSA and

commercial transactions would be an "apples to apples" comparison.  Tr. at 3721:1–4 (Gulley).

234.  The bucketing approach was a logical one to use because the FPR (and the Discount Relationship Chart) contained different discounts for each product group and SIN, whereas a given commercial order might include multiple SINs as well as items that were not available on the GSA pricelist.

235.  One potentially concerning feature of the bucketing methodology is that because the buckets were divided by quarter, some of the GSA sales for which Gulley calculated a discount occurred *before* the allegedly PRC-triggering commercial transactions in the same bucket.  *Id.* at 3872:6–13.  Similarly, the first bucket included at least one GSA sale that was booked in the first weeks of January 2007, before the contract became effective.  *Id.* at 3872:17–21.  Still, the United States is correct that if deep discounts in preceding quarters would have likewise triggered the PRC, any inconsistent timing within each bucket had at most a minimal effect on damages.  U.S.'s Resp. at 44–45.

236.  Norton's expert also criticized Dr. Gulley's use of a line item, rather than order, analysis.  In response to that criticism, Dr. Gulley also conducted a separate order level review.  Tr. at 3771:20–3772:2 (Gulley).  He used the Banded MSRP method because the number of missing MSRPs was significant at the order level and used time periods instead of buckets (since the buckets were grouped by SIN and product type).  *Id.* at 3772:9–3773:18.  In each scenario under this order level analysis, however, Dr. Gulley's damages were significantly *higher*.  *Id.* at 3774:2–3.

237.  Mr. Tucker, on the other hand, calculated that applying order level discounts instead of line item discounts would reduce Dr. Gulley's estimated damages for the FPR Base Review by $129.9 million and the FPR Plus Base Review by $117.7 million on a standalone basis.  Tr. at 4400:12–19 (Tucker).  He criticized Dr. Gulley's "order level" analysis as faulty because it

abandoned the bucketing approach.  *Id.* at 4423:12–19.  Mr. Tucker's criticism here is well-taken.  Dr. Gulley did not convincingly explain why the order level discount calculated by Dr. Holt could not be applied to the bucketing method.  However, Mr. Tucker's point also serves to underscore the overall conservative effect that the bucketing approach had on the damages calculation.

238.  For each "bucket," Dr. Gulley chose ten transactions that corresponded to either the FPR or FPR Plus method.  For the Base method, he then took the average discount for those ten transactions and applied the Discount Relationship Ratio from the Discount Relationship Chart to determine what GSA's "should have received" discount for each bucket would have been.  *See* Tr. at 3741:14–3743:1 (Gulley) (explaining example on Slides 36–38).  For the Banded method, Dr. Gulley only averaged the ten discounts because the Banded method assumed that the discounts in the discount relationship chart were the channel margin discounts.  *Id*. 3743:3–13.  The "should have received" GSA discount for each bucket was compiled in a single table.  U.S. Ex. 360.

239.  The ten transactions that were averaged for each bucket were identified by counsel.  Tr. at 3778:6–9 (Gulley).  This specific step in the process was unreasonable.  Although bucketing by line item was reasonable, ignoring the order level discounts for those line items when calculating the "average" discount resulted in an unreasonably inflated average "should have received" discount.  For example, Norton points to an order in which a customer paid full price for two years of service and received an additional month of service at a 96.7% discount, but Dr. Gulley included the 96.7% discount for that line item in his analysis.  *See* Tr. at 3853:23–3856:22

(discussing order to Promise Technologies).[11]  In his testimony, Mr. Tucker also pointed to other examples in which Dr. Holt's work identified order level discounts significantly lower than the line item discount that Dr. Gulley selected and averaged when calculating the "should have paid" discount for each bucket.  *See id.* at 4395:9–4397:13 (Tucker) (describing two examples).

240.  Dr. Gulley acknowledged that he had asked why ten line items were selected, and the United States had explained that its position was that even choosing just the single, largest transaction would have triggered the PRC; therefore using the average of ten transactions was an attempt to be more conservative that would inure to Norton's benefit.  Tr. at 3869:11–25 (Gulley).

241.  After deriving the "should have received" discounts for each bucket, Dr. Gulley conducted eight separate damages analyses on the GSA sales data that varied by FPR or FPR Plus assumptions, Base or Banded methodologies, and stratified or non-stratified calculations.  *Id.* at 3745:14–17.



---

[11] Dr. Gulley maintained that this discrepancy was because the final month fell into a different "bucket" than the other two.  Tr. at 3856:23–3858:15 (Gulley).  On its own, the Court would not find a single example of this situation problematic because grouping by some time period was necessary, and lines had to be drawn at some point.  Using larger time divisions could have increased inaccuracies in the timing of PRC-triggering sales, which Norton also complains about, and a shorter time period may have led to *more* incongruent cutoffs like the Promise Technology example.

Slide 42 of Gulley's Testimony, U.S. Demon. Ex. 6.  For both the FPR and FPR Plus datasets, the Base Method Stratified calculation returned the most conservative estimate.  Tr. at 3745:18–23 (Gulley).

242.  For each GSA line item sold, Dr. Gulley applied the "should have paid" discount for the corresponding bucket and compared it to the actual sale price.  Where the GSA sale price was lower, no damages were attributed to that sale, but where the actual GSA sale price was higher than the "should have paid" price, the difference between the two was calculated in damages.  *Id.* at 3746:8–19.  Dr. Gulley then further broke down the calculated damages into non-standard discount damages and Rewards Band E damages.  *Id.* at 3747:12–18.  He did that by using the Rewards Band E price for the relevant product to calculate how much of the total discount was attributable to the Rewards buying program and how much was attributable to non-standard discounting.  *Id.* at 3748:15–21 (explaining example on Slide 53).

243.  That straightforward method was complicated by the fact that numerous deals were missing either the SIN, product group, or MSRP, making it impossible to determine the correct bucketed discount or the should-have-paid price.  *Id.* at 3749:4–9.  Although the significant majority of the GSA sales had complete data, almost 7% were missing the Base MSRP and just over 1% were missing other data.  *Id.* at 3750:5–12.

244.  For the transactions missing MSRP, Dr. Gulley imputed the MSRP from other known MSRPs in the same bucket.  *Id.* at 3750:18–3751:3.  That was the largest portion of the missing data, and Dr. Gulley testified that he felt "very confident about" the imputation method.  *Id.* at 3757:17–18.

245.  Norton, however, points to testimony that sales missing a GSA MSRP were not GSA sales at all, but instead were "open market" sales.  *See* Tr. at 2590:25–2591:11 (Barton) (explaining

that open market sales were ones without a GSA SKU); Dx. 326 (noting, alongside a flow chart for determining what sales are GSA sales, that open market items can be included in GSA orders with additional requirements).  Mr. Tucker calculated that after excluding line items whose SKU did not appear on the GSA pricelist, Express, Government, or Enterprise pricelists at the time of the sale, Dr. Gulley's damages calculation would be decreased by $112.6 million.  Tr. at 4353:14–24, 4356:2–25 (Tucker).  The United States counters that Symantec's own sales data classified those sales as GSA sales, using the internal SIC 91 code.  U.S.'s Prop. FF&CL ¶¶ 153–54, *id.* at 4544:2–4545:5.

246.  For the other missing data, Dr. Gulley interpolated the damages from that transaction from the other calculated damages rather than interpolating the missing variable.  Tr. at 3751:4–7 (Gulley).  He used both stratified and non-stratified interpolation.  The non-stratified interpolation method utilized the entirety of the data to interpolate the damages for the sales with missing data, whereas the stratified approach used additional data points on order value and levels to interpolate from more closely analogous sales data.  *Id.* at 3760:11–3761:10.

247.  Here, too, Mr. Tucker opined that Dr. Gulley's interpolation was unreliable because the population he was using for his interpolation (or as Mr. Tucker calls it, extrapolation) was not sufficiently comparable: mainly because the population of incomplete cases, in contrast to the population of complete cases, included enterprise option sales, sales that post-dated the end of the GSA contract, and items that were not on the GSA pricelist.  Tr. at 4413:21–4414:25 (Tucker).

248.  Dr. Gulley also tested the sensitivity of his interpolation methods to potential errors and determined that his interpolation was reliable.  Tr. at 3763:6–3764:10 (Gulley).

249.   In his reply report, Dr. Gulley significantly decreased the number of interpolated sales in his damages calculation based on information provided by counsel.  *See* U.S.'s Prop. FF&CL ¶ 573.

250.  After conducting the damages calculations under each different theory, Dr. Gulley's method that returned the lowest damages was the Stratified Base MSRP Method using the FPR Plus dataset, which Dr. Gulley calculated at $281,552,189.  The same methodology applied to the FPR dataset was calculated at $322,858,720.  Tr. at 3766:4–12, 3769:21–23 (Gulley) (discussing slides 75 and 78).

251.  Mr. Tucker also pointed out that the GSA discount was a baseline discount for GSA as well, and that on a majority of GSA sales the federal agencies negotiated and received significantly higher discounts than those contained in the FPR.  Tr. at 4324:24–4326:5 (Tucker).  As he explained through the help of a demonstrative, agencies negotiated $689 million in additional discounts above and beyond what the GSA discount entitled them to.



Slide 16 of Tucker's testimony, Tucker Demon.

252.  Mr. Tucker's various adjustments, while calculated on a standalone basis, also overlapped. Tr. at 4427:3–7 (Tucker).  Therefore, if some but not all of the adjustments are applied, the order

in which they are applied makes a difference.  *Id.* at 4426:23–4427:9.  A sequential breakdown

of Mr. Tucker's various adjustments was admitted as a separate exhibit.  Dx. 800.

## F. California

253.  Symantec's products were sold to California agencies during the life of Symantec's GSA

contract through Symantec-approved resellers.  The California Department of General Services

("DGS") contracted with the Symantec-approved resellers under two different state purchasing

programs: (1) the California Multiple Award Schedule program ("CMAS"); and (2) the Software

License Program ("SLP").  Tr. at 3963:1–7 (Lower).

254.  Much like the function of GSA at the federal level, DGS negotiates leveraged procurement

agreements state and local agencies can then purchase from.  *Id.* at 3958:21–3960:3.

255.  The Court heard testimony from Rhonda Smith, a longtime employee of DGS who held

positions such as Program Manager of the CMAS program and Chief of the Acquisitions Branch,

and Scott Lower, a DGS employee who created the SLP program and personally handled the

negotiations with all software manufacturers that participated at the time, including Symantec.

Tr. at 4074:18–4076:14 (Smith); Tr. at 3980:7–12 (Lower).  The Court found both Smith and

Lower to be knowledgeable and fully credible.

### 1. CMAS Program

256.  CMAS resellers sold products or services that were available on existing GSA contracts at

the same GSA price.   Tr. at 4078:5–7 (Smith).  Each CMAS contract identifies a "base GSA

contract" that is used as the maximum that a state agency can pay.  *Id.* at 4078:9–13.

257.  CMAS contracts were held only by Symantec resellers, never Symantec itself.  *Id.* at

4125:24–4126:4.  Many of the CMAS contracts entered into evidence did not identify the

relevant Symantec GSA contract as the base contract, instead identifying a reseller contract that offered Symantec products.  *See* Norton's Prop. Cal. FF&CL ¶ 29 (listing CMAS contracts).

258.  DGS grants state agencies authority to purchase directly from CMAS suppliers up to a certain threshold, depending on the size of the agency.  Tr. at 4077:24–4078:4 (Smith).

259.  The same products that could be purchased through the base GSA contract could be purchased through the CMAS contract.  State agencies looked at GSA Advantage to determine what products were available, and the availability and price of products under CMAS changed automatically with the availability and price of products on the GSA MAS contract.  *Id.* at 4124:10–23.

260.  Because CMAS contracts are based on GSA pricing, they are not competitively bid, and DGS does not do its own assessment of the offered CMAS pricing.  *Id.* at 4078:14–20, 4079:9–10; *see also id.* at 3962:17–19 (Lower) ("[T]he pricing was competitively assessed through the federal government, and they felt that the feds did their job well, so they relied on the -- the GSA contracts.").

261.  California state agencies are instructed to get three CMAS quotes and select the lowest one, and they are encouraged to try and negotiate better prices with the resellers.  Tr. at 4080:1–3, 4080:25–4081:2 (Smith).

262.  Symantec would provide resellers with Letters of Authorization that would allow the reseller to be granted a CMAS contract.  Tr. at 2633:4–11 (Acara).  The Letter of Authorization served to assure the DGS analyst that the reseller was authorized to sell the manufacturer's products.  Tr. at 4121:23–4122:1 (Smith).

263.  Symantec knew that resellers selling through CMAS used Symantec's GSA pricing.  *See, e.g.*, U.S. Ex. 696 (noting that CMAS is one of the state programs that "reference our GSA

pricing"); U.S. Ex. 1465 (noting in an internal email that "[t]he California CMAS is based on our GSA pricing and T's & C's").

## 2. SLP Program

264. In contrast to the CMAS program, SLP sought to negotiate higher discounts directly with software manufacturers.  Tr. at 3978:18–23 (Lower).  State agencies had a higher spending threshold under the SLP program than under CMAS—up to $2 million.  *Id.* at 3979:17–25.  The baseline for the SLP negotiations was always the GSA price.  *Id.* at 3979:7–12.

265. Mr. Lower testified that he endeavored to negotiate more attractive overall terms for SLP contracts.  Even if prices were the same as GSA prices, Lower sought concessions such as volume discounts or 0% maintenance renewals that would make the overall package more attractive.  *Id.* at 3982:4–18.

266. In negotiating the Symantec deals, Lower verified Symantec's GSA pricing on GSA Advantage.  *Id.* at 3981:20–24.

267. All SLP negotiations took place directly between Symantec and DGS, and DGS did not negotiate further with the resellers.  *Id.* at 3995:2–8.  After DGS and Symantec agreed on SLP discount levels, Symantec provided DGS with a Letter of Offer which memorialized their negotiations and provided a list of the Symantec-approved resellers.  *Id.* at 3985:5–18.

268. The letters of offer under the SLP program authorized resellers for approximately a period of two years.  *Id.* at 3997:4–6.  Resellers were not supposed to sell Symantec products through SLP, *id.* at 3998:7–21, but at least one internal Symantec email suggested that Symantec approved deals while negotiations for new contracts were still pending, *see* Cal. Ex. 460 (advising internal Symantec team of a request to approve a higher band pricing based on a quote from the previous SLP contract).

269.  There were no SLP contracts selling Symantec products in place between September 1, 2009 and June 13, 2010.  Tr. at 4065:23–4066:1 (Lower).

270.  Symantec had concerns that the SLP Letter of Supply process could create compliance problems for the GSA contract.  In a 2010 email, Reinhardt wrote to Lokie that she believed a proposed SLP letter would negatively impact the GSA contract, saying "[W]ith the new proposed discount of 50% off, I know GSA will call, put us through an audit and pay back fees for the difference.  The federal Government places orders for $150K all the time at the standard GSA discount.  There is no completive [*sic*] situation, no penetration of a new market or new products that justify a 50% discount for an order over $150K . . . . Putting a discount in a written letter is more difficult to explain to GSA, than a one off, order by order discount.  Why is it so important to draft a new letter, why can't it be addressed for each individual order?"  U.S. Ex. 1154.

### 3. Damages

271.  California presented expert testimony on damages from Dr. Zachary Nye.  Because DGS did not maintain a centralized database of sales to state and local agencies, Tr. at 4139:17–20 (Smith), Dr. Nye collected data from multiple databases produced by Symantec in discovery, Tr. at 4147:4–15 (Nye).

272.  Dr. Nye merged those databases and then filtered to narrow it down to sales in the relevant time period, under the academic and government buying programs, to California addresses, and through authorized CMAS and SLP resellers.  *Id.* at 4151:17–4153:12.  He then further eliminated sales to private or federal customers.  *Id.* at 4156:15–16.  After that filtering, Dr. Nye had a dataset of 23,614 line items in 7,807 orders that met the criteria.  *Id.* at 4158:6–7.

273.  For each of the remaining sales in the dataset, Dr. Nye assumed a 10% markup in sales price to the end user to account for the reseller's channel margin.  The total sales in that dataset, with the 10% markup, were $48,551,301.  *Id.* at 4158:8–21.  Dr. Nye determined that 10% was a conservative estimate based on his review of internal Symantec documents in which Symantec employees and resellers discussed the question.  *See id.* at 4173:20–4174:5 (discussing Dr. Nye's opinion of the 10% assumption).  Although reseller margins varied by product, those documents suggest that it was reasonably close to 10% for security products and typically higher for the more expensive availability products.  *See* U.S. Ex. 2062 (estimating a 10–17% markup); U.S. Ex. 1801 (2013 email estimating that the margins were 10–15%); Cal. Ex. 452 (stating in results of a 2010 survey that the average was 7.9% for security products and 27.4% for storage products).  Although some margins were undoubtedly lower, many were likely much higher as well, and the Court believes 10% to have been a reasonable estimate.

274.  Dr. Nye's dataset of sales did not indicate whether the sale was made pursuant to a CMAS or SLP contract or a direct sale, nor was he asked to analyze that.  Tr. at 4270:4–7 (Nye); *see also* Dx. 610; Dx. 611 (Nye data).

275.  Dr. Nye then used three different methods to calculate damages on those sales.  Method 1 calculated what price the California agencies would have paid if they had received Rewards Band E pricing.  Tr. at 4162:3–24 (Nye).  Method 1 did not utilize the bucketing methodology and instead only matched each transaction to the Rewards Band E price in effect at the time, but it required use of the SKU lookup table created by Dr. Holt.  *Id.* at 4162:25–4163:25.  A little over half of the identified orders—4,010—resulted in damages under Method 1, for a total of $2,733,485.  *Id.* at 4164:10–20.

276.  Methods 2 and 3 corresponded to the Base and Banded MSRP methods, and were calculated twice with both the "FPR" and "FPR Plus" discount rates, which Dr. Nye referred to as Methods 2a, 2b, 3a, and 3b.  *Id.* at 4165:4–6, 4167:4–15.

277.  To calculate damages under Methods 2 and 3, Dr. Nye utilized the "should have received" discount rates provided by Dr. Gulley.  *Id.* at 4166:20–22.

278.  Dr. Nye calculated the following damages amounts under each of those four scenarios:

| Summary of Damages Under Methods 2 & 3 | | | |
|---|---|---|---|
| Method | Number of Invoices | Total Sales | Total Damages |
| 2a<br>(Banded MSRP FPR Plus) | 7,638 | $48,321,603 | $35,391,846 |
| 2b<br>(Banded MSRP FPR) | 7,696 | $48,321,603 | $38,350,914 |
| 3a<br>(Base MSRP FPR Plus) | 7,699 | $48,602,679 | $35,369,872 |
| 3b<br>(Base MSRP FPR) | 7,779 | $48,602,679 | $38,487,176 |

279.  Slide 20 of Dr. Nye's testimony, Cal. Demon. Ex. 1A; Tr. at 4170:20–4172:10 (Nye).

280.  Dr. Nye did not make any adjustments for the twenty months when no SLP contract for Symantec products was in place. Tr. at 4260:21–25 (Nye).

## IV. EVIDENTIARY DISPUTES

### A. Motions to Strike

Before turning to the Conclusions of Law, the Court must first resolve some outstanding evidentiary disputes.  Beginning with the simplest question, the United States attached two appendices to its Proposed Findings of Fact and Conclusions of Law further elaborating on the reasoning behind the inclusion of each given line item in the FPRPlus_Include column.  *See* U.S.'s Prop. FF&CL at 88 n.9 (explaining that Appendix A "added a 'US Grouping' field that explains why the United States believes each transaction is either not in eSPA or the reason provided in eSPA is inconsistent with the Non-Standard Discount Policy" and that Appendix B

91

totals the transactions for each grouping).  Norton moved to strike those appendices as an improper attempt to introduce new evidence after the close of trial.[12]  Norton's 1st Mot. Strike at 1.  In its Response to Norton's Proposed Findings of Fact and Conclusions of Law, the United States attached yet another appendix showing "excerpts" from Dr. Holt's Potential PRC Sales Chart filtered to show direct sales to commercial end users, *see* U.S.'s Resp. at 14 n.10, which predictably prompted another motion to strike by Norton, Norton's 2d Mot. Strike at 1.

Norton is correct, and the United States does not dispute, that new evidence is not properly introduced after the close of trial.  *See, e.g.*, *Hardin v. Dadlani*, 221 F. Supp. 3d 87, 114 (D.D.C. 2016) (refusing to consider new affidavits and supplemental evidence in a post-trial motion).  Appendices A and B attempt to do exactly that.  The "U.S. Grouping" column attempts to bolster the factual basis for why various transactions were included in the FPR Plus dataset, but those "groupings" were never so much as alluded to during trial, and those explanations are unavoidably new.  Appendix C is a closer call because it is drawn from data exhibits that are in evidence, *see* App'x C of U.S.'s Resp., but the Court is still unconvinced.  Appendix C collects information relating to a certain category in three different exhibits, reduces the relevant columns, and presents that information in a new document.  As Norton persuasively points out, it is much more akin to a new summary exhibit of voluminous data than an excerpt.  Norton's 2d Mot. Strike at 5.  Because summary exhibits must also be admitted at trial, the attempt to present one belatedly is improper.  *See United States v. Abou-Khatwa*, 40 F.4th 666, 688 (D.C. Cir.

---

[12] Norton also moved to strike on the grounds that the Appendices were an unauthorized expansion of the applicable page limit, proffered Mr. Harris's excluded opinions, and attempted to present the beliefs of counsel as evidence.  1st Mot. Strike at 1.  Because the Court grants Norton's motion on the first ground, it does not reach the other arguments.

2022) (noting that "summaries admitted under [Rule 1006] are evidence themselves").  The Court accordingly grants both motions to strike.

**B. Objections to Evidence Reflecting the Work Product of Excluded Expert Charles Harris**

Turning to the more difficult question, Norton objected at trial to the admission into evidence of several summary exhibits that contained work product of the United States' excluded expert, Mr. Harris.  Specifically, Norton objected to the admission at trial of any exhibits that contained Mr. Harris's auditor notes or the "FPR_Include" and "FPRPlus_Include" columns, which contained a binary 1 or 0 indicating whether a given sale should be included for each dataset.  The three exhibits at issue are U.S. Summary Exhibits 1, 4, and 5, which were subsets of tables compiled by Dr. Holt and were provided to Dr. Gulley for his damages tabulation.  The Court accepted that evidence on a conditional basis and ordered additional post-trial briefing on the issue.

Two years earlier, this Court had concluded that Mr. Harris's testimony was not admissible because it was comprised of improper legal conclusions: "Harris would testify, in essence, that it is his expert opinion that Norton/Symantec committed violations of the PRC." *Expert Mem. Op.*, 2020 WL 1508904, at *6.  One of the key portions of Mr. Harris's excluded report and testimony was how he distilled the very large universe of potential PRC violations identified by Dr. Holt to the subset that was presented to Dr. Gulley for the damages analysis. *Compare* U.S. Exs. 1958, 1959, 1960 (Holt's raw data of Potential PRC Sales), *with* U.S. Summ. Ex. 1 (including only 2,244 potentially PRC-violating line items for Dr. Gulley's review).  In its opinion, the Court stated that Harris "simply agreed with counsel that . . . the transactions Dr. Holt had identified looked like the kinds of transactions he would have flagged," which were

then "passed along to Dr. Gulley with Harris's imprimatur." *Expert Mem. Op.*, 2020 WL 1508904 at *8.[13]

Ultimately, the Court believes this issue is incorrectly characterized as an evidentiary objection. Norton's supporting cases go primarily to whether experts may testify to legal conclusions—of course, they cannot and that is exactly why the Court excluded Mr. Harris's testimony. *See, e.g.*, *Nat'l Ass'n of the Deaf v. Dist. Hosp. Partners, L.P.*, No. 14-cv-1122, 2016 WL 447444, at *6 (D.D.C. Feb. 4, 2016) ("While courts have at times permitted greater leeway and allowed expert testimony, couched in legal conclusions, when such testimony would assist the factfinder in navigating the complex legal regime at issue, those courts have been careful to caution that an expert may not testify about how the application of those legal standards should cut in the particular case before them." (emphasis removed)). But the exclusion of improper legal conclusions in expert testimony does not bar a party from adopting and presenting that legal theory and attempting to prove it through other admissible evidence.

The United States' analogy to non-testifying expert work is persuasive. U.S.'s Harris Br. at 22–23. If the United States had never tried to qualify Harris as an expert and only presented those opinions as assumptions based on the opinion of a non-testifying expert or consultant under Rule 26, Norton would not generally even be entitled to discover that work product. *See* Fed. R. Civ. P. 26(b)(4)(D) ("Ordinarily, a party may not . . . discover facts known *or opinions held* by an expert who has been retained or specially employed by another party in anticipation of

---

[13] Despite the fact that the Court offered in a footnote to entertain a motion for reconsideration if that characterization was incorrect, and despite the fact that the jury trial was later converted to a bench trial, the United States did not seek reconsideration of the Court's ruling until about two years later, on the opening day of trial, after hearing Norton's opening argument. *See* Tr. at 110:7–111:2 (describing the procedural background and moving for reconsideration). The Court denied the motion for reconsideration. *Id.* at 111:7.

litigation or to prepare for trial and who is not expected to be called as a witness at trial."
(emphasis added)); *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 288
F.R.D. 222, 227–28 (D.D.C. 2012) (explaining that consulting expert immunity "shields from
discovery facts known or opinions held by" a non-testifying expert except in exceptional
circumstances); *Liveperson, Inc. v. 24/7 Customer, Inc.*, No. 14-cv-1559, 2015 WL 4597546, at
*2 (S.D.N.Y. July 30, 2015) (determining that this limitation extends even to the identity of non-
testifying experts).

The situation becomes more complicated when a testifying expert relies on the work of
another non-testifying expert.  Several cases have found that a testifying expert's reliance on a
non-testifying expert's work can constitute the "exceptional circumstances" needed to overcome
the limitation on non-testifying expert discovery.  *See Dura Auto. Sys. of Indiana, Inc. v. CTS
Corp.*, 285 F.3d 609, 613–15 (7th Cir. 2002) (affirming exclusion of a testifying expert whose
report relied on the professional and technical judgment of assistants in a different expertise and
were not timely disclosed to the other party); *Westrick*, 288 F.R.D. at 229 (allowing discovery
into a non-testifying expert's work involving the storage and care of protective vests that may
have impacted the testifying expert's results); *Long-Term Cap. Holdings, LP v. United States*,
No. 01-cv-1290, 2003 WL 21269586, at *2 (D. Conn. May 6, 2003) (allowing limited discovery
into work of non-testifying experts who "'sifted' through the available discovery, and imputed
the data into financial models designated by the Testifying Experts" after which "the Testifying
Experts then relied on the information from those models in forming their opinions").  But
discovery is generally denied where it does not impact the ability of the opposing party to
evaluate the testifying expert's work.  *See Lowery v. Cir. City Stores, Inc.*, 158 F.3d 742, 765
(4th Cir. 1998), *cert. granted and judgment vacated on other grounds*, 527 U.S. 1031 (1999)

(affirming district court's decision to refuse discovery of "the data runs, computer programs and codes used by" the testifying expert because they were developed by non-testifying experts); *Doe v. District of Columbia*, 231 F.R.D. 27, 41 (D.D.C. 2005) (denying motion to compel records authored by non-testifying expert whose work was relied on in testifying expert's opinion because the testifying expert's report and deposition "constitute[d] 'other means' by which the District [could] discover what happened in [the non-testifying expert's] interviews and how those interviews influenced [the testifying expert's] opinions).

Either way, the requested remedy in those cases is usually discovery into the work of the non-testifying expert, not exclusion of the testifying expert.  Here, Norton was not deprived of any discovery regarding Mr. Harris's work and was able to evaluate and effectively cross examine Dr. Gulley despite the excluded testimony from Mr. Harris.  Although Mr. Harris's work involved professional judgment, it was legal in nature rather than scientific or technical. *Cf. Dura Auto. Sys. of Indiana, Inc.*, 285 F.3d at 614–15 (involving a situation in which the testifying expert relied on the professional judgment and expertise of consultants performing groundwater mapping analysis to form his own opinion that a particular plant contaminated a well).  Those legal conclusions are the province of the Court, and Dr. Gulley's analysis rises or falls with the Court's resolution of those underlying questions.

Relatedly, Norton cites a series of cases that exclude testimony of later experts based on a domino effect of unreliability in an earlier expert's testimony.  *See Sprint Commc'ns Co. L.P. v. Comcast IP Holdings, LLC*, No. 12-cv-1013, 2015 WL 410342, at *3 (D. Del. Jan. 29, 2015), *aff'd*, 675 F. App'x 974 (Fed. Cir. 2017) (finding that second expert's opinion that relied on first expert's unreliable methodology was unreliable by extension); *Apple Inc. v. Wi-LAN Inc.*, No. 14-cv-2235, 2019 WL 4253833, at *1 (S.D. Cal. July 22, 2019) (finding that a lack of factual

support in the first expert's claim infected all three experts); *Robert F. v. N. Syracuse Cent. Sch. Dist.*, No. 518-cv-0594, 2021 WL 6277234, at *2 (N.D.N.Y. Oct. 21, 2021) (denying reconsideration on exclusion of a second expert after determining that the second expert was dependent on excluded first opinion); *Gbarabe v. Chevron Corp.*, No. 14-cv-00173, 2017 WL 956628, at *15–17 (N.D. Cal. Mar. 13, 2017) (denying a motion to substitute a new expert at a late stage of litigation where plaintiffs failed to act diligently despite acknowledging that the first expert's report was flawed and partially plagiarized).  But the court has not found that Mr. Harris's methodology was unreliable, only that it was an improper legal conclusion.  Nothing about Mr. Harris's work product would infect Dr. Gulley's analysis with unreliability.[14]

Dr. Gulley's testimony is not *per se* inadmissible because he relied on those legal assumptions.  "It is entirely appropriate for a damages expert to assume liability . . . [t]o hold otherwise would be illogical."  *Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 886 F. Supp. 2d 873, 882 (N.D. Ill. 2012).  As the Court already explained, "Gulley appears to have relied on Harris only to determine which transactions Gulley should consider in his calculations, and the Government plans to prove that same information using different evidence" and that "[i]f the Government does fail to prove that the transactions considered by Gulley were the right ones to consider, the Government's claim may fail on its own for lack of proof."  *MIL Mem. Op.*, 567 F. Supp. 3d at 277.  That continues to characterize the Court's position on Dr. Gulley's testimony.

---

[14] And contrary to Norton's suggestion, Dr. Gulley's analysis goes well beyond "parroting" the assumptions of counsel.  *See* Norton's Harris Br. at 19–20.  Although Norton points to another case in which Dr. Gulley's report and testimony were excluded as "assumption . . . devoid of any descriptive calculation or analysis," Norton's Harris Br. at 21 (discussing *Capps v. Newmark Southern Region, LLC*, No. 5:18-cv-133, 2020 WL 2615753 (E.D.N.C. May 22, 2020), the Court has little difficulty concluding that Dr. Gulley's testimony in the present case contains extensive descriptive calculation and analysis.

Which brings the Court to the more fundamental problem with what the United States has done.  The United States was entitled to provide assumptions on liability and which transactions to consider to Dr. Gulley, but the labeling of those datasets as "assumptions" does not excuse the need to prove liability through other evidence.  And indeed, the paucity of evidentiary proof for identifying which specific transactions should be considered is highly concerning.

The United States contends that the Court can make the necessary legal determination for itself based on 1) Dr. Holt's work and testimony, in evidence, about how she compiled the universe of potential PRC-violating sales, and 2) for the FPR Plus Review, the eSPA descriptions or lack thereof that accompanied each transaction and were also compiled by Dr. Holt, along with the "strategic" ranking of the corresponding clients.  U.S.'s Harris Br. at 12–13, 15–16.  But there was an additional step after Dr. Holt performed her analysis, in which the United States downsized the potential universe of PRC-triggering transactions compiled by Dr. Holt to the much smaller subset of transactions used as an input for Dr. Gulley's calculations.  *See* Norton's Harris Br. at 5, 13; U.S.'s Harris Br. at 6; Norton's Harris Reply at 5.

What Mr. Harris did was select sales from a larger data set pursuant to articulated criteria provided by counsel.  If those criteria lack a basis in the evidentiary record or the selected sales did not fairly represent the underlying data, that goes to the weight and the probative value of the evidence.  One of the cases cited by Norton, *see* Norton's Harris Br. at 20–21, is instructive.  In *Bradshaw v. Vilsack*, the court determined that a summary exhibit created by a paralegal for plaintiffs' counsel was incomplete and used comparators cherry-picked at instruction of counsel. 560 F. Supp. 3d 101, 141–42 (D.D.C. 2021).  But the court did not exclude the chart, rather, it determined in its conclusions of law that the chart was "not probative" for those reasons.  *Id.*; *see also United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008) ("Even if the calculations

98

are mistaken, the chart is itself admissible, since admissible evidence may be unpersuasive and a

defendant has the opportunity to rebut it.").  The United States' position therefore requires the

Court to analyze the 2,244 transactions to determine as a matter of law and fact whether they

would trigger the PRC.  That is possible, if far from ideal.

Norton's next objection, that the Summary Exhibits are inadmissible under Rule 1006, is

a closer fit.[15]  *See* Norton's Harris Br. at 23.  That summary exhibits admitted under Rule 1006

cannot contain conclusions or opinions is beyond dispute.  *See United States v. Honeywell Int'l*

*Inc.*, 337 F.R.D. 456, 459 (D.D.C. 2020) ("In order to constitute summary evidence, the witness'

declaration or testimony cannot contain opinions or conclusions.").  In *Honeywell*, the Court

allowed a summary witness's declaration describing what a collection of records did and did not

contain, as well as calculations of total sales based on the information therein.  *Id.*  It struck,

however, a single sentence that drew an inference from that information.  *Id.* at 460.  Here, the

selection of sales of course requires some judgment, but the same is true of any filtering criteria

used to prepare a summary exhibit.  It does not necessarily make the entire result a conclusion.

*Cf. United States v. Lemire*, 720 F.2d 1327, 1349 (D.C. Cir. 1983) ("The distinction between

valid summary testimony and argument is not a bright line.  The task of organizing testimony

can quickly turn into the marshalling of facts to support a particular position.").

Relatedly, Norton protests that summary exhibits should have been introduced through

the person who prepared them in order to be admissible under Rule 1006.  Norton's Harris Br. at

23–24; *see also Hemphill*, 514 F.3d at 1358 ("[A]s part of the foundation for a [summary] chart,

the witness who prepared the chart should introduce it.").  The United States counters that they

---

[15] The Court does not believe that Norton has waived this argument, as it objected generally and
consistently to the summary exhibits when they were introduced at trial and was directed by the
Court to put its more specific arguments into the post-trial briefing.

were, because Dr. Holt prepared "the bulk" of the summary exhibits.  U.S.'s Harris. Br. at 23 n.9.

It was clear at trial that Dr. Holt did not have any role in how the FPR and FPR Plus transactions

were chosen, though she acknowledged that the Summary Exhibits were derived from her work.

*See, e.g.*, Tr. at 3519:5–9 (Holt) (Q. "Dr. Holt, you understand this is the summary exhibit that

the United States took from your data set, correct?  A. Correct.").

Altogether, the Court does not believe the Summary Exhibits fit the strict confines of

Rule 1006.  While they are undoubtedly derived from voluminous data, they present the data in a

way that doubles as legal argument and were not introduced by a witness who prepared it.  *See*

*United States v. Fahnbulleh*, 752 F.3d 470, 479 (D.C. Cir. 2014) ("For a summary of documents

to be admissible, the documents must be so voluminous as to make comprehension by the jury

difficult and inconvenient; the documents themselves must be admissible; the documents must be

made reasonably available for inspection and copying; the summary must be accurate and

nonprejudicial; and the witness who prepared the summary should introduce it.").

Still, the Court is persuaded that they should nevertheless be considered under Rules 611

and 703.  Federal Rule of Evidence 611 gives the district court broad discretion "over the mode

and order of . . . presenting evidence so as to: (1) make those procedures effective for

determining the truth . . . ."  Fed. R. Evid. 611(a).  "A trial judge also may allow use of a chart or

other summary tool under [Rule] 611(a) . . . to 'clarify and simplify complex testimony or other

information and evidence or to assist counsel in the presentation of argument to the court or

jury.'"  *United States v. Milkiewicz*, 470 F.3d 390, 397 (1st Cir. 2006) (quoting *United States v.*

*Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998).  A pedagogical aid that is "designed to summarize

aspects of [an expert]'s testimony and report" under Rule 611(a) is akin to a demonstrative, not

itself evidence but "a kind of road map" to assist the trier of fact.  *Minebea Co. v. Papst*, 231

F.R.D. 1, 3 (D.D.C. 2005).  Likewise, an expert such as Dr. Gulley "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed" even if otherwise inadmissible, and even inadmissible facts may be "disclose[d] to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."  Fed. R. Evid. 703.  "[A] pedagogical aid that is allowed under Rule 611(a) to illustrate or clarify a party's position, or allowed under Rule 703 to assist expert testimony, may be less neutral in its presentation."  *Milkiewicz*, 470 F.3d at 398.

The summary exhibits undoubtedly assist the trier of fact in evaluating Dr. Gulley's opinion by clarifying the very basis for his calculations.  The underlying work product by Dr. Holt reassures the Court that the sales and eSPA data is accurate, and the Court will examine that information for itself to determine as a matter of law whether the transactions in fact triggered the PRC.  While allowing such evidence could well be prejudicial in a jury trial, any potential unreliability in the methodology or results of how the transactions were selected is mitigated by the fact that this is a bench trial.  And as will be seen, Norton has in fact mounted a vigorous defense that significantly undercuts the probative value of the selected transactions and Dr. Gulley's use of them.  Accordingly, the Court overrules Norton's objection to U.S. Summary Exhibits 1, 4, and 5.[16]

---

[16] The United States has indicated that it would withdraw its conditional request to admit the original Harris spreadsheets, U.S. Exhibits 1905 and 1961, if the Court admitted the Summary Exhibits.  U.S.'s Harris. Br. at 7 n.4.  Accordingly, the Court need not consider that request.

## V.  CONCLUSIONS OF LAW

Having established and explained its findings of fact, the Court now provides its

conclusions of law.[17]

### A. United States' Claims Under the False Claims Act[18]

#### 1. False Claims and Statements (Counts I & II)

Counts I and II of the Omnibus Complaint, for False Claims and False Statements, are

based on the same factual issues, thus the Court discusses them together.  31 U.S.C.

§ 3729(a)(1)(A) creates liability for any person who "knowingly presents . . . a false or

fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), often known as a

"presentment" claim.  The elements of presentment claims are that: "(1) the defendant submitted

or caused to be submitted a claim to the government; (2) the claim was false; and (3) the

defendant knew the claim was false." *See Tran*, 53 F. Supp. 3d at 129 (citation and alteration

omitted).  The claim's falsity also "must be material to the [Government]'s course of action."

*Escobar*, 579 U.S. at 191.

Relatedly, FCA § 3729(a)(1)(B) establishes liability for any person who "knowingly

makes [or] uses . . . a false record or statement material to a false or fraudulent claim."  31

U.S.C. § 3729(a)(1)(B).  To state such a "false statements" claim, "a plaintiff must allege that (1)

---

[17] As indicated in the Joint Pretrial Statement and reaffirmed in the post-trial briefing, the United States abandoned what remained of its unjust enrichment and payment by mistake counts as duplicative.  *See* Joint Pretrial Statement at 18, ECF No. 208; U.S. Resp. at 8 n.6.  The Court accordingly does not address them.

[18] At the close of the United States' case, Norton moved for judgment on the FCA counts pursuant to Federal Rule of Civil Procedure 52(c).  *See* Def. NortonLifeLock Inc.'s Mot. J. Pursuant R. 52(c), ECF No. 298.  In that motion, Norton challenged the United States' proof with respect to falsity, materiality, scienter, and causation for the fraudulent inducement theory. *Id.* at 1.  Because the Court disagrees with Norton's contentions in several key respects, as described herein, it denies that motion.

the defendant made or used [or caused to be made or used] a 'record or statement;' (2) the record

or statement was false; (3) the defendant knew it was false; and (4) the record or statement was

'material' to a false or fraudulent claim." *United States ex rel. Hood v. Satory Global, Inc.*, 946

F. Supp. 2d 69, 85 (D.D.C. 2013).  The false statements provision is "designed to prevent those

who make false records or statements . . . from escaping liability solely on the ground that they

did not themselves present a claim for payment or approval." *Totten v. Bombardier Corp.*, 380

F.3d 488, 501 (D.C. Cir. 2004).  "[A]ny request for payment is properly considered a claim for

purposes of the FCA," *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d

1372, 1375–76 (D.C. Cir. 2000), making the falsity, materiality, and scienter elements the areas

of dispute between the parties on both counts.

The United States presents three theories of falsity.  First, it argues that because the

various invoices for payment under the GSA were "falsely inflated," that the claims fall into the

paradigmatic category of FCA presentment claims where the claim itself was false.  U.S.'s Prop.

FF&CL at 112.  Second, that because the CSPs were materially false, the contract itself was

fraudulently induced.  *Id.*  Third, that the claims impliedly certified compliance with the CSP

Disclosures, PRC clause, and Modifications Clause, which were material to the GSA's decision

to pay.  *Id.* at 113.  The "overcharges" theory essentially overlaps with the theory of implied

certification with the PRC and will therefore be addressed together.[19]

---

[19] "In the paradigmatic case, a claim is false because it 'involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'" *SAIC*, 626 F.3d at 1266 (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)).  The invoices paid under the GSA contract were not "factually" false in the sense that the Government paid for goods and services it did not receive or of a different type or quality than Norton represented.  *Cf. United States v. Speqtrum, Inc.*, 47 F. Supp. 3d 81, 91 (D.D.C. 2014) (involving a "classic case" of a factually false claim in which a provider billed for services that were never provided).  Instead, the United States claims that Symantec's failure to comply with

The FCA requires that the false claim at issue have been made "knowingly." 31 U.S.C. § 3729(a)(1)(A); *United States ex rel. Purcell v. MWI Corp. ("Purcell")*, 807 F.3d 281, 287 (D.C. Cir. 2015). "Knowingly" is defined for purposes of the FCA to mean that the defendant has "actual knowledge of the information;" "acts in deliberate ignorance of the truth or falsity of the information;" or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). "[T]he FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation . . . [or] reasonable but erroneous interpretations of a defendant's legal obligations." *Purcell*, 807 F.3d at 287–88. Norton raises a "reasonable interpretation" defense with respect to the knowledge requirement for the PRC theories, as well as disputing causation and materiality. Norton's Prop. Fed. FF&CL at 81–85. Because the scienter determination as it relates to the PRC substantially narrows the scope of the FCA claims, the Court will begin there.

### a. Scienter and the Price Reduction Clause

By way of reminder, the PRC requires that the contractor report "all price reductions to the customer (or category of customers) that was the basis of award" to GSA and explain "the conditions under which the reductions were made." GSAM § 552.238-75(b). It includes three situations in which a price reduction to the basis of award customer will trigger a discount for GSA: (1) When the contractor "[r]evises the commercial catalog, pricelist, schedule or other document upon which contract award was predicated to reduce prices" to the basis of award customer; (2) when the contractor "[g]rants more favorable discounts or terms and conditions than those contained in the commercial catalog, pricelist, schedule or other documents upon

---

the second and third PRC triggers resulted in overcharges, and that the "failure to come clean as to [Symantec's] false CSP disclosures, which would have prompted GSA to exercise its Price Adjustment Clause remedies" rendered the charges overages. U.S.'s Prop. FF&CL at 113.

which contract award was predicated;" and (3) when the contractor "[g]rants special discounts to the customer (or category of customers) that formed the basis of award, and the change disturbs the price/discount relationship of the Government to the customer (or category of customers) that was the basis of award," unless a PRC exception applies.  *Id.* § 552.238-75(c)(1)(i)–(iii); (d).

### i. "Commercial Class of Customers"

The Final FPR stated that the basis of award was Symantec's "commercial class of customers."  U.S. Ex. 30 at 1.  The Court holds that the phrase "commercial class of customers" referred to non-federal customers, including resellers and distributors.[20]  This is consistent with the way that "commercial" and "customer" were used in the FAR and the contract solicitation.  *See* FAR § 2.101 (2005)[21] (defining "commercial product" as one that is "customarily used by the general public or by nongovernmental entities"); GSAM § 552.212-73 (referencing the definition of commercial item in the FAR); *id.* § 515.408 (defining "customer" in the CSP instructions as "any entity, except the Federal Government, which acquires supplies or services from the Offeror" including "original equipment manufacturers, value added resellers, state and local Governments, distributors, educational institutions . . ., dealers, national accounts, and end users").  Bradbury expressed that same understanding in her 2006 email collecting the initial CSP data, stating that "[c]ommercial is defined as any entity other than the Federal Government . . . .  Sales to distributors, OEMs, VARs and end users (state, local and education must be included) are considered direct sales."  U.S. Ex. 38.  Testimony from multiple Symantec employees likewise confirmed that "commercial" meant "nongovernmental" as that term was

---

[20] The parties agreed at trial that "class of" and "category of" are synonymous terms.  *See* Tr. at 1926:14–15 ("Symantec agrees that 'class of' and 'category of' as used in the final proposal revision are the same . . . .").

[21] The 2005 FAR, which was applicable at that time, is available at https://www.acquisition.gov/sites/default/files/archives/pdf/FAC_2005-14.pdf.

used within the company. *See* Tr. at 1890:17–19 (Bradbury) (agreeing that "Symantec would consider distributors and resellers to be part of its commercial customers"); *id.* at 1339:5–7 (Russell) (agreeing that he understood "commercial" to mean "nongovernmental"). Dixon, who negotiated on behalf of GSA, also understood "commercial" to mean "nongovernmental." *Id.* at 3129:10–11 (Dixon) ("[C]ommercial customers are any customers that are not government customers.").

Bradbury's purported understanding that the phrase "commercial class of customers" meant "commercial end users," thereby excluding channel partners, is unreasonable. *See* Tr. at 2249:6–21 (Bradbury) (testifying that "commercial customers" had a different meaning of "end users" for the purpose of the FPR, based on her oral negotiations with Dixon). It is inconsistent with Bradbury's own draft BAFO in which she included "authorized distributors" and "partner level A" as the proposed basis of award for different SIN categories, U.S. Ex. 16B, and which Dixon allegedly told her "were just combined and she was going to call them commercial class of customers" in the final version. *See* Tr. at 1854:21–1855:3 (Bradbury). And it is inconsistent with emails sent by Bradbury during the life of the contract in which she states that sales to distributors, even those reselling to government end users, would implicate the PRC. *See* U.S. Ex. 164 at SYM1617690.

The Court gives no weight to Dixon's post-negotiation memorandum that described the basis of award as "commercial end users" because that section was clearly erroneously copied and pasted from another post-negotiation memorandum from a different company. U.S. Ex. 71 at 5. That section is identical to the section in the other company's memorandum, *see* U.S. Ex. 344 at 5, making Norton's speculation that Dixon updated that section but somehow failed to

change all of the relevant names or any of the other dates and text entirely unconvincing, *see* Norton's Resp. at 7 n.2.

Norton's assertion that this Court has already held that its interpretation of "commercial class of customers" is objectively reasonable misunderstands this Court's prior holdings. *See* Norton's Resp. at 11–12; *see also MIL Mem. Op.*, 567 F. Supp. 3d at 274 ("The Court is not convinced that its previous rulings conclusively held, for all purposes, that the contract terms were ambiguous or that Norton's interpretations of them were reasonable such that all evidence on those issues is completely irrelevant."). Norton argues that whether a term is ambiguous and whether an interpretation is reasonable are purely legal questions, but the cases it cites involve textually ambiguous statutes or regulations. *See* Norton's Prop. Fed. FF&CL at 81–82 (citing *Purcell*, 807 F.3d at 288, 290 (regulatory requirement); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007) (statute); *United States ex rel. Olhausen v. Arriva Med., LLC*, No. 21-10366, 2022 U.S. App. LEXIS 10989, at *5-6 (11th Cir. Apr. 22, 2022) (Medicare rule); *United States ex rel. Streck v. Allergan Inc.*, 746 F. App'x 101, 106 (3d Cir. 2018) (statute); *United States ex rel. McGrath v. Microsemi Corp.*, 690 F. App'x 551, 552 (9th Cir. 2017) (regulation); *United States ex rel. Donegan v. Anesthesia Assocs. of Kansas City, PC*, 833 F.3d 874, 879-80 (8th Cir. 2016) (regulation). Here, although the contractual phrase "commercial class of customers" is ambiguous, the reasonableness of any given interpretation of it is more than a matter of purely legal statutory or textual interpretation—it involves disputed questions of fact regarding the contract negotiations. *See MSJ Mem. Op.*, 471 F. Supp. 3d at 294 ("[T]here is sufficient ambiguity—particularly on the face of the contractual documents themselves—that the Court cannot say there is no dispute of fact with regard to Symantec's duty under this clause.").

Prior to any discovery, the Court determined that because the phrase was ambiguous, the Court would need to rely on extrinsic evidence to give its terms meaning, and that both parties had proffered evidence that favored their preferred reading of the PRC, precluding judgment as a matter of law on the issue. *MTD Mem. Op.*, 130 F. Supp. 3d at 139. Following discovery, the Court revisited the issue but again found that the phrase was ambiguous and that "the interaction of the class of customer defined in this way with the 'discount relationship' provisions of the PRC introduces too much ambiguity for the Court to say there is no dispute of fact with regard to Symantec's obligations." *MSJ Mem. Op.*, 471 F. Supp. 3d at 293. But following trial and having weighed the evidence, the Court determines that "commercial class of customers" indeed includes resellers and distributors, and that Bradbury's subjective interpretation to the contrary is unconvincing and internally contradictory. Because the contract in light of the full record supports only one reasonable interpretation of that phrase, it is of no moment whether GSA ever warned Norton away from that interpretation.

### ii. "Price/Discount Relationship"

Norton's "reasonable interpretation" defense also falls short regarding the other key ambiguous term in the PRC, the "price/discount relationship." The United States contends that the Discount Relationship Chart contained the price/discount relationship and set the ratios that could not be disturbed without triggering the third PRC clause. U.S.'s Prop. FF&CL at 110. In contrast, Norton claims that it was just a summary that justified GSA's decision to accept less than the best price while the actual price/discount relationship was the discounts off of the pricelists found in the FPR. Norton's Prop. Fed. FF&CL at 81; Norton's Resp. at 6–8.

As a matter of contract interpretation, the United States has the better understanding of the Discount Relationship Chart because Norton's interpretation renders the third PRC trigger meaningless. The FPR included the GSA discount negotiated off of a commercial pricelist, as is

typical.  *See* GSAM § 538.271 (instructing contracting officers to "[n]egotiate [MAS] contracts

as a discount from established catalog prices").  The GSA discounts found in the FPR make clear

how to comply with the first PRC trigger, as Norton did during the life of the contract.  But the

third PRC trigger requires more information than just the GSA discount; it requires comparing

those GSA discounts to the other basis of award customer discounts, which is exactly what the

Discount Relationship Chart did.  The different terms and conditions meant that GSA was not

entitled to the same discounts as the other commercial customers found on the chart, but changes

to those discounts would still impact the ratio to which GSA was entitled under the third PRC

trigger.  In fact, that is how Molina understood the chart and used it to administer Symantec's

GSA contract.  Tr. at 3224:19–3225:5 (Molina) ("It was the price relationship statement . . . .

when I would receive a modification, I would make sure that they proposed the discount that was

on this chart for the government; and that when I received invoices, I would ensure that the—the

discount that was placed in the modification matched the discounts to the commercial

customer.").

The Court disagrees with Norton to the extent it continues to argue that there is no

requirement to show that it held its contrary interpretation at the time of the contract.  *See*

Norton's Prop. Fed. FF&CL at 82–83.  Although *Purcell* specifies that subjective intent is

irrelevant, that does not mean timing is also irrelevant.  *See Purcell*, 807 F.3d at 290 (D.C. Cir.

2015) ("[S]ubjective intent—including bad faith—is irrelevant when a defendant seeks to defeat

a finding of knowledge based on its reasonable interpretation of a regulatory term.").  The Court

has already so held twice.  *MSJ Mem. Op.*, 471 F. Supp. 3d at 304–05 ("Merely putting forward a

reasonable alternative interpretation of the text, however, is not enough, as it only shows facial

ambiguity . . . .  [A] deliberate or knowing misinterpretation, even if 'reasonable,' can give rise

to FCA liability." (citations omitted)); *Recons. Op.*, 560 F. Supp. 3d at 46 ("There is nothing irreconcilable about requiring a defendant to have actually held its objectively reasonable interpretation at the relevant time, while ignoring whether that defendant subjectively desired to submit falsities . . . .  If defendants were able to defeat scienter merely with interpretations adopted for litigation, rather than those actually held and used, this Court would have expected that to be stated clearly by a higher court.").

Although Norton draws the Court's attention to a recent Seventh Circuit case that suggests that timing is irrelevant to the *Safeco* scienter analysis, *see* Norton's Prop. Fed. FF&CL at 82 (citing *United States v. Supervalu Inc.*, 9 F.4th 455, 470 (7th Cir. 2021)), the Court is not persuaded that the binding precedent in *Purcell* and *Safeco* renders timing of an interpretation irrelevant.  "[C]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct," *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 105 (2016), which is consistent with other precedent requiring that a reasonable interpretation be held contemporaneously, *see United States v. Allergan, Inc.*, 746 F. App'x 101, 106 (3d Cir. 2018) ("Basing a defense on a reasonable, but erroneous, interpretation of a statute" requires inquiry into "whether a defendant's interpretation of that ambiguity *was* objectively unreasonable . . ." (emphasis added)); *United States v. Newman*, No. 16-cv-1169, 2017 WL 3575848, *8 (D.D.C. Aug. 17, 2017) (explaining that "Defendants' argument about knowing falsity is incapable of resolution at the pleading stage" because "the complaint . . . says nothing about whether Defendant *held or acted on* any particular interpretation of the regulations at issue" (emphasis added)); *United State ex rel. Bahnsen v. Boston Sci. Neuormodulation Corp.*, No. 11-cv-1210, 2017 WL 6403864, at *9 (D.N.J. Dec. 15, 2017) ("[A] claimant cannot avoid liability by manufacturing an after-the-fact reasonable interpretation of an ambiguous

provision.").  Very few contracts are so free from ambiguity that a party with bright legal counsel could not manufacture some kind of reasonable after-the-fact justification for a given action. Some indication that the defendant actually held that interpretation at the time is required.

Here, the Court finds persuasive the evidence showing that Norton in fact understood during the life of the contract that non-standard discounts to resellers and distributors could trigger the PRC.  Although in one internal email Bradbury described the basis of award as "the Government pricelist for products and maintenance and the commercial pricelist for Professional Services," Dx. 37, with much more frequency she and others expressed the understanding in internal emails that non-standard discounts, including to resellers and distributors, could trigger the PRC, *see* Findings of Fact, *supra* ¶ 180 (collecting emails that demonstrate that understanding); U.S. Ex. 259 (notes from internal audit meeting stating that training on the GSA contract "was given to the Public sector sales reps and not the Commercial sales reps that needed to adhere to those policies"); Tr. at 966:1–6 (Reinhardt) (agreeing that an email was "consistent with what we've seen in all the other documents, that a non-standard discount offered to a customer can have price reduction clause implications" in Symantec's understanding).  The Court therefore rejects Norton's post-hoc interpretation that would render the third PRC trigger a nullity and the discount relationship found in the Discount Relationship Chart meaningless.

<u>iii. PRC Exceptions</u>

Nonetheless, the evidence does show that Norton contemporaneously understood the PRC to be much less comprehensive than the United States now interprets it.  The same sources that demonstrate that Symantec understood that non-standard discounts could trigger the PRC also demonstrate that Symantec understood at the time that its contract carved out non-standard discounts with different terms and conditions, such as up-front commitments, as long as those discounts were approved in eSPA.  *Id.*; *see also* Tr. at 1936:20–24 (Bradbury) ("Would a non-

standard discount to a customer in Symantec's commercial class of customers on an order less than the maximum order threshold that did not have an eSPA trigger a price reduction under Symantec's PRC?  A. It would . . . .").  Notes from the internal auditing team's meeting with Reinhardt and Lokie show that the public sector team indicated this same understanding in that context, as well.  *See* U.S. Ex. 259 ("When there is a non-standard discount given to a federal entity, we are required to enter the reasons on why it was given.  The reason has to fall into one of the eight exceptions.  That information can be pulled from eSPA."); Tr. at 359:3–19 (Berney) (agreeing based on deposition testimony that the notes in U.S. Ex. 259 should refer to non-standard discounts given to "non-federal" entities).

Both the CSP disclosures and Bradbury's draft BAFO disclosed the eSPA system and proposed to make approved eSPA discounts an exception to the PRC.  Findings of Fact, *supra* ¶¶ 95, 123.  Although Dixon removed that language from her Draft FPR, she agreed to add the language "under similar terms and conditions" to the closure in the final version.  *Id.* ¶ 143. Bradbury understood that change to mean that sales with an eSPA that had different terms and conditions from the GSA contract would not trigger the PRC even if they disturbed the price/discount relationship. *See* U.S. Ex. 1126; Tr. at 1864:1–4 (Bradbury) ("[T]here's no way that we could certify that you're getting the best discount to any commercial customers.  You know we have eSPA?  We can't agree to that.  So she let me add in there 'under similar terms and conditions.'").

That understanding was not objectively unreasonable.  Indeed, there is a good deal of logic to Symantec's very practical interpretation that an eSPA approval with different terms and conditions would remove a sale from the scope of the PRC, given the sheer quantity of non-standard discounts it provided on any given day and the impracticality of submitting

modifications for each one.  *See United States v. Data Translation, Inc.*, 984 F.2d 1256, 1260–63 (1st Cir. 1992) (determining that a GSA questionnaire's disclosure requirement was so broad that no reasonable contractor could have thought literal compliance was required, but that a practical reading requiring disclosure of relevant data was reasonable).

What's more, GSA did nothing to warn Norton away from that interpretation during the life of the contract.  The two CAV visits conducted by GSA, while not themselves audits, did not raise any concerns that would have put Norton on notice of any problems with its PRC monitoring and compliance.  Findings of Fact, *supra* ¶¶ 186–87.  When Reinhardt responded to a question from Molina about why channel partners received better discounts and why GSA did not receive a non-standard discount by providing the Discount Summary Chart with the different terms and conditions, Molina did not follow up or indicate any confusion about what different terms and conditions also justified the non-standard discounts.  Tr. at 3425:7–3426:6 (Molina). And Morsell expressed that understanding to the GSA auditor in 2011 and was not corrected. *See* Dx. 45 (stating in an August 2011 email to Harris that "[o]nly discount requests that meet one of the deviation statements provided to GSA during negotiations are approved").

That does not entirely eliminate the potential universe of violations, though, because the United States based its "FPR Plus" dataset on transactions that it believes did not have an eSPA approval or had an eSPA explanation that deviated from the non-standard discounting reasons disclosed to Dixon during negotiations.  The Court must therefore make additional findings about the scope and limits of Symantec's reasonable interpretation.

In her response to Dixon's administrative letter, Bradbury wrote that:

Information regarding deviations from existing discounting policies was provided in Symantec's original proposal submission.  Any deviations from published discounts require management approval. Deviations must be documented and approved in accordance with the following guidelines: As previously disclosed to

GSA as part of Symantec's established discounting policies, the Worldwide Sales discounting tool referred to as "eSPA" was established to allow Symantec the flexibility to respond to competition. This process provides non-standard competitive pricing to strategic accounts by requiring commitments from the identified account for annual quantity purchases, or to meet one of the following guidelines; which are provided as examples:

> 1. To meet market competition or displace a named competitor at a customer site;
> 2. Customers who agree to standardize on Symantec products and services;
> 3. New Market or market segment penetration;
> 4. Educational, including prime contractors, or Charitable organizations or institutes;
> 5. Introduction of a new product and services through more aggressive discounts and in exchange for press or customer references.

U.S. Ex. 8A at SYM000382003.  The list was expressly intended to be examples only, and the paragraph is broad enough and vague enough to encompass most eSPA approvals.  *Id.*  In addition, the Reason Code Chart submitted along with the Frequency Chart included additional, but similar, categories that were quite broad in scope, including categories like "quarter end discount," "customer satisfaction issue," "contract pricing," "product bundle," "previous purchase price match," and "other."  U.S. Ex. 4A at SYM00015052.  Taken together, these disclosures made clear that non-standard discounts were given for a variety of reasons—some of which were not competitive—and were not limited to customers of any particular size.

The Court disagrees with the United States' invitation of defining "strategic" customers by a particular amount of business or finding violations where eSPA justifications did not match one of the five categories referenced in the administrative letter.  That approach places too much weight on a non-exhaustive list of examples while ignoring that Symantec also provided a more comprehensive disclosure through the Reason Code Chart.  Moreover, the evidence showed that there was no standard understanding of what "strategic" meant within Symantec.  *See* Tr. at 798:24–25 (Robbins) ("Every sales rep I've ever talked to will tell me, 'Hey, this account is strategic to me.'"); *id.* at 761:7–10 (Simon) ("[D]id everyone within Symantec, to your

knowledge, have the exact same idea of what constituted a strategic account?  A. I'm quite sure they didn't."); *id.* at 260:10–13 (McGee) (agreeing that "different sales teams could have different views of . . . whether any given account was a strategic account").

At the same time, however, the evidence shows that Symantec did not believe the eSPA exception to be limitless.  For example, in a December 2008 email, Bradbury admonished a sales representative who was requesting an additional 5% discount off of the distributor price for a sale to a government end user, saying, "You even indicate that there's no competition . . . that just kills us with GSA.  This will trigger a GSA price reduction which we have discussed with you many times," and suggested adding a specific clause stating that the discount was to displace a named competitor if possible.  U.S. Ex. 164 at SYM1617690–91.  And the "terms and conditions" textual hook in the FPR is only reasonable if there is some demonstrable justification for the discount beyond the mere desire to close a deal.  Thus, to the extent that a sale had no eSPA approval at all or had an eSPA that did not provide a meaningful justification, the Court agrees that it would have violated the PRC even when accounting for Norton's reasonable interpretation of the contract.  A meaningful justification would include the reasons disclosed in Bradbury's list of examples from the administrative letter or other similar competitive justifications, or a variation in terms and conditions of the types found in the Reason Code Chart, such as term commitments and multi-year incentives, up front purchases, pro-rated add-ons, mid-contract upgrades, standardization with Symantec products, and product bundles.

* * *

Accordingly, the Court holds that "commercial class of customers" included distributors and resellers and Norton's alternative interpretation is objectively unreasonable, and that "the price/discount relationship" was found in the Discount Summary Chart.  However, Norton's understanding of the FPR to exclude non-standard discounts made under different terms and

conditions and approved in eSPA was objectively reasonable, and GSA did not warn Norton away from that understanding.  The United States has therefore not established that Norton acted with the requisite scienter when failing to provide a price reduction based on non-standard discounts approved in eSPA with dissimilar terms and conditions from GSA.

### b. Implied Certification

"To establish the existence of a 'false or fraudulent' claim on the basis of implied certification of a contractual condition, the FCA plaintiff . . . must show that the contractor withheld information about its noncompliance with material contractual requirements."  *SAIC*, 626 F.3d at 1269.  "[S]tatutory, regulatory, and contractual requirements are not automatically material, even if they are labeled conditions of payment."  *Escobar*, 136 S. Ct. at 2001.  The material terms that the United States claims were impliedly certified were the CSP disclosure requirements, the PRC, and the Modifications clause.  U.S.'s Prop. FF&CL at 113.  The Court addresses each in turn.

### i. PRC

Under the United States' theory, by offering deep non-standard discounts to commercial customers in a manner that deviated from the Frequency Chart and discounting policy disclosures that Symantec had made during negotiations, Symantec violated both PRC triggers, and the subsequent claims that did not receive a corresponding discount were overcharges.  *See* U.S.'s Prop. FF&CL at 106–10.  Likewise, the United States argues that compliance with the PRC is so integral and material to GSA's decision to pay a claim that each claim certified compliance with the PRC.

### Falsity

At the outset, this theory is significantly narrowed by the Court's determination that Norton did not act with the requisite scienter in failing to provide comparable discounts to GSA

as the non-standard discounts with an eSPA approval for different terms and conditions provided to commercial customers.  The Court must still determine, however, whether there were transactions submitted that violated the PRC under Symantec's objectively reasonable interpretation of it, thereby rendering any certifications and claims false.

As part of its "FPR Plus" dataset, the United States included sales that Dr. Holt had identified as lacking an eSPA record as well as sales that did not match one of the five enumerated reasons disclosed by Bradbury.  *See* Tr. at 3518:25–3519:4 (Holt) (explaining that she had identified a total of over 16,000 potential PRC-violating line items with no corresponding eSPA).  333 transactions in the FPR Plus dataset indicate that no eSPA entry was identified, some of which have some other non-eSPA corresponding number or annotation, and many which simply say "null."  *See* U.S. Summ. Ex. 1 (filtering for "1" on the FPRPlus_Include column and then the eSPA_SFDC column).

Norton argues that just because an eSPA entry could not be identified does not mean that it did not exist, and it points out that Norton's employees uniformly testified that an order with a non-standard discount would not be booked by the Orders to Cash team unless it had an eSPA entry.  *See, e.g.*, Tr. at 1644:20–1645:14 (Vissers) (explaining that the Orders to Cash team required proper eSPA approval and was serious about documenting them).  The eSPA field did not interface with the Oracle sales data, meaning that the field for the eSPA number only had to have something filled out in order to be approved.  *Id.* at 693:7–24 (Thompson).  However, orders over $100,000 received an additional second-level review, and smaller orders were sampled for regular internal audits.  *Id.* at 697:4–699:9.  Dr. Holt testified that the eSPA data was "really messy" and required significant work to match with the Oracle sales data.  Tr. at 3505:23–3506:11 (Holt).  While it is possible that some of these transactions were in fact lacking

an eSPA approval, there is insufficient evidence to find that it was more likely than not that those discounts were not approved in eSPA.[22]

In addition, the "FPR Plus" dataset includes transactions with an eSPA that nevertheless failed to state an adequate reason, such as stating a name with no explanation in the comment field. *See, e.g.*, U.S. Summ. Ex. 1 at lines 10, 11, 16. The Court is not entirely convinced this means there was not actually a reason, given the credible and consistent testimony from eSPA approvers at Symantec that there had usually been prior discussions and negotiations about an approval before the eSPA was even submitted. *See* Tr. at 765:22–766:2 (Simon) ("I can tell you the ones that hit my desk, you know, I'm sure most of them were approved because there had been prior conversations. I wasn't seeing it for the first time."). It is therefore plausible that a significant portion of those discounts did contain differences in terms or conditions or fit into the competitive scenarios described and the Court simply does not have enough information to tell. Other entries suggest that there may have been a competitive rationale, but there is simply not enough detail for the Court to discern with certainty. *See, e.g.*, U.S. Summ. Ex. 1 at line 2162 ("The customer[']s budget is very limited and this is a very competitive situation. Price will be a factor whether we get it or [competitor] gets their disk business."); *id.* at line 290 ("Keeping

---

[22] Separately, Symantec had a robust system in place through the Orders to Cash team to enforce the eSPA requirement for non-standard discounts that was routinely audited and that its employees uniformly believed to have been effective. Thus, even if some unapproved discounts slipped through the cracks without an eSPA, those instances would not rise to the level of reckless disregard to meet the scienter requirement. When Bradbury personally compiled the Reason Codes Chart, she failed to notice that the eSPA data was only a fraction of the total non-standard discounts for that year, or that the listed reasons were far broader than the summary list she used when responding to the administrative letter. Findings of Fact, *supra* ¶ 81. While this may have been negligent, it was not so obvious an error as to rise to the level of reckless disregard.

renewal rate similar to last years cost, otherwise, [customer] will not renew and look to move to a competitive product.").

Still, some explanations are clearly motivated by little more than a desire to make a sale, such as "allows the customer to sign off on the entire deal . . . without hav[ing] to go through the budget committee", *id.* at line 21, "[f]iscal year end pricing for client with little budget," U.S. Summ. Ex. 1 at 29, and "Customer has 20K to spend before end of their FY," *id.* at 760. One entry even included a reprimand from a high-level approver saying "In the future . . . . we[] need more information that explains what and why we are doing this deep of a discount." *Id.* at line 53. Although the Court cannot agree with every transaction flagged by the United States in the FPR Plus dataset, it agrees with enough of them to determine that the United States has met its burden of showing Symantec's implied certification with the PRC—even as Symantec understood that clause—was false.

<u>Materiality</u>

The Supreme Court has endorsed an implied certification theory where "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 579 U.S. at 190. Although the Supreme Court in *Escobar* expressly left the question open, in this Circuit, "a claim that 'merely demand[s] payment,' as opposed to one that makes specific representations about goods or services provided, is sufficient to provide a basis for an implied false certification claim." *Scutellaro*, 2017 WL 1422364, at *19 n.23 (explaining that the *SAIC* standard remains unchanged in light of the Supreme Court's silence on the question).

As this Court already held, "PRC violations would necessarily have been material to payments, because regardless of the precise details of how the price-discount relationship would

be calculated, the entire point of the PRC was to require price reductions when appropriate.  If prices were not properly reduced when required under the PRC, this would obviously and necessarily be material to overpayments by the plaintiffs." *MSJ Mem. Op.*, 471 F. Supp. 3d at 304.  The PRC mandates that contractors report and provide GSA with a comparable price reduction in the three circumstances agreed to.  GSAM § 552.238-75.  A breach of the PRC clause is therefore no "garden-variety . . . regulatory violation[]" or a "minor or insubstantial" noncompliance.  *See Escobar*, 579 U.S. at 194.  It is an omission that renders the relevant price an overcharge.

Norton's only counterpoint is that even when Molina observed what she believed to be potential PRC violations in 2011, she did not decline to pay any invoices and instead stated that the parties would handle it during the upcoming audit.  Norton's Prop. Fed. FF&CL at 85.  While it is true that "courts need not opine in the abstract when the record offers insight into the Government's actual payment decisions," *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1032 (D.C. Cir. 2017), in context that evidence does not undermine materiality at all.  Molina only stated that the transactions "appear[ed]" to be a PRC violation rather than say so with absolute certainty.  U.S. Ex. 106 at SYM01355274.  Molina also did not dismiss the potential violation as unimportant or accept Morsell's explanation without comment; instead, she specifically stated that the potential violation would be addressed during the audit.  *Id.*  It is perfectly logical that Molina would defer to the formal audit that was already programmed to deal with the proper amount that should be recovered based on what she believed was a one-time violation.  "[I]f the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, *and has signaled no change in position*, that is strong evidence that the requirements are not material." *Escobar*, 579 U.S. at 195 (emphasis

added).  Molina's reference to the audit signals a change in position, and if anything shows that she fully expected GSA to recuperate any funds it was owed as a result.

<u>Scienter</u>

The next question is whether Symantec acted with at least reckless disregard for the falsity of those certifications.  "Establishing knowledge . . . on the basis of implied certification requires the plaintiff to prove that the defendant knows (1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay."  *SAIC*, 626 F.3d at 1271.  The United States has shown both.

The Global Discount Authority Guidelines stated that eSPA approvals were technically required for all non-standard discounts, those Guidelines did not constrain what reasons were considered acceptable for discounting.  U.S. Ex. 146 at 3 (11/2006 Global Discount Authority Guidelines); U.S. Ex. 128B at 3 (10/2007 Global Discount Authority Guidelines); U.S. 1480 at 1 (08/2011 Global Discount Authority Guidelines).  Approvers did not take PRC or GSA compliance into account when approving sales.  In fact, even individuals with high discount approval authority did not receive even basic training on the PRC or GSA contract.  As one VP-level sales manager for Symantec who had discount approval authority between 80 and 90%, Tr. at 744:23–745:4 (Randall), testified:

> Q. And you never considered or thought about the GSA contract in the regular course of your job at Symantec, correct?
> A. That's correct.
> Q. And, in fact, you had no understanding of Symantec's GSA at all, right?
> A. That's correct.
> Q. You don't recall ever having any training regarding the GSA contract, right?
> A. I don't recall any training like that.
> Q. And you don't recall your sales team having any training regarding GSA, correct?
> A. Correct.

Q. And you don't recall whether anyone on your sales team, including yourself, reviewed nonstandard discounts to non-GSA customers to confirm whether they complied with terms of the GSA contract, correct?
A. Just to be clear, I don't recall considering or being asked to consider GSA pricing, nor do I recall that from my sales team.

*Id.* at 758:4–23.

Bradbury testified that she knew commercial sales representatives continued using eSPA during the contract period, but she did not know at what types of discounts they provided or the reasons, and that in fact she "never looked at the eSPA again."  Tr. at 2276:23–2277:24 (Bradbury).  Neither did Reinhardt.  *Id.* at 1013:11–21 (Reinhardt).   Although Bradbury educated her immediate team about the GSA contract and PRC, on one email providing guidance she specifically stated that "[w]e don't want to send this to reps but rather use it as a guideline when they ask for clarification as to why they cannot offer SLED customer[s] a better discount or more favorable terms and conditions than GSA customers."  U.S. Ex. 1126.  In other words, Bradbury and her immediate team only offered guidance when approached for clarification rather than taking affirmative steps to ensure that sales representatives (even those on the public sector team) understood the PRC.  Symantec's leadership, including Schumm and Lokie, failed to take basic steps to learn about the GSA contract or delegate responsibility for compliance to a particular person.  In fact, Schumm fired the only person who was plausibly responsible for compliance with no thoughts to the consequences for the GSA contract.  Findings of Fact, *supra* ¶¶ 163, 168–69.

The internal audit was another missed warning sign that should have prompted Symantec to take its PRC obligations seriously.  Reinhardt and Lokie identified and pointed out to the internal auditors the problem that the commercial sales team was not even trained on the basics of the GSA contract.  *See* U.S. Ex. 259 at SYM00766199 (notes from internal audit meeting stating that training on the GSA contract "was given to the Public sector sales reps and not the

Commercial sales reps that needed to adhere to those policies").  Indeed, although the audit's conclusions would have provided reason for Freedman, Reinhardt, or Lokie to be concerned that eSPA requirements were or even could be strictly enforced, none of them read the results. Findings of Fact, *supra* ¶ 186.

"Reckless disregard" covers this kind of collective abdication of responsibility.  The standard is akin to "aggravated gross negligence."  *United States v. Krizek*, 111 F.3d 934, 941 (D.C. Cir. 1997).  Congress added this level of scienter to the FCA in order "to capture the ''ostrich-like' conduct which can occur in large corporations' where 'corporate officers . . . insulate themselves from knowledge of false claims submitted by lower-level subordinates.'" *SAIC*, 626 F.3d at 1274 (quoting S. Rep. No. 99–345, at 7 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5272).  In *Krizek*, for example, the D.C. Circuit has identified reckless disregard where an assistant made certifications "with little or no factual basis" and "no effort" to ascertain their truth or falsity, and the doctor "'failed utterly' to review bills submitted on his behalf" that "even the shoddiest recordkeeping would have revealed" to be false.  *Krizek*, 111 F.3d at 942.

The failure of Symantec's leadership to make even the most cursory effort to even learn about its obligations under the GSA contract satisfies the standard of aggravated gross negligence.  *See United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*, 5 F.4th 315, 348 (3d Cir. 2021) (finding reckless disregard where defendant "recklessly delegated to unknowledgeable individuals the responsibility for ensuring that employees were properly classified"); *Siebert v. Gene Sec. Network, Inc*, 75 F. Supp. 3d 1108, 1118 (N.D. Cal. 2014) ("[W]here an FCA defendant has certified compliance with statutory or regulatory criteria, and then fails to familiarize itself with those criteria, the defendant acts in reckless disregard of

the truth or falsity of the statement of compliance with those criteria."); *Scollick ex rel. United States v. Narula*, No. 1:14-cv-01339, 2022 WL 3020936, at *13 (D.D.C. July 29, 2022) (granting summary judgment to third-party insurers who did not have actual knowledge of the alleged fraud but noting that "there is no doubt that participants in federal programs must familiarize themselves with the requirements").  Had Symantec taken even just the basic step of training its approval-level sales leadership about the GSA contract, that would have likely brought non-standard discounting substantially within Symantec's interpretation of the PRC, encouraged approvers to require more thorough documentation and justification, or created opportunities for leadership to understand the significance of the audit findings.  Instead, Symantec proceeded with reckless disregard for the consequences to the GSA contract.

ii. CSP Disclosures

The Court turns next to the implied certification of the CSP disclosures, which consisted of the Frequency Chart, the non-standard discounting policy, the modified sales estimate, the Rewards Program disclosures, and the lack of rebate disclosures.  U.S.'s Prop. FF&CL at 108–09.

Falsity

As more fully explained in the Findings of Fact, the Court finds that the Frequency Chart was false.  Findings of Fact, *supra* ¶¶ 72–79.  It purported to represent non-published discounts but in fact was dramatically skewed by a large number of standard channel partner discounts, and it failed to include the Veritas data even after the submission was updated.  *Id.*  The United States has met its burden, through the testimony and work of Dr. Holt, of showing that complete disclosures would have painted a much different picture.  An accurate and complete chart, once updated with the Veritas data, would have shown a higher number of total non-standard

discounts spread evenly across deciles rather than a bell curve of fewer total discounts centered in the 30-40% range.

This was not, contrary to Norton's suggestion, a situation of innocent "bad math." Norton's Prop. Fed. FF&CL at 70–71 (quoting *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp.*, 298 F. Supp. 91, 102 (D.D.C. 2004) (holding that erroneous calculations do not rise to the level of reckless disregard)). *Ervin* involved a situation in which a company reasonably relied on a qualified subcontractor who ran a flawed model. *Ervin*, 298 F. Supp. 2d at 102. In contrast, what made the Frequency Chart false was that it was held out as a summary of non-published discounts for all Symantec and Veritas products, when in fact it showed all discounts for only Symantec products, making it both over- and under- inclusive. Findings of Fact, *supra* ¶¶ 71–76. To give a simplified analogy: suppose a chart depicted the number of people in a store at different points in time throughout the day. Even if the chart was perfectly accurate for that purpose, if someone titled it "Number of Customers," the chart would become inaccurate because it would have actually captured employees in addition to customers. And if that same chart was submitted as evidence to demonstrate the average number of customers in the entire mall, it would become more inaccurate still. That is what happened with the Frequency Chart. It has nothing to do with math and everything to do with mischaracterizing what the math shows.

The revised sales estimate, which Bradbury consciously manipulated in order to avoid an EEO audit, was also false. *Id.* ¶¶ 97–100. In contrast, the non-standard discounting policy description was carelessly imprecise and vague—but it was not substantively false, thus the Court does not further consider its impact. *Id.* ¶¶ 89–90.

The failure to disclose Symantec's rebate programs apart from an oblique reference to "Opportunity Registration" on the Discount Relationship Chart that came nowhere close to explaining even the opportunity registration rebates (much less the myriad of other rebates), further rendered the CSPs false.  There was no mention in the documents provided to GSA of even the most obviously relevant rebate program in effect: the "GSA Master Aggregator Rebate Program," which gave a 5% rebate to certain distributors in connection with any GSA sale.  *See* U.S. Ex. 189 (describing program); U.S. Ex. 187B at 2 (same); Tr. at 1578:3–22 (Bradbury) (acknowledging that the program was in effect prior to October 2007).

Norton's suggestion that back-end rebates fell outside the scope of negotiations is unconvincing.  *See* Norton's Prop. Fed. FF&CL at 71.  The GSAM explicitly includes rebates on its list of examples of price reductions included within the definition of "discount" for the purpose of MAS solicitations.  GSAM § 552.212-70(a).  Moreover, the CSP instructions for the solicitation require contractors to provide CSP information "for all customers or customer categories to whom you sell at a price (discounts and concessions in combination) that is equal to or better than the price(s) offered to the Government under this solicitation . . . ."  *Id.* at Figure 515.4.  That would have included disclosures about rebates to channel partners regardless of whether they would be included in the future basis of award, because they received higher discounts than were being offered to GSA.  Norton's only support for the theory that back-end rebates were outside the scope of negotiations was Bradbury's purported understanding that Dixon had ruled out resellers and distributors from the basis of award at the October 2006 meeting, testimony that Bradbury wavered on and that the Court finds implausible, Findings of Fact, *supra* ¶ 86, not to mention inconsistent with Bradbury's partial disclosure of a front-end

rebate on the Discount Relationship Chart and her testimony that she would have disclosed rebates if she had known about them, Tr. at 1591:10–13 (Bradbury).

Finally, the Rewards program information that Bradbury provided to Dixon was inaccurate.  Bradbury explained to Dixon, based on her limited knowledge of the new program and the PowerPoint, that GSA would need to accept Rewards terms and conditions electronically, enroll in and track ordering under a SAN number, and agree to co-termination of maintenance and autorenewal, leading Dixon to state that she was not interested in Rewards.  Tr. at 1625:19–1626:10 (Bradbury).  However, Bradbury learned before the contract was finalized that co-termination was not required, *see* U.S. Ex. 142 at 22 (November 2006 Rewards Guide); and never informed Dixon of that fact or disclosed the pricing that was available under Rewards Band E, *see* U.S. Ex. 400 ¶ 22 (request for this admission); Tr. at 1629:1–25 (noting that Symantec changed its response to the relevant question to admit during the corporate designee deposition).  It was also possible to provide a paper addendum with the Rewards terms and to assign customers to a higher Rewards Band based on past purchases.  *See* Dx. 92 (November 2006 email informing sales team that a "pen and paper contract" version of the Rewards agreement would soon be available); U.S. Ex. 151B at 38 (2007 public sector PowerPoint explaining band fixing).  The incorrect information Bradbury gave Dixon about the Rewards program was therefore false.

<u>Materiality</u>

Whether each of those falsities was material is a separate question.  The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  Contractual language "linking

compliance to eligibility for payment" may be sufficient, but not necessary, to prove materiality. *SAIC*, 626 F.3d at 1269.

The United States introduced evidence that as a general matter, GSA cares a great deal about CSP disclosure violations and attempts to recover overpaid funds on that basis. *See* U.S. Exs. 559, 1528, 1297, 1798, 1836, 1850 (Department of Justice press releases regarding settlement in cases with allegedly false CSP disclosures); *see also* U.S. Ex. 198B (letter from reseller noting that the failure to disclose rebate incentive programs had recently been the source of liability for OEMs). Norton points out that the designated deposition testimony of GSA's 30(b)(6) representative acknowledged auditor findings that large percentages of CSPs selected for a sample were not current, accurate, and complete, and stating that "GSA is not overly concerned with defective CSPs." Jx.001 at 123:8–125:12 (Walsh Dep.). Those realities are not mutually inconsistent: GSA can care about accurate CSPs but lack the resources and abilities to robustly enforce that provision. And while Molina did not cease approving modifications when she inherited the contract and did not locate the CSPs she was looking for, at that stage she was also not responsible for auditing or negotiating the contract and had no reason to suspect that Symantec's CSP disclosures were inaccurate.

For the same reasons that the Court will discuss in more detail with respect to the fraudulent inducement theory, the Court holds that most of the CSP disclosures were material to GSA's decision to continue paying claims under the contract. The incorrect Frequency Chart gave GSA an incorrect representation of the total number of non-standard discounts (because the Veritas data was missing) and an inaccurate depiction of the distribution of those discounts (because standard discounts were included). As Dr. Holt's corrected chart shows, an accurate Frequency Chart would have given Dixon, who always strove to achieve the best discounts for

GSA, leverage and motivation to negotiate a higher discount.  The Rebate disclosures are

obviously material for a similar reason: If Dixon had known that channel partners were routinely

receiving discounts several percentage points higher than what Bradbury demonstrated, it would

have changed her position as to the fairness of the GSA price.

Even though the original Percival chart also showed a few transactions in the highest

discount deciles, the total number and relative percentage of high discounts were significantly

higher in the corrected chart.  Findings of Fact, *supra* ¶¶ 78–79.  Moreover, Bradbury testified

that she recalled telling Dixon that most of the discounts in the highest ranges of the Frequency

Chart were probably for site licenses, which Symantec often deeply discounted.  Tr. at 1519:11–

20 (Bradbury).  Had Dixon been aware of the higher numbers and proportions of discounts in

those high decile ranges, she probably would not have accepted that explanation so easily.

The Rewards Program disclosures are a closer call.  Even though Bradbury's

representations about the program during negotiations were inaccurate, there is no reason to

think that Dixon would have wanted to participate in Rewards even if she had known that the

terms and conditions were more flexible.  Tracking points and complying with the different

terms and conditions was somewhat onerous, and the periodic re-leveling of points would have

introduced an undesirable measure of inconsistency into the GSA contract, which did not

guarantee any purchases at all.  *See* Tr. at 2920:9–19 (explaining that a GSA contract only

guarantees a consideration commitment of $2,500, but no actual purchases).  On the other hand,

understanding the advantageous pricing of Rewards and the overall looseness of the terms would

have likewise strengthened Dixon's bargaining position even if she did not want to participate in

the program itself.  Given the lack of memory from the key witnesses on this point, overall the

Court thinks the United States has fallen short of its burden to show that certification of the

Rewards disclosures was material to GSA.  But because the other misrepresentations are material, this theory nonetheless survives.

Scienter

The Government must also prove that Symantec *knowingly* represented those material falsities.  The FCA defines "knowingly" to include "actual knowledge," "deliberate ignorance of the truth or falsity," and "reckless disregard of the truth or falsity."  31 U.S.C. § 3729(b)(1).  "[T]he FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation . . . [or] reasonable but erroneous interpretations of a defendant's legal obligations."  *Purcell*, 807 F.3d at 287–88.  Bradbury acted with reckless disregard as to the truth or falsity of the Frequency Chart and the Rebate disclosures.[23]

With respect to the Frequency Chart, Bradbury had asked for "[s]ales to distributors, OEMs, and [value-added resellers]" be included in the data sent to Percival, U.S. Ex. 38, and when she first received the chart she stated that she believed the high concentration of discounts in the 30–40% range was attributable to channel sales, U.S. Ex. 47.  She also understood that the purpose of the chart was to explain *non-standard* discounts, meaning deviations from Symantec's regular discounting policies and procedures.  *See* Tr. at 2094:19–2095:5 (Bradbury) ("[GSA] wanted to know what are your discount practices, what are your discounting policies and procedures . . . and how often do you deviate from them . . . .  If you deviated a hundred percent of the time, then that would tell the contracting officer your list price isn't real.").  She

---

[23] Because the Court has held that the certification was not material regarding the Rewards disclosures, it does not consider that here, even though the evidence suggests that within a few months, Bradbury was aware of even more inaccuracies in her representation of Rewards.  *See* U.S. Ex. 151B (PowerPoint for which she is listed as one of the presenters suggests to sales representatives that they offer term-based discounts in Rewards by "fixing" customers at Band E); U.S. Ex. 154 (suggesting using a Rewards Addendum to the master licensing agreement instead of completing it online).

nevertheless titled the chart "Summary of Non-Published Discounts" based only on her determination that she did not see any distributor and reseller names in the data.  Findings of Fact, *supra* ¶¶ 71–72.

What's more, Bradbury never updated the chart to include the Veritas products after supplementing Symantec's offer, and her uncorroborated and tentative recollection that she thought she submitted them is thoroughly unconvincing.  *Id.* ¶ 80.  Norton's theory that GSA must have lost the updated Frequency Chart is just as unconvincing.  *See* Norton's Resp. at 23 & n.7.  It is based solely on Molina's initial belief that she did not receive the entire contract file, including the CSPs, when the contract was transferred to her.  *See* Dx. 258 at 1 (email from Molina stating that "many items were missing"); Dx. 38  at US-GSA-00263901 (email stating that Symantec claimed to have "sent their CSP information to [Dixon]" that was "substantial in size" but they did not want to reprint it).  The boxes of information referred to were the pricelists, whereas the CSPs that Molina was looking for were not found because they were never submitted.  *See* Dx. 673 at SYM01351184 (email from Morsell in which she states that she "wasn't sure if there were any CSP Charts submitted with the original offer and it sounds like there weren't").  The fact that Molina gave Symantec the benefit of the doubt when she inherited the contract does not show that GSA lost a substantial part of the file, nor does it warrant an adverse inference that the updated Veritas discounting disclosures were provided despite not appearing in a single email or cover letter to that effect.

Bradbury's failure to investigate or corroborate the makeup of the discounts in the original Frequency Chart or ensure that the information there was updated with the Veritas discounts was, at a minimum, reckless.  "Reckless disregard under the FCA is 'an extreme version of ordinary negligence.'"  *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764

F.3d 19, 29 (D.C. Cir. 2014) (citations omitted). Bradbury had information that alerted her to the inaccuracies and incompleteness of the Frequency Chart, yet she represented it to be something it was not—a comprehensive summary of Symantec's (and later Veritas's) non-standard discounts. Indeed, her failure to so much as send an email to IT or Percival seeking an explanation about the concentration of discounts before making that representation, or to follow up with the results of the Veritas analysis, is suggestive of the higher standard of deliberate indifference.

Bradbury's failure to disclose Symantec's rebating practices was also reckless disregard. Symantec had both front-end and back-end rebate incentive programs for channel partners, including prior to the Symantec negotiations, which Bradbury understood at the time of negotiations. Tr. at 1575:10–13 (Bradbury) ("You understood when making Symantec's offer for its GSA contract that Symantec had various rebate programs. Correct? A. Yes."); U.S. Ex. 397B, Attch. 1 (interrogatory response attaching chart of rebate incentive programs). Yet Bradbury conceded that the channel partner agreements she submitted to GSA did not contain any mention of those rebate programs. Tr. at 1576:8–19 (Bradbury). Bradbury also agreed that she was aware of at least the opportunity registration program, which is why at least the front-end portion of that incentive appeared on the Discount Relationship Chart. *See id.* at 1607:9–12; U.S. Ex. 186C (flyer announcing rebate programs effective September 1, 2006). She testified that she was aware "rebates would come and go. There were hundreds of different kinds of rebates. They would come and go, whatever." Tr. at 1591:8–10 (Bradbury).

Bradbury testified: "If the rebate was in effect at the time and I knew about it and I was told about it, I would have disclosed it. If I didn't know about it, if they didn't tell me there was a rebate, I didn't disclose it." *Id.* at 1591:10–13. Given Bradbury's experience in the industry and her understanding that there were "hundreds" of rebates that constantly changed, the Court

doubts that Bradbury sincerely believed there to have only been one single front-end rebate program in effect at the time of negotiations. But even taking her testimony at face value, it was certainly reckless of her to passively wait to be told about rebate programs when it was her responsibility to collect and disclose that information.

Bradbury, and other leaders in Symantec, were also aware of the serious consequences for failures to comply with GSA contract obligations related specifically to CSPs. *See, e.g.*, U.S. Ex. 615 (email chain between Muscarella, Russell, and Bradbury regarding a False Claims Act lawsuit against Sun Microsystems which Bradbury identified as being "related to non disclosure of discounts to resellers"); U.S. Ex. 198B (letter from reseller noting that the failure to disclose rebate incentive programs had recently been the source of liability for OEMs). In addition, while administering the Veritas GSA contract, on one occasion Bradbury offered GSA an additional discount based on a back-end rebate that was being offered to a reseller, showing that she was well aware of the relevance of such rebates to GSA. *See* U.S. Ex. 77. Bradbury, and Symantec, nevertheless failed to ensure that their disclosures were accurate throughout the life of the contract.

### iii. Modifications Clause

Finally, the Modifications Clause requires offerors to update their CSPs when adding new products to a contract. It states that "[w]hen requesting additions," the offeror must submit, among other things, "[d]iscount information for the new item(s) or new SIN(s)." GSAM § 552.243-72(b). "Specifically," the offeror must "submit the information requested in paragraphs 3 through 5 of the [CSPs Form]." *Id.* § 552.243-72(b)(ii). "If this information is the same as the initial award, a statement to that effect may be submitted instead." *Id.* The United States argues that by misrepresenting its CSPs in the first place, and by periodically certifying

that its sales practices had not changed, Symantec repeatedly breached its obligation to provide its actual CSPs each time it was making a modification.  U.S.'s Prop. FF&CL at 106.

<u>Falsity & Materiality</u>

The Court already granted partial summary judgment to the United States on the duty element for the Modifications Clause but could not grant judgment as a matter of law on the issue of breach because the falsity of the initial CSPs was subject to a dispute of material fact. *MSJ Mem. Op.*, 471 F. Supp. 3d at 294.  Now that the Court has held that the CSPs were materially false, it has little difficulty determining that each subsequent certification asserting that the CSPs had not changed was likewise false.  Norton argues that there was nothing substantively inaccurate about the non-standard discounting policy in the first place, and that it continued to function in largely the same way throughout the contract.  Norton's Prop. Fed. FF&CL ¶ 100.

The Court agrees on that point, but it makes little difference because the Court has determined that the Frequency Chart and rebates disclosures were materially false.  For example, on one occasion shortly after Molina inherited the contract, Reinhardt provided additional information at her request, in which Reinhardt certified that the CSPs had not changed and resubmitted the same non-standard discounting policy description that had been included in the original offer as well as the Global Discount Authority Guidelines and a CSP chart.[24]  U.S. Exs.

---

[24] That CSP chart, which was for SIN 132-32 only, included a column for rebates that contained a "0" for every category and indicated that non-standard discounts for distributors ranged from 36–95% and for resellers ranged from 4–67%.  U.S. Ex. 228 at SYM00439072.  Molina did not reference it in her memorandum approving the modification.  U.S. Ex. 231.  The Court cannot say based on the evidence presented whether that specific chart was false, but it does lend further support to the fact that Symantec believed non-standard discounts approved in eSPA in accordance with the disclosed policy to fall outside the PRC and that GSA did nothing to contradict that understanding.

228 (email and attachments, including CSP chart); 229D (cover letter); 229B (Global Discount Authority Guidelines); 229E (non-standard discount policy).  What's more, the evidence showed that Symantec's CSPs *had* changed during the life of the contract in at least one respect: the rebate programs, as Bradbury testified that she knew, were constantly "coming and going."  Tr. at 1591:8–10 (Bradbury).  Neither Bradbury nor any other Symantec employee disclosed those changes to GSA.

Those certifications were material.  If Molina had reason to know of the initial falsity of the CSPs or the changes to the rebates, it would have likely influenced her decision to pay.  For example, if Symantec had submitted a modification in which it stated that the CSPs *had* changed but declined to give any detail about how, it seems indisputable that Molina or any other Contracting Officer would have insisted on more information before approving the modification in that situation.  The entire point of the Modifications Clause is to ensure that new products are added with the same rigor and standards of fair and reasonable pricing as the original contract. The false certifications submitted in accordance with the Modifications Clause are therefore material.

Scienter

Finally, the certifications made in accordance with the Modifications Clause were made with reckless disregard to their truth or falsity.  Reinhardt, who submitted the majority of the modifications, did not take any steps to actively ensure that her certification that commercial sales practices had not changed was accurate.  Findings of Fact, *supra* ¶ 148.  This is the exact kind of assertion "with little or no factual basis," "no effort" to ascertain truth or falsity that satisfies the reckless disregard standard.  *Krizek*, 111 F.3d at 942.

Again, leaders at Symantec were aware that failures to accurately disclose and update CSPs were material to GSA's decision to continue paying.  *See, e.g.*, U.S. Ex. 615 (email chain between Muscarella, Russell, and Bradbury regarding a False Claims Act lawsuit against Sun Microsystems which Bradbury identified as being "related to non disclosure of discounts to resellers"); U.S. Ex. 198B (letter from reseller noting that the failure to disclose rebate incentive programs had recently been the source of liability for OEMs).  Bradbury, and Symantec, nevertheless failed to ensure that their disclosures were accurate throughout the life of the contract.

After Bradbury and Reinhardt both left Symantec, no one at Symantec even had ready access to the CSPs, and the public sector team took months to retrieve the GSA materials from their laptops when GSA requested the CSPs in 2011.  *See* U.S. Ex. 1309 at 2 (February 2011 email from Molina requesting CSPs "as we discussed months ago" and Lokie forwarding the message internally to ask about the status of locating Bradbury and Reinhardt's files); U.S. Ex. 1318 at SYM-LIT02491325 (March 2011 email discussing ongoing difficulty locating the CSPs in Bradbury's computer).  It is impossible that anyone could have had a reasonable basis to certify that the CSPs had not changed during that period because no one had access to them or knew what they contained.

### c. Fraudulent Inducement: CSP Disclosures

The fraudulent inducement theory is one of legal falsity; namely, that Symantec's GSA contract itself was procured by fraud in the form of the false CSP disclosures.  *See* U.S. Prop. FF&CL at 118–19.  The United States contends that Norton's CSP disclosures were materially false in several respects: the Frequency Chart, the explanation of the non-standard discounting policy, the modified sales estimate, and the lack of rebate disclosures.  *Id.* at 108–09.

### i. Falsity, Materiality, & Scienter

136

The Court has already described in detail how each of these CSP disclosure elements were false.  And although it has already determined that these falsities were material to GSA's decision to continue authorizing payment under the GSA contract,[25] it bears mentioning that the CSPs had a heightened materiality to GSA's decision to enter the contract in the first place.  As this Court already held, "[t]he very existence of the CSPs disclosure requirements and the GSAM's instructions to incorporate them into every MAS Schedule contract that GSA negotiates suggests that they will have at least some influence in shaping GSA's decisions."  *MSJ Mem. Op.*, 471 F. Supp. 3d at 303.

Thus, complete and accurate disclosure of CSPs is far more than a technicality; it is the very foundation of negotiations with GSA.  As Bradbury herself aptly put it when asked about the purpose of providing the discounting information:

> GSA wanted to see how you do business.  They wanted to understand because every company's different.  So they want to understand -- every company, they were saying you tell us how you do business.  You tell us who your customers are, how you -- what are your sales practices to those customers, because this was -- this chart was like a data point for them.  They wanted to know what are your discount practices, what are your discounting policies and procedures, what are your terms and conditions, and how often do you deviate from them.  And they wanted to know, does that -- is your list price real?  If you deviated a hundred percent of the time, then that would tell the contracting officer your list price isn't real.

---

[25] Consistent with that analysis, the Court concludes that the inaccuracies in the Rewards Program disclosures were not material to the negotiations with GSA.  At the time of the October meeting, the program had been announced but not yet taken effect.  Bradbury was necessarily working with limited knowledge, but her disclosures were accurate based on the information available to her.  Findings of Fact, *supra* ¶ 85.  Bradbury learned before the contract was finalized that co-termination was not required, see U.S. Ex. 142 at 22 (November 2006 Rewards Guide), but the record does not demonstrate that she had actual or constructive knowledge of the other major exceptions that would have made Rewards more desirable to GSA, such as the ability to accept terms in a paper addendum or fix GSA or other commercial customers at Band E based on past sales.  Accordingly, the Court holds in the alternative that the United States has not met its burden of showing that Bradbury acted with reckless disregard to the truth of falsity of the Rewards disclosures during the negotiation.

Tr. at 2094:19–2095:5 (Bradbury).  Dixon also testified that she reviewed CSP disclosures when evaluating a solicitation, and referenced Symantec's CSP disclosures in her pre-negotiation memorandum.  *Id.* at 3134:23–25 (Dixon); U.S. Ex. 70.  As for the rebates, Bradbury also conceded that "GSA would have thought rebates were important."  Tr. at 1592:17–18 (Bradbury).

ii. Causation

Although the falsities in the CSP disclosures were obviously material, "a statement could be material—that is, capable of influencing the government's decision to enter a contract— without causing the government to do so."  *United States ex rel. Cimino v. Int'l Bus. Machines Corp.*, 3 F.4th 412, 419 (D.C. Cir. 2021).  To prevail on a fraudulent inducement theory, an FCA plaintiff must therefore also establish both actual and proximate cause.  *Id.* at 420. "Actual cause, also called cause-in-fact or factual cause, concerns whether a defendant's conduct resulted in the plaintiff's harm," whereas proximate cause "concerns whether a defendant should be held legally liable for the conduct that caused the plaintiff's harm."  *Id.*  Norton contends that the United States has failed to establish the causation standard laid out in *Cimino*, which it contends requires showing that "but for Symantec's allegedly false CSPs, GSA would not have awarded Symantec a GSA Schedule contract."  Norton's Prop. Fed. FF&CL at 68.

*Cimino* does not require a showing that GSA would not have entered *any* contract at all had the CSPs been complete and accurate, only that GSA would not have entered the *specific* contract that it agreed to.  In *Cimino*, the complaint alleged that the defendant had "learned that the IRS was not interested in renewing the [licensing] agreement" and instead "intended to negotiate an extension only for the software that it needed," and that as a result IBM made certain false representations "to pressure the IRS into another long-term deal."  *Id.* at 416.  That case therefore involved a situation where the government agency did not intend to contract at all,

138

or perhaps intended to enter a much smaller contract, and was allegedly induced to renew its full contract by IBM's fraud.  Other persuasive precedent suggests that but-for causation can be satisfied by a showing that GSA would have still been willing to contract, but on different terms. *See United States ex. rel Marsteller v. Tilton*, 880 F.3d 1302, 1314 (11th Cir. 2018) (acknowledging the applicability of a fraudulent inducement theory where "the original fraud . . . influenced the Government's decision to enter into a particular contract at a particular price"); *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 107 (D.D.C. 2017) (determining that "at the complaint stage, the Court can reasonably infer that DynCorp's justification of its proposed prices as based on 'historical data' could have induced the government to agree to the prices"); *United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 36, 52 (D.D.C. 2015) (holding that plaintiff had stated a claim for fraudulent inducement based on allegations that the defendant "failed to report that the average discount for the relevant category of commercial customers was higher than what it was giving to the government" which "caused the government to pay inflated prices").

One of the falsities in Symantec's submission fails the causation test.  Although Bradbury knowingly and falsely reduced the estimate of total sales in order to avoid an EEO audit, the record does not contain any evidence that GSA would have altered its negotiation position in any way as a result.  Not only did Dixon not follow up on the revised estimate, she waived another pre-award audit by GSA with an even lower projected sales threshold of $1 million.  U.S. Ex. 70 at 6 ("[T]he Government has decided at this time to waive the pre-award audit and consider auditing Symantec Corporation after five years.").  Nor is it apparent that the EEO audit would have illuminated the falsities in the CSPs had it occurred.  The Court therefore concludes that the revised sales estimate was not a but-for cause of GSA's acceptance of the contract.

Nonetheless, the United States clears the causation hurdle with respect to the Frequency Chart and the lack of the rebate disclosures. Although Dixon had no specific recollection of the Symantec negotiations, she testified that she attempted to get the best or "as good a price as possible" for the government, and that she believed she accomplished that goal throughout her career. Tr. at 3118:19–3119:3 (Dixon). Her pre-negotiation memorandum likewise stated that she sought the discounts offered to Symantec's "best customer." U.S. Ex. 70 at 12. Contemporaneous emails show that Dixon sought clarification on the CSPs, and the buying programs disclosure in particular, when something was unclear. U.S. Ex. 58 (responding to Bradbury's disclosure of the buying programs to say "I am confused").

In fact, Dixon intended to cancel the November 2006 meeting and delay the award because "[t]here are a lot of issues that need clarification and correction," and only went forward with the meeting at Bradbury's urging. U.S. Ex. 64 at SYM00345429. Bradbury's and Reinhardt's recollections of that meeting show that Dixon actively sought to understand how the proposed GSA prices compared to other customers' prices and pressed for better discounts as a result. *See* Tr. at 2134:6–18 (Bradbury) ("[W]e were going over pricing and starting to break out the different price lists . . . if there were volume discounts based on zero to 1 or, you know, zero to 10 or 11 to – whatever . . . . [W]e had put in a proposed GSA discount and calculated the GSA price and then compared it, showed her how it compared to the other price lists. Q. And so was that -- were those discounts what you ultimately agreed to with Ms. Dixon? A. *Pretty close*, yes." (emphasis added)); *id.* at 1144:16–1147:5 (Reinhardt) (recalling that the November 2006 meeting included a lengthy discussion of the pricelists and the buying programs).

Had a more accurate depiction of the frequency of non-standard discounts and the rebate policies been made available to Dixon, it is clear from this context that she would have pushed

for better discounts to GSA.  This circumstantial evidence is enough to show that it was more likely than not that the falsities in the Frequency Chart and lack of rebate disclosures were the actual cause of Dixon's decision to accept the GSA contract at the prices she accepted.

### 2. Causing False Claims and Statements (Counts III & IV)

Liability under the FCA for presentment and false statements encompasses indirect liability as well, for anyone who "*causes* to be presented[] a false or fraudulent claim" or "*causes* to be made or used[] a false record or statement material to a false claim."  31 U.S.C. §§ 3729(a)(1)(A)–(B) (emphasis added).  Here, the United States contends that Symantec caused two of its major resellers, Carahsoft and GTSI, to submit false claims on their own GSA contracts by directing GSA to rely on its false CSPs for the pricing of Symantec products on those resellers' own GSA contracts.  U.S.'s Prop. FF&CL at 119.

Norton first argues that the indirect presentment claims fail because there is no evidence of the resellers' claims for payment that were presented to the Government, the "*sine qua non*" of FCA liability.  Norton's Prop. Fed. FF&CL at 88–89 (citing *United States ex rel. Pogue v. Diabetes Treatment Centers of Am.*, 565 F. Supp. 2d 153, 160 (D.D.C. 2008)).  The United States responds that those claims are found in the reseller and distributor IFF data that was introduced through Dr. Gulley's testimony without objection.  U.S. Resp. at 42; *see* Tr. at 3718:23–3719:3, 3723:18–3724:16 (Gulley); U.S. Exs. 1915, 1916.  While Dr. Gulley's testimony on this point was not particularly detailed, it is clear enough that the datasets of commercial transactions that he relied on for his analysis included those sales.  And because the United States' theory for the indirect presentment claims is based on Symantec's false CSP disclosures, it does not depend on showing that any single transaction violated the PRC.

Nonetheless, indirect presentment claims require showing "that the defendant's conduct was 'at least a substantial factor in causing, if not the but-for cause of, submission of false claims.'" *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 48 (D.D.C. 2011) (quoting *Miller v. Holzmann*, 563 F. Supp. 2d 54, 119 n. 95 (D.D.C. 2008), vacated in part and remanded on other grounds by *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871 (D.C. Cir. 2010)).  This can occur "where the non-submitter was the driving force behind an allegedly fraudulent scheme." *Tran,* 53 F. Supp. 3d at 127 (collecting cases).  There is not enough evidence to allow the Court to conclude that Symantec's relationship with its resellers fits this pattern.

The United States relies on Symantec's express authorization allowing resellers to sell its products on their GSA contracts, and its express authorization allowing the resellers to use Symantec's CSPs when negotiating and adding products to those contracts.  U.S.'s Prop. FF&CL at 120; U.S.'s Resp. at 43; *see also* U.S. Ex. 306 (Carahsoft Letter of Supply); U.S. Ex. 307 (GTSI[26] Letter of Supply); U.S. Ex. 309 (authorization for use of CSPs).  But that does not on its own demonstrate that Symantec's CSPs were a substantial factor in setting the prices on the reseller's GSA contracts, particularly where there was no testimony about those negotiations and no evidence of what the resellers' basis of award or negotiated GSA pricelists were for those contracts.  And as Symantec points out, it is at least somewhat suspect to assume that GSA actually relied on Symantec's CSPs when negotiating the resellers' contracts, because during much of that time Molina did not have what she considered to be complete CSPs.  Norton's

---

[26] At some points in the record, GTSI is also referred to by its later name, "Unicom."  *See* Tr. at 1971:7–9 (Bradbury) (confirming that "GTSI later changed its name to UNICOM").  The Court refers to it here as GTSI for consistency with the majority of documents in the record.

Prop. Fed. FF&CL at 89; *see also* U.S. Ex. 336 (GTSI modification submission from 2011 directing GSA to contact Molina for the CSPs).

The United States also places a great deal of weight on the fact that as a practical matter reseller prices closely matched manufacturer prices. *See* Tr. at 2862:5–9 (Morrison) ("Q.  And in your experience in those instances where a manufacturer and a reseller both have MAS contracts, are the manufacturer's GSA prices generally relevant to GSA in evaluating the reseller's prices?  A.  Absolutely.").  There was substantial testimony that because any government purchaser could see Symantec's GSA prices through the GSAAdvantage! website, Symantec's GSA pricelist set a "street price" for its products, including those sold on its resellers' own GSA schedule contracts.  Tr. at 1987:15–23 (Bradbury); *id.* at 781:15–17 (Simon).  But there is limited evidence of the extent to which GTSI and Carahsoft's prices actually did track Symantec's prices.  For example, in a 2010 email Bradbury explained that a reseller's use of an identical SKU listed at a higher price on Symantec's GSA contract and would force Symantec to lower its own price.  U.S. Ex. 325.  And a GTSI modification letter from 2011 stated that the newly added products "match[ed] Symantec's GSA discount and GSA sell price."  U.S. Ex. 336 at US-GSA-00011314.  Thus, even though the resellers were not aware that their prices were inflated, they closely tracked Symantec's GSA prices and relied on the representations Symantec had made.  Still, these limited instances, which occurred fairly late in the life of the contract and involved only certain products, are not strong enough evidence for the Court to conclude that Symantec's inaccurate CSPs caused the resellers' GSA contract prices to be inflated.

One July 2011 letter from GTSI shows that the reseller was concerned about this link between the manufacturers' CSPs—specifically, rebates—and the reseller's contract.  U.S. Ex.

198B.  In that letter, GTSI explains that there has been an increase in FCA litigation for resellers

based on "various incentive programs offered to Value Added Resellers." *Id.*  It goes on to say:

> To date, we have operated under the assumption that you have appropriately
> disclosed within any Commercial Sales Practices report(s) filed with the
> Government (whether filed by you directly, or provided to us to be filed on your
> behalf) the existence and nature of the VAR incentive programs you provide to
> GTSI in any schedule negotiations relating to price. If this is not your standard
> practice, we urge you begin doing so immediately, as we believe it to be in our
> mutual interest. In addition, we strongly encourage you to provide regular updates
> to the Government (or to GTSI, as applicable) as required under the Price Reduction
> Clause requirements.

*Id.*  That letter is certainly relevant to scienter in the sense that it put Symantec on notice

of a potential problem, but again, it does not give rise to an inference of causation.

The Court has already concluded that Symantec's inaccurate CSP disclosures

inflated its own GSA contract pricing, but the United States has not provided enough

evidence to conclude that Symantec's pricing also impacted the pricing on the resellers'

own GSA contracts.  Alternatively, although the CSPs were material to Symantec's

negotiations, the Court cannot be sure the same is true of the resellers' negotiations

without knowing more about what other information, if any, the resellers provided during

their own negotiations.  The FCA's materiality requirement is "rigorous," *Escobar*, 579

U.S. at 192, and the United States asks the Court to assume too much to impose such

sweeping liability under third-party contracts.  Accordingly, the Court finds for Symantec

on Counts III and IV.

### 3. Reverse False Claims Act (Count V)

Count V of the Omnibus Complaint alleges violations of another FCA provision, 31

U.S.C. § 3729(a)(1)(G), which establishes a cause of action for "reverse" false claims by creating

liability for any person who "knowingly conceals or knowingly and improperly avoids or

decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. §
3729(a)(1)(G). "Obligation" is defined in the FCA as "an established duty, whether or not fixed,
arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship,
from a fee-based or similar relationship, from statute or regulation, or from the retention of any
overpayment." *Id.* § 3729(b)(3). Neither party addresses this count in much detail, instead
falling back on their previous positions. The Government claims that Symantec violated this
provision by "failing to disclose and reduce prices when the PRC was triggered; and . . . falsely
certifying its CSPs remained current, accurate, and complete, concealing or avoiding price
adjustment under the Price Adjustment Clause," both of which it believes were material
obligations. U.S.'s Prop. FF&CL at 121. And Norton simply asserts that "Symantec did not
breach its CSP or PRC obligations under the GSA Schedule contract, let alone knowingly, so
there was no obligation to pay or transmit money to the government." Norton's Prop. Fed.
FF&CL at 90.

"A considerable body of case law confirms that the Government's ability to pursue
reimbursement for overpayments or fraudulently induced payments does not constitute an
'obligation.'" *United States ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 269
(D.D.C. 2016) (collecting cases); *accord Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii
LLC*, 512 F. Supp. 3d 1096, 1119 (D. Haw. 2021) ("[T]he court agrees with the substantial
authority holding that an actionable reverse false claim cannot be based on a defendant's failure
to refund the same payment that was obtained by an actionable false claim."); *United States ex
rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 191 (D. Md. 2019) (dismissing a
reverse false claim count "premised on the same conduct as" the presentment claims); *United*

*States ex rel. Riedel v. Bos. Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 82–83 (D.D.C. 2018) (same).

The Court previously allowed this count to go forward "on the basis that Symantec knowingly failed to adjust the Contract's pricing terms as required by the Price Reduction Clause" because "internal audits in 2010 and 2011 put Symantec executives on notice that the company's undisciplined discounting practices could have led to violations of its Price Reduction Clause commitments." *MTD Mem. Op.*, 130 F. Supp. 3d at 125–26. As noted in the Court's summary judgment opinion, that theory is conceptually distinct from the United States' CSP-based theory. *MSJ Mem. Op.*, 471 F. Supp. 3d at 307. Thus, there is nothing "reverse" about a false claim premised on the fraudulent CSP disclosures.

The PRC clause, though, functions differently. "[A]bsent an acknowledgment of indebtedness, reverse-false-claim liability is unavailable . . . unless the relevant legal instrument imposes a self-executing obligation to tender money or property to the United States." *Landis*, 160 F. Supp. 3d at 272. The language of the PRC uses mandatory language, stating that "a price reduction *shall* apply" in the three identified situations and that "[t]he contractor *shall* offer the price reduction to the Government with the same effective date . . . ." GSAM § 552.238-75(c)(2). The PRC is therefore the kind of classic self-executing obligation that would give rise to reverse false claims liability. Although the self-executing obligation to extend price reductions is conceptually distinct from implied certification with the PRC, in practice those two theories precisely overlap. Thus, the same analysis with respect to materiality, falsity, and scienter under the implied certification with the PRC clause theory applies fully to Count 5 as well.

### 4. Damages and Penalties

As described above, the United States' claims under the FCA survive to different extents. GSA was fraudulently induced to enter the MAS contract with Symantec under the terms that it did because of Symantec's knowingly, materially false CSP disclosures with respect to the rebate program disclosures and the Frequency Chart. Symantec also impliedly certified compliance with the PRC and CSP requirements when submitting claims throughout the life of the contract. Symantec made knowing, materially false statements related to those claims for payment during the negotiation and the life of the contract through the subsequent modifications reaffirming the initially false CSPs. And it failed to offer the price reductions to which GSA was entitled during the life of the contract.

### a. Discount Damages

In order to recover treble damages for those violations, the United States must show both actual and proximate cause. *See United States ex rel. Schwedt v. Plan. Rsch. Corp.*, 59 F.3d 196, 200 (D.C. Cir. 1995) (finding that a defendant should be liable "only for those damages that would not have come about if the defendant's misrepresentations had been true"); *SAIC*, 626 F.3d at 1278 ("In calculating FCA damages, the fact-finder seeks to set an award that puts the government in the same position as it would have been if the defendant's claims had not been false."); *United States ex rel. Longhi v. United States*, 575 F.3d 458, 473 (5th Cir. 2009) ("Before the government may recover treble damages, it must 'demonstrate the element of causation between the false statements and the loss.'" (citation omitted)); *United States ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540, 572 (E.D. Pa.), *aff'd*, 593 F. App'x 139 (3d Cir. 2014) ("[I]n addition to proving that [defendant] knowingly made a materially false statement that induced the government to award it a contract, in order to prevail on his claims under the FCA and recover damages, [relator] must show loss causation."); *United States v. Advance Tool Co.*, 902

F. Supp. 1011, 1017 (W.D. Mo. 1995), *aff'd*, 86 F.3d 1159 (8th Cir. 1996) (finding an FCA violation where defendant provided GSA with tools that did not meet requirements but declining to award actual damages because "Plaintiff failed to present sufficient evidence at trial concerning the fair market value of the tools delivered to GSA so as to allow the Court to determine the extent of the Plaintiff's actual damages").  And as with the other elements of the FCA claims, the United States bears the burden of proving damages by a preponderance of the evidence.  31 U.S.C. § 3731(d).  "Under the FCA, the government bears the burden of presenting sufficient evidence to allow the [fact finder] to determine the amount of damages it is owed," which "must be proven with reasonable certainty" and "cannot be based on speculation or guesswork."  *SAIC*, 958 F. Supp. 2d 53, 77–78 (D.D.C. 2013) (citations and quotations omitted).

Beginning with the fraudulent inducement theory of liability, the Court cannot discern a proximate connection between Symantec's wrongful conduct in that respect and the United States' claimed damages.  Although it is more likely than not that GSA would have insisted on a more advantageous discount had Symantec not made the misleading representations during negotiations, there is simply no evidence of *how much* more advantageous the GSA discounts would have been.  Just because Dixon could have likely achieved a better discount with accurate disclosures, it does not follow that she could have achieved the same should-have-paid discount calculated based on the PRC violations which, as discussed below, the Court believes are unrealistically high in any event.  Symantec made clear from the beginning that it was not offering GSA its best price in all circumstances, and Dixon agreed to that in her discretion as a contracting officer.  There is simply no support in the record to suggest that the full and accurate CSPs would have resulted in GSA receiving the overall lowest price; the difference is only one of degree.

But nothing in Dr. Gulley's testimony or any other testimony allows the Court to determine with reasonable certainty the degree of difference in the GSA discount that resulted from Symantec's material and fraudulent misrepresentations in the negotiations. All of Dr. Gulley's calculations turn on the commercial discounts provided during the life of the contract that the United States believes would have triggered either the second or third clause of the PRC. Even the FPR Plus dataset, which incorporates the idea that the deviations from the disclosed CSPs would trigger a price reduction, assumes that GSA would have received an equivalent discount to the triggering commercial transactions.

The fraudulent inducement theory under the FCA is grounded in the common law tort, thus it is appropriate to rely on common law cases to determine the contours of "reasonable certainty" that the United States must provide for calculating damages. *See Cimino*, 3 F.4th at 419 (noting that the common law requirements for fraudulent inducement claims, including causation, are incorporated into the FCA); *see also Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 31 N.Y.3d 569, 580 (2018) ("Loss causation is a well-established requirement of a common-law fraudulent inducement claim for damages."). Although some amount of uncertainty will not bar recovery of damages in common law cases, the plaintiffs still bear the burden of providing "a reasonable method to calculate damages." *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, No. CV 7906-VCG, 2020 WL 948513, at *20 (Del. Ch. Feb. 27, 2020). The *Great Hill* case provides a good example: in that case, plaintiffs provided an all-inclusive and unified damages calculation that the expert admitted could not be apportioned between the different alleged acts of fraud. *Id.* Despite having found the elements of liability for fraud met in some respects and determining that some harm occurred, the court declined to award any damages, stating:

> While I have found that the Plaintiffs suffered harm from the non-disclosure of PayPal's termination threats, harm is in itself insufficient for a damages award if I have no basis to make a responsible estimate of damages. . . . While I assume that the Plaintiffs suffered some pecuniary damage . . . were I to assign an amount to that damage I would be only marginally more confident than if I randomly picked a number between $0 and $121,813,817. . . . The Plaintiffs were allowed to make [the] strategic choice to present one unified remedy theory. This choice, however, now prevents me from awarding damages for the parts of its case that it was able to prove as it has given me no way to separate the actual harm to the Plaintiffs from the consequences of allowed behavior by the Defendants.

*Id.* at *3 (cleaned up).

The Court feels the same way regarding the damages from the CSP disclosures. While the Court believes some harm occurred, the United States has made the strategic choice to tie its damages calculations to the PRC violations, leaving no way for the Court to disentangle the two. Determining how much of a discount GSA would have received had the CSP disclosures been complete and accurate would amount to little more than pulling a number out of thin air, and this the Court declines to do so. The same problem is equally applicable to the United States' theory of implied certification with the Modifications Clause. The Price Adjustment Clause allows GSA to reduce prices "at its election" for the contract or a specific modification if it determines "that the price negotiated was increased by a *significant* amount" as a result of incomplete or inaccurate CSPs. GSAM § 552.215-72(a) (emphasis added); *see also id.* § 552.215-72(d) ("Failure to agree on the amount of the decrease shall be resolved as a dispute."). That provision does not, by its terms, have the same mandatory language as the PRC, nor does it guarantee GSA a matching discount to the discounts in the incomplete disclosures. Because the Court cannot determine the amount by which the inaccurate CSPs increased the negotiated prices in the original contract, it likewise cannot determine with reasonable certainty how much GSA would have paid had Symantec come clean about those originally false CSPs. The United States has

therefore failed to prove with reasonable certainty any damages proximately caused by its

fraudulent inducement theory or Modifications Clause theory.

That leaves Dr. Gulley's calculations based on the allegedly PRC-triggering violations.

The Court's conclusions regarding Symantec's reasonable interpretation of the contract preclude

reliance on Dr. Gulley's should-have-paid discounts that were calculated using the "FPR

Review" dataset, because that dataset was drawn from all commercial sales that the United States

believed violated the PRC regardless of eSPA approval.  Findings of Fact, *supra* ¶¶ 223–24.  The

FPR Plus Review dataset, in contrast, collected transactions that the United States claimed

violated the PRC and did not fall within one of the five categories Bradbury had disclosed in the

non-standard discounting policy disclosure.  *Id.* ¶ 224.  Although the FPR Plus dataset more

closely aligns with Symantec's subjective, reasonable understanding, the Court finds that those

transactions are still broader than what Symantec reasonably understood to violate the PRC and

includes transactions that arguably did satisfy the competitive and differing terms requirements.

*See, e.g.*, U.S. Summ. Ex. 1 at line 49 ("This is a competitive displacement aimed at motivating

the reseller to install NetBackup in their data center, become proficient with and ultimately lead

with our backup solutions."); *id.* at line 685 ("Will position the deal at this aggressive discount as

an Early Adopter - one time only price, and requires them to be a reference and to let us develop

an internal case study.").

In theory, this might not have mattered because the should-have-paid discounts were

calculated based on the average of at least ten discounts in each bucket, any one of which could

have potentially triggered the PRC.   Findings of Fact, *supra* ¶ 238.  However, even just

eliminating sales that purportedly did not contain an eSPA (because the Court disagrees that this

failed to show no eSPA existed) results in four buckets that no longer contain any PRC-

triggering transactions: Buckets 12, 42, 49, and 119.  *See* U.S. Summ. Ex. 1 at lines 148–57, 545–55, 645–54, 1649–60 (filtering for FPR Plus Sales and then filtering for sales with an eSPA entry).  And the remaining transactions in some other buckets do not contain transactions with sufficient detail for the Court to say it is more likely than not that a PRC violation occurred.  *See, e.g., id.* at lines 426–27 (containing two transactions that only explain "Here's the revised quote. We will also have $25K in Services on a separate direct quote for this deal." for bucket 33). Although the Court does not take issue with the bucketing methodology as a general matter, Dr. Gulley's testimony does not explain how to apportion his total results if the Court agrees with some buckets and not others (or some transactions and not others), and the United States has not directed it to anything in the record indicating how to reliably do so.

Apart from the Court's doubt about the accuracy of the should-have-paid discounts after accounting for its holding on Symantec's reasonable interpretation, the Court also disagrees with Dr. Gulley's approach of having ignored the order level discounts for each line item when calculating the "average" discount, which resulted in an unreasonably inflated average should-have-received discount.  Findings of Fact, *supra* ¶ 239.  Even though the GSA contract assigned discounts on a per-SIN basis, the order total would have impacted not only any volume discounts, but potentially also the relevant terms and conditions that were the basis for Symantec's reasonable interpretation.  For instance, the order level might reflect discounts for mid-contract upgrades, standardization on multiple Symantec products, or product bundles, all of which the Court believes would have been meaningful justifications within Symantec's reasonable interpretation of the contract.  *See, e.g.*, U.S. Summ. Ex. 1 at line 242 (noting that "All pricing has been normalized to reflect the same unit price no matter what pack size is ordered, so small pack's [*sic*] will have a much larger net discount due to their higher list

price.").  And as Mr. Tucker's analysis demonstrated, it was possible to apply the order-level

discount percentages to the triggering transactions without abandoning the bucketing approach

altogether.  Findings of Fact, *supra* ¶ 237.

Those two deficiencies are enough for the Court to conclude that it cannot possibly

untangle whatever actual damages GSA sustained from Dr. Gulley's results.[27]  Without knowing

what discount GSA should have received as a result of the transactions that would have triggered

the PRC when accounting for Symantec's reasonable interpretation, the Court cannot say with

reasonable certainty what amount of damages was actually and proximately caused by

Symantec's false implied certification with the PRC clause.  It therefore finds that the United

States has failed to meet its burden of proving damages under its theory of implied certification

with the PRC, as well.

The Court recognizes the tension in its determination that the United States has met its

burden on liability but not on damages with respect to the PRC discounts.  Still, the treble

damages imposed under the FCA "are essentially punitive in nature."  *Vermont Agency of Nat.*

*Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784–85 (2000); *see also Texas Indus., Inc. v.*

*Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) ("The very idea of treble damages reveals an

intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of

wrongdoers.").  Against that backdrop, it is especially important to hold the United States to its

burden of proving those damages rather than attempting to estimate them through numerical

guesswork.

---

[27] Moreover, the Court also registers some skepticism with later steps in Dr. Gulley's analysis, such as identifying PRC triggers from the first quarter that pre-dated the GSA contract, Findings of Fact, *supra* ¶ 233, and interpolating sales from a population of transactions that included Enterprise site licenses, which tended to have much higher discounts, *id.* ¶ 245.

*b. Rebate Damages*

Fortunately for the United States, there is significantly less guesswork involved in determining damages stemming from the false Rebate Program disclosures.  Given the clear falsity and materiality of the lack of rebate disclosures, which the Court has already discussed, it is near obvious that GSA would have insisted on a comparable corresponding discount upon learning of the rebate.  The same evidence that put Symantec on notice of its deficiencies in that respect also suggests as much.  *See* Tr. at 1592:17–18 (Bradbury) (conceding that "GSA would have thought rebates were important"); U.S. Ex. 198B (expressing concern about whether Symantec had disclosed rebates because "in recent years the Federal Government has brought a number of claims . . . in connection with various incentive programs offered to Value Added Resellers"); U.S. Ex. 615 (email chain regarding a False Claims Act lawsuit against Sun Microsystems which Bradbury identified as being "related to non disclosure of discounts to resellers"); U.S. Ex. 77 (voluntarily offering a GSA price reduction under the Veritas contact based on a rebate).

The United States asks the Court to calculate 3% of its total damages to account for the failure to disclose Symantec's myriad rebating programs throughout the life of the contract, which were as high as 16%.  U.S.'s Prop. FF&CL at 121–24; *see also* U.S. Ex. 186C (flyer advertising opportunity registration rebates).  The 3% number is a conservative estimate that is adequately supported in the record.  For example, Bradbury offered a voluntary 4% increase in the GSA discount as "the result of an additional five percent (5%) rebate being offered" to Veritas distributors for the relevant product category when administering that contract, which suggests that she would have agreed to an additional discount that was slightly less than the rebate.  U.S. Ex. 77.  The Opportunity Registration Program rebates started at 5% for Silver

Level partners, U.S. Ex. 186C, and up until 2008 there was a 5% rebate specific to GSA sales, U.S. Ex. 187A.

The problem is that the Court has not awarded any discount damages to which it can apply that 3% number.  Here, however, Mr. Tucker's sequential reductions prove helpful.  Mr. Tucker calculated the sequential impact of various modification to Dr. Gulley's analysis, which were summarized in Defense Exhibit 800.  Dx. 800 at 2.  The first of those reductions calculates the should-have-paid discounts on an order level rather than line item basis, and the fourth excludes sales made under Carahsoft and GTSI's own GSA contracts, *id.*, both of which the Court agrees are necessary adjustments.  The Court disagrees that the second, third, and fifth reductions are necessary, or at least not to the extent Mr. Tucker has calculated them.  Those adjustments exclude transactions for which Dr. Gulley extrapolated damages, transactions not on the GSA pricelist, and sales to agencies that predated the earliest PRC trigger in the corresponding bucket, and they reduce the FPR Plus Base Method Stratified totals by $34,226,420, $32,707,226, and $30,251,239 respectively.[28]  *Id.*  Still, the Court believes those adjustments more than compensate for the overinclusion of triggering transactions in the initial dataset such that the adjusted total provides a ballpark (and indeed exceptionally conservative) estimate to serve as a baseline for the rebate damages.  Mr. Tucker's total under the FPR Plus Base Stratified method, after accepting all his adjustments except exclusion of channel partners, is $11,877,224—a mere fraction of the original $281,552,189 that Dr. Gulley calculated with that same methodology.  *Id.*  3% of that total is $356,316.72.  The Court therefore awards treble that amount to the United States as rebate damages, a total of $1,068,950.16.

---

[28] The Court has already held as a matter of law that channel partners were included in the basis of award, therefore the Court does not apply Mr. Tucker's final reduction, which excluded discounts to resellers, distributors, and through Rewards.  Tr. at 4426:21–22 (Tucker).

*c. Civil Penalties*

Finally, the Court's conclusions on liability entitle the United States to penalties under the FCA regardless of whether they also prove actual damages. The Supreme Court has confirmed that penalties may be awarded under the FCA even if the government discovered the fraud in time to withhold payment and suffered no damage. *See Rex Trailer Co. v. United States*, 350 U.S. 148, 152–53 & n.5, (1956) (recognizing that its previous opinion in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) had determined that "there is no requirement, statutory or judicial, that specific damages be shown"); *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995) ("[A] contractor who submits a false claim for payment may still be liable under the FCA for statutory penalties, even if it did not actually induce the government to pay out funds or to suffer any loss . . . . By attaching liability to the claim or demand for payment, the statute encourages contractors to 'turn square corners when they deal with the government.'" (internal citation omitted)); Claire M. Silvia, *The False Claims Act: Fraud Against the Government* § 4:60 (3d 2022 update).

Unfortunately, the United States' request for civil penalties on the false claims is again inextricably intertwined with its discount damages calculations. Dr. Gulley identified 5,316 GSA orders with an overcharge under the FPR Review and 5,270 under the FPR Plus Review. Tr. at 3768:12–14, 3771:3–7 (Gulley). The discrepancy in identified claims is due to the method used to identify those transactions, which relied on comparing the "should have paid" GSA price to the actual GSA price and removing the transactions where the actual GSA sale price was lower than the should-have-paid price, because on many transactions the agencies negotiated a *better* discount than the should-have-paid discount. Findings of Fact, *supra* ¶ 240; *see also* Tr. at 4325:21–4326:5 (Tucker) (explaining that GSA received significant discounts above and beyond its negotiated GSA price on many sales). This creates a problem, because the Court has found as

a matter of law that both datasets were overinclusive for calculating the should-have-paid discount, but it has no way of calculating that discount, and thus no way of determining how many claims were "false."

However, the same conduct underlies the United States' claims under both the presentment and false statements theories of liability.  The United States has naturally asked the Court to assess penalties for each false claim, of which it believes there are many more.  U.S.'s Prop. FF&CL at 125.  But "nothing in the statute requires the court to impose penalties based on the number of false claims under § 3729(a)(1)(A), instead of the number of false statements under § 3729(a)(1)(B)."  *United States v. Saavedra*, 661 F. App'x 37, 45–46 (2d Cir. 2016). Where the same false statements and records underlie the claims at issue, courts have in fact found that separate penalties should not be awarded for both the claims and the statements or records.  *See BMY--Combat Sys. Div. of Harsco Corp. v. United States*, 44 Fed. Cl. 141, 150 n.4 (1998) ("The court also found that plaintiff had submitted false records in support of its false claims, which is a separate violation of the FCA.[]  Such records, however, do not equate to separate penalties when the records and the claim support the same false demand for money.") (citation omitted); *see also United States ex rel. Smith v. Gilbert Realty Co.*, 840 F. Supp. 71, 75 (E.D. Mich. 1993) (declining to impose penalties for each falsely endorsed rent check out of concerns about proportionality and only assessing penalties for the seven false certifications to the housing authority); *but see United States v. Bd. of Educ. of City of Union City*, 697 F. Supp. 167, 176 (D.N.J. 1988) (awarding penalties for both false invoices and false progress reports).

The Court can therefore assess the statutory penalties based on the following false statements which it has concluded violated the FCA:

- The submission of the materially false Frequency Chart during negotiations,

- The failure to disclose Symantec's rebating policies during negotiations,

- The original GSA pricelist, which transmitted the falsely inflated prices, and

- Each of the eighteen modification requests in the record which claimed the CSPs had not changed. *See* U.S. Exs. 206, 211, 214, 216, 219, 220, 222, 224, 233, 234, 239, 242, 243; Dxs. 33, 34, 39, 44, 47.

The FCA imposes a penalty between $5,000 and $11,000 for each false claim or statement. *See* 31 U.S.C. § 3729(a)(1)(G); Civil Monetary Penalties Inflation Adjustment, 64 F.R. 47,099-01, 47,104 (1999) (adjusting the FCA penalties to a maximum of $11,000). "The determination of the amount of the statutory civil penalties rests within the discretion of the district court." *United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 501 F. Supp. 2d 51, 56 (D.D.C. 2007). Although there is no statutorily defined list of criteria to consider when assessing penalties, courts "consider[] the totality of the circumstances, including such factors as the seriousness of the misconduct, the scienter of the defendants, and the amount of damages suffered by the United States as a result of the misconduct." *Id.*

The Court determines that civil penalties for the false statements and records related to the negotiations—the Frequency Chart, the omission of the Rebate Program disclosures, and the initially inflated GSA pricelist—should be assessed at the maximum of the statutory range. The Court has already determined that Bradbury's actions were committed with a minimum of reckless disregard, but that the information available to her was suggestive that she may have had actual knowledge. Moreover, those misrepresentations infected the entirety of the contract over the next several years. The Court will therefore award $11,000 in penalties to the United States for each of those statements.

The statements in each of the modifications also warrant maximum penalties because Symantec acted with reckless disregard in certifying that its CSPs had not changed.  In addition, although the United States was not able to prove certain aspects of damages with sufficient precision, it is clear that the government suffered in larger amounts than awarded here.  Courts routinely consider the level of damages to benchmark appropriate penalties, *see, e.g.*, *United Stats v. Krizek*, 111 F.3d 934, 940 (D.C. Cir. 1997) (vacating a civil penalty and damages total of $81 million in part because it was "astronomical" compared to the actual damages), and the Court's ability to do so here is no less for the lack of a precisely proven damages total, *cf. United States v. Honeywell Int'l*, No. 08-cv-0961, 2021 WL 2493382, at *8 (D.D.C. June 18, 2021) (explaining that the court could assign FCA penalties without determining proportion in which each defendant was at fault).  Awarding the maximum amount of penalties per false statement also promotes deterrence of similar conduct in the future.  *See Stevens*, 529 U.S. at 785 (explaining the purpose of the FCA's civil penalty and treble damages provisions to "punish past, and to deter future, unlawful conduct" (citation omitted)); *Miller,* 501 F. Supp. 2d at 57 ("[T]he court would be remiss if it did not consider the nature of these penalties as deterrents to future conduct from entities in similar situations to the defendants in this case.").   Accordingly, the Court will assess a penalty of $11,000 for each of those statements in the modifications, for a total of $198,000.  The grand total in penalties is therefore $231,000, bringing the total judgment in favor of the United States on its FCA claims to $1,299,950.16.

### B. United States' Common Law Claims

#### 1. Negligent Misrepresentation (Count VI)

As explained above, the Court will apply the following elements of the negligent misrepresentation claim drawn from the Second Restatement: 1) a duty to exercise reasonable

care or competence in obtaining or communicating information and 2) a misrepresentation of that information, where 3) the defendant understood the plaintiff would rely upon the information and 4) the plaintiff actually and justifiably relied upon the information, 5) resulting in harm to the plaintiff. Many of these elements, and the parties' arguments on them, overlap with the previous analysis.

The Court previously granted partial summary judgment to the United States on portions of the duty element: the "duty to disclose CSPs generally [and] duties under the Modifications Clause," but found disputes of material fact on others: "duties under the PRC [and] some more specific CSP disclosure duties." *MSJ Mem. Op.* 471 F. Supp. 3d at 299. The Court concludes now, consistent with its analysis on the FCA claims, that Symantec had a duty to disclose commercial sales that violated the PRC and to offer a corresponding discount to GSA. It also had a duty, as has already been held, to ensure that its CSP disclosures were accurate and complete and to accurately certify any changes to the company's commercial sales practices when submitting modifications.

The "misrepresentation" prong overlaps with the falsity analysis of the FCA claims. Consistent with the Court's conclusions there, it holds that Symantec misrepresented its commercial sales practices through the inaccurate Frequency Chart, the lack of rebate disclosures, the sales estimate, and the Rewards program; and Symantec misrepresented that those CSPs remained accurate and current with each successive modification under the Modifications Clause. But Symantec's non-standard discounting policy disclosure (which provided a vague description of eSPA) was not false, and therefore not a misrepresentation. With respect to the PRC, Symantec's silence in the face of its affirmative duty to notify GSA of price reductions was also a misrepresentation. But because that duty arose from the contract

itself, and Symantec's interpretation of that term in the contract was objectively reasonable, the scope of liability for the negligent misrepresentation claim is similarly cabined by Symantec's interpretation of that contract.  *See* Restatement (Second) of Torts § 552, Comment (e) (explaining that a defendant in a negligent misrepresentation action "is subject to liability if, but only if, he has failed to exercise the care or competence of a reasonable man in obtaining or communicating the information."); *see, e.g.*, *Burlington Ins. Co. v. Okie Dokie*, 398 F. Supp. 2d 147, 154 (D.D.C. 2005) (denying plaintiff's motion for summary judgment on negligent misrepresentation claim for failure to show that the alleged misrepresentation was made in violation of the duty to exercise reasonable care).

There is sufficient evidence that Symantec understood that GSA would rely on that information.  For the CSP disclosures, Bradbury was well aware of the central role that CSPs played in the negotiations, including her representations about non-standard discounts and rebates.  Tr. at 2094:19–2095:5 (Bradbury); *id.* at 1592:17–18.  Symantec understood that GSA expected compliance with the PRC reporting requirements and relied on Symantec's silence or representations in that respect, as demonstrated by internal emails during that time period.  For example, internal emails cautioning against certain non-standard discounts repeatedly invoked the PRC.  Findings of Fact, *supra* ¶ 180.

The requirement that the plaintiff actually have relied upon the information overlaps somewhat with the causation and materiality standards.  Consistent with the prior analysis, Symantec's misrepresentations with respect to the Frequency Chart and Rebate programs (but not the Rewards program or the sales estimate) were the actual, but-for causes of inducing GSA to enter the contract under the terms it did.  Molina credibly testified that she relied on Symantec's representations that the CSPs had not changed, Tr. at 3236:22–3637:2 (Molina), and

her internal memoranda approving modifications in some instances explicitly stated the same, *see* U.S. Exs. 231, 245; *see also* Tr. at 2857:21–24 (Morrison) (testifying that GSA contracting officers "absolutely" rely on the truthfulness of certifications that CSPs had not changed).  GSA also relied on Symantec's representations, or lack thereof, regarding the PRC and would even take action to request a discount if it learned through other means that a basis of award customer received a better discount.  *See* Tr. at 2174:14–2175:5 (Bradbury) (explaining that because state sales were "publicly available," if GSA discovered that "the price is lower and their volume is less than GSA, then GSA is going to ask me for a price reduction"); U.S. Ex. 1154 (email from Reinhardt expressing concerns about a proposed state sale discount because "I know GSA will call, put us through an audit and pay back fees for the difference").

The plaintiff must also have justifiably relied on the misrepresentation.  "Cases applying the Restatement make clear that a party cannot have 'justifiably relied' on any misrepresentation if it knew, or had reason to know, that the representation was false."  *Mei Ling*, 2018 WL 3814498, at *32 (collecting cases).  GSA was clearly justified in relying on Symantec's CSP disclosures; after all, Bradbury was already experienced in negotiating and administering the Veritas GSA contract and the new contract combined the Veritas and Symantec products in a single contract.  Tr. at 2037:7–18, 2104:4–7 (Bradbury).  There is no evidence suggesting that GSA had reason to know that the relevant CSP disclosures or modification certifications were false.[29]  On the contrary, Dixon sought additional information and clarification as needed until she felt comfortable finalizing the contract.  *See* U.S. Ex. 64 (writing to delay the November

---

[29] One potential exception to this is the modified sales estimate, which arguably should have at least prompted Dixon to inquire further.  But because that particular misrepresentation was not material or actually relied on by Dixon in awarding the contract, it does not matter whether she would have been justified in relying on it.

2006 meeting because "[t]here are a lot of issues that need clarification and correction"); Tr. at 1144:16–1147:5 (Reinhardt) (recalling that the November 2006 meeting included a lengthy discussion of the pricelists and the buying programs). As for the PRC, Molina did observe what she believed to be potential one-off PRC violations in 2011 and did not decline to pay any invoices at that time because of the upcoming audit. U.S. Ex. 106. This single instance, which occurred near the end of the contract term when an audit was already scheduled, does not suggest that Molina had reason to know that Symantec was not complying with its PRC disclosure obligations.

Symantec's misrepresentations likely resulted in harm to GSA. Specifically, as described above, those misrepresentations induced GSA to enter the contract at higher prices and continue paying claims under the contract at higher prices despite its entitlement to price reductions under both the PRC and CSPs. According to the Second Restatement, "[t]he damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause," which includes "the difference between the value of what he has received in the transaction and its purchase price or other value given for it" or "pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation." Restatement (Second) of Torts § 552B (1977). Unlike the FCA, negligent misrepresentation does not provide "benefit-of-the-bargain" damages. *Id.* § 552B(2).

Damages for the lack of rebates disclosures is duplicative of the damages the Court calculated under the FCA and subsumed in that amount. The question remains, however, of whether the precision for calculating damages under common law claims like negligent misrepresentation is less demanding than under the FCA, and whether the United States could therefore recover for PRC and CSP damages under its negligent misrepresentation theory. Cases

applying § 552B of the Restatement suggest that reasonable certainty is also required in order to award damages for negligent misrepresentation.  *See Alta Health Strategies, Inc. v. CCI Mech. Serv.*, 930 P.2d 280, 286 (Utah Ct. App. 1996) (stating that "[a]lthough such damages may not be determined by speculation, they also need not be precisely determined" when discussing Restatement (Second) of Torts § 552B); *W. Cities Broad., Inc. v. Schueller*, 830 P.2d 1074, 1078 (Colo. App. 1991), *aff'd*, 849 P.2d 44 (Colo. 1993) (noting that the state follows § 552 and determining that the issue should not have been submitted to the jury because there was no "legally sufficient evidence to support any rational determination of the value of the leasehold" or "any other quantifiable monetary costs, expenses, or losses").

As explained above, the United States has failed to present sufficient evidence from which the Court can calculate with reasonable certainty the amount of damages that were proximately caused by Symantec's negligent misrepresentations (other than the rebates disclosures).  Indeed, Dr. Gulley's analysis does not even attempt to quantify what the difference in GSA's payments would have been had the CSPs been accurate and complete.  Moreover, the potential PRC-triggering transactions collected in the FPR Plus Review are overbroad and lacking in sufficient detail that would allow the Court to make a determination of whether they would have constituted a price reduction.  Without at least some guidelines to make that determination, any determination the Court could make in that respect would be grounded in little more than speculation.  Accordingly, the United States' negligent misrepresentation claim fails on the essential element of damages.

### 2. Breach of Contract (Count VII)

Under federal common law, the elements of a breach of contract claim are "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of

that duty; and (4) damages caused by the breach." *Red Lake Band of Chippewa Indians*, 624 F.

Supp. 2d at 12 (collecting cases).  With respect to the fourth element, "[o]nly once Plaintiff has

proven that it in fact suffered a loss (i.e., suffered damages), such that Defendants are liable for a

breach of contract claim, does the Court move to the next stage—i.e., the damages determination

stage." *Id.*  Therefore, "a plaintiff need only show that 'responsibility for damages is clear,' not

that 'the amount thereof be ascertainable with absolute exactness or mathematical precision.'"

*Id.* (citations omitted).

i. Duty and Breach

The Court previously granted summary judgment for the United States on the validity of

the contract, the duties relating to the Modifications Clause, and the general disclosure of the

CSPs.  *MSJ Mem. Op.* 471 F. Supp. 3d at 280, 282, 294.  Symantec breached those duties.  The

Frequency Chart and the lack of information about the Rebate Program made the CSP

disclosures both inaccurate and incomplete.  *See* Findings of Fact, *supra* ¶¶ 68–81; Tr. at

1600:9–1601:5 (Bradbury) (admitting that a rebate deviating from standard discounting practices

needed to be disclosed as part of the CSPs).[30]

Based on its interpretation of the contract following the presentation of evidence, the

Court also concludes that Symantec had a duty arising from the PRC to report and explain "all

price reductions to the customer (or category of customers) that was the basis of award," GSAM

§ 552.238-75(b), which for the Symantec GSA contract was the commercial (nongovernmental)

class of customers.  Symantec likewise had a duty to give a price reduction to GSA in the three

---

[30] Norton argues that the United States is estopped from claiming damages based on the failure to disclose rebates and Rewards pricing based on Dixon's representations that GSA was not interested in them.  Norton's Resp. at 33–34.  The Court disagrees that Dixon did make that representation with respect to the rebate program and finds that the Rewards Program disclosures were not material in any event.  It therefore need not address this argument.

identified situations, including where more favorable discounts to the commercial class of customers than were contained in the CSPs were provided or when discounts were offered to commercial customers that disturbed the price-discount relationship found in the Discount Relationship Chart, unless an exception applies.  *Id.* § 552.238-75(c)(1)(i)–(iii); (d).

As noted above, however, Symantec's reasonable interpretation of the contract excluded non-standard discounts approved in eSPA under different terms and conditions.  That was a reasonable interpretation of the ambiguous language "under similar terms and conditions" added in the closure.  Norton argues that the contract should therefore be construed against the drafter, in this case GSA.  Norton's Prop. Fed. FF&CL at 92; *Turner Const. Co. v. United States*, 367 F.3d 1319, 1321 (Fed. Cir. 2004) ("When a dispute arises as to the interpretation of a contract and the contractor's interpretation of the contract is reasonable, we apply the rule of *contra proferentem*, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document."); *see also id.* ("[W]here a government contract contains latent ambiguity, the court will construe the ambiguous term against the government as drafter of the contract, provided that the contractor's interpretation was reasonable and the contractor relied on that interpretation when preparing its bid."  (citing *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1355–56 (Fed. Cir. 2002))).  However, the United States correctly notes that while the vast majority of the terms in the contract were form language drafted by GSA, this one was not—it was negotiated between the parties and added at Symantec's request.  U.S.'s Resp. at 20; *see* Tr. at 1864:1–3 (Bradbury) (testifying that she proposed the change because "there's no way that we could certify that [GSA was] getting the best discount to any commercial customers . . . . we have eSPA . . . . We can't agree to that").  "[W]hen the contract terms are negotiated, *contra proferentem* is inapplicable."

*Cray Rsch., Inc. v. United States*, 44 Fed. Cl. 327, 330 (1999).  Accordingly, the Court declines to apply that doctrine here.

Although it was sufficient for the purpose of the FCA scienter analysis to determine that Symantec's contemporaneous interpretation was reasonable, for the breach of contract claim the Court must therefore take the additional step of determining whether its interpretation was, in fact, the correct one.  *See Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (explaining that the doctrine of *contra proferentem* "is a rule of last resort" relied on only where the ambiguous term cannot be determined from the text and circumstances). Both the text and the extrinsic evidence support Norton's interpretation of that phrase in the closure.  The phrase "similar terms and conditions" should be construed to mean something, and it is not clear what, if anything, it would mean under the United States' interpretation.  GSA's 30(b)(6) witness similarly understood that language to mean that "one would have to compare the terms and conditions of a commercial sale to the terms and conditions of the GSA sale to determine if they're comparable for price reduction clause purposes."  JX001 at 214:2–11. Bradbury's testimony about the reason for adding the phrase was credible and in fact quite logical, as it would have been unrealistic to expect that either party could keep pace with price reductions for every non-standard discount under the threshold.  Dixon also testified that she did not remember the changes to the Final FPR and had no basis to agree or disagree with Bradbury's recollection in that respect.  Tr. at 3209:5–8 (Dixon).  And Symantec's actions throughout the life of the contract reflected that understanding and its limitations.  Findings of Fact, *supra* ¶ 179.

The Court therefore determines that Symantec's contemporaneous understanding of its PRC duties was in fact the correct one as a matter of law.  Nevertheless, as explained above,

Symantec breached the PRC clause in at least some instances even under that understanding. The FPR Plus dataset contains numerous transactions giving deep discounts on orders under $100,000 for reasons that were inconsistent with the disclosures made to GSA and no meaningfully different terms, such as to fit a customer's budget.

ii. Causation & Damages

The breach of the CSP obligations more likely than not induced GSA to contract with Symantec at a higher price than it otherwise would have, satisfying the but-for causation element for the breach of contract claim just as it did for the fraudulent inducement theory. Dixon actively sought to understand how the proposed GSA prices compared to other customers' prices and pressed for better discounts as a result. *See* Tr. at 2134:6–18 (Bradbury) ("[W]e were going over pricing and starting to break out the different price lists . . . if there were volume discounts based on zero to 1 or, you know, zero to 10 or 11 to – whatever . . . . [W]e had put in a proposed GSA discount and calculated the GSA price and then compared it, showed her how it compared to the other price lists."); *id.* at 1144:16–1147:5 (Reinhardt) (recalling that the November 2006 meeting included a lengthy discussion of the pricelists and the buying programs).

Yet again, the United States comes up short on proving damages as a result of the CSP disclosure violations.[31] Even if the negotiated GSA discount would have been some amount less, there is no evidence whatsoever of how much less. Dr. Gulley's damages calculations only calculate the discounts it believes GSA was entitled to as a result of the alleged PRC triggers, and it does not offer a theory for how much the original discounts would have differed. Both the FCA and common law breach of contract place the burden of proving damages with "reasonable certainty" on the plaintiff. *See SAIC*, 958 F. Supp. 2d at 77–78 ("Under the FCA, the

---

[31] Any damages as a result of the improper rebates disclosures are, again, subsumed in the Court's damages determination under the FCA.

government bears the burden of presenting sufficient evidence to allow the [fact finder] to determine the amount of damages it is owed," which "must be proven with reasonable certainty" and "cannot be based on speculation or guesswork" (citations and quotations omitted)); *Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554, 572 (Ct. Cl. 1966) ("[I]t is not essential that the amount of damages be ascertainable with absolute exactness or mathematical precision . . . . It is enough *if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation*." (emphasis added)).  Those standards are not meaningfully different, therefore the Court concludes that the same analysis for the CSP damages under the FCA applies with equal force to the breach of contract claim.

The analysis with respect to the PRC damages is also the same as for the previous counts.  At least some of the non-standard discounts offered to commercial customers violated even Symantec's reasonable construction of the PRC, entitling GSA to a similar discount and resulting in damages to GSA in the form of discounts it should have received but did not.  Had Symantec fulfilled its obligations, GSA would have demanded those price reductions and paid less for the products it received.  Again, "a plaintiff need only show that 'responsibility for damages is clear,' not that 'the amount thereof be ascertainable with absolute exactness or mathematical precision.'"  *Red Lake Band of Chippewa Indians*, 624 F. Supp. 2d at 12 (citations omitted).  The line between mathematical precision and reasonable certainty is a blurry one, and this case falls right in that ambiguous zone.  Had the Court agreed with the legal underpinnings of the FPR Plus dataset, Dr. Gulley's analysis would have largely withstood criticism as a reasonably certain calculation of damages, and even more so along with some of the adjustments suggested by Mr. Tucker.  But because the Court only agrees with some, not all, of the transactions in that dataset, the rest of the damages analysis unravels.  Any attempt by the Court to weave it back together

would be hopelessly imprecise, nor could the Court say with reasonable certainty that it was an accurate reflection of damages.

### C.  California's Claims

#### 1. False Claims and False Records and Statements in Violation of the California False Claims Act (Counts X and XI)[32]

The state of California also presented its case on two counts for false claims and false statements under the California False Claims Act ("CFCA").  The CFCA was modeled after the federal FCA, making federal decisions "persuasive authority" in adjudicating CFCA claims.  *See Shasta Servs.*, 440 F. Supp. 2d at 1111; *MSJ Mem. Op.*, 471 F. Supp. 3d at 310.  Like the federal FCA, the CFCA creates liability for "[a]ny person who . . . (1) [k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval . . . [or] (2) [k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."  Cal. Gov't Code § 12651(a)(1), (2).  The CFCA was "designed to prevent fraud on the public treasury" and "should be given the broadest possible construction consistent with that purpose."  *City of Pomona v. Superior Ct.*, 89 Cal. App. 4th 793, 801 (2001), as modified (June 29, 2001) (quotations and citation omitted).

There are two California buying programs at issue: the CMAS program and the SLP program.  The CMAS program allowed resellers to sell products on an existing GSA schedule, identified as the "base GSA contract," from which state agencies can purchase directly up to a certain threshold.  Finding of Fact, *supra* ¶¶ 256–57.  Because CMAS contracts are based on

---

[32] Norton likewise moved for judgment at the close of California's case on the same basis as it had challenged the United States' case, as well as the purported lack of evidence with respect to the false claims submitted to California and the reliance of California's damages expert on Dr. Gulley's work.  *See* Def. NortonLifeLock Inc.'s Mot. J. Pursuant R. 52(c), ECF No. 299.  As explained in this section, the Court disagrees that California failed to present evidence in support of each of its claims and will deny that motion.

GSA pricing, they are not competitively bid, and DGS does not do its own assessment of the offered CMAS pricing.  *Id.* ¶ 260.  In order to sell Symantec products on a CMAS contract, the resellers needed a Letter of Authorization provided by Symantec.  *Id.* ¶ 262.  Symantec understood how CMAS worked and that CMAS pricing was equal to GSA pricing.  *Id.* ¶ 263; U.S. Ex. 696 (noting that CMAS is one of the state programs that "reference our GSA pricing"); U.S. Ex. 1465 (noting in an internal email that "[t]he California CMAS is based on our GSA pricing and T's and C's").

The SLP Program, on the other hand, was a specialized program in which DGS negotiated more aggressive discounts and terms and conditions directly with software manufacturers.  Findings of Fact, *supra* ¶¶ 264–65.  The baseline for those negotiations was the GSA price, which the negotiator, Lower, verified on GSA Advantage!.  *Id.* ¶¶ 264–66; Tr. at 3981:20–24 (Lower).  After DGS and Symantec agreed on SLP discount levels, Symantec provided DGS with a Letter of Offer which memorialized their negotiations and provided a list of the Symantec-approved resellers.  Findings of Fact, *supra* ¶ 267.

Under California's theory, Symantec knowingly made false statements to GSA and DGS, which were material to DGS's decision to enter into CMAS and SLP contracts for Symantec products with various resellers and caused the submission of false claims by those resellers.  Cal.'s Prop. FF&CL at 16, ¶ 4.  Although California groups its arguments for both the CMAS and SLP programs together, there are significant differences between the two, and the Court addresses each in turn.

### a. CMAS Program

The same legal falsities that infected Symantec's own GSA contract also impacted the CMAS contracts.  As described in the Court's Conclusions of Law for the United States' claims, there were numerous falsities in the original CSPs (the Frequency Chart and Rebate program

disclosures[33]) and Symantec's implied certification with the PRC and Modifications Clause were false. California argues that as a result, Symantec's published GSA pricelist on the GSA Advantage! website was falsely inflated. Cal.'s Prop. FF&CL at 17, ¶ 6. The Court agrees for the same reasons that it determined that Symantec's GSA contract was fraudulently induced.

Those falsely inflated prices were clearly material to the CMAS contracts—they were the entire basis of those contracts. CMAS contracts only needed to identify a base GSA contract, without further investigating or evaluating the fairness of those prices. *See* Tr. at 3962:17–19 (Smith) ("The -- pricing was competitively assessed through the federal government, and they felt that the feds did their job well, so they relied on the -- the GSA contracts."); *id.* at 4083:20– 25 ("We don't, you know, verify anything other than that it's a current GSA, that we can find it on -- on the GSA eLibrary. We look at it because we use the minimum order in the federal GSA as the minimum order for the CMAS, but that's, basically, the extent that we look at the -- the GSA contract."). It does not matter that DGS never requested or consulted the CSPs when negotiating CMAS contracts; the entire point is that it relied on the analysis GSA had already done. Symantec understood this connection as well and knew that California would rely on its GSA pricing for those contracts. Findings of Fact, *supra* ¶ 266; U.S. Ex. 696 (noting that CMAS is one of the state programs that "reference our GSA pricing"); U.S. Ex. 1465 (noting in an internal email that "[t]he California CMAS is based on our GSA pricing and T's and C's"). In fact, Symantec provided Letters of Authorization allowing resellers to sell Symantec products to CMAS. Findings of Fact, *supra* ¶ 262. Smith also credibly testified that had DGS learned that a

---

[33] Although the Rewards Program disclosure and sales estimate were also false, the Court has already determined that they were not material to Symantec's GSA contract, and by extension could not have been material to the CMAS contracts.

given GSA price was based on fraudulent disclosures, DGS would have investigated and, if warranted, terminated the CMAS contract.  Tr. at 4085:2–10 (Smith).

Of course, Symantec itself did not actually hold CMAS contracts directly, thus it is also necessary to show that the GSA pricing caused the resellers to submit false claims in order establish a violation of Cal. Gov't Code § 12651(a)(1).  Cal. Gov't Code § 12651(a)(1) (creating liability for anyone who "[k]nowingly presents *or causes to be presented* a false or fraudulent *claim* for payment or approval." (emphasis added)).  Here, California's case begins to falter. Remember that each of the CMAS contracts identified a "base" GSA contract for its pricing. But a significant number of the CMAS contracts entered into evidence identified a base GSA contract other than Symantec's.  Nine of the CMAS contracts in evidence were entered before January 25, 2007, meaning they could not possibly have been based on Symantec's GSA contract, which was not yet in existence.  *See* Norton's Prop. Cal. FF&CL at 6, ¶ 27 (listing the contracts and corresponding dates); Cal.'s Resp. at 12 (disputing only the relevance of that fact); Tr. at 4130:7–10 (Smith) ("Q. And for those 2006 and earlier CMAS contracts, the base contract in those CMAS contracts would not have been Symantec's 2007 GSA schedule agreement.  A. I don't think so.").  And eleven more of the CMAS contracts (twenty[34] in total) explicitly listed a base GSA contract other than Symantec's.  *See* Norton's Prop. Cal. FF&CL at 7, ¶ 29 (listing the contracts and corresponding base contracts); Cal.'s Resp. at 12–13 (disputing only the relevance of that fact).

California nonetheless argues that "[b]ecause Symantec made continuous modifications to its GSA contracts, it was possible for a CMAS state purchaser to buy a Symantec product that

---

[34] Norton states that there are nineteen in total, but apparently failed to include one of the CMAS contracts that predated Symantec's GSA contracts, Cal. Ex. 289, on the second chart.  *Compare* Norton's Prop. Cal. FF&CL ¶ 27, *with id.* ¶ 29.

was connected to Symantec's 2007 GSA schedule even if that CMAS contract (or the corresponding base GSA contract) was entered into before the effective date of Symantec's GSA contract." Cal.'s Resp. at 11. As Smith explained, a California agency could buy through a CMAS contract as long as the product still appeared on the GSA Advantage! website, and thus the CMAS contracts updated automatically whenever the base GSA contract updated. Tr. at 4124:4–20 (Smith).

Still, that does not mean that the relevant base contract pricing was always the same as *Symantec's* GSA contract pricing. California does not robustly argue otherwise, instead relying on Symantec's purported control of pricing on reseller GSA contracts, which the Court has already rejected as insufficiently grounded in the evidence. *See* Cal.'s Resp. at 36. The contracts might have been modified or the base contract pricing might have been updated to match Symantec's GSA contract, but what might have happened is not a substitute for evidentiary proof, and there is no hard evidence to suggest that occurred. The Court therefore holds that any liability for indirect presentment under the CFCA must be limited to the CMAS contracts where the 2007 Symantec GSA contract was the identified base contract: Cal. Exs. 028, 243, 255A, 258A, 259A, 260A, 262A, 394, 396, 426, 432, 435, 446.

*b. SLP Program*

California's SLP program was designed to negotiate better pricing than GSA, and California's theory here is that it would have achieved marginally better prices had it been starting from the "correct" GSA price. California also claims that Symantec made a false statement to Lower during the SLP negotiations when it specifically affirmed that the GSA price was Symantec's best. Cal.'s Prop. FF&CL at 17, ¶ 7.

Symantec takes issue with California's theory as "resting on a single hearsay statement" that contradicts Lower's other testimony and the record. Norton's Cal. Resp. at 7. Specifically,

it notes that Lower admitted in his 30(b)(6) deposition that he had no "real specific memories" of what he considered in his SLP negotiations with Symantec. *Id.* at 8 (quoting JX002 at 70:8–71:2). Norton also argues that the record lacks necessary evidence about the timing of the statement or the role of the primary negotiator for Symantec identified by Lower, Troy Kallas. *Id.* Lower mentioned working with multiple Symantec employees in addition to Kallas, Tr. at 3980:20–25, and there is independent evidence that Kallas was a Symantec employee with knowledge of the California SLP negotiations. *See* U.S. Ex. 1731 (email chain between Kallas and Barton discussing the SLP discounts).

The Court finds Lower's assertion that Symantec told him GSA pricing was its best pricing to be minimally probative. Lower could remember that representation generally without remembering specifically what he relied on in any given negotiation, thus the Court does not perceive any serious inconsistency with his deposition testimony. Nevertheless, it is not entirely apparent to the Court that Lower in fact understood the statement to mean the best price inclusive of non-standard discounts or other channel discounts—after all, he must have understood that the resellers had an additional margin beyond the GSA price. In fact, Lower's testimony is ambiguous on this point. *See* Tr. at 3981:4–9 (Lower) ("[F]irst I asked for the best price, as I do with every publisher. GSA was their best price. I said, 'Well, I want pricing better than GSA.'"). It also seems likely that this recollection was shaped by Lower's memories of how manufacturer negotiations progressed as a typical matter. *See* Tr. at 3979:9–12 (Lower) ("[F]irst, I'd ask each publisher, give me your best price. And, of course, they gave me GSA, and I worked from GSA to try -- to get more aggressive pricing . . . .").

Norton also takes issue—understandably—with the fact that California did not mention this particular misrepresentation by Kallas in its Complaint, response to relevant interrogatories,

175

summary judgment briefing, or Joint Pretrial Statement.  Norton's Cal. Resp. at 9–10; *see also* Omnibus Compl. at 78–81, ¶¶ 344–61; Joint Pretrial Statement at 7; DX 321 (responding to interrogatory 18, which asks California to "[i]dentify each false statement you allege Symantec made that were material to false claims made to California").  Although California has steadfastly claimed throughout this litigation that GSA pricing was the basis of its SLP negotiations, the Court agrees that it is highly problematic for California to place such significant weight on a previously undisclosed statement by someone who was never a witness or apparently even identified as one.  *See* DX 321 at 5–6 (identifying potential witnesses).  And as the Court previously cautioned the parties, "Plaintiffs are . . . limited to the claims identified in the pretrial statement."  *MIL Mem. Op.*, 567 F. Supp. 3d at 268 (citation omitted).  Altogether, the Court is skeptical that California has proven this statement independently violated the false statements provision of the CFCA, and it is barred from pursuing that theory as an independent basis of liability now in any event.

Still, Symantec's GSA pricing, which was falsely inflated, was material to the SLP negotiations.  Lower credibly testified that he compared the offered discounts to the GSA price on GSA Advantage! when evaluating Symantec's offers.  Tr. at 3964:1–11 (Lower).  The fact that the eventual SLP discounts were negotiated off of Symantec's Academic and Government pricelists rather than its GSA pricelist does not weaken the link between GSA and SLP pricing.  *See, e.g.*, Cal. Ex. 24 at CAGO008060; Cal. Ex. 244 at CAGO008057; Cal. Ex. 297 at CAGO038852.  The GSA discounts were also calculated off of commercial and government MSRP, so using the government pricelist as the basis for the SLP discounts lends itself to a natural comparison between the two.

But again, any falsities inherent in Symantec's GSA contract are only actionable if Symantec "presented or caused to be presented a false or fraudulent claim." Cal. Gov't Code § 12651(a)(1). Because Symantec was not a signatory to any SLP contracts, this theory requires California to prove that Symantec caused its resellers to submit false claims through the SLP program. Unlike the CMAS program, where CMAS pricing was identical to and explicitly tied to Symantec's GSA contract, the SLP contracts had different pricing and terms.

There is evidence that some of the SLP Letters of Offer negotiated with Symantec either matched or exceeded GSA discounts, in addition to other terms and conditions. U.S. Ex. 1069 (discussing an SLP offer that matched GSA discounts); Tr. at 2014:4–7 (Bradbury) (confirming that "the SLP letter you ultimately negotiated with the State of California in late 2009 held the line on GSA discounts"); U.S. Ex. 1154 (expressing concern in a 2010 email that the proposed SLP discount of 50% for orders over $150,000 would negatively impact the GSA contract). This is consistent with Lower's testimony that he evaluated whether an offer was more favorable as a whole. In his words:

> I evaluated a package based on the whole complete package. So there could be -- maintenance could be -- there could be a commitment for maintenance for three years for one. There could be volume discounts. That's another factor I -- I -- I factored into my decisions. And also 0 percent on maintenance renewals, which was real big too. I would factor in making my decisions whether it was a better deal total. So it was a complete package that I would look at before I made a decision on whether we should go forward.
> Q. Could it be possible in your negotiations that the pricing on actual products might stay the same but you got these other discounts that made the overall package more attractive to California?
> A. Absolutely.

Tr. at 3982:4–18 (Lower).

What is not clear, based on this same evidence, is whether the GSA contract was an actual and proximate cause of the resellers' claims under the SLP program. Even though the

GSA prices were a relevant starting point for negotiations, each SLP Letter of Offer varied, and did not necessarily mirror the GSA discounts.  Because Lower evaluated the entire package and made additional commitments such as minimum purchases and multi-year commitments, there were other aspects of the overall negotiation that affected the final agreement.  The SLP Letters of Offer also specified that the ordering entities would "be responsible for independently negotiating their final price with their Authorized Resellers," which could be more advantageous based on the unique circumstances of each deal.  *See* Cal. 244.  And although Lower checked the prices for Symantec's products on GSA Advantage!, he conceded that he looked for the product generally rather than whether it was listed on *Symantec's* GSA contract.  Tr. at 4051:2–4 ("I would have relied on whatever products were on GSA.  Didn't have to be off of their contract.  Could have been on another contract.").

In addition, one of the SLP letters of offer predated the Symantec GSA contract, making it impossible for Symantec's misrepresentations with respect to its GSA contract to have influenced DGS's decision to accept the pricing on that contract.  *See* Cal. Ex. 239.  And there was also a period of time when no SLP contracts were current, meaning no sales could have occurred in that time through the SLP program.  Cal. Ex. 460 (email noting that SLP contract had expired and a new one was being negotiated); Tr. at 4000:2–4 (Lower) (confirming that DGS was the customer referred to in the email).

Because California's claims are indirect presentment claims, they require a showing "that the defendant's conduct was 'at least a substantial factor in causing, if not the but-for cause of, submission of false claims.'"  *Toyobo Co.*, 811 F. Supp. 2d at 48 (quoting *Miller v. Holzmann*, 563 F. Supp. 2d at 119 n. 95).  The connection between the public GSA prices for Symantec products was undoubtedly a factor in the SLP negotiations, but the Court cannot say it was more

likely than not that it was a substantial factor in the eventual submission of claims.  The connection between the publicly available information, the individualized negotiations, the additional reseller contracts and negotiations, and eventual claims is simply too tenuous.

Accordingly, the Court finds that California has met its burden with respect to the CMAS contracts that relied on the 2007 Symantec GSA contract as a base contract, but it has not met its burden with respect to the SLP contracts.

### 2. Penalties and Damages

#### a. Existence of Claims

California has met its burden of proving by a preponderance of the evidence that claims were submitted.  The Court agrees with California that the absence of specific purchase orders and invoices are not always required so long as the existence of a claim can be proven by circumstantial evidence.  *See United States ex rel. El-Amin v. George Washington Univ.*, 522 F. Supp. 2d 135, 141–42 (D.D.C. 2007) ("While it is evident the FCA requires Relators to prove the existence of 'a false or fraudulent claim,' 31 U.S.C. § 3729(a), nothing in the language of the FCA requires Relators to possess (and present to the factfinder) the actual claim form, whether it be paper or electronic, submitted to the government."); *United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 740–41 (N.D. Ill. 2007) (upholding jury's determination of the number of claims based on witness testimony even though the forms were not moved into evidence).  The case Norton relies on, *United States ex rel. Booker v. Pfizer, Inc.*, granted summary judgment to the defendants because "relators' only proffered evidence of actual false claims was aggregate data reflecting the amount of money expended by Medicaid for . . . an off-label use" based on third-party survey data.  847 F.3d 52, 58 (1st Cir. 2017).  California's evidence is far more specific than that.  It includes thousands of sales from Symantec's own data

that were sold to California agency end-users and were coded either "CMAS," "SLP," or "CMAS/SLP."  Cal. Ex. 1000.

Most of Norton's protestations with respect to the sales data fall short.  It argues that the sales data does not show "(1) that there definitively was—in fact—a sale to that end-user; (2) of the actual sale price paid by the California end-user to the independent reseller or distributor; (3) of the date the actual sale, if it occurred, took place; and (4) the California state purchasing program, if any, that was the utilized for the sale, if it occurred (nor, for those resellers with multiple CMAS and/or SLP contracts, under which of their contracts the sale was made, if any)."  Norton's Prop. Cal. FF&CL at 22 n.4.  The Court finds it more likely than not—indeed, highly certain—that the end user tracked in Symantec's own sales data was the actual end user, particularly since the corresponding delivery information also appears in the spreadsheet.  The spreadsheet does include the order date, which is sufficiently specific for determining when the claim occurred.  The lack of an actual sale price is relevant to damages, but not for the purpose of determining whether a claim existed.

The biggest problem is the inability to link each sale in the data to a particular SLP or CMAS contract, because the Court has already held that not all those contracts give rise to liability.  Any liability for indirect presentment under the CFCA must be limited to claims under CMAS contracts for which the 2007 Symantec GSA contract was the identified base contract.  That information could have been determined by using the procurement agreement number on the purchase order to locate the underlying procurement agreement.  That would then in turn indicate the GSA base contract it was tied to for the CMAS contracts.  Tr. 4135:17–23 (Smith).  Without those purchase orders, it is not clear which sales were made pursuant to the actionable contracts and which were not.  Similarly, it would indicate whether the sale was made

competitively rather than through SLP or CMAS, which occurred on at least one occasion. *Id.* at 4136:1–4137:9 (agreeing that the purchase order Cal. 68 was made competitively and not through a leveraged buying program).

Nonetheless, the sheer volume of transactions in the sales data makes it inevitable that at least some claims were filed pursuant to the CMAS contracts that were tainted by Symantec's inflated GSA pricing. For example, there are over 1,000 line items in the OMM sales data exclusively labeled "CMAS" even after excluding sales labeled "SLP" or "CMAS/SLP." Cal. Ex. 1000. The Court therefore finds it more likely than not that some false claims were submitted.

### b. Damages

The imprecision inherent in determining which sales took place under which contracts could potentially be overcome by the record, such as reducing the number of transactions by the same percentage as the proportion of contracts that the Court believes should have been excluded. But such a workaround would only run into bigger problems down the road. California's damages expert, Dr. Nye, relied heavily on the federal experts' methodology and conclusions, and much of his analysis fails along the same lines. Specifically, Dr. Nye utilized the same "should have paid discounts" calculated by Dr. Gulley for his methods 2 and 3, which the Court has already determined to rely on overinclusive PRC triggers and improper failure to consider the order-level discounts. Those calculations fail to capture the CSP-based damages from the initial fraudulent inducement and the Modifications Clause for the same reasons described above, and the PRC damages are too intertwined with the inflated should-have-paid discounts for the Court to distill a reasonably certain estimate.

Perhaps intuiting the problem with Dr. Gulley's should-have-paid discounts, California suggests an alternative method for calculating damages: that because Bradbury admitted that

Symantec would routinely offer discounts of 70, 80, or 90 percent, that the Court should pick one of those numbers and apply it as the should-have-paid discount.  Cal.'s Prop. FF&CL ¶¶ 85–86.  But such an approach would suffer from the same lack of legal underpinning as Dr. Gulley's discounts in any event, because it does not account for Symantec's reasonable interpretation that excluded sales approved in eSPA with different terms and conditions from the PRC.  The relevant portion of Bradbury's testimony suggests as much.  *See* Tr. at 2276:23–25 (Bradbury) ("I knew commercial customers were using eSPA.  I did not know -- I was not aware of every eSPA transaction or the reason."); *id.* at 2279:1–2 (insisting even after admitting her awareness of the discounts that "[w]e disclosed our eSPA to GSA").

Dr. Nye's first method, which assumed that California should have received Rewards Band E pricing and calculated damages as a result is probably closer, but still lacks a foundation in the record itself.  The Court has already found that any inaccuracies in the Rewards Program disclosures were not material, thus California cannot claim that it would have been entitled to Rewards Band E pricing any more than the United States can.  It is plausible that any incremental increase in the negotiated GSA price as a result of accurate CSP disclosures would have been closer to Rewards Band E pricing than the proposed should-have-paid discounts calculated by Dr. Gulley, but the Court still has no principled evidentiary basis from which to estimate that number.  Without it, any attempt at estimating damages would be pure speculation.  The Court therefore concludes that California has failed to meet its burden for proving damages with reasonable certainty.

### c. Penalties

Like the United States' approach, California's tabulation of its false claims turns entirely on its calculation of damages.  Dr. Nye's calculation of the number of invoices under his versions of the base and banded theories fails for the same reasons.  Unlike Dr. Gulley, Dr. Nye

also calculated Rewards damages as a standalone method.  Findings of Fact, *supra* ¶ 242, *id.*
¶ 275 (explaining that Dr. Gulley attributed his total damages to Rewards or non-standard
discounting only after applying the should-have-paid discounts).  The result is that California,
unlike the United States, presented a separate estimate of the total number of purportedly false
invoices that was not dependent on the should-have-paid discounts: 4,010 invoices, to be exact.
Tr. at 4164:7–12 (Nye).

There was a grand total of 23,614 line items in Dr. Nye's dataset, but only 7,807 orders.
Tr. at 4157:20–4158:7 (Nye).  1,213 of those line items were exclusively and definitively labeled
CMAS sales.  *See* Cal. 1000 (filtering for "CMAS" in the "type" column on the OMM_Data
tab).  The Court excludes from that number the separate renewals tab, which does not indicate
whether any given sale was made through CMAS or SLP, and any line items ambiguously
labeled as pertaining to either CMAS or SLP.  Those 1,213 line items pertained to 351 different
orders (counting the unique number of orders in the ORDER_NUMBER column while the
"type" filter is set to "CMAS").  Because Dr. Nye calculated under his Rewards method that
4,010 of the total 7,807 invoices resulted in damages, the Court can apply that same ratio (.51)[35]
to the number of CMAS-only orders to determine that approximately 179 CMAS invoices
contributed to the Rewards damages.

As explained above, that number is still overinclusive of the transactions that occurred
under reseller CMAS contracts which did not link to Symantec's GSA contract, but there is an
evidentiary basis by which the Court can further adjust that number.  The Court has already
determined that only thirteen of the thirty-three CMAS contracts are a proper source of liability,
and none of the four SLP Letters of Offer.  This is a ratio of 39% of the CMAS contracts.  39%

---

[35] The Court rounds downwards to further compensate for any overinclusion.

of 179 orders is approximately 69 orders.  Admittedly, this is hardly a precise methodology, particularly given that the Court cannot endorse the Rewards calculation of damages for lack of evidentiary proof.  The Court has therefore erred on the side of overcorrecting on other reductions, including eliminating all sales marked "CMAS/SLP" and disregarding renewal transactions, both of which likely contained some qualifying CMAS sales, and rounding downwards at all relevant steps.

The Court will therefore award penalties for 69 false claims.  No specific factors are specified in the CFCA statute, *see* Cal. Gov't Code § 12651(a), so the Court will rely on the discretionary factors articulated for federal FCA penalties, *see Miller*, 501 F. Supp. 2d at 56 ("Though there is no defined set of criteria by which to assess the proper amount of civil penalties against the defendant, the Court finds that an approach considering the totality of the circumstances, including such factors as the seriousness of the misconduct, the scienter of the defendants, and the amount of damages suffered by the United States as a result of the misconduct is the most appropriate.").  The Court believes that the statutory minimum is warranted here.  The falsity in each of these claims stemmed from the initial disclosures, of which the individuals negotiating and authorizing the SLP and CMAS contracts may not even have been aware, leading the Court to conclude that this is not the kind of "brazen" or "intricate" scheme that merits a harsher penalty.  *See id.*  The Court also finds that the maximum penalty would be disproportionate in light of California's failure to prove its actual damages.  *See Advance Tool Co.*, 902 F. Supp. 1018 (recognizing that the proportionality of civil penalties under the FCA can give rise to Eighth Amendment concerns); *Gilbert Realty Co.*, 840 F. Supp. at 74 (same).  It will therefore assess penalties at the statutory minimum of $5,500 for each claim, for a total of $379,500.

As the Court concluded above, the initial GSA pricelist and the subsequent modifications that certified the accuracy of the CSPs were false records material to a false claim within the meaning of Cal. Gov't § 12651(a)(2).  However, those pricelists and modifications also underlie the claims that the Court has assessed penalties for.  It therefore declines to award potentially duplicative penalties for those statements and records as well.  *See BMY—Combat Sys. Div. of Harsco Corp. v. United States*, 44 Fed. Cl. 141, 150 n.4 (1998) ("The court also found that plaintiff had submitted false records in support of its false claims, which is a separate violation of the FCA.  Such records, however, do not equate to separate penalties when the records and the claim support the same false demand for money."); *see also Schwedt*, 59 F.3d at 199 ("Each individual false claim *or* statement triggers the statute's civil penalty." (emphasis added)).[36]

## VI. CONCLUSION

For the foregoing reasons, the Court finds in favor of the United States in part, and awards damages and penalties in the amount of $1,299,950.16.  It further finds in favor of California in part, and awards penalties in the amount of $379,500.  In addition, the Court grants Defendant's Motions to Strike (ECF Nos. 348, 354) and denies Defendant's Motions for

---

[36] Furthermore, the Court notes that it is not clear California could recover penalties for many of those statements.  A prior version of the CFCA limited liability for civil penalties to "each false claim," which the California Court of Appeals had held to preclude penalties for false statements or records instead of false claims.  *See Fassberg Constr. Co. v. Hous. Auth. of City of Los Angeles*, 152 Cal. App. 4th 720, 736–37 (2007), *as modified on denial of reh'g* (June 21, 2007) (holding that the plain meaning of the statute only awarded civil penalties for claims, not statements).  The statute was amended in 2009 and replaced the phrase "for each claim" with "for each violation," making clear that all the enumerated violations in the CFCA triggered liability for penalties.  2009 Cal. Legis. Serv. Ch. 277 (A.B. 1196) (filed October 11, 2009).  Assuming without deciding that the "deeply rooted" "presumption against retroactive legislation" in the face of legislative silence applies here, *see Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 945 (1997), California may not be entitled to penalties for statements that occurred before the effective date of that amendment in any event.

185

Judgment (ECF Nos. 298, 299).  A judgment and order consistent with this opinion will be separately and contemporaneously issued.


Dated:  January 19, 2023                              RUDOLPH CONTRERAS
                                                      United States District Judge