# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA *ex rel.*      :
LORI MORSELL, *et al.*,      :
      :
      Plaintiffs,      :      Civil Action No.:      12-800 (RC)
      :
      v.      :
      :      Re Document Nos.:      364, 365
GEN DIGITAL, INC.      :
(f/k/a SYMANTEC CORPORATION;      :
f/k/a NORTONLIFELOCK INC.),      :
      :
      Defendant.      :

## <u>MEMORANDUM OPINION</u>

### Granting in Part and Denying in Part the United States' Motion to Amend and Supplement the Court's Findings of Fact and Conclusions of Law; Denying California's Motion to Amend and Supplement the Court's Findings of Fact and Conclusions of Law

## I. INTRODUCTION

Relator Lori Morsell brought this *qui tam* action in 2012 alleging that her employer, Symantec,[1] had violated the False Claims Act in connection with a General Services Administration ("GSA") Master Award Schedule ("MAS") contract. At the highest level, the action alleged that Symantec did not appropriately disclose to GSA non-standard discounts and rebates offered to comparator customers, undermining GSA's ability to negotiate favorable pricing. The United States moved to intervene, as did the states of California and Florida, and Morsell elected to pursue claims on behalf of New York. *See* United States' Notice of Election to Intervene, ECF No. 21; Notice of the People of the State of California of Election to Intervene,

---

[1] During the litigation, Symantec's name changed to NortonLifeLock. It has since changed again to Gen Digital. The Court herein refers to Defendant interchangeably as Symantec or Norton.

ECF No. 28; Notice of Election to Intervene by State of Florida, ECF No. 29; Notification that

Relator Intends to Proceed with Action on Behalf of New York State, ECF No. 40.  After

exhaustive litigation, the United States and California[2] proceeded against Symantec to a four-

week bench trial conducted in February and March 2022.  Following the trial, the parties

submitted proposed findings of fact and conclusions of law and related briefing.  Pursuant to

Federal Rule of Civil Procedure 52(a)(1), the Court issued its Findings of Fact and Conclusions

of Law (the "FFCL") on January 19, 2023.  *See United States ex rel. Morsell v. NortonLifeLock,*

*Inc.*, 651 F. Supp. 3d 95 (D.D.C. 2023).  The Court entered partial judgment in favor of the

United States in the amount of $1,229,950.16 in damages and penalties and partial judgment in

favor of California in the amount of $379,500 in penalties.  *Id.* at 108.  The United States now

moves under Federal Rules of Civil Procedure 52(b) and 59(a)(2) to amend and supplement the

FFCL, *see* United States' Mot. Amend and Suppl. Findings Fact & Conc. Law ("U.S.'s Mot."),

ECF No. 364, and California moves separately to join the United States' motion as to

California's claims, *see* State of Cal.'s Mot. Amend and Suppl. Findings Fact & Conc. Law

("Cal.'s Mot."), ECF No. 365.[3]  For the reasons set forth below, the United States' motion is

granted in part and denied in part and California's motion is denied.

---

[2] Prior to trial, Florida and Norton reached an agreement resulting in a stipulated dismissal of Florida's claims with prejudice.  *See* Stipulation of Vol. Dismissal with Prejudice by Florida, ECF No. 267.  At the start of the trial, the parties informed the Court that Morsell and Norton had reached a tentative settlement as to the claims brough on behalf of New York, which Morsell later voluntarily dismissed with prejudice.  *See* Stipulation of Vol. Dismissal with Prejudice, ECF No. 358.

[3] Due to the nature of California's submission, the Court herein focuses principally on the United States' motion, leaving its independent consideration of California's motion for the end.

## II.  FACTUAL BACKGROUND

The Court presumes familiarity with and herein incorporates the background information, including the factual overview, procedural history, and regulatory framework, detailed in the FFCL.  *See Morsell*, 651 F. Supp. 3d at 108–13, 118–21.  While the Court also presumes familiarity with the findings of fact and conclusions of law comprehensively laid out in the FFCL, it briefly reiterates the aspects most relevant here.  The United States brought both False Claims Act ("FCA") and common law claims, but the Court focuses only on the FCA claims, as the United States does not challenge the Court's findings as to the common law claims.  Under the FCA, the United States brought presentment and false statements claims (Counts I & II), indirect presentment claims (Counts III & IV), and concealment, or "reverse" FCA, claims (Count V).  *See* United States', California's, Florida's, & Relator's Omnibus & Restated Compl. in Intervention ¶¶ 248–285, ECF No. 41.

With respect to the presentment and false statements claims, the Court first found that Symantec contemporaneously held an objectively reasonable understanding of the Price Reduction Clause ("PRC") that was "much less comprehensive" than the United States' interpretation.  *Morsell,* 651 F. Supp. 3d at 170–73.  Specifically, the Court recognized as objectively reasonable Symantec's "interpretation that an eSPA approval with different terms and conditions would remove a sale from the scope of the PRC."  *Id.* at 171.  However, the Court found that "Symantec did not believe the eSPA exception to be limitless," so "to the extent that a sale had no eSPA approval at all or had an eSPA that did not provide a meaningful justification, . . . it would have violated the PRC even when accounting for Norton's reasonable interpretation of the contract."  *Id.* at 172–73.  Accordingly, even under this narrower view, the Court found

that Symantec violated the FCA when it knowingly failed to inform GSA about certain transactions that would have triggered the PRC.  *Id.* at 173–78.

The Court next held that Symantec made false Commercial Sales Practice ("CSP") disclosures.  *Id.* at 178.  Specifically, as relevant here, the Court found that Symantec violated the FCA through its submission of the Frequency Chart, which "was held out as a summary of non-published discounts for all Symantec and Veritas products, when in fact it showed all discounts for only Symantec products, making it both over- and under- inclusive," and through its "failure to disclose Symantec's rebate programs," which "further rendered the CSPs false." *Id.* at 178–79.  Relatedly, the Court also found that, under the Modifications Clause,[4] "each subsequent certification asserting that the CSPs had not changed was likewise false" and violated the FCA.  *Id.* at 183–84.  Finally, the Court found that Symantec fraudulently induced the GSA contract, as "the falsities in the Frequency Chart and lack of rebate disclosures were the actual cause of Dixon's decision to accept the GSA contract at the prices she accepted."  *Id.* at 187.[5]

With respect to the indirect presentment claims, the Court found Symantec not liable. *See id.* at 187–89.  Specifically, the Court found that the United States had "not provided enough evidence to conclude that Symantec's pricing also impacted the pricing on the resellers' own GSA contracts."  *Id.* at 189.  Nor had the United States shown that Symantec's false CSPs were material to the resellers' negotiations, as the Court was without evidence of "what other information, if any, the resellers provided during their own negotiations."  *Id.*

---

[4] When a contractor submits changes to a MAS contract, such as adding or deleting items or reducing prices, the Modifications Clause "requires the contractor to submit either updated CSPs for the new items or provide confirmation that the previous CSPs have not changed." *Morsell*, 651 F. Supp. 3d at 120.

[5] Gwendolyn Dixon was the GSA contract specialist with responsibility over the Symantec solicitation during most of the period during which its MAS contract was negotiated. *See Morsell*, 651 F. Supp. 3d at 130.

By contrast, with respect to the reverse FCA claims, the Court found Symantec liable. *Id.* at 190. Specifically, after explaining that the PRC is "the kind of classic self-executing obligation . . . to extend price reductions," the Court concluded that Symantec failed to fulfill that obligation even under its narrower view of the PRC that the Court found objectively reasonable. *Id.* at 189–90.

Turning to damages and penalties, the Court first explored two possible categories of damages: (1) discount damages, or the amount less GSA would have paid if Symantec had not made false CSP disclosures concerning discounts offered to comparator customers, had not made false implied certifications of compliance with the CSP and PRC requirements concerning discounts when submitting claims throughout the life of the contract, and had not failed to offer the price reductions to which GSA was entitled under the PRC during the life of the contract; and (2) rebate damages, or the amount less GSA would have paid if Symantec had not made false CSP disclosures concerning its rebate programs. *Id.* at 190–95.

With respect to discount damages, the Court first found, referring to the United States' damages expert, that "nothing in Dr. Gulley's testimony or any other testimony allows the Court to determine with reasonable certainty the degree of difference in the GSA discount that resulted from Symantec's material and fraudulent misrepresentations in the negotiations." *Id.* at 191. Accordingly, the Court explained that "[d]etermining how much of a discount GSA would have received had the CSP disclosures been complete and accurate would amount to little more than pulling a number out of thin air." *Id.* at 192. By extension, it found that the same problem plagued the false implied certifications concerning the CSPs under the Modifications Clause. *See id.* at 193. Turning to the PRC-triggering violations, the Court found that two "deficiencies" in Dr. Gulley's analysis rendered it impossible for the Court to "untangle whatever actual

damages GSA sustained." *Id.* at 194.  First, the Court found that Dr. Gulley's analysis was not susceptible to accurate recalibration to contour, with reasonable certainty, Symantec's narrower view of the PRC that the Court found objectively reasonable. *Id.* at 193.  Second, the Court "disagree[d] with Dr. Gulley's approach of having ignored the order level discounts for each line item when calculating the 'average' discount, which resulted in an unreasonably inflated average should-have-received discount." *Id.*

With respect to rebate damages, however, the Court found that there was sufficient record evidence to make a reasonably certain damages estimate.  The Court first identified 3% as a "conservative estimate that is adequately supported in the record" of the rebate that GSA would have received if Symantec had provided truthful information about its rebate programs. *Id.* at 195.  The Court next adopted a "ballpark (and indeed exceptionally conservative) estimate to serve as a baseline for the rebate damages." *Id.*  Applying the 3% rebate to that ballpark estimate, the Court calculated a rebate damages award of $356,316.72, trebled to $1,068,950.16. *See id.*

Moving to civil penalties, the Court first explained that its "conclusions on liability entitle[d] the United States to penalties under the FCA regardless of whether they also prove actual damages." *Id.* at 195.  Next, the Court noted that "the United States' request for civil penalties on the false claims is . . . inextricably intertwined with its discount damages calculations." *Id.* at 196.  Thus, by failing to present adequate proof to permit identification of the sales on which it should have received a discount, the United States left the Court with "no way of determining how many claims were 'false.'" *Id.*  However, because "the same conduct underlie[d] the United States' claims under both the presentment and false statements theories of

liability," *id.*, the Court assessed statutory penalties of $11,000 for each of twenty-one identified false statements, for a total of $231,000, *id.* at 197.

### III.  LEGAL STANDARDS

#### A.  Federal Rule of Civil Procedure 52(b)

Under Federal Rule of Civil Procedure 52(b), a party may file a motion requesting that the Court "amend its findings—or make additional findings—and . . . amend the judgment accordingly."  Fed. R. Civ. P. 52(b).  This Rule "permits the trial court to correct manifest errors of law or fact, make additional findings or take other action that is in the interests of justice." *Ashraf–Hassan v. Embassy of France*, 185 F. Supp. 3d 94, 108 (D.D.C. 2016) (quoting *Bigwood v. Def. Intelligence Agency*, 770 F. Supp. 2d 315, 318 n.2 (D.D.C. 2011)).  "The decision to amend findings or the judgment is committed 'to the sound discretion of the trial judge.'" *Paleteria La Michoacana v. Productos Lacteos Tacumbo S.A. De C.V.*, 247 F. Supp. 3d 76, 91 (D.D.C. 2017) (quoting *Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, No. 94-cv-1184, 1997 WL 243223, at *2 (D.D.C. May 7, 1997)).  "Accordingly, the moving party 'bears a heavy burden in seeking to demonstrate clear error [or] manifest injustice necessitating amendment of the judgment.'" *FMD Restoration, Inc. v. Baistar Mech., Inc.*, 320 F.R.D. 320, 322 (D.D.C. 2017) (quoting *Material Supply Int'l*, 1997 WL 243223, at *2).  "Rule 52 cannot be a substitute for an appeal." *Salazar v. District of Columbia*, 685 F. Supp. 2d 72, 75 (D.D.C. 2010); *see also Material Supply Int'l*, 1997 WL 243223, at *2 (explaining that Rule 52 "is not an avenue for relitigating issues upon which the moving party did not prevail at trial").

#### B.  Federal Rule of Civil Procedure 59(a)(2)

Rule 59(a)(2) provides that, "[a]fter a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of

fact and conclusions of law or make new ones, and direct the entry of a new judgment."  Fed. R.

Civ. P. 59(a)(2).  "A court should grant a motion under Rule 59(a)(2) only to correct manifest

errors of law or fact, or, in some limited situations, to present newly discovered evidence."

*Ashraf-Hassan*, 185 F. Supp. 3d at 112 (quoting *Chavez v. City of Albuquerque*, 640 F. Supp. 2d

1340, 1343 (D.N.M. 2008)).  "As with motions brought under Rule 52, 'Rule 59 motions may

not be used to [relitigate] old matters, or to raise arguments or present evidence that could have

been raised prior to the entry of judgment.'"  *FMD Restoration*, 320 F.R.D. at 323 (quoting

*Salazar*, 685 F. Supp. 2d at 75).

## IV.  ANALYSIS

The United States moves for relief in three "steps", with each step containing multiple

sometimes interdependent arguments for relief.  *See generally* U.S.'s Mot.  The Court addresses

each argument in turn, noting where its analysis of one also bears on or obviates another.[6]

### A.  "Step One"

The United States first argues that the Court made "tabulation errors, inconsistencies, and

omissions" that do not disturb the "overarching liability and damages reasoning" and for which

there is sufficient record evidence to correct.  *Id.* at 5.  Specifically, the United States argues that

the Court "mis-tabulated rebate damages," "mistakenly concluded that the number of false

claims tainted by Symantec's rebate fraud was contingent on the number of claims tainted by

Symantec's discount fraud" for purposes of calculating civil penalties, and "erred in failing to

award the United States, at the very least, the 'exceptionally conservative' estimate of discount

damages it derived."  *Id.* at 5–6.  It also argues that the Court failed to "address the United

---

[6] Most significantly, as set forth below, the Court considers the United States' "step
three" arguments by way of analyzing its "step one" arguments.  *See infra* note 10.

States' claim that Symantec violated the Second PRC Trigger by fixing and jumping customers to Band E under the Rewards buying program." *Id.* at 20.

### 1. Rebate Damages

As summarized above, in the FFCL the Court described at length the infirmities in the evidence presented by the United States that rendered it impossible to calculate an estimate of discount damages to a reasonable certainty. *See Morsell*, 651 F. Supp. 3d at 190–95. By contrast, with respect to rebate damages, the Court found that there was a sufficient evidentiary basis to support the United States' request "to calculate 3% of its total damages to account for the failure to disclose Symantec's myriad rebating programs throughout the life of the contract." *Id.* at 195. The Court identified a complicating factor, however, in the fact that it had "not awarded any discount damages to which it can apply that 3% number." *Id.* Accordingly, the Court, repurposing a set of assumptions employed by Symantec's damages expert, Mr. Tucker, to limit the universe of relevant transactions, calculated a "a ballpark (and indeed exceptionally conservative) estimate to serve as a baseline for the rebate damages"—which came to $11,877,224. *Id.* The Court applied the 3% rebate damages figure to that baseline for a total of $353,316.72, and trebled that total to reach the rebate damages award of $1,068,950.16. *Id.*

The United States argues that the Court's process to reach this figure was flawed from the start. It explains that "a rebate is measured against a product's sale price, not against the discounts it received to derive that sales price." U.S.'s Mot. at 6–7. Accordingly, it argues that the Court "erroneously applied 3% against estimated discounts, not against the sales prices on the Government's orders." *Id.* at 7. The United States uses a simple hypothetical to illustrate the importance of this distinction:

> For example, if the Court purchases a smartphone costing $100.00 and receives a 3%
> rebate on that product, the Court's rebate equals $3.00 (3% of 100). If the Court

> purchases the same smartphone a week later and it has been marked down to $90.00 with a 3% rebate, the Court's rebate on that second purchase would be $2.70 (3% of $90). The Court's rebate would not equal 3% of the $10.00 mark-down or discount (i.e., 30 cents).

*Id.*  To correct the Court's error, the United States proposes using U.S. Exhibit 359 to identify the amount of total sales to GSA, less sales to resellers.[7]  *See id.* at 7–9.  U.S. Exhibit 359 is a spreadsheet Dr. Gulley used to make "damages calculations on a per-government-sale basis," and therefore contains each GSA transaction.  Trial Tr. at 3765 (Gulley), ECF No. 331.  Using U.S. Exhibit 359, the United States calculates the "total at-issue sales on Symantec's Contract" as $179,129,956.10.  U.S.'s Mot. at 8.  It applies 3% to that figure, yielding $5,373,898.68, which, trebled, would sum to a rebate damages award of $16,121,696.04.  *See id.* at 10.

The Court agrees that it erred in interpreting the United States' rebate damages request.  The Court based its rebate damages calculation on its understanding that the "United States ask[ed] the Court to calculate 3% of its total *damages*," *Morsell*, 651 F. Supp. 3d at 195 (emphasis added), when in fact the United States requested to calculate "3% of the amounts the Government contends it *should have paid in total*," U.S.'s Prop. Findings Fact & Concs. Law ("U.S. Prop. FF & CL") at 124, ECF No. 347 (emphasis added).[8]  This error in turn led the Court to engage in the process to calculate its "exceptionally conservative," "ballpark" estimate of

---

[7] The Court found that Symantec was not liable for causing resellers to submit false statements and claims.  *See Morsell*, 651 F. Supp. 3d at 189 (finding for Symantec on Counts III and IV, the indirect presentment claims).

[8] Symantec argues that "[t]he government's trial submission requested rebate damages of 3% off the discount damages awarded to the government, exactly as the Court calculated these damages (correcting for the government's failure to prove discount damages)."  Gen Digital's Opp'n to Mots. Amend and Suppl. Findings Fact & Concs. Law ("Gen Digital's Opp'n") at 13, ECF No. 367.  But the very sections of the government's trial submission it cites for this proposition disprove it.  *See* U.S. Prop. FF & CL at 103 (calculating rebate damages off the amount "the United States should have paid in total"); *id.* at 124 ("To calculate [rebate damages], the Court simply needs to take 3% of the amounts the Government contends it should have paid in total").

discount damages to use as the baseline off of which to calculate rebate damages.[9]  *Morsell*, 651 F. Supp. 3d at 195.  That too was error.  The Court described at length the infirmities in the United States' damages presentation that left the Court unable to "determine with reasonable certainty how much GSA would have paid had Symantec come clean about [the] originally false CSPs."  *Id.* at 192–93; *see id.* at 192 ("Determining how much of a discount GSA would have received had the CSP disclosures been complete and accurate would amount to little more than pulling a number out of thin air . . . .").  Because the Court could not develop a reasonably certain estimate of discount damages, it could not develop a reasonably certain estimate of the should-have-paid price or, in turn, rebate damages.  The substitution of ballpark estimation for reasonable certainty was error.[10]

---

[9] The record includes sufficient evidence that the 3% rebate would have applied to all sales, *see Morsell*, 651 F. Supp. 3d at 179 (noting, with citations to the record, that the GSA Master Aggregator Rebate Program was the "most obviously relevant rebate program in effect" at the time of contracting and "gave a 5% rebate to certain distributors in connection with *any* GSA sale" (emphasis added)); Trial Tr. at 618:17–22 (Cochran), ECF No. 308 (confirming that "back-end rebates were, essentially, tracking the *total volume* purchased by a reseller or distributor in a time period and then calculating that total buy and then giving them a percentage rebate for that volume" (emphasis added)), even as there were a variety of additional rebate programs, some of which focused on particular resellers or product categories, *see, e.g.*, U.S. Ex. 77 (email from Kimberly Bradbury describing rebate program targeted to a particular "product category").

[10] The United States separately asserts that it now should be awarded as actual damages the ballpark estimate that the Court originally used as a baseline off of which to calculate rebate damages.  *See* U.S.'s Mot. at 19.  But the Court now finds that its attempt at ballpark estimation for want of reasonable certainty was error.  In doing so, it adheres to its finding that it "cannot possibly untangle whatever actual [discount] damages GSA sustained from Dr. Gulley's result" and therefore that the United States is not entitled to discount damages.  *See Morsell*, 651 F. Supp. 3d at 194.  Consequently, the Court also rejects the United States alternative arguments, which constitute "Step Three" in its motion, to increase the ballpark estimate of discount damages or else reverse the findings underlying the Court's conclusion that it could not make a reasonably certain estimate of discount damages.  *See* U.S.'s Mot. at 39–45.  These arguments merely reflect disagreement with the weight accorded to and inferences drawn from certain evidence, or the lack thereof, and as such do not state claims for relief under Rule 52 or Rule 59.  *See Paleteria La Michoacana*, 247 F. Supp. 3d at 91 ("A motion under Rule 52(b) 'is not an avenue for relitigating issues upon which the moving party did not prevail at trial.'" (citation

Having concluded that its prior methodology for calculating rebate damages was flawed, the Court must next determine whether sufficient evidence exists in the record such that the Court may calculate a reasonably certain estimate of the United States' rebate damages. The United States contends that the record contains the requisite information to make such a calculation. Specifically, the United States argues that rebate damages may be calculated by taking total at-issue sales (*i.e.*, total sales less reseller sales), *see* U.S.'s Mot. at 10 (identifying "total at-issue sales on Symantec's GSA contract" as the appropriate figure from which to calculate rebate damages), and multiplying that number by 3%—the "conservative estimate" of the rebate the United States would have received had Symantec disclosed all relevant information regarding its rebate programs, *Morsell*, 651 F. Supp. 3d at 195.

The Court agrees that the approach outlined by the United States represents a supportable method for calculating a reasonably certain estimate of rebate damages in this case. For one, the Court agrees that the total amount of at-issue sales represents the proper starting point for such a calculation. After all, that amount represents the sum of money that the United States *actually paid* on Symantec's contract. To be sure, the amount that the United States actually paid is higher than the amount it should have and would have paid had Symantec disclosed and applied all applicable discounts throughout the life of the contract. *See* U.S.'s Mot. at 10 n.2 ("Should the Court award discount or Rewards damages, the total sales price used to calculate rebate damages would be reduced."). And as the United States' smartphone hypothetical illustrates, there is a strong theoretical argument for calculating rebate damages based on the should-have-paid price rather than the actually-paid price. *See id.* at 7. But for purposes of calculating rebate

---

omitted); *FMD Restoration*, 320 F.R.D. at 323 ("As with motions brought under Rule 52, 'Rule 59 motions may not be used to [relitigate] old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" (citation omitted)).

damages in this case, any discrepancy between the amount that the United States actually paid and the amount it should have paid is mitigated by two factors.  The first is that the Court's 3% approximation of the United States' likely rebate had Symantec disclosed all of its various rebate programs is a "conservative estimate."  *See Morsell*, 651 F. Supp. 3d at 195.  Second, the Court has not (and will not) award discount damages.  *See id.* at 190–94.  Combined, these factors more than compensate for the fact that the starting point for the rebate damages calculation is higher than it would have been had the Government introduced sufficient evidence to enable the Court to estimate the should-have-paid price.

Persuaded that the total price paid by the Government represents the proper starting point from which to calculate rebate damages, the Court finds that the evidence admitted at trial shows that the total at-issue sales amounted to $179,129,956.10.  *See* U.S. Ex. 359.[11]  From there, it makes sense to apply a 3% rebate given the Court's previous findings that (1) "it is near obvious that GSA would have insisted" on receiving comparable rebates had it known of Symantec's various rebate programs and that (2) 3% is a "conservative estimate" of the rebate GSA would have received had those programs been adequately disclosed.  *See Morsell*, 651 F. Supp. 3d at 194–95.  3% of $179,129,956.10 is $5,373,898.68.  The Court will therefore amend the FFCL to award the United States treble that amount—$16,121,696.04—as rebate damages.

### 2.  Civil Penalties

The United States argues that the Court's error as to rebate damages also led it to err in awarding civil penalties.  *See* U.S.'s Mot. at 10–11.  In the FFCL, the Court found that "the United States' request for civil penalties on the false claims [was] . . . inextricably intertwined

---

[11] Largely for the reasons stated below, *see infra* note 13, the Court rejects Symantec's objections relating to the use of Exhibit 359 to calculate rebate damages, *see* Gen Digital's Opp'n at 14–15.

with its discount damages calculations." *Morsell*, 651 F. Supp. 3d at 196.  The Court explained

that because the United States' discount damages analysis was "overinclusive for calculating the

should-have-paid discount," leaving the Court with "no way of calculating that discount," the

Court also had "no way of determining how many claims were 'false.'"  *Id.*  Accordingly, the

Court instead assessed statutory penalties based on twenty-one identifiable false statements.  *Id.*

at 196–97.  The United States argues that the Court's finding regarding the should-have-paid

discount was actually irrelevant, as "Symantec's rebate fraud is not intertwined with the

Government's discount damages."  U.S.'s Mot. at 11.  That is, because "the price of each claim

transacted under Symantec's GSA Contract should have been 3% lower," that made "each claim

false" under either the implied certification theory or the fraudulent inducement theory,

regardless of whether those claims *also* should have been discounted.  *Id.*  Accordingly, the

United States argues that, because these false claims are identifiable, penalties were mandatory

as to each claim, so it was error for the Court to instead award penalties only as to the much

smaller universe of false statements.  *See id.* at 14–17.

The Court agrees.  As the Court explained in the FFCL, penalties may be awarded even

in the absence of damages.  *See Morsell*, 651 F. Supp. 3d at 196; *United States ex rel. Schwedt v.

Planning Rsch. Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995) ("[T]he submitter of the 'false claim' or

'false statement' is liable for a civil penalty, regardless of whether the submission of the claim

actually causes the government any damages; even if the claim is rejected, its very submission is

a basis for liability.").  Indeed, the "complementary" function of civil penalties vis-a-vis damages

is most operative when calculation of specific damages is impractical.  *United States ex rel. Bunk

v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 403–04 (4th Cir. 2013); *see United States

ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005) ("The statute provides for

penalties even if (indeed, *especially* if) actual loss is hard to quantify . . . ." (emphasis in original)); *see also United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551–52 (1943) (referring to an earlier version of the FCA: "We think the chief purpose of the [statutory penalties] was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole.").

Moreover, "[e]ach individual false claim or statement triggers the statute's civil penalties." *Schwedt*, 59 F.3d at 199 (finding error in the district court's "fail[ure] to consider that the individual progress reports, though not in themselves actual invoices, might constitute 'false claims' or 'statements' under the Act" giving rise to civil penalties); *see United States v. Honeywell Int'l Inc.*, 47 F.4th 805, 810 (D.C. Cir. 2022) ("Each false claim subjects a person to treble damages in addition to a civil penalty."); *United States ex rel. Landis v. Tailwind Sports Corp.*, 324 F. Supp. 3d 67, 74 (D.D.C. 2018) ("The False Claims Act provides that those who violate its provisions shall be liable for civil penalties of $5,500 to $11,000 for each claim submitted."); *United States v. Honeywell Int'l Inc.*, No. 08-cv-0961, 2021 WL 2493382, at *8 (D.D.C. 2021) (explaining the jury's duty to determine whether false claims were submitted and how many and the Court's duty to "set the level of FCA penalties from within the statutory range and multiply that dollar figure by the number of false claims"). Indeed, attaching a mandatory civil penalty to each one in a series of false claims appears to have been an explicit goal of Congress when it amended the FCA to "recognize[] fraud-in-the-inducement liability." *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005) (quoting the explanation from the Senate Report on the 1986 amendments to the FCA that "[e]ach and every claim submitted under a contract, loan guarantee, or other agreement which

was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim").

In summary, regardless of whether damages are proven, civil penalties are mandatory as to each false claim or statement for which a defendant is found liable. Here, the Court correctly found that it could not determine how many claims were false under Symantec's objectively reasonable interpretation of the PRC. *See Morsell*, 651 F. Supp. 3d at 196–98. But it erred in its failure to recognize that, because it found Symantec liable for false CSP disclosures concerning rebates under either an implied certification theory, *see id.* at 178–82, or a fraudulent inducement theory, *see id.* at 184–87, and because rebates would have applied to all GSA sales under the contract, *see supra* note 9, each claim Symantec submitted under the contract was false and therefore subject to mandatory civil penalties.

Symantec makes two unpersuasive arguments to the contrary. First, it argues that the United States' position "seeks to apply penalties to all GSA Schedule transactions, without accounting for eSPA approvals or those transactions' terms and conditions, ignoring the Court's finding that these factors narrow the set of claims that could arguably be deemed false." Gen Digital's Opp'n at 15. This is a category error: the Court's finding as to Symantec's reasonable interpretation of the PRC with respect to eSPA approvals served only to narrow the universe of transactions for which Symantec's failures to adhere to the PRC could give rise to FCA liability. *See Morsell*, 651 F. Supp. 3d at 170–73. It did nothing to limit the reach of Symantec's liability for false CSP disclosures concerning its rebate programs. *See id.* at 179, 183 (rejecting Symantec's "suggestion that back-end rebates fell outside the scope of negotiations" with GSA and finding that it acted with at least reckless disregard in "fail[ing] to ensure that [its] disclosures were accurate throughout the life of the contract").

Second, Symantec argues that awarding penalties for each claim under the GSA contract "would produce duplicative penalties and violate Symantec's right to the due process of law." Gen Digital's Opp'n at 15.  Any concern about duplicative penalties is eliminated by the fact that the United States did not request, and the Court does not award, civil penalties on the false claims *in addition to* the false statements; rather, the Court awards civil penalties only on Symantec's false claims.  *See* U.S.'s Mot. at 16 (seeking penalties only on Symantec's false claims); *cf. Gosselin*, 741 F.3d at 407–08 (explaining that "the court must permit the government or its assignee the freedom to navigate its FCA claims through the uncertain waters of the Eighth Amendment" by "accept[ing] reduced penalties within constitutional limits, as ultimately adjudged by the courts").

Even generously interpreting Symantec's spare reference to due process as stating a constitutional challenge to an award of penalties on each false claim under either the Fifth or Eighth Amendment, it would still fail.  It is true that FCA awards are subject to constitutional limits.  *See Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000) ("[T]he FCA imposes damages that are essentially punitive in nature . . . ."); *United States v. Mackby*, 261 F.3d 821, 830 (9th Cir. 2001) ("[T]he civil sanctions provided by the False Claims Act are subject to analysis under the Excessive Fines Clause because the sanctions represent a payment to the government, at least in part, as punishment.").  But proving a violation is a high bar.  Under the Eighth Amendment, a fine is excessive only if "it is grossly disproportional to the gravity of [the] offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).  This "test is by no means onerous" and fines ordered pursuant to the FCA will only be found excessive "infrequent[ly]." *Gosselin*, 741 F.3d at 408; *see United States v. Mackby*, 339 F.3d 1013, 1017–18 (9th Cir. 2003) ("The fact . . . that Congress provided for treble damages

and an automatic civil monetary penalty per false claim shows that Congress believed that making a false claim to the government is a serious offense.").  Similarly, the Due Process Clause of the Fifth Amendment "imposes limits on 'grossly excessive' monetary penalties that go beyond what is necessary to vindicate the government's 'legitimate interests in punishment and deterrence.'"  *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 387 (4th Cir. 2015) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996)).

In evaluating whether an award is excessive in the FCA context, courts have construed actual damages as compensatory and civil penalties as punitive.  *See id.* at 389.  The Supreme Court has not "identif[ied] concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award," but it has clarified that "[s]ingle-digit multipliers are more likely to comport with due process."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 424–25 (2003).  Specifically, the Supreme Court has suggested that a 4:1 ratio of punitive-to-compensatory damages "might be close to the line of constitutional impropriety," though it noted that "ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'"  *Id.* at 425 (citation omitted).

Here, the misconduct was serious and vast in scope.  As the Court explained in the FFCL:

GSA was fraudulently induced to enter the MAS contract with Symantec under the terms that it did because of Symantec's knowingly, materially false CSP disclosures with respect to the rebate program disclosures and the Frequency Chart.  Symantec also impliedly certified compliance with the PRC and CSP requirements when submitting claims throughout the life of the contract.  Symantec made knowing, materially false statements related to those claims for payment during the negotiation and the life of the contract through the subsequent modifications reaffirming the initially false CSPs.  And it failed to offer the price reductions to which GSA was entitled during the life of the contract.

18

*Morsell*, 651 F. Supp. 3d at 190.  Against this backdrop, the United States seeks the maximum penalty of $11,000 for each of the 3,352 claims it contends Symantec made under the GSA contract, for a total of $36,872,000 in civil penalties.  *See* U.S.'s Mot. at 17.

The Court finds that this figure is in proportion to the gravity of the offense.  The United States proved that the fraud Symantec perpetrated on GSA caused the government to overpay throughout the life of the contract.  While the United States did not prove much of the amount of overpayment to a reasonable certainty, it plausibly alleged that the overpayment easily reached into the tens of millions of dollars.  *Morsell*, 651 F. Supp. 3d at 197 ("[I]t is clear that the government suffered in larger amounts than awarded here."); *State Farm*, 538 U.S. at 425 (explaining that due process admits greater punitive damages where "a particularly egregious act has resulted in only a small amount of economic damages").  Indeed, the Court's "exceptionally conservative" ballpark estimate of discount damages alone reached nearly $12 million, which, even before trebling, would produce a punitive-to-compensatory damages ratio of only a little over 3:1, well within the boundary beyond which the Supreme Court has said punitive damages may be suspect.[12]  And rebate damages—which, after trebling, amount to $16,121,696.04— substantially reduce the ratio even further.  When those damages are combined with the ballpark estimate of discount damages, the ratio of punitive-to-compensatory damages is just over 1:1.  Accordingly, the Court finds that the United States' requested civil penalty total of $36,872,000 is constitutionally permissible.  *See Drakeford*, 792 F.3d at 389 (affirming the constitutionality of civil penalty of $119,515,000 on 21,730 false claims); *United States ex rel. Montcrieff v.*

---

[12] That the Court found that the United States failed to prove all of its actual damages to a reasonable certainty does not control its analysis of the constitutionality of civil penalties.  *See State Farm*, 538 U.S. at 418 (identifying as a "guidepost" in evaluating punitive damages "the disparity between the actual *or potential* harm suffered by the plaintiff and the punitive damages award" (emphasis added)).

*Peripheral Vascular Assocs., P.A.*, 649 F. Supp. 3d 404, 424, 428 (W.D. Tex. 2023) (awarding $21,825,592 in civil penalties on 7,380 false claims and finding that amount constitutionally permissible).

The Court also finds that figure warranted.  As it explained in the FFCL, "[t]he determination of the amount of the statutory civil penalties rests within the discretion of the district court." *Morsell*, 651 F. Supp. 3d at 197 (quoting *United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 501 F. Supp. 2d 51, 56 (D.D.C. 2007)).  The Court's original reasoning in awarding the statutory maximum of $11,000 per false *statement* applies equally to its present award per false *claim*; as the Court explained in the FFCL, and as Symantec itself implicitly acknowledges, "the same false statements and records underlie the claims at issue." *Id.* at 196; *see* Gen Digital's Opp'n at 15 (arguing that assessing penalties for both false statements and false claims would be "duplicative").  Symantec's original "false statements and records related to the [contract] negotiations," including its "omission of the Rebate Program disclosures," warrant penalties "at the maximum of the statutory range."  *Morsell*, 651 F. Supp. 3d at 197.  So too Symantec's "reckless disregard in certifying that its CSPs had not changed," misrepresentations that "infected the entirety of the contract over the next several years."  *Id.* Moreover, the conduct for which the Court found Symantec liable—making knowingly false statements and omissions that defrauded the government into overpaying for its products—lies at the heart of what Congress sought to prevent by enacting the FCA, increasing the deterrent value of any penalties.  *See United States v. McNinch*, 356 U.S. 595, 599 (1958) (explaining that Congress enacted the FCA "to stop th[e] plundering of the public treasury" through, among other things, the Government being "charged exorbitant prices for goods delivered").  Accordingly, the

Court awards $11,000 for each of Symantec's 3,352 false claims,[13] for a total of $36,872,000 in civil penalties.

### 3.  Second PRC Trigger

The United States next takes issues with the Court's finding that any misrepresentations concerning the Rewards program were immaterial.[14]  *See* U.S.'s Mot. at 20.  It argues that the Court simply concluded that "Bradbury's falsities in those disclosures about Rewards were not material" when it also should have considered evidence showing that "Symantec violated the Second PRC Trigger by fixing and jumping customers to Band E under the Rewards buying

---

[13] The Court agrees with the United States that U.S. Exhibit 359 contains sufficiently reliable data to arrive at this number.  Symantec argues that U.S. Exhibit 359 is unreliable because the "Court found [it] improperly overbroad for the purposes of calculating FCA damages."  Gen Digital's Opp'n at 15.  But that overstates the Court's narrow finding, in which it evaluated Dr. Gulley's methodology to winnow total at-issue sales to the narrower group of transactions from which to calculate discount damages.  By contrast, the Court here uses U.S. Exhibit 359 simply to derive total sales data unaffected by Dr. Gulley's winnowing methodology.  Symantec did not object to the reliability of this data at trial, s*ee* Trial Tr. at 3765:22–24 (Gulley) (Symantec reiterating a standing objection to Mr. Gulley's testimony on the ground that he relied on excluded testimony, which the Court had already denied, but not otherwise objecting to the admission of U.S. Exhibit 359); *see United States ex rel. Morsell v. NortonLifeLock, Inc.*, 567 F. Supp. 3d 248, 277 (D.D.C. 2021) (denying Symantec's motion to exclude Mr. Gulley's testimony on this ground), which makes sense given that it is derived of Symantec's own IFF sales data, *see* Trial Tr. at 3717:25–3720:4 (Gulley).  Accordingly, using U.S. Exhibit 359, the Court finds, after excluding orders through resellers, that Symantec submitted 3,352 claims under the GSA contract.  Symantec notably does not directly attack the accuracy of this figure or propose any alternative.

Along similar lines, Symantec suggests in a footnote that using the filtering functions on U.S. Exhibit 359 to generate the total number of GSA orders, less reseller orders, somehow violates its right to cross-examine witnesses.  *See* Gen Digital's Opp'n at 15 n.8.  This is unpersuasive, as the filtering functions are not testimony and Symantec in fact cross-examined Dr. Gulley using those same functions.  *See* Trial Tr. at 3884:6–3888:18 (Gulley), ECF No. 332 (cross-examining Dr. Gulley to establish the amount of transactions through resellers using U.S. Exhibit 359 and the filtering functions in the exhibit spreadsheet).

[14] The Rewards program was "akin to a frequent flyer program, in which customers accumulated points across multiple orders that allowed them to achieve progressively more favorable bands of pricing."  *Morsell*, 651 F. Supp. 3d at 122.

program." *Id.* But the Court did consider that evidence. In its findings of fact, the Court laid out the conditions for each of the three PRC triggers. *See Morsell*, 651 F. Supp. 3d at 120–21. It also walked through the Rewards program, explaining, with citations to record evidence, how prices differed across bands. *See id.* at 121–22. It described in detail the "band jumping" damages analysis conducted by the United States' expert Dr. Holt. *Id.* at 148–50. It also described criticism of that analysis leveled by Symantec's expert, Mr. Tucker, on grounds that Dr. Holt's analysis "was done on a line item level rather than an order level." *Id.* at 149–50. Thus, the Court evaluated the relevant evidence concerning band jumping, including the weaknesses of that evidence, even though it did not ultimately conclude that band jumping constituted a separate violation of the PRC. The Court sees no error in that process. *See Schilling v. Schwitzer-Cummins Co.*, 142 F.2d 82, 84 (D.C. Cir. 1944) ("While counsel may be disappointed that findings do not discuss propositions sincerely contended for, that, alone, does not make them inadequate or suggest that such propositions were not understood by the court. . . . Certainly, we should not require or encourage trial judges, in preparing findings, to assert the negative of each rejected contention as well as the affirmative of those which they find to be correct."); Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment ("[T]he judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts.").

## B. "Step Two"

The United States next points to three additional, and more fundamental, findings that it claims require revision in order to avoid legal error. *See* U.S.'s Mot. at 27. The Court finds that all three arguments merely amount to attempts to relitigate matters properly decided by the Court as the trier of fact and therefore fail to state grounds for relief under Rule 52 or Rule 59.

1.  FPR Closure Paragraph

First, the United States argues that the Court misinterpreted the closure paragraph in the Final Proposed Revision ("FPR") to which GSA and Symantec agreed.  *Id.*  To review, in the FFCL the Court described the "standard clauses" included in all MAS contracts that are "designed to ensure that the prices negotiated for government purchasers are appropriately advantageous at the time of negotiation and that they remain so during the life of the Contract." *Morsell*, 651 F. Supp. 3d at 119.  Among those clauses is the PRC, regarding which the Court explained the "three events which trigger price reductions when they occur."  *Id.* at 120.  The Court then laid out its findings concerning the "preparation and negotiation of Symantec's GSA contract."  *Id.* at 125.  As relevant here, the Court explained that "Symantec submitted its initial offer for a GSA MAS contract on February 28, 2006," which included "the standard solicitation terms and questions"—including the PRC.  *Id.* at 125; *see* U.S. Ex. 4A at SYM00014753.  That offer stated that it was in reference to "Refresh #17" of "Solicitation No. FCIS-JB-980001-B," U.S. Ex. 4A at SYM00014716, SYM00014687.  After extensive negotiations spanning nearly a year, the parties agreed to the FPR.  *Morsell*, 651 F. Supp. 3d at 139.  That signed FPR states that it was submitted "with respect to [Symantec's] offer under the General Services Administrations Federal Supply Service Multiple Award Schedule" and that Symantec "agree[s] to abide by terms and conditions of Solicitation Number FCIS-JB-980001B, Refresh #17."  U.S. Ex. 30 at SYM00344346.

The Court explained that the signed FPR was the product of a last-minute flurry of negotiation.  *See Morsell*, 651 F. Supp. 3d at 137–39.  Specifically, as relevant here, while Symantec's most recent proposal had included a "Conclusion" stating that it was "confident that this Final Proposal Revision provides the Government with fair and reasonable prices for

Symantec Products," *id.* at 136; U.S. Ex. 16B at SYM00370750, GSA returned a revised draft

with a closure instead certifying that "the discounts[, pricing and/or rates] given to the

Government are either equal to and/or greater than what is granted to any commercial and/or

Government customer," *Morsell*, 651 F. Supp. 3d at 138; U.S. Ex. 20B at SYM00396770.  After

a phone conversation between GSA and Symantec, GSA "agreed to modify [that] phrase in the

closure." *Morsell*, 651 F. Supp. 3d at 138.  The further modified version, as reflected in the

final, signed FPR, included an additional "terms and conditions" clause,  *id.*, such that the

closure read: "Symantec Corporation certifies that the discounts, pricing and/or rates given to the

Government are equal to and/or greater than what is granted to any commercial and/or

Government customer *under similar terms and conditions*."  U.S. Ex. 30 at SYM00344351

(formatting omitted; emphasis added).

     The Court concluded that this eleventh-hour revision was meaningful.  Specifically, it

found that the addition of the terms and conditions clause to the closure, in conjunction with

other evidence, tended to show that Symantec held a contemporaneous understanding that "non-

standard discounts with different terms and conditions" that were "approved in eSPA" did not

trigger the PRC.  *Morsell*, 651 F. Supp. 3d at 170–71.  The Court found that this understanding

"was not objectively unreasonable" under the circumstances, and therefore that Symantec lacked

the requisite intent to establish FCA liability for purported PRC violations concerning

eSPA-approved discounts on sales with different terms and conditions.  *Id.* at 171; *see United

States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287–88 (D.C. Cir. 2015) (explaining that the

"FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or

regulation" or "those claims made based on reasonable but erroneous interpretations of a

defendant's legal obligations").

The United States argues that the Court erred in making this finding because the Court did not make a predicate finding that the "Closure is facially ambiguous as to its impact on the PRC." U.S.'s Mot. at 29.  For support, it provides an extended summary of federal and D.C. law concerning contract interpretation, focused principally on the notion that extrinsic evidence of a contract's meaning may only be consulted if its text is ambiguous.  *See id.* at 27–29.  But this overlooks that the Court's review of the closure paragraph was actually addressed to the issue of scienter under the FCA.  *Morsell*, 651 F. Supp. 3d at 166 (section titled "Scienter and the Price Reduction Clause").  As such, it did not purport to authoritatively construe the contract, but rather simply to identify whether Symantec's interpretation was "reasonable," *regardless* of whether it was "erroneous."  *Purcell*, 807 F.3d at 288.  Moreover, the United States' attempt to distinguish the PRC as unrelated to the closure is unavailing, as the signed FPR that includes the revised closure paragraph explicitly incorporates by reference the "terms and conditions" of the solicitation which were included in Symantec's offer—including the PRC.  *See* U.S. Ex. 30 at SYM00344346.  Finally, and in any event, the Court *did* find the closure ambiguous as it related to the PRC.  *Morsell*, 651 F. Supp. 3d at 201 (explaining, with respect to the United States' breach of contract claims, that "[a]s noted above, . . . Symantec's reasonable interpretation of the contract excluded non-standard discounts approved in eSPA under different terms and conditions.  That was a reasonable interpretation of the *ambiguous* language 'under similar terms and conditions' added in the closure." (emphasis added)).

As such, while the United States may disagree with the Court's conclusion that Symantec contemporaneously held an objectively reasonable interpretation of the PRC that narrowed its liability under the FCA, it has not established that it is entitled to relief on these grounds under Rule 52 or Rule 59.

2.  Indirect Liability

Second, the United States argues that the Court erred in finding that Symantec was not liable for causing resellers to submit false statements and claims.  *See* U.S.'s Mot. at 33.  It first asks the Court to "revisit" its conclusion that there was "insufficient evidence as to the role that Symantec's CSP Disclosures played in setting the prices on the Reseller's contracts to support an indirect Presentment Claim."  *Id.*  The Court declines to do so, finding no error in its extensive summary of the evidence on this issue and analysis of its infirmities.  *See Morsell*, 651 F. Supp. 3d at 187–89.

The United States next claims that the Court erred by not finding that "overcharges on the Resellers' GSA contracts were directly and proximately caused by Symantec's own false statements and its direct violation of the Act's False Statement Provisions, including its GSA pricelist that contained falsely inflated prices."  U.S.'s Mot. at 33.  But again, this is merely an expression of the United States' disagreement with the Court's conclusion as to proximate cause. The evidence the United States cites to support its position is the same evidence the Court considered before finding the contrary.  *Compare* U.S.'s Mot. at 34 (citing to the Carahsoft Letter of Supply, U.S. Ex. 306; the GTSI Letter of Supply, U.S. Ex. 307; the authorization for use of CSPs, U.S. Ex. 309; and Bradbury's testimony at page 1987) *with Morsell*, 651 F. Supp. 3d at 189 (reviewing the same evidence, which was cited by the United States in its trial submission, before finding that the United States "has not provided enough evidence to conclude that Symantec's pricing also impacted the pricing on the resellers' own GSA contracts").  This attempt to relitigate an issue properly decided by the trier of fact provides no occasion for relief under Rule 52 or Rule 59.  *Paleteria La Michoacana*, 247 F. Supp. 3d at 91 ("A motion under Rule 52(b) 'is not an avenue for relitigating issues upon which the moving party did not prevail

at trial.'" (citation omitted)); *FMD Restoration*, 320 F.R.D. at 323 ("As with motions brought

under Rule 52, 'Rule 59 motions may not be used to [relitigate] old matters, or to raise

arguments or present evidence that could have been raised prior to the entry of judgment.'"

(citation omitted)).

### 3. Order-Level Discount Calculations

Third, the United States argues that "[t]he Court's reasoning that determining damages in

this case also required an order-level review also constitutes legal error." U.S.'s Mot. at 35.

This appears to be a response to the Court's finding that it "disagrees with Dr. Gulley's approach

of having ignored the order level discounts for each line item when calculating the 'average'

discount, which resulted in an unreasonably inflated average should-have-received discount."

*Morsell*, 651 F. Supp. 3d at 193. But even if the United States is right that the order-level

approach "mixes apples and oranges, allowing non-bucket transactions to affect the should-have-

received discount of the bucket," U.S.'s Mot. at 36, that would not disturb the Court's overall

conclusion that its finding concerning Symantec's reasonable interpretation of the PRC rendered

Dr. Gulley's datasets overinclusive in a way that precluded a reasonably certain estimate of

discount damages. *See Morsell*, 651 F. Supp. 3d at 193 ("Although the Court does not take issue

with the bucketing methodology as a general matter, Dr. Gulley's testimony does not explain

how to apportion his total results if the Court agrees with some buckets and not others (or some

transactions and not others), and the United States has not directed it to anything in the record

indicating how to reliably do so."). The United States thus has not carried its burden to establish

that the Court's finding should be amended on this ground.

### C.  California's Motion

California filed a four-page document styled as a motion to amend and supplement the FFCL, but that principally purports to "join[] in the U.S.' Motion" while also making a stray request that the Court "amend, supplement, or alter its Findings regarding California accordingly" in the event it amends the FFCL "on issues raised in the U.S.'s motion relevant to California's derivative claims."  Cal.'s Mot. at 2.  As laid out in detail in the FFCL, while the California False Claims Act was "modeled after the federal FCA," *Morsell*, 651 F. Supp. at 117, California's claims concerned two distinct California purchasing programs about which the court made independent findings of fact, *see id.* at 156–59, in support of independent conclusions of law, *id.* at 203–12.  California's spare submission falls well short of carrying its "heavy burden" to prove entitlement to relief under Rule 52 or Rule 59.  *FMD Restoration, Inc.,* 320 F.R.D. at 322.  Regardless, the brief substance of its submission only focuses with particularity on joining the United States' arguments to support its claim to discount damages, which the Court rejected above.  *See* Cal.'s Mot. at 3–4.  Accordingly, California's motion fails.

## V.  CONCLUSION

For the foregoing reasons, the United States' Motion to Amend and Supplement the Findings of Fact and Conclusions of Law (ECF No. 364) is **GRANTED in part and DENIED in part**.  The Judgment is amended as follows: (1) the United States is awarded rebate damages in the amount of $16,121,696.04; and (2) the United States is entitled to civil penalties in the amount of $36,872,000.00.  The Judgment is not otherwise amended.  California's Motion to Amend and Supplement the Findings of Fact and Conclusions of Law (ECF No. 365) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  January 16, 2024                                          RUDOLPH CONTRERAS
                                                                 United States District Judge