**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | : | | |
| LORI MORSELL, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 12-800 (RC) |
| | : | | |
| v. | : | | |
| | : | Re Document Nos.: | 377, 381 |
| GEN DIGITAL, INC. | : | | |
| (f/k/a SYMANTEC CORPORATION; | : | | |
| f/k/a NORTONLIFELOCK INC.), | : | | |
| | : | | |
| Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

**DENYING DEFENDANT'S MOTION TO AMEND AND SUPPLEMENT THE AMENDED FINDINGS OF
FACT AND CONCLUSIONS OF LAW**

## I.  INTRODUCTION

Relator Lori Morsell brought this *qui tam* action in 2012 alleging that her employer,

Symantec,[1] had violated the False Claims Act in connection with a General Services

Administration ("GSA") Master Award Schedule ("MAS") contract.  At the highest level, the

action alleged that Symantec did not appropriately disclose to GSA non-standard discounts and

rebates offered to comparator customers, undermining GSA's ability to negotiate favorable

pricing.  The United States moved to intervene, as did the states of California and Florida, and

Morsell elected to pursue claims on behalf of New York.  *See* United States' Notice of Election

to Intervene, ECF No. 21; Notice of the People of the State of California of Election to Intervene,

ECF No. 28; Notice of Election to Intervene by the State of Florida, ECF No. 29; Notification

---

[1] During the litigation, Symantec's name changed to NortonLifeLock.  It has since
changed again to Gen Digital.  The Court herein refers to Defendant interchangeably as
Symantec or Norton.

that Relator Intends to Proceed with Action on Behalf of New York State, ECF No. 40.  After exhaustive litigation, the United States and California proceeded against Symantec to a four-week bench trial conducted in February and March 2022.  Following the trial, the parties submitted proposed findings of fact and conclusions of law and related briefing.  Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court issued its Findings of Fact and Conclusions of Law (the "FFCL") on January 19, 2023.  *See United States ex rel. Morsell v. NortonLifeLock, Inc.* ("*Morsell I*"), 651 F. Supp. 3d 95 (D.D.C. 2023), *opinion amended and supplemented sub nom. United States ex rel. Morsell v. Gen Digital, Inc.* ("*Morsell II*"), No. 12-cv-800, 2024 WL 166015 (D.D.C. Jan. 16, 2024).  The Court entered partial judgment in favor of the United States in the amount of $1,229,950.16 in damages and penalties and partial judgment in favor of California in the amount of $379,500 in penalties.  *Id.* at 108.

Thereafter, the United States moved under Federal Rules of Civil Procedure 52(b) and 59(a)(2) to amend and supplement the FFCL.  *See* United States' Mot. Amend and Suppl. Findings Fact & Conc. Law ("U.S.'s Mot."), ECF No. 364.  The Court granted in part and denied in part the United States' motion.  *See Morsell II*, 2024 WL 166015, at *1.  Relevantly, the Court agreed with the United States that the original FFCL had (1) miscalculated rebate damages by erroneously calculating those damages based off of a rough estimate of the discount that GSA should have received over the life of the contract, *id.* at *5, which (2) led it to also understate civil penalties, *id.* at *6–7.  After fixing these errors, the Court awarded the United States $16,121,696.04 in rebate damages, $36,872,000 in civil penalties, and amended the judgment accordingly.  *Id.* at *6, *9, *12.

Symantec now contends that the revised damage award and civil penalties are too high, and it asks the Court to again amend and supplement the FFCL or alter and amend the judgment

to fix what it views as mistakes in the calculations that led to those figures.  *See* Def.'s Mot. Amend and Suppl. Am. Findings Fact & Conc. Law ("Def.'s Mot."), ECF No. 377.  For the reasons set forth below, Symantec's motion is denied.

## II.  BACKGROUND

The Court presumes familiarity with and herein incorporates the background information, including the factual overview, procedural history, and regulatory framework, detailed in the FFCL.  *See Morsell I*, 651 F. Supp. 3d at 108–13, 118–21.  While the Court also presumes familiarity with the findings of fact and conclusions of law comprehensively laid out in the FFCL, *see generally id.*—including those portions subsequently amended, *see Morsell II*, 2024 WL 166015, at *4–10—it briefly reiterates the aspects most relevant here.

In 2012, Relator Morsell filed a *qui tam* action against Symantec under the False Claims Act ("FCA").  *Morsell I*, 651 F. Supp. 3d at 109.  Two years later, the United States, California, and Florida intervened.  *See id.*  The case eventually proceeded to a bench trial, after which the Court found Symantec liable on certain of the United States' FCA claims—namely, its presentment and false statement claims (Counts I & II) as well as its concealment, or "reverse" FCA, claim (Count V).  *See Morsell II*, 2024 WL 166015, at *2–3.

Most relevant here, the Court held that Symantec had violated the FCA by making false Commercial Sale Practice ("CSP") disclosures.  *Morsell I*, 651 F. Supp. 3d at 178.  One of those false disclosures concerned Symantec's failure to divulge the existence of various back-end rebate programs that it offered to customers.  *Id.* at 178–79.  For example, Symantec did not inform GSA of "the most obviously relevant rebate program in effect" at the time: a "GSA Master Aggregator Program" under which the company "gave a 5% rebate to certain distributors in connection with any GSA sale."  *Id.* at 179.  The Court had no trouble concluding that

Symantec's failure to disclose its rebate practices was material to "GSA's decision to continue paying claims under the contract," *id.* at 180, and that that failure was made with "reckless disregard," *id.* at 182–83.  Relatedly, the Court also found that, under the Modifications Clause,[2] "each subsequent certification asserting that the CSPs had not changed was likewise false" and violated the FCA.  *Id.* at 183–84.  With respect to rebates, the Court explained that Symantec's rebate programs were constantly changing throughout the life of the contract and that, had the GSA contracting officer known of these changes, "it would have likely influenced her decision to pay." *Id.* at 184.  Finally, the Court held that Symantec fraudulently induced the GSA contract in part because the "lack of rebate disclosures" was one of the "actual cause[s] of [the GSA contracting officer's] decision to accept the GSA contract at the prices she accepted."  *Id.* at 187.

The Court next turned to damages and penalties.  In doing so, the Court initially attempted to calculate rebate damages—that is the amount less GSA would have paid if Symantec had not made false CSP disclosures concerning its rebate programs—based off of an estimate of the discount the Government should have received for purchases made under the contract.  *Id.* at 194–95.  The Court explained that a "conservative estimate" of the rebate the Government should have received was 3%, and that a "ballpark . . . estimate" of the discount the Government should have separately received was $11,877,224.  *Id.* at 195.  After applying a 3% rebate to that ballpark estimate, the Court calculated that the United States should have received a rebate of $353,316.72 which, trebled, amounted to $1,068,950.16 in rebate damages.  *Id.*

---

[2] When a contractor submits changes to a MAS contract, such as adding or deleting items or reducing prices, the Modifications Clause "requires the contractor to submit either updated CSPs for the new items or provide confirmation that the previous CSPs have not changed." *Morsell I*, 651 F. Supp. 3d at 120.

4

But that approach to calculating damages was "flawed from the start."  *Morsell II*, 2024 WL 166015, at *5.  "[A] rebate is measured against a product's sale price, not against the discounts it received to derive that sales price."  *Id.* (citation omitted).  Thus, the Court should have applied the 3% rebate to the "sales prices on the Government's orders" under the contract, not a rough estimate of the discounts the United States should have received on those orders.  *Id.*

To correct this error, the Court determined that it could multiply "total at-issue sales (*i.e.*, total sales less reseller sales) . . . by 3%—the 'conservative estimate' of the rebate the United States would have received had Symantec disclosed all relevant information regarding its rebate programs."  *Id.* at *6 (citation omitted).  The Court explained that "the total amount of at-issue sales represents the proper starting point for such a calculation [because] that amount represents the sum of money that the United States *actually paid* on Symantec's contract."[3]  *Id.*  To calculate total at-issue sales, the Court turned to U.S. Exhibit 359.  *Id.*  Exhibit 359 showed "that the total at-issue sales amounted to $179,129,956.10."  *Id.*  3% of that figure is $5,373,898.68, which the Court then trebled to $16,121,696.04 as an award for rebate damages.  *Id.*

Moving to civil penalties, in the initial FFCL, the Court explained that its "conclusions on liability entitle[d] the United States to penalties under the FCA regardless of whether [the Government] also prove[d] actual damages."  *Morsell I*, 651 F. Supp. 3d at 195.  However, because "the United States' request for civil penalties on the false claims [was] . . . inextricably intertwined with its discount damages calculations," the Court found that it had "no way of

---

[3] The Court acknowledged that that amount exceeded the amount the Government "should have and would have paid had Symantec disclosed and applied all applicable discounts throughout the life of the contract."  *Morsell II*, 2024 WL 166015, at *6.  But "any discrepancy between the amount that the United States actually paid and the amount it should have paid" was mitigated both by the fact that the Court's 3% estimate of the Government's likely rebate was a "conservative estimate" and by the fact that the no discount damages were awarded despite the Court's finding that Symantec was liable for such damages.  *Id.* (citation omitted).

determining how many claims were 'false.'" *Id.* at 196.  Nevertheless, because "the same conduct underlie[d] the United States' claims under both the presentment and false statements theories of liability," *id.*, the Court instead assessed statutory penalties of $11,000 for each of twenty-one identified false statements, for a total of $231,000, *id.* at 197.

On the United States' motion for reconsideration, the Court determined that this, too, was error.  More specifically, the Court agreed with the United States that its "finding regarding the should-have-paid discount was actually irrelevant, as Symantec's rebate fraud is not intertwined with the Government's discount damages." *Morsell II*, 2024 WL 166015, at *6 (internal quotation marks omitted).  Because "each claim transacted under Symantec's GSA Contract should have been 3% lower," "each claim [was] false under either the implied certification theory or the fraudulent inducement theory, regardless of whether those claims also should have been discounted." *Id.* (internal quotation marks omitted).  Said differently, "rebates would have applied to all GSA sales under the contract," and thus "each claim Symantec submitted under the contract was false and therefore subject to mandatory civil penalties." *Id.* at *7 (citation omitted).  And because each of these false claims was identifiable, "penalties were mandatory as to each claim, [and] it was error for the Court to instead award penalties only as to the much smaller universe of false statements." *Id.* at *6.

As it did with regard to rebate damages, the Court turned to Exhibit 359 to correct its assessment of civil penalties.  Using that Exhibit, the Court determined that Symantec submitted 3,352 claims under the GSA contract. *Id.* at *9 & n.13.  The Court separately determined that the maximum penalty of $11,000 was warranted for each of these claims. *Id.* at *9.  After multiplying the maximum penalty by the number of false claims, the Court awarded a total of $36,872,000 in civil penalties. *Id.*

Now, Symantec argues that the Court erred in recalculating both rebate damages and civil penalties.  Specifically, Symantec contends that the Court's calculations improperly incorporate sales to the Government that were *not* made under Symantec's GSA Contract, either because those sales constituted so-called "open market" sales or because they occurred before the contract was signed.  Def.'s Mot at 1.  The company argues that the inclusion of these sales resulted in an award of damages and penalties that is $15,806,129 higher than it should be.  *Id.* Accordingly, Symantec moves the Court "to amend and supplement the [FFCL] pursuant to [Rule] 52(b) and/or alter or amend its judgment pursuant to Rule 59(e)."  *Id.*  The United States opposes Symantec's motion, *see* United States' Opp'n Def.'s Mot. Amend and Suppl. Am. Findings Fact & Conc. Law ("U.S.'s Opp'n"), ECF No. 378, and Symantec has filed a reply,[4] *see* Def.'s Reply in Supp. Mot. Amend and Suppl. Am. Findings Fact & Conc. Law ("Def.'s Reply"), ECF No. 379.  Symantec's motion is thus ripe for review.

## III.  LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 52(b)

Under Federal Rule of Civil Procedure 52(b), a party may file a motion requesting that the Court "amend its findings—or make additional findings—and . . . amend the judgment

---

[4] The United States also seeks leave to file a surreply.  United States' Mot. Leave File Surreply, ECF No. 381.  Symantec opposes the United States' motion for leave.  Def.'s Mem. Opp'n Pl.'s Mot. Leave File Surreply, ECF No. 383.  The decision to grant or deny leave to file a surreply "is entrusted to the sound discretion of the district court."  *Banner Health v. Sebelius*, 905 F. Supp. 2d 174, 187 (D.D.C. 2012).  "A court determining whether to allow a surreply considers whether the reply raises new arguments, whether the proposed surreply would be helpful to the resolution of the pending motion, and whether the other party would be unduly prejudiced."  *Jackson v. Starbucks Corp.*, No. 19-cv-1487, 2022 WL 888180, at *3 n.2 (D.D.C. Mar. 25, 2022).  Here, Symantec's reply brief does not raise new arguments and the proposed surreply is generally not helpful—it largely rephrases points already made in the Government's opposition brief.  Thus, although Symantec would not be prejudiced were leave to file granted, the Court will deny the United States leave to file its proposed surreply.

accordingly." Fed. R. Civ. P. 52(b).  This Rule "permits the trial court to correct manifest errors of law or fact, make additional findings or take other action that is in the interests of justice." *Ashraf–Hassan v. Embassy of France*, 185 F. Supp. 3d 94, 108 (D.D.C. 2016) (quoting *Bigwood v. Def. Intelligence Agency*, 770 F. Supp. 2d 315, 318 n.2 (D.D.C. 2011)).  "The decision to amend findings or the judgment is committed 'to the sound discretion of the trial judge.'" *Paleteria La Michoacana v. Productos Lacteos Tacumbo S.A. De C.V.*, 247 F. Supp. 3d 76, 91 (D.D.C. 2017) (quoting *Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, No. 94-cv-1184, 1997 WL 243223, at *2 (D.D.C. May 7, 1997)).  The moving party "bears a heavy burden in seeking to demonstrate clear error [or] manifest injustice necessitating amendment of the judgment." *FMD Restoration, Inc. v. Baistar Mech., Inc.*, 320 F.R.D. 320, 322 (D.D.C. 2017) (quoting *Ashraf-Hassan*, 185 F. Supp. 3d at 108).  "Rule 52 cannot be a substitute for an appeal." *Salazar v. Dist. of Columbia*, 685 F. Supp. 2d 72, 75 (D.D.C. 2010); *see also Material Supply Int'l*, 1997 WL 243223, at *2 (explaining that Rule 52 "is not an avenue for relitigating issues upon which the moving party did not prevail at trial").

## B.  Federal Rule of Civil Procedure 59(e)

Rule 59(e) permits a party to file a motion to "alter or amend a judgment" within 28 days of the entry of that judgment. Fed. R. Civ. P. 59(e).  Rule 59(e) motions are "disfavored and relief from judgment is granted only when the moving party establishes extraordinary circumstances." *Niedermeier v. Off. of Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001); *see also Anyanwutaku v. Moore*, 151 F.3d 1053, 1057 (D.C. Cir. 1998).  A court must grant a motion to amend or alter a judgment only: "(1) if there is an 'intervening change of controlling law'; (2) if new evidence becomes available; or (3) if the judgment should be amended in order to 'correct a clear error or prevent manifest injustice.'" *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217

8

(D.C. Cir. 2018) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per

curiam)); *see also Solomon v. Univ. of S. Cal.*, 255 F.R.D. 303, 305 (D.D.C. 2009).  As with

motions brought under Rule 52, Rule 59(e) motions may not be used to "relitigate old matters, or

to raise arguments or present evidence that could have been raised prior to the entry of

judgment."  *Niedermeier*, 153 F. Supp. 2d at 28 (internal citation and quotation marks omitted);

*see also Turner v. U.S. Capitol Police*, No. 12-cv-45, 2014 WL 169871, at *1 (D.D.C. Jan. 16,

2014).  The party seeking reconsideration bears the burden of establishing that relief is

warranted.  *See Zuza v. Off. of the High Representative*, No. 14-cv-1099, 2016 WL 447442, at *1

(D.D.C. Feb. 4, 2016).

## IV.  ANALYSIS

Symantec argues that the amended FFCL overstates the amount of rebate damages and

civil penalties that should have been awarded for two reasons.  The Court will address these

contentions in turn.

### A.  Open Market Sales

Symantec first contends that the Court clearly erred "in amending [the] FFCL to include

in its revised calculations sales of products that were not listed on Symantec's GSA Schedule

contract."  Def.'s Mot. at 3.  According to Symantec, the purported inclusion of these "open

market" sales infected the Court's revised calculations of both rebate damages and civil

penalties.  *Id.* at 3–5.  Symantec argues that, as to the former, the Court wrongfully included

$99,354,392 of open market sales in its calculation of total "at-issue sales" for purposes of

calculating rebate damages.  *Id.* at 3.  Once the open market sales are excluded, Symantec says

that total at-issue sales should be $79,775,564—3% of which is $2,393,267.  *Id.* at 4–5.  That

equates to "a $2,980,632 reduction in single damages and a reduction of $8,941,895 in treble

damages." *Id.* at 5.  As for civil penalties, the company contends that, of the 3,352 claims

previously found to be false by the Court, 622 were open market sales.  *Id.* at 5.  Consequently, it

says that penalties should have only been applied to 2,730 (as opposed to 3,352) claims.  *Id.*

Accounting for this supposed error would reduce Symantec's civil penalties by $6,842,000 (from

$36,872,000 to $30,030,000).  *Id.*

       The Government does not appear to dispute that "to the extent that a sale was not made

under Symantec's GSA Schedule Contract, it should be excluded from the Court's damages

calculations."  *Id.* at 3; *see also United States ex rel. Morsell v. NortonLifeLock, Inc.*, 567 F.

Supp. 3d 248, 278 (D.D.C. 2021) ("The Government does not dispute that sales for products not

available on the GSA contract should be excluded . . . .").  The question, then, is whether the

Court's revised damage and penalty calculations did, in fact, improperly include open market

sales.  As framed by Symantec, the answer to that question turns on whether sales that are

missing a "GSA MSRP" in Exhibit 359 are, as Symantec contends, "not GSA sales at all."  *See*

Def.'s Mot. at 4 (citation omitted).

       To put this argument into context, recall that the Court relied heavily on Exhibit 359 in

revising its calculation of the rebate damages and civil penalties owed by Symantec.  *See Morsell

II*, 2024 WL 166015, at *5–6, *9.  Exhibit 359 is a spreadsheet that "contains each GSA

transaction" and which the Government's damages expert "used to make damages calculations

on a per-government-sale basis."  *Id.* at *5 (internal quotation marks omitted).  On the United

States' motion for reconsideration, the Court used the spreadsheet to calculate the "total at-issue

sales on Symantec's Contract"—in other words, "the sum of money that the United States

*actually paid* on Symantec's contract."  *Id.* at *5–6.  To calculate this sum, the Court took

10

Exhibit 359 and then filtered out sales made to resellers.[5]  *Id.*  After filtering out the sales to resellers, the Court was left with the universe of transactions that it then summed to calculate total at-issue sales.  *Id.* at *6.

Particularly relevant here, Exhibit 359 includes a column—column G—which indicates "GSA MSRP."  U.S. Ex. 359.  For each sale listed in the Exhibit, the relevant "GSA MSRP" cell either contains a number or is blank.  *Id.*  Symantec now argues that, in filtering Exhibit 359 to calculate total at-issue sales, the Court should have also excluded any sale for which the GSA MSRP cell is empty because, in its view, the lack of a GSA MSRP indicates that the sale was an open market sale.[6]  Def.'s Mot. at 4; *see also Morsell I*, 651 F. Supp. 3d at 154 ("Norton, however, points to testimony that sales missing a GSA MSRP were not GSA sales at all, but instead were 'open market' sales.").

The Court is not convinced.  For one thing, evidence and testimony presented at trial showed that the transactions that Dr. Gulley, the Government's damages expert, included in Exhibit 359 were sales that Symantec itself identified as GSA contract sales at the time they were made.  To be more specific, Dr. Gulley testified that Exhibit 359 is derived from data in Symantec's own IFF datasets.  *See* U.S.'s Opp'n at 8; *see also* Trial Tr. at 3717–24 (Gulley).  In those datasets, Symantec used a specific code to identify sales to the Government made under the

---

[5] The Court filtered out these sales because it had previously held that "Symantec was not liable for causing resellers to submit false statements and claims."  *Morsell II*, 2024 WL 166015, at *5 n.7.

[6] The Government is correct that Symantec could have and should have raised this argument in response to the United States' own motion to alter or amend the FFCL.  U.S.'s Opp'n at 4–6; *see Lynch v. Wal-Mart Assocs., Inc.*, No. 20-cv-934, 2024 WL 491230, at *2 (D.D.C. Feb. 8, 2024) ("[A] losing party may not use a Rule 59 motion to raise new issues that could have been raised previously . . . ." (citation omitted)).  The United States' motion made plain that the Government's proposed method for recalculating damages and penalties encompassed the sales which Symantec now argues are open market sales.  *See* U.S.'s Mot. at 7–10, 12–14.

GSA Contract.  Trial Tr. at 1707:14– 16 (Bradbury) (explaining that Symantec used "SIC Code 91" to track GSA sales).  Symantec used a separate code to track open market sales.  Trial Tr. at 1173:7–11 (explaining that Symantec used "SIC Code 98" to track "federal open market sales").  Of course, neither SIC Code 91 nor SIC Code 98 appears anywhere in Exhibit 359.  *See* Def.'s Reply at 5.  But that is largely beside the point given that the evidence suggests that Dr. Gulley only included in Exhibit 359 those transactions which Symantec itself contemporaneously identified as GSA sales.  The Court finds Symantec's contemporaneous identification of sales as GSA sales to be particularly compelling evidence that the contested sales were, in fact, made under the GSA contract.

Were that not enough, the United States also points out that a number of sales listed in Exhibit 359 do not contain a "GSA MSRP" but can nevertheless be affirmatively identified as GSA contract sales by reference to other documents in the record.  *See* U.S.'s Opp'n at 10 & n.1.  This fact significantly undermines Symantec's position that the lack of a GSA MSRP is, in and of itself, proof that a specific sale was an open market sale.

To be sure, there is *some* evidence in the record that supports Symantec's contention that a sale in Exhibit 359 that is missing a "GSA MSRP" was an open market sale.  Dr. Gulley testified that "one reason" a sale "could be" missing a GSA MSRP was because it was an open market sale.  Trial Tr. at 3896:3–21 (Gulley).  But the Court does not find Dr. Gulley's somewhat equivocal testimony on this point sufficient to outweigh the other evidence suggesting that all of the sales listed in Exhibit 359 were sales made under the GSA contract regardless of whether the sale lacked a GSA MSRP.  That necessarily means that Symantec has failed to carry its "heavy burden" of showing "clear error" or "manifest injustice necessitating amendment of

the judgment.'"  *See FMD Restoration*, 320 F.R.D. at 322 (quoting *Ashraf-Hassan*, 185 F. Supp.

3d at 108).  Reconsideration of rebate damages and civil penalties is, therefore, not warranted.

### B.  Sales Prior to Contract Formation

Symantec next argues that the Court erred by including in its revised award "sales made

prior to the formation of Symantec's GSA Schedule Contract."[7]  Def.'s Mot. at 5.  Symantec and

GSA entered into the contract on January 25, 2007, *Morsell I*, 651 F. Supp. 3d at 109, yet

Symantec cites evidence to suggest that a few sales made prior to that date (*i.e.*, on January 12,

17, and 23, 2007) were included in the revised damage calculations, Def.'s Mot. at 5–6.  The

Government responds with various theories for why these sales may nonetheless constitute sales

completed under the GSA contract, *see* U.S.'s Mot. at 12–13, and the Court agrees that the fact

that Symantec itself coded these sales as GSA sales tends to suggest that they may have been

"'booked' before they were finally completed under the GSA contract," *id.*; *see also supra* Part

IV.A.  As such, Symantec has not shown that the inclusion of those sales in the Court's damages

calculation was clearly erroneous.  *See Smith v. Lynch*, 115 F. Supp. 3d 5, 12 (D.D.C. 2015)

(explaining that the clear error standard is "a very exacting standard" which contemplates only

those mistakes that are "dead wrong" (first quoting *Bond v. U.S. Dep't of Just.*, 286 F.R.D. 16,

22 (D.D.C. 2012); and then quoting *Lardner v. F.B.I.*, 875 F. Supp. 2d 49, 53 (D.D.C. 2012))).

Nor has Symantec shown that further amendment of the FFCL or reopening of the judgment is

required to prevent manifest injustice, even were the Court to assume, favorably to Symantec,

that the few sales the company has identified were executed prior to formation of the company's

contract with GSA.  "Manifest injustice requires at least (1) a clear and certain prejudice to the

---

[7] Symantec could have and should have raised this argument earlier for reasons similar to
those already discussed.  *See supra* note 6.

moving party that (2) is fundamentally unfair in light of governing law." *Leidos*, 881 F.3d at 217 (cleaned up).  Here, the total amount of the sales in question is $2,765.  Def.'s Mot. at 7.  3% of $2,765 is $82.95.  Trebled, that amounts to a possible overstatement of rebate damages by $248.85.  And because all sales in question derived from a single order, the amount of civil penalties would be overstated by $11,000.  *See* Ex. 2, Def.'s Mot. at 7, ECF No. 377-3.  Figures this small are essentially immaterial in the context of a judgment that awarded over $16 million in rebate damages and almost $39 million in civil penalties.  Moreover, the Court has already explained that the rebate damages awarded in this case likely understate (by a significant amount) the difference in cost between what the Government should have paid and the price it actually paid over the life of the contract.  *See Morsell II*, 2024 WL 166015, at *6.  Taken together, these factors prevent Symantec from showing that the amended damages and penalties work a manifest injustice.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Amend and Supplement the Amended Findings of Fact and Conclusions of Law (ECF No. 377) is **DENIED**; and the United States' Motion for Leave to File a Surreply (ECF No. 381) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  August 30, 2024                                             RUDOLPH CONTRERAS
                                                                                United States District Judge